**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| REEBOK INTERNATIONAL LTD., | |
| Plaintiff, | |
| v. | Civil Action No. 04-12668 (RGS)(RBC) |
| | Honorable Richard G. Stearns |
| WAL-MART STORES, INC., | |
| Defendant. | |

**DECLARATION OF DAVID K.S. CORNWELL, ESQ.**

I, David K.S. Cornwell, hereby state and declare under oath and under the penalty of perjury that the following are true to the best of my knowledge and understanding:

1.      I am a director in the law firm of Sterne, Kessler, Goldstein & Fox, P.L.L.C., and am admitted to practice *pro hac vice* on behalf of plaintiff Reebok International Ltd. ("Reebok") in this action.  I make this declaration in opposition to Wal-Mart's Summary Judgment Motion for Invalidity and in support of Reebok's Cross-Motion for Summary Judgment of Validity and Motion of Summary Judgment of Infringement of U.S. Design Patent No. D495,127 to Marvin *et al.* ("the '127 patent").

2.      Attached hereto as Exhibit A is a true and accurate copy of the '127 patent.

3.      Attached hereto as Exhibit B is a true and accurate copy of the Notice of Recordation of Assignment from the U.S. Patent and Trademark Office ("USPTO") and Assignment for the '127 patent.

4.      Attached hereto as Exhibit C is a true and accurate copy of the Prosecution History of U.S. Patent Application No. 29/203,335, which issued as the '127 patent.

5.      Attached hereto as Exhibit D are true and accurate copies of each reference cited by applicants or by the Examiner during prosecution of U.S. Patent Application No. 29/203,355.

6.      Attached hereto as Exhibit E is a true and accurate copy of U.S. Patent No. 1,081,442 to Geiger.

7.      Attached hereto as Exhibit F is a true and accurate copy of page 18 of "Shoes, a Lexicon of Style," by Valerie Steel, Rizzoli (1999), illustrating the Ferragamo layered heel shoe.

8.      Attached hereto as Exhibit G is a true and accurate copy of U.S. Patent No. 2,669,038 to De Werth.

9.      Attached hereto as Exhibit H are true and accurate color photographs of men's, women's and youth's version of the "Oxide shoe," purchased at a Wal-Mart store. The bright blue shoe is a youth's shoe. The bright orange shoe is a men's shoe. The bright yellow shoe is a women's shoe.

Respectfully submitted,

_____
David K.S. Cornwell (*pro hac vice*)
STERNE KESSLER GOLDSTEIN & FOX, P.L.L.C.
1100 New York Avenue, N.W.
Washington, D.C. 20005
Telephone: 202-371-2600
Facsimile: 202-371-2540

Dated: May  2  , 2005

384116_1.DOC

2

# EXHIBIT A

US00D495127S1

(12) **United States Design Patent**   (10) Patent No.:    **US D495,127 S**
Marvin et al.                          (45) Date of Patent:    ✶✶ **Aug. 31, 2004**

(54) **PORTION OF A MIDSOLE**

(75) Inventors: **William Marvin**, Brighton, MA (US);
**Brian Christensen**, Centerville, MA (US)

(73) Assignee: **Reebok International Ltd.**, Canton, MA (US)

(**) Term: **14 Years**

(21) Appl. No.: **29/203,335**

(22) Filed: **Apr. 14, 2004**

**Related U.S. Application Data**

(62) Division of application No. 10/607,541, filed on Jun. 27, 2003.

(51) **LOC (7) Cl.** .................................................. **02-99**
(52) **U.S. Cl.** .................................................... **D2/972**
(58) **Field of Search** ......................... D2/902, 907, 908,
D2/943, 944, 969, 972–974, 964–967; 36/45,
50.1, 77 M, 77 R, 83, 88, 113, 114, 126–130

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 1,081,442 | A | | 12/1913 | Geiger |
| D93,966 | S | | 12/1934 | Bressler |
| D95,767 | S | * | 5/1935 | Marks ........................ D2/965 |
| 2,048,683 | A | | 7/1936 | Brockman |
| D112,267 | S | * | 11/1938 | Court ........................... D2/965 |
| D125,773 | S | | 3/1941 | Macauley |
| 3,777,374 | A | | 12/1973 | Hendricks |
| D261,446 | S | * | 10/1981 | Schmohl ..................... D2/907 |
| 4,641,438 | A | | 2/1987 | Laird et al. |
| D290,542 | S | * | 6/1987 | O'Rourke .................. D2/907 |
| 4,680,876 | A | | 7/1987 | Peng |
| 4,736,531 | A | | 4/1988 | Richard |
| D295,459 | S | | 5/1988 | Zuidema et al. |
| D295,691 | S | | 5/1988 | Zuidema et al. |
| D295,692 | S | | 5/1988 | Zuidema et al. |
| D296,384 | S | | 6/1988 | Tong |
| 4,760,651 | A | | 8/1988 | Pon-Tzu |
| 4,823,482 | A | | 4/1989 | Lakic |
| D301,659 | S | | 6/1989 | Le |
| D302,352 | S | | 7/1989 | Austin |
| D303,451 | S | * | 9/1989 | Weiner ........................ D2/908 |
| 4,887,367 | A | | 12/1989 | Mackness et al. |
| 4,918,838 | A | | 4/1990 | Chang |
| 4,936,030 | A | | 6/1990 | Rennex |
| D316,773 | S | | 5/1991 | Valle |
| 5,014,449 | A | | 5/1991 | Richard et al. |
| D319,337 | S | | 8/1991 | Hatfield |
| D320,303 | S | | 10/1991 | Kiyosawa |
| D322,153 | S | | 12/1991 | Schneider et al. |
| D323,577 | S | | 2/1992 | Kayano |
| D324,940 | S | | 3/1992 | Claveria |
| D325,288 | S | | 4/1992 | Richard et al. |
| D326,355 | S | | 5/1992 | Cotsidas |
| D327,770 | S | | 7/1992 | Prats et al. |
| 5,181,873 | A | | 1/1993 | Tolbert |
| D334,463 | S | | 4/1993 | Chang |
| D334,833 | S | | 4/1993 | Blissett |
| 5,224,277 | A | | 7/1993 | Sang Do |
| D341,708 | S | | 11/1993 | Blissett |
| D344,401 | S | | 2/1994 | Kilgore |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 299 669 B1 | 12/1993 |
| FR | 2 563 979 | 5/1984 |
| GB | 2 244 200 A | 11/1991 |

OTHER PUBLICATIONS

Shoes, A Lexicon of Style by Valerie Steel; Rizzoli, 1999; p. 18, Ferragamo layered heel.*

*Primary Examiner*—Dominic Simone
(74) *Attorney, Agent, or Firm*—Sterne, Kessler, Goldstein & Fox P.L.L.C.

(57) **CLAIM**

The ornamental design for a portion of a midsole, as shown and described.

**DESCRIPTION**

FIG. **1** is a side view of a portion of a midsole showing our new design; and,
FIG. **2** is a cross sectional view thereof taken along line **2—2**.
The broken line is environmental only and forms no part of the claimed design.

**1 Claim, 2 Drawing Sheets**





**US D495,127 S**

Page 2

U.S. PATENT DOCUMENTS

| | | | | | | |
|---|---|---|---|---|---|---|
| D350,018 S | | 8/1994 | Kilgore | 5,505,010 A | 4/1996 | Fukuoka |
| D350,019 S | | 8/1994 | Kilgore | 5,595,002 A | 1/1997 | Slepian et al. |
| D350,020 S | | 8/1994 | Kilgore | D377,859 S | 2/1997 | Bramani |
| D350,225 S | | 9/1994 | Kilgore | 5,607,749 A | 3/1997 | Strumor |
| D350,227 S | | 9/1994 | Kilgore | 5,621,984 A | 4/1997 | Hsieh |
| D350,433 S | | 9/1994 | Kilgore | 5,625,966 A | 5/1997 | Perotto et al. |
| 5,343,639 A | | 9/1994 | Kilgore et al. | D379,864 S | 6/1997 | Kayano |
| D351,057 S | | 10/1994 | Kilgore | D384,192 S | 9/1997 | Hsieh |
| D351,720 S | | 10/1994 | Kilgore | D388,241 S | 12/1997 | Merceron |
| 5,353,523 A | | 10/1994 | Kilgore et al. | D404,896 S * | 2/1999 | Cooper ........................ D2/972 |
| D351,936 S | | 11/1994 | Kilgore | 5,901,467 A | 5/1999 | Peterson et al. |
| D352,155 S | | 11/1994 | Merceron | 5,975,861 A | 11/1999 | Shin et al. |
| D352,157 S | | 11/1994 | Merceron | 6,282,814 B1 | 9/2001 | Krafsur et al. |
| D352,159 S | | 11/1994 | Kilgore | 6,519,873 B1 | 2/2003 | Buttigieg |
| D352,160 S | | 11/1994 | Kilgore | D485,053 S * | 1/2004 | McDowell .................. D2/972 |
| 5,367,792 A | | 11/1994 | Richard et al. | 2001/0049888 A1 | 12/2001 | Krafsur et al. |
| D354,617 S | * | 1/1995 | Kilgore ...................... D2/964 | 2003/0196354 A1 | 10/2003 | Chu |
| 5,502,901 A | | 4/1996 | Brown | | | |

* cited by examiner



FIG.1



# FIG.2

# EXHIBIT B





**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**
ASSISTANT SECRETARY AND COMMISSIONER
OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

FEBRUARY 23, 2004

                                    PTAS
STERNE, KESSLER, GOLDSTEIN & FOX PLLC        *800010423A*
1100 NEW YORK AVENUE, N.W.
WASHINGTON, DC 20005


              UNITED STATES PATENT AND TRADEMARK OFFICE
            NOTICE OF RECORDATION OF ASSIGNMENT DOCUMENT

THE ENCLOSED DOCUMENT HAS BEEN RECORDED BY THE ASSIGNMENT DIVISION OF
THE U.S. PATENT AND TRADEMARK OFFICE.  A COMPLETE MICROFILM COPY IS
AVAILABLE AT THE ASSIGNMENT SEARCH ROOM ON THE REEL AND FRAME NUMBER
REFERENCED BELOW.

PLEASE REVIEW ALL INFORMATION CONTAINED ON THIS NOTICE.  THE
INFORMATION CONTAINED ON THIS RECORDATION NOTICE REFLECTS THE DATA
PRESENT IN THE PATENT AND TRADEMARK ASSIGNMENT SYSTEM.  IF YOU SHOULD
FIND ANY ERRORS OR HAVE QUESTIONS CONCERNING THIS NOTICE, YOU MAY
CONTACT THE EMPLOYEE WHOSE NAME APPEARS ON THIS NOTICE AT 703-308-9723.
PLEASE SEND REQUEST FOR CORRECTION TO:  U.S. PATENT AND TRADEMARK OFFICE,
ASSIGNMENT DIVISION, BOX ASSIGNMENTS, CG-4, 1213 JEFFERSON DAVIS HWY,
SUITE 320, WASHINGTON, D.C. 20231.


RECORDATION DATE: 02/23/2004           REEL/FRAME: 014355/0165
                                       NUMBER OF PAGES: 3

BRIEF:  ASSIGNMENT OF ASSIGNOR'S INTEREST (SEE DOCUMENT FOR DETAILS).

ASSIGNOR:
  MARVIN, WILLIAM                      DOC DATE: 02/17/2004

ASSIGNOR:
  CHRISTENSEN, BRIAN                   DOC DATE: 02/11/2004

ASSIGNOR:
  LITCHFIELD, PAUL E.                  DOC DATE: 02/12/2004

ASSIGNOR:
  MCINNIS, WILLIAM                     DOC DATE: 02/11/2004

ASSIGNEE:
  REEBOK INTERNATIONAL LTD.
  1895 J.W. FOSTER BOULEVARD
  CANTON, MASSACHUSETTS 02021

014355/0165 PAGE 2

SERIAL NUMBER: 10607541                    FILING DATE: 06/27/2003
PATENT NUMBER:                             ISSUE DATE:


KIMBERLY WHITE, EXAMINER
ASSIGNMENT DIVISION
OFFICE OF PUBLIC RECORDS

# PATENT ASSIGNMENT

Electronic Version v07
Stylesheet Version v02

## 02/23/2004
## 800010423

| SUBMISSION TYPE: | NEW ASSIGNMENT |
|---|---|
| NATURE OF CONVEYANCE: | ASSIGNMENT OF ASSIGNOR'S INTEREST |

### CONVEYING PARTY DATA

| Name | Execution Date |
|---|---|
| William MARVIN | 2004-02-17 |
| Brian CHRISTENSEN | 2004-02-11 |
| Paul E. LITCHFIELD | 2004-02-12 |
| William MCINNIS | 2004-02-11 |

### RECEIVING PARTY DATA

| Name | Street Address | Internal Address | City | State/Country | Postal Code |
|---|---|---|---|---|---|
| Reebok International Ltd. | 1895 J.W. Foster Boulevard | | Canton | MASSACHUSETTS | 02021 |

### PROPERTY NUMBERS  Total: 1

| Property Type | Number |
|---|---|
| Application Number | 10607541 |

### CORRESPONDENCE DATA

**FAX NUMBER:** 202/3712540
*Correspondence will be sent via US Mail when the fax attempt is unsuccessful.*
When the customer number has been provided, the Office of Public Records will obtain the correspondence data from the
official record on file at the USPTO.
**CUSTOMER NUMBER:** 026111

| NAME OF PERSON SIGNING: | Rae Lynn Prengaman |
|---|---|
| DATE SIGNED: | 2004-02-23 |

Total Attachments: 2
source=Assignment20730080000p1.TIF
source=Assignment20730080000p2.TIF

# ASSIGNMENT

In consideration of the sum of One Dollar ($1.00) or equivalent and other good and valuable consideration paid to each of the undersigned inventors: (1) William MARVIN, (2) Brian CHRISTENSEN, (3) Paul E. LITCHFIELD and (4) William MCINNIS, the undersigned inventors hereby sell and assign to Reebok International Ltd., 1895 J.W. Foster Boulevard, Canton, MA 02021 (the Assignee) his/her entire right, title and interest, including the right to sue for past infringement and to collect for all past, present and future damages:

*check applicable box(es)*
         ☒ for the United States of America (as defined in 35 U.S.C. § 100),
         ☒ and throughout the world,

(a) in the invention known as Cushioning Sole for an Article of Footwear for which application for patent in the United States of America has been executed by the undersigned on (1) ⟨signature⟩, (2) ⟨signature⟩ (3) ⟨signature⟩ and (4) ⟨signature⟩ (also known as United States Application No. 10/607,541, filed June 27, 2003), in any and all applications thereon, in any and all Letters Patent(s) therefor, and

(b) in any and all applications that claim the benefit of the patent application listed above in part (a), including continuing (continuation, divisional, or continuation-in-part) applications, reissues, extensions, renewals and reexaminations of the patent application or Letters Patent therefor listed above in part (a), to the full extent of the term or terms for which Letters Patents issue, and

(c) in any and all inventions described in the patent application listed above in part (a), and in any and all forms of intellectual and industrial property protection derivable from such patent application, and that are derivable from any and all continuing applications, reissues, extensions, renewals and reexaminations of such patent application, including, without limitation, patents, applications, utility models, inventor's certificates, and designs together with the right to file applications therefor; and including the right to claim the same priority rights from any previously filed applications under the International Agreement for the Protection of Industrial Property, or any other international agreement, or the domestic laws of the country in which any such application is filed, as may be applicable;

all such rights, title and interest to be held and enjoyed by the above-named Assignee, its successors, legal representatives and assigns to the same extent as all such rights, title and interest would have been held and enjoyed by the Assignor had this assignment and sale not been made.

The undersigned inventors agree to execute all papers necessary in connection with the application(s) and any continuing (continuation, divisional, or continuation-in-part), reissue, reexamination or corresponding application(s) thereof and also to execute separate assignments in connection with such application(s) as the Assignee may deem necessary or expedient.

The undersigned inventors agree to execute all papers necessary in connection with any interference or patent enforcement action (judicial or otherwise) related to the application(s) or any continuing (continuation, divisional, or continuation-in-part), reissue or reexamination application(s)

thereof and to cooperate with the Assignee in every way possible in obtaining evidence and going forward with such interference or patent enforcement action.

The undersigned inventors hereby represent that he/she has full right to convey the entire interest herein assigned, and that he/she has not executed, and will not execute, any agreement in conflict therewith.

The undersigned inventors hereby grant Robert Greene Sterne, Esquire, Registration No. 28,912; Edward J. Kessler, Esquire, Registration No. 25,688; Jorge A. Goldstein, Esquire, Registration No. 29,021; David K.S. Cornwell, Esquire, Registration No. 31,944; Robert W. Esmond, Esquire, Registration No. 32,893; Tracy-Gene G. Durkin, Esquire, Registration No. 32,831; Michele A. Cimbala, Esquire, Registration No. 33,851; Michael B. Ray, Esquire, Registration No. 33,997; Robert E. Sokohl, Esquire, Registration No. 36,013; Eric K. Steffe, Esquire, Registration No. 36,688; Michael Q. Lee, Esquire, Registration No. 35,239; Steven R. Ludwig, Esquire, Registration No. 36,203; John M. Covert, Esquire, Registration No. 38,759; Linda E. Alcorn, Esquire, Registration No. 39,588; Lawrence B. Bugaisky, Esquire, Registration No. 35,086; Donald J. Featherstone, Esquire, Registration No. 33,876; Robert C. Millonig, Esquire, Registration No. 34,395; Michael V. Messinger, Esq., Registration No. 37,575; Judith U. Kim, Esq., Registration No. 40,679; Timothy J. Shea, Jr., Esq., Registration No. 41,306; and Patrick E. Garrett, Esq., Registration No. 39,987; all of STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C., 1100 New York Avenue, N.W., Washington, D.C. 20005-3934, power to insert in this assignment any further identification that may be necessary or desirable in order to comply with the rules of the United States Patent and Trademark Office for recordation of this document.

IN WITNESS WHEREOF, executed by the undersigned inventors on the date opposite his/her name.

Date: _2 - 17 - 04_    Signature of Inventor: _____
                                              William MARVIN

Date: _11 FEB 2004_    Signature of Inventor: _____
                                              Brian CHRISTENSEN

Date: _12 / 2 / 04_    Signature of Inventor: _____
                                              Paul E. LITCHFIELD

Date: _11 Feb 2004_    Signature of Inventor: _____
                                              William MCINNIS

SKGF_DC1:185140.1

# EXHIBIT C
# (Part 1 of 2)



**Sterne Kessler**
**Goldstein Fox**
ATTORNEYS AT LAW

Robert Greene Sterne
Edward J. Kessler
Jorge A. Goldstein
David K.S. Cornwell
Robert W. Esmond
Tracy-Gene G. Durkin
Michele A. Cimbala
Michael B. Ray
Robert E. Sokohl
Eric K. Steffe
Michael Q. Lee
Steven M. Ludwig
John M. Covert
Linda E. Alcorn
Robert C. Millonig
Lawrence B. Bugaisky
Donald J. Featherstone
Michael V. Messinger

Judith U. Kim
Timothy J. Shea, Jr.
Patrick E. Garrett
Heidi L. Kraus
Edward W. Yee
Albert L. Ferro*
Donald R. Banowit
Peter A. Jackman
Teresa U. Medler
Jeffrey S. Weaver
Kendrick P. Patterson
Vincent L. Capuano
Eldora Ellison Floyd
Thomas C. Fiala
Brian J. Del Buono
Virgil Lee Beaston
Kimberly N. Reddick
Theodore A. Wood

Elizabeth J. Haanes
Joseph S. Ostroff
Frank R. Cottingham
Christine M. Lhulier
Rae Lynn Prengaman
Jane Shershenovich*
Lawrence J. Carrolli*
George S. Bardmesser
Daniel A. Klein*
Jason D. Eisenberg
Michael D. Specht
Andrea J. Kamage
Tracy L. Muller*
LuAnne M. DeSantis
John J. Figueroa
Ann E. Summerfield
Tiera S. Coston*
Aric W. Ledford*

Michael D. Specht
Jessica L. Parezo
Timothy A. Doyle*
Cynthia M. Bouchez
Nicole D. Dretar*
Ted J. Ebersole

Registered Patent Agents•
Karen R. Markowicz
Nancy J. Leith
Helene C. Carlson
Gaby L. Longsworth
Matthew J. Dowd
Aaron L. Schwartz
Mary B. Tung
Katrina Y. Pei Quach
Bryan L. Skelton
Robert A. Schwartzman

Teresa A. Colella
Jeffrey S. Lundgren
Victoria S. Rutherford
Eric D. Hayes
Michelle K. Holcubek
Robert H. DeSelms
Simon J. Elliott
Julie A. Heider
Mita Mukerjee
Scott M. Woodhouse
Of Counsel
Kenneth C. Bass III
Evan R. Smith
Marvin C. Guthrie
*Admitted only in Maryland
* Admitted only in Virginia
•Practice Limited to
  Federal Agencies

April 14, 2004

*WRITER'S DIRECT NUMBER:*
(202) 772-8580
*INTERNET ADDRESS:*
DAVIDC@SKGF.COM

# SPECIAL PROCEDURES SUBMISSION
## -Expedited Design Application-

Commissioner for Patents
PO Box 1450
Alexandria, VA 22313-1450

**Mail Stop:**
**Expedited Design**
**(Rocket Docket)**

Re:     U.S. Design Patent Application
        Appl. No. To Be Assigned; Filed: Herewith
        *(Divisional of 10/607,541; Filed June 27, 2003)*
        For:          **Portion of a Midsole**
        Inventors:    Marvin *et al.*
        Our Ref:      2073.0080001/DKSC/HMR

Sir:

        The following documents are forwarded herewith for appropriate action by the U.S. Patent and Trademark Office:

1.    PTO Fee Transmittal Form PTO/SB/17;

2.    Request For Expedited Examination of a Design Application (37 C.F.R. 1.155);

3.    Deletion of Inventors Name in the Prior Application Under 37 C.F.R. 1.63(d)(2);

4.    Authorization to Treat a Reply as Incorporating an Extension of Time Under 37 C.F.R. § 1.136(a)(3);

5.    PTO Transmittal Form PTO/SB/18: Design Patent Application Transmittal;

6.    U.S. Design Patent Application entitled:

      **Portion of a Midsole**

      and naming as inventors:

Commissioner for Patents
April 14, 2004
Page 2

**William Marvin**
**Brian Christensen**

the application consisting of:

a.  an Application Data Sheet (37 C.F.R. § 1.76);

b.  Two (2) pages of textual specification including one claim;

c.  Two (2) sheets of formal drawings comprising Figures 1-2 and;

d.  A true copy of the executed Declaration, as originally filed in U.S. Appl. No. 10/607,541;

7.  An Information Disclosure Statement (IDS);

8.  Form PTO-1449 (7 pages) including copies of seventy one (71) references (AA1-AM1, AA2-AK2, AA3-AK3, AA4-AK4, AA5-AK5, AA6-AK6, AA7and AB7) cited therein;

9.  Two (2) return postcards; and

10. Credit Card Payment Form (PTO-2038) for $1240.00 to cover:

$900.00 Expedited Examination fee; and
$340.00 Design Patent Application fee.

It is respectfully requested that, of the two attached postcards, one be stamped with the filing date of these documents and returned to our courier, and the other, prepaid postcard, be stamped with the filing date and unofficial application number and returned as soon as possible.

The U.S. Patent and Trademark Office is hereby authorized to charge any fee deficiency, or credit any overpayment, to our Deposit Account No. 19-0036.

Respectfully submitted,

STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.

David K. S. Cornwell
Attorney for Applicants
Registration No. 31,944

DKSC/HMR/adw
Enclosures

251249_1.DOC

PTO/SB/17 (10-03)
Approved for use through 07/31/2006. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# FEE TRANSMITTAL
## for FY 2004
*Effective 10/01/2003. Patent fees are subject to annual revision.*

| Complete if Known | |
|---|---|
| Application Number | To Be Assigned |
| Filing Date | Herewith |
| First Named Inventor | William Marvin |
| Examiner Name | To Be Assigned |
| Art Unit | To Be Assigned |
| Attorney Docket No. | 2073.0080001/DKSC/HMR |

☐ Applicant claims small entity status. See 37 CFR 1.27

| TOTAL AMOUNT OF PAYMENT | ($) | 1240.00 |
|---|---|---|

## METHOD OF PAYMENT (check all that apply)

☐ Check  ☒ Credit card  ☐ Money Order  ☒ Other**  ☐ None

☐ **Charge any deficiencies or credit any overpayments in Deposit Account: *the fees to Deposit Acct. No. 19-0036.*

Deposit Account Number: **19-0036**

Deposit Account Name: **Sterne Kessler, Goldstein & Fox P.L.L.C.**

The Director is authorized to: (check all that apply)
☐ Charge fee(s) indicated below    ☐ Credit any overpayments
☐ Charge any additional fee(s) or any underpayment of fee(s)
☐ Charge fee(s) indicated below, except for the filing fee to the above-identified deposit account.

## FEE CALCULATION

### 1. BASIC FILING FEE

| Large Entity | | Small Entity | | | |
|---|---|---|---|---|---|
| Fee Code | Fee ($) | Fee Code | Fee ($) | Fee Description | Fee Paid |
| 1001 | 770 | 2001 | 385 | Utility filing fee | |
| 1002 | 340 | 2002 | 170 | Design filing fee | 340.00 |
| 1003 | 530 | 2003 | 265 | Plant filing fee | |
| 1004 | 770 | 2004 | 385 | Reissue filing fee | |
| 1005 | 160 | 2005 | 80 | Provisional filing fee | |

SUBTOTAL (1)  ($)  **340.00**

### 2. EXTRA CLAIM FEES FOR UTILITY AND REISSUE

| | Extra Claims | | Fee from below | Fee Paid |
|---|---|---|---|---|
| Total Claims | - 20 **= | X | | = |
| Independent Claims | - 3 **= | X | | = |
| Multiple Dependent | | X | | = |

| Large Entity | | Small Entity | | | |
|---|---|---|---|---|---|
| Fee Code | Fee ($) | Fee Code | Fee ($) | Fee Description | |
| 1202 | 18 | 2202 | 9 | Claims in excess of 20 | |
| 1201 | 86 | 2201 | 43 | Independent claims in excess of 3 | |
| 1203 | 290 | 2203 | 145 | Multiple dependent claim, if not paid | |
| 1204 | 86 | 2204 | 43 | ** Reissue independent claims over original patent | |
| 1205 | 18 | 2205 | 9 | ** Reissue claims in excess of 20 and over original patent | |

SUBTOTAL (2)  ($)  **0.00**

**or number previously paid, if greater; For Reissues, see above

## FEE CALCULATION (continued)

### 3. ADDITIONAL FEES

| Large Entity | | Small Entity | | | |
|---|---|---|---|---|---|
| Fee Code | Fee ($) | Fee Code | Fee ($) | Fee Description | Fee Paid |
| 1051 | 130 | 2051 | 65 | Surcharge - late filing fee or oath | |
| 1052 | 50 | 2052 | 25 | Surcharge - late provisional filing fee or cover sheet | |
| 1053 | 130 | 1053 | 130 | Non-English specification | |
| 1812 | 2,520 | 1812 | 2,520 | For filing a request for ex parte reexamination | |
| 1804 | 920* | 1804 | 920* | Requesting publication of SIR prior to Examiner action | |
| 1805 | 1,840* | 1805 | 1,840* | Requesting publication of SIR after Examiner action | |
| 1251 | 110 | 2251 | 55 | Extension for reply within first month | |
| 1252 | 420 | 2252 | 210 | Extension for reply within second month | |
| 1253 | 950 | 2253 | 475 | Extension for reply within third month | |
| 1254 | 1,480 | 2254 | 740 | Extension for reply within fourth month | |
| 1255 | 2,010 | 2255 | 1,005 | Extension for reply within fifth month | |
| 1401 | 330 | 2401 | 165 | Notice of Appeal | |
| 1402 | 330 | 2402 | 165 | Filing a brief in support of an appeal | |
| 1403 | 290 | 2403 | 145 | Request for oral hearing | |
| 1451 | 1,510 | 1451 | 1,510 | Petition to institute a public use proceeding | |
| 1452 | 110 | 2452 | 55 | Petition to revive - unavoidable | |
| 1453 | 1,330 | 2453 | 665 | Petition to revive - unintentional | |
| 1501 | 1,330 | 2501 | 665 | Utility issue fee (or reissue) | |
| 1502 | 480 | 2502 | 240 | Design issue fee | |
| 1503 | 640 | 2503 | 320 | Plant issue fee | |
| 1460 | 130 | 1460 | 130 | Petitions to the Commissioner | |
| 1807 | 50 | 1807 | 50 | Processing fee under 37 CFR 1.17(q) | |
| 1806 | 180 | 1806 | 180 | Submission of Information Disclosure Stmt | |
| 8021 | 40 | 8021 | 40 | Recording each patent assignment per property (times number of properties) | |
| 1809 | 770 | 2809 | 385 | Filing a submission after final rejection (37 CFR 1.129(a)) | |
| 1810 | 770 | 2810 | 385 | For each additional invention to be examined (37 CFR 1.129(b)) | |
| 1801 | 770 | 2801 | 385 | Request for Continued Examination (RCE) | |
| 1802 | 900 | 1802 | 900 | Request for expedited examination of a design application | |
| Other fee (specify) Request for Expedited Exam. in Design Application | | | | | 900.00 |

*Reduced by Basic Filing Fee Paid

SUBTOTAL (3)  ($)  **900.00**

## SUBMITTED BY

| | (Complete (if applicable)) |
|---|---|
| Name (Print/Type) David K. S. Cornwell | Registration No. (Attorney/Agent) 31,944   Telephone (202) 371-2600 |
| Signature | Date April 14, 2004 |

**WARNING:** Information on this form may become public. Credit card information should not be included on this form. Provide credit card information and authorization on PTO-2038.

This collection of information is required by 37 CFR 1.17 and 1.27. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

PTO/SB/27 (08-03)
Approved for use through 07/31/2006. OMB 0651-0031
U.S. Patent and Trademark Office; U.S DEPARTMENT OF COMMERCE
Under the Paperwork Reduction ACT of 1995, no persons are required to respond to collection of information unless it displays a valid OMB control number.

| **REQUEST FOR EXPEDITED EXAMINATION OF A DESIGN APPLICATION (37 CFR 1.155)** | Application Number | To Be Assigned |
|---|---|---|
| | Filing Date | April 13, 2004 |
| | First Named Inventor | William Marvin |
| | Title | Portion of a Midsole |
| | Atty Docket Number | 2073.0080001/TGD/HMR |

-OR-  HAND DELIVER TO THE DESIGN GROUP DIRECTOR'S OFFICE
ADDRESS TO:
MAIL STOP EXPEDITED DESIGN
COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, VA 22313-1450

This is a request for expedited examination of a design application under 37 CFR 1.155.

NOTE:   If the Request made by this form accompanies original application papers, include form PTO/SB/18 "Design Patent Application Transmittal" or its equivalent.

A preexamination search was conducted. The field of search was:

U.S. patents in Class 36, subclasses: 34R, 35R, 35B, and 34 A, and Class D2, subclasses: 968, 927, 915, 36 and

27.  The following Class and Subclasses were also search for U.S. patents from the beginning through December 30,

1997:  Class 36, Subclasses:  25R, 28, and 29; and Class D2, subclasses 947,953, 960 and 964.

Related applications:  10/607,541

If not previously filed for the above-identified application, the following items required by 37 CFR 1.155 are enclosed:
Formal drawings (see 37 CFR 1.84).
The fee set forth in 37 CFR 1.17(k).
An information disclosure statement in compliance with 37 CFR 1.98.

| April 14, 2004 | *[signature]* |
|---|---|
| Date | Signature |
| 202-371-2600 | David K. S. Cornwell |
| Telephone Number | Typed or printed name |

**WARNING:  Information on this form may become public. Credit card information should not be included on this form. Provide credit card information and authorization on PTO-2038.**

This collection of information is required by 37 CFR 1.155. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 6 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Mail Stop Expedited Design, Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.

251278_1.DOC

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re application of: | Confirmation No.: N/A |
| Marvin *et al.* | Art Unit: 2900 |
| Application No.: To Be Assigned<br>*(Division of 10/607,541; Filed: June 27, 2003)* | Examiner: To Be Assigned |
| Filed: Herewith | Atty. Docket: 2073.0080001/DKSC/HMR |
| For: **Portion of a Midsole** | |

## Deletion of Inventors Name in the Prior Application
## Under 37 C.F.R. 1.63(d)(2)

Assistant Commissioner of Patents
Washington, D.C. 20231

Sir:

    Applicants respectfully requests that Paul E. Litchfield and William McInnis be deleted as co-inventors. They are no longer inventors of the design being claimed in this new divisional application.

    Prompt and favorable consideration is requested.

               Respectfully submitted,

               STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.

               David K. S. Cornwell
               Attorney for Applicants
               Registration No. 31,944

Date:   April 14, 2004

1100 New York Avenue, N.W.
Washington, D.C. 20005-3934
(202) 371-2600

251139_1.DOC

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re application of: | Confirmation No.: N/A |
| Marvin *et al.* | Art Unit: 2900 |
| Appl. No.: To Be Assigned | |
| *(Divisional of 10/607,541; Filed June 27, 2003)* | Examiner: To Be Assigned |
| Filed: Herewith | Atty. Docket: 2073.0080001/DKSC/HMR |
| For: **Portion of a Midsole** | |

## Authorization to Treat a Reply as Incorporating an Extension of Time Under 37 C.F.R. § 1.136(a)(3)

Commissioner for Patents
PO Box 1450
Alexandria, VA  22313-1450

Sir:

The U.S. Patent and Trademark Office is hereby authorized to treat any concurrent or future reply that requires a petition for an extension of time under this paragraph for its timely submission, as incorporating a petition for extension of time for the appropriate length of time. The U.S. Patent and Trademark Office is hereby authorized to charge all required extension of time fees to our Deposit Account No. 19-0036, if such fees are not otherwise provided for in such reply.

Respectfully submitted,

STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.

David K. S. Cornwell
Attorney for Applicants
Registration No. 31,944

Date:     April 14, 2004

1100 New York Avenue, N.W.
Washington, D.C. 20005-3934
(202) 371-2600

251272_1.DOC

PTO/SB/18 (08-03)
Approved for use through 07/31/2006. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# DESIGN PATENT APPLICATION TRANSMITTAL

*(Only for new nonprovisional applications under 37 CFR 1.53(b))*

| | |
|---|---|
| *Attorney Docket No.* | 2073.0080001/DKSC/HMR |
| *First Named Inventor* | William Marvin |
| *Title* | Portion Of A Midsole |
| *Express Mail Label No.* | |

ADDRESS TO:
Mail Stop Design
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

*DESIGN V. UTILITY: A "design patent" protects an article's ornamental appearance (e.g., the way an article looks) (35 U.S.C. 171), while a "utility patent" protects the way an article is used and works (35 U.S.C. 101). The ornamental appearance of an article includes its shape/configuration or surface ornamentation upon the article, or both. Both a design and a utility patent may be obtained on an article if invention resides both in its ornamental appearance and its utility. For more information, see MPEP 1502.01.*

## APPLICATION ELEMENTS
*See MPEP 1500 concerning design patent application contents.*

1. [X] Fee Transmittal Form *(e.g., PTO/SB/17)*
   *(Submit an original, and a duplicate for fee processing)*

2. [ ] Applicant claims small entity status.
   See 37 CFR 1.27.

3. [X] Specification          [Total Pages __2__]
   *(preferred arrangement set forth below, MPEP 1503.01)*
   - Preamble
   - Cross References to Related Applications
   - Statement Regarding Fed sponsored R & D
   - Description of the figure(s) of the drawings
   - Feature description
   - Claim (only one (1) claim permitted, MPEP 1503.03)

4. [X] Drawing(s) (37 CFR 1.152) *[Total Sheets __2__]*

5. Oath or Declaration          *[Total Pages __3__]*

   a. [ ] Newly executed (original or copy)

   b. [X] Copy from a prior application (37 CFR 1.63(d))
      *(for continuation/divisional with Box 16 completed)*
      *DELETION OF INVENTOR(S)*
      i. [X] Signed statement attached deleting inventor(s) named in the prior application, see 37 CFR 1.63(d)(2) and 1.33(b)

6. [X] Application Data Sheet. See 37 CFR 1.76

## ACCOMPANYING APPLICATION PARTS

7. [ ] Assignment Papers (cover sheet & document(s))

8. [ ] 37 CFR 3.73(b) Statement    [ ] Power of
   *(when there is an assignee)*          Attorney

9. [ ] English Translation Document *(if applicable)*

10. [X] Information Disclosure    [ ] Copies of IDS
    Statement (IDS)/PTO-1449          Citations

11. [ ] Preliminary Amendment

12. [X] Return Receipt Postcard (MPEP 503)
    *(Should be specifically itemized)*

13. [ ] Certified Copy of Priority Document(s)
    (if foreign priority is claimed)

14. [X] Request for Expedited Examination of a Design Application (37 CFR 1.155)
    (NOTE: Substitute "Mail Stop Expedited Design" for "Mail Stop Design" in the address indicated above.)

15. [X] Other:  Authorization to Treat a Reply as Incorporating an Extension of Time Under 37 C.F.R. § 1.136(a)(3)

## 16. If a CONTINUING APPLICATION, check appropriate box, and supply the requisite information below and in the first sentence of the specification following the title, or in an Application Data Sheet under 37 CFR 1.76:

[ ] Continuation   [X] Divisional   [ ] Continuation-in-part (CIP) of prior application No.: 10/607,541

*Prior application information:* Examiner  To Be Assigned          Art Unit: 3728

**For CONTINUATION or DIVISIONAL APPS only:** The entire disclosure of the prior application, from which an oath or declaration is supplied under Box 5b, is considered a part of the disclosure of the accompanying continuation or divisional application and is hereby incorporated by reference. The incorporation can only be relied upon when a portion has been inadvertently omitted from the submitted application parts.

## 17. CORRESPONDENCE ADDRESS

[X] Customer Number:  26111          OR  [ ] Correspondence address below

| | |
|---|---|
| Name | Sterne, Kessler, Goldstein & Fox P.L.L.C. |
| Address | |
| City | State | Zip Code |
| Country | Telephone | Fax |

| | | |
|---|---|---|
| Name (Print/Type)  David K. S. Cornwell | Registration No. (Attorney/Agent) | 31,944 |
| Signature | Date  April 14, 2004 | |

This collection of information is required by 37 CFR 1.53(b). The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Mail Stop Design, Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

US-Request                                                    Page 1 of 2

---

# APPLICATION DATA SHEET

Electronic Version v14
Stylesheet Version v14.0

| Title of Invention | Portion of a Midsole |
|---|---|

| Application Type: | Design Application |
|---|---|
| Attorney Docket Number: 2073.0080001/DKSC/HMR | |

Correspondence address:
**Customer Number:**          26111          *26111*

Continuing Data:

This is a Division of US application number 10/607,541, filed 2003-06-27.

Inventors Information:

Inventor 1:

| **Applicant Authority Type:** | Inventor |
|---|---|
| **Citizenship:** | US |
| **Given Name:** | William |
| **Family Name:** | Marvin |
| **City of Residence:** | Brighton |
| **State of Residence:** | MA |
| **Country of Residence:** | US |
| **Address-1 of Mailing Address:** | 1895 J. W. Foster Boulevard |
| **Address-2 of Mailing Address:** | |
| **City of Mailing Address:** | Canton |
| **State of Mailing Address:** | MA |
| **Postal Code of Mailing Address:** | 02021 |
| **Country of Mailing Address:** | US |
| **Phone:** | |
| **Fax:** | |
| **E-mail:** | |

Inventor 2:

**Applicant Authority Type:**           Inventor
**Citizenship:**                        US
**Given Name:**                         Brian
**Family Name:**                        Christensen
**City of Residence:**                  Centerville
**State of Residence:**                 MA
**Country of Residence:**               US
**Address-1 of Mailing Address:**       1895 J. W. Foster Boulevard
**Address-2 of Mailing Address:**
**City of Mailing Address:**            Canton
**State of Mailing Address:**           MA
**Postal Code of Mailing Address:** 02021
**Country of Mailing Address:**         US
Phone:
Fax:
E-mail:

Attorney Information:

| Name | Registration Number |
|------|---------------------|
| David K. S. Cornwell | 31,944 |

Publication Information:
Suggested Figure for Publication -
Suggested Classification -
Suggested Technology Center -
Total Number of Drawing Sheets - 2

Atty Docket No.
2073.0080001

# SPECIFICATION

[0001]      This application is a divisional of U.S. Utility Patent Application No. 10/607,541; filed June 27, 2003, which is incorporated herein in its entirety by reference thereto.

[0002]      BE IT KNOWN, that WE, WILLIAM MARVIN and BRIAN CHRISTENSEN, both citizens of the United States, have invented a new, original and ornamental design for a PORTION OF A MIDSOLE of which the following is a specification, reference being had to the accompanying drawings, forming a part thereof.

[0003]      Figure 1 is a side view of a portion of a midsole showing our new design; and

[0004]      Figure 2 is a cross sectional view thereof taken along line 2-2.

[0005]      The broken line is environmental only and forms no part of the claimed design.

Atty Docket No.
2073.0080001

CLAIM: The ornamental design for a portion of a midsole as shown and described.



FIG.1



FIG.2



## Declaration for Patent Application

Docket Number: <u>2073.0080000/DKSC/JRM</u>

As a below named inventor, I hereby declare that:

My residence, mailing address and citizenship are as stated below next to my name.

I believe I am the original, first and sole inventor (if only one name is listed below) or an original, first and joint inventor (if plural names are listed below) of the subject matter that is claimed and for which a patent is sought on the invention entitled: <u>Cushioning Sole for an Article of Footwear,</u>

the specification of which is attached hereto unless the following box is checked:

☒    was filed on <u>June 27, 2003</u>;
      as United States Application Number or PCT International Application Number <u>10/607,541</u>; and
      was amended on _____ (if applicable).

I hereby state that I have reviewed and understand the contents of the above identified specification, including the claims, as amended by any amendment referred to above.

I acknowledge the duty to disclose information that is material to patentability as defined in 37 C.F.R. § 1.56, including for continuation-in-part applications, material information that became available between the filing date of the prior application and the national or PCT international filing date of the continuation-in-part application.

I hereby claim foreign priority benefits under 35 U.S.C. § 119(a)-(d) or (f), or § 365(b) of any foreign application(s) for patent, inventor's or plant breeder's rights certificate(s), or § 365(a) of any PCT international application, which designated at least one country other than the United States of America, listed below and have also identified below, by checking the box, any foreign application for patent, inventor's or plant breeder's rights certificate(s), or PCT international application having a filing date before that of the application on which priority is claimed.

Prior Foreign Application(s)
                                                                                 Priority Claimed

                                                                                    □ Yes    □ No

_____    _____    _____
(Application No.)              (Country)              (Day/Month/Year Filed)

                                                                                                   □ Yes    □ No

_____    _____    _____
(Application No.)              (Country)              (Day/Month/Year Filed)

Send Correspondence to:

                          STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.
                                1100 New York Avenue, N.W.
                                Washington, D.C. 20005-3934

Direct Telephone Calls to:

                                 (202) 371-2600

Appl. No. 10/607,541
Docket No. 2073.0080000/DKSC/JRM

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001 and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

| | |
|---|---|
| Full name of sole or first inventor | William MARVIN |
| Signature of sole or first inventor | Date 2 - 17 - 04 |
| Residence | Brighton, MA |
| Citizenship | U.S. |
| Mailing Address | 1895 J.W. Foster Boulevard, Canton, MA 02021 |
| | |

| | |
|---|---|
| Full name of second inventor | Brian CHRISTENSEN |
| Signature of second inventor | 11 FEB 2004 Date |
| Residence | Centerville, MA |
| Citizenship | U.S. |
| Mailing Address | 1895 J.W. Foster Boulevard, Canton, MA 02021 |
| | |

| | |
|---|---|
| Full name of third inventor | Paul E. LITCHFIELD |
| Signature of third inventor | 12/2/04 Date |
| Residence | Westboro, MA |
| Citizenship | U.S. |
| Mailing Address | 1895 J.W. Foster Boulevard, Canton, MA 02021 |
| | |

Appl. No. 10/607,541
Docket No. 2073.0080000/DKSC/JRM

| Full name of fourth inventor | William MCINNIS | |
|---|---|---|
| Signature of fourth inventor | *[signature]* | Date 11 Feb 04 |
| Residence | *Westwood, MA* | |
| Citizenship | U.S. | |
| Mailing Address | 1895 J.W. Foster Boulevard, Canton, MA 02021 | |
| | | |

(Supply similar information and signature for subsequent joint inventors, if any)

SKGF_DC1:185130.1

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re application of: | Confirmation No.: N/A |
| Marvin *et al.* | Art Unit: 2900 |
| Appl. No.: To Be Assigned | |
| *(Divisional of 10/607,541; Filed June 27, 2003)* | Examiner: To Be Assigned |
| Filed: Herewith | Atty. Docket: 2073.0080001/DKSC/HMR |
| For: **Portion of a Midsole** | |

## Information Disclosure Statement

Commissioner for Patents
PO Box 1450
Alexandria, VA 22313-1450

Sir:

Listed on accompanying Form PTO-1449 are documents that may be considered material to the examination of this application, in compliance with the duty of disclosure requirements of 37 C.F.R. §§ 1.56, 1.97 and 1.98.

Where the publication date of a listed document does not provide a month of publication, the year of publication of the listed document is sufficiently earlier than the effective U.S. filing date and any foreign priority date so that the month of publication is not in issue. Applicants have listed publication dates on the attached Form PTO-1449 based on information presently available to the undersigned. However, the listed publication dates should not be construed as an admission that the information was actually published on the date indicated.

Applicants reserve the right to establish the patentability of the claimed invention over any of the information provided herewith, and/or to prove that this information may not be prior art, and/or to prove that this information may not be enabling for the teachings purportedly offered.

This statement should not be construed as a representation that a search has been made, or that information more material to the examination of the present patent application does not exist. The Examiner is specifically requested not to rely solely on the material submitted herewith.

Applicants have checked the appropriate boxes below.

☐ 1. Statement under 37 C.F.R. 1.704(d). Each item of information contained in this Information Disclosure Statement was cited in a communication from a foreign patent office in a counterpart application and this communication was not received by any individual designated in 37 C.F.R. § 1.56(c) more than thirty days prior to the filing of this information disclosure statement.

☒ 2. Filing under 37 C.F.R. § 1.97(b). This Information Disclosure Statement is being filed within three months of the date of filing of a national application other than a continued prosecution application (CPA), OR within three months of the date of entry of the national stage as set forth in 37 C.F.R. § 1.491 in an international application, OR before the mailing date of a first Office Action on the merits OR before the mailing of a first Office Action after the filing of a request for continued examination under 37 C.F.R. § 1.114. No statement or fee is required.

☐ 3. Filing under 37 C.F.R. § 1.97(c). This Information Disclosure Statement is being filed more than three months after the U.S. filing date AND after the mailing date of the first Office Action on the merits, but before the mailing date of a Final Rejection, or Notice of Allowance, or an action that otherwise closes prosecution in the application.

- 3 -                                          Marvin *et al.*
                                        Appl. No. To Be Assigned

☐ a.  Statement under 37 C.F.R. § 1.97(e)(1). I hereby state that each item of information contained in this Information Disclosure Statement was first cited in any communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of this Information Disclosure Statement.  37 C.F.R. § 1.97(e)(1).

☐ b.  Statement under 37 C.F.R. § 1.97(e)(2). I hereby state that no item of information in this Information Disclosure Statement was cited in a communication from a foreign patent office in a counterpart foreign application and, to my knowledge after making reasonable inquiry, was known to any individual designated in 37 C.F.R. § 1.56(c) more than three months prior to the filing of this Information Disclosure Statement. 37 C.F.R. § 1.97(e)(2).

☐ c.  Attached is our PTO-2038 Credit Card Payment Form in the amount of $_____ in payment of the fee under 37 C.F.R. § 1.17(p).

☐ 4.  Filing under 37 C.F.R. § 1.97(d) This Information Disclosure Statement is being filed more than three months after the U.S. filing date and after the mailing date of a Final Rejection or Notice of Allowance, but before payment of the Issue Fee. Enclosed find our PTO-2038 Credit Card Payment Form in the amount of $_____ in payment of the fee under 37 C.F.R. § 1.17(p); in addition:

☐ a.  Statement under 37 C.F.R. § 1.97(e)(1). I hereby state that each item of information contained in this Information Disclosure Statement was cited in a communication from a foreign patent office in a counterpart foreign

- 4 -

application not more than three months prior to the filing of this Information Disclosure Statement. 37 C.F.R. § 1.97(e)(1).

☐ b.  Statement under 37 C.F.R. § 1.97(e)(2). I hereby state that no item of information in this Information Disclosure Statement was cited in a communication from a foreign patent office in a counterpart foreign application and, to my knowledge after making reasonable inquiry, was known to any individual designated in 37 C.F.R. § 1.56(c) more than three months prior to the filing of this Information Disclosure Statement. 37 C.F.R. § 1.97(e)(2).

☐ 5.  The document(s) was/were cited in a search report by a foreign patent office in a counterpart foreign application.  Submission of an English language version of the search report that indicates the degree of relevance found by the foreign office is provided in satisfaction of the requirement for a concise explanation of relevance. 1138 OG 37, 38.

☐ 6.  A concise explanation of the relevance of the non-English language document(s) appears below:

☐ 7.  Copies of the documents are submitted herewith.

☐ 8.  Copies of the documents were cited by or submitted to the Office in an IDS that complies with 37 C.F.R. § 1.98(a)-(c) in Application No._____, filed _____, which is relied upon for an earlier filing date under 35 U.S.C. § 120. Thus, copies of these documents are not attached. 37 C.F.R. § 1.98(d).

- 5 -                                               Marvin *et al.*
                                                Appl. No. To Be Assigned

☐ 9. No copies of U.S. patents and patent application publications cited on the attached Form PTO-1449 are submitted in accordance with 1276 OG 55 because this application was filed after June 30, 2003.

☐ 10. It is expected that the examiner will review the prosecution and cited art in the parent application no(s). 10/607,541 in accordance with MPEP 2001.06(b), and indicate in the next communication from the office that the art cited in the earlier prosecution history has been reviewed in connection with the present application.

It is respectfully requested that the Examiner initial and return a copy of the enclosed PTO-1449, and indicate in the official file wrapper of this patent application that the documents have been considered.

The U.S. Patent and Trademark Office is hereby authorized to charge any fee deficiency, or credit any overpayment, to our Deposit Account No. 19-0036.

Respectfully submitted,

STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.

David K. S. Cornwell
Attorney for Applicants
Registration No. 31,944

Date:    April 14, 2004

1100 New York Avenue, N.W.
Washington, D.C. 20005-3934
(202) 371-2600

251385_1.DOC

| FORM PTO-1449 | ATTY. DOCKET NO. 2073.0080001/DKSC/HMR | APPLICATION NO. To Be Assigned |
|---|---|---|
| | FIRST NAMED INVENTOR William Marvin | |
| INFORMATION DISCLOSURE STATEMENT | FILING DATE Herewith | ART UNIT 2900 |

## U.S. PATENT DOCUMENTS

| EXAMINER INITIAL | | DOCUMENT NUMBER | DATE | NAME | CLASS | SUB-CLASS | FILING DATE |
|---|---|---|---|---|---|---|---|
| | AA1 | Des. 93,966 | 12/04/1934 | Bressler | | | 10/29/1934 |
| | AB1 | Des. 125,773 | 03/11/1941 | Macauley | | | 12/28/1940 |
| | AC1 | Des. 295,459 | 05/03/1988 | Zuidema et al. | | | 06/15/1987 |
| | AD1 | Des.295,691 | 05/17/1988 | Zuidema et al. | | | 06/15/1987 |
| | AE1 | Des. 295,692 | 5/17/1988 | Zuidema et al. | | | 06/15/1987 |
| | AF1 | Des. 296,384 | 06/28/1988 | Tong | | | 09/10/1987 |
| | AG1 | Des. 301,659 | 06/20/1989 | Le | | | 10/06/1988 |
| | AH1 | Des. 302,352 | 07/25/1989 | Austin | | | 05/06/1987 |
| | AI1 | Des. 316,773 | 05/14/1991 | Valle | | | 06/16/1987 |
| | AJ1 | Des. 319,337 | 08/27/1991 | Hatfield | | | 12/07/1990 |
| | AK1 | Des. 320,303 | 10/01/1991 | Kiyosawa | | | 05/09/1989 |

## FOREIGN PATENT DOCUMENTS

| EXAMINER INITIAL | | DOCUMENT NUMBER | DATE | COUNTRY | CLASS | SUB-CLASS | TRANSLATION |
|---|---|---|---|---|---|---|---|
| | AL1 | 0 299 669 B1 | 12/15/1993 | EPO | | | Yes No |
| | AM1 | 2 563 979 | 05/10/1984 | France | | | Yes  X  No |
| | AN1 | 2 244 200 A | 11/27/1991 | Great Britain | | | Yes No |
| | AO1 | | | | | | Yes No |
| | AP1 | | | | | | Yes No |

## OTHER (Including Author, Title, Date, Pertinent Pages, etc.)

| | | | |
|---|---|---|---|
| | AR | 1 | |
| | AS | 1 | |
| | AT | 1 | |

| EXAMINER | DATE CONSIDERED |
|---|---|

**EXAMINER:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to Applicant.

| FORM PTO-1449 | ATTY. DOCKET NO. 2073.0080001/DKSC/HMR | APPLICATION NO. To Be Assigned |
|---|---|---|
| | FIRST NAMED INVENTOR William Marvin | |
| INFORMATION DISCLOSURE STATEMENT | FILING DATE Herewith | ART UNIT 2900 |

## U.S. PATENT DOCUMENTS

| EXAMINER INITIAL | | DOCUMENT NUMBER | DATE | NAME | CLASS | SUB-CLASS | FILING DATE |
|---|---|---|---|---|---|---|---|
| | AA2 | Des. 322,153 | 12/10/1991 | Schneider et al. | | | 08/28/1989 |
| | AB2 | Des. 323,577 | 02/04/1992 | Kayano | | | 03/14/1990 |
| | AC2 | Des. 324,940 | 03/31/1992 | Claveria | | | 06/20/1989 |
| | AD2 | Des. 325,288 | 04/14/1992 | Richard et al. | | | 02/15/1990 |
| | AE2 | Des. 326,355 | 05/26/1992 | Cotsidas | | | 09/11/1991 |
| | AF2 | Des. 327,770 | 07/14/1992 | Prats et al. | | | 09/11/1991 |
| | AG2 | Des. 334,463 | 04/06/1993 | Chang | | | 06/22/1988 |
| | AH2 | Des. 334,833 | 04/20/1993 | Blissett | | | 10/31/1991 |
| | AI2 | Des. 341,708 | 11/30/1993 | Blissett | | | 04/15/1992 |
| | AJ2 | Des. 344,401 | 02/22/1994 | Kilgore | | | 11/01/1991 |
| | AK2 | Des. 350,018 | 08/30/1994 | Kilgore | | | 01/19/1994 |

## FOREIGN PATENT DOCUMENTS

| EXAMINER INITIAL | | DOCUMENT NUMBER | DATE | COUNTRY | CLASS | SUB-CLASS | TRANSLATION |
|---|---|---|---|---|---|---|---|
| | AL2 | | | | | | Yes No |
| | AM2 | | | | | | Yes No |
| | AN2 | | | | | | Yes No |
| | AO2 | | | | | | Yes No |
| | AP2 | | | | | | Yes No |

## OTHER (Including Author, Title, Date, Pertinent Pages, etc.)

| | | | |
|---|---|---|---|
| | AR | 2 | |
| | AS | 2 | |
| | AT | 2 | |

| EXAMINER | DATE CONSIDERED |
|---|---|

**EXAMINER**: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to Applicant.

| FORM PTO-1449 | ATTY. DOCKET NO.<br>2073.0080001/DKSC/HMR | APPLICATION NO.<br>To Be Assigned |
|---|---|---|
| | FIRST NAMED INVENTOR<br>William Marvin | |
| INFORMATION DISCLOSURE STATEMENT | FILING DATE<br>Herewith | ART UNIT<br>2900 |

## U.S. PATENT DOCUMENTS

| EXAMINER INITIAL | | DOCUMENT NUMBER | DATE | NAME | CLASS | SUB-CLASS | FILING DATE |
|---|---|---|---|---|---|---|---|
| | AA3 | Des. 350,019 | 08/30/1994 | Kilgore | | | 01/19/1994 |
| | AB3 | Des. 350,020 | 08/30/1994 | Kilgore | | | 01/19/1994 |
| | AC3 | Des. 350,225 | 09/06/1994 | Kilgore | | | 01/19/1994 |
| | AD3 | Des. 350,227 | 09/06/1994 | Kilgore | | | 01/19/1994 |
| | AE3 | Des. 350,433 | 09/13/1994 | Kilgore | | | 11/01/1991 |
| | AF3 | Des. 351,057 | 10/04/1994 | Kilgore | | | 01/19/1994 |
| | AG3 | Des. 351,720 | 10/25/1994 | Kilgore | | | 01/19/1994 |
| | AH3 | Des. 351,936 | 11/01/1994 | Kilgore | | | 01/19/1994 |
| | AI3 | Des. 352,155 | 11/08/1994 | Merceron | | | 08/26/1993 |
| | AJ3 | Des. 352,157 | 11/08/1994 | Merceron | | | 08/26/1993 |
| | AK3 | Des. 352,159 | 11/08/1994 | Kilgore | | | 01/19/1994 |

## FOREIGN PATENT DOCUMENTS

| EXAMINER INITIAL | | DOCUMENT NUMBER | DATE | COUNTRY | CLASS | SUB-CLASS | TRANSLATION |
|---|---|---|---|---|---|---|---|
| | AL2 | | | | | | Yes<br>No |
| | AM2 | | | | | | Yes<br>No |
| | AN2 | | | | | | Yes<br>No |
| | AO2 | | | | | | Yes<br>No |
| | AP2 | | | | | | Yes<br>No |

## OTHER (Including Author, Title, Date, Pertinent Pages, etc.)

| | | | |
|---|---|---|---|
| | AR | 3 | |
| | AS | 3 | |
| | AT | 3 | |

| EXAMINER | DATE CONSIDERED |
|---|---|
| | |

**EXAMINER:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to Applicant.

| FORM PTO-1449<br><br>INFORMATION DISCLOSURE STATEMENT | ATTY. DOCKET NO.<br>2073.0080001/DKSC/HMR | APPLICATION NO.<br>To Be Assigned |
|---|---|---|
| | FIRST NAMED INVENTOR<br>William Marvin | |
| | FILING DATE<br>Herewith | ART UNIT<br>2900 |

## U.S. PATENT DOCUMENTS

| EXAMINER INITIAL | | DOCUMENT NUMBER | DATE | NAME | CLASS | SUB-CLASS | FILING DATE |
|---|---|---|---|---|---|---|---|
| | AA4 | Des. 352,160 | 11/08/1994 | Kilgore | | | 03/23/1994 |
| | AB4 | Des. 354,617 | 01/24/1995 | Kilgore | | | 03/23/1994 |
| | AC4 | Des. 377,859 | 02/11/1997 | Bramani | | | 11/30/1995 |
| | AD4 | Des. 379,864 | 06/17/1997 | Kayano | | | 04/03/1996 |
| | AE4 | Des. 384,192 | 09/30/1997 | Hsieh | | | 12/15/1995 |
| | AF4 | Des. 388,241 | 12/30/1997 | Merceron | | | 08/02/1996 |
| | AG4 | 1,081,442 | 12/16/1913 | Geiger | | | 05/20/1912 |
| | AH4 | 2,048,683 | 07/28/1936 | Brockman | | | 08/13/1934 |
| | AI4 | 3,777,374 | 12/11/1973 | Hendricks | | | 12/11/1973 |
| | AJ4 | 4,736,531 | 04/12/1988 | Richard | | | 04/13/1987 |
| | AK4 | 4,760,651 | 08/02/1988 | Pon-Tzu | | | 11/29/1987 |

## FOREIGN PATENT DOCUMENTS

| EXAMINER INITIAL | | DOCUMENT NUMBER | DATE | COUNTRY | CLASS | SUB-CLASS | TRANSLATION |
|---|---|---|---|---|---|---|---|
| | AL4 | | | | | | Yes<br>No |
| | AM4 | | | | | | Yes<br>No |
| | AN4 | | | | | | Yes<br>No |
| | AO4 | | | | | | Yes<br>No |
| | AP4 | | | | | | Yes<br>No |

## OTHER (Including Author, Title, Date, Pertinent Pages, etc.)

| | | | |
|---|---|---|---|
| | AR | 4 | |
| | AS | 4 | |
| | AT | 4 | |

| EXAMINER | DATE CONSIDERED |
|---|---|

EXAMINER:  Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to Applicant.

| FORM PTO-1449 | ATTY. DOCKET NO.<br>2073.0080001/DKSC/HMR | APPLICATION NO.<br>To Be Assigned |
|---|---|---|
| | FIRST NAMED INVENTOR<br>William Marvin | |
| INFORMATION DISCLOSURE STATEMENT | FILING DATE<br>Herewith | ART UNIT<br>2900 |

## U.S. PATENT DOCUMENTS

| EXAMINER INITIAL | | DOCUMENT NUMBER | DATE | NAME | CLASS | SUB-CLASS | FILING DATE |
|---|---|---|---|---|---|---|---|
| | AA5 | 4,641,438 | 02/10/1987 | Laird *et al.* | | | 11/15/1984 |
| | AB5 | 4,680,876 | 07/21/1987 | Peng | | | 11/21/1984 |
| | AC5 | 4,823,482 | 04/25/1989 | Lakic | | | 09/04/1987 |
| | AD5 | 4,887,367 | 12/19/1989 | Mackness *et al.* | | | 07/11/1988 |
| | AE5 | 4,918,838 | 04/24/1990 | Chang | | | 08/05/1988 |
| | AF5 | 4,936,030 | 06/26/1990 | Rennex | | | 11/08/1988 |
| | AG5 | 5,014,449 | 5/14/1991 | Richard *et al.* | | | 09/22/1989 |
| | AH5 | 5,181,873 | 01/26/1993 | Tolbert | | | 10/07/1991 |
| | AI5 | 5,224,277 | 07/06/1993 | Sang Do | | | 04/23/1992 |
| | AJ5 | 5,343,639 | 09/06/1994 | Kilgore *et al.* | | | 10/18/1993 |
| | AK5 | 5,353,523 | 10/11/1994 | Kilgore *et al.* | | | 10/13/1993 |

## FOREIGN PATENT DOCUMENTS

| EXAMINER INITIAL | | DOCUMENT NUMBER | DATE | COUNTRY | CLASS | SUB-CLASS | TRANSLATION |
|---|---|---|---|---|---|---|---|
| | AL5 | | | | | | Yes<br>No |
| | AM5 | | | | | | Yes<br>No |
| | AN5 | | | | | | Yes<br>No |
| | AO5 | | | | | | Yes<br>No |
| | AP5 | | | | | | Yes<br>No |

## OTHER (Including Author, Title, Date, Pertinent Pages, etc.)

| | | | |
|---|---|---|---|
| | AR | 5 | |
| | AS | 5 | |
| | AT | 5 | |

| EXAMINER | DATE CONSIDERED |
|---|---|
| | |

**EXAMINER:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to Applicant.

Page 6 of 7

| FORM PTO-1449 | ATTY. DOCKET NO. 2073.0080001/DKSC/HMR | APPLICATION NO. To Be Assigned |
| --- | --- | --- |
| | FIRST NAMED INVENTOR William Marvin | |
| INFORMATION DISCLOSURE STATEMENT | FILING DATE Herewith | ART UNIT 2900 |

## U.S. PATENT DOCUMENTS

| EXAMINER INITIAL | | DOCUMENT NUMBER | DATE | NAME | CLASS | SUB-CLASS | FILING DATE |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | AA6 | 5,367,792 | 11/29/1994 | Richard *et al.* | | | 08/27/1992 |
| | AB6 | 5,502,901 | 04/02/1996 | Brown | | | 05/10/1994 |
| | AC6 | 5,505,010 | 04/09/1996 | Fukuoka | | | 05/11/1994 |
| | AD6 | 5,595,002 | 01/21/1997 | Slepian *et al.* | | | 12/05/1994 |
| | AE6 | 5,607,749 | 03/04/1997 | Strumor | | | 04/26/1996 |
| | AF6 | 5,621,984 | 04/22/1997 | Hsieh | | | 08/07/1995 |
| | AG6 | 5,625,966 | 05/06/1997 | Perotto *et al.* | | | 04/10/1996 |
| | AH6 | 5,901,467 | 05/11/1999 | Peterson *et al.* | | | 12/11/1997 |
| | AI6 | 5,975,861 | 11/02/1999 | Shin *et al.* | | | 07/09/1997 |
| | AJ6 | 6,282,814 | 09/04/2001 | Krafsur *et al.* | | | 10/15/1999 |
| | AK6 | 6,519,873 | 02/18/2003 | Buttigieg | | | 10/10/2000 |

## FOREIGN PATENT DOCUMENTS

| EXAMINER INITIAL | | DOCUMENT NUMBER | DATE | COUNTRY | CLASS | SUB-CLASS | TRANSLATION |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | AL6 | | | | | | Yes No |
| | AM6 | | | | | | Yes No |
| | AN6 | | | | | | Yes No |
| | AO6 | | | | | | Yes No |
| | AP6 | | | | | | Yes No |

## OTHER (Including Author, Title, Date, Pertinent Pages, etc.)

| | | | |
| --- | --- | --- | --- |
| | AR | 6 | |
| | AS | 6 | |
| | AT | 6 | |

| EXAMINER | DATE CONSIDERED |
| --- | --- |
| | |

**EXAMINER:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to Applicant.

252057_1.DOC

Page 7 of 7

| FORM PTO-1449 | | ATTY. DOCKET NO. 2073.0080001/DKSC/HMR | | APPLICATION NO. To Be Assigned |
|---|---|---|---|---|
| | | FIRST NAMED INVENTOR William Marvin | | |
| INFORMATION DISCLOSURE STATEMENT | | FILING DATE Herewith | | ART UNIT 2900 |

## U.S. PATENT DOCUMENTS

| EXAMINER INITIAL | | DOCUMENT NUMBER | DATE | NAME | CLASS | SUB-CLASS | FILING DATE |
|---|---|---|---|---|---|---|---|
| | AA7 | 2001/0049888 | 12/13/2001 | Krafsur et al. | | | 07/10/2001 |
| | AB7 | 2003/0196354 | 10/23/2003 | Chu | | | 04/22/2002 |
| | AC7 | | | | | | |
| | AD7 | | | | | | |
| | AE7 | | | | | | |
| | AF7 | | | | | | |
| | AG7 | | | | | | |
| | AH7 | | | | | | |
| | AI7 | | | | | | |
| | AJ7 | | | | | | |
| | AK | | | | | | |

## FOREIGN PATENT DOCUMENTS

| EXAMINER INITIAL | | DOCUMENT NUMBER | DATE | COUNTRY | CLASS | SUB-CLASS | TRANSLATION |
|---|---|---|---|---|---|---|---|
| | AL7 | | | | | | Yes No |
| | AM7 | | | | | | Yes No |
| | AN7 | | | | | | Yes No |
| | AO7 | | | | | | Yes No |
| | AP7 | | | | | | Yes No |

## OTHER (Including Author, Title, Date, Pertinent Pages, etc.)

| | | | |
|---|---|---|---|
| | AR | 7 | |
| | AS | 7 | |
| | AT | 7 | |

| EXAMINER | DATE CONSIDERED |
|---|---|
| | |

EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to Applicant.

SKGF Rev. 12/03/03

PTO-2038 (02-2003)
Approved for use through 02/28/2006.  OMB 0651-0043
United States Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid
OMB control number.

# United States Patent & Trademark Office
### Credit Card Payment Form
### Please Read Instructions before Completing this Form

## Credit Card Information

| Credit Card Type: | Visa | MasterCard | X American Express | Discover |
|---|---|---|---|---|

| | |
|---|---|
| Credit Card Account #: | 3785 727438 01005 |
| Credit Card Expiration Date: | 08/2005 |
| Name as it Appears on Credit Card: | SKGF P.L.L.C. |
| Payment Amount: $(US Dollars): | 946.00 |

| Signature: | Date: April 14, 2004 |
|---|---|

**Refund Policy:** The Office may refund a fee paid by mistake or in excess of that required.  A change of purpose after the payment of a fee will not entitle a party to a refund of such fee. The Office will not refund amounts of twenty-five dollars or less unless a refund is specifically requested, and will not notify the payor of such amounts (37 CFR 1.26). Refund of a fee paid by credit card will be via credit to the credit card account.
**Service Charge:** There is a 50.00 service charge for processing each payment refused (including a check returned "unpaid") or charged back by a financial institution (37 CFR 1.21(m)).

## Credit Card Billing Address

| | |
|---|---|
| Street Address 1: | Sterne, Kessler, Goldstein & Fox P.L.L.C. |
| Street Address 2: | 1100 New York Avenue, N.W. |
| City: | Washington |
| State: | D.C. | Zip/Postal Code : 20005-3934 |
| Country: | U.S.A. |
| Daytime Phone #: | (202) 371-2600 | Fax #:  (202) 371-2540 |

## Request and Payment Information

**Description of Request and Payment Information:**
$770.00 Patent Application fee;
$176.00 Excess claims fee; and
$40.00 Assignment Recordation fee.

| Patent Fee | Patent Maintenance Fee | Trademark Fee | Other Fee |
|---|---|---|---|
| Application No. | Application No. | Serial No. | IDON Customer No. |
| To Be Assigned | | | |
| Patent No. | Patent No. | Registration No. | |
| Attorney Docket No. | | Identify or Describe Mark | |
| 2244.0190000/TGD/NRK | | | |

*If the cardholder includes a credit card number on any form or document other than the Credit Card Payment Form,*
*the United States Patent & Trademark Office will not be liable in the event that the credit card number becomes public knowledge.*

Page 1 of 2



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPL. NO. | FILING OR 371 (c) DATE | ART UNIT | FIL FEE REC'D | ATTY.DOCKET NO | DRAWINGS | TOT CLMS | IND CLMS |
|---|---|---|---|---|---|---|---|
| 29/203,335 | 04/14/2004 | 2914 | 340 | 2073.0080001/DKSC/HMR | 2 | 1 | 1 |

26111
STERNE, KESSLER, GOLDSTEIN & FOX PLLC
1100 NEW YORK AVENUE, N.W.
WASHINGTON, DC 20005

**CONFIRMATION NO. 3878**

**FILING RECEIPT**

*OC000000012382972*

Date Mailed: 04/16/2004

Receipt is acknowledged of this regular Patent Application. It will be considered in its order and you will be notified as to the results of the examination. Be sure to provide the U.S. APPLICATION NUMBER, FILING DATE, NAME OF APPLICANT, and TITLE OF INVENTION when inquiring about this application. Fees transmitted by check or draft are subject to collection. Please verify the accuracy of the data presented on this receipt. **If an error is noted on this Filing Receipt, please write to the Office of Initial Patent Examination's Filing Receipt Corrections, facsimile number 703-746-9195. Please provide a copy of this Filing Receipt with the changes noted thereon. If you received a "Notice to File Missing Parts" for this application, please submit any corrections to this Filing Receipt with your reply to the Notice. When the USPTO processes the reply to the Notice, the USPTO will generate another Filing Receipt incorporating the requested corrections (if appropriate).**

**Applicant(s)**

William Marvin, Brighton, MA;
Brian Christensen, Centerville, MA;

**Domestic Priority data as claimed by applicant**

This application is a DIV of 10/607,541 06/27/2003

**Foreign Applications**

**If Required, Foreign Filing License Granted:** 04/16/2004

**Projected Publication Date:** None, application is not eligible for pre-grant publication

**Non-Publication Request:** No

**Early Publication Request:** No

**Title**

Portion of a midsole

**Preliminary Class**

D02

---

## LICENSE FOR FOREIGN FILING UNDER
### Title 35, United States Code, Section 184
### Title 37, Code of Federal Regulations, 5.11 & 5.15

**GRANTED**

The applicant has been granted a license under 35 U.S.C. 184, if the phrase "IF REQUIRED, FOREIGN FILING LICENSE GRANTED" followed by a date appears on this form. Such licenses are issued in all applications where the conditions for issuance of a license have been met, regardless of whether or not a license may be required as set forth in 37 CFR 5.15. The scope and limitations of this license are set forth in 37 CFR 5.15(a) unless an earlier license has been issued under 37 CFR 5.15(b). The license is subject to revocation upon written notification. The date indicated is the effective date of the license, unless an earlier license of similar scope has been granted under 37 CFR 5.13 or 5.14.

This license is to be retained by the licensee and may be used at any time on or after the effective date thereof unless it is revoked. This license is automatically transferred to any related applications(s) filed under 37 CFR 1.53(d). This license is not retroactive.

The grant of a license does not in any way lessen the responsibility of a licensee for the security of the subject matter as imposed by any Government contract or the provisions of existing laws relating to espionage and the national security or the export of technical data. Licensees should apprise themselves of current regulations especially with respect to certain countries, of other agencies, particularly the Office of Defense Trade Controls, Department of State (with respect to Arms, Munitions and Implements of War (22 CFR 121-128)); the Office of Export Administration, Department of Commerce (15 CFR 370.10 (j)); the Office of Foreign Assets Control, Department of Treasury (31 CFR Parts 500+) and the Department of Energy.

**NOT GRANTED**

No license under 35 U.S.C. 184 has been granted at this time, if the phrase "IF REQUIRED, FOREIGN FILING LICENSE GRANTED" DOES NOT appear on this form. Applicant may still petition for a license under 37 CFR 5.12, if a license is desired before the expiration of 6 months from the filing date of the application. If 6 months has lapsed from the filing date of this application and the licensee has not received any indication of a secrecy order under 35 U.S.C. 181, the licensee may foreign file the application pursuant to 37 CFR 5.15(b).

 UNITED STATES PATENT AND TRADEMARK OFFICE

COMMISSIONER FOR PATENTS
UNITED STATES PATENT AND TRADEMARK OFFICE
P.O. Box 1450
ALEXANDRIA, VA 22313-1450
www.uspto.gov

APR 2 0
APR 2 0 2004

STERNE, KESSLER, GOLDSTEIN & FOX PLLC
1100 NEW YORK AVENUE, N.W.
WASHINGTON DC 20005

RECEIVED
APR 22 2004
STERNE, KESSLER,
GOLDSTEIN & FOX P.L.L.C.

In re Application of          :
William Marvin               :
Serial No.: 29/203,335       :
Filed: April 14, 2004        :        **REQUEST FOR EXPEDITED**
For: Portion of a Midsole    :              **EXAMINATION**
                             :

This is in response to the Request for expedited examination applicant filed April 14, 2004, to expedite the above-identified application under the provisions of 37 CFR 1.155.

Applicant has satisfied the provisions set forth in 37 CFR 1.155, thus the petition is **GRANTED**.

The application will be forwarded to the examiner for action on the merits commensurate with this decision.

Should there be any questions with regard to this letter please contact John Kittle by letter addressed to the Director, Technology Center 3700/2900, and P.O. BOX 1450 ALEXANDRIA, VA 22313-1450 or by telephone at (703) 308-0873 or by facsimile transmission at (703) 308-3139.

John E. Kittle
Director
Technology Center 3700/2900

# EXHIBIT C
# (Part 2 of 2)



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

## NOTICE OF ALLOWANCE AND FEE(S) DUE

26111    7590    05/18/2004

STERNE, KESSLER, GOLDSTEIN & FOX PLLC
1100 NEW YORK AVENUE, N.W.
WASHINGTON, DC 20005

RECEIVED MAY 19 2004

STERNE, KESSLER,
GOLDSTEIN & FOX P.L.L.C.

DSC 5/20/04 HMR 5/20
HMR    JFMVL 5/21/04

| EXAMINER |
|---|
| SIMONE, DOMINIC V |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2912 | |

DATE MAILED: 05/18/2004

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 29/203,335 | 04/14/2004 | William Marvin | 2073.0080001/DKSC/HMR | 3878 |

TITLE OF INVENTION: PORTION OF A MIDSOLE

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE | PUBLICATION FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|
| nonprovisional | NO | $480 | $0 | $480 | 08/18/2004 |

THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. **PROSECUTION ON THE MERITS IS CLOSED.** THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS. THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON PETITION BY THE APPLICANT. SEE 37 CFR 1.313 AND MPEP 1308.

THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN <u>THREE MONTHS</u> FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. **THIS STATUTORY PERIOD CANNOT BE EXTENDED.** SEE 35 U.S.C. 151. THE ISSUE FEE DUE INDICATED ABOVE REFLECTS A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE APPLIED IN THIS APPLICATION. THE PTOL-85B (OR AN EQUIVALENT) MUST BE RETURNED WITHIN THIS PERIOD EVEN IF NO FEE IS DUE OR THE APPLICATION WILL BE REGARDED AS ABANDONED.    Issue Fee, Continuing Appln

HOW TO REPLY TO THIS NOTICE:    August 18, 2004

I. Review the SMALL ENTITY status shown above.

If the SMALL ENTITY is shown as YES, verify your current SMALL ENTITY status:

A. If the status is the same, pay the TOTAL FEE(S) DUE shown above.

B. If the status is changed, pay the PUBLICATION FEE (if required) and twice the amount of the ISSUE FEE shown above and notify the United States Patent and Trademark Office of the change in status, or

If the SMALL ENTITY is shown as NO:

A. Pay TOTAL FEE(S) DUE shown above, or

B. If applicant claimed SMALL ENTITY status before, or is now claiming SMALL ENTITY status, check the box below and enclose the PUBLICATION FEE and 1/2 the ISSUE FEE shown above.

☐ Applicant claims SMALL ENTITY status.
See 37 CFR 1.27.

## DOCKETED

II. PART B - FEE(S) TRANSMITTAL should be completed and returned to the United States Patent and Trademark Office (USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). Even if the fee(s) have already been paid, Part B - Fee(s) Transmittal should be completed and returned. If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should be completed and an extra copy of the form should be submitted.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Utility patents issuing on applications filed on or after Dec. 12, 1980 may require payment of maintenance fees. It is patentee's responsibility to ensure timely payment of maintenance fees when due.**

Page 1 of 3

PTOL-85 (Rev. 11/03) Approved for use through 04/30/2004.

## PART B - FEE(S) TRANSMITTAL

**Complete and send this form, together with applicable fee(s), to:** **Mail**

**Mail Stop ISSUE FEE**
**Commissioner for Patents**
**P.O. Box 1450**
**Alexandria, Virginia 22313-1450**

**or Fax** (703) 746-4000

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 4 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Legibly mark-up with any corrections or use Block 1)

26111    7590    05/18/2004

STERNE, KESSLER, GOLDSTEIN & FOX PLLC
1100 NEW YORK AVENUE, N.W.
WASHINGTON, DC 20005

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**
I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being facsimile transmitted to the USPTO, on the date indicated below.

_____ (Depositor's name)

_____ (Signature)

_____ (Date)

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 29/203,335 | 04/14/2004 | William Marvin | 2073.0080001/DKSC/HMR | 3878 |

TITLE OF INVENTION: PORTION OF A MIDSOLE

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE | PUBLICATION FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|
| nonprovisional | NO | $480 | $0 | $480 | 08/18/2004 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| SIMONE, DOMINIC V | 2912 | D02-972000 |

1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-02 or more recent) attached. **Use of a Customer Number is required.**

2. For printing on the patent front page, list (1) the names of up to 3 registered patent attorneys or agents OR, alternatively, (2) the name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 _____

2 _____

3 _____

3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. Inclusion of assignee data is only appropriate when an assignment has been previously submitted to the USPTO or is being submitted under separate cover. Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE                (B) RESIDENCE: (CITY and State OR COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent):    ☐ individual    ☐ corporation or other private group entity    ☐ government

4a. The following fee(s) are enclosed:

☐ Issue Fee
☐ Publication Fee
☐ Advance Order - # of Copies _____

4b. Payment of Fee(s):

☐ A check in the amount of the fee(s) is enclosed.
☐ Payment by credit card. Form PTO-2038 is attached.
☐ The Director is hereby authorized to charge the required fee(s), or credit any overpayment, to Deposit Account Number _____ (enclose an extra copy of this form).

Director for Patents is requested to apply the Issue Fee and Publication Fee (if any) or to re-apply any previously paid issue fee to the application identified above.

_____ (Authorized Signature)                _____ (Date)

NOTE: The Issue Fee and Publication Fee (if required) will not be accepted from anyone other than the applicant; a registered attorney or agent; or the assignee or other party in interest as shown by the records of the United States Patent and Trademark Office.

This collection of information is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, Alexandria, Virginia 22313-1450.

Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

TRANSMIT THIS FORM WITH FEE(S)



### UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 29/203,335 | 04/14/2004 | William Marvin | 2073.0080001/DKSC/HMR | 3878 |

26111       7590       05/18/2004

STERNE, KESSLER, GOLDSTEIN & FOX PLLC
1100 NEW YORK AVENUE, N.W.
WASHINGTON, DC 20005

| EXAMINER |
|---|
| SIMONE, DOMINIC V |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2912 | |

DATE MAILED: 05/18/2004

## Determination of Patent Term Extension or Adjustment under 35 U.S.C. 154 (b)

Design patents have a term measured from the issue date of the patent and the term remains the same length regardless of the time that the application for the design patent was pending. Since the above-identified application is an application for a design patent, the patent is not eligible for Patent Term Extension or Adjustment under 35 U.S.C. 154(b).

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (703) 305-1383. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at (703) 305-8283.

PTOL-85  (Rev. 11/03) Approved for use through 04/30/2004.

| *Notice of Allowability* | Application No. | Applicant(s) | |
|---|---|---|---|
| | 29/203,335 | MARVIN ET AL. | |
| | Examiner | Art Unit | |
| | Dominic Simone | 2912 | |

-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☐ This communication is responsive to _____.

2. ☒ The allowed claim(s) is/are *the single design claim.*

3. ☒ The drawings filed on <u>14 April 2004</u> are accepted by the Examiner.

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a) ☐ All  b) ☐ Some*  c) ☐ None  of the:

        1. ☐ Certified copies of the priority documents have been received.

        2. ☐ Certified copies of the priority documents have been received in Application No. _____ .

        3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

    * Certified copies not received: _____.

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application. **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ A SUBSTITUTE OATH OR DECLARATION must be submitted. Note the attached EXAMINER'S AMENDMENT or NOTICE OF INFORMAL PATENT APPLICATION (PTO-152) which gives reason(s) why the oath or declaration is deficient.

6. ☐ CORRECTED DRAWINGS ( as "replacement sheets") must be submitted.

    (a) ☐ including changes required by the Notice of Draftsperson's Patent Drawing Review ( PTO-948) attached

        1) ☐ hereto or 2) ☐ to Paper No./Mail Date _____.

    (b) ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date _____.

    **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

7. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**

1. ☒ Notice of References Cited (PTO-892)

2. ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)

3. ☒ Information Disclosure Statements (PTO-1449 or PTO/SB/08), Paper No./Mail Date <u>4/14/04</u>

4. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material

5. ☐ Notice of Informal Patent Application (PTO-152)

6. ☐ Interview Summary (PTO-413), Paper No./Mail Date _____.

7. ☐ Examiner's Amendment/Comment

8. ☐ Examiner's Statement of Reasons for Allowance

9. ☐ Other _____.

Dominic Simone
Primary Examiner
Art Unit: 2912

| | | | | | |
|---|---|---|---|---|---|
| ***Notice of References Cited*** | | Application/Control No.<br><br>29/203,335 | | Applicant(s)/Patent Under Reexamination<br>MARVIN ET AL. | |
| | | Examiner<br><br>Dominic  Simone | | Art Unit<br><br>2912 | Page 1 of 1 |

**U.S. PATENT DOCUMENTS**

| * | | Document Number<br>Country Code-Number-Kind Code | Date<br>MM-YYYY | Name | Classification |
|---|---|---|---|---|---|
| X | A | US-D95,767 | 05-1935 | Marks, John C. | D2/965 |
| X | B | US-D112,267 | 11-1938 | Court, Colley B. | D2/965 |
| X | C | US-D261,446 | 10-1981 | Schmohl, Michael W. | D2/907 |
| X | D | US-D290,542 | 06-1987 | O'Rourke, John J. | D2/907 |
| X | E | US-D303,451 | 09-1989 | Weiner, Stanley | D2/908 |
| X | F | US-D354,617 | 01-1995 | Kilgore, Bruce J. | D2/964 |
| X | G | US-D404,896 | 02-1999 | Cooper, Aaron Alexander Carroll | D2/972 |
| X | H | US-D485,053 | 01-2004 | McDowell, Sean M. | D2/972 |
| | I | US- | | | |
| | J | US- | | | |
| | K | US- | | | |
| | L | US- | | | |
| | M | US- | | | |

**FOREIGN  PATENT DOCUMENTS**

| * | | Document Number<br>Country Code-Number-Kind Code | Date<br>MM-YYYY | Country | Name | Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

**NON-PATENT DOCUMENTS**

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | SHOES, A Lexicon of Style by Valerie Steel; Rizzoli, 1999; Page 18, Ferragamo layered heel□□(Shoe Digest-Design Library) |
| | V | |
| | W | |
| | X | |

\*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

Page 1 of 7

| | | ATTY. DOCKET NO. 2073.0080001/DKSC/HMR | APPLICATION NO. To Be Assigned |
|---|---|---|---|
| FORM PTO-1449 | | FIRST NAMED INVENTOR William Marvin | |
| INFORMATION DISCLOSURE STATEMENT | | FILING DATE Herewith | ART UNIT 2900 |

U.S. PTO
29/203335
041404

## U.S. PATENT DOCUMENTS

| EXAMINER INITIAL | | DOCUMENT NUMBER | DATE | NAME | CLASS | SUB-CLASS | FILING DATE |
|---|---|---|---|---|---|---|---|
| | AA1 | Des. 93,966 | 12/04/1934 | Bressler | | | 10/29/1934 |
| | AB1 | Des. 125,773 | 03/11/1941 | Macauley | | | 12/28/1940 |
| | AC1 | Des. 295,459 | 05/03/1988 | Zuidema et al. | | | 06/15/1987 |
| | AD1 | Des.295,691 | 05/17/1988 | Zuidema et al. | | | 06/15/1987 |
| | AE1 | Des. 295,692 | 5/17/1988 | Zuidema et al. | | | 06/15/1987 |
| | AF1 | Des. 296,384 | 06/28/1988 | Tong | | | 09/10/1987 |
| | AG1 | Des. 301,659 | 06/20/1989 | Le | | | 10/06/1988 |
| | AH1 | Des. 302,352 | 07/25/1989 | Austin | | | 05/06/1987 |
| | AI1 | Des. 316,773 | 05/14/1991 | Valle | | | 06/16/1987 |
| | AJ1 | Des. 319,337 | 08/27/1991 | Hatfield | | | 12/07/1990 |
| | AK1 | Des. 320,303 | 10/01/1991 | Kiyosawa | | | 05/09/1989 |

all considered

## FOREIGN PATENT DOCUMENTS

| EXAMINER INITIAL | | DOCUMENT NUMBER | DATE | COUNTRY | CLASS | SUB-CLASS | TRANSLATION |
|---|---|---|---|---|---|---|---|
| | AL1 | 0 299 669 B1 | 12/15/1993 | EPO | | | Yes  No |
| | AM1 | 2 563 979 | 05/10/1984 | France | | | Yes  X  No |
| | AN1 | 2 244 200 A | 11/27/1991 | Great Britain | | | Yes  No |
| | AO1 | | | | | | Yes  No |
| | AP1 | | | | | | Yes  No |

## OTHER (Including Author, Title, Date, Pertinent Pages, etc.)

| | | |
|---|---|---|
| AR | 1 | |
| AS | 1 | |
| AT | 1 | |

| EXAMINER | DATE CONSIDERED |
|---|---|
| | 5/1/04 |

**EXAMINER:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to Applicant.

Page 2 of 7

| FORM PTO-1449 | ATTY. DOCKET NO. 2073.0080001/DKSC/HMR | APPLICATION NO. To Be Assigned |
|---|---|---|
| INFORMATION DISCLOSURE STATEMENT | FIRST NAMED INVENTOR William Marvin | |
| | FILING DATE Herewith | ART UNIT 2900 |

U.S. PTO
29/203335
6800

041404

### U.S. PATENT DOCUMENTS

| EXAMINER INITIAL | | DOCUMENT NUMBER | DATE | NAME | CLASS | SUB-CLASS | FILING DATE |
|---|---|---|---|---|---|---|---|
| | AA2 | Des. 322,153 | 12/10/1991 | Schneider et al. | | | 08/28/1989 |
| | AB2 | Des. 323,577 | 02/04/1992 | Kayano | | | 03/14/1990 |
| | AC2 | Des. 324,940 | 03/31/1992 | Claveria | | | 06/20/1989 |
| | AD2 | Des. 325,288 | 04/14/1992 | Richard et al. | | | 02/15/1990 |
| | AE2 | Des. 326,355 | 05/26/1992 | Cotsidas | | | 09/11/1991 |
| | AF2 | Des. 327,770 | 07/14/1992 | Prats et al. | | | 09/11/1991 |
| | AG2 | Des. 334,463 | 04/06/1993 | Chang | | | 06/22/1988 |
| | AH2 | Des. 334,833 | 04/20/1993 | Blissett | | | 10/31/1991 |
| | AI2 | Des. 341,708 | 11/30/1993 | Blissett | | | 04/15/1992 |
| | AJ2 | Des. 344,401 | 02/22/1994 | Kilgore | | | 11/01/1991 |
| | AK2 | Des. 350,018 | 08/30/1994 | Kilgore | | | 01/19/1994 |

*all considered*

### FOREIGN PATENT DOCUMENTS

| EXAMINER INITIAL | | DOCUMENT NUMBER | DATE | COUNTRY | CLASS | SUB-CLASS | TRANSLATION |
|---|---|---|---|---|---|---|---|
| | AL2 | | | | | | Yes No |
| | AM2 | | | | | | Yes No |
| | AN2 | | | | | | Yes No |
| | AO2 | | | | | | Yes No |
| | AP2 | | | | | | Yes No |

### OTHER (Including Author, Title, Date, Pertinent Pages, etc.)

| | | | |
|---|---|---|---|
| | AR | 2 | |
| | AS | 2 | |
| | AT | 2 | |

| EXAMINER | DATE CONSIDERED 5/12/04 |
|---|---|

EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to Applicant.

Page 3 of 7

| FORM PTO-1449 | ATTY. DOCKET NO. 2073.0080001/DKSC/HMR | APPLICATION NO. To Be Assigned |
|---|---|---|
| INFORMATION DISCLOSURE STATEMENT | FIRST NAMED INVENTOR William Marvin | |
| | FILING DATE Herewith | ART UNIT 2900 |

US PTO 29/203335 041404

### U.S. PATENT DOCUMENTS

| EXAMINER INITIAL | | DOCUMENT NUMBER | DATE | NAME | CLASS | SUB-CLASS | FILING DATE |
|---|---|---|---|---|---|---|---|
| | AA3 | Des. 350,019 | 08/30/1994 | Kilgore | | | 01/19/1994 |
| | AB3 | Des. 350,020 | 08/30/1994 | Kilgore | | | 01/19/1994 |
| | AC3 | Des. 350,225 | 09/06/1994 | Kilgore | | | 01/19/1994 |
| | AD3 | Des. 350,227 | 09/06/1994 | Kilgore | | | 01/19/1994 |
| | AE3 | Des. 350,433 | 09/13/1994 | Kilgore | | | 11/01/1991 |
| | AF3 | Des. 351,057 | 10/04/1994 | Kilgore | | | 01/19/1994 |
| | AG3 | Des. 351,720 | 10/25/1994 | Kilgore | | | 01/19/1994 |
| | AH3 | Des. 351,936 | 11/01/1994 | Kilgore | | | 01/19/1994 |
| | AI3 | Des. 352,155 | 11/08/1994 | Merceron | | | 08/26/1993 |
| | AJ3 | Des. 352,157 | 11/08/1994 | Merceron | | | 08/26/1993 |
| | AK3 | Des. 352,159 | 11/08/1994 | Kilgore | | | 01/19/1994 |

*all considered*

### FOREIGN PATENT DOCUMENTS

| EXAMINER INITIAL | | DOCUMENT NUMBER | DATE | COUNTRY | CLASS | SUB-CLASS | TRANSLATION |
|---|---|---|---|---|---|---|---|
| | AL2 | | | | | | Yes No |
| | AM2 | | | | | | Yes No |
| | AN2 | | | | | | Yes No |
| | AO2 | | | | | | Yes No |
| | AP2 | | | | | | Yes No |

### OTHER (Including Author, Title, Date, Pertinent Pages, etc.)

| | | | |
|---|---|---|---|
| | AR | 3 | |
| | AS | 3 | |
| | AT | 3 | |

| EXAMINER | DATE CONSIDERED 5/12/04 |
|---|---|

EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to Applicant.

Page 4 of 7

| FORM PTO-1449 | ATTY. DOCKET NO. 2073.0080001/DKSC/HMR | APPLICATION NO. To Be Assigned |
| --- | --- | --- |
| | FIRST NAMED INVENTOR William Marvin | |
| INFORMATION DISCLOSURE STATEMENT | FILING DATE Herewith | ART UNIT 2900 |

### U.S. PATENT DOCUMENTS

| EXAMINER INITIAL | | DOCUMENT NUMBER | DATE | NAME | CLASS | SUB-CLASS | FILING DATE |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | AA4 | Des. 352,160 | 11/08/1994 | Kilgore | | | 03/23/1994 |
| | AB4 | Des. 354,617 | 01/24/1995 | Kilgore | | | 03/23/1994 |
| | AC4 | Des. 377,859 | 02/11/1997 | Bramani | | | 11/30/1995 |
| | AD4 | Des. 379,864 | 06/17/1997 | Kayano | | | 04/03/1996 |
| | AE4 | Des. 384,192 | 09/30/1997 | Hsieh | | | 12/15/1995 |
| | AF4 | Des. 388,241 | 12/30/1997 | Merceron | | | 08/02/1996 |
| | AG4 | 1,081,442 | 12/16/1913 | Geiger | | | 05/20/1912 |
| | AH4 | 2,048,683 | 07/28/1936 | Brockman | | | 08/13/1934 |
| | AI4 | 3,777,374 | 12/11/1973 | Hendricks | | | 12/11/1973 |
| | AJ4 | 4,736,531 | 04/12/1988 | Richard | | | 04/13/1987 |
| | AK4 | 4,760,651 | 08/02/1988 | Pon-Tzu | | | 11/29/1987 |

*all considered*

### FOREIGN PATENT DOCUMENTS

| EXAMINER INITIAL | | DOCUMENT NUMBER | DATE | COUNTRY | CLASS | SUB-CLASS | TRANSLATION |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | AL4 | | | | | | Yes No |
| | AM4 | | | | | | Yes No |
| | AN4 | | | | | | Yes No |
| | AO4 | | | | | | Yes No |
| | AP4 | | | | | | Yes No |

### OTHER (Including Author, Title, Date, Pertinent Pages, etc.)

| | | | |
| --- | --- | --- | --- |
| | AR | 4 | |
| | AS | 4 | |
| | AT | 4 | |

| EXAMINER | DATE CONSIDERED 5/12/04 |
| --- | --- |

EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to Applicant.

Page 5 of 7

| FORM PTO-1449 | ATTY. DOCKET NO. 2073.0080001/DKSC/HMR | APPLICATION NO. To Be Assigned |
|---|---|---|
| | FIRST NAMED INVENTOR William Marvin | |
| INFORMATION DISCLOSURE STATEMENT | FILING DATE Herewith | ART UNIT 2900 |

## U.S. PATENT DOCUMENTS

| EXAMINER INITIAL | | DOCUMENT NUMBER | DATE | NAME | CLASS | SUB-CLASS | FILING DATE |
|---|---|---|---|---|---|---|---|
| | AA5 | 4,641,438 | 02/10/1987 | Laird *et al.* | | | 11/15/1984 |
| | AB5 | 4,680,876 | 07/21/1987 | Peng | | | 11/21/1984 |
| | AC5 | 4,823,482 | 04/25/1989 | Lakic | | | 09/04/1987 |
| | AD5 | 4,887,367 | 12/19/1989 | Mackness *et al.* | | | 07/11/1988 |
| | AE5 | 4,918,838 | 04/24/1990 | Chang | | | 08/05/1988 |
| | AF5 | 4,936,030 | 06/26/1990 | Rennex | | | 11/08/1988 |
| | AG5 | 5,014,449 | 5/14/1991 | Richard *et al.* | | | 09/22/1989 |
| | AH5 | 5,181,873 | 01/26/1993 | Tolbert | | | 10/07/1991 |
| | AI5 | 5,224,277 | 07/06/1993 | Sang Do | | | 04/23/1992 |
| | AJ5 | 5,343,639 | 09/06/1994 | Kilgore *et al.* | | | 10/18/1993 |
| | AK5 | 5,353,523 | 10/11/1994 | Kilgore *et al.* | | | 10/13/1993 |

## FOREIGN PATENT DOCUMENTS

| EXAMINER INITIAL | | DOCUMENT NUMBER | DATE | COUNTRY | CLASS | SUB-CLASS | TRANSLATION |
|---|---|---|---|---|---|---|---|
| | AL5 | | | | | | Yes No |
| | AM5 | | | | | | Yes No |
| | AN5 | | | | | | Yes No |
| | AO5 | | | | | | Yes No |
| | AP5 | | | | | | Yes No |

## OTHER (Including Author, Title, Date, Pertinent Pages, etc.)

| | | | |
|---|---|---|---|
| | AR | 5 | |
| | AS | 5 | |
| | AT | 5 | |

| EXAMINER | DATE CONSIDERED 5/12/04 |
|---|---|

**EXAMINER:** Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to Applicant.

Page 6 of 7

| FORM PTO-1449 | ATTY. DOCKET NO. 2073.0080001/DKSC/HMR | APPLICATION NO. To Be Assigned |
|---|---|---|
| | FIRST NAMED INVENTOR William Marvin | |
| INFORMATION DISCLOSURE STATEMENT | FILING DATE Herewith | ART UNIT 2900 |

## U.S. PATENT DOCUMENTS

| EXAMINER INITIAL | | DOCUMENT NUMBER | DATE | NAME | CLASS | SUB-CLASS | FILING DATE |
|---|---|---|---|---|---|---|---|
| | AA6 | 5,367,792 | 11/29/1994 | Richard et al. | | | 08/27/1992 |
| | AB6 | 5,502,901 | 04/02/1996 | Brown | | | 05/10/1994 |
| | AC6 | 5,505,010 | 04/09/1996 | Fukuoka | | | 05/11/1994 |
| | AD6 | 5,595,002 | 01/21/1997 | Slepian et al. | | | 12/05/1994 |
| | AE6 | 5,607,749 | 03/04/1997 | Strumor | | | 04/26/1996 |
| | AF6 | 5,621,984 | 04/22/1997 | Hsieh | | | 08/07/1995 |
| | AG6 | 5,625,966 | 05/06/1997 | Perotto et al. | | | 04/10/1996 |
| | AH6 | 5,901,467 | 05/11/1999 | Peterson et al. | | | 12/11/1997 |
| | AI6 | 5,975,861 | 11/02/1999 | Shin et al. | | | 07/09/1997 |
| | AJ6 | 6,282,814 | 09/04/2001 | Krafsur et al. | | | 10/15/1999 |
| | AK6 | 6,519,873 | 02/18/2003 | Buttigieg | | | 10/10/2000 |

## FOREIGN PATENT DOCUMENTS

| EXAMINER INITIAL | | DOCUMENT NUMBER | DATE | COUNTRY | CLASS | SUB-CLASS | TRANSLATION |
|---|---|---|---|---|---|---|---|
| | AL6 | | | | | | Yes No |
| | AM6 | | | | | | Yes No |
| | AN6 | | | | | | Yes No |
| | AO6 | | | | | | Yes No |
| | AP6 | | | | | | Yes No |

## OTHER (Including Author, Title, Date, Pertinent Pages, etc.)

| | | |
|---|---|---|
| AR | 6 | |
| AS | 6 | |
| AT | 6 | |

| EXAMINER | DATE CONSIDERED 5/12/04 |
|---|---|

**EXAMINER:** Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to Applicant.

252057_1.DOC

Page 7 of 7

| ATTY. DOCKET NO. 2073.0080001/DKSC/HMR | APPLICATION NO. To Be Assigned |
|---|---|

FORM PTO-1449

| FIRST NAMED INVENTOR William Marvin | |
|---|---|

INFORMATION DISCLOSURE STATEMENT

| FILING DATE Herewith | ART UNIT 2900 |
|---|---|

## U.S. PATENT DOCUMENTS

| EXAMINER INITIAL | | DOCUMENT NUMBER | DATE | NAME | CLASS | SUB-CLASS | FILING DATE |
|---|---|---|---|---|---|---|---|
| | AA7 | 2001/0049888 | 12/13/2001 | Krafsur *et al.* | | | 07/10/2001 |
| | AB7 | 2003/0196354 | 10/23/2003 | Chu | | | 04/22/2002 |
| | AC7 | | | | | | |
| | AD7 | | | | | | |
| | AE7 | | | | | | |
| | AF7 | | | | | | |
| | AG7 | | | | | | |
| | AH7 | | | | | | |
| | AI7 | | | | | | |
| | AJ7 | | | | | | |
| | AK | | | | | | |

## FOREIGN PATENT DOCUMENTS

| EXAMINER INITIAL | | DOCUMENT NUMBER | DATE | COUNTRY | CLASS | SUB-CLASS | TRANSLATION |
|---|---|---|---|---|---|---|---|
| | AL7 | | | | | | Yes No |
| | AM7 | | | | | | Yes No |
| | AN7 | | | | | | Yes No |
| | AO7 | | | | | | Yes No |
| | AP7 | | | | | | Yes No |

## OTHER (Including Author, Title, Date, Pertinent Pages, etc.)

| | | | |
|---|---|---|---|
| | AR | 7 | |
| | AS | 7 | |
| | AT | 7 | |

| EXAMINER | DATE CONSIDERED 3/12/04 |
|---|---|

EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to Applicant.

SKGF Rev. 12/03/03



## Sterne Kessler Goldstein Fox
ATTORNEYS AT LAW

# Fax    ☒ Urgent    ☐ Return reply requested    ☐ Original will be sent as confirmation

To:  U. S. Patent and Trademark Office

Attention:  **Mail Stop Issue Fee**

From:  David K.S. Cornwell
        Attorney for Applicants
        Reg. No. 31,944

Pages (including cover sheet):  6

Fax No:  703 746 4000

Date:  May 24, 2004

Re:  Allowed U.S. Design Patent Application
     **Appl. No. 29/203,335**
     Filed:  April 14, 2004
     For:   Portion of a Midsole
     Inventors:  Marvin *et al.*

Our Reference:  2073.0080001/DKSC/HMR

# Message
Transmitted herewith are the following documents for appropriate action:

1. SKGF Cover letter;
2. Issue Fee Transmittal (Form PTOL-85B);
3. Fee Transmittal (Form PTO/SB/17); and
4. PTO-2038 Credit Card Payment Form for $489.00 to cover:
    $480.00 Issue Fee; and
    $9.00 Advance copies of patent.

Please note that this Issue Fee is being filed today by facsimile in accordance with the January 15, 2002 Official Gazette Notice.

**Certification of Facsimile Transmission**

**I hereby certify that this paper is being facsimile transmitted
to the Patent and Trademark Office on the date shown below.**

Amy D. Wise
Name

Date:   May 24, 2004

267734.1

If any portion of this transmission is not received clearly or in full,
contact us at 202.371.2600 or f 202.371.2540

This message is intended for the exclusive use of the individual or entity to which it is addressed.  The message may contain information that is privileged, confidential, or otherwise exempt from disclosure under applicable law.  If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, copying or use of this communication in any way is strictly prohibited.  If you have received this communication in error, please call us collect immediately, and 4return the original message to us at the above address via the U.S. Postal Service.

Sterne, Kessler, Goldstein & Fox P.L.L.C. : 1100 New York Avenue, NW : Washington, DC  20005 : 202.371.2600 f 202.371.2540 : www.skgf.com



**Sterne Kessler Goldstein Fox**
ATTORNEYS AT LAW

Robert Greene Sterne
Edward J. Kessler
Jorge A. Goldstein
David K.S. Cornwell
Robert W. Esmond
Tracy-Gene G. Durkin
Michele A. Cimbala
Michael B. Ray
Robert E. Sokohl
Eric K. Steffe
Michael Q. Lee
Steven R. Ludwig
John M. Covert
Linda E. Alcorn
Robert C. Millonig
Donald J. Featherstone
Lawrence B. Bugaisky
Michael V. Messinger

Judith U. Kim
Timothy J. Shea, Jr.
Patrick E. Garrett
Heidi L. Kraus
Edward W. Yee
Albert L. Ferro*
Donald R. Banowit
Peter A. Jackman
Teresa U. Medler
Jeffrey S. Weaver
Kendrick P. Patterson
Vincent L. Capuano
Eldora Ellison Floyd
Thomas C. Fiala
Brian J. Del Buono
Virgil Lee Beaston
Kimberly N. Reddick
Theodore A. Wood

Elizabeth J. Haanes
Joseph S. Ostroff
Frank R. Cottingham
Christine M. Lhulier
Rae Lynn Prengaman
Jane Shershenovich*
George S. Bardmesser
Daniel A. Klein*
Jason D. Eisenberg
Michael D. Specht
Andrea J. Kamage
Tracy L. Muller*
LuAnne M. DeSantis
John J. Figueroa
Ann E. Summerfield
Tiera S. Coston
Aric W. Ledford*
Jessica L. Parezo

Timothy A. Doyle*
Gaby L. Longsworth*
Nicole D. Dretar*
Ted J. Ebersole
Jyoti C. Iyer*

Registered Patent Agents•
Karen R. Markowicz
Nancy J. Leith
Helene C. Carlson
Matthew J. Dowd
Aaron L. Schwartz
Katrina Y. Pei Quach
Bryan L. Skelton
Robert A. Schwartzman
Teresa A. Colella
Jeffrey S. Lundgren
Victoria S. Rutherford

Eric D. Hayes
Michelle K. Holoubek
Robert H. DeSelms
Simon J. Elliott
Julie A. Heider
Mita Mukherjee
Scott M. Woodhouse

Of Counsel
Kenneth C. Bass III
Evan R. Smith
Marvin C. Guthrie

*Admitted only in Maryland
*Admitted only in Virginia
•Practice Limited to
Federal Agencies

May 24, 2004

WRITER'S DIRECT NUMBER:
(202) 772-8580
INTERNET ADDRESS:
DAVIDC@SKGF.COM

Commissioner for Patents
PO Box 1450
Alexandria, VA  22313-1450

*Mail Stop Issue Fee*

Re:    Allowed U.S. Design Patent Application
       Appl. No. 29/203,335; Filed:  April 14, 2004
       For:    **Portion of a Midsole**
       Inventors:    Marvin *et al.*
       Our Ref:    2073.0080001/DKSC/HMR

Sir:

In response to the **Notice of Allowance and Issue Fee Due** dated May 18, 2004, the following documents are forwarded for appropriate action by the U.S. Patent and Trademark Office:

1.    Issue Fee Transmittal (Form PTOL-85B);

2.    Fee Transmittal (Form PTO/SB/17);

3.    One (1) return postcard; and

4.    PTO-2038 Credit Card Payment Form for $489.00 to cover:
      $480.00 Issue Fee; and
      $9.00 Advance copies of patent.

It is respectfully requested that the attached postcard be stamped with the date of filing of these documents, and that it be returned to our courier.

Commissioner for Patents
May 24, 2004
Page 2

The U.S. Patent and Trademark Office is hereby authorized to charge any fee deficiency, or credit any overpayment, to our Deposit Account No. 19-0036. If extensions of time under 37 C.F.R. § 1.136 other than those otherwise provided for herewith are required to prevent abandonment of the present patent application, then such extensions of time are hereby petitioned, and any fees therefor are hereby authorized to be charged to our Deposit Account No. 19-0036.

Respectfully submitted,

STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.

David K. S. Cornwell
Attorney for Applicants
Registration No. 31,944

DKSC/HMR/adw
Enclosures

267421_1.DOC

PTO/SB/17 (10-03)
Approved for use through 07/31/2006. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# FEE TRANSMITTAL
# for FY 2004
*Effective 10/01/2003. Patent fees are subject to annual revision.*

☐ Applicant claims small entity status. See 37 CFR 1.27

**TOTAL AMOUNT OF PAYMENT**          ($)    489.00

| Complete if Known | |
|---|---|
| Application Number | 29/203,335 |
| Filing Date | April 14, 2004 |
| First Named Inventor | William Marvin |
| Examiner Name | Simone, Dominic V. |
| Art Unit | 2912 |
| Attorney Docket No. | 2073.0080001/DKSC/HMR |

## METHOD OF PAYMENT (check all that apply)

☐ Check  ☒ Credit card  ☐ Money Order  ☒ Other**  ☐ None

**\*Charge any deficiencies or credit any overpayments in Deposit Account:** *the fees to Deposit Acct. No. 19-0036.*

Deposit Account Number     19-0036

Deposit Account Name     Sterne, Kessler, Goldstein & Fox P.L.L.C.

**The Director is authorized to:** (check all that apply)
☐ Charge fee(s) indicated below    ☐ Credit any overpayments
☐ Charge any additional fee(s) or any underpayment of fee(s)
☐ Charge fee(s) indicated below, **except for the filing fee** to the above-identified deposit account.

## FEE CALCULATION

### 1. BASIC FILING FEE

| Large Entity Fee Code | Fee ($) | Small Entity Fee Code | Fee ($) | Fee Description | Fee Paid |
|---|---|---|---|---|---|
| 1001 | 770 | 2001 | 385 | Utility filing fee | |
| 1002 | 340 | 2002 | 170 | Design filing fee | |
| 1003 | 530 | 2003 | 265 | Plant filing fee | |
| 1004 | 770 | 2004 | 385 | Reissue filing fee | |
| 1005 | 160 | 2005 | 80 | Provisional filing fee | |

SUBTOTAL (1)  ($)    0.00

### 2. EXTRA CLAIM FEES FOR UTILITY AND REISSUE

| | Extra Claims | | Fee from below | Fee Paid |
|---|---|---|---|---|
| Total Claims | - 20 **= | X | = | |
| Independent Claims | - 3 **= | X | = | |
| Multiple Dependent | | X | = | |

| Large Entity Fee Code | Fee ($) | Small Entity Fee Code | Fee ($) | Fee Description |
|---|---|---|---|---|
| 1202 | 18 | 2202 | 9 | Claims in excess of 20 |
| 1201 | 86 | 2201 | 43 | Independent claims in excess of 3 |
| 1203 | 290 | 2203 | 145 | Multiple dependent claim, if not paid |
| 1204 | 86 | 2204 | 43 | ** Reissue independent claims over original patent |
| 1205 | 18 | 2205 | 9 | ** Reissue claims in excess of 20 and over original patent |

SUBTOTAL (2)  ($)    0.00

**\*\*or number previously paid, if greater; For Reissues, see above**

## FEE CALCULATION (continued)

### 3. ADDITIONAL FEES

| Large Entity Fee Code | Fee ($) | Small Entity Fee Code | Fee ($) | Fee Description | Fee Paid |
|---|---|---|---|---|---|
| 1051 | 130 | 2051 | 65 | Surcharge - late filing fee or oath | |
| 1052 | 50 | 2052 | 25 | Surcharge - late provisional filing fee or cover sheet | |
| 1053 | 130 | 1053 | 130 | Non-English specification | |
| 1812 | 2,520 | 1812 | 2,520 | For filing a request for *ex parte* reexamination | |
| 1804 | 920* | 1804 | 920* | Requesting publication of SIR prior to Examiner action | |
| 1805 | 1,840* | 1805 | 1,840* | Requesting publication of SIR after Examiner action | |
| 1251 | 110 | 2251 | 55 | Extension for reply within first month | |
| 1252 | 420 | 2252 | 210 | Extension for reply within second month | |
| 1253 | 950 | 2253 | 475 | Extension for reply within third month | |
| 1254 | 1,480 | 2254 | 740 | Extension for reply within fourth month | |
| 1255 | 2,010 | 2255 | 1,005 | Extension for reply within fifth month | |
| 1401 | 330 | 2401 | 165 | Notice of Appeal | |
| 1402 | 330 | 2402 | 165 | Filing a brief in support of an appeal | |
| 1403 | 290 | 2403 | 145 | Request for oral hearing | |
| 1451 | 1,510 | 1451 | 1,510 | Petition to institute a public use proceeding | |
| 1452 | 110 | 2452 | 55 | Petition to revive - unavoidable | |
| 1453 | 1,330 | 2453 | 665 | Petition to revive - unintentional | |
| 1501 | 1,330 | 2501 | 665 | Utility issue fee (or reissue) | |
| 1502 | 480 | 2502 | 240 | Design issue fee | 480.00 |
| 1503 | 640 | 2503 | 320 | Plant issue fee | |
| 1460 | 130 | 1460 | 130 | Petitions to the Commissioner | |
| 1807 | 50 | 1807 | 50 | Processing fee under 37 CFR 1.17(q) | |
| 1806 | 180 | 1806 | 180 | Submission of Information Disclosure Stmt | |
| 8021 | 40 | 8021 | 40 | Recording each patent assignment per property (times number of properties) | |
| 1809 | 770 | 2809 | 385 | Filing a submission after final rejection (37 CFR 1.129(a)) | |
| 1810 | 770 | 2810 | 385 | For each additional invention to be examined (37 CFR 1.129(b)) | |
| 1801 | 770 | 2801 | 385 | Request for Continued Examination (RCE) | |
| 1802 | 900 | 1802 | 900 | Request for expedited examination of a design application | |

Other fee (specify) Advance Copies of Patent (3)       9.00

*Reduced by Basic Filing Fee Paid      SUBTOTAL (3)  ($)    489.00

## SUBMITTED BY

(Complete (if applicable))

| Name (Print/Type) | David K. S. Cornwell | Registration No. (Attorney/Agent) | 31,944 | Telephone | (202) 371-2600 |
|---|---|---|---|---|---|
| Signature | | | | Date | May 24, 2004 |

**WARNING: Information on this form may become public. Credit card information should not be included on this form. Provide credit card information and authorization on PTO-2038.**

This collection of information is required by 37 CFR 1.17 and 1.27. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

PART B - FEE(S) TRANSMITTAL

Complete and send this form, together with applicable fee(s), to: <u>Mail</u>

Mail Stop ISSUE FEE
Commissioner for Patents
P.O. Box 1450
Alexandria, Virginia 22313-1450

or <u>Fax</u>    (703) 746-4000

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 4 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Legibly mark-up with any corrections or use Block 1)

26111    7590    05/18/2004

STERNE, KESSLER, GOLDSTEIN & FOX PLLC
1100 NEW YORK AVENUE, N.W.
WASHINGTON, DC 20005

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**
I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being facsimile transmitted to the USPTO, on the date indicated below.

_____ (Depositor's name)

_____ (Signature)

_____ (Date)

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 29/203,335 | 04/14/2004 | William Marvin | 2073.0080001/DKSC/HMR | 3878 |

TITLE OF INVENTION: PORTION OF A MIDSOLE

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE | PUBLICATION FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|
| nonprovisional | NO | $480 | $0 | $480 | 08/18/2004 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| SIMONE, DOMINIC V | 2912 | D02-972000 |

1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☐ "FEE ADDRESS" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-02 or more recent) attached. **Use of a Customer Number is required.**

2. For printing on the patent front page, list (1) the names of up to 3 registered patent attorneys or agents OR, alternatively, (2) the name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 ___Sterne, Kessler, Goldstein & Fox P.L.L.

2 _____

3 _____

3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. Inclusion of assignee data is only appropriate when an assignment has been previously submitted to the USPTO or is being submitted under separate cover. Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE

Reebok International Ltd.

(B) RESIDENCE: (CITY and STATE or COUNTRY)

Canton, MA

Please check the appropriate assignee category or categories (will not be printed on the patent):    ☐ individual    ☒ corporation or other private group entity    ☐ government

4a. The following fee(s) are enclosed:

☒ Issue Fee
☐ Publication Fee
☒ Advance Order - # of Copies ___3___

4b. Payment of Fee(s):

☐ A check in the amount of the fee(s) is enclosed.
☒ Payment by credit card. Form PTO-2038 is attached.
☒ The Director is hereby authorized to charge the required fee(s), or credit any overpayment, to Deposit Account Number ___19-0036___ (enclose an extra copy of this form).

Director for Patents is requested to apply the Issue Fee and Publication Fee (if any) or to re-apply any previously paid issue fee to the application identified above.

(Authorized Signature)  David K. S. Cornwell, Esq.    (Date)    Reg. No. 31,944

NOTE: The Issue Fee and Publication Fee (if required) will not be accepted from anyone other than the applicant; a registered attorney or agent; or the assignee or other party in interest as shown by the records of the United States Patent and Trademark Office.

This collection of information is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, Alexandria, Virginia 22313-1450.

Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

TRANSMIT THIS FORM WITH FEE(S)

PTO-2038 (02-2003)
Approved for use through 02/28/2006.  OMB 0651-0043
United States Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# United States Patent & Trademark Office

## Credit Card Payment Form
## Please Read Instructions before Completing this Form

### Credit Card Information

| **Credit Card Type:** | ☐ Visa | ☐ MasterCard | ☒ American Express | ☐ Discover |
|---|---|---|---|---|

| | |
|---|---|
| Credit Card Account #: | 3785 727438 01005 |
| Credit Card Expiration Date: | 08/2005 |
| Name as it Appears on Credit Card: | SKGF P.L.L.C. |
| Payment Amount: $(US Dollars): | 489.00 |
| Signature: | _[signature]_   Date: May 24, 2004 |

**Refund Policy:** The Office may refund a fee paid by mistake or in excess of that required.  A change of purpose after the payment of a fee will not entitle a party to a refund of such fee. The Office will not refund amounts of twenty-five dollars or less unless a refund is specifically requested, and will not notify the payor of such amounts (37 CFR 1.26). Refund of a fee paid by credit card will be via credit to the credit card account.
**Service Charge:** There is a 50.00 service charge for processing each payment refused (including a check returned "unpaid") or charged back by a financial institution (37 CFR 1.21(m)).

### Credit Card Billing Address

| | |
|---|---|
| Street Address 1: | Sterne Kessler, Goldstein & Fox P.L.L.C. |
| Street Address 2: | 1100 New York Avenue, N.W. |
| City: | Washington |
| State: | D.C.    Zip/Postal Code : 20005-3934 |
| Country: | U.S.A. |
| Daytime Phone #: | (202) 371-2600    Fax #:  (202) 371-2540 |

### Request and Payment Information

Description of Request and Payment Information:
$480.00 Issue Fee; and
$9.00 Advance copies of patent.

| Patent Fee | Patent Maintenance Fee | Trademark Fee | Other Fee |
|---|---|---|---|
| Application No.  29/203,335 | Application No. | Serial No. | IDON Customer No. |
| Patent No. | Patent No. | Registration No. | |
| Attorney Docket No.  2073.0080001/DKSC/HMR | | Identify or Describe Mark | |

*If the cardholder includes a credit card number on any form or document other than the Credit Card Payment Form, the United States Patent & Trademark Office will not be liable in the event that the credit card number becomes public knowledge.*



**Sterne Kessler Goldstein Fox**
ATTORNEYS AT LAW

# Fax

☒ Urgent          ☐ Return reply requested          ☐ Original will be sent as confirmation

To:  U. S. Patent and Trademark Office

Attention:  **Kimberly Terrell**

From:  David K.S. Cornwell
        Attorney for Applicants
        Reg. No. 31,944

Pages (including cover sheet):  3

Fax No:  703 746 4658

Date:  May 24, 2004

Re:   Allowed U.S. Design Patent Application
      **Appl. No. 29/203,335**
      Filed:  April 14, 2004
      For:   Portion of a Midsole
      Inventors:  Marvin *et al.*
Our Reference:  2073.0080001/DKSC/HMR

# Message

Transmitted herewith are the following documents for appropriate action:

1. Request for Expedited Issuance of Design Patent Under MPEP 1309; and
2. A copy of the Notice granting the Request for Expedited Examination of the above-referenced design application.

Please note that the Issue Fee in the above-referenced allowed application is also being filed today by separate facsimile to Publications (Mail Stop Issue Fee) at (703) 746-4000, in accordance with the January 15, 2002 Official Gazette Notice.

### Certification of Facsimile Transmission

**I hereby certify that this paper is being facsimile transmitted to the Patent and Trademark Office on the date shown below.**

Amy D. Wise *adw*
Name

Date:      May 24, 2004

267743.1

If any portion of this transmission is not received clearly or in full,
contact us at 202.371.2600 or f 202.371.2540

This message is intended for the exclusive use of the individual or entity to which it is addressed. The message may contain information that is privileged, confidential, or otherwise exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, copying or use of this communication in any way is strictly prohibited. If you have received this communication in error, please call us collect immediately, and 4return the original message to us at the above address via the U.S. Postal Service.

Sterne, Kessler, Goldstein & Fox P.L.L.C. : 1100 New York Avenue, NW : Washington, DC  20005 : 202.371.2600 f 202.371.2540 : www.skgf.com

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re application of: | Confirmation No.: N/A |
| Marvin *et. Al.* | Art Unit: 2912 |
| Application No.: 29/203,335 | Examiner: Simone, Dominic V. |
| Filed: April 14, 2004 | Atty. Docket: 2073.0080001/DKSC/HMR |
| For: **Portion of a Midsole** | |

**Request for Expedited Issuance of Design Patent Under MPEP 1309**

**ATTN: Kimberly Terrell**
Commissioner for Patents
PO Box 1450
Alexandria, VA 22313-1450

Sir:

The Applicants respectfully request that the issuance of the above-referenced allowed application be expedited for the following reasons:

1. Applicants filed this application with a Request for Expedited Examination, which was subsequently GRANTED (copy attached); and

2. Applicants are aware of at least one infringement of the design claimed in this allowed application.

Accordingly, expedited issuance is respectfully requested. If additional information is required to approve this request, please contact the undersigned at the number provided.

Respectfully submitted,

STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.

David K. S. Cornwell
Attorney for Applicants
Registration No. 31,944

Date: __May 24, 2004__
1100 New York Avenue, N.W.
Washington, D.C. 20005-3934
(202) 371-2600

267629.1



UNITED STATES PATENT AND TRADEMARK OFFICE



COMMISSIONER FOR PATENTS
UNITED STATES PATENT AND TRADEMARK OFFICE
P.O. BOX 1450
ALEXANDRIA, VA 22313-1450
www.uspto.gov

APR 20 2004

STERNE, KESSLER, GOLDSTEIN & FOX PLLC
1100 NEW YORK AVENUE, N.W.
WASHINGTON DC 20005

In re Application of                     :
William Marvin                           :
Serial No.: 29/203,335                   :       **REQUEST FOR EXPEDITED**
Filed: April 14, 2004                    :              **EXAMINATION**
For: Portion of a Midsole                :

This is in response to the Request for expedited examination applicant filed April 14, 2004,
to expedite the above-identified application under the provisions of 37 CFR 1.155.

Applicant has satisfied the provisions set forth in 37 CFR 1.155, thus the petition is **GRANTED**.

The application will be forwarded to the examiner for action on the merits commensurate with
this decision.

Should there be any questions with regard to this letter please contact John Kittle by letter
addressed to the Director, Technology Center 3700/2900, and P.O. BOX 1450 ALEXANDRIA,
VA 22313-1450 or by telephone at (703) 308-0873 or by facsimile transmission at (703) 308-
3139.

*John E. Kittle*
---------------------------------------
John E. Kittle
Director
Technology Center 3700/2900



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | ISSUE DATE | PATENT NO. | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 29/203,335 | 08/31/2004 | D495127 | 2073.0080001/DKSC/HMR | 3878 |

26111    7590    08/12/2004
STERNE, KESSLER, GOLDSTEIN & FOX PLLC
1100 NEW YORK AVENUE, N.W.
WASHINGTON, DC 20005

RECEIVED
AUG 17 2004
STERNE, KESSLER,
GOLDSTEIN & FOX P.L.L.

# ISSUE NOTIFICATION

The projected patent number and issue date are specified above.

## Determination of Patent Term Extension or Adjustment under 35 U.S.C. 154 (b)

Design patents have a term measured from the issue date of the patent and the term remains the same length regardless of the time that the application for the design patent was pending. Since the above-identified application is an application for a design patent, the patent is not eligible for Patent Term Extension or Adjustment under 35 U.S.C. 154(b).

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (703) 305-1383. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at (703) 305-8283.

APPLICANT(S):

William Marvin, Brighton, MA;
Brian Christensen, Centerville, MA;

IR103 (Rev. 11/03)



US00D495127S

(12) **United States Design Patent**
Marvin et al.

(10) Patent No.: **US D495,127 S**
(45) Date of Patent: ** **Aug. 31, 2004**

(54) **PORTION OF A MIDSOLE**

(75) Inventors: **William Marvin**, Brighton, MA (US);
**Brian Christensen**, Centerville, MA (US)

(73) Assignee: **Reebok International Ltd.**, Canton, MA (US)

(**) Term: **14 Years**

(21) Appl. No.: **29/203,335**

(22) Filed: **Apr. 14, 2004**

**Related U.S. Application Data**

(62) Division of application No. 10/607,541, filed on Jun. 27, 2003.

(51) LOC (7) Cl. .................................................... **02-99**
(52) U.S. Cl. ........................................................ **D2/972**
(58) Field of Search .......................... D2/902, 907, 908,
D2/943, 944, 969, 972–974, 964–967; 36/45,
50.1, 77 M, 77 R, 83, 88, 113, 114, 126–130

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 1,081,442 | A | 12/1913 | Geiger | |
| D93,966 | S | 12/1934 | Bressler | |
| D95,767 | S | * 5/1935 | Marks | D2/965 |
| 2,048,683 | A | 7/1936 | Brockman | |
| D112,267 | S | * 11/1938 | Court | D2/965 |
| D125,773 | S | 3/1941 | Macauley | |
| 3,777,374 | A | 12/1973 | Hendricks | |
| D261,446 | S | * 10/1981 | Schmohl | D2/907 |
| 4,641,438 | A | 2/1987 | Laird et al. | |
| D290,542 | S | * 6/1987 | O'Rourke | D2/907 |
| 4,680,876 | A | 7/1987 | Peng | |
| 4,736,531 | A | 4/1988 | Richard | |
| D295,459 | S | 5/1988 | Zuidema et al. | |
| D295,691 | S | 5/1988 | Zuidema et al. | |
| D295,692 | S | 5/1988 | Zuidema et al. | |
| D296,384 | S | 6/1988 | Tong | |
| 4,760,651 | A | 8/1988 | Pon-Tzu | |
| 4,823,482 | A | 4/1989 | Lakic | |
| D301,659 | S | 6/1989 | Le | |
| D302,352 | S | 7/1989 | Austin | |

| | | | | |
|---|---|---|---|---|
| D303,451 | S | * 9/1989 | Weiner | D2/908 |
| 4,887,367 | A | 12/1989 | Mackness et al. | |
| 4,918,838 | A | 4/1990 | Chang | |
| 4,936,030 | A | 6/1990 | Rennex | |
| D316,773 | S | 5/1991 | Valle | |
| 5,014,449 | A | 5/1991 | Richard et al. | |
| D319,337 | S | 8/1991 | Hatfield | |
| D320,303 | S | 10/1991 | Kiyosawa | |
| D322,153 | S | 12/1991 | Schneider et al. | |
| D323,577 | S | 2/1992 | Kayano | |
| D324,940 | S | 3/1992 | Claveria | |
| D325,288 | S | 4/1992 | Richard et al. | |
| D326,355 | S | 5/1992 | Cotsidas | |
| D327,770 | S | 7/1992 | Prats et al. | |
| 5,181,873 | A | 1/1993 | Tolbert | |
| D334,463 | S | 4/1993 | Chang | |
| D334,833 | S | 4/1993 | Blissett | |
| 5,224,277 | A | 7/1993 | Sang Do | |
| D341,708 | S | 11/1993 | Blissett | |
| D344,401 | S | 2/1994 | Kilgore | |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 299 669 B1 | 12/1993 |
| FR | 2 563 979 | 5/1984 |
| GB | 2 244 200 A | 11/1991 |

OTHER PUBLICATIONS

Shoes, A Lexicon of Style by Valerie Steel; Rizzoli, 1999; p. 18, Ferragamo layered heel.*

*Primary Examiner*—Dominic Simone
(74) *Attorney, Agent, or Firm*—Sterne, Kessler, Goldstein & Fox P.L.L.C.

(57) **CLAIM**

The ornamental design for a portion of a midsole, as shown and described.

**DESCRIPTION**

FIG. **1** is a side view of a portion of a midsole showing our new design; and,
FIG. **2** is a cross sectional view thereof taken along line 2—2.
The broken line is environmental only and forms no part of the claimed design.

**1 Claim, 2 Drawing Sheets**





## US D495,127 S
Page 2

| U.S. PATENT DOCUMENTS | | | |
|---|---|---|---|
| D350,018 S | 8/1994 | Kilgore | |
| D350,019 S | 8/1994 | Kilgore | |
| D350,020 S | 8/1994 | Kilgore | |
| D350,225 S | 9/1994 | Kilgore | |
| D350,227 S | 9/1994 | Kilgore | |
| D350,433 S | 9/1994 | Kilgore | |
| 5,343,639 A | 9/1994 | Kilgore et al. | |
| D351,057 S | 10/1994 | Kilgore | |
| D351,720 S | 10/1994 | Kilgore | |
| 5,353,523 A | 10/1994 | Kilgore et al. | |
| D351,936 S | 11/1994 | Kilgore | |
| D352,155 S | 11/1994 | Merceron | |
| D352,157 S | 11/1994 | Merceron | |
| D352,159 S | 11/1994 | Kilgore | |
| D352,160 S | 11/1994 | Kilgore | |
| 5,367,792 A | 11/1994 | Richard et al. | |
| D354,617 S * | 1/1995 | Kilgore | ...................... D2/964 |
| 5,502,901 A | 4/1996 | Brown | |

| | | | |
|---|---|---|---|
| 5,505,010 A | 4/1996 | Fukuoka | |
| 5,595,002 A | 1/1997 | Slepian et al. | |
| D377,859 S | 2/1997 | Bramani | |
| 5,607,749 A | 3/1997 | Strumor | |
| 5,621,984 A | 4/1997 | Hsieh | |
| 5,625,966 A | 5/1997 | Perotto et al. | |
| D379,864 S | 6/1997 | Kayano | |
| D384,192 S | 9/1997 | Hsieh | |
| D388,241 S | 12/1997 | Merceron | |
| D404,896 S * | 2/1999 | Cooper | ........................ D2/972 |
| 5,901,467 A | 5/1999 | Peterson et al. | |
| 5,975,861 A | 11/1999 | Shin et al. | |
| 6,282,814 B1 | 9/2001 | Krafsur et al. | |
| 6,519,873 B1 | 2/2003 | Buttigieg | |
| D485,053 S * | 1/2004 | McDowell | .................. D2/972 |
| 2001/0049888 A1 | 12/2001 | Krafsur et al. | |
| 2003/0196354 A1 | 10/2003 | Chu | |

* cited by examiner



FIG.1

**U.S. Patent**    Aug. 31, 2004    Sheet 2 of 2    **US D495,127 S**



# FIG.2

**EXHIBIT D**
**(Part 1 of 17)**

A. GEIGER.

PIECED HEEL.

APPLICATION FILED MAY 20, 1912.

**1,081,442.**

Patented Dec. 16, 1913.



WITNESSES:

INVENTOR

Adolph Geiger

BY

ATTORNEY

COLUMBIA PLANOGRAPH CO., WASHINGTON, D. C.

# UNITED STATES PATENT OFFICE.

## ADOLPH GEIGER, OF BROOKLYN, NEW YORK.

### PIECED HEEL.

**1,081,442.**  Specification of Letters Patent.  **Patented Dec. 16, 1913.**

Application filed May 20, 1912.  Serial No. 698,573.

*To all whom it may concern:*

Be it known that I, ADOLPH GEIGER, a citizen of the United States, and a resident of the city of Brooklyn, county of Kings, and State of New York, have invented certain new and useful Improvements in Pieced Heels, of which the following is a specification.

The essential object of this invention is to provide a heel in which some or all of the lifts can be or are made of two or more pieces of leather, thus permitting the utilization of small pieces or remnants of leather which would have to be discarded or wasted entirely if it were necessary to form the lift of a single integral piece. The pieces of which the various lifts are composed, are so formed or shaped, however, that only as many nails will be required to hold the heel together as there are pieces to each lift. For example: In some of the figures a construction is shown in which there are two pieces to each lift, and in this construction only two nails will be necessary. In the other figures, the lifts are shown as being made of three pieces each, in which event three nails are necessary.

In the drawings Figure 1 is a bottom plan view of a pile of lifts assembled together before being secured together to form a heel, each of the lifts being made of two pieces of leather; Fig. 2 is a sectional view on the lines 2—2, Fig. 1; Fig. 3 is a bottom plan view of a pieced heel in which the upper two lifts are each formed of one piece, the remainder of the lifts being each formed of two pieces of leather; Fig. 4 is a section on the line 4—4, Fig. 3; Fig. 5 is an end elevation of a heel formed as shown in Figs. 3 and 4; Fig. 6 is a plan view showing the shape of the pieces used to form each of the lifts of the heels depicted in Figs. 1 to 5, inclusive; Fig. 7 is a view showing the shape of the pieces used to form the lifts depicted in Figs. 8 to 11, inclusive; Fig. 8 is a top plan view of a heel formed partly of three-piece lifts and partly of two-piece lifts; Fig. 9 is a view of a heel formed entirely of three-piece lifts, the jaws of a heel-building machine being shown in dotted lines; Fig. 10 is a sectional view on the line 10—10, Fig. 9; and Fig. 11 is an end elevation of a heel formed as shown in Figs. 7 to 10, inclusive.

In that form of the invention shown in Figs. 1 to 6, inclusive, the pieced lifts are made of two pieces each, which are shaped as shown in Fig. 6. Each piece is formed with one edge 1 which extends perpendicularly to the breast of the heel, and with edges 2, each of which is disposed obliquely to the edge 1 and to the breast. The two pieces comprising the heel are brought together and then the nails 3 are driven through the pieces, said nails being placed closely to the edges 1. The various lifts may be arranged with the joints between the two pieces of adjoining lifts crossing each other, as shown in Figs. 3, 4, and 5. In order to secure the best results, it is preferable that the top-most lift or lifts be each of one piece, as in Figs. 4 and 5, and the lower lifts is pieced.

In that form of the invention shown in Figs. 7 to 11, inclusive, the pieced heels are made of three pieces each, preferably shaped substantially as shown in Fig. 7, each piece being provided with a circular offset 5, and the three offsets 5 all engage each other, thus tending to lock the three pieces of the lift together. Each piece of the lift is provided with a recess or notch 6 adapted to receive the offset 5 of one of the other pieces. The heel may be composed entirely of lifts formed of three pieces each, as shown in Fig. 9, or there may be some lifts of three pieces each and some of two pieces each, as shown in Fig. 8. Two of the offsets 5 of the three-piece variety are so located that they will receive those nails which are specifically designated in Fig. 8, it being understood that the nails 3 in Fig. 8 are in the same position as the nails 3 in Fig. 5. In other words, the two nails which are indicated by reference numerals 3 in Fig. 8, and which are shown in Fig. 5, will catch and pass through both of the pieces of the two-piece lifts and will pass through two of the pieces of the three-piece lift.

It is preferable to make small heels of the two-piece lifts, such heels being suitable for ladies' and children's shoes, and to make large heels for men's shoes of three-piece lifts. The heel shown in Fig. 8 may be used for medium sized heels.

In that form of the invention shown in Figs. 1 to 6, inclusive, the nails are driven through that center line of the top lift which is parallel to the breast, and the nails are also equidistant from the center line which is perpendicular to the breast of the heel. In order to give all of the lifts the same

**2**                                      1,081,442

strength between the nail-hole and the joint, all of the edges 1 of all of the lifts are in registration with each other. The point 9 which is found at the angle between edge 1 and that edge 2 which extends to the curved portion or back of the heel, is preferably a little farther from the breast 11 of the heel than the exact geometric center of the smallest lift, this construction being used in order to allow as much stock as possible for the nail in the top lift of each heel. The angles 9 which are formed between the edges 1 and those edges 2 which lead to the breast of the heel, are not all uniform, but the angles 10 are the same in each lift.

It is to be noted that the edges 1 and 2 of the two piece lifts and the corresponding edges of the three piece lifts are each cut straight or perpendicularly to the surface of the lifts and of the pieces comprising the same. The various pieces forming the lifts, therefore, can be cut or stamped by dies or similar tools from the pieces of leather which are to be utilized, and each piece can be cut or formed by one stroke of the cutter and at a single operation. Each edge 1 or 2, therefore, abuts against the corresponding edge of the adjoining piece, and the shoemaker is enabled to dispense with interlocking or dove-tailed edges.

Many changes in the details of construction may be made without departing from the scope of the invention or of the various claims.

I claim as my invention:

1. A pieced heel comprising a plurality of lifts of two pieces each, each piece of each lift having a straight edge perpendicular to the breast of the heel, and two oblique edges, one extending from said straight edge to the breast and the other from said straight edge to the curved back of the heel, each piece being substantially perpendicular to the surface of that piece and of the lift of which the piece forms a part.

2. A pieced heel comprising a plurality of lifts of two pieces each, each piece of each lift having a straight edge perpendicular to and, if produced, bisecting the breast of the heel, and two oblique edges, one extending from said straight edge to the breast and the other from said straight edge to the curved back of the heel, each edge of each piece being substantially perpendicular to the surface of that piece and of the lift of which the piece forms a part.

3. A pieced heel comprising a plurality of lifts of two pieces each, each piece of each lift having a straight edge perpendicular to and, if produced, bisecting the breast of the heel, and two oblique edges, one extending from said straight edge to the breast and the other from said straight edge to the curved back of the heel, each edge of each piece being substantially perpendicular to the surface of that piece and of the lift of which the piece forms a part, said pieces being secured together by two nails, one nail being on one side of said edge which is perpendicular to the breast, and the other nail being on the other side of said edge.

4. A pieced heel composed of a plurality of lifts each of which is formed of two pieces, each piece having an edge which if produced would bisect the breast of the heel and extend perpendicularly thereto, each piece having also two edges extending outwardly from said first-mentioned edge and obliquely thereto, and a pair of nails driven through the heel, there being one nail on each side of said first-mentioned edge, the line connecting said nails being substantially parallel to the breast of the heel, each edge of each piece being substantially perpendicular to the surface of the lift.

In testimony whereof I have hereunto affixed my name in the presence of two witnesses.

ADOLPH GEIGER.

Witnesses:
  REBECCA C. TALBOT-PERKINS,
  JOSEPH A. MEEHAN.

---

Copies of this patent may be obtained for five cents each, by addressing the "Commissioner of Patents, Washington, D. C."

July 28, 1936.                O. BROCKMAN                2,048,683

RESILIENT HEEL

Filed Aug. 13, 1934



*Fig.1.*



*Fig.2.*    *Fig.3.*



*Fig.4.*

*Fig.6.*

*Fig.5.*

Inventor

Oscar Brockman

By *Mason Fenwick & Lawrence*
Attorneys

Patented July 28, 1936

2,048,683

# UNITED STATES PATENT OFFICE

2,048,683

## RESILIENT HEEL

Oscar Brockman, Louisville, Ky.

Application August 13, 1934, Serial No. 739,658

1 Claim.  (Cl. 36—35)

This invention relates to heels for shoes and it has for its object the provision of an elastic heel hollowed or grooved on the back and sides between the top and bottom faces in such manner as to provide a thin or substantially feather edge with the top face of the heel whereby when it is fitted to a shoe, the feather edge may be readily trimmed with a knife by those inexpert in the art of shoe repairing in such manner as to make a presentable job.

Another object of the invention is to provide a heel of the type described which can be attached by the user to the shoe by means of cementing, the thin edges being readily trimmed with an ordinary pocket knife without diminishing by a buffing machine.

Still another object of the invention is to provide a resilient heel, the sides and back of which terminate in a thin edge at the top whereby one size of heel may be fitted to several sizes of shoe by the mere act of trimming as above indicated.

A further object of the invention is the provision of an elastic heel having a deep groove furrowing its side and back faces whereby the resiliency of the peripheral portions of the heel at the sides and back is increased, enhancing the resiliency of the heel and improving its shock absorbing capacity.

A still further object of the invention in a heel of the class described is to provide a relatively thin intermediate horizontal section or neck permitting the bottom of the heel to twist relative to the top in both a lateral and rearward direction so that regardless of the tendency of the foot to turn inside or outside or the tendency of the walker to pound on the rear portion of the heel, the latter will always present its entire flat surface to the pavement, preventing the heel being worn over to one side or at the back.

Other objects of the invention will appear as the following description of preferred and practical embodiments thereof proceed.

In the drawing which accompanies and forms a part of the following specification and throughout the several figures of which the same characters of reference have been employed to designate identical parts:

Figure 1 is a side elevation of a shoe illustrating a heel embodying the principles of the present invention;

Figure 2 is a horizontal section taken along the line 2—2 of Figure 1;

Figure 3 is a vertical section taken along the line 3—3 of Figure 1;

Figure 4 is a side elevation of a modified form of the invention;

Figure 5 is a vertical section taken along the line 5—5 of Figure 4; and

Figure 6 is a plan view of the heel shown in Figure 4.

Referring now in detail to the several figures and first adverting to that form of the invention shown in the group of Figures 1 to 3, inclusive, the numeral 1 represents the heel which as shown is of substantially the same superficial area at the top face 2 and bottom face 3. The front face 4 of the heel is vertical as is customary in the art and as shown at 5 in Figure 2, it curves concavely. No novelty of invention is attributed to this front face of the heel.

Figures 1 and 3 show that a deep peripheral groove 6 extends along the lateral and back faces of the shoe. For the purpose of carrying out the invention, quite a deep groove is essential and while the invention is not restricted to any particular depth or shape of groove, a groove the sides of which converge at an acute angle is found most efficient in function.

The groove 6 is so situated that its upper side intersects the plane of the top face of the heel forming at the sides and back of the heel a thin or substantially feather edge 7. The top of the heel is designed to be cemented to the shoe in the position indicated at Figure 1. If then, any portion of the thin edge 7 projects beyond the edge of the shoe, it is an easy matter to trim the thin edge away so as to make the heel conform to the shoe, by crude means such as an ordinary pocket knife or a razor blade without any particular skill on the part of the user. Since the entire side and back faces of the heel do not have to be cut away, a neat job can be done without the use of a buffing or finishing machine.

The provision of the thin edge 7 and the facility by which it may be trimmed, makes it possible for one size of heel to be fitted to several sizes of shoe, it being merely necessary to trim away more or less of the thin edge 7 as the case may require. This is of advantage since it enables the retailer to stock only one-third as many sizes as he had to where each heel fits a particular sized shoe and no other size.

It is apparent from a contemplation of Figures 1 and 3 that the provision of the peripheral groove about three sides of the heel forms a relatively narrow intermediate portion or neck 8. When the pressure of the foot is put upon this heel, it is obvious that the foot can be twisted

**2**                                    2,048,683

from one side to the other and that the upper face 2 of the heel will assume different degrees of angularity both in a lateral direction and in a rear direction with respect to the lower face 3 of the heel. Thus, if the foot is put down in such a manner as to bring either the inner or outer edge of the heel against the pavement, the super-flexibility of the intermediate portion or neck will cause the heel to twist planting the entire flat lower face against the sidewalk. This prevents the heel being worn laterally or at the back which is a common fault with most heels.

The thinness of the cross section in the intermediate part of the heel also increases its resiliency and adds to its shock absorbing properties, while the fact that that portion of the foot which is above the groove 6 is unsupported, relieves the extending edges of the lower portion of the heel from excessive pressure and consequently, minimizes wear on these portions and lengthens the life of the heel.

Figures 4, 5, and 6 show a modified form of the invention in which that portion of the heel constituting the thin edges in Figures 1, 2, and 3 is entirely done away with and the heel 9 has no extending edges, but on the contrary its upper face is less than the area of its bottom face being off-set inwardly so as to form the groove or channel 10 around the front and sides of the heel. This heel is designed to be applied by cementing it to shoes which are larger than the upper face of the heel. Thus, no trimming is necessary. At least three sizes of heel should be provided to cover the entire range in the sizes of shoes, one heel being adaptable for several consecutive sizes of shoe smaller than itself. This heel has all the attributes of the heel shown in Figures 1, 2, and 3. The presence of the groove 10 decreases the cross section in horizontal planes intersecting said groove, thus increasing the resiliency and shock absorbing property of the heel.

The relatively large area of the lower face of the heel affords ample support for the foot, while the thin cross section at a distance above the bottom face of the heel permits the twisting action referred to in connection with Figures 1, 2, and 3 which prevents the bottom face of the heel being worn off on either side or at the back of the shoe.

It is contemplated that the heel may be made of rubber or rubber composition or any resilient composition having properties similar to those of rubber.

While I have in the above described what I believe to be preferred and practical embodiments of my invention, it will be understood by those skilled in the art that the details of construction are by way of example, and not to be construed as limiting the scope of the invention as claimed.

What I claim is:

Resilient heel having a groove in the lateral and rear faces, the sides of which converge at an acute angle, the upper side of said groove forming with the top face of said heel relatively thin edges, and the lower face of said groove forming with the bottom face a relatively broad base, said heel being designed for attachment to a shoe by cement applied to the upper face, the thin edge being adapted to be trimmed to conform to a shoe, the reduced horizontal section of said heel between said upper face and base permitting sidewise and rear deflection of said base under the initial pressure of the foot against the pavement whereby the entire surface of said base contacts the pavement preventing localized wear at the side and rear portions of said base.

OSCAR BROCKMAN.

# United States Patent [19]

**Hendricks**

[11] **3,777,374**

[45] **Dec. 11, 1973**

[54] **PLEASURE SHOE**

[76] Inventor: **Leslie Hendricks,** P.O. Box 111, Russell Springs, Ky. 42642

[22] Filed: **July 19, 1972**

[21] Appl. No.: **273,285**

[52] U.S. Cl. .................................................. **36/38**
[51] Int. Cl............................................. **A43b 21/30**
[58] Field of Search ......................................... 36/38

[56] **References Cited**
**UNITED STATES PATENTS**

| | | | |
|---|---|---|---|
| 175,998 | 4/1876 | Jensen | 36/38 |
| 458,010 | 8/1891 | Beach | 36/38 |
| 1,110,375 | 9/1914 | Budai et al. | 36/38 |
| 1,127,456 | 2/1915 | Kurz | 36/38 |
| 1,625,048 | 4/1927 | Nock | 36/38 |

*Primary Examiner*—Alfred R. Guest

[57] **ABSTRACT**

A footwear device that makes walking or standing a pleasure by aiding in prevention of foot and leg fatigue by putting a "bounce" in every step; the device consisting of a compression spring unit that is fitted into each shoe heel and which includes a bottom base member and top base member that are spaced apart and parallel to each other, the base members being interconnected by an integral, resilient, compression coil spring therebetween and which absorbs the shock of walking and which cushions the underside of a person's heel.

**1 Claim, 3 Drawing Figures**



PATENTED DEC 11 1973                                    3,777,374



Fig.1



Fig.2



Fig.3

3,777,374

1

## PLEASURE SHOE

This invention relates generally to footwear such as shoes and boots for being worn on persons' feet.

It is well known that to date all efforts for eliminating or ameliorating sore or tired feet have been by incorporating rubber heels on shoes and other footwear. The rubber wears away and compacts under the great pressure of heavy walking, so that depending on rubber for cushioning has not proved to be ideal.

Accordingly, it is a principal object of the present invention to provide an improved shoe footwear in which a fatigue arrestor is installed which overcomes the above described situation and which provides a cushioning and shock absorbing action throughout the life of the shoe or heel.

Another object is to provide a pleasure shoe which is designed in a model for supporting persons of normal or light weight, and also in a model for persons of heavy weight so to absorb the heavier load.

Still another object is to provide a pleasure shoe in which the shock absorbing action promotes a person to walk more erect and so encourage a better general good health.

Still another object is to provide a pleasure shoe that would be ideal for persons who walk for long hours in their work such as postmen, policemen, and nurses, or factory workers and others who stand for long hours on their feet.

Other objects are to provide a pleasure shoe which is simple in design, inexpensive to manufacture, rugged in construction, easy to use, and efficient in operation.

These and other objects will be readily evident upon a study of the following specification and the accompanying drawing, wherein:

FIG. 1 is a side view of the invention shown installed in a shoe.

FIG. 2 is a top view of one model of the invention designed for lesser weight factor.

FIG. 3 is a top view of another model designed for heavier weight factor.

Referring now to the drawing in detail, the reference numeral 10 represents a pleasure shoe according to the present invention wherein there is a spring or torque mechanism 11 that serves as a fatigue arrestor to a wearer of the shoe. The mechanism 11 is installed in the shoe heel 12 and comprises a one piece unit that includes a flat top base member 13, a flat bottom base

2

member 14 in parallel, spaced apart relation and which are interconnected by a compression coil spring 15 therebetween. The coil spring comprises a flexible flat rod 1/8 inch thick and 1/4 inch wide spring steel. Where the intermediate full circular spring enjoins the bases it is horizontal at opposite side from where segments extend relatively vertically. These opposing ends give a yielding "springboard" action to not strain the heel.

The model A in FIG. 2 is designed for persons wherein weight is not a factor to consider, while model B in FIG. 3 is designed for heavy persons such as those who weigh 200 or more pounds.

Compression between the external contact surface of the heel and a shoe plateau, on which the foot rests, makes it desirable to cement the spring cushion heel rest to the plateau of the shoe sole and the top side of the compiled spring to a complete coverage of sponge rubber for additional cushioning.

The pleasure shoe is adaptable for all shoe styles for men or women. The purchasers of the shoes are fitted to the fatigue arrestor by being fitted in the store. The pleasure shoe is trouble-free and long-lasting.

While various changes may be made in the detail construction, it is understood that such changes will be within the spirit and scope of the present invention as is defined by the appended claims.

I claim:

1. In a pleasure shoe the combination of a footwear shoe having a heel, and a fatigue arrestor installed in said heel, said fatigue arrestor comprising a spring mechanism, said spring mechanism comprising a top base member and a bottom base member with a compression coil spring therebetween, said coil spring being resiliently compressible under the weight of a person so to cushion his walking or standing, said coil spring comprising one full turn when used by a person where weight is not a factor to consider, and said coil spring comprising one and one-quarter turn when used by a person who weighs 200 or more pounds, said coil spring turn being of a generally square configuration with opposite sides of said square turn being parallel with said top and bottom bases, said top base enjoining a lower said parallel side while said bottom base enjoins a higher said parallel side.

*  *  *  *  *

# United States Patent [19]

## Laird et al.

[11] Patent Number: **4,641,438**

[45] Date of Patent: **Feb. 10, 1987**

[54] **ATHLETIC SHOE FOR RUNNER AND JOGGERS**

[76] Inventors: **Bruce A. Laird; Richard A. Laird,** both of Box 169, R.D. #1, Northampton, Pa. 18067

[21] Appl. No.: **671,699**

[22] Filed: **Nov. 15, 1984**

[51] Int. Cl.⁴ ........................ A43B 13/04; A43B 13/00
[52] U.S. Cl. ..................................... 36/59 C; 36/59 R; 36/32 R; D2/320
[58] Field of Search ..................... 36/103, 25 R, 32 R, 36/31, 59 R, 59 A, 59 C, 28; D2/320

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D. 119,291 | 3/1940 | Watanabe | D2/320 |
| D. 266,371 | 10/1982 | Stubblefield | D2/320 |
| 2,433,303 | 12/1947 | Spini | 36/59 C |
| 3,350,795 | 11/1967 | Schlecht | 36/55 |
| 3,785,646 | 1/1974 | Ruskin | 36/32 R |
| 4,283,865 | 8/1981 | Dassler | 36/59 C |
| 4,316,332 | 2/1982 | Giese et al. | 36/30 R |
| 4,402,146 | 9/1983 | Parracho et al. | 36/32 R |
| 4,439,936 | 4/1984 | Clarke et al. | 36/25 R |
| 4,445,286 | 5/1984 | Norton | 36/32 R |
| 4,501,077 | 2/1985 | Young | 36/25 R |

| | | | |
|---|---|---|---|
| 4,510,702 | 4/1985 | Ehrlich, Jr. | 36/31 |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2618588 | 11/1977 | Fed. Rep. of Germany | 36/59 R |
| 357157 | 3/1938 | Italy | 36/32 R |
| 328731 | 3/1958 | Italy | 36/32 R |

*Primary Examiner*—Werner H. Schroeder
*Assistant Examiner*—Steven N. Meyers
*Attorney, Agent, or Firm*—Ruth Moyerman

[57] **ABSTRACT**

An athletic shoe for running is disclosed. The shoe has a tread design of triangular faced, slope-sided, prism-shaped, canted studs arranged in a pattern which limits and controls impact forces conducted to the foot. A set of triangular, prism-shaped stabilizer pins molded laterally into and across the outersole protects the metatarsal bones and helps to propel the foot into the next step. Tetrahedral lateral heel stabilizers control lateral roll of the ankle area and pyramidal buttress supports at the stabilizer end reduce impact shock to the metatarsal area. An interior sole further reduces impact forces and an interior lining directs perspiration away from the foot.

**13 Claims, 12 Drawing Figures**



U.S. Patent    Feb. 10, 1987    Sheet 1 of 4    4,641,438



FIG. 1



FIG.4



FIG. 9



FIG. 3



FIG. 2



FIG. 8

FIG. 5



54
26
52
53

FIG. 10

FIG. 6



67
66 66
64

FIG. 7



FIG. 11

60
57
8
57
62
58
57
57
56
18
18
18
57

*FIG. 12*



4,641,438

1

### ATHLETIC SHOE FOR RUNNER AND JOGGERS

#### BACKGROUND OF THE INVENTION

1. Field of the Invention

This invention relates to athletic shoes, and in particular to shoes used for running where the user's body weight exceeds one hundred forty pounds.

2. Description of the Prior Art

In recent years, burgeoning interest in physical fitness and health has resulted in vast numbers of people pursuing running as a means of conditioning their bodies. Unfortunately, injuries to the joints, muscles, ligaments and tendons of the runner's lower extremeties has increased due in no small measure to ill-fitting and poorly designed running shoes. During contact of the running shoe with the running surface, a force of three to eight times body weight impacts on the runner's foot. The impact of the foot is absorbed by the running shoe or transmitted directly to the leg. The results of this impact on the foot and leg due to improperly designed shoes can be shin splints, muscle soreness, hamstring strains, stress fractures and sore knee joints.

Many devices have been proposed and patented over the years to improve the design and function of running shoes. U.S. Pat. No. 4,402,146 to Parracho et al discloses a runming shoe sole with heel tabs to increase lateral stability and reduce ankle fatigue. U.S. Pat. No. 4,430,810 to Bente discloses an outer sole for sports shoes having adjustable sole flexibility in the heel region adaptable to the individual requirements of the runner and track. U.S. Pat. No. 4,364,188 to Turner et al discloses a running shoe with a rear stabilization means to decrease the tendency to overpronation.

Other patents of interest relating to athletic shoes include U.S. Pat. No. 4,235,026; U.S. Pat. No. 4,378,643; U.S. Pat. No. 4,255,877; U.S. Pat. No. 4,245,406; U.S. Pat. No. 4,128,950 and U.S. Pat. No. 4,307,521. Although these shoes ameliorate to some extent the effects of impact shock to the foot, they do not completely resolve the problems.

#### SUMMARY OF THE INVENTION

The aforementioned prior art problems are overcome by the athletic shoe of this invention. The shoe has an outer sole with a tread comprised of canted, triangular-faced, prism-shaped, slant-sided studs of varying sizes. These studs are arrayed around the bottom of the sole in a predetermined configuration to absorb the greatest impact and dissipate the shock away from the foot. This is made possible both because of the stud's prism-shaped configuration and the distribution pattern.

Resilient stabilizer pins, preferably of a Teflon type material and having a triangular prism configuration, are molded laterally, face down, into the metatarsal area of the outer sole to displace pressure on the metatarsal bones during the pronation phase of the foot in running, and to help correctly propel the foot correctly into its next step.

Tetrahedral-shaped buttress supports, attached preferably by molding, to the ends of the stabilizer pins at the outer sole side direct the foot's impact shock away from the metatarsal area.

A lateral stabilization means comprising two tetrahedral-shaped tabs, one each attached to the sides of the outer sole heel area controls the amount of lateral roll of

2

the runner's ankle and reduces the stress transmitted thereby to the ankle and knee joints.

A second sole (not to be confused with the conventional innersole) of a resilient polymer such as polyurethane, is provided to reduce impact shock to the foot when the outer sole strikes the running surface.

Lastly, a lining in the upper shoe interior of natural or synthetic materials allows the perspiration of the foot to evaporate more efficiently and also modulates against overpronation of the foot.

It is therefore an object of this invention to provide a running shoe which, by means of a tread design and tread displacement, absorbs and dissipates impact shock from the running surface away from the foot.

It is another object of this invention to provide a shoe with stabilizer pins molded laterally into and across the outer sole metatarsal area to protect the metatarsal bones from impact forces entering in the pronation phase. Additionally, the pins aid the foot as it propels into the next step.

It is still another object of this invention to provide a buttress support system proximate the ends of the stabilizer pins which directs shock away from the metatarsal bones.

It is yet another object of this invention to provide a lateral stabilization means on each shoe side in the outer sole heel area which controls lateral roll motion and relieves stress on the ankle and knee joints.

It is yet another object of this invention to provide, through a natural or synthetic upper shoe lining, an efficient perspiration evaporation to control overpronation and over flexing of the foot, thereby maintaining a normal and natural form of the foot; to give support to the metatarsal bone structure, thereby maintaining a natural form of the foot under pressure; and to stabilize and control the amount of pressure placed on the metatarsal bone structure.

It is still a further object of this invention to provide an auxiliary interior sole of a resilient polymer to absorb shock transmitted from the outer sole to the shoe interior.

These and other objects will be more readily ascertainable to one skilled in the art by reference to the accompanying drawings and exemplary embodiments that follow.

#### BRIEF DESCRIPTION OF THE DRAWING(S)

FIG. 1 is a side elevation of the athletic shoe of this invention.

FIG. 2 is a bottom elevation of the device showing the stud design and tread configuration.

FIG. 3 is a longitudinal cross section of the device showing the interior shoe construction taken on lines 3—3 of FIG. 2.

FIG. 4 is a cross section taken on lines 4—4 of FIG. 2.

FIG. 5 is a side elevation of a stud.

FIG. 6 is a tilted isometric view of a stud.

FIG. 7 is yet another tilted isometric view of a stud.

FIG. 8 is an enlargement of a stabilizer pin.

FIG. 9 shows a top peel-back fragmentary view of the outer sole exposing the stabilizer pins. The buttress supports are shown in exploded view.

FIG. 10 is an enlargement of the buttress supports.

FIG. 11 is a side elevation of the shoe in phantom showing vectors used to pinpoint the stress epicenters and to show placement and outward extension of the buttress supports and lateral stabilizer.

4,641,438

3

FIG. 12 is a partial enlarged view of FIG. 2.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT(S)

Referring now to FIG. 1, shoe 8 includes outer sole 10, shown with tread studs 12 extending downward. Pyramidial lateral stabilizer 14 (one of a pair) is shown as a tab mounted to the outside edge of outersole 10 proximate heel area 5 with apex 11 extended upward to heel counter 16. Pyramidial buttress supports 18 are shown attached to the outside edge of outer sole 10 proximate the metatarsal, or midstance, area 7. Show upper 20 is covered with conventional synthetic material which is reinforced in the toe box area 22 and heel counter area 16.

Also shown are conventional Achilles pad 6 and ties 13. Lastly, sole toe-off area 9 is shown which, together with heel area 5 and midstance area 7, are reference areas for placement of studs 12, as will be explained in reference to FIG. 2.

Referring now to FIG. 2 and FIG. 12, the bottom area of outer sole 10 is shown with studs 12 arranged in a predetermined pattern to form the ground contacting part of the tread. Referring first to heel area 5, three circumferential heel studs 28 generally cover heel area 5 with their apexes 29 converging at the forward center of heel area 5. Faces 31 of heel studs 28 are canted inward toward apex 29. Heel studs 28, and all other studs as well, are also shown with sloped sides 27 which give the pyramidial or five-faced down configuration which is shown more clearly in FIGS. 5 and 6.

Forward of heel area 5 is midstance area 7. Midstance area 7 includes three sets of studs. A single elongated, longitudinally disposed stud 30 is shown as the only member of the first set. Its face 33 is canted tward shoe inside edge 35. Three arch studs 32 and seven midstance circumferential studs 34 comprise set two. Arch studs 32 are positioned adjacent elongated stud 30 and generally between opposed circumferential studs 34 proximate the inside of sole 10. Faces 37 of arch studs 32 are canted toward adjacent circumferential studs 34. Faces 39 of circumferential stud 34 cant inward toward adjacent arch studs 32. Set three of midstance studs is comprised itself of three sets of studs—lateral midstance studs alpha 36, beta studs 38 and gamma studs 40 are positioned in the metatarsal area 23 of sole 10. The midstance studs are all canted toward shoe outside edge 47.

Lastly, a set of lateral studs 42 and eleven toe area circumferential studs 43 are located in toe-off area 9 and a single truncated pyramid shaped stud 44 is located in the front of the tread with its apex extending around into toe box 22 (see FIG. 1).

Also shown in FIG. 2 are lateral stabilizers 14 which extend outward from outer sole 10 and buttress supports 18 which also are shown extending outward from outer sole 10.

Referring now to FIG. 3 which is a cross section taken on lines 3—3 of FIG. 2, outer sole 10 is again shown having studs 12 extending downward. The bottoms of studs 12 are not parallel to the shoe bottom but are slightly canted as explained previously and also as shown again in FIGS. 4 and 5. Ends 53 of stabilizer pins 26 are shown extending laterally through outer sole 10. Their exact placement, as well as buttress supports 18, is extremely important and is predetermined as will be shown in reference to FIG. 9.

4

FIGS. 3 and 4 together show the layers of materials of shoe 8 as they are disposed under the foot. Beginning with outsole 10, shoe upper 20 and then interior sole 24 are positioned above outer sole 10. Both extend from the heel area to the toe area. Next in upward order is interior lining 21 which is preferably a natural skin, although synthetic material could be substituted so long as it gives the equivalent absorbent quality. FIG. 3 shows also that the shoe 10 is constructed so that lining 21 wraps around the foot except for a thin conventional foot pad 25.

Referring now to FIG. 5, an individual and representative stud 12 is shown in side view having sloped sides 46, stud face 48 which is shown canted (or sloped) and which is the face which contacts the running surface, and base 50 which joins outer sole 10.

Referring now to FIGS. 6 and 7, stud 12 is shown from a top view in FIG. 6 having sloped sides 46, stud face 48 which contacts the running surface, and base 50 which interfaces with outer sole 10. In FIG. 7, stud 12 is shown tilted from another angle having sloped sides 46, stud face 48 and stud base 50.

FIG. 8 shows more clearly the prismatic configuration of stabilizer pin 26 including base 52, apex 54 and end 53.

Referring now to FIG. 9, a peel-back of a partial view of sole 10 shows the three stabilizer pins 26 in place. In FIG. 9, outer sole 10 is shown peeled back at the longitudinal cross section of sole 10 where stabilizer pins 26's apex 54 lies. When studs 12 impact the running surface, the impact force is conducted to stabilizer pin base 52 from apex 54, and from there both to the sole and also outward to buttress supports 18 (shown exploded in this view). Buttress supports 18 aid in dissipating the impact force away from stabilizer pins 26 and therefore away from the user's foot.

Referring now to FIG. 10, buttress support 18 is shown having base 64. Sides 66 indicate the surface of the prism along which the impact force is dissipated. Rear face 67, visible in this view, abuts the shoe.

The tetrahedral configuration of lateral stabilizers 14 and buttress supports 18, the pyramidial configuration of tread studs 12 and the triangular configuration of stabilizer pins 26 are extremely important. These shapes and configurations act to spread the impact shock over a greater area of the foot. This dissipation phenomena is due to the mathematically proven relationships inherent in triangles and pyramids, etc. wherein force or stress at the apex travels in downward and outward vectors and is therefore dissipated over the larger base area.

FIG. 11 shows the major design parameter points of the shoe construction. Point 56 indicates the main contact point of outer sole 10 with the running surface which locates lateral stabilizer 14. Point 58 indicates the forward end point of toe box 22 and single stud 44. Point 60 locates the position of shoe upper 20 lace grid. Point 62 locates the top of heel counter 16. By extending vectors, variously 57, from these primary points, the location of other necessary components are sited including buttress supports 18.

There are many variations which may be practiced within the scope of this invention. Although stabilizer pins 26 are preferably made of Teflon, other resilient materials may be used so long as they are lightweight, but have strength and flexibility characteristics.

Interior sole 24 is preferably formed of EVA polyurethane, but other similar materials may be used. The outer shoe upper construction is conventional and

4,641,438

5

forms no part of this invention. Any materials now in common use are satisfactory. Likewise, laces on shoe upper 20 may be replaced with Velcro fasteners. Interior lining 20 may be manmade or of natural fiber material but natural animal skin is preferred.

The sole of this invention has many advantages. Chief among these is that the shoe tread configuration of studs absorbs and dissipates impact shock from contact of the shoe tread with the running surface.

Secondly, the stabilizer pins absorb and direct impact shock away from the metatarsal bones and help propel the foot into the next step.

Thirdly, the lateral stabilizers control lateral foot roll and thereby alleviate stress placed on the ankle and knee joints.

Fourthly, the pyramidal buttress supports dissipate impact shock and support the metatarsal bones.

Fifthly, the interior sole reduces and absorbs impact shock conducted from the outer sole towards the foot.

Lastly, the interior lining directs perspiration away from the foot and helps to control overpronation of the foot.

Overall, the shoe is especially useful to the overweight and underconditioned runner which is the runner most likely to be injured.

Having now illustrated and described my invention, it is not intended that such description limit this invention, but rather that the invention be limited only by a reasonable interpretation of the appended claims.

What is claimed is:

1. In an athletic shoe intended for runners having a body weight exceeding one hundred forty pounds having a shoe upper covering, an interior sole, a shoe upper, a heel counter and a toe end including a toe box, an elastomeric outer sole including a heel area, a midstance and a toe-off area and an outer sole outside edge and inside edge, the improvement comprising an outer sole formed of resilient material having thereon a plurality of triangular faced, slope sided, prism shaped, canted studs distributed circumferentially around and laterally and longitudinally thereon, said outer sole bottom in a predetermined configuration including three circumferential studs in the heel area and wherein said three heel studs are oriented and canted so that the apexes of each of their triangular faces converge proximate said heel areas' forward center and wherein said three heel studs are sized to substantially cover said heel area to maximize the displacement of impact force when a runner's heel touches the ground, said predetermined configuration also including three sets of studs in said midstance area, said first midstance area set comprising a single elongated, longitudinally disposed stud oriented to receive the impact of the runner's foot when it touches ground in the pronation phase of impact, and wherein said longitudinal studs triangular face is canted toward the shoe's inside edge, said second midstance area set comprising three arch studs longitudinally disposed with respect to each other throughout said sole's arch area and interspersed between opposed facing, circumferential studs and said elongated studs, said arch studs being canted toward said adjacent circumferential opposed studs and said circumferential studs being canted toward adjacent arch studs, said third set of midstance studs comprising an alpha, beta and gamma row of lateral metatarsal studs, said rows being generally parallel to each other with said metatarsal stud's triangular faces being canted toward said sole outside edge.

6

2. The athletic shoe according to claim 1 wherein there are two sets of lateral studs in said toe-off area to give the foot traction, propulsion and lift-off, said first set comprising two side-by-side groups of three studs each, each of said groups of three studs forming a triangular configuration, apex oriented and canted toward said toe end of said shoe, said second toe-off set comprising a single, truncated pyramid-shaped toe box stud.

3. The athletic shoe according to claim 1 comprising, additionally, three resilient stabilizer pins, said pins each having a triangular prism configuration and wherein said pins are disposed laterally and coextensively through the metatarsal area of said outer sole, one each at generally the cuneiform, metatarsal and phalanges area of the foot, said pins being oriented so that a face of said prism opposes said outer sole, said pins thereby maximizing dissipation of foot contact shock at these areas.

4. The athletic shoe according to claim 3 comprising, additionally, six buttress supports, said supports each having a tetrahedral configuration, one face on said support being attached to an exterior surface of each of said stabilizer pins with said tetrahedron apex being vertically oriented upward from said outer sole and a tetrahedron face being in a plane generally parallel with said outer sole, said supports decreasing in size from heel area to toe-off area.

5. An athletic shoe according to claim 3 wherein said stabilizer pins are comprised of resilient polymer.

6. An athletic shoe according to claim 3 wherein said outer sole is molded together with said stabilizer pins.

7. The athletic shoe according to claim 1 comprising, additionally, a pair of lateral stabilization means, said means having a tetrahedral configuration with one face of one of said tetrahedrons each attached to opposing sides of said shoe at the outer sole heel area with said tetrahedron apex vertically oriented upwards from said sole and said stabilizer being joined to said heel counter so that a face of said tetrahedron is generally parallel with said outer sole.

8. An athletic shoe according to claim 7 wherein said lateral stabilization means is vulcanized to said outer sole and said heel area.

9. The athletic shoe according to claim 1 comprising, additionally, an interior lining, said lining covering generally interior surfaces of said shoe upper contacting the wearer's foot, to modulate the foot contour and enhance perspiration evaporation.

10. The athletic shoe according to claim 9 comprising, additionally, an interior sole, said interior sole being positioned between said shoe outer covering and said shoe interior lining and formed from ethylene vinyl acetate polyurethane.

11. An athletic shoe according to claim 9 wherein said interior lining is comprised of animal skin.

12. An athletic shoe according to claim 9 wherein said interior lining is comprised of synthetic fibers.

13. In an athletic shoe intended for runners having a body weight exceeding one hundred forty pounds, having an outer sole, an interior sole and a shoe upper, the improvement comprising:

    (a) an elastomeric outer sole including a heel and metatarsal area, said sole formed of resilient material and having a plurality of triangular faced, prism-shaped canted studs arcuately and laterally distributed around said sole bottom in a predetermined configuration to absorb and dissipate impact

4,641,438

**7**

shock entering through said outer sole when said studs contact a running surface;

(b) a plurality of resilient stabilizer pins, said pins having a triangular prism configuration and wherein said pins are disposed laterally and coextensively through the metatarsal area of said outer sole, said pins being oriented so that a face of said prism opposes said sole, said pins thereby providing maximum dissipation of contact shock;

(c) buttress supports, said supports having a tetrahedral configuration, one face of said support being attached to an exterior surface of said stabilizer pins with said tetrahedron apex being vertically oriented upward from said sole and a tetrahedron face being in a plane parallel with said outer sole;

**8**

(d) a pair of lateral stabilization means, said means having a tetrahedral configuration with one face of one of said tetrahedrons each attached to opposing sides of said outer sole heel area with said tetrahedron apex vertically oriented upwards from said sole and said stabilizer being joined to said shoe upper heel counter so that a face of said tetrahedron is generally parallel with said outer sole;

(e) an interior sole, said interior sole being positioned between said shoe outer covering and said shoe interior lining and formed from ethylene vinyl acetate polyurethane; and,

(f) an interior lining, said lining covering generally all interior surfaces of said upper shoe contacting the wearer's foot, to modulate the foot contour and enhance perspiration evaporation.

\* \* \* \* \*

# EXHIBIT D
# (Part 2 of 17)

# United States Patent [19]

## Peng

[11]  Patent Number:  **4,680,876**

[45]  Date of Patent:  **Jul. 21, 1987**

[54]  **ARTICLE OF FOOTWEAR**

[76]  Inventor:  **Koh K. Peng,** Jalan C. 10, Taman
Melawati, Setapak, Kuala Luppur,
Malaysia

[21]  Appl. No.: **673,610**

[22]  Filed:  **Nov. 21, 1984**

[51]  **Int. Cl.**[4] ...................... **A43B 21/28;** A43B 21/26;
A43B 21/22

[52]  **U.S. Cl.** ................................... **36/35 B;** 36/34 R;
36/35 R; 36/37

[58]  **Field of Search** .................... 36/34 R, 35 R, 35 B,
36/37, 38, 27, 28, 29, 3 R, 3 B, 36 R

[56]  **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,942,312 | 1/1934 | Tutoky | 36/38 |
| 2,387,334 | 10/1945 | Lemke | 36/38 |
| 2,825,154 | 3/1958 | Windle | 36/38 |
| 2,836,907 | 6/1958 | Windle | 36/38 |
| 3,429,545 | 2/1969 | Michel | 36/38 |
| 4,129,951 | 12/1978 | Petrosky | 36/29 |
| 4,342,158 | 8/1982 | McMahon et al. | 36/35 B |
| 4,455,766 | 6/1984 | Rubens | 36/38 |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 333847 | 10/1919 | Fed. Rep. of Germany | 36/35 R |
| 2901084 | 7/1980 | Fed. Rep. of Germany | 36/29 |
| 465267 | 4/1914 | France | 36/35 R |
| 262803 | 2/1929 | Italy | 36/35 B |

*Primary Examiner*—Werner H. Schroeder
*Assistant Examiner*—Steven N. Meyers
*Attorney, Agent, or Firm*—Anthony A. O'Brien

[57]  **ABSTRACT**

An article of footwear has a heel upper **(1)(1***b***)(1***c***)(1***d***)** components and lower **(2)** components of which are spring loaded apart to limit stop positions either by a volume of elastomeric material **(5)(7)(70***b***)** or by a gas spring. In accordance with the invention means **(48)(48***a***)(48***b***) (48***c***)(48***d***)** is provided which is adjustable to vary the rate of the spring without alteration of the limit stop position to which the components **(1)(1***b***)(1***c***)(1***d***)** and **(2)** of the heel are urged by the spring **(5)(70)(70***b***).**

**17 Claims, 24 Drawing Figures**





*FIG. 1*



*FIG. 2*

*FIG. 3*



*FIG. 4*



*FIG.5*



*FIG. 6*



FIG.7



FIG.8



FIG.9

**U.S. Patent**   Jul. 21, 1987    Sheet 4 of 9    **4,680,876**



FIG. 10



FIG. 11



FIG. 12



*FIG. 13*



*FIG. 14*



*FIG. 15*



FIG. 16



FIG.17



FIG.18



FIG.19



FIG.20

FIG.21



FIG. 22

FIG. 23

FIG. 24

4,680,876

| 1 | 2 |

# ARTICLE OF FOOTWEAR

## BACKGROUND OF THE INVENTION

This invention relates to an article of footwear.

The desirability of providing the ground-engaging part, more especially the heel, of an article of footwear, with a shock-absorption capacity greater than is practicably obtainable by the resilience of the material used in the construction of the article per se has been recognised for many years. To make walking on hard pavements, for example, more comfortable it has been proposed to incorporate helical metal compression springs or gas springs. For example, U.K. patent specification No. 200,368 of 1922 proposes the use of air springs in both the sole and heel regions of a boot. The problem remains, however, that comfort is determined by the relationship between the weight of the wearer, the hardness of the surface on which he is walking and the rate of the spring medium. It is a sine qua non that the spring medium should be capable of restoring the shape of the unloaded article between steps, but this can be achieved with a spring medium of such low shock-absorption as to represent very little improvement in wearer comfort. On the other hand a high shock-absorption characteristic is achieved with a relatively "hard" spring which may cause discomfort through excessive "bounce".

Prior art efforts to overcome this problem, i.e. to adapt the spring rate to the particular user, have involved (a) in the case of gas springs the introduction or exhaustion of gas (for example U.K. patent specification No. 200,368) and (b) in the case of rubber or metal springs their replacement with springs of different rate (for example U.K. patent specifications Nos. 390,368 and 427,126). Neither of these solutions is satisfactory because a source of compressed gas is not always readily available, and whereas metal springs suited to the user's weight may be selected they cannot readily be changed whenever he walks on different surfaces. These operations are in any case elaborate and expensive and not easily carried out by the wearer as occasion demands and without access to special equipment or accessories.

U.K. patent specification No. 456,979 discloses a heel sprung by a helical compression spring the rate of which can be varied by turning a screw. Here, however, the same screw determines the limit of telescopic extension of the two parts of the heel and consequently any variation of the spring rate will also affect the height of the unloaded heel and alter the extent of telescopic extension of the two heel components. U.K. patent specification No. 456,979 is not regarded by the present applicant as a practicable proposal, for example because of the manifest danger of loosening of the woodscrew, but even with improvements of a non-inventive character this specification does not disclose a sprung heel which can be readily adjusted by the wearer without affecting characteristics of the heel distinct from the rate of the spring.

## SUMMARY OF THE INVENTION

A principal object of the present invention is to overcome the drawbacks of prior art proposals and fulfil this long-felt want in a simple and commercially practicable manner.

In accordance with the present invention there is provided an article of footwear comprising upper and lower components capable of limited movement toward and away from one another, a spring medium between said components and a member adjustably movable with respect to one of said components to very the rate of the spring without alteration of the limit stop positions to which the unloaded components are urged by the spring medium.

In preferred constructions the components have peripheral walls one of which telescopically receives the other, said walls defining an enclosure for the spring medium and having respective, oppositely-directed abutments which come into contact to prevent separation of the components.

A collapsible member between said components may define an enclosure for the spring medium, and the collapsible member may be reinforced by a wall extending from one of said components toward the other adjacent the collapsible member, said wall serving also to limit the approach of said components.

The collapsible member may be of concertina configuration, and radially innermost and radially outermost portions of the member may be thickened or otherwise reinforced to provide annular bead formations which become stacked when the member is collapsed, thereby limiting the approach of said components.

In embodiments in which the enclosure is defined by a collapsible member the components may be additionally interconnected by a telescopic link articulated to one of the components and adapted to prevent relative lateral movement of said components except accompanied by relative angular movement about the point of articulation.

The adjustable member preferably comprises a head portion which is rotatable but non-axially displaceable relative to said one component, the head portion being engageable on the side of said one component remote from the other for rotating the same and being integral on the other side of said one component with a screw-threaded shank portion in engagement with a screw-threaded bore in a compression element, the arrangement being such that rotation of the shank causes axial displacement relative thereto of the compression element which in turn varies the rate of the spring medium.

The head preferably has a formation for engagement by a tool to rotate the same and a peripheral formation for keying engagement with a plug which covers the head in use of the article and is non-rotatable relative to said one component but which plug is disengageable from said head to permit access thereto by said tool.

Said spring medium may be a gas spring in an enclosure between said components and the adjustable member may be adjustably movable relative to one of the components into or out of the enclosure, thereby to vary the volume of the enclosure and hence the rate of the gas spring.

Alternatively, said spring medium may be a body of elastomeric material, in which case the compression element preferably spans the area within the, or the innermost, wall and is in sliding contact therewith.

In embodiments in which a gas spring is used, the enclosure of the gas spring may be defined by an annular collapsible element which extends between the compression element and the other of said components, the compression element having a peripheral recess into which the collapsible element will be received if the compression element is forced into contact with said other component.

4,680,876

3

Alternatively, the cross-sectional area of the compression element may be less than that of the enclosure and a, or a second, collapsible element may extend in gas-tight manner between said one component and the periphery of the compression element.

Where a link is used, separation of said components may be limited by the abutment of an enlargement of one part of the link with a shoulder in a bore of another part of the link, said other part of the link being constituted by said screw-threaded shank portion. Said components may be the upper and lower components of a hollow heel structure.

BRIEF DESCRIPTION OF THE DRAWINGS

Preferred embodiments of the invention will now be described with reference to the accompanying drawings, in which:

FIGS. 1 and 2 are sectional elevations of a hollow heel structure taken respectively on the lines G—G and H—H of FIG. 3,

FIG. 3 is a plan view of the heel of FIGS. 1 and 2 with upper parts removed,

FIGS. 4 and 5 are views similar to FIG. 1 with the heel in different states of compression,

FIG. 6 is an exploded view illustrating the different components of the heel of FIGS. 1–5,

FIGS. 7 and 8 are sectional elevations of a second embodiment of a hollow heel in accordance with the invention, taken respectively on the lines I—I and J—J of FIG. 9,

FIG. 9 is a plan view with upper parts removed of the heel of FIGS. 7 and 8,

FIGS. 10 and 11 illustrate the heel of FIGS. 7–9 in different states of compression,

FIG. 12 is an exploded view of the heel of FIGS. 7–11, showing the different elements of its construction,

FIGS. 13, 14 and 15 are similar side sectional elevations of a third embodiment of hollow heel in accordance with the invention showing the elastomeric spring in different states of compression,

FIG. 16 is an exploded view of the heel of FIGS. 13–15, showing the elements of its construction,

FIGS. 17 and 18 illustrate optional variants of the embodiment of FIGS. 13–16,

FIG. 19 is a side sectional elevation of a third embodiment of a hollow heel in accordance with the invention,

FIG. 20 illustrates in side sectional elevation a fourth embodiment of a hollow heel in accordance with the invention in three angular attitudes,

FIG. 21 is a sectional plan view taken on the line XXI—XXI of FIG. 20, and

FIGS. 22–24 illustrate a fifth embodiment of a hollow heel in accordance with the invention, FIG. 22 being a perspective view showing outer parts of the heel in phantom lines, FIG. 23 being a side sectional elevation and FIG. 24 being an exploded view showing the individual elements of the construction.

DETAILED DESCRIPTION OF THE INVENTION

The hollow heel for a boot or shoe illustrated in FIGS. 1–6 comprises upper and lower components 1 and 2 which are relatively telescopic but the extension of each of which relative to the other is limited by limit stop means comprising flanges 1A and 1B defining limit stop positions between which said components are capable of limited movement toward and away from one another as shown in FIG. 1. The upper component 1 of

4

the heel is connected to the underside of the rear portion of the sole 27 of the associated article of footwear by T-flanges 31 on the sole 27 which locate in T-slots 34 in the heel component 1 and by an apertured lug 32 on the sole 27 which locates in a recess in the upper surface of the component 1 and is held therein by a pin 37.

In a central position the rear portion of the sole 27 is formed with a hole 41 in which a plug 44 can be seated. The plug 44 has a radial lug 47 which engages in a radial extension 41A of the hole 41 when the plug is seated in the hole, to prevent rotation of the plug 44 in the hole 41 for a reason to be later explained, and the plug is formed with a slit 45 in which any suitable instrument, such as a screwdriver or penknife, can be inserted when it is desired to remove the plug 44 from the hole 41.

The heel illustrated is a spring heel to which resilience is imparted by a gas spring. The gas spring is constituted by a mass of gas (such as air) trapped in a sealed enclosure 5 within the hollow heel, the enclosure being formed by a collapsible tubular concertina-like membrane 58 sealed at its opposite ends by a disc 60 fixed to the lower heel component 2, and by a disc 59 fixed to a compression element 54.

The compression element 54 has a central, internally screw-threaded blind bore 53 and has peripheral lugs 55 which, by engaging in grooves 56 in the inner periphery of the wall of the upper heel component 1, prevent rotation of the element 54 while permitting it to move in the up-and-down direction. Such up-and-down movement is controlled by the external screw-threads of a shank of a rotatable member 49, which has a reduced-diameter head portion 48 held against axial displacement in a hole 43 in the upper heel component 1 by a circlip 50. The circlip 50 engages in a peripheral groove 57 in the head 48 below peripheral splines 51 of the head which, when the plug 44 is positioned as in FIGS. 1 and 2, engage the teeth 46 so that the plug prevents rotation of the rotary part 48,53 of the compression member 48,53,54. The free end of the head 48 is formed with a slot 52 which can be engaged by a suitable tool such as a screwdriver, or even a coin, when it is desired to adjust the compression member 48,53,54 after removing the plug 44.

To reduce friction the upper component 1 and the lower component 2 of the hollow heel each have ribs 9 contacted by the other component. A sealing ribbon 10 is located between the parts in a recess in component 2 but to allow the entry and expulsion of air between components 1 and 2 outside the enclosure 5 a channel 11 is provided in the wall of component 2.

In use of the heel 1, 2 illustrated the rate of the gas spring 5 can be adjusted at any time by the wearer, without simultaneously varying the overall height of the unloaded heel (FIGS. 1 and 2) by removing the plug 44 from the hole 41 in the sole 27, rotating the rotatable part 48,49 of the compression member by means of a tool inserted in the slot 52 and then repositioning the plug 44 to hold the rotatable part 48,49 in its new position. Rotation of the part 48,49 in one sense will drive the part 54 downward, thereby forcing gas (such as air) in the enclosure 5 under greater initial pressure while its rotation in the other sense will relieve the pressure of the gas spring 5.

As shown in FIG. 4, telescopic contraction of the heel under abnormal forces is limited by abutment of the free end of the wall of component 1 with the bottom of component 2. In the exceptional circumstances that the pressure in gas spring 5 has been increased by moving

4,680,876

5

the element 54 down so far that, when the heel "bot-toms out" under an exceptional load, the element 54 will contact the floor of heel part 2 at the same time as, or even before, the wall of component 1 the fully col-lapsed membrane 58 will, as shown in FIG. 5, be re-ceived into an annular peripheral recess of the element 54.

The exploded view of FIG. 6 shows how the heel assembly of FIGS. 1–5 can be put together. The heel component 1 with the compression member 48,49,54 mounted therein is inserted in the heel component 2 by passing the ribbed flange 1A under the ribbed flange 1B. At the same time the gas spring 5 is positioned in heel component 2, after which the front of heel component 2 is closed off by inserting T-formations 17 on opposite sides of a front wall 16 in T-grooves 18 at opposite extremities of the wall of part 2. A flange 22 enters a slot 21 and notches 20 snap over protrusions 19. T-forma-tions 31 of the sole 27 are now slid into T-slots 34 in component 1, lug 32 is pressed into its recess in compo-nent 1 until locking pin 37 can be inserted and finally the plug 44 is positioned in hole 41 to engage the splines on head 48.

The embodiment of FIGS. 7–12 resembles that of FIGS. 1–6 and like parts have like references. In this case, however, the axially movable compression ele-ment 54A does not act on the collapsible element 58A but instead is of lesser diameter than the element 58A which extends into contact with the underside of the top of heel component 1. However, the compression element 54A is connected to a second, inner collapsible element 62 extending between element 54A and the underside of the top of component 1. The effect of axially displacing the element 54A by rotating the ele-ment 48A is thus not to compress the element 58A but to vary the volume of the gas spring 5 and therefore the pressure prevailing therein, assuming that the mass of the gas is constant. To prevent the element 54A being screwed fully off the element 48A a cord 64 passes through an eye 66 in part 54A and emerges from a bore in part 48A to be engaged by a clip 65.

The collapsible element 58 of FIGS. 1–6, or each collapsible element 58A and 62 of FIGS. 7–12 may be of bellows-like configuration and may be made of metal. They may be manufactured in the following way. An originally cylindrical metal tube may be first subjected to lateral forces to give it a bellows-like configuration and then subjected to longitudinal forces to give it the desired length. As shown in FIG. 12 two tubes 58A and 62 of different length and diameter are then assembled, as by welding, with discs 60 and 63 which close one of their respective ends and a washer 59A which bridges the other end of the larger tube 58A and the other end of the smaller tube 62 defining the gas-tight enclosure 5.

In use gas, such as air, is introduced at suitable pres-sure into the enclosure 5 before it is sealed. When the wearer of the article of footwear wishes to alter the resilient characteristics of the heel he first removes the plug 44, e.g. by insertion of a penknife or screwdriver in the slit 45 and then by engaging the recess 52 with a suitable tool, such as a screwdriver, he rotates the mem-ber 48A so that the bellows 62 is extended, as shown in FIG. 11 or contracted, as shown in FIG. 10. The effect of extending the bellows 62 is to "harden" the resilient heel, because the volume of the enclosure 5 is reduced, while the effect of contracting the bellows 62 is to "soften" the resilient heel because the volume of the enclosure 5 is effectively increased, the mass of the gas

6

in the enclosure 5 in both cases remaining constant. Having adjusted the heel to his satisfaction the wearer simply replaces the plug 44 in the hole 41, whereupon the teeth 46 engage the splines of the head 48 to prevent any unintended rotation and consequently any unin-tended alteration of the rate of the gas spring 5.

The embodiment of the invention illustrated in FIGS. 13–16 differs from the previous embodiments in that the gas spring 5 is replaced by a spring in the form of a body 70 of resilient material, such as foam rubber (natural or synthetic) and the rate of the spring is varied by varying the amount of compression applied to the body 70 by a compression element 54B. In other respects, however, this embodiment of a hollow heel resembles those of FIGS. 1–6 and 7–12 and like parts have like reference numerals.

In the embodiment of FIGS. 13–16 the body 70 of foam rubber is encapsulated in a rigid lining member 72 which serves to prevent extrusion of the foam rubber outwardly of the wall of component 1 of the heel and which receives the compression element 54B as a tight sliding fit. The compression element 54B is reinforced on its upper surface by flanges 69 to prevent distortion under load. To prevent the compression element 54B becoming detached from the rotary element 49 the screw-thread of the latter terminates at 68.

FIG. 13 shows the compression element 54B in its highest possible position within the hollow heel, so that the spring 70 is as "soft" as possible. In FIG. 14 the spring 70 has been "hardened" as much as possible by displacing the compression element 54B as far as possi-ble down the rotary element 48B. FIG. 15 illustrates what happens when the heel, "hardened" as in FIG. 14, is subjected to an exceptional load. In these conditions the body 70 is fully compressed but will return the components 1 and 2 of the heel to the position of FIG. 14 when the heel is relieved of load.

FIGS. 17 and 18 illustrate optional variants of the embodiment of FIGS. 13–16. In FIG. 17 the lining member 72 can be dispensed with because the lower heel component 2B is telescopically received in the upper heel component 1B, instead of vice versa. The outwardly-directed, ribbed flange at the upper end of the wall of component 2B is entrapped by an inwardly directed flange 89 fixed by screws to the lower end of the wall of component 1B. In FIG. 18 the wall of the lower component 2C is telescopically received in an annular slot in the wall of the upper heel component 1C. Relative telescopic movement of the components 1C and 2C is limited by pins 91 which extend inward of the slot from the wall of component 1C and are engaged in respective channels 92 in the wall of component 2C.

The embodiments of FIGS. 19 and 20,21 differ from the remaining embodiments by the absence of mutually telescopic, rigid walls on the upper and lower compo-nent of the hollow heel. In these embodiments a rigid wall 1D depends from the upper wall component but this serves primarily to limit downward movement of the upper component relative to the lower component, as well as helping to prevent distortion of the collapsible wall 2D of the lower heel component. In FIG. 19 both the radially innermost and the radially outermost por-tions of the bellows-like collapsible element 2D are thickened as at 2E. These thickenings both reinforce the structure of the collapsible element 2D and adopt a stacked formation if the element 2D is fully compressed, in effect providing solid inner and outer annuli which

4,680,876

7                                                              8

protect from distortion the thinner, web portions of the element 2D which connect them.

In place of the co-operating flanges 1A,1B of previous embodiments movement away from one another of the ground-engaging part 29 of the lower component 2D of the heel and its upper component 1D is limited by a telescopic link 93 having an enlarged head reciprocable in a bore in the rotatable element 48D. This bore is of reduced diameter at its lower end to provide an annular shoulder which the enlarged head of the link 93 will abut when the heel is of maximum permitted height. An advantage of the embodiments of FIGS. 19,20 and 21 over those previously described is that angular movement between the upper and lower heel components 1D and 29 is permissible except under conditions of maximum load as exemplified by the lowest of the three views of FIG. 20. The link 93 and co-operating bore in the part 48D prevent relative lateral movement of the upper and lower components of the heel except accompanied by relative angular movement about the point 94 of articulation of the link 93 to the lower heel component 2D. The extent of permitted angular deflection in a given direction can be controlled by the shape of a recess 95 in which the lower end of the link 93 is seated, and angular deflection in a given direction can be prevented altogether by an upright stop 96. In a preferred construction relative angular movement between the upper and lower components of the heel is permitted in one direction only, the stop 96 being of rearwardly-opening horseshoe shape as shown in FIG. 21. By this arrangement, as illustrated by the successive views of FIG. 20, maximum shock-absorption is provided when, in walking, the rear of the heel first strikes the ground, by the permitted angular deflection of the two components of the heel. This advantage is obtained, however, without instability of the heel to forces applied laterally or forwardly.

The embodiment of the invention illustrated in FIGS. 22–24 resembles those of FIGS. 1–6 and 7–12, like parts having like reference numerals, but in this embodiment the gas spring 5 is constituted by a tubular membrane 78 which is sealed in a gas-tight manner to the periphery of the compression element 54 at one end and to the periphery of a disc 79 at its other end. Both of these peripheries have grooves 81 in which the respective end of the membrane 78 is clamped by a ring 80. Additional rings 82 occupy corrugations along the length of the membrane 78 to reinforce it. As in the embodiment of FIGS. 7–12 a cord 64 passed through a loop in the compression element 54 and held by a U-shaped member 65 seated in the head 48A prevents total separation between the rotary part 48A and the axially-movable part 54 of the compression component.

I claim:

1. An article of footwear comprising a ground-engaging part comprising upper and lower components, limit stop means associated with said components to define limit stop positions between which said components are capable of limited movement toward and away from one another, a spring medium between said components, a compression element movable relative to one of said components independently of the limit stop means, an adjustable member which is rotatable but not axially displaceable relative to said one component and means operatively connecting the adjustable member and the compression element whereby rotation of the adjustable member displaces the compression element toward or away from said one component thereby to vary the rate

of the spring medium without altering said limit stop positions between which the components are relatively movable by, or against the action of, the spring medium.

2. An article as claimed in claim 1, wherein the components have peripheral walls one of which telescopically receives the other, said walls defining an enclosure for the spring medium and having said limit stop means comprise respective, oppositely-directed flanges which come into contact to prevent separation of the components.

3. An article as claimed in claim 1, wherein a collapsible member between said components defines an enclosure for the spring medium.

4. An article as claimed in claim 3, wherein the collapsible member is reinforced by a wall extending from one of said components toward the other adjacent the collapsible member, said wall serving also to limit the approach of said components.

5. An article as claimed in claim 3, wherein the collapsible member is of concertina configuration.

6. An article as claimed in claim 5, wherein radially innermost and radially outermost portions of the collapsible member are thickened or otherwise reinforced to provide annular head formations which become stacked when the member is collapsed, thereby limiting the approach of said components.

7. An article as claimed in claim 6, wherein the adjustable member comprises a head portion which is rotatable but non-axially displaceable relative to said one component, the head portion being engageable on the side of said one component remote from the other for rotating the same and being integral on the other side of said one component with a screw-threaded shank portion in engagement with a screw-threaded bore in a compression element, the arrangement being such that rotation of the shank causes axial displacement relative thereto of the compression element which in turn varies the rate of the spring medium.

8. An article as claimed in claim 7, wherein the head portion has a formation for engagement by a tool to rotate the same and a peripheral formation for keying engagement with a plug which covers the head portion in use of the article and is non-rotatable relative to said one component but which plug is disengageable from said head portion to permit access thereto by said tool.

9. An article as claimed in claim 8, wherein said spring medium is a body of elastomeric material.

10. An article as claimed in claim 8, wherein said spring medium is a gas spring in an enclosure between said components and wherein the adjustable member is adjustably movable relative to one of the components into or out of the enclosure, thereby to vary the volume of the enclosure and hence the rate of the gas spring.

11. An article as claimed in claim 10 wherein the compression element spans the area within the, or the innermost, wall and is in sliding contact therewith.

12. An article as claimed in claim 11, wherein the enclosure of the gas spring is defined by an annular collapsible element which extends between the compression element and the other of said components, the compression element having a peripheral recess into which the collapsible element will be received if the compression element is forced into contact with said other component.

13. An article as claimed in claim 1, wherein said components are upper and lower components of a hollow heel structure.

4,680,876

9

14. An article of footwear comprising a ground-engaging part comprising upper and lower components, limit stop means associated with said components to define limit stop positions between which said components are capable of limited movement toward and away from one another, a spring medium between said components, a compression element movable relative to one of said components independently of the limit stop means, an adjustable member which is rotatable but not axially displaceable relative to said one component, a screw-threaded interconnection operatively connecting the adjustable member and the compression element and means for preventing rotation of the compression element with the adjustable member whereby rotation of the adjustable member displaces the compression element toward or away from said one component thereby to vary the rate of the spring medium without altering said limit stop positions between which the components are relatively movable by, or against the action of, the spring medium.

15. An article of footwear comprising upper and lower components, limit stop means associated with said components to define limit stop positions between which said components are capable of limited movement toward and away from one another, a spring medium between said components and a member adjustably movable with respect to one of said components independently of the limit stop means to vary the rate of the spring without alteration of the limit stop position to which the unloaded components are urged by the spring medium, a collapsible member of concertina configuration between said components defining an enclosure for the spring medium, radially innermost and radially outermost portions of the collapsible member being thickened or otherwise reinforced to provide annular bead formations which become stacked when the member is collapsed, thereby limiting the approach of said components, and a telescopic link additionally interconnecting said components, the link being articulated to one of the components and being adapted to prevent relative lateral movement of said components except accompanied by relative angular movement about the point of articulation.

16. An article of footwear comprising upper and lower components, limit stop means associated with said components to define limit stop positions between which said components are capable of limited movement toward and away from one another, a spring medium between said components and a member adjustably movable with respect to one of said components independently of the limit stop means to vary the rate of the spring without alteration of the limit stop position to which the unloaded components are urged by the spring medium, a collapsible member of concertina configuration between said components and defining an enclosure for the spring medium, radially innermost and radially outermost portions of the collapsible member being thickened or otherwise reinforced to provide annular bead formations which become stacked when the member is collapsed, thereby limiting the approach of the components, the adjustable member comprising a head portion which is rotatable but non-axially displaceable relative to said one component, the head portion being engageable on the side of said one component remote from the other for rotating the same and being integral on the other side of said one component with a

10

screw-threaded shank portion in engagement with a screw-threaded bore in a compression element, the arrangement being such that rotation of the shank causes axial displacement relative thereto of the compression element which in turn varies the rate of the spring medium, the head having a formation for engagement by a tool to rotate the same and a peripheral formation for keying engagement with a plug which covers the head in use of the article and is non-rotatable relative to said one component but which plug is disengageable from said head to permit access thereto by said tool, the spring medium being a gas spring in an enclosure between said components and the adjustable member being adjustable movable relative to one of the components into or out of the enclosure, thereby to vary the volume of the enclosure and hence the rate of the gas spring, the cross-sectional area of the compression element being less than that of the enclosure and a second collapsible element extending in gas-tight manner between said one component and the periphery of the compression element.

17. An article of footwear comprising upper and lower components, limit stop means associated with said components to define limit stop positions between which said components are capable of limited movement toward and away from one another, a spring medium between said components and a member adjustably movable with respect to one of said components independently of the limit stop means to vary the rate of the spring without alteration of the limit stop position to which the unloaded components are urged by the spring medium, the adjustable member comprising a head portion which is rotatable but nonaxially displaceable relative to said one component, the head portion being engageable on the side of said one component remote from the other for rotating the same and being integral on the other side of said one component with a screw-threaded shank portion in engagement with a screw-threaded bore in a compression element, the arrangement being such that rotation of the shank causes axial displacement relative thereto of the compression element which in turn varies the rate of the spring medium, a collapsible member of concertina configuration between said components and defining an enclosure for the spring medium, radially innermost and radially outermost portions of the collapsible member being thickened or otherwise reinforced to provide annular bead formations which become stacked when the member is collapsed, thereby limiting the approach of the components, the components being additionally interconnected by a telescopic link articulated to one of the components and adapted to prevent relative lateral movement of said components except accompanied by relative angular movement about the point of articulation, the spring medium being a gas spring in an enclosure between said components, the adjustable member being adjustably movable relative to one of the components into or out of the enclosure, whereby to vary the volume of the enclosure and hence the rate of the gas spring, separation of the said components being limited by the abutment of an enlargement of one part of the link with a shoulder in a bore of another part of the link, said other part of the link being constituted by said screw-threaded shank portion.

* * * * *

# United States Patent [19]

## Richard

[11] Patent Number: **4,736,531**

[45] Date of Patent: **Apr. 12, 1988**

[54] **ATHLETIC SHOE FOR AEROBIC EXERCISE AND THE LIKE**

[75] Inventor: **Daniel J. Richard,** Grand Rapids, Mich.

[73] Assignee: **Wolverine World Wide, Inc.,** Rockford, Mich.

[21] Appl. No.: **37,415**

[22] Filed: **Apr. 13, 1987**

[51] Int. Cl.⁴ ........................ **A43B 5/00;** A43B 13/14; A43B 17/18; A43B 23/07

[52] U.S. Cl. .......................................... **36/114;** 36/10; 36/31; 36/45; 36/55

[58] Field of Search ............... 36/10, 96, 55, 45, 30 R, 36/28, 31, 32 R, 3 A, 59 A, 59 R

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,664,728 | 4/1928 | Behr | 36/114 |
| 1,803,554 | 5/1931 | Knilans | 36/114 |
| 2,109,884 | 3/1938 | Hill | 36/45 |
| 2,147,197 | 2/1939 | Glidden | 36/45 X |
| 2,205,577 | 6/1940 | Roberts | 36/45 |
| 3,363,342 | 1/1968 | Stohr | 36/28 X |
| 3,555,706 | 1/1971 | Edmonds | 36/114 |
| 4,364,188 | 12/1982 | Tuner et al. | 36/31 |
| 4,402,146 | 9/1983 | Parracho et al. | 36/32 R X |
| 4,541,186 | 9/1985 | Mulvihill | 36/114 |
| 4,559,722 | 12/1985 | Norton | 36/89 |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 540572 | 10/1941 | United Kingdom | 36/55 |

*Primary Examiner*—Stuart S. Levy
*Assistant Examiner*—Thomas R. Hannon
*Attorney, Agent, or Firm*—Price, Heneveld, Cooper, DeWitt & Litton

[57] **ABSTRACT**

An athletic shoe having an inner, forefoot-enveloping and gripping, elastic slipper sock for encompassing the forepart of the foot, the bottom of the elastic slipper sock being anchored to the sole assembly and being independent of the shoe upper, to move simultaneously with the foot and keep the shoe in tune with the foot. An extended toe bumper has medial and lateral cutouts astraddle the metatarsalphalangeal joint line to form vertically narrower portions. These cooperate with flexible mesh interconnecting portions of a bifurcated vamp in the upper, to effect controlled forefoot independence.

22 Claims, 2 Drawing Sheets





FIG. I



FIG. 2

**FIG. 3**



**FIG. 4**



4,736,531

| 1 | 2 |

## ATHLETIC SHOE FOR AEROBIC EXERCISE AND THE LIKE

### BACKGROUND OF THE INVENTION

This invention relates to athletic footwear for aerobics.

Within the last decade, tremendous developments have been made in the construction of athletic footwear. In the early stages of these recent developments, much emphasis was placed on improvements for running and jogging activities. These running shoes have been adopted by the public for many other athletic activities. Although running footwear does often provide certain benefits for other activities, many of these different activities in fact require different characteristics from the footwear.

In aerobic exercise there are many movements not encountered during running and jogging events, and movements that are accentuated in extent and/or rapidity and/or frequency, as contrasted to other athletic activities. Examples of these are repeated, rapid lateral thrust movements and frequent substantial vertical flexing of the foot. Aerobic exercisers spend considerable time on the forefoot. Consequently, a study of footwear and foot movements during aerobic activities has demonstrated the undesirable tendency of the foot to move independently of the shoe far too often, many times even moving partially or totally off of the shoe support. The foot also tends to shift about laterally within the shoe, and in general to move before the shoe moves in response, after which the shoe moves in the direction of the foot in a delayed action, without always terminating in conformity with the foot. In short, the shoe does not stay "in tune" with the foot. Some potential results are general lack of comfort, lack of security and confidence during the exercise, blisters, pain and possible injury. Increasing popularity of aerobic style exercise increases the odds of difficulty.

There have been some prior efforts to incorporate features for keeping athletic shoes on the feet during vigorous activities. These have been in specialty athletic shoes for sports such as basketball and gymnastics, basically to bind the shoe more securely to the foot. These include the use of wraparound gore straps emanating from the heel region of the shoe to fasten tightly at the tongue, to tightly bind the shoe onto the foot, and straps that encircle and bind the midfoot and connect by Velcro(R) fasteners at the instep region. There has also been a totally elastic racing shoe for running races.

### SUMMARY OF THE INVENTION

The object of this invention is to provide an athletic shoe especially suited for aerobic exercising, specially constructed to keep the shoe "in time" with the foot. The shoe effects comfortable containment of the foot even during the abrupt lateral thrusts and extended vertical flexes experienced in this vigorous activity.

The athletic shoe of this invention comprises a specially formed combination of elastic forefoot slipper sock within a footwear shell, the elastic slipper sock being integrally anchored within the sole assembly but basically unattached to the shoe upper. It extends beneath the inner sole, being bonded to the sole assembly beneath the inner sole. The forefoot elastic slipper sock extends throughout the forepart of the shoe to totally encompass the forepart of the foot. The slipper sock has a rearwardly-upwardly oriented, foot-receiving opening defined by a forwardly-upwardly extending peripheral edge extending up from the heel region of the sole to the instep region at the tongue area. The portion of the slipper sock over the instep region of the foot includes a foam cushion layer serving also as the shoe tongue.

The shoe has an extended polymeric toe bumper which not only extends around the toe of the shoe but also extends back on the medial and lateral sides beyond the widest part of the shoe to the narrower instep region. This stability-adding toe bumper has medial and lateral cutouts producing vertically narrower and flexible connector portions adjacent and astraddle the ball region of the foot. These provide forefoot shoe flexibility relative to the rest of the shoe, giving controlled independence to the forefoot sole. The extended toe bumper also inhibits toe delamination. This toe bumper cooperates with a U-shaped flex gap extending forwardly along both sides of the shoe and across the top, and containing mesh fabric to connect the adjacent two portions of the vamp. These features facilitate shoe flex in direct response to movement of the elastic slipper sock with the foot.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a side elevational view of a shoe made in accordance with this invention;

FIG. 2 is a side elevational view of the shoe sole assembly and integrally bonded elastic slipper sock, with portions of the shoe upper shell shown in phantom;

FIG. 3 is a top plan view of the shoe, with the left front quarter portion of the vamp being cut away to depict the underlying forefoot slipper sock for illustrative purposes; and

FIG. 4 is a perspective view of the elastic forefoot slipper sock, with the rear portion of the inner sole shown in phantom.

### DESCRIPTION OF THE PREFERRED EMBODIMENT

Referring now specifically to the drawings, the novel aerobic exercising shoe 10 includes a sole assembly 12 and an upper assembly 14 defining a foot receiving cavity and including an outer shell and an elastic forefoot slipper sock 16 for enveloping and gripping the forepart of the foot.

Sole assembly 12 includes an outer polymeric sole 20 which incorporates an integrally molded transverse polymeric section 22 underlying the widest part of the shoe beneath the metatarsal-phalangeal joint line, to be beneath what is commonly called the ball of the foot, extending from the lateral side to the medial side of the shoe. This section 22 has a durometer significantly less than the remaining portions of outer sole 20, for cushion resilience and flexibility. Specifically, section 22 is of a soft gum rubber or natural rubber with a durometer of about 50–55 Shore A scale, whereas outsole 20 is a hard rubber with a durometer of about 70 Shore A scale. The bottom of section 22 is substantially at the same level as the bottom of the outer sole, generally. The sole assembly also includes a polymeric midsole 24 which extends the full length of the sole assembly. In typical fashion, midsole 24 has a lower durometer and greater compressibility than outer sole 20, being an EVA polymer with a durometer of about 55 Shore C scale. An inner sole 26 is installed in a manner to be described in more detail hereinafter.

4,736,531

3

Shoe upper **14** is an outer shell, preferably of leather, which includes a lower heel portion **30** and an upper heel portion **32**, the forward end of the latter terminating at the lacing strips and also defining an upper foot-receiving opening. Extending around lower heel portion **30** is a rigid heel cup **34** for reinforcement and stability. This heel cup is typically of a stiff polymer bonded to midsole **24** around the periphery of the heel cup. The forward portion of shoe upper **14** is a vamp which is bifurcated into upper vamp portion **36***a* and toe vamp portion **36***b*, these being separated from each other by a U-shaped gap which extends along both sides of the shell and across the top, forwardly of the lacing strips. Extending across this gap is a narrow band of porous mesh fabric **38**, as of nylon or the equivalent. This band thus extends around in front of the U-shaped lacing strip **38** which has two lacing strip portions **38***a* and **38***b* (FIG. 3). Laces (not shown) extend across the lacing opening to form closure means in conventional fashion. The lacing strip has opposite lacing orifices **40** such as the speed lacing orifices depicted in FIGS. 1 and 3. Mesh **38** extends, therefore, around both the medial and axial sides of the shoe upper, in a downwardly-rearwardly direction adjacent the instep portion of the foot, and then upwardly rearwardly to abut heel portion **32** (FIG. 1).

A semi-rigid toe bumper **28** vertically overlaps the midsole and a small bottom portion of the toe, as well as the juncture between the midsole and toe. This toe bumper extends rearwardly past the widest portion of the shoe which is at the metatarsal-phalangeal joint line, and back to the instep portion as depicted. Adjacent the opposite edges of flex member **22**, there are vertical cutouts **28***'* in the lower portion of the toe bumper forming vertically narrower connections at those locations, so that the vertical dimension of this toe bumper is considerably less. These effect vertical flexibility to the shoe and, especially when combined with the flexibility offered by the gap and mesh band **38** in the shell upper, enable the forefoot portion of the shoe to have controlled independence with optimum flexibility.

Located within the shell of the shoe upper is the special elastic forefoot slipper sock **16**. This slipper sock is made of a four way stretch material such as Spandex(TM) or equivalent materials on the market. This elastic member extends throughout the entire forepart of the shoe, having an upwardly-rearwardly oriented foot-receiving opening defined by a peripheral edge **50** which tapers upwardly-forwardly from the heel region at the bottom, i.e., at the sole, to the instep region at the top, i.e., at the tongue area. This instep, tongue region includes a thin layer of foam material at **16'**, retained in position within a dual layer of the stretch material as by a series of surrounding stitches **52**. This effects cushioning and serves as a shoe tongue.

This elastic slipper sock, which is preferably seamless, includes a bottom which is anchored within the sole assembly, preferably by adhesive bonding. It extends beneath the inner sole to be between the inner sole and the midsole. The bottom of member **16** is bonded to the underlying midsole **24** and also to the overlying inner sole **26**. The extension of this bottom part beneath the front part of the heel combined with the top part extending over the instep at the tongue causes the rising rear part of the foot to elastically torque the rear of the shoe upper shell into a following movement. The remaining portion of the elastic slipper sock, however, is basically, and preferably totally, unconnected to the

4

shoe upper so as to be free to move simultaneously with the foot by stretching. In an experimental model, a tacking stitch was placed between the shoe upper and member **16** at one location. Although this construction was advantageous compared to the prior art, the totally unconnected arrangement is functionally notably better and preferable.

The insole can be a single member or two members. If it is composed of two members, the bottom member is bonded to the underlying slipper sock while the top member is normally simply positioned on top of the bottom member and left unadhered.

Conceivably the elastic member could be extended to encompass the entire heel region of the foot, as well as the forepart of the foot. However, it has been determined that this does not add to the benefits and complicates putting the shoes on one's feet.

The novel shoe assembly has demonstrated remarkable capacity to keep "in tune" with the foot during vigorous aerobic exercises. The elastic slipper sock tightly envelops the forefoot of the foot, lending comfort and security while containing the foot, i.e., supplying comfort containment. The slipper sock moves totally simultaneously with the foot, stretching momentarily away from the shoe as necessary, but almost immediately bringing the shoe into total conformity with the foot. This rapid reaction of the shoe to the slipper sock and foot combination is further aided by the narrower regions at the cutouts in the toe bumper and the flex gap and connecting band between the two portions of the vamp. This porous flex band also aids in breathing of the shoe.

Certain additional advantages and features may be apparent to those in the art upon studying this disclosure, or may be experienced by persons employing the novel shoe structure. Furthermore, certain minor variations could conceivably be made in the construction without departing from the concept presented. Therefore, the invention is intended to be limited not by the specific details of the preferred illustrative embodiment set forth, but only by the scope of the appended claims and the reasonably equivalent structures thereto.

The embodiments of the invention in which an exclusive property or privilege is claimed are defined as follows:

**1**. An athletic shoe for aerobic exercising and the like comprising:

a sole assembly;

an upper secured to said sole assembly, defining a foot-receiving cavity and having closure means for retention of the shoe on a foot;

a forefoot-enveloping and gripping, elastic slipper sock in said cavity encompassing the forepart of said cavity, said elastic slipper sock having a bottom anchored to said sole assembly and free to grip onto a foot in said cavity independent of said upper; and

an insole having a forward portion in said slipper sock on the inner upper surface of said slipper sock bottom.

**2**. The shoe in claim **1** wherein said elastic slipper sock is substantially unattached to said shoe upper to be generally free to stretch and move relative to said upper.

**3**. The shoe in claim **1** wherein said elastic forefoot slipper sock is totally unattached to said shoe upper to be completely free to stretch and move relative to said upper.

4,736,531

5

**4.** The shoe in claim **1** wherein said elastic slipper sock bottom extends to the front of the heel and having its upper part over the instep region.

**5.** The shoe in claim **4** wherein said elastic slipper sock comprises a stretchable elastic fabric having a foam layer in the instep region to serve also as a shoe tongue.

**6.** The shoe in claim **1** wherein said bottom of said elastic slipper sock is bonded to said sole assembly to anchor it.

**7.** The shoe in claim **6** wherein said sole assembly includes a midsole, and said elastic slipper sock bottom is bonded to the top of said midsole and to the bottom of said insole.

**8.** The aerobic exercise shoe in claim **1** wherein said insole comprises a lower insole member adhered to said elastic slipper sock bottom, on top thereof, and an upper insole member placed on said lower insole member.

**9.** The aerobic exercise shoe in claim **1** wherein said elastic slipper sock has a rearwardly and upwardly oriented, foot-receiving opening defined by a peripheral edge of said slipper sock which tapers upwardly-forwardly from the heel region at said bottom to the instep region.

**10.** The shoe in claim **1** including a toe bumper which extends around the toe and rearwardly above both sides of said shoe along said sole assembly, past the widest metatarsal-phalangeal joint line portion of the shoe to the narrower instep region, said toe bumper having vertically narrower portions astraddle said widest portion.

**11.** The shoe in claim **10** wherein said upper has a vamp which is bifurcated into two portions by a U-shaped gap extending along both sides of the shoe and across the upper, a porous mesh connector extending across said gap and interconnecting said two vamp portions.

**12.** The shoe in claim **11** wherein said sole assembly includes an outer sole and a midsole, said outer sole having a transverse molded polymeric section underlying the metatarsal-phalangeal joint line.

**13.** An aerobic exercise shoe comprising:

a sole assembly;

an upper secured to said sole assembly, defining a foot-receiving cavity and having closure means for retention of the shoe on a foot;

a forefoot-enveloping and gripping, elastic slipper sock in said cavity encompassing the forepart of said cavity, said elastic slipper sock having a bottom anchored to said sole assembly at the heel and the remainder of said elastic sipper sock being unattached to said upper to be free to contract onto and move with a foot in said cavity, to stretch and move relative to said upper;

said elastic slipper sock having a rearwardly and upwardly oriented, foot-receiving opening defined by a peripheral edge of said slipper sock which tapers upwardly-forwardly from the heel region at said bottom to the instep region; and

an insole having a forward portion in said slipper sock on the inner upper surface of said slipper sock bottom.

**14.** An athletic shoe comprising:

a sole assembly including an outer sole, a midsole and an inner sole;

an upper secured to said sole assembly, defining a foot-receiving cavity and having closure means for retention of the shoe on a foot;

a toe bumper along said midsole and the lower part of said upper around the toe and rearwardly along

6

both sides of said shoe past the widest metatarsal-phalangeal joint line portion of the shoe to the narrower instep region, said toe bumper having vertically narrower portions astraddle said widest portion to add independence to the toe portion of said sole assembly.

**15.** The shoe in claim **14** wherein said outer sole has a transverse resilient gum rubber section underlying said joint line portion, between said narrower toe bumper portions, the bottom thereof being substantially at the same level as the bottom of said outer sole.

**16.** The shoe in claim **15** wherein said upper has a vamp bifurcated by a U-shaped gap extending across the upper, and extending downwardly-rearwardly along both sides of the shoe, a porous mesh connector extending across aid gap and interconnecting said two vamp portions.

**17.** The shoe in claim **14** including a toe bumper along said midsole and the lower part of said upper around the toe and rearwardly along both sides of said shoe past the widest metatarsal-phalangeal joint line portion of the shoe to the narrower instep region, said toe bumper having vertically narrower portions astraddle said widest portion to add independence to the toe portion of said sole assembly.

**18.** An athletic shoe comprising:

a sole assembly including an outer sole, a midsole and an inner sole;

an upper secured to said sole assembly, defining a foot-receiving cavity and having closure means for retention of the shoe on a foot;

said upper has a vamp bifurcated by a U-shaped gap extending across the upper, and extending downwardly-rearwardly along both sides of the shoe, and a porous mesh connector extending across said gap and interconnecting said two vamp portions.

**19.** The shoe in claim **18** having a metatarsal-phalangeal joint line portion and wherein said outer sole has a transverse resilient gum rubber section underlying said joint line portion, the bottom thereof being substantially at the same level as the bottom of said outer sole.

**20.** An athletic shoe comprising:

a sole assembly including an outer sole, a midsole and an inner sole, and having a metatarsal-phalangeal joint line portion;

an upper secured to said sole assembly, defining a foot-receiving cavity and having closure means for retention of the shoe on a foot;

said outer sole having a transverse resilient gum rubber section underlying said joint line portion, the bottom thereof being substantially at the same level as the bottom of said outer sole.

**21.** The shoe in claim **20** including:

a toe bumper along said midsole and the lower part of said upper around the toe and rearwardly along both sides of said shoe past the widest metatarsal-phalangeal joint line portion of the shoe to the narrower instep region, said toe bumper having vertically narrower portions astraddle said widest portion to add independence to the toe portion of said sole assembly.

**22.** The shoe in claim **20** including:

said upper having a vamp bifurcated by a U-shaped gap extending across the upper, and extending downwardly-rearwardly along both sides of the shoe, a porous mesh connector extending across said gap and interconnecting said two vamp portions.

* * * * *

# United States Patent [19]

## Pon-Tzu

[11] **Patent Number:** **4,760,651**

[45] **Date of Patent:** **Aug. 2, 1988**

[54] **AIR-VENTILATING SHOE PAD HAVING SHOE-LIFT EFFECT**

[76] Inventor: **Chi Pon-Tzu,** 3F, No. 8-2, 411 Lane An-Ching St., San-Chung City, Taiwan

[21] Appl. No.: **8,530**

[22] Filed: **Jan. 29, 1987**

[51] Int. Cl.⁴ ......................... **A43B 7/06; A43B 13/38; A43B 11/00**

[52] U.S. Cl. ......................................... **36/3 B; 36/44; 36/138; 128/582; 128/588**

[58] Field of Search .................. 128/582, 588; 36/3 B, 36/3 R, 43, 44, 29

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,097,438 | 7/1963 | Evans | 36/138 X |
| 3,180,039 | 4/1965 | Burns, Jr. | 36/3 B |
| 4,215,492 | 8/1980 | Sandmeier | 36/3 B |
| 4,602,441 | 7/1980 | El Sakkaf | 36/3 R |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 594172 | 6/1925 | France | 36/3 B |
| 826665 | 1/1938 | France | 36/3 R |
| 1155947 | 12/1957 | France | 36/3 B |
| 2165439 | 4/1986 | United Kingdom | 36/3 B |

*Primary Examiner*—James Kee Chi

[57]  **ABSTRACT**

A shoe pad includes an air-blowing compression chamber provided in the central space, a protruding tongue plate provided on the end portion of the pad to serve as a shoe-lift and plural concave slots or guide holes formed in the protruding tongue plate for circulating air passages, so that the shoe pad may be put into any shoe to enforce the air circulation in a shoe.

**2 Claims, 2 Drawing Sheets**



**U.S. Patent**    Aug. 2, 1988    Sheet 1 of 2    **4,760,651**





*Fig. 2*



*Fig. 4*       *Fig. 5*



*Fig. 6*

4,760,651

## 1

### AIR-VENTILATING SHOE PAD HAVING SHOE-LIFT EFFECT

### BACKGROUND OF THE INVENTION

To let air circulating in a shoe is a very good concept. However, all current wellknown air ventilation devices used in a shoe highlight that an air-blowing mechanism is mounted in the heel. For instance, a conventional "Fresh Air shoe" must be enlarged to obtain a bigger space to facilitate the air circulation inside the shoe to thereby make its appearance so awkward. Furthermore, the shoe heel after being formed with an empty interior to fix such an air-blowing mechanism, the service life of the shoe may be shortened and the bottom of the heel may easily cause air leakage to thereby lose its air-blowing function.

The present inventor has found the defects of such a conventional shoe and invented the present air-ventilating shoe pad.

### SUMMARY OF THE INVENTION

The object of the present invention is to provide a shoe pad including an air-blowing compression chamber provided in the central space, a protruding tongue plate provided on the end portion of the shoe pad to serve as a shoe-lift and plural concave slots or guide holes formed in the protruding tongue plate for passages of the circulating air, so that the shoe pad may be put into any shoe to enforce the air circulation in a shoe.

Accordingly, the object of the present invention is to provide a shoe pad having the following functions:

1. To promote the air circulation in the shoe;

2. To provide a pad with proper size adapted to snugly fix into various types of shoes;

3. To direct air into the shoe from environmental fresh air source; and

4. To help a shoe wearer smoothly wear a shoe by the "shoe-lift" formed in situ in the shoe.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a side cross sectional view of the present invention

FIG. 2 is a back view of the present invention.

FIG. 3 is a top view of the present invention.

FIG. 4 is example 1 of the cross sectional view of the tongue plate of the present invention.

FIG. 5 is example 2 of the cross sectional view of the tongue plate of the present invention.

FIG. 6 is an exclusive view of the structure of the unidirectional valve blade of the air circulation port and passage of the present invention.

FIG. 7 is a perspective view showing an application of the present invention.

### DETAILED DESCRIPTION OF THE INVENTION

FIG. 1 is a side sectional view of the present invention, in which shoe pad(10) is an oblique wedge-shaped pocket body comprising an upper and a lower pad plates(11,12) and a pleated elastic side wall 13 circumferentially disposed between the two plates 11, 12, a bugle-shaped spring(14) (or plate spring or other elastic device) which maybe added between the upper and lower pad plates(11,12) to help the air chamber ( also called air-blowing chamber(10a)) in the pocket body of the shoe pad after being compressed. All these items belong to the structure of the most basic form of the present

## 2

invention. The compression resulted from the stepping and treading by the wearer's foot makes the air-blowing chamber (10a) squeezing the air outwardly to cause the air flowing in the shoe and the shoe opening to inhale and exhale the air like a man's breathing.

At the heel of the shoe pad(10) disclosed in FIG. 1, a tongue plate 20 extends upwardly from the rear portion of the pad 10. The shoe, the lateral cross section of the tongue plate(20) is shown in FIG. 4, its back portion is formed with plural concave slots(21) extending on the surface of the shoe pad communicated with the air-blowing chamber. Also in the lateral cross section of tongue plate(20a) as shown in FIG. 5, plural air circulating passages(21a) are provided to direct the air at the shoe opening into the air-blowing chamber. Features of the functions of said tongue plate can serve as the general air passage and also serve as a shoe-life to guide the shoe to be fitted into a wearer's foot.

FIG. 2 shows a back view of the shoe pad of which a broad rim is formed along the contour of the upper and lower plates 11, 12 which can be cut to snugly fit each shoe pad into various differently-sized shoes.

FIG. 3 is a top view of the present invention, in which the dotted lines show plural guide slots 15 each slightly concave downwardly from the upper plate 11 to serve as passage of the air circulating in the chamber 10a. Plural air bents 17 each formed as a small round hole are formed through the upper plate 11 and defined in the guide slots 15. The convex grains 16 as shown in the larger circles may serve for massage purpose and may make space between a wearer's foot bottom and the pad for air flowing through the air vents.

The air vent(17) and the ports(18) of the air passage(21) in the aforesaid shoe pad can be provided with an unidirectional valve blade during their forming. As shown in FIG. 6, the upper pad plate(11) is formed by plastic injection or vacuum forming with the air vents 17 or port 18, an oblique valve blade(19) is extruded according to the size of the round hole of the vent or port as shown in FIG. 6 such that the valve blade may be formed as an oval form with its minor axis equal to the diameter of the round hole, and its major axis larger than the diameter of the round hole to allow the valve blade covering the air vent or port and to allow the single directional air flow from one side to the other side, and vice versa. If the upward facing valve blades are provided in the air circulation ports of the upper pad plate and the downward(inward) facing valve blades are provided in the air circulation ports under the tongue plate and upon the wearer's stepping or treading, the air in the chamber 10a will be blown upwardly through the vents 17 as closing the port 18 of the tongue plate 20. Alternatively, upon the lifting of a wearer's foot, the valve of tongue port 18 will be opened to suck air from an upper opening and the valve of the vents 17 will be closed.

I claim:

1. A shoe pad adapted to fit in a shoe comprising:

an upper plate having air vents formed therethrough, a lower plate and a pleated elastic side wall circumferentially disposed between said upper and lower plates, defining an oblique wedge-shaped pocket body serving as an air-blowing chamber;

a spring added between said upper and lower plates;

a tongue plate protruding on a rear end portion of said upper plate; and

4,760,651

3

plural guide slots each concave downwardly from
said upper plate serving as passages of the air circu-
lating in said air-blowing chamber and each said air
vent of said upper plate formed in said guide slot,
the improvement which comprises:
said tongue plate formed on the rear portion of said
upper plate having plural concave slots longitudi-
nally formed on the back portion of said tongue

4

plate communicated with said air-blowing cham-
ber, said tongue plate formed as a shoe-lift for help-
ing the wearing of said shoe.
2. A shoe pad according to claim 1, wherein said
tongue plate is formed with plural air circulating pas-
sages therein adapted to direct air from shoe opening
into said air-blowing chamber of said shoe pad.

* * * * *

# EXHIBIT D
# (Part 3 of 17)

# United States Patent [19]

## Lakic

[11] Patent Number: 4,823,482

[45] Date of Patent: * Apr. 25, 1989

[54] **INNER SHOE WITH HEAT ENGINE FOR BOOT OR SHOE**

[76] Inventor: **Nikola Lakic**, 73-355 Guadalupe Ave. Unit M, Palm Desert, Calif. 92260

[ * ] Notice: The portion of the term of this patent subsequent to Apr. 12, 2005 has been disclaimed.

[21] Appl. No.: **93,579**

[22] Filed: **Sep. 4, 1987**

[51] Int. Cl.⁴ ........................... A43B 7/02; A43B 5/04; F28F 7/00

[52] U.S. Cl. ......................................... 36/2.6; 36/119; 128/382; 165/46

[58] Field of Search ....................... 36/26, 27, 28, 117, 36/119, 3 R, 10; 219/211, 527; 128/382, 383; 165/46; 2/1

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,663,796 | 5/1972 | Hines et al. | 36/2.6 X |
| 4,154,009 | 5/1979 | Kubelka et al. | 36/119 |
| 4,507,877 | 2/1985 | Yaccari et al. | 36/2.6 |
| 4,615,127 | 10/1986 | Delery | 36/117 |
| 4,665,308 | 5/1987 | Courvoisier et al. | 36/2.6 X |
| 4,697,359 | 10/1987 | Balbinot | 36/2.6 |
| 4,702,022 | 10/1987 | Porcher | 36/119 |
| 4,730,403 | 3/1988 | Walkhoff | 36/119 |
| 4,736,530 | 4/1988 | Lakic et al. | 36/2.6 |

#### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2321817 | 11/1973 | Fed. Rep. of Germany | 36/3 R |
| 1223883 | 4/1986 | U.S.S.R. | 36/2.6 |
| 2107853 | 5/1983 | United Kingdom | 2/1 |

*Primary Examiner*—James Kee Chi
*Attorney, Agent, or Firm*—Plante Strauss Vanderburgh

[57] **ABSTRACT**

There is disclosed an inner shoe for a boot such as a ski boot which includes a foot warmer mechanism having a heat engine which includes a compressor, evaporator and condenser coils and interconnecting conduits for circulating a working refrigeration fluid. In a preferred embodiment, the cycle of the heat engine can be reversed, thereby cooling the inner shoe. The mechanism also includes an entirely sealed, remote latch to lock the heat engine out of operation. The inner shoe can have an air system that includes an air bag which surrounds its instep area and communicates to a sealed chamber between the soles of the shoe. The air bag can be pressured to maintain a sense of tightness or security to the ski boot. The air system also augments heat transfer within the boot.

**25 Claims, 11 Drawing Sheets**



Case 1:04-cv-12668-RGS    Document 18-8    Filed 05/02/2005    Page 3 of 38



*FIG. I*



*FIG. 2*



FIG. 3

FIG. 4

FIG. 5



FIG. 7

FIG. 6



FIG. 8

FIG. 9



FIG. 10



FIG. II



FIG. 12

Case 1:04-cv-12668-RGS    Document 18-8    Filed 05/02/2005    Page 9 of 38



FIG. 13

FIG. 14

FIG. 15

FIG. 16



FIG. 17

FIG. 19

FIG. 18

FIG. 20



FIG. 21



FIG. 22



FIG. 23



FIG. 24

4,823,482

<table>
<tr><td>1</td><td>2</td></tr>
</table>

INNER SHOE WITH HEAT ENGINE FOR BOOT
OR SHOE

## BACKGROUND OF THE INVENTION

1. The Field of the Invention

This invention relates to a warming device for shoes and boots, and in particular to a simple device for generating heat within a shoe or boot.

2. Brief Statement of the Prior Art

U.S. Pat. No. 3,534,391 discloses an electrical generator which is mounted on the outside of a ski boot which is driven from a tether that is connected between the generator and a ski. The generated current is passed through heating elements located in the ski boot. The external mounting and tether render this device quite cumbersome and difficult to use.

French Patent Nos. 701,420 and 2,365,973 and U.S. Pat. No. 3,977,093 disclose shoes with batteries mounted in the heels, and with electric resistance heaters in the soles of the shoes. Batteries require frequent replacement, and are particularly inefficient in a cold environment.

U.S. Pat. No. 1,506,282 discloses an electric generator mounted in an telescoping heel of a shoe which generates electricity for an electric lamp, heating coil, wireless outfit or a therapeutic appliance. A telescoping heel of this design would be very difficult to seal against water and mud, and the patented device would· most likely be limited to indoor applications.

U.S. Pat. Nos. 2,442,026 and 1,272,931 disclose air pumps which are located in the heels of shoes and operated during walking. In the first mentioned patent, alcohol vapors are mixed with the air stream and passed over a catalyst to generate heat. This system is cumbersome and difficult to use, and it requires replenishing the alcohol. Also, the heater elements are open in the shoe for air and gas circulation. In U.S. Pat. No. 1,272,931, the air is forced through constricted passageways to generate heat by compression. The heated air is openly discharged into the shoe, as there is no provision for a closed loop air path.

U.S. Pat. No. 382,681 discloses an armature which is mounted in a heel and manually rotated to generate heat by friction, which is dissipated in the shoe by metal conductors. U.S. Pat. No. 3,493,986 discloses an inner sole for a shoe which is formed of piezoelectric or magnetostrictive material which generate heat while the user walks.

U.S. Pat. No. 2,475,092 discloses a bouncing skate having spring coils on the bottom of its sole. German Patent Nos. 180866 and 620,963, and U.K. Patent No. 443,571 disclose springs mounted within a shoe for orthopedic purposes. None of these patents disclose shoe heaters.

U.S. Pat. No. 4,507,877 discloses a heater for a ski boot which is mounted on the inner shoe of the boot and which includes rechargeable storage batteries, control switch and electrical heating coil. Products of this design have been marketed with chargeable and with nonrechargeable batteries. These units do not provide any sustained heating, but are useful only to provide monetary heating because of the limited storage capacity of small batteries and the low efficiencies which they experience at sub-freezing temperatures.

All of the aforementioned attempts have failed to provide a practical self sustaining heater within a shoe which harnesses the movement between the wearer's heel and the heel of the shoe to generate heat. This relative movement can be sufficient, particularly when the wearer's weight is applied, to generate the necessary heat, provided a practical heat generator can be installed within the narrow confines of the shoe and heel, without significantly affecting its external appearance and comfort.

Air bags have been positioned in ski boots, over the instep and forefoot, and have been provided with inflation pumps to provide a variable control on the snugness of fit of the boots. U.S. Pat. No. 4,420,893 discloses an air pump which is operated by the flexing of the ankle during normal skiing actions to circulate fresh air through a ski boot. While this may be useful to reduce the humidity within a boot, it would not be suitable in very cold weather.

## BRIEF DESCRIPTION OF THE INVENTION

This invention comprises a foot warmer mechanism for a shoe, particularly for a ski boot. The foot warmer mechanism is mounted entirely on an insert for the outer boot or shoe, and includes an a heat engine and, in particular, a heat engine operating on a substantially- or quasi-Carnot cycle. For this purpose, the warming mechanism includes a compressor for compressing a gas, a condenser for condensing the gas into a liquid, an expansion and evaporator zone for expanding the liquified gas into a gas and a return line to cycle the expanded gas to the compressor.

## BRIEF DESCRIPTION OF THE DRAWINGS

The invention will be described with reference to the FIGURES, of which:

FIG. 1 is an elevational sectional view of a ski boot fitted with the foot warmer invention;

FIG. 2 is a perspective view of the inner shoe of the boot of FIG. 1;

FIGS. 3 and 4 are elevational section views of the ski boot illustrating an air cushion between the inner shoe and boot;

FIG. 5 is an enlarged sectional view of the air pump used with the boot of FIGS. 3 and 4;

FIG. 6 is a perspective view of the inner shoe in partial cut away section;

FIG. 7 is an enlarged view of the area within the line 7—7' of FIG. 6;

FIG. 8 is a diagrammatic view of the working elements of the heat engine used in the invention;

FIG. 9 is an elevational sectional view of a suitable compressor for use in the invention;

FIG. 10 is a sectional view on line 10—10' of FIG. 9;

FIG. 11 is a view along line 11—11' of FIG. 1;

FIG. 12 is a view along line 12—12' of FIG. 1;

FIG. 13 is an elevational sectional view of the brake mechanism used with the shoe warmer;

FIG. 14 is a view along line 14—14' of FIG. 15;

FIG. 15 is a view along line 15—15' of FIG. 13;

FIG. 16 is a view of the upper end of the rear tab of the inner shoe;

FIG. 17 is an elevational sectional view on line 17—17' of FIG. 18 of an alternative compressor for use in the invention;

FIG. 18 is a view along line 18—18' of FIG. 17;

FIG. 19 is an elevational sectional view of the alternative compressor along line 19—19' of FIG. 20 to reverse the cycle of the heat engine;

FIG. 20 is a view along line 20—20' of FIG. 19;

4,823,482

3

FIG. 21 is a perspective view of the compressor shown in FIGS. 17–20;

FIG. 22 illustrates the incorporation of the compressor and controls of FIGS. 17–21 in a ski boot;

FIG. 23 illustrates an alterative embodiment of the invention; and

FIG. 24 is a view along line 24—24' of FIG. 23.

DESCRIPTION OF PREFERRED EMBODIMENT

Referring now to FIG. 1, the invention is shown as applied to the inner shoe of an outwardly appearing, conventional ski boot 10. Although the invention is shown as applied to a ski boot, it could also be applied to any conventional boot or shoe of similar construction. The ski boot 10 is shown in phantom lines and comprises a molded plastic shell 12 with a molded outer sole 14 and a plastic molded upper portion 16. The upper portion 16 can be spread or opened to permit moving the boots on and off the wearer's foot and has a plurality of fastening buckles 18 and 20 to secure the upper portion 16 in a snug conforming fit about the wearer's ankle and foot. Some of the fastener buckles, particularly buckles 18 which are over the instep are provided with adjustment for controlled variation of their tension, thereby providing control over the relative degree of movement of the foot within the boot 10. Alternative and conventional tension adjustments could be used, e.g., cables can be extended over the instep and provided with tensioning adjustments.

In the conventional outer ski boot 10, the outer sole 14 is hollow form with reinforcing ribbing (not shown) which extends longitudinally and transversely across the outer sole 14, subdividing its hollow interior into a number of recesses or compartments. In the application of my invention to this boot, this ribbing is reduced in height, or eliminated entirely, to provide an open hollow interior to house the foot warmer mechanism.

The inner shoe 22 for the ski boot 10 is shown in elevational cross sectional view and comprises a snug fitting sock having an upper neck 23 which extends above the upper edge 25 of the upper portion of the ski boot 10, an integral tongue 21, and an integral lower sole 28. The inner shoe also supports an air bag 27 which surrounds the upper instep of the shoe and which is contained within the boot 10.

The foot warmer of the invention is applied to the inner shoe 22 by molding a lower sole 28 of several layers. The lowermost layer 56 is separated from the upper layer 58 of the lower sole 28 of the inner shoe 22 by a thin layer 57 of thermal insulation. The space between the lower sole 28 and inner sole 24 is sealed by a membrane 29 which is formed into a bellows configuration. The interior of the boot is thus provided with two air chambers, that contained within the air bag 27, and that contained between the inner sole 24 and lower sole 28. These air chambers are contiguous, i.e., in open communication, in the manner described hereinafter.

Some of the components of the heat engine of the shoe are received within the lower sole 28, and can be molded within this sole during its manufacture, or can be housed within hollow compartments which are molded in the lower sole 28, which is received within the hollow interior of the outer sole 14 of the ski boot 10.

The heat engine components which are located in the lower sole 28 are the compressor 60 and the evaporator coil 62, with appropriate connecting tubing such as 61 for transferring the expanded and evaporated gas from the

4

evaporator coil 62 to the compressor 60, and tubing 63 for transferring the compressed gas from the compressor 60 to the condenser coil 64.

The inner shoe 22 also includes an inner sole 24 which is a stiff, or relatively non-flexible plate that is pivotally secured to the lower sole 28 of the inner shoe 22 at its toe end. Preferably the upper and lower soles are molded together of the same plastic, thereby providing an integral hinge 30 at the toe of the inner shoe 22. The inner sole 24 is resiliently biased upwardly by spring arms 34 and 35 which project rearwardly and forwardly, respectively, from coil spring 38. If desired, a pocket 98 can be formed in the upper layer 58 of the outer sole 28 and a leaf spring 97 can be placed in this compartment, to supplement the resilient action of spring 38.

The compressor 60 has an upright post 48 which extends from the internal piston of the compressor. At its upper end the post 48 has a bearing plate 49 which is received against the undersurface 44 of the inner sole 24. The post 48, as hereinafter described, is attached at its lower end to the piston of compressor 60, to translate reciprocating vertical motion to compression of the working fluid of the heat engine.

At the heel end, the inner sole 24 has a distal tab 66 which projects into a brake compartment 68 formed as a pocket behind the heel of the inner shoe 22. The lower sole 28 has a raised integral block 142 at its heel end, which receives a machine screw fastener 144 for pivotal attachment of the brake latch, described in greater detail with reference to FIGS. 13–16. The brake pocket 68 is covered by vertical plate 72. An actuator cable 74 extends from the brake compartment 68 to the upper portion of the inner shoe 22 and is provided with a suitable handle, ring 76, to actuate the brake of the mechanism. As hereinafter described, the brake is functional to provide a releasable locking of the inner sole 24 against vertical displacement, thereby providing for engagement and disengagement of the heat engine.

Referring now to FIG. 2, the inner shoe is shown in a perspective view. A portion of the side of membrane 29 is cut away to permit viewing into the confined space between the inner sole 24 and lower sole 28. The inner shoe 22 is formed of a molded, compressible plastic foam which is integrally sealed to a stiff bottom plate which forms the inner sole 24. The lower sole 28 is integrally attached to the inner sole 24 at its toe end and is coextensive with the length and width of the inner sole 24. At its heel end, the lower sole 28 supports a stiff or rigid vertical tab 78 that is formed as an integral molding of the lower sole 28. The tab 78 has brackets 80 and 82 at its upper end to receive the cable 74 which terminates in the pull ring 76 and which extends downwardly through a protective, flexible conduit 84 to the brake compartment 68. The lower sole 28 also distally supports the brake compartment 68 which is formed as an integrally molded pocket at its heel end with a removable vertical plate 72 that is slidably received in the pocket to protect the moveable elements of the brake to prevent interference with the inner surfaces of the outer boot 10 that would obstruct free movement of these elements. The bag 27 extends laterally across the instep of the inner shoe and communicates through the sidewall of membrane 29 by one or more channels 31, which are preferably sized adequately to avoid any significant resistance to air flow.

The interior of the inner shoe 22 can be formed with channels 86 about its surface, all as conventional for the

4,823,482

<table>
<tr><td>5</td><td>6</td></tr>
</table>

construction of inner shoes of ski boots. The rearwardly projecting spring arm 34 which resilient urges the upper sole 24 and lower sole 28 apart also appears in FIG. 2.

Referring now to FIGS. 3 and 4, the heat engine elements are not illustrated, to provide a simplified illustration of the function and operation of the air bag 27. Also, the air circulation system shown in these FIGS. 3 and 4, can be used without the heating means, for benefits of comfort and shock absorbency. As previously mentioned, the air bag 27 forms a confined chamber which is in open communication with the enclosed chamber, cavity 33, that is located between the inner sole 24 and lower sole 28. An air pump 92 is provided to permit the wearer to adjust the air pressure within the cavity 33 and air bag 27. The pump applies air though flexible conduit 93 into the cavity 33.

The air bag 27 functions to maintain a sense and feeling of tight lacing or binding of the ski boot, while permitting a limited freedom of movement of the inner shoe within the boot. In FIG. 3, the inner shoe is shown in its most elevated position, with the heel of the inner sole elevated above the lower sole 28. The air bag 27 is compressed in this position, exhausting its air into the cavity 33 which is confined by membrane 29. When the wearer's weight is applied to the heel, the heel of the inner sole 24 moves downwardly, forcing the air from cavity 33 into the air bag 27. Thus, although the instep of the inner shoe 22 moves away boot 10, the wearer still senses a tightness of fit, as the air bag 27 maintains pressure on the instep. The normal movement of the wearer's foot within the shoe will create a forced circulation of air through the cavity 33 which is heated (or cooled as described hereafter) by the coil 64 and into the air bag 27. This forced circulation increases the heat transfer throughout the heat engine.

Referring now to FIG. 5, the air pump 92 comprises a flexible bulb 95 which is sealed in the assembly by ring 91. The bulb 95 receives air pressure through the inlet valve 89 and discharges the air under pressure through outlet valve 87. The air system is also provided with a relief valve 85, which when depressed will relieve the air pressure within the air bag system.

Referring now to FIG. 6, the inner shoe of the ski boot is shown with a portion of the side of the inner shoe cut away to reveal its interior and the major components of the heat engine.

The inner sole 24 supports the condenser coil 64 of the heat engine and receives the compressed fluid from the compressor 60 through conduit 63. The lower layer 56 of the outer sole 28 receives the evaporator coil 62 of the heat engine which is in the form of a continuous serpentine coil that receives the depressed working fluid from an expansion valve or tube, described hereinafter. The lower layer is separated from the upper layer 58 by a layer of thermal insulation 57. Preferably, a peripheral seal 54 is positioned between the upper layer 58 and lower layer 56. The seal is formed of a resilient material, e.g., rubber or a flexible plastic. This seal 54 can be separately formed and secured to the peripheral edge of the inner shoe, or can be integrally molded with the inner shoe. The seal 54 projects slightly outside of the sole layers so that it will resiliently engage against the inside wall of the sole 14 of the ski boot, thereby restricting or preventing air flow between the upper and lower layers of the lower sole 28. The compressor 60 is mounted in the outer sole 28 with plate 49 mounted beneath the inner sole 24 at the heel of the inner shoe.

At the instep area, the upper layer 58 of the outer sole 28 has two pockets 88 and 90 which are laterally disposed and which receive the helical windings of the torsion springs 38 that provide the resilient upward bias to the U-shaped arms 34 and 35 that urge the inner sole 24 in an upward direction.

As shown in FIG. 7, the upper surface of the inner sole 24 has a plurality of parallel grooves 94 in which are received the tubes 96 which constitute the condenser coil 64 of the heat engine (see FIG. 8). The inner sole is preferably covered with a cushioning layer 46.

Referring now to FIG. 8, the heat engine of the invention will be briefly described. As there illustrated, the heat engine comprises a closed circulation system comprising compressor 60 with check valves 65 and 67. Tubing 63 discharges the compressed working fluid into the condenser coil 64, and the condensed fluid is discharged through the capillary coil 69. The capillary coil 69 discharges the expanded fluid into the evaporator coil 62. The expanded and evaporated gas from this coil is discharged by tubing 61 through valve 67 into compressor 60.

The compressor 60 is illustrated in greater detail in FIG. 9 and includes a piston 50 that is mounted on the end of post 48 and reciprocally received in cylinder 52. Post 48 is received through a suitable packing gland 51 in cylinder 52. Piston 50 has a valve, such as a flapper valve 53, which functions with ports 55 to permit free upward movement of piston 50. The cylinder 52 is also provided with the aforementioned check valves 65 and 67 which can be simple check valves such as flapper valves or spring biased ball valves.

The functioning of the heat engine is in accordance with conventional heat engine cycles. A suitable working fluid such as Freon, ammonia, etc., is circulated through the heat engine in a refrigeration and heating cycle. The working fluid is compressed by compressor 60 and is transferred through line as compressed, mixed liquid and gas phases. The working fluid, under compression from compressor 60 condenses into a liquid in the condenser coil 64, releasing its latent heat of evaporation. The condensed working liquid thus releases its latent heat to the inner sole 24, warming the interior of the shoe. The working fluid passes through capillary coil 69 where it expands as it undergoes a frictional pressure drop through the capillary coil 69. The frictional flow pressure drop is sufficient to reduce the pressure of the working fluid and cause evaporation of the liquid, forming a gas phase in the evaporator coil 62. As it evaporates, the working fluid absorbs heat from the surrounding area to provide the necessary latent heat of vaporization of the liquid. The heat is absorbed from the lower layer 56 of the lower sole 28, which is in heat exchange relationship with the external sole 14 of boot 10. The evaporated gas is then transferred through check valve 67 into compressor 60 for continuous circulation in the system.

As can be seen from the preceding description, heat is liberated by the condenser coil 64 and is absorbed by evaporator coil 62.

The condenser coil 64 is shown in FIG. 11 as a plurality of interconnected parallel tubes 96 which are received within the grooves 94 of the inner sole 24 (see also FIG. 7). The condenser coil receives the compressed, working fluid through tubing 63. The coil discharges the working fluid through an expansion valve 39 (see FIG. 12), which functions similarly to the capillary tube 69, previously described in reference to FIG.

4,823,482

7

8. The evaporator coil 62 receives the depressed working fluid. This coil is shown in FIG. 12 as a continuous serpentine tubing which discharges the evaporated gas through tubing 61 to the compressor 60.

FIG. 11 shows the preferred construction of vertical tab 78. Preferably this tab is formed with a plurality of vertical channels 70 coextensive its length, thereby forming vertical recesses which can receive the tubing 93 for the air system, or flexible conduits such as 84 (shown in FIGS. 1, 2 and 6) and/or flexible conduits 148 and 150 (shown in FIG. 22).

Referring now to FIGS. 13 through 16, the brake mechanism will be described in greater detail. As previously described, the lower sole 28 supports, at its heel end, the vertical tab 78 which has a vertical slot 152 to receive the tab 66 at the end of the inner sole 24. The length of this vertical slot 152 provides the limits of travel for the heel and post 48 (not shown). The brake mechanism includes a latch 146 that is pivotally secured to lock onto the tab 66 on the heel of the inner sole 24. Latch 146 has a spring arm 154 and an actuator arm 156 with a latching finger 160. The spring 162 resiliently biases the mechanism into an unlatched position, which is shown by the solid lines. When the cable 74 is pulled upwardly, the latch finger 160 is rotated into engagement with tab 66, thereby locking the tab 66 and its dependent inner sole 24 in the depressed position, all as shown by the phantom lines in FIGS. 13 and 14.

As shown in FIG. 16, the cable 74 extends upwardly through a mounting bracket 80 and a locking bracket 82 which has a single elongated slot 164. A pin 166 is transversely permanently secured to the cable 74 so that when it is pulled through the slot 164 and rotated, as shown in FIG. 16, it will lock the cable 74 against retraction, thereby securing the latch finger 160 in its detenting position against the bias of the spring 162.

Referring now to FIGS. 17 and 18, there is illustrated an alternative compressor for use in the invention. The alternative compressor 100 is formed with an outer cylindrical casing 102 which receives the concentric sleeve 108 and cylinder 52. Cylinder 52 is similar to that previously described and includes an aperture in its top wall with a packing gland 51 that reciprocally receives post 48. Piston 50 is distally carried on post 48 for sliding movement within cylinder 52 and includes seal means such as O-ring 42, and valve 53 previously described. The external cylindrical casing 102 has apertures 103 and 105 which are aligned with the apertures 106 and 107 of cylinder 52. The apertures 103 and 105 receive the check valves 67 and 65, respectively, of the heat engine, all previously described. In this illustrated embodiment, the check valves 67 and 65 are operable to control the fluid flow in the direction indicated by the arrowhead lines.

Sleeve 108 is rotatably received between cylinder 52 and casing 102. The cylinder 52 and casing 102 are stationary. Sleeve 108 has a first set of apertures 110 and 111 and a second set of angularly offset apertures 120 and 121; see also FIGS. 19 and 20. In FIGS. 18 and 20, the upper valves 110 and 120 are in sectional view. The lower apertures 121 and 111 are located below apertures 110 and 120 and are identified by placing these numbers in parenthesis. Apertures 110 and 111 are in open communication with fluid check valves 67 and 65, previously described.

Referring to FIGS. 19 and 20, the external cylindrical casing 102 also has apertures 112 and 113 which are aligned with apertures 116 and 117 of cylinder 52. Aper-

8

tures 112 and 113 receive check valves 41 and 43, respectively, which are oriented in a reverse flow direction from check valves 67 and 65.

In the configuration illustrated in FIGS. 19 and 20, the concentric sleeve 108 has been rotated from its position shown in FIGS. 17 and 18 to align its set of apertures 120 and 121 with apertures 112 and 113 of casing 102 and apertures 116 and 117 of cylinder 52. This will direct flow in the opposite direction from that of FIGS. 17 and 18, all as indicated by the arrowhead lines.

The alternative compressor is shown in perspective view in FIG. 21. In this illustration, tabs 130 and 132 project downwardly from the rotatable sleeve 108. Cables 126 and 128 are attached to respective tabs 130 and 132. As shown in FIG. 22, the cables extend to the upper end of vertical tab 78 through flexible conduits 148 and 150, where they terminate in pull rings 122 and 123. For purposes of illustration, the pull rings and associated structure is shown without illustration of the air pump 92 and the brake system, which are shown in FIGS. 2 and 6. In actual practice, there is adequate room at the upper end of vertical tab 78 for placing of the pull rings 122 and 123 beside the other structure of the brake cable and ring 76 and the air pump 92.

The cables 126 and 128 can be locked in positions by two pairs of clamp blocks 124 and 136, and 125 and 135. The lowermost clamp block 124 and 135 of each pair of clamp blocks has a narrow slit to receive a cable. The clamp blocks have a diameter to fit within the pull rings, thus permitting locking of the pull ring on its respective upper or lower clamp block. In this manner, remote control of the position of the cylinder 108 in the compressor can be controlled, permitting the wearer to rotate this cylinder, and reverse the heat engine between heating and cooling of the shoes.

The compressor shown in FIGS. 17–20 is thus effective in reversing the operation of the heat engine in the shoe. This permits the shoe to be operated with a heating cycle for warming the wearer's foot and toes during cold weather applications with the coil 64 functioning as the condenser section of the heat engine. When the concentric sleeve 108 is rotated to the position shown in FIGS. 19 and 20, however, the cycle is reversed and the coil 64 then functions as the evaporator portion of the heat engine. This absorbs heat from the interior cavity of the shoe, cooling the wearer's foot and toes during hot weather applications. In this manner, the mechanism can be used for warming or cooling the wearers foot at the discretion of the wearer. During use, the working fluid may need to be recharged to the compressor. This can be accomplished by adding fresh working fluid through port 47. This port can be closed by a conventional valve, not shown.

Referring now to FIGS. 23 and 24, the invention can also be applied to a simplified fluid circulation system. In this application, the piston 50, post 48, heel plate 49 and spring arm 34 are all as previously described. A working fluid or gas is circulated through the capillary coil 33 under pressure during the downstroke of the piston 50. During this movement, the flapper valve on the undersurface of the piston will close the fluid ports 55 in piston 50. When the wearer's weight is lifted from the heel, spring arm 34 moves the plate 49 upwardly, lifting the piston, and the fluid in the cylinder passes through ports 55 into the chamber beneath the piston. Check valves such as 67 and 65 previously described maintain the pressures and flow direction in the system.

4,823,482

9

10

The capillary 33 functions to provide a high fluid pressure drop, thereby generating frictional heat and functioning as a heating unit. These lines could be in the form of a serpentine coil winding such as coil 64, previously described.

The invention has been described with reference to the illustrated and presently preferred embodiment. It is not intended that the invention be unduly limited by this disclosure of the presently preferred embodiment. Instead, it is intended that the invention be defined, by the means, and their obvious equivalents, set forth in the following claims:

What is claimed is:

1. In a boot of the construction having an outer shell and an inner shoe lining with an inner shoe having an upper portion with an integral inner sole and a contour conforming to the inner shape of said shell, the improvement comprising:

a. a lower sole coextensive with said integral inner sole of said inner shoe and pivotally secured thereto at the toe of said shoe, and having at least a first open-topped compartment of a size and shape to fit within the heel area of said outer shell;

b. resilient lift means biasing the heel of said inner sole in an upward direction;

c. a heat engine operating on a Carnot cycle that includes:

(1) a closed circulation loop having first and second coils separated by a restrictor;

(2) a working fluid within said loop;

(3) a compressor for the working fluid; and

d. mechanical means linking said heel of said inner sole to said compressor, whereby up and down movements of said heel are operative to compress said working fluid and circulate it through said closed loop releasing heat in said first coil and absorbing heat in said second coil.

2. The improvement of claim 1 wherein said boot is a ski boot with a molded plastic outer shell and a molded inner shoe.

3. The improvement of claim 1 wherein said inner shoe closely fits into said shell, and said first and second coils are mounted, respectively, in said inner sole and said lower sole, and including a thermally insulating layer therebetween.

4. The improvement of claim 3 wherein said inner sole has a plurality of surface grooves and wherein said first coil is received within said grooves.

5. The improvement of claim 3 including a flexible seal extending entirely about the periphery of said lower sole and operative to resilient engage and seal against the inside wall of said boot.

6. The improvement of claim 1 wherein said compressor has its discharge port communicating with said first coil and its intake port communicating with said second coil, thereby serving to supply heat interiorly of said inner shoe.

7. The improvement of claim 1 wherein said compressor has its discharge port communicating with said second coil and its intake port communicating with said first coil, thereby serving to remove heat from the interior of said inner shoe.

8. The improvement of claim 7 including means to switch said compressor ports between said first and second coils, thereby reversing the flow through said coils, and reversing said heat engine between operations of cooling and heating the interior of said inner shoe.

9. The improvement of claim 8 including cable means extending from said reversal means to a remote location, exterior of said inner shoe.

10. The improvement of claim 1 wherein said first fluid coil is in the inner sole of said inner shoe.

11. The improvement of claim 10 wherein said compressor has two sets of pairs of inlet and outlet check valves in reversed flow direction, and including means to switch said compressor inlet and outlet ports between said first and second sets of paired check valves, thereby reversing the heating and cooling cycles of said heat engine.

12. The improvement of claim 1 wherein said resilient lift means includes spring means located between said inner and lower soles and having a spring arm positioned beneath the heel of said inner sole.

13. The improvement of claim 12 wherein said spring means includes a second spring arm positioned beneath the mid-portion of said inner sole.

14. The improvement of claim 1 including brake means to restrain the movement of said inner sole.

15. The improvement of claim 14 wherein said brake means includes a cam lever pivotally mounted in the heel of the shoe.

16. The improvement of claim 15 wherein said cam lever is operative to move into a position obstructing the upward movement of said inner sole.

17. The improvement of claim 16 wherein said cam lever is covered with a protective rubber covering.

18. The improvement of claim 1 including a flexible liner within the shoe and covering said inner sole.

19. The improvement of claim 1 including an air bag extending about and over the instep area of said inner shoe.

20. The improvement of claim 19 including means secured between said inner and lower soles of said inner shoe, thereby forming a sealed cavity between said soles.

21. The improvement of claim 20 wherein said air bag extends into a sealed communication with said sealed cavity.

22. The improvement of claim 21 wherein said lower sole supports a vertical tab at its heel which extends upwardly to the top of said shell.

23. The improvement of claim 22 including air pump means mounted on the upper end of said vertical tab with an air hose communicating from said air pump to said sealed cavity.

24. The improvement of claim 20 wherein said means is a flexible membrane which extends between the peripheral edges of said inner and lower soles of said inner shoe.

25. The improvement of claim 1 wherein said lower sole supports a vertical tab at its heel and including a brake compartment in the lower end of said vertical tab.

*  *  *  *  *

# United States Patent [19]

## Mackness et al.

[11] Patent Number: 4,887,367

[45] Date of Patent: Dec. 19, 1989

[54] **SHOCK ABSORBING SHOE SOLE AND SHOE INCORPORATING THE SAME**

[75] Inventors: **Terry Mackness; Frank V. Wezel,** both of Southend-on-Sea, England

[73] Assignee: **Hi-Tec Sports PLC,** Essex, England

[21] Appl. No.: **217,188**

[22] Filed: **Jul. 11, 1988**

[30]      **Foreign Application Priority Data**

Jul. 9, 1987 [GB] United Kingdom ................. 8716200
May 31, 1988 [GB] United Kingdom ................. 8812867

[51] Int. Cl.⁴ ............................................. A43B 13/18
[52] U.S. Cl. ........................................... **36/28;** 36/29;
                              36/35 R; 36/35 B; 36/129
[58] Field of Search ................. 36/28, 29, 35 R, 35 B,
                                   36/114, 129

[56]            **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,044,190 | 6/1962 | Urbany | 36/29 |
| 4,364,188 | 12/1982 | Turner | 36/129 |
| 4,535,553 | 8/1985 | Derderian | 36/29 |
| 4,616,431 | 10/1986 | Dassler | 36/28 |
| 4,680,876 | 6/1987 | Peng | 36/35 R |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2356936 | 5/1974 | Fed. Rep. of Germany | 36/28 |
| 2709478 | 9/1978 | Fed. Rep. of Germany | 36/29 |
| 3216299 | 10/1983 | Fed. Rep. of Germany | 36/29 |
| 3245964 | 6/1984 | Fed. Rep. of Germany | 36/35 R |
| 82/0571 | 3/1982 | PCT Int'l Appl. | 36/29 |
| 0223748 | 10/1924 | United Kingdom | 36/28 |
| 1603646 | 11/1981 | United Kingdom | 36/29 |

*Primary Examiner*—Werner H. Schroeder
*Assistant Examiner*—Diana L. Biefeld
*Attorney, Agent, or Firm*—Pollock, Vande Sande & Priddy

[57]          **ABSTRACT**

An improved structure of the sole of shoes suitable for use in sports or any casual wear is characterized in that the mid-sole is provided with resilient spherical bodies within recesses in the front portion and/or the heel portion of the sole, and that the hardness of the resilient bodies can be adjusted to enhance the elasticity of the soles of the shoes by virtue of the fact that the spherical bodies can be inflated and deflated or can be bodily replaced, thereby enabling the requisite shock absorbing effect to relieve impact stress during running and fatigue during long walking to be obtained.

**17 Claims, 4 Drawing Sheets**





*FIG.1.*





*FIG. 3.*

**U.S. Patent**    Dec. 19, 1989    Sheet 4 of 4    **4,887,367**





FIG.6.

4,887,367

## 1

### SHOCK ABSORBING SHOE SOLE AND SHOE INCORPORATING THE SAME

#### FIELD OF THE INVENTION

The present invention relates generally to sports shoes or casual shoes and more specifically concerns improved shock absorbing shoe soles and shoes incorporating the same.

#### BACKGROUND OF THE INVENTION

Generally speaking, most people put their bodies under varying degrees of impact during exercise, and it has been established that the forces exerted on the heel and the ball or front sole of the feet during running are three to four times greater than those exerted during normal walking. Thus, during running or jogging, the reaction forces exerted on the body from the ground may be three to four times higher than individual body weight. Not only is this the cause of many sports injuries, but also it makes the participants tired or exhausted. Sports shoes for running or jogging or playing games and casual shoes for walking are commercially available in a variety of designs, but, generally speaking, the soles of such shoes and consequently the shoes in their entirety do not match the individual requirements of the wearer as regards providing the desired degree of resilience and elasticity.

It is known to provide means in a sports shoe for enabling the characteristics of the shoe to be adapted to the requirements of the user. For example, U.S. Pat. No. 4,430,810 discloses an arrangement wherein a number of bores extend through the relatively soft material of the heel portion of a running shoe from one side thereof to the other, the bores being spaced apart from each other in the longitudinal heel-to-toe direction of the shoe, and rod-shaped stiffening members of selectable greater hardness than the soft heel material can be inserted into the bores so as selectively to increase the overall hardness of the sole and adapt the shockabsorbing capabilities of the shoe to the individual requirements of the runner and to the nature of the surface upon which he intends to run. The proposal to stiffen the heel of a shoe by insertion of appropriate stiffening elements into bores in the heel is known also from French Patent No. 958,766, and in U.S. Pat. No. 3,785,646 discloses a shoe having a rubber sole with transverse bores into which rod-like metal weights may be inserted. Another arrangement, known from applicants British Patent No. 2,156,654, not only enables heel hardness characteristics to be selectively varied to suit the requirements of the wearer, but also allows different relative hardnesses to be achieved on different sides of the heel for controlling rear-foot movement and minimizing the risk of damage through excessive pronation or supination. Another known arrangement of only marginal interest to the present invention is disclosed in European Patent Application Ser. No. 0161653.

It is further known to incorporate air pockets into the heel portion and/or the sole portion of a shoe so as to provide shock absorption and/or resiliency properties. Described in British Patents Nos. 2,150,0010 and 2,183,446 are shoes which incorporate an inflatable bladder within a cavity in the heel portion of the shoe, the degree of inflation of the bladder in each case being selectively variable. The shoe of British Patent No. 2,150,010 also incorporates a plurality of sealed air pockets generally in the metatarsal region of the ball of

## 2

the foot. Disclosed in European Patent Application Serial No. 0160880 is a molded shoe sole wherein air can transfer between cavities defined by bulges molded into the sole and heel portions for providing shock absorption and movement facilitation characteristics, though without any possibility of adjusting the air pressure within the cavities. An arrangement similar to that disclosed in European Patent Application Serial No. 0160880 is described in British Patent Application No. 2,073,006, and in the latter case means are provided to enable the desired fluid pressure in the interconnected cavities to be determined. A shoe provided with a selectively inflatable insole is described in British Patent No. 358,205. The shoe described in International Patent Application No. WO 82/00571 has a gas pressure chamber in its sole and includes a pump arrangement which keeps the gas pressure constant. Other shoes incorporating pneumatic structures in their heel and/or sole portions are described in British Patent Specifications Nos. 390,368, 490,647, 2,023,405 and 2,034,169 and in U.S. Pats. Nos. 4,183,156, 4,219,945 and 4,271,606.

None of the aforementioned documents discloses a sports shoe, or a sole for such a shoe, which affords to the user the degree of selectable resilience that is afforded by a pneumatic sole structure having means for pressure adjustment, coupled with selectability as regards the distributed hardness characteristics within the sole and/or heel region.

#### SUMMARY OF THE INVENTION

The principal object of the present invention thus is to overcome or at least substantially reduce the abovementioned disadvantages of conventional shoes.

The present invention in one of its aspects resides in the concept of relieving impact forces on the heels and/or front soles of the feet during exercise, and thereby reducing injuries and fatigue, by incorporating resiliently deformable bodies of selectable or adjustable hardness characteristics in a removable and interchangeable manner within accommodating recesses provided in the thickness of the shoe sole between the inner sole of the shoe contacted by the wearer and the ground contacting sole surface.

Thus, in one exemplary shoe construction according to the invention, spherical pneumatic bodies are provided in accommodating recesses in the shoe sole, with the curved surfaces of the spherical bodies between and in contact with the insole and undersole of the shoe and the bodies, or at least some of them, being selectively inflatable and deflatable to accommodate individual body weights and exercise habits. For wearers who prefer hard soles, the pneumatic bodies may be pumped up relatively hard, whereas, for those who prefer soft soles, they can be softened by releasing some air therefrom.

Furthermore or alternatively, the elasticity of the soles may be adjustably determinable, at least in part, in accordance with the invention, by use of solid or foamed elastomer spherical bodies of selectably different durometer hardnesses, selected for example from three different hardnesses, of 35°, 45°, or 55°, to accommodate individual exercise habits. Such different hardness bodies might for example be made from different densities of EVA (ethylene vinyl acetate), or, if made from foamed elastomer, might be of a closed-cell foamed plastic material so as to take advantage of the resilience imparted by the entrapped gases.

4,887,367

3

In the structure of conventional sports and casual shoes, each shoe is constructed with an upper and a sole extending the full length of the shoe from the heel to the toes, the sole generally comprising a treaded outer wear-resistant sole, a mid-sole portion formed for example of foamed plastics material, an inserted heel sometimes called a heel wedge and an insole pad which usually is removable. In the structure of an exemplary sole of the present invention, the heel and also the metatarsal region of the front sole is provided with one or more punched holes or otherwise formed recesses which penetrate directly from the insole pad to but not through the outer sole through the mid-sole and the heel insert. These recesses underlying the removable insole are accessible to the wearer and may be used by the wearer to removably accommodate small balls or other bodies of different size or diameter and different durometer hardnesses to provide adequate elasticity and support during sporting and recreational activities. As previously mentioned herein, the removable balls may be selectively inflatable for determining their hardness characteristics, or may alternatively be formed of elastomeric material of selectable density and durometer hardness or of a foamed plastic material, preferably of closed-cell configuration.

The bodies received in the heel and/or front-sole recesses do not have to be of spherical configuration in accordance with the invention, other shapes being possible. Thus, according to a further exemplary sole of the present invention, generally cylindrical air-filled bodies are axially received within the recesses, the bodies preferably having concertinafolded cylindrical walls, whereby the resilience of the bodies is concentrated predominantly in their axial direction so as to be of greatest assistance to the wearer of the shoe.

By virtue of the sole structure according to the present invention, the impact forces arising from contact with the ground can be distributed to suit the special requirements of the user. Particularly in the case where the bodies incorporated into the shoe sole are inflatable, but also in other cases, the shock absorber bodies can be selectively adjusted to provide or to maintain a given elastic response. Furthermore, the weight of the shoe itself can be reduced, because the punched hole portions can accommodate insert bodies in the form of air sacs which are certainly lighter than the EVA or PU (polyurethane) material of the heel insert; during exercise, the lighter the shoes, the greater generally are the benefits to the exerciser. Additionally, the geometric shape of the insert bodies enables optimum elasticity characteristics to be achieved, and by providing the wearer with direct access to the insert bodies, the option is obtained to further increase the flexibility of use by varying the degree of inflation of the bodies with air or other gases, or even by the injection of fluids such as oils, emulsions, water, hydrogen, helium etc., into the bodies.

BREIF DESCRIPTION OF THE DRAWINGS

Other features of the present invention are set forth with particularity in the appended claims and will become apparent from the following detailed description of exemplary embodiments which are illustrated in the accompanying drawings.

FIG. 1 is a schematic side view, partly in cut-away cross-section, showing an exemplary sports shoe provided in its sole portion with spherical resilient bodies according to the teachings of the present invention;

4

FIG. 2 is a top plan view of the sole of the sports shoe of FIG. 1, showing the disposition of the spherical resilient bodies in the shoe sole;

FIG. 3 is a schematic side view of an alternative shoe sole according to the present invention, showing the spherical resilient bodies being inflated by means of an air pump;

FIG. 4 is a schematic side view of an alternative sole construction according to the invention wherein a plurality of spherical bodies may be inserted in accordance with the wearers requirements into each of a plurality of recesses in the heel portion of the shoe sole;

FIG. 5 shows schematically a side-elevation view of the construction of the heel portion of a further sports shoe in accordance with the present invention; and

FIG. 6 is a schematic sectional end-elevation view of the heel portion of the sports shoe of FIG. 5.

DESCRIPTION OF PREFERRED
EMBODIMENTS

Referring to FIG. 1, a running shoe generally designated 1 is shown. The shoe 1 includes a sole 2 and an upper 3 secured to the sole, the upper (as is conventional) including a reinforced counter or heel cup surrounding the heel portion of the shoe.

The sole has a synthetic rubber base 4 in which a tread pattern of gripping elements or cleats is formed. The base 4 is attached, for example by means of adhesive or by welding, to a first resilient midsole layer 5 which is in turn attached to a further resilient midsole layer 6, for example by means of adhesive or by welding. The midsole layers 5, 6 may be formed of foamed plastic materials and could, if desired, be formed in one piece rather than as two separate pieces. A further resilient heel wedge layer 7 formed from foamed plastic material is provided at the heel end of the shoe 1. The layer 7 raises the heel portion of the shoe and may be attached to the layer 6 by means of adhesive or by welding, for example, and may be formed all in one piece or alternatively may be formed in two or more longitudinally extending pieces which advantageously can have increasing durometer hardnesses towards the peripheral edges of the heel to ensure lateral stability throughout the life of the shoe.

The complete sole 2 may be secured to the upper 3 by means of adhesive, for example, and a removable insole or foot-bed 8 is provided within the shoe.

Further shown in FIG. 1 is the provision of resilient spherical bodies in the sole of the shoe at the heel and at the ball of the foot. At the heel portion of the shoe there is formed a recess 9 defined by holes punched in the mid-sole layers 5,6 and in the inserted heel wedge 7, and a resilient spherical body 10 is inserted into the recess 9 as shown. The spherical body 10 sits within the recess 9 with its lower surface in tangential contact with the upper surface of the outer sole 4 and its upper surface projecting slightly above the upper surface of the heel wedge 7 for tangentially contacting the underside of the removable insole 8. Further recesses 11 are provided, in a similar manner, at the front portion of the sole in the region of the ball of the wearer's foot, these further recesses as shown being of smaller diameter and greater number than the recess 9 in the heel and being arranged in two or three or more rows each of a plurality of recesses as shown in FIG. 2, and resilient spherical bodies 12 of smaller diameter than the one provided in the heel are accommodated in respective ones of these recesses. As described hereinafter, the resilient spheri-

4,887,367

5

cal bodies 10,12 have the function of determining the elasticity characteristics of the shoe.

FIG. 2 shows a top plan view of the shoe sole 2 and illustrates the arrangement of the recesses 11 in the region of the ball of the foot, it being understood that the illustrated arrangement is exemplary only.

The resilient spherical bodies 10,12, or at least some of them, are preferably gas-filled pneumatic bodies, and preferably are provided with an inflation valve port 13 whereby, as shown in FIG. 3, air may be pumped into or released from the respective spherical body 10,12 by means of an air pump 15, thus to increase or decrease the hardness characteristics of the spherical body for matching the shoe to the body weight and individual requirements of the wearer. This facility is advantageous particularly in the course of a long run, such as a marathon, or a long game, since it enables the shoe characteristics to be adjusted during the run or during the game to take account of different conditions and changing levels of fatigue. On a long run, running shoes can become up to 15° C. hotter than at the start of the run, on account of friction effects, which can cause the inflatable bodies 10,12 to become undesirably firm and insufficiently cushioning. This problem can be overcome, in accordance with the invention, by adjusting the pressure of the inflatable bodies.

In use of a sports shoe constructed in accordance with the present invention, the presence of the resilient bodies provides excellent cushioning and protection against shock, and also provides a resilience to the shoe characteristics which is invigorating and beneficial, the resilience of the spherical bodies as they resile from their compressed states as the foot is lifted providing a positive spring to the step of the wearer.

FIG. 4 shoes schematically a form of shoe sole in accordance with the invention which has a plurality of recesses 16 provided in the heel region of the sole, each recess being of lesser size than the corresponding heel recess provided in the shoe of FIG. 1, and has a plurality of pneumatic bodies 17 provided in each recess, some at least of such bodies being selectively inflatable and deflatable. One effect of this arrangement is to provide a more uniform distribution throughout the heel area of the shoe sole of the advantageous effects provided by the arrangement of FIG. 1.

Referring now to FIGS. 5 and 6 of the drawings, the shoe shown schematically therein comprises an upper 21 and a sole 22, the sole comprising a rubber outsole layer 23, a midsole 24 formed of one or more layers of compression molded EVA, for example, an insole 25 formed of Texon board, for example, and a removable footbed 26 which desirably is reinforced so as to contribute to the lateral stability of the shoe, for example by being transversely ridged. As shown, an opening 27 is provided in the insole 25 in registry with a recess 28 formed in the midsole 24, a reinforcing piece of Texon board 29 is provided in the bottom of the recess 28, and a gas-filled member 30 is received partially within the recess 28.

The gas-filled member 30 as shown has a domed upper or head portion 31 of greater transverse dimension than the opening 27 provided in the insole 25 so that such head portion 31 does not fit into the recess 28 formed in the midsole 24, but rather rests upon the upper surface of the Texon insole 25 around the periphery of the opening 27 and defines an upwardly domed gas cushion seated on the insole. A body portion 32 of the gas-filled member 30 is of generally cylindrical

6

shape, with concertina side walls as shown and a flat base, and fits into the recess 28 formed in the midsole 24.

The gas-filled member 30 is preferably arranged to be removable from its accommodating recess in the shoe sole, and different members having different gas pressures can be made available whereby the shoe can be configured to suit the requirements of the user. Additionally, or alternatively, the gas-filled member 30 can as shown be provided with a valve 33 enabling it to be selectively inflated or deflated.

The concertina-pleated side walls of the gas-filled member 30 provided the advantage that the pneumatic resilience of the member is substantially unidirectional and in the axial direction of its accommodating recess, which is advantageous as regards the stability of the shoe.

The lateral edges of the midsole 24, at least in the region of the heel of the shoe, may be of greater durometer hardness than the central midsole region to ensure that the lateral stability of the shoe is maintained during the life of the shoe. This is indicated schematically in FIG. 6 by the shaded lateral areas of the midsole 24 and might, for example, be achieved by forming the midsole of a number of different portions formed of different density materials and adhered together.

The gas-filled member 30 can be made in the form of a single hollow gas-filled sac formed of a suitable synthetic plastic material, or could be a composite body formed as a plurality of gas-filled sacs adhered together. Alternatively, the gas-filled member 30 could be formed in whole or in part as a closed-cell foamed plastic structure. Additionally, pneumatic resilience could be provided in the ball of the foot region of the shoe by incorporation therein of resilient bodies similar to the member 30 or of any other suitable shape and form. Furthermore, while FIGS. 5 and 6 show the provision of only one resilient member 30 in the heel of the shoe, it will be appreciated that more than one such member could be provided.

While the invention has been described herein in relation to specific embodiments, it is to be well understood by those skilled in the art that the invention can be embodied in other forms. For example, the resilient bodies provided in the shoe sole can be of virtually any shape that is capable of providing cushioning; they could comprise, for example, circular disc shaped bodies, oval or egg shaped hemispherical bodies, cylindrical bodies, rectangular or etc. Furthermore, the resilient bodies need not be inflatable, but could, for example, comprise solid elastomeric material.

We claim:

1. A sport shoe or casual shoe comprised of an upper and a sole, the sole comprising an outer sole, a mid-sole and an insole, and wherein the mid-sole is configured with at least one hole so as to define at least one recess within the sole, and at least one resilient body of selectable hardness characteristics is received within said at least one recess, said at least one resilient body being provided with a port or valve whereby a fluid may be introduced into or extracted from the body for changing the characteristics thereof to match the requirements of the wearer.

2. A sports shoe or casual shoe according to claim 1 wherein said port or valve is accessible via the insole of the shoe.

3. A sports shoe or casual shoe according to claim 1, in which said at least one resilient body is adapted to be replaceable by the wearer via the insole.

4,887,367

7

**4.** A sports shoe or casual shoe according claim **1** in which a plurality of resilient bodies selected in dependence upon the wearers requirements are adapted to be inserted into said at least one recess.

**5.** A sports shoe or casual shoe according to claim **1** wherein said at least one resilient body is generally spherical.

**6.** A sports shoe or casual shoe according to claim **1** wherein said at least one resilient body is generally cylindrical with its axis generally perpendicular to the plane of the sole.

**7.** A sports shoe or casual shoe according to claim **6** wherein the cylindrical side wall of said at least one resilient body is concertina-pleated.

**8.** A sports shoe or casual shoe according to claim **6**, wherein said at least one resilient body has an enlarged domed head portion underlying the insole.

**9.** A sports shoe or casual shoe according to claim **1** wherein said at least one recess is provided in a heel portion of the shoe sole.

**10.** A sports shoe or casual shoe according to claim **1** wherein said at least one recess is provided in a metatarsal portion of the shoe sole.

**11.** A sports shoe or casual shoe according to claim **11**, in which at least one said recess is provided in the heel portion of the shoe and a plurality of such recesses are distributed throughout the metatarsal portion of the shoe.

**12.** A sports shoe or casual shoe according to claim **10**, in which at least one said recess is provided in the heel portion of the shoe and a plurality of such recesses are distributed throughout the metatarsal portion of the shoe.

**13.** A sports shoe or casual shoe comprising an upper, a sole, and a removable insole, said sole comprising a wear-resistant outsole layer, at least one midsole layer, and a heel wedge, at lest one recess being defined in said heel wedge and midsole layer between the underlying outsole and the overlying insole, and a pneumatically resilient body of selectable hardness characteristics being received within the at least one recess and being accessible for changing the hardness characteristics thereof by removal of the insole, said pneumatic resilient member comprising a generally cylindrical member axially received in said recess and having a first end supported by the axially innnermost end of said recess and a second enlarged end defining a domes upper end surface underlying said removable insole and peripher-

8

ally supported by said midsole layer, the cylindrical surface of said pneumatic resilient member being concertina-pleated whereby the pneumatic resilience of said member is predominantly axially directed.

**14.** A sports shoe or casual shoe comprising an upper, a sole, and a removable insole, said sole comprising a wear-resistant outsole layer, at least one midsole layer, and a heel wedge, a first recess being formed in said heel wedge and midsole layer at a first location corresponding to the heel of a wearer's foot, a plurality of second recesses being formed in said midsole layer at a plurality of second locations corresponding to the metatarsal region of a wearer's foot, said recesses being bounded on the underside by the outsole layer and above by the removable insole, a first resilient body of selectable hardness characteristics removably received in said first recess, the first resilient body comprising a gas-filled body and valve means for selectively inflating and deflating said body, and a plurality of second resilient bodies of selectable hardness characteristics removably received in said plurality of second recesses.

**15.** A sports shoe or casual shoe according to claim **14**, wherein at least some of said plurality of second resilient bodies comprise gas-filled bodies.

**16.** A sports shoe or casual shoe according to claim **14**, wherein at least some of said plurality of second resilient bodies comprise elastomer bodies of selected hardness characteristics.

**17.** A sports shoe or casual shoe comprising an upper, a sole, and a removable footbed, said sole comprising a wear-resistant outsole, a midsole, and an insole, said removable footbed overlying said insole, and wherein an opening in said insole in the region thereof which corresponds to the heel of said shoe communicates with an opening in said midsole so as to define a recess extending between said outsole and said removable footbed, and a pneumatic resilient member is accommodated in said recess, said pneumatic resilient member comprising a generally cylindrical member axially received in said recess and having a first end supported by the axially innermost end of said recess and a second enlarged end defining a domed upper end surface underlying said removable footbed and peripherally supported by said insole, the cylindrical surface of said pneumatic resilient member being concertina-pleated whereby the pneumatic resilience of said member is predominantly axially directed.

* * * * *

# UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.  :   4,887,367

DATED       :   DECEMBER 19, 1989

INVENTOR(S) :   Terry MACKNESS; Frank VAN WEZEL

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 7, line 25:
Claim 11 should be dependent on claim 9.

Column 7, line 37:
Claim 13, line 4, the word "least" is misspelled.
Column 7, line 47:
Claim 13, line 14, the word "domed" is misspelled..

Signed and Sealed this

Fifteenth Day of October, 1991

*Attest:*

HARRY F. MANBECK, JR.

*Attesting Officer*                  *Commissioner of Patents and Trademarks*

# United States Patent [19]

**Chang**

[11] **Patent Number:** **4,918,838**

[45] **Date of Patent:** **Apr. 24, 1990**

[54] **SHOE SOLE HAVING COMPRESSIBLE SHOCK ABSORBERS**

[75] Inventor: **David J. H. Chang**, Taichung, Taiwan

[73] Assignee: **Far East Athletics Ltd.**, Taipei, Taiwan

[21] Appl. No.: **228,458**

[22] Filed: **Aug. 5, 1988**

[51] Int. Cl.⁵ ....................... **A43B 13/20; A43B 21/26**

[52] U.S. Cl. ............................................. **36/28; 36/29**

[58] Field of Search ................. 36/28, 29, 35 R, 35 B, 36/36 R, 37, 102

[56] **References Cited**

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,229,889 | 10/1980 | Petrosky | 36/28 |
| 4,577,417 | 3/1986 | Cole | 36/28 X |
| 4,680,876 | 7/1987 | Peng | 36/35 R X |
| 4,768,295 | 9/1988 | Ito | 36/29 X |
| 4,779,359 | 10/1988 | Famolare | 36/28 |

*Primary Examiner*—Donald Watkins

*Attorney, Agent, or Firm*—Cushman, Darby & Cushman

[57] **ABSTRACT**

This is a sole with compressible shock absorbers which not only provides an improved shock absorbing function but also provides more comfort for the wearer. The shock absorbers consist of a polygonal replaceable air bellows placed in a polygonal recess on the forefoot section of the shoe and a cylindrical replaceable air cylinder placed in a circular recess on the heel section of the shoe. The air cylinder and air bellows are made of an integrally resilient air-tight material such that, during exercise, the shock absorbers absorb and then return the energy in a controlled upward direction, by way of the bellows-type body and the friction caused between the inside wall of the recess and the bellows itself. Moreover, since the shock absorbers can be placed easily by hand, the wearer can adjust the shoes in line with his weight and type of sport performed. The uses of the shoe are therefore maximized because the air cylinder and air bellows will continue to function even after the outer sole has experienced considerable wear and tear.

12 Claims, 6 Drawing Sheets





*Fig. 1.*





*Fig. 1A.*



*Fig. 2.*



*Fig.3.*

*Fig.5A.*

*Fig.5B.*





*Fig.4B.*

*Fig.4A.*







*Fig. 6A.*



*Fig. 6B.*



*Fig. 6C.*

4,918,838

**1**

# SHOE SOLE HAVING COMPRESSIBLE SHOCK ABSORBERS

The present invention relates to a sole with compressible shock absorbers and, in particular, to replaceable air cylinders and bellows installed respectively in the heel and forefoot of the shoe. These compressible air cylinders and bellows provide complete shock absorbtion for the foot.

In our daily life, our shoes are the instruments that bear the weight of our body and are constantly subjected to the impact of that weight throughout the day. Our shoes are, therefore, the most important medium through which the external force acts on the body.

Through research we have discovered that the impact force exerted on the soles of the shoes of an ordinary man during running is three to four times greater than that during walking. This is because of the combination of gravity together with the effects of body weight at running speed. Moreover, the impact is concentrated on the heel and forefoot portions of the foot, one foot at a time only. This quickly results in tiredness, muscular pain and possibly in serious injury. In view of this, it is essential that the structural design of the shoe must not only provide comfort for the wearer but must also reduce the heavy impact of the external force acting again the sole of the shoe.

The primary intention of this invention is to overcome the disadvantages mentioned above by providing replaceable air cylinders and bellows which are inserted into purposely dimensioned recesses both in the forefoot and heel area of the shoe's midsole. In this way, the wearer, when exercising, it relieved of the strong external impact on the bottom of the foot.

Furthermore, by using air cylinders constructed out of a resilient, totally air-tight material whereby the air sealed within has been precisely controlled by means of specially designed equipment, one can ensure that the desired shock absorbing effect can be permanently maintained. Under normal conditions, the air pressure within the cylinders is between 3–5 psi. However, for those with a heavier body or for particularly strenuous exercises, the internal air pressure can be increased to between 6–8 psi. The air cylinders will continue to provide shock absorbtion and protection from injury, even after the outsoles of the shoes have been subjected to considerable wear-and-tear.

The invention works in the following way: the cylindrical replaceable air cylinder is bedded into the heel portion of the foot. The upper end forms a lip over the precisely dimensioned recess, once in place, such that the cylinder will remain in proper contact with the heel of the foot regardless whether or not the sole is on the ground. The flange acts also to prevent the cylinder from collapsing down into the upper surface of the sole unit.

The air cylinder in place, it now undergoes two stages of compression once subjected to the pressure resulting from the wearer's exercise. The first stage allows the top surface of the cylinder to be flattened down onto the level of the sole itself. Part of the shock is absorbed at this stage. The remainder of the resultant shock is transmitted down towards the base of the cylinder via the bellows, the side walls of the cylinder itself. The shock absorbtion is thus gradual and controlled. The same effect is experienced at the forefoot where the air bellows performs the same function.

**2**

A further benefit of this invention is that the air cylinder and air bellows are made of an integrally resilient material such as polyvinyl chloride or polyurethane or rubber. Since the replaceable one-piece cylinder can simply be placed manually into the recess in the shoe's sole, no further production processes are required for final shoe manufacture. In this case, production is both efficient and cheap and servicing is practicable.

A special feature worthy of mentioning is that the air cylinder and air bellows are quite different from the inflatable air cushion or air-bag sole presently prevailing in the market place. The major difference is that the air cylinder and air bellows absorb shock and impact and then return the energy only through the two upermost points of the cylinders' arcs. Foot stability is not affected because the horse-shoe shaped section of EVA (FIG. 1A), in which the cylinder and bellows are encased, provides a much large area of stability.

However, in the case of the air cushion or air-bag there is a much larger area through which the shock is absorbed, and, by extension, the surrounding area of EVA is much smaller and thus giving no extra element of stability. As a result, the foot will move from side to side within the shoe itself leading not only to instability but also, and more seriously, to injuries.

Finally, since the simplicity of this invention allows one to position and remove the air cylinder manually, the user may select, according to his weight and type of sport, a replacement air cylinder with a greater density (ie. 6–8 psi).

## BRIEF DESCRIPTION OF THE DIAGRAMS

The following description of the air cylinder and air bellows concept should be read in line with the attached diagrams, as follows:

FIG. 1 Perspective view of the various components of the aforesaid invention;

FIG. 1A Shows the horseshoe type stabilizer made of a more dense material surrounding the air cylinder at the heel section of the shoe;

FIG. 2 is cross-section of the sole and the correct placement of the shock absorber;

FIG. 3 Top elevation view demonstrating placement of shock absorbers in the sole-unit itself;

FIG. 4A Shows the changes experienced during movement by the air bellows at forefoot section of the shoe;

FIG. 4B Shows the changes experienced during movement by the air cylinder at the heel of the shoe;

FIG. 5A Shows the changes experienced during jumping by the air bellows at the forefoot section of the shoe;

FIG. 5B Shows the changes experienced during jumping by the air cylinder at the heel of the shoe;

FIG. 6 Shows the air bellows of the afore-said invention in:

A. normal condition

B. during rapid vertical impact (i.e. jumping)

C. during impact, air bellows forms an arc to accomodate metatarsal bones.

## DETAILED DESCRIPTION OF THE INVENTION

In reference to FIGS. 1 and 2, the cylindrical body (item No. 21) of the replaceable air cylinder is placed into the circular recess (item No. 121) in the heel portion of the sole unit (item No. 1). The bellows like body (item No. 13) of the replaceable air bellows (item No. 3)

4,918,838

3

is placed into a square-shaped recess (item No. 111) in the forefoot section of the sole unit (item No. 11). The bottom ends of the air cylinder and air bellows are both smooth planar surfaces such that they come into line with the upper surface of the outer sole (item No. 5) by way of simple manual insertion. A removable innersole pad (item No. 4) is made of ethylene-vinyl acetate polymer or polyurethane and is provided with a dome (item No. 22) at the heel area and with a quadrilateral profile at the forefoot area. The bottom surface of the dome is shaped to cover the uppermost surface arc of the air cylinder (item No. 2) and the bottom surface of the forefoot of the innersole pad (item No. 4) is shaped to cover the uppermost surface of the air bellows (item No. 3). During assembly, therefore, the innersole pad fits perfectly over the configuration of the air cylinder and bellows respectively, ensuring maximum comfort for the wearer.

In reference to FIG. 4A, the diagram shows how the air bellows changes shape to protect the metatarsal bones when the sole of the shoe hits the ground. Moreover, during running, the configuration of the air bellows changes in proportion to the magnitude of the impact force applied to the sole. In this way, the effects of shock absorbtion, energy return and comfort are achieved.

FIG. 4B shows the configuration of the air cylinder (item No. 2) at the heel of the foot before being subjected to the impact force.

FIG. 5B shows the changes in the configuration of the compressed air cylinder (item No. 2) when the heel is subjected to a strong impact force. In such cases, it is precisely the heel that transmits the force through to the air cylinder from the top surface to the bottom of the sole such that the force is broken down into 2 stages achieving the dual effects of energy return and shock absorbtion.

A flange (item No. 23) is formed at the point where the side walls of the air cylinder meet the surface arc. Once in place, the air cylinder undergoes two stages of compression. The first half of the shock is absorbed when, on being subjected to the initial pressure, the top surface of the cylinder is flattened down onto the level of the sole itself (item No. 1). The remainder of the shock is transmitted down towards the base of the cylinder via the side walls (ie. bellow) of the air cylinder. Since the air cylinder contracts downwards within the recess (and since the cylinder itself is totally air-tight), the impact is returned to the foot and transform a kind of energy in direct relation to the impact exerted. The harder the impact, the more the energy is returned. Both the recess (item No. 121) and the bellow-like body of the air cylinder (item No. 21) control the direction of the impact force and, in turn, cause the energy inside the air cylinder to move at once downwards and then immediately upwards, such as a piston in an engine. Moreover, the friction created between the inside of the recess and the walls of the bellows-like body produces heat and causes the air inside the cylinder to expand. In this way, the air cylinder becomes more rigid and tends to be more resilient even after a long run.

The effects of energy return and shock control not only enable the wearer to conserve energy but also serve to reduce the possibility of injury. Marathon runners can run longer and faster, basketball players can jump higher.

FIG. 6 shows the physical state of a polygonal replaceable air bellows placed in the forefoot portion of

4

the shoe during exercise and the resultant response in terms of shock absorbtion. Comfort is ensured because the curve of the shock absorber alters in line with the shape of the wearer's foot, regardless of his weight or type of sport.

I claim:

1. A shoe sole unit with compressible shock absorbers comprising:
   shock absorbers which comprise a replaceable generally cylindrically-shaped air cylinder installed at the heel, and a replaceable polygonal-shaped air bellows at the forefoot portion respectively;
   a sole unit which provides on the forefoot and the heel portion a suitable recess for receiving each of said replaceable shock absorbers; and
   a removable innersole pad disposed above said sole unit and said replaceable shock absorbers thereby obtaining a shock absorbing shoe sole unit with that also provides energy return, and motion control.

2. A shoe sole unit according to claim 1 wherein said air bellows is shaped so as to have a pre-determined number of folds in the vertical direction with which said air bellows is capable of contracting steadily when subject to an impact force.

3. A shoe sole unit according to claim 1 wherein said replaceable air cylinder comprises an uppermost arced surface and a cylindrical body located thereunder, said cylindrical body having a pre-determined number of bellows like folds in the vertical direction, whereby, upon the application of an impact force, first, said uppermost arced surface is pressed inwardly and second, said cylindrical body contracts steadily in the vertical direction.

4. A shoe sole unit according to claim 3 wherein said replaceable air cylinder has a flange at the intersection of said uppermost surface arc and said cylindrical body such that said flange is in exact engagement with the surface of said sole unit and is adjacent to the recess.

5. The shoe sole unit according to claim 1 wherein said recess on the forefoot portion of said shoe sole is of shape and size identical to those of said polygonal replaceable air bellows such that said polygonal replaceable air bellows can be received in said recess; and said recess on the heel portion of said shoe sole is of shape and size identical to those of said cylindrical replaceable air cylinder such that said cylindrical replaceable air cylinder can be received in said recess on the heel portion.

6. A shoe sole unit comprising:
   shock absorbers including a replaceable cylindrically-shaped air cylinder installed at the heel portion thereof, and a replaceable polygonal air bellows installed at the forefoot portion thereof, respectively;
   a sole unit structurally arranged to provide on its forefoot and heel portions thereof a recess for receiving each of said replaceable shock absorbers; and
   a removable innersole pad disposed above said sole unit and said replaceable shock absorbers.

7. A shoe sole unit comprising:
   shock absorbers including a replaceable air cylinder installed at the heel portion thereof, and a replaceable air bellows installed at the forefoot portion thereof, respectively, said replaceable air bellows having the same thickness as the forefoot portion of said shoe sole and said replaceable air cylinder

4,918,838

5

being the same height as the heel portion of said shoe sole;

a sole unit structurally arranged to provide on its forefoot and heel portions a suitable recess for receiving each of said replaceable shock absorbers; and

a removable innersole pad disposed above said sole unit and said replaceable shock absorbers.

8. A shoe sole unit comprising:

shock absorbers including a replaceable air cylinder installed at the heel portion thereof, and a replaceable air bellows installed at the forefoot portion thereof, respectively;

a sole unit structurally arranged to provide on the forefoot and heel portions thereof a suitable recess for receiving each of said replaceable shock absorbers; and

a removable innersole pad disposed above said sole unit and said replaceable shock absorbers, said

6

removable innersole having an inward, concave, bottom surface profile at the forefoot and heel portions thereof respectfully.

9. A shoe sole unit according to claim 8 wherein said inward, concave, bottom surface profile above said forefoot portion is arranged so as to mate with the top surface of said replaceable air bellows.

10. A shoe sole unit according to claim 8 wherein said inward, concave, bottom surface profile above said heel portion is arranged so as to mate with the top surface of said uppermost surface arc of said replaceable air cylinder.

11. The shoe sole according to claim 8 wherein said removable innersole pad is made integrally of polyurethane.

12. The shoe sole according to claim 8 wherein said removable innersole pad is made integrally of ethylene-vinyl acetate polymer.

* * * * *

**EXHIBIT D
(Part 4 of 17)**

# United States Patent [19]

**Rennex**

[11] **Patent Number:** 4,936,030

[45] **Date of Patent:** Jun. 26, 1990

[54] **ENERGY EFFICIENT RUNNING SHOE**

[76] Inventor: **Brian G. Rennex**, 2332 Antiqua Ct., Reston, Va. 22091

[21] Appl. No.: **269,750**

[22] Filed: **Nov. 8, 1988**

### Related U.S. Application Data

[63] Continuation-in-part of Ser. No. 65,595, Jun. 23, 1987, abandoned.

[51] Int. Cl.⁵ .......................... A43B 13/18; A43B 7/32
[52] U.S. Cl. ............................................. 36/28; 36/29; 36/102
[58] Field of Search ..................... 36/27, 28, 29, 35 R, 36/35 B, 38, 102, 129

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,044,190 | 7/1962 | Urbany . |
| 3,914,881 | 10/1975 | Sartegel . |
| 4,030,213 | 6/1987 | Daswick . |
| 4,183,156 | 1/1980 | Rudy . |
| 4,217,705 | 8/1980 | Donzis . |
| 4,237,625 | 12/1980 | Cole . |
| 4,322,893 | 4/1982 | Halborsen . |
| 4,342,158 | 8/1982 | McMahon et al. . |
| 4,358,902 | 11/1982 | Cole . |
| 4,420,893 | 12/1983 | Stephan . |
| 4,446,346 | 5/1984 | Johnson . |
| 4,451,994 | 6/1984 | Fowler . |
| 4,486,964 | 12/1984 | Rudy . |
| 4,546,555 | 10/1985 | Spademan . |
| 4,635,384 | 1/1987 | Huh et al. . |
| 4,660,299 | 4/1987 | Omilusik . |
| 4,680,876 | 7/1987 | Peng . |

4,763,426  8/1988  Polus et al. .

#### FOREIGN PATENT DOCUMENTS

2183446  11/1986  United Kingdom .

#### OTHER PUBLICATIONS

"Groucho Running," *J. Applied Physiology* 23–26 (Jun. 1987), by T. McMahon and P. Greene.
"Running Shoes Waste Natural Energy of Feet," *N.Y. Times*, Sect. C, p. 2 (Jun. 2, 1987) by J. Gleick.
"Mechanics of Locomotion," 3*Int. J. of Robotics Research* 4 (1984), by T. A. McMahon.

*Primary Examiner*—Donald Watkins
*Attorney, Agent, or Firm*—Lowe, Price, LeBlanc, Becker & Shur

[57] **ABSTRACT**

This invention relates to a shoe having a mechanism in its sole to transmit the mechanical energy of heel impact to the front of the foot, where it is stored and then released during thrust. The mechanical energy of the impact on the rest of the foot (in front of the heel) is also stored and then released during thrust. The shoe is energy-efficient in that it returns as much of the energy of impact as possible to the runner during thrust. This means that the leg and foot muscles do not have to do as much work to lift the body weight against gravity. In addition to this resiliency feature, there is a compliance feature which reduces the impact shock on the runner's skeleton, muscles, and tendons. This compliance is achieved because the foot impact force is transmitted to the upper skeleton through a spring, which softens the shock transmitted to this upper skeleton.

**43 Claims, 10 Drawing Sheets**



FIG. 1



FIG. 2



FIG. 3





FIG. 4

FIG. 5

FIG. 6

Case 1:04-cv-12668-RGS    Document 18-9    Filed 05/02/2005    Page 5 of 25



FIG. 7

FIG. 8



FIG. 9

Case 1:04-cv-12668-RGS    Document 18-9    Filed 05/02/2005    Page 6 of 25



FIG. 10



FIG. 11

FIG. 12

FIG. 13





FIG. 14

Case 1:04-cv-12668-RGS    Document 18-9    Filed 05/02/2005    Page 8 of 25

FIG. 15



FIG.16



FIG.17



FIG. 18



FIG. 19



FIG. 20



Case 1:04-cv-12668-RGS    Document 18-9    Filed 05/02/2005    Page 10 of 25

# FIG. 21





# FIG. 22



FIG.23



FIG.24

FIG.25

FIG.26



FIG.27

Case 1:04-cv-12668-RGS    Document 18-9    Filed 05/02/2005    Page 13 of 25

FIG.28



4,936,030

<div style="display:flex">
<div>

**1**

### ENERGY EFFICIENT RUNNING SHOE

#### BACKGROUND OF THE INVENTION

This is a continuation-in-part of Application Ser. No. 065,595, now abandoned, filed 6-23-87. This invention relates to running shoes and in particular to energy-efficient running shoes.

The act of running involves vertical motion of a runner's center of gravity. The lifting of the runner's weight requires muscle work. When the runner's foot impacts the ground, the kinetic energy and the momentum associated with the vertical motion must be absorbed. Some of the vertical kinetic energy is stored in the resilient parts of the leg and foot, but most of it is lost to the ground and the leg. The lost energy must be replaced by muscle work. This invention is intended to minimize lost energy or, equivalently, to maximize the energy efficiency of running.

Scientific inquiry of running includes the study of the efficiency of running as a function of various parameters. Researchers have been attempting to apply their results to the optimization of running parameters to achieve greater energy efficiency and to reduce injuries. Dr. Thomas A. McMahon of Harvard University discussed how the resiliency of tracks can be tuned to improve performance and safety in his article "Mechanics of Locomotion," T. McMahon, 3 *Int. J. of Robotics Research* 4 (1984). One of his results is that running times improve by two or three percent and injuries are reduced by a factor of two when the effective spring constant of the track is approximately two times that of a runner's leg. Running shoes cannot improve energy efficiency equivalent to that achieved with tuned tracks, however, because impact is on the heel whereas take-off is from the toe.

Even if all of the impact energy is efficiently returned to the runner in toe thrust, the improvement in running times is expected to be only two or three percent. The reason is that the shoe acts in series with the runner's leg. Also, for effective running, the runner's knee must bend almost the same amount regardless of the spring in the shoes. Consequently, the runner's leg must work to support almost the same force for almost the same time, even though the shoe is providing some springboard action. The small benefit of a few percent results from the fact that the springboard action enables the runner to bound slightly higher, while bending the knee slightly less, for an equivalent amount of muscle work. Prior art running shoes capture roughly half of the impact energy (that due to front sole impact) and would be expected to improve running times by roughly one percent. My invention captures the other half and improves running times by yet another one percent.

Two concepts important in understanding the manner in which running shoes operate are compliance and resilience. Compliance refers to the property of the sole to give or compress upon foot impact; resilience refers to the property of the sole to return to its original shape. This can be made clearer by referring to a spring model with damping. The term damping includes all friction losses. A spring system may be very compliant by virtue of having considerable damping, but not energy efficient. Prior art running shoes have this drawback. The term resilience as used herein means that damping is minimized, so energy efficiency is maximized. In summary, compliance describes a system where impact

</div>
<div>

**2**

energy is lost as well as conserved, whereas resilience refers to a system where energy loss is minimized.

An example of an invention that provides compliance in a shoe is described in U.S. Pat. No. 4,446,634. This shoe has liquid-filled bladders under the heel and sole, and controls the heel compliance with an adjustable valve in between. Since provision is made for energy storage and release, however, this shoe would not be energy efficient.

U.S. Pat. Nos. 4,237,625 and 4,358,902 disclose energy-efficient shoes. These have liquid-filled bladders below the heel and ball of the foot and resilient material below these bladders. However, there is no provision to transmit the energy of heel impact to the front of the foot, to store it, and to release it during thrust. The only energy that might be returned during thrust is that stored in the resilient material below the front of the foot, and this would be a small portion of the impact energy. Accordingly, this shoe would not be very energy-efficient.

U.S. Pat. No. 4,451,994 discloses a shoe having a resilient mid-sole. This shoe cannot capture the heel-impact energy, nor can it give back much of the "mid-sole-impact" energy during thrust. U.S. Pat. No. 4,030,213 discloses a shoe with springs throughout the sole. This shoe may be compliant, but it would not be energy efficient, since there is no provision for transferring heel impact energy to the front of the shoe.

Other references discovered by applicant during a prior art search are the following: U.S. Pat. Nos. 3,914,881; 4,217,705; 4,420,893; 4,546,555; 4,183,156; 4,486,964; 4,763,426; 4,635,384 and 4,342,158. Although compliant shoes are disclosed in these patents, none are energy-efficient.

#### SUMMARY OF THE INVENTION

Accordingly, one subject of the present invention is to provide a running shoe with improved performance that will make running more enjoyable and satisfying.

Another object of the present invention is to provide a running shoe that will reduce injuries.

A further object of the present invention is to provide a running shoe that will provide a high level of energy efficiency and adequate compliance on existing noncompliant surfaces, such as concrete.

A still further object of the present invention is to provide a shoe that will make walking less tiring and more comfortable by reducing the shock on the foot and other body parts.

Another still further object of the present invention is to provide a running shoe that has the ability to dramatically reduce impact shocks on the foot and body to compensate for weakened body parts, without a loss of running speed or energy efficiency.

Another object of the present invention is to provide a running shoe that corrects for pronation problems.

Yet another object of the present invention is to improve running times over prior art running shoes.

Other objects of the present invention will be apparent to those skilled in the art from the specification and drawings.

Briefly, in accordance with one embodiment of this invention, the foregoing objectives are achieved by providing a running shoe with a sole structure that transmits the force and energy of heel impact produced by vertical kinetic energy to the front of the shoe where it is stored. At the proper time this energy is released to

</div>
</div>

4,936,030

3

contribute to the thrust off of the running surface at the front of the shoe.

The structure of this embodiment is comprised of two mechanisms. The first, referred to hereinafter as the "transmission mechanism," transmits the heel impact force to the front of the foot; the second, referred to hereinafter as the "storage/thrust mechanism," stores the energy associated with this force and then releases it during thrust. The transmission mechanism is mechanically coupled to the storage/thrust mechanism so that when the runner's heel impacts the running surface, the resulting impact energy is transmitted to the front of the foot where it is briefly stored and then released from the front of the foot during takeoff.

In another embodiment the foregoing objectives are achieved by providing means in the heel of the shoe which transmits the energy of heel impact produced by vertical kinetic energy, means for storing this energy and separate means in the front of the shoe for releasing this energy to contribute to thrust off of the running surface.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a schematic side view of the running shoe according to this invention, showing the location in the sole of the transmission mechanism and the storage/-thrust mechanism.

FIG. 2 is an end view of the heel portion of the first embodiment of this invention, showing the transmission mechanism.

FIG. 3 is a top view of the heel portion of the first embodiment of this invention.

FIG. 4 is a perspective view of the force-redirection mechanism used in the first embodiment of this invention.

FIG. 5 is a side view of the first embodiment of this invention, showing the transmission mechanism and the storage/thrust mechanism.

FIG. 6 is a perspective view of the storage/thrust mechanism used in the first embodiment of this invention.

FIG. 7 is a front view of the toe portion of the first embodiment of this invention, showing the storage/-thrust mechanism.

FIG. 8 is a top view of the toe portion of the first embodiment of this invention, showing the storage/-thrust mechanism.

FIG. 9 is a side view of the ratchet release mechanism used in the first embodiment of this invention.

FIG. 10 is a "force versus time" curve for a runner's foot impact and thrust.

FIG. 11 is a side view of the heel portion of a variation of the first embodiment of this invention using a double rack and pinion transmission mechanism.

FIG. 12 is an end view of an anti-tilt mechanism for the heel force plate of this invention.

FIG. 13 is a side view of a second embodiment of this invention, showing the transmission mechanism and the storage/thrust mechanism using Sylphon bellows.

FIG. 14 is a bottom view of the running shoe of this invention, showing two storage/thrust mechanisms.

FIG. 15 is a side view of the heel portion of a third embodiment of this invention, using two Sylphon bellows in the transmission mechanism.

FIG. 16 is a side view of the toe portion of a fourth embodiment of this invention using sequential storage springs.

4

FIG. 17 is another side view of the toe portion of the fourth embodiment of this invention, showing the sequential compression of all storage springs.

FIG. 18 is another side view of the toe portion of the fourth embodiment of this invention, showing the mechanism for sequentially compressing the storage springs.

FIG. 19 is another side view of the toe portion of the fourth embodiment showing the position of the storage springs when the first spring is fully compressed.

FIG. 20 is a "force versus time" curve for the fourth embodiment of this invention.

FIG. 21 is a side view of the toe portion of a variation of the fourth embodiment of this invention in which two storage springs are compressed so as to achieve a combined constant "force versus time" curve.

FIG. 22 is a "force versus time" curve for the variation of the fourth embodiment of this invention illustrated in FIG. 21.

FIG. 23 is a side view showing the hydraulic energy transfer mechanism of the fifth embodiment of this invention.

FIG. 24 is a side view of an auxiliary heel stabilizer employing stabilizer bellows for the fifth embodiment of this invention.

FIG. 25 is an end view of an auxiliary heel stabilizer employing a stabilizer cable and a stabilizer roller for the fifth embodiment of this invention.

FIG. 26 is a top view of the auxiliary heel stabilizer employing a stabilizer cable and stabilizer roller for the fifth embodiment of this invention.

FIG. 27 is a side view of the auxiliary heel stabilizer shown in FIGS. 25 and 26.

FIG. 28 is a top view of a sixth embodiment of the invention showing possible locations of multiple hydraulic bellows and multiple energy accumulators of the type used in the fifth embodiment.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Referring now to the drawings wherein like referenced numbers designate identical or corresponding parts throughout the several views, FIG. 1 is a schematic representation of the location of transmission mechanism 1, which re-directs the runner's heel impact force and transmits it to the front of the sole, and storage/thrust mechanism 2, which stores the energy of the heel impact force below the front of the foot and releases it to contribute to the thrust which propels the runner back into the air.

Referring now to FIG. 2, heel force plate 3, which is positioned under the runner's heel 4, receives the force of heel impact on running surface 5. Heel force plate 3 has four vertical guide bars 6, arranged in a quadrilateral configuration about heel 4, which move perpendicular to the running surface in channels 7 in anti-tilt housing 8. This ensures that heel force plate 3 does not tilt or bind, even when the impact force of the ground is not centered on it. Stops 9 on guide bars 6 prevent the guide bars from exiting channels 7.

FIG. 3 more clearly illustrates anti-tilt housing 8, and guide bars 6 and channels 7 contained therein. As further shown in this figure, force re-direction mechanism 10, which is driven by the upward motion of heel force plate 3, causes drive shafts 11, positioned at opposite sides of the sole, to move forward toward the toe of the running shoe, thereby transmitting the heel impact force to the front of the sole.

4,936,030

5

One end of force re-direction mechanism 10 is shown in greater detail in FIG. 4. It should be noted that the other end of this mechanism has the same component parts and operates in the same manner as described hereinafter. Heel force plate 3 comprises horizontal plate 12, whose bottom is covered with a conventional running shoe material such as Vibram, and raised plate 13 aligned perpendicular to plate 12. Pin 14 is attached to the top portion of raised plate 13 and extends slightly beyond the side edge thereof. Hinged link 15, located along side the end of vertical plate 12, is rotatably fastened to pin 14. The other end of hinged link 15 is rotatably fastened at the end of one arm of conventional bent lever 16 by pin 17. Bent lever 16 is rotatably fastened to an axle 18 at the junction point of its two arms.

Referring again to FIG. 2, axle 18 passes through and is embedded in sole 19 of the running shoe, so that it does not move relative to sole 19. The upper arm of bent lever 16 is rotatably fastened to a second hinged link 20 by pin 21. The other end of hinged link 20 is rotatably fastened to drive shaft 11 by pin 22.

When heel force plate 3 strikes running surface 5, the impact force causes it to move upward toward heel 4 and sole 19. Since axle 18 is not free to move relative to sole 19, the upward movement of heel force plate 3 causes hinged link 15 to move upward and bent lever 16 to rotate in an arc in a counterclockwise direction. It should be understood that the corresponding bent lever on the opposite end of heel force plate 3 will rotate in the same direction as bent lever 16. Raised plate 13 is used because hinged link 15 must pull rather than push. The counterclockwise rotation of bent lever 16 pulls hinged link 20 towards the toe of the shoe, thereby forcing drive shaft 11 to travel in the same direction. Hence, it will be seen that hinged link 20 converts the circular arc motion of bent lever 16 to the straight-line motion of drive shaft 11. It should also be noted that the two legs of bent lever 16 may be of different lengths in order to provide mechanical advantage to force-redirection mechanism 10.

Referring now to FIG. 5, drive shaft 11 is coupled at its front end to another force re-direction mechanism 23. Drive shaft 11 is contained in a shaft housing 24, which constrains it to travel forward and rearward in a straight line. It should be understood that an identical drive shaft and shaft housing are located on the opposite side of the shoe.

Referring now to FIG. 6, drive shaft 11 is connected to bent lever 25 by conventional hinged link 26. Hinged link 26 is rotatably fastened to the upper arm of bent lever 25 by pin 27, and rotatably fastened to drive shaft 10 by pin 28. An axle 29 passes through bent lever 25 at the junction of its two arms and is rigidly mounted in the forward portion of sole 19 so that bent lever 25 can rotate around it. The lower arm of bent lever 25 is connected to raised plate 30 of storage plate 31 by hinged link 32. Hinged link 32 is rotatably connected to raised plate 30 by pin 33 and rotatably connected to the lower arm of lever 25 by pin 34. Storage plate 31 is rigidly connected to one end of helical storage spring 35. The other end of storage spring 35 is rigidly attached to thrust force plate 36, which contacts running surface 5 and, like heel force plate 3, has its bottom covered with a conventional running shoe sole material such as Vibram. Alternatively, multiple springs, resilient plastic, or an elastomer can replace storage spring 35, thereby providing an advantage in durability or weight. When drive shaft 11 is driven forward by force

6

re-direction mechanism 10, bent lever 25 rotates in a counterclockwise direction around axle 29, moving storage force plate 31 downward and compressing storage spring 35.

Ideally, storage spring 35 obeys a force law $F = kx^y$, where y is less than 1.0 and held as small as possible, k is the spring constant of storage spring 35, and x is the distance travelled by spring 35 from its uncompressed position to its compressed position. Alternatively, storage spring 35 may be pre-compressed in which case $F = F_0 + K$, where $F_0$ is the pre-compression force.

Referring now to FIGS. 7 and 8, storage force plate 31 is fixably attached to four guide bars 37 arranged in a quadrilateral pattern around the toe portion of the running shoe. Guide bars 37 move perpendicular to storage force plate 31 in channels 38 contained in anti-tilt housing 39. The top portion of each guide bar 37 is connected by a spring 40 to said housing at the top of its corresponding channel 38. Springs 40 have minimal resistance and thus require a minimum amount of energy to stretch. A conventional ratchet device 41 is attached between housing 40 and guide bar 37, allowing storage force plate 31 to move downward but not upward. This ensures that the impact energy stored in spring 35 is not lost by the upward movement of force plate 31. It will be seen that such upward movement would move drive shafts 11 rearward, resulting in the re-transmission of the impact energy back to heel 4.

Compression of storage spring 35 by storage force plate 31 continues for the duration of the heel impact interval. Storage spring 35 is also compressed from the bottom by thrust force plate 36 during the period of toe impact. Thrust force plate 36 has four guide bars 42, each of which shares a channel 38 with a guide bar 37 from thrust force plate 31. Alternatively, anti-tilt housing 39 has separate channels for guide bars 37 and 42. Four conventional ratchet devices 44, each of which is mounted to the exterior wall of one of channels 38, prevent thrust force plate 36 from moving downward against the running surface until released, as described with reference to FIG. 9 below. This ensures that any toe impact energy is stored until thrust. Ratchets 44 are released at the beginning of the thrust interval, allowing storage spring 35 to expand to its uncompressed state and causing thrust force plate 36 to push against the running surface, thereby aiding the runner's propulsion into the air.

Ratchet mechanism 44 is shown in FIG. 9. Ratchet release is determined by the relative spacing between storage force plate 31 and anti-tilt housing 39. Hinged link 101 is rotatably mounted at one end to the bottom of storage force plate 31 and rotatably mounted at the other end to the bottom arm of bent lever 102. Bent lever 102 is rotatably mounted at the junction of its two arms to axle 103, which is fixably attached to anti-tilt housing 39. The upper arm of bent lever 102 is rotatably mounted to one end of hinged link 104, and the other end of hinged link 104 is rotatably mounted to conventional ratchet arm 105. This latter attachment point is vertically lower than the former attachment point and remains so throughout the range of movement of hinged link 104. The other end of ratchet arm 105 is rotatably mounted to thrust force plate 36. Ratchet teeth 106 are formed at the bottom portion of anti-tilt housing 39 so that ratchet arm 105 can engage each tooth as it moves upward.

As storage spring 35 is compressed and force plates 31 and 35 move toward each other, hinged link 101

4,936,030

7

moves downward relative to axle 103, causing bent lever 102 to rotate counter-clockwise. This rotation causes hinged link 104 to move toward storage spring 35, thereby pulling ratchet arm 105 away from teeth 106. When force plates 31 and 36 are sufficiently close, ratchet arm 105 disengages from ratchet teeth 106, allowing storage spring 35 to expand to its uncompressed state and causing storage force plate 36 to move downward. Ratchet arm 105 remains disengaged until, after thrust, the action of recovery springs 40 of FIG. 7 cause storage force plate 31 and thrust force plate 36 to return to their pre-impact positions with respect to anti-tilt housing 39. For recovery springs 40 to have effect, ratchets 41 must be released, allowing storage force plate 31 to move upward. This is accomplished with a ratchet release mechanism similar to that shown in FIG. 9, except that the release is keyed to the relative motion of storage force plate 31 and thrust force plate 36. Accordingly, release occurs when thrust force plate 36 expands to its original position with respect to storage force plate 31. This release, in turn, causes bent lever 25 (shown in FIG. 6) to return to its original position, which in turn moves bent lever 16 (shown in FIG. 4) to its original position and heel force plate 3 to its original position in preparation for the next heel impact.

Alternatively a conventional electronic device may be used to measure the relative velocity between storage force plate 31 and thrust force plate 36. When the velocity becomes zero, this devices releases ratchet 44. As another alternative, release could occur after a fixed time delay. Although this method possibly provides more optimized timing of the release, it has the disadvantage of requiring battery power.

It should be understood that the entire force re-direction mechanism of FIGS. 4 and 5 could be incorporated into the sole of the shoe, with the accompanying restriction that the sole must be thicker and/or the allowed travel of the force-plates smaller.

FIG. 10 is a plot of the force exerted by a runner's foot on the ground (vertical axis) versus time (horizontal axis) from "Groucho Running," by T. McMahon, et al., 62 *J. Applied Physiology*, 23–26 (June 1987). The time interval during which the foot (through the shoe) is in contact with the ground is referred to as the foot-contact interval. The portion of the foot-contact interval in which the heel is striking the running surface is referred to as the "impact interval" and the portion of this interval in which the toe is lifting off of the running surface is referred to as the "thrust interval." At initial heel impact there is a force spike 46 resulting from the fact that the runner's leg is very stiff, since it is almost straight when the runner's heel first impacts the running surface. The remaining portion of the impact interval is represented by the upwardly sloping portion of peak 47, during which time the force of the runner's foot on the ground is increasing, while the thrust interval is represented by the downwardly sloping portion of peak 47, during which time the force is decreasing. Transmission mechanism and the storage portion of storage/thrust mechanism 2 of the present invention operate during the impact interval, and the thrust portion of storage/thrust mechanism 2 operates during the thrust interval.

A brief discussion of the mechanics of running shows how the invention is energy efficient and compliant. As explained above, spike 46 near the beginning of the impact interval occurs because the straight leg is very stiff. If the model of a mass (the runner's weight) on a spring (the runner's legs) is used, then the effective

8

spring constant is high, corresponding to a stiff leg. The impact interval is inversely proportional to the square root of the spring constant, and the area under the curve during the impact interval must equal the runner's original vertical momentum. Since the impact interval decreases with greater values of spring constant, the height of force spike 46 must increase to maintain the same momentum area.

This force spike can be as large as 5 times the runner's weight. It is transmitted up the leg and spine, damaging joints, ligaments, and tendons. It can be reduced by making the ground more compliant, or, as in this invention, by putting a compliant mechanism in the shoe. Either case can be modeled with a mass (the runner's weight) on two springs in series (representing the runner's leg and either the compliant ground or a compliant shoe).

The two-spring model predicts the force on the ground, and this is an indication of the resulting shock on the skeleton. This force is equal to the force that would result from a one-spring model with a spring constant, k, defined by $1/k = 1/k_1 + 1/k_2$, where $k_1$ is the spring constant of the runner's leg and $k_2$ is the spring constant of the running or a compliant running surface. In effect, the leg spring constant $k_1$ is decreased by the second spring in series, to the value of the effective spring constant, thus reducing significantly the shock felt by the leg. With two springs, the force spike in FIG. 10 becomes an elbow on the left side of peak 47, shown by the dotted line.

A value for spring constant $k_2$ that is too large will not give optimal compliance and a value that is too small will give a foot-contact interval that is too long. Such a long interval would result in slow and inefficient running. In the previously mentioned article entitled *Mechanics of Locomotion*, McMahon presented evidence that the optimal value for spring constant $k_2$ is approximately twice that of spring constant $k_1$.

A second embodiment of force re-direction mechanism 10 is illustrated in FIG. 11. In this embodiment, bent lever 16 in FIG. 4 is replaced by a pair of racks 48 and 49 and a pinion 50. This arrangement allows a more variable amount of travel for heel force plate 3. Heel force plate 3 is rigidly attached to perpendicularly aligned rack 48. Pinion 50 is rotatably fastened to an axle 51, which passes through and is embedded in sole 19 of the running shoe so that it is not free to move relative to the sole. The upward movement of heel force plate 3 and rack 48 due to heel impact causes pinion 50 to rotate counterclockwise, driving rack 49 forward. Rack 49 is rigidly attached to drive shaft 11, causing it to move forward on heel impact. The same rack and pinion force re-direction mechanism may also be used in place of force re-direction mechanism 23 in FIG. 6. While this mechanism probably would weigh more than the bent lever mechanism of the first embodiment of the present invention, it would eliminate the need for hinged links 15 and 20 of FIG. 4 therein.

FIG. 12 illustrates a cut-away side view of an alternative embodiment of anti-tilt housing 8 and heel force plate 3 to prevent heel force plate 3 from tilting. Housing 8 has a U-shaped channel 55 which constrains movement of raised rod 16 to a direction perpendicular to the plane of heel force plate 3. Conventional corrugated flat springs 56 are attached between the inner portion of the outer wall of housing 8 and the outer walls of channel 55. Springs 56 move easily in a direction perpendicular

4,936,030

9                                                10

to their axis but resist change along their length, thus preventing raised plate 13 and heel force plate 3 from tilting laterally relative to housing 8. Another set of four springs prevents tilting longitudinally. This embodiment produces very little friction.

FIG. 13 illustrates a second embodiment of the present invention using hydraulics to convert the heel impact energy to toe thrust energy. Conventional Sylphon bellows 57 is attached at one end to heel force plate 3 and at the other end to a wall 58 which is parallel to heel force plate 3 and which is located in heel housing 59. Bellows 57 is constrained to move perpendicular to the running surface by guide bars 7 (as shown in FIG. 3) attached to heel force plate 3. A tube 61 is attached at one end to the top of bellows 57 through a hole in wall 58 and at the other end to a second Sylphon bellows 62 in the toe portion of the sole. The top portion of Sylphon bellows 62 is attached to a wall 63 in housing 64, and the bottom portion of Sylphon bellows 62 is attached to storage force plate 31. As described above with respect to FIGS. 6 and 7, the bottom portion of storage force plate 31 is attached to the top end of storage spring 35 and the bottom end of storage spring 35 is attached to thrust force plate 36. Sylphon bellows 57 and 62 are filled with oil and change volume in the vertical direction only when compressed.

Upon heel impact, heel force plate 3 compresses bellows 57 against wall 58. This causes oil to flow through tube 61, which is just large enough to avoid significant viscous friction from oil flow due to the sudden impact. Oil emerging from the other end of tube 61 causes bellows 62 to expand, which in turn moves storage force plate 31 downward and compresses storage spring 35. Conventional catch mechanisms 41 and 44 operate in the same manner described above with respect to FIGS. 7 and 9 to allow thrust force plate 36 to move downward to aid take-off thrust and to prevent storage force plate 31 and thrust plate 36 from returning to their rest positions until after the shoe is in midair. A conventional one-way valve 65 prevents the oil, and hence the heel impact force, from returning to the heel after thrust. At that time a conventional release mechanism that is keyed to the return of thrust force plate 36 to its uncompressed position with respect to storage force plate 31 (as in FIG. 9), opens valve 65 and allows the oil in bellows 57 and 62 to return to their original pre-impact positions. It should be seen that it is still necessary to have an anti-tilt housing mechanism in this embodiment similar to that discussed in connection with the first embodiment of FIGS. 2–7.

The second embodiment illustrated in FIG. 13 has the advantage of eliminating certain moving parts, namely the bent levers and drive shafts. Also, considerable force can be accommodated hydraulically.

An alternative to metal Sylphon bellows would be bellows constructed of an elastomer, possibly in conjunction with metal hoops. This would reduce the weight of the bellows and improve durability. Alternatively, bladders in a housing or pistons could be used instead of bellows.

In yet another version of the hydraulic embodiment, several bellows may be distributed over heel force plate 3. This could reduce the total weight and the amount of bellows material while accommodating the impact forces. As another variation of the hydraulic embodiment, air can be used as the hydraulic material rather than oil. Although this would result in a lighter shoe, it would be less energy-efficient, since air compresses and therefore some impact energy would be lost.

In another alternative embodiment, conventional hollow spheres are used to fill part of the volume inside the Sylphon bellows in order to reduce the weight of the oil or other fluid in the bellows. The bellows have a minimum volume to which they can be compressed without damage and that minimum volume can be filled with hollow spheres. The hollow spheres have a diameter at least three times the diameter of the connective tubes between the bellows.

FIG. 14 illustrates a variation of the second embodiment of the present invention having multiple thrust/storage mechanisms. In this embodiment thrust storage mechanisms 51 and 52 are side-by-side in the front of the shoe and transmission mechanism 53 is in the heel of the shoe. The same hydraulic force re-direction mechanism of FIG. 13 would be used, except that tube 61 would be split into two branches at the front of the shoe by conventional hydraulic valve 54. Upon heel impact, a portion of the oil flowing from bellows 57 would go to the Sylphon bellows in thrust/storage mechanism 51 and the remaining portion would go to the Sylphon bellows in thrust/storage mechanism 52. This configuration allows for different proportions of impact force to be transmitted to each side of the front of the shoe. Pronation problems could be corrected by altering the relative amount of oil flowing to thrust/storage mechanisms 51 and 52.

FIG. 15 illustrates a third embodiment of the present invention. In this embodiment Sylphon bellows 57 again are connected at one end to heel force plate 3 and at the other end to housing wall 58. A tube 66 is connected at one end to the top of bellows 57 through a hole in wall 58 and at the other end to a second Sylphon bellows 65. One end of bellows 65 is connected to drive shaft 11 and the other end is mounted against the interior side wall of housing 59.

Upon heel impact, heel force plate 3 moves upward, causing oil to flow through tube 66 into bellows 65. Bellows 65 expands, moving drive shaft 11 forward. At the front of the shoe, the horizontal movement of drive shaft 11 is changed to vertical movement, using either the same type of Sylphon bellows mechanism as illustrated in FIGS. 14 or 15 or some other device, such as the bent lever illustrated in FIG. 6. Energy stored in the toe portion of the shoe is prevented from returning to the heel either by a conventional valve between the two bellows in the front of the shoe (assuming the mechanism of FIG. 15 is employed) or by the ratchet release mechanism described above with respect to the first embodiment of FIGS. 2–8 (assuming a bent lever mechanism is used). In this way, the Sylphon bellows in the heel mechanism do not return to their original positions until after the runner is in mid-air. As an alternative embodiment, the bellows of FIG. 15 can be replaced with a chamber containing two pistons, one moving vertically and the other moving horizontally.

FIG. 16 illustrates schematically the fourth embodiment of the present invention. In this embodiment, storage spring 35 of FIGS. 5 and 6 is replaced by three storage springs 67, 68 and 69; and storage force plate 31 is replaced by three storage force plates 70, 71 and 72. This configuration limits the impact force of the foot on the running surface by switching from one storage spring to the next when the impact force reaches a prescribed value. Doing so limits the impact or shock felt by the skeleton to a particular value, e.g., 25 percent

4,936,030

11 | 12

over the runner's body weight. Obviously, any number of storage springs could be used in this embodiment.

This embodiment employs the bent lever force re-direction mechanism of the first embodiment of the present invention illustrated in FIGS. 2–8. Upon heel impact, the first storage force plate 70 of FIG. 16 in the toe of the shoe is driven from position 73 to position 74 and the force on the first spring 67 increases to a maximum force corresponding to the first small peak 99 illustrated in the force-vs-time curve of FIG. 20. When storage force plate 70 reaches point 74, the driving force is switched to storage force plate 71, as described hereinafter. At that time, the force in FIG. 19 reduces to zero because the impact force is now acting against the second spring 68 which initially has zero travel. When storage force plate 71 has moved from position 73 to position 74 and storage spring 68 has been compressed to the same maximum force 99 as spring 67, the driving force is switched to the third storage force plate 72, as described hereinafter. It, in turn, compresses storage spring 69 until force plate 72 has reached position 74. Each of force plates 70, 71 and 72 is restrained from returning to position 73 by ratchet devices 75, 76 and 77, respectively, attached to housing 78 of the toe housing. FIG. 17 illustrates the situation where storage springs 67, 68 and 69 are fully depressed.

During the thrust interval, catch 44 is released in the same manner as described above with respect to FIGS. 7 and 9. Springs 67, 68 and 69 then simultaneously give a powerful downward thrust to thrust force plate 31, causing it to move from position 79 to position 80, which aids in propelling the runner's leg into the air.

The first of two examples of means for switching the impact drive force from one spring to the next is shown in FIG. 18. Bent levers 84, 85 and 86 are each connected to drive shaft 11 and rotate about axles 90, 91, and 92 in the same manner as illustrated in FIG. 6. Similarly, bent lever 84 is connected at one end to storage force plate 70, bent lever 85 is connected to storage force plate 71, and bent lever 86 is connected to storage force plate 72, in the same manner as illustrated in FIG. 6. Conventional roller bearings 87, 88 and 89 are rotatably attached to the other ends of bent levers 84, 85 and 86, respectively. Attached to the bottom side of drive shaft 11 are tabs 81, 82 and 83, each of which has an inclined ramp 93, 94 and 95, respectively. At the end of these ramps are flat surfaces 96, 97 and 98, respectively, positioned parallel to the bottom surface of drive shaft 11. In the rest position roller bearings 87, 88 and 89 are in contact with the bottom surface of drive shaft 11, with bearing 87 positioned immediately adjacent ramp 93, bearing 88 positioned forward of ramp 94 at a specified distance, described below, and bearing 89 positioned forward of ramp 95 at a greater distance, also described below.

The initial forward motion of drive shaft 11 causes roller bearing 87 to move up ramp 93, which rotates bent lever 84 counterclockwise around axle 90. This rotation compresses storage spring 67. When bearing 87 reaches flat portion 96 of tab 81, storage force plate 70 arrives at position 74, and bearing 88 arrives at the beginning of ramp 94, as shown in FIG. 19. The positions of bent lever 84 and storage force plate 72 do not change as drive shaft 11 continues moving forward. However, this movement causes roller bearing 88 to move up ramp 94, thereby rotating bent lever 85 counterclockwise and depressing storage force plate 71 and storage spring 68.

When bearing 88 reaches flat portion 97 of tab 82, storage force plate 71 arrives at position 74 and bearing 89 arrives at the beginning of ramp 95. The positions of bent lever 85 and storage force plate 71 do not change as drive shaft 11 continues moving forward. Again, however, such movement causes roller bearing 89 to move up ramp 95, thereby rotating bent lever 86 counterclockwise and depressing storage force plate 72 and storage spring 69. As with the first embodiment of this invention, ratchets 44 are released at the beginning of the thrust interval, allowing thrust force plate 36 to move downward against the running surface and storage springs 67, 68 and 69 to return to their released rest positions.

The chart of FIG. 20 illustrates the force-vs-time curve for the sequential spring embodiment of FIGS. 18 and 19. As shown in this chart, the force on the runner's body during the impact interval follows a "saw-tooth like" pattern, with the rise 100 in the first saw-tooth corresponding to the movement of storage force plate 70 from positions 73 to 74 and the accompanying compression of storage spring 67. At the moment force plate 70 reaches position 74 (corresponding to the arrival of roller bearing 87 at flat portion 96 of tab 81), the force drops to zero. It begins an essentially identical second rise 101 corresponding to the movement of storage force plate 71 from position 73 to 74, followed by another drop to zero as force plate 71 reaches position 74. This is followed by yet another sawtooth force curve with rise 102 corresponding to the movement of storage force plate 72 from positions 73 to 74. Portion 103 of the force-vs-time curve corresponds to the downward movement of thrust force plate 36 following its release by ratchet mechanism 44.

Alternatively, a separate Sylphon bellows mechanism, such as shown in FIG. 13, is used to drive each of storage plates 70, 71 and 72. In this embodiment each bellows is connected by a separate tube with a bellows to rear bellows 58. Upon impact only the valve to the first bellows is open. The compression of rear bellows 57 causes the first Sylphon bellows to expand and storage force plate 70 to move from position 73 to 74. A conventional lever system then closes the first valve and opens the second valve, at which time the second Sylphon bellows expands and storage force plate 71 moves downward. This process continues until each of the Sylphon bellows has responded, each of the storage force plates has moved downward to position 74, and each of the storage springs is fully compressed. The force-vs-time curve for this embodiment is essentially the same as the curve of FIG. 19.

Another alternative embodiment of the storage thrust means for limiting impact force is shown in FIG. 21. The objective of this embodiment is to limit the impact force to a constant curve, $F_0$, as shown in the force-vs-time curve of FIG. 22, which does not return to zero in the sawtooth manner of the previous embodiment shown in FIG. 20. This effect is achieved using a pair of bent levers 200 and 201 arranged longitudinally along drive shaft 11. Bent lever 200 pivots at its center around fixably mounted axle 202 and bent lever 201 pivots around fixably mounted axle 203. Roller bearing 204 is rotatably mounted on the upper arm of bent lever 200 and roller bearing 205 is rotatably mounted on the upper arm of bent lever 201. Roller bearings 206 and 207 are rotatably mounted to the bottom arms of bent levers 200 and 201, respectively, and ride along the top surface of storage force plates 208 and 209, respectively.

4,936,030

13

In the rest position, roller bearings 204 and 205 are positioned in contact with the lower surface of drive shaft 11. A tab 210 is mounted on drive shaft 11 and positioned rearward and immediately adjacent to roller bearing 204. Tab 210 has a leading ramp 211 at its forward edge of length $2X_o$, followed by a flat surface parallel to the bottom portion of drive shaft 11, over which surfaces roller bearing 204 rides during forward movement of the drive shaft. A second tab 212 is mounted on drive shaft 11 and positioned rearward of tab 210, and rearward and immediately adjacent to roller bearing 205. Tab 212 has a leading ramp 213 with the same incline as ramp 211 but of length $X_o$. Ramp 213 is followed by a second ramp 214, with the same incline in the opposite direction as ramp 213, so that, as viewed from its end, tab 212 forms an isosceles triangle.

As drive shaft 11 moves forward from its rest position, roller bearing 204 moves down ramp 211 causing bent lever 200 to rotate counterclockwise, depressing storage force plate 208 and compressing storage spring 215. Similarly, roller bearing 205 moves down ramp 213, causing bent lever 201 to rotate counterclockwise and depressing storage force plate 209 and compressing storage spring 216. Since storage springs 215 and 216 each exert an equal force kx while being compressed, the slope of the total force curve that they exert in opposing the forward motion of drive shaft 11 is 2kx, as shown in FIG. 22.

After roller bearing 205 has travelled a distance $X_o$, it begins moving up ramp 214, while bearing 204 continues moving down ramp 211. This causes bent lever 201 to push drive shaft 11 forward, rather than oppose such movement. Thus, the force of storage spring 216 opposes the force of storage spring 215. The sum of these two forces, indicated by the slopes $+k$ and $-k$ in FIG. 22, results in a constant force $F_o$ acting to oppose the forward movement of drive shaft 11.

The important point here is that optimal compliance can be achieved, which is tantamount to the curve $F(x)=F_o$, where $F_o$ is a constant, with such pairs of spring systems. There are two ways to achieve any desired shape of the $F(x)$ curve. One is to vary the shape of ramps 211, 213 and 214 located along one or more drive shafts 11; the other is to use more than one pair of such spring systems. The latter course will be necessary when the range of motion of the storage force plate is limited, e.g., by the elastic limit of the storage springs. The fact that any desired shape can be achieved means that optimized performance of a runner can be achieved.

Another important point is that storage springs 67, 68 and 69 in FIGS. 17–18 and storage springs 213 and 214 in FIGS. 20–21 cannot be acted upon by or act upon the drive shaft when the slope of the inclined ramps is zero, i.e., parallel to the drive shaft. When this slope is zero the force on a single spring drops to zero. Furthermore, if greater forces are required, they can be achieved by conventional clutches which cause additional springs or spring-pairs to be engaged. This can be done in a fixed manner (to achieve a fixed force curve), or in a variable manner with a conventional lever system which engages and disengages additional spring systems in proportion to the impact force.

To give more rationale to the embodiments of FIGS. 16–21, one ideally would like to have optimal compliance (give of the surface), optimal resilience (give back of the surface), and a minimum of foot-contact time. Unfortunately, these goals conflict, and the optimal

14

trade-off must be found. The first problem is that optimal compliance (a lower curve) takes more time to absorb vertical momentum, prolonging the impact interval. This is a problem for two reasons: (1) it results in slower running, and (2) the muscles have to work against the ground longer, using more energy.

In the case of the tuned track mentioned in the foregoing article by McMahon, the shape of the curve in the impact interval is approximately the mirror reflection of that in the thrust interval. Thus, the thrust interval must be the same as the impact interval. The embodiments of FIGS. 16–21 improve upon this because the maximum force during the thrust interval can be considerably more than that during the impact interval. Another way to see this is to note that each interval is proportional to the inverse square root of the spring constant. During impact, the effective spring constant (the sum of the separate spring constants) is considerably less than it is when all the springs release together during thrust. The result is that the penalty of greater foot-contact time, or equivalently, muscle-work time, need be paid only during the impact interval. Thus, these embodiments are improvements over a tuned track.

In the sequential spring embodiment of FIGS. 16–21 it may be necessary to restrict the value of the effective spring constant during thrust (equal to the sum of the sequenced spring constants) to a value that is not injurious to the foot and leg, especially the shins. In this case, the spring travel has to be correspondingly longer.

FIG. 23 depicts the essential components of the fifth, and preferred embodiment of the energy-efficient running shoe. In this embodiment the energy storage means is a separate and distinct mechanism from the means which release energy upon thrust off of the running surface. This embodiment has several advantages over the earlier embodiments, i.e., it employs (1) a simple light linkage mechanism for heel stability, (2) a light intermediate accumulator for convenient energy storage, and (3) a timing system for energy fluid transfer.

Rear bellows 302 is sandwiched between upper rear plate 304 and lower rear plate 306 and is connected to energy accumulator 308 via the path consisting of tubes 310 and 311. Rear bellows 302 is also connected to front bellows 314 via the path consisting of tubes 310, 312, and 318. Energy accumulator 308 is connected to front bellows 314 via the path consisting of tubes 316 and 318. Tube 316 contains forward-flow valve 320, tube 312 contains backflow valve 322, and tube 311 contains check valve 324 which permits flow only into energy accumulator 308 from rear bellows 302. Backflow timing mechanism 326 opens and closes backflow valve 322 at prescribed times via backflow actuator 328. Likewise, forward-flow timing mechanism 330 opens and closes forward-flow valve 320 via forward-flow actuator 332. Foot-strike trigger 334 triggers forward-flow timing mechanism 330 via forward-flow signal line 336 and backflow timing mechanism 326 via backflow signal line 338.

Energy accumulator 308 contains pressurized gas 340 which is separated from the hydraulic fluid in accumulator 308 by diaphragm 342. Front bellows 314 is housed inside resilient front sole 346 in such a manner that the sides of these two components do not touch and in such a manner that the bottoms of these two components push against the running surface together during toe thrust. Front plate 348 is flexibly connected to upper rear plate 304 via upper plate connector 350 in such a manner that the runner's foot is free to bend at the toe.

4,936,030

15

In like manner, lower rear plate 306 is flexibly connected to resilient front sole 346 via lower plate connector 352. Foam insert 354 ensures that the runner's foot is comfortably supported by upper rear plate 304 and by front plate 348. Fabric top 356 constrains the runner's foot to the entire sole assembly in a conventional manner. Front cover 358 protects front bellows 314 from wear and dirt.

The following is the sequence of actions by which the fifth embodiment captures heel impact energy and returns it in toe thrust. Upon heel impact rear bellows 302 is compressed between upper rear plate 304 and lower rear plate 306. Hydraulic fluid is thereby forced into energy accumulator 308 via tubes 310 and 311. Check valve 324 prevents this fluid from flowing back through tubes 310 and 311 to rear bellows 302. Rear bellows 302 remains compressed after this fluid is expelled due to the vacuum created in tubes 310 and 311. During this time, backflow valve 322, and forward-flow valve 320 are closed, thereby preventing hydraulic fluid from flowing into front bellows 314. Check valve 324 prevents hydraulic fluid from flowing back from energy accumulator 308 into rear bellows 302.

When the runner begins toe thrust, forward-flow timing mechanism 330 is triggered by foot-strike trigger 334 via forward-flow signal line 336. This triggering causes forward-flow valve 320 to open. This, in turn, allows pressurized gas 340 to expand, forcing hydraulic fluid into front bellows 314, which expands to push against the running surface giving a spring board effect to lift the runner back into the air. The stiffness and thickness of resilient front sole 346 are chosen so that it compresses under front sole impact until its bottom surface is approximately even with the bottom surface of front bellows 314. Then, both resilient front sole 346 and front bellows 314 push together in toe thrust.

Forward-flow timing mechanism 330 causes forward-flow actuator 332 to close forward-flow valve 320 when the runner's foot has just left the running surface. This prevents pressurized fluid from leaving energy accumulator 308 during the recovery period when the runner's foot is in the air and prevents fluid in front bellows 314 from returning to accumulator 308 after toe strike. When the runner's foot is in the air backflow timing mechanism 326 causes back-flow actuator 328 to open backflow valve 322. The negative pressure created by the vacuum in rear bellows 302 and line 310 then draws the fluid into rear bellows 302 through tubes 318, 312 and 310. Rear bellows 302 also acts as a weak spring, which aids in drawing the fluid back into it from front bellows 314. After the fluid has been drawn into rear bellows 302, backflow timing mechanism 326 causes backflow actuator 328 to close backflow valve 312. The shoe is then ready for the next heel strike. Foot strike trigger 334 initiates the timing for the opening and closing of forward-flow timing mechanism 328 and backflow timing mechanism 326.

One advantage of this design is that the hydraulic fluid can be moved back to the heel without having to perform work against high pressure in the closed hydraulic fluid system. This minimizes the portion of heel energy used to compress rear bellows 302 during impact. Since this portion of heel impact energy is not transmitted forward, this minimization, in turn, maximizes the energy efficiency of the invention. It should be understood that foot-strike trigger 334 can be in another part of the shoe, with the appropriate adjust-

16

ment to the timing in forward-flow timing mechanism 330 and backflow timing mechanism 326.

An essential feature of the fifth embodiment is that the impact energy is stored under compression in accumulator 308 so that it can then expand front bellows 314 during toe thrust. This is accomplished with a minimum of parts by virtue of the timing system and the manner in which front bellows 314 is housed in resilient front sole 346 without any need for guide systems to provide for front-sole lateral stability. That is, resilient front sole 346 provides for front-sole lateral stability.

It should be understood that energy accumulator 308 can be modified in a variety of ways. For example, the use of a reservoir connected to the gas side of energy accumulator 308 changes the "force vs distance" curve for compression of the rear sole. That is, instead of the heel impact force being proportional to the inverse gas volume, it is proportional to the inverse of the sum of the gas volume plus a constant. This reduces the maximum force on the leg, but at the price of requiring a higher initial pressure in the hydraulic system. As another example, the shape of energy accumulator 308 can be designed to modify the above-mentioned force curve. Another alternative is to use an energy accumulator with a hydraulic piston to compress a mechanical spring. Or, one could store the energy by expanding a stiff elastomer bladder. Finally, a combination of one or more of these embodiments could be used.

The shape of energy accumulator 308 depends on its location and style considerations. For the location shown in FIG. 1, a cylindrical shape works best with the vertical axis of the cylinder oriented laterally. This allows a relatively large volume to be accommodated in a relatively thin sole. With molded fabrication the shape could be one in which the ends are rounded. Or for minimization of the sole thickness, the shape could be that of an oblate spheroid. The advantage of the location shown in FIG. 1 is that the hydraulic tube length is minimized and energy accumulator 308 is hidden. Alternatively, the location can be on the outside of the sole, or on the top or back of the shoe. Pressure points under the toe area are eliminated by making front plate 348 sufficiently stiff to distribute the pressure exerted by front bellows 314 over the entire toe area. Front plate 348 is stiffened, for example, using composite material or laminated material.

Front bellows 314 in the fifth embodiment may have, for example, an area of 25 cm². Assuming it has a vertical travel of 2 cm, the working volume of front bellows 314 is 0.05 liters. This corresponds to a weight of approximately 20 gm or 0.7 oz which is acceptable for current light-weight running shoes. Assuming this volume, a compression ratio of 4:1 in energy accumulator 308, and 100 joules for the impact energy (this corresponds to a 100 km person bounding 10 cm into the air while running), the initial pressure in energy accumulator 308 is 15 atmospheres, and the final pressure 60 atmospheres.

In the preferred embodiment for front bellows 314 and rear bellows 302, lightness is achieved using a Sylphon bellows with walls made of a flexible synthetic fabric reinforced with metal or plastic hoops. This type of bellows collapses almost completely flat, allowing the front sole to be optimally thin. Alternatively, these bellows could be replaced by bladders, a very weak conical disk spring, a conical disk bellows, or pistons. Also, the area of these embodiments need not be restricted to a circular shape. The goal is lightness and the

## 17

capability of compressing the component completely flat. The flatness capability contributes to lightness because it minimizes the amount of hydraulic fluid. The other requirement of this component is that its surface not stretch when compressed, since stretching would lower the energy efficiency.

If a bladder is used instead of rear bellows 302, a spring or a expanding device must be used inside to expand the bladder during recovery. This could be any device which returns to its original shape when not compressed, and which is just barely strong enough to accomplish this shape return. For example, interlocking hoops could be used, provided that they are not compressed beyond their elastic limit when the bladder is fully compressed.

Tubes 310, 311, 312, 316, and 318 have the smallest diameter possible without causing significant flow resistance and reducing energy efficiency. Valves 311, 320 and 322 are of a conventional design and are mechanically actuated, again using conventional mechanisms consisting of cables and levers. Alternatively, servovalves can be used which are electrically actuated. Forward-flow timing mechanism 330 and back flow timing mechanism 326 are conventional and similar to those used to control camera shutter speeds. Thus, the time delays can be adjusted for different runners and different running speeds. Alternatively, electronic timers can be used which are also adjustable. Finally, footstrike trigger 334 has a conventional design in which a pin protruding below front sole 346 causes a brake cable (first and second signal lines 338 and 336) to trigger first and second timing mechanisms 326 and 330 upon heel impact. Alternatively, the foot trigger could be an electronic pressure detector, and the signal lines 338 and 336 could be electrical.

Upper plate connector 350 and lower plate connector 352 allow toe flexion. Alternatively, these connectors could be eliminated by making upper rear plate 304 and front plate 348 a single thin member with adequate flexion. Similarly, resilient front sole 346 and lower rear plate 306 could be made a single member with adequate flexion.

The fact that heel and mid-sole portions of the running shoe sole works in places saves weight but creates heel instability. In particular, rear plate 304 and lower rear plate 306 are free to move with respect to each other in a lateral shear mode and a longitudinal torsional mode. The stiffness of these two plates, however, prevents longitudinal shearing. Fabricating rear bellows 302 with a sufficiently large diameter and a sufficiently large bellows wall width, w (see FIG. 24) improves heel stability.

Further improvement requires an auxiliary heel stabilizer. FIG. 24 shows the first embodiment of this mechanism. Rear bellows 302 is contained in stabilizer bellows 360, which does not contain hydraulic fluid and which has a large diameter and wall width "w" for resistance to shear and torsional motion. This permits the stabilizing benefit of such a stabilizing bellows without paying the weight penalty of filling the entire large stabilizing bellows with hydraulic fluid. The tops and bottoms of rear bellows 302 and stabilizer bellows 360 are fixably attached to upper rear plate 304 and lower plate 306, respectively. This embodiment of an auxiliary heel stabilizer can be used in the mid-sole as well as the heel-sole.

An alternative embodiment of an auxiliary heel stabilizer is shown in rear view (FIG. 25), top view (FIG.

## 18

26), and side view (FIG. 27). Back frame 362 is rigidly attached to lower rear plate 306 and reinforced by x-brace 364. Stabilizer cables 366, on either side of the heel, connect upper plate 304 to back frame 362, via roller axle 369, mounted in stabilizer roller 368. Stabilizer cables 366 have minimum elasticity, thereby constraining upper rear plate 304 from moving in a lateral shear or longitudinal torsional mode with respect to lower rear plate 306. Stabilizer roller 368 prevents binding which would reduce the energy efficiency of the invention. The design of this auxiliary heel stabilizer permits optimal lightness. It should be understood that its shape can be modified from a rectangular shape to a curved shape to conform to the runner's heel.

FIG. 28 shows an alternative arrangement of the hydraulic energy transfer mechanism of the fifth embodiment of the instant invention. This arrangement distributes the runner's impact forces over the running shoe sole, resulting in reduced weight for upper rear plate 4 and lower rear plate 6 without sacrificing foot comfort. It also allows individualized adjustments for effects like pronation. The penalty is the added complication of more components and a slight increase in bellows weight.

In operation, multiple rear bellows 401 and 403, and mid-sole bellows 402 are compressed in heel and mid-sole strike, thereby forcing hydraulic fluid into multiple energy-accumulators, 421, 422, and 423, respectively. In toe thrust, the fluid is forced into multiple front bellows, 404, 405, and 406, respectively, for a spring board effect. The locations of the various bellows and the gas pressures in the various multiple energy-accumulators can be varied for individual orthopedic adjustment.

Alternatively, a plurality of rear bellows could feed a single energy accumulator, which could then feed a plurality of front bellows. This would eliminate some of the multiple energy-accumulators.

In addition to the foregoing embodiments, other sources of energy can be used to supplement the energy of heel impact. In such an embodiment, the work performed by any voluntary muscle group in the body can be used to provide such additional energy. For example, the runner can squeeze Sylphon bellows or pistons with his hands, arms or legs and the resulting force can be transmitted hydraulically by a tube to the storage/-thrust mechanism. Alternatively, the runner can pull and push conventional piston or lever systems with the arms and legs, or the energy can be electrically stored and then transmitted to the storage mechanism by conventional electro-mechanical transducers. This embodiment allows a more complete exercise because more muscles are involved, and this allows enhanced performance over what can be achieved when only the running muscles of the legs are used.

In yet another embodiment the invention would be separate from the runner's shoe. For example, it can be contained in a separate sole that is strapped onto the runner's shoe.

Obviously, numerous additional modifications and variations of the present invention are possible in light of the above teachings. It is therefore to be understood that within the scope of the appended claims the invention may be practiced otherwise than as specifically described herein.

What is claimed as new and desired to be secured by Letters Patent of the U.S. is:

1. An energy-efficient shoe wherein the sole of said shoe comprises:

4,936,030

19

intermediate energy storage means for storing energy of heel impact upon a running surface;

transmission means in the heel of said sole for transmitting said energy to said intermediate energy storage means; and

thrust means in the front of said sole and coupled to said intermediate energy storage means for releasing said energy during thrust off of said running surface, whereby the center of mass of the wearer of said shoe is impelled upward from said running surface.

2. The energy-efficient shoe of claim 1, wherein said transmission means comprises:

a rear force plate for receiving the force of said heel impact;

force re-direction means for changing the direction of said heel impact force from substantially perpendicular to said rear force plate to substantially parallel with said rear force plate; and

force transmission means for transmitting said direction-changed heel impact force from the rear of said sole to the front of said sole.

3. The energy-efficient shoe of claim 2, further comprising a housing to which said rear force plate is movably coupled and which prevents said rear force plate from tilting relative to the plane of said sole.

4. The energy-efficient shoe of claim 2, wherein said force re-direction means comprises:

a pair of bent levers;

two pairs of hinged links; and

an axle embedded in said sole, wherein said bent levers are rotatably connected at the opposite ends of said axle and the end of each arm of each of said bent levers is rotatably connected to one of said hinged links.

5. The energy-efficient shoe of claim 2, wherein said force transmission means comprises a pair of drive shafts and a housing for said drive shafts and wherein said drive shafts are coupled at one end thereof to said first force re-direction means and coupled at the opposite end thereof to said second force re-direction means.

6. The energy-efficient shoe of claim 2, wherein said first force re-direction means comprises a pair of rack and pinion mechanisms, each of which comprises:

a first rack aligned perpendicular to the plane of said rear force plate and coupled at one end to said rear force plate;

a second rack aligned parallel to the plane of said rear force plate and coupled at one end to said force transmission means; and

a pinion rotatably coupled to said first rack and the opposite end of said second rack.

7. The energy-efficient shoe of claim 1, wherein said thrust means comprises:

a storage force plate;

a thrust force plate;

energy release means which allows said thrust force plate to push against said running surface during thrust; and

recovery means which allows said storage force plate and said thrust force plate to return to their preimpact positions after thrust of said shoe.

8. The energy-efficient shoe of claim 7, wherein said intermediate energy storage means comprises:

means coupled to said transmission means for moving said storage force plate toward said thrust force plate in response to the energy received from said transmission means;

20

energy storage means connected between said storage force plate and said thrust force plate; and

ratchet means which allow said storage force plate and said thrust force plate to move only toward each other, thereby increasing the energy stored in said energy storage means.

9. The energy-efficient shoe of claim 8, wherein said energy storage means comprises a helical spring.

10. The energy-efficient shoe of claim 8, wherein said energy storage means comprises an elastomer.

11. The energy-efficient shoe of claim 8, wherein said energy storage means comprises a resilient plastic material.

12. The energy-efficient shoe of claim 1 wherein said thrust means comprises:

a plurality of storage force plates;

a thrust force plate;

energy release means for allowing said thrust force plate to push against said running surface during thrust; and

a plurality of recovery means, each of which is coupled to a different one of said storage force plates and allows said storage force plate to return to its rest position after thrust.

13. The energy-efficient shoe of claim 12, wherein said intermediate energy storage means comprises:

a plurality of springs, each of which is connected at one end to a different one of said storage force plates and at the other end to said thrust force plate; and

means for moving said storage force plates toward said thrust force plate in a timed sequence whereby only one storage force plate moves at a time and each succeeding storage force plate begins said movement after the preceding storage force plate reaches its closest distance to said thrust force plate.

14. The energy-efficient shoe of claim 13, wherein said moving means comprises a plurality of bent lever driving means each of which comprises:

a bent lever;

a first roller bearing rotatably mounted at the end of one arm of said bent lever and in contact with the top surface of said storage force plate; and

a second roller bearing rotatably mounted at the end of the other arm of said bent lever and in contact with said transmission means, whereby said bent lever rotates in response to the energy transmitted by said transmission means and moves a different one of said storage force plates towards said thrust force plate.

15. The energy-efficient shoe of claim 13, wherein said moving means comprises:

a plurality of bellows, each of which is connected at one end to a different one of said storage force plates;

a control valve having a single input port, a plurality of output ports and means for routing hydraulic fluid from said input port to each of said output ports in a timed sequence; and

a plurality of output tubes, each of which is coupled at one end to a different one of said output ports and at the other end to a different one of said bellows, whereby each of said bellows is hydraulically activated in said timed sequence.

16. The energy-efficient shoe of claim 1, wherein said thrust means comprises:

a first storage force plate;

4,936,030

21

a second storage force plate;

a thrust force plate;

energy release means for allowing said thrust force plate to push against said running surface during thrust; and

recovery means for allowing said first storage force plate and said second storage force plate to return to their rest positions after thrust of said shoe.

17. The energy-efficient shoe of claim 16, wherein said intermediate energy storage means comprises:

a first storage spring connected at one end to said first storage force plate and at the other end to said thrust force plate;

a second storage spring connected at one end to said second storage force plate and at the other end to said thrust force plate; and

means for moving said first storage force plate and said second storage force plate to achieve for a first specified period of time a linearly increasing force acting against said thrust force plate and to achieve for a second specified period of time a constant force acting against said thrust force plate.

18. The energy-efficient shoe of claim 1, wherein said transmission means comprises:

a rear force plate for receiving said heel impact force;

a first housing mounted over said rear force plate;

a second housing mounted at the front of said shoe sole;

a bellows connected at one end to said rear force plate and at the other end to said housing; and

a tube connected at one end to said bellows and at the other end to said storage/thrust means, whereby said heel impact force moves said rear force plate upward, causing compression of said bellows and hydraulic transmission of said heel impact energy to said storage/thrust means.

19. The energy-efficient shoe of claim 18, wherein said bellows contains a plurality of hollow spheres, each of which has a diameter at least three times the diameter of said tube.

20. The energy-efficient shoe of claim 1, wherein said transmission means comprises:

a rear force plate for receiving said heel impact force;

a housing mounted over said rear force plate;

a piston connected at one end to said rear force plate and at the other end to said housing; and

a tube connecting the chamber of said first piston to said storage/thrust means, whereby said heel impact force moves said rear force plate upwards causing compression of said first piston and operation of said storage/thrust means.

21. The energy-efficient shoe of claim 1, wherein said transmission means comprises:

a rear force plate for receiving said heel impact force;

a housing mounted over said rear force plate;

a drive shaft aligned parallel to said sole;

a first bellows having its axis aligned perpendicular to the sole of said shoe and connected at one end to said rear force plate and at the other end to said housing;

a second bellows having its axis aligned parallel to the sole of said shoe and connected at one end to said housing and at the other end to said drive shaft; and

a tube connected between said first bellows and said second bellows, whereby said heel impact force compresses said first bellows, expands said second bellows and moves said drive shaft forward.

22

22. The energy-efficient shoe of claim 1, wherein said energy is transmitted by hydraulic fluid from said transmission means to said intermediate energy storage means and from said intermediate energy storage means to said thrust means.

23. The energy-efficient shoe of claim 22, wherein said transmission means comprises:

an energy accumulator for storing energy hydraulically delivered;

a first energy transfer means for transmitting hydraulic fluid from said transmission means to said energy accumulator;

a second energy transfer means for transmitting said hydraulic fluid from said energy accumulator to said thrust means; and

a third energy transfer means for transmitting said hydraulic fluid from said thrust means to said transmission means.

24. The energy-efficient shoe of claim 23, wherein said first energy transfer means comprises:

a tube for transmitting hydraulic fluid from said transmission means to said energy accumulator; and

a valve connected to said tube for permitting said hydraulic fluid to flow from said transmission means to said energy accumulator and for preventing said hydraulic fluid from flowing from said energy accumulator to said transmission means.

25. The energy-efficient shoe of claim 23, wherein said energy accumulator comprises:

a first compartment for storing said hydraulic fluid; and

a second compartment isolated from said first compartment for storing a compressible gas.

26. The energy-efficient shoe of claim 25, wherein said energy accumulator comprises:

a housing;

a compressible medium contained in said housing; and

actuation means for hydraulically compressing said compressible medium.

27. The energy-efficient shoe of claim 25, wherein said compressible medium comprises a gas.

28. The energy-efficient shoe of claim 26, wherein said compressible medium comprises a mechanical spring.

29. The energy-efficient shoe of claim 26, wherein said compressible medium comprises an elastomer.

30. The energy-efficient shoe of claim 23, wherein said second fluid transfer means comprises:

a tube connected between said energy accumulator and said thrust means;

a valve connected to said tube for permitting hydraulic fluid to flow from said energy accumulator to said thrust means through said tube; and

control means for opening said valve during impact of the toe portion of said sole on said running surface and for closing said valve after said hydraulic fluid is transmitted from said energy accumulator to said thrust means.

31. The energy-efficient shoe of claim 23, wherein said third fluid transfer means comprises:

a tube connected between said thrust means and said transmission means;

a valve connected to said tube for permitting hydraulic fluid to flow from said thrust to said transmission means; and

control means for opening said valve immediately following thrust off of said running surface by said

4,936,030

23

shoe and for closing said valve at other times, whereby said hydraulic fluid is transmitted from said thrust means to said transmission means when said valve is opened.

32. The energy-efficient shoe of claim 22, wherein said means comprises;

a front plate attached to the front portion of said sole; and

an hydraulic reservoir fixedly attached at one end to said front plate and located in a cavity in said front portion of said sole.

33. The energy-efficient shoe of claim 32, wherein said impeller means further comprises a resilient front portion of said sole for storing toe impact energy.

34. The energy-efficient running shoe of claim 22, wherein said transmission means comprises:

a rear hydraulic reservoir in the heel portion of said sole containing hydraulic fluid prior to impact of said heel upon said running surface;

an upper rear plate in the top of said sole fixedly attached to one end of said rear hydraulic reservoir; and

a lower rear plate in the bottom of said sole, fixedly attached to the opposite end of said rear hydraulic reservoir, wherein during impact of said heel upon said running surface said upper rear plate and said lower rear plate compress said rear hydraulic reservoir, thereby transmitting said hydraulic fluid from said rear hydraulic reservoir to said intermediate energy storage means.

35. The energy-efficient shoe of claim 34, wherein said rear hydraulic reservoir comprises a bellows.

36. The energy-efficient shoe of claim 34, wherein said rear hydraulic reservoir comprises a conical disk spring.

37. The energy-efficient shoe of claim 34, wherein said hydraulic reservoir comprises a bladder.

38. The energy-efficient shoe of claim 34, wherein said rear hydraulic reservoir comprises a piston.

39. The energy-efficient shoe of claim 34, further comprising heel stabilizer means for preventing shear and torsional motion of said heel.

24

40. The energy-efficient shoe of claim 39, wherein said heel stabilizer means comprises a bellows surrounding said rear hydraulic reservoir.

41. The energy-efficient shoe of claim 39, wherein said heel stabilizer means comprises:

a back frame rigidly attached to the bottom of said lower rear plate, oriented vertically with height approximately equal to the thickness of said sole and width extending across the back of said sole;

a cross frame for strengthening said back frame;

stabilizer cables for providing a sliding connection between said back frame and said upper rear plate; and

stabilizer rollers for allowing said sliding connection to have low friction, wherein said upper rear plate is constrained to move up and down with respect to said lower rear plate during foot strike, without significant tilting or shearing.

42. An energy-efficient shoe wherein the sole of said shoe comprises:

a plurality of intermediate energy storage means for storing energy of heel impact upon a running surface;

a plurality of transmission means in the heel of said sole, each of which transmits energy of heel impact upon a running surface to a corresponding one of said intermediate energy storage means; and

a plurality of thrust means positioned in the front of said sole, each of which is coupled to a corresponding one of said intermediate energy storage means and releases during thrust off of said running surface said energy accumulated by said one of said corresponding intermediate energy storage means, whereby the center of mass of the wearer of said shoe is impelled upward from said running surface.

43. The energy-efficient shoe of claim 42, wherein the sole of said shoe further comprises transmission means located in the mid-sole portion thereof for transmitting energy obtained from impact of said mid-sole portion on said running surface to locations forward of said mid-sole portion.

*  *  *  *  *

# EXHIBIT D
# (Part 5 of 17)

# United States Patent [19]

## Richard et al.

[11]  Patent Number:  **5,014,449**

[45]  Date of Patent:  **May 14, 1991**

[54]  **SHOE SOLE CONSTRUCTION**

[75]  Inventors:  **Daniel Richard**, West Linn; **Kenneth Kolman**, Beaverton; **Charles Case**, Beaverton; **Ronald Becker**, Stayton, all of Oreg.; **Alex Gross**, Aspen, Colo.

[73]  Assignee:  **Avia Group International, Inc.**, Portland, Oreg.

[21]  Appl. No.:  **411,044**

[22]  Filed:  **Sep. 22, 1989**

[51]  Int. Cl.$^5$ ...................... **A43B 13/18; A43B 21/26**

[52]  U.S. Cl. ......................................... **36/114; 36/28; 36/30 R; 36/29**

[58]  Field of Search ...................... 36/114, 29, 28, 27, 36/35 R, 35 B, 7.8, 25, 30 R; 5/449, 450

[56]  **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 886,801 | 5/1908 | Harmon | 36/32 |
| 1,241,142 | 9/1917 | O'Hara | 36/28 |
| 3,087,262 | 4/1963 | Russell | 36/28 |
| 3,608,215 | 9/1971 | Fukuoka | 36/29 |
| 4,083,125 | 4/1978 | Benseler et al. | 36/32 R |
| 4,229,889 | 10/1980 | Petrosky | 36/29 |
| 4,342,158 | 8/1982 | McMahon et al. | 36/35 B |
| 4,561,140 | 12/1985 | Graham et al. | 36/37 |
| 4,670,995 | 6/1987 | Huang | 36/29 |
| 4,680,876 | 7/1987 | Peng | 36/37 |
| 4,741,114 | 5/1988 | Stubblefield | 36/114 |
| 4,753,022 | 6/1988 | Gasbarro | 36/29 |
| 4,768,295 | 9/1988 | Ito | 36/29 |
| 4,887,367 | 12/1989 | Mackness et al. | 36/35 B |
| 4,918,838 | 4/1990 | Chang | 36/29 |
| 4,918,841 | 4/1990 | Turner et al. | 36/28 |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 203631 | 5/1907 | Fed. Rep. of Germany . | |
| 2800359 | 7/1979 | Fed. Rep. of Germany | 36/28 |
| 417548 | 11/1910 | France | 36/7.8 |
| 777630 | 6/1957 | United Kingdom | 36/29 |
| 1603646 | 11/1981 | United Kingdom | 36/29 |

### OTHER PUBLICATIONS

Lydico Shoe Brochure, Atlanta Super Show, Feb. 1990.

Footwear News Article, Dec. 11, 1989.

*Primary Examiner*—Steven N. Meyers
*Attorney, Agent, or Firm*—Sterne, Kessler, Goldstein & Fox

[57]  **ABSTRACT**

The present invention comprises an intermediate layer for a shoe sole consisting of a hollow shell having convolutions disposed along the periphery thereof. The convolutions are adapted to cushion the foot by compressing when force is applied thereto, and expanding to their original configuration when the force is relieved. An inner filler material may be provided within the shell for added cushioning and resilience.

**10 Claims, 7 Drawing Sheets**









*FIG. 4*



*FIG. 11*



FIG. 6



*FIG. 7*

*FIG. 10*



FIG.8



FIG. 9

5,014,449

1

## SHOE SOLE CONSTRUCTION

### FIELD OF THE INVENTION

This invention relates to shoes, and more particularly to a shoe sole construction.

### BACKGROUND OF THE INVENTION

Through the years, attempts have been made to produce footwear that is both comfortable and exhibits improved performance. Many attempts have proved unsatisfactory, in that they have failed to produce the desired effectiveness. A major emphasis of these attempts has been to increase the cushioning and performance of an athletic shoe by making modifications to the midsole (the material which generally lies above the outsole and below the insole). The numerous attempts to provide superior cushioning in athletic shoes have led to at least two broad categories of developments.

One category utilizes different materials and configurations of the midsole to improve cushioning, as well as to provide selective stability. For example, materials of different hardness may be used, or a variety of devices may be encapsulated in the midsole to increase cushioning and stability. Typically, such midsoles are constructed of cellular ethyl vinyl acetate (EVA), polyurethane (PU), or a combination of both. While EVA has the advantage of being light-weight, and PU has the advantage of increased memory capabilities and resilience, the cellular structure of both materials has a tendency to break down and thus, diminish the useful lifespan of the midsole, and thus, the shoe.

A second category of developments in midsoles includes those structures which have encapsulated an insert within the midsole material itself. The insert, usually made of plastic material that is harder than the midsole material, does to a limited degree increase the lifespan of the shoe sole since, unlike the cellular material, it does not break down. However, as with the first category of developments, in the second category, the insert is still designed to be encapsulated within either EVA or PU. Therefore, this structure does not completely eliminate the tendency of the cellular material to break down. Thus, the lifespan of these midsoles is still seriously limited by the lifespan of the primary midsole material itself.

### SUMMARY OF THE INVENTION

It is with these problems of the prior art in mind, that the present invention was developed. The present invention may be characterized as a shoe sole construction comprising an outer sole layer and an intermediate layer disposed above the outer sole layer. The intermediate layer may be comprised of a hollow outer shell defining an interior chamber. The shell may be comprised of a thermoplastic elastomer. An inner filler material may be encapsulated within the interior chamber of the intermediate layer. The filler material may be comprised of a synthetic foam. The foam is preferably selected from the group consisting of polyether polyurethane, polyester polyurethane and ethyl vinyl acetate. The shell may be formed by blow molding.

The present invention may also be characterized as a shoe sole construction comprising an intermediate layer for supporting the forces generated by a wearer. The intermediate layer may include a hollow outer shell having a plurality of convolutions arranged horizontally along a substantial portion of the outer periphery

2

of the intermediate layer extending from the top surface to the bottom surface. The convolutions may be arranged in independent vertical columns along the outer periphery. A recess may be formed between adjacent columns. The columns may be uniformly arranged, and may be arranged at an angle to a central axis of the intermediate layer.

Furthermore, the present invention may be characterized as a midsole construction for a shoe comprising a resilient midsole cradle element having a cavity therein. A hollow insert may be disposed within the cavity. The hollow insert may include a plurality of convolutions arranged horizontally along a portion of the insert such that the convolutions compress in an accordion-like fashion when force from the foot of the wearer is applied thereto. The insert may be disposed in the heel region of the midsole; the forefoot region of the midsole; or both the heel and forefoot regions. The cavity may be formed in the upper surface, the bottom surface, or both the upper and bottom surfaces of the midsole cradle element.

In addition, the present invention may be characterized as a shoe sole construction comprising an outer sole having a plurality of lugs extending downwardly from a peripheral portion of the outer sole to create a concavity in the central portion of the outer sole. An intermediate layer may be disposed above the outer sole. The intermediate layer may include a plurality of convolutions formed along the periphery of the intermediate layer such that the convolutions are adapted to compress in an accordion-like fashion when the force from the foot of a wearer is applied thereto.

### BRIEF DESCRIPTION OF THE DRAWINGS

Various objects, features, and attendant advantages of the present invention will be more fully appreciated as the same becomes better understood when considered in connection with the accompanying drawings in which:

FIG. 1 is a right side view of an athletic shoe having the intermediate layer of the present invention;

FIG. 2 is a rear perspective view of the athletic shoe shown in FIG. 1;

FIG. 3 is a cross sectional view of the athletic shoe taken along line 3—3 in FIG. 1;

FIG. 4 is a cross sectional view of the athletic shoe taken along line 4—4 in FIG. 1;

FIG. 5 is a top plan view of the intermediate layer of the present invention shown removed from the shoe;

FIG. 6 is an exploded view of an alternate embodiment of the present invention showing discrete heel and forefoot inserts supported in a cradle element;

FIG. 7 is a top plan view of the intermediate layer of FIG. 6;

FIG. 8 is a side view of the forefoot and heel inserts of FIG. 6 shown within the cradle element;

FIG. 9 is a top plan view of the forefoot and heel inserts of FIG. 8, in partial cutaway showing, in phantom, the cradle element;

FIG. 10 is a cross sectional view of the cradle element, taken along line 10—10 of FIG. 6.

FIG. 11 is a cross sectional view taken along line 11—11 of FIG. 9.

5,014,449

3

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

Referring now to the drawings, wherein like reference numerals represent identical or corresponding parts throughout the several views, FIG. 1 illustrates a right (medial) side view of an athletic shoe for the right foot of a wearer incorporating the intermediate layer of the present invention. An athletic shoe for the left foot having the intermediate layer of the present invention would be a mirror image of the one shown in FIG. 1. The upper of the athletic shoe, which does not form part of the present invention, is designated by reference numeral 8. Upper 8 may take numerous forms other than that shown in the figures. Similarly, while the present invention is shown embodied on an athletic shoe, the invention may be practiced on any type of footwear, including walking or dress shoes, and accordingly should not be limited to athletic shoes.

A shoe sole, disposed below upper 8, preferably includes an outer sole 14 and the intermediate layer or midsole of the present invention, designated generally by 12. Alternatively, outer sole 14 could be integral with intermediate layer 12. The periphery of outer sole 14 generally follows the profile of the human foot. Along the periphery of outer sole 14 are a plurality of lugs 52 which extend downwardly from outer sole 14. Lugs 52 create a concavity in the central portion of the heel region of outer sole 14 which advantageously provides improved shock absorption. The manner in which this is achieved is disclosed in U.S. Pat. No. 4,372,058 and is incorporated herein by reference.

Referring more particularly to FIGS. 3 and 4, intermediate layer 12 is disposed between outer sole 14 and upper 8. An upper surface 13 of intermediate layer 12 is secured along the lasting margin 11 of the bottom surface of upper 10. A lower surface 16 of intermediate layer 12 is secured to a top surface 15 of outer sole 14. Intermediate layer 12 is preferably secured to outer sole 14 and upper 10 by adhesives. However, other suitable securing means may be utilized, for example, radio frequency welding. Furthermore, the present invention should not be limited to the particular securement configuration shown; that is, it is not necessary that intermediate layer 12 be directly affixed to upper 8 or directly affixed to outer sole 14 as additional layers or materials may be interposed above and below intermediate layer 12. As can best be seen from FIG. 5, intermediate layer 12 has a medial side 17, a lateral side 18, a forefoot or front region 19, a center region 20 and a heel or rear region 21.

With continuing reference to FIG. 5, intermediate layer 12 is preferably shaped to conform to the shape of outer sole 14. That is, intermediate layer 12 follows the profile of the human foot, including a curved in arch area designated generally by 23. Furthermore, as best seen in FIG. 1, the height of intermediate layer 12 in heel region 21, measured by the distance between upper surface 13 and lower surface 16, is greater than the height in front region 19. Intermediate layer 12 preferably progressively increases in height beginning at center region 20. In the embodiment shown in FIGS. 1–5, the greatest height of intermediate layer 12 is in heel region 21 which is approximately two centimeters; and the smallest height in forefoot region 19 which is approximately one centimeter. Obviously, the height of intermediate layer 12 can be varied from that disclosed herein and the height in the heel region 21 could alternately be less than or equal to the height in the forefoot region.

4

One aspect of the present invention, although not limited thereto, is the material from which intermediate layer 12 is constructed. Intermediate layer 12 is preferably composed of a thermoplastic elastomer which exhibits the following characteristics:

| SPECIFIC GRAVITY | 1.0 to 1.5 |
| FLEXURAL MODULUS psi | 40,000–75,000 |
| IZOD IMPACT, notched ft-lbs/in | 2.0-NB |
| TENSILE PROPERTIES | |
| at 10% Elongation psi | 2,500–4,000 |
| at 15% Elongation psi | 3,000–4,400 |
| Tensile Strength psi | 6,000–9,300 |
| Elongation at Break, % | 300–500 |

One example of a suitable elastomer is HYTREL, a polyester elastomer available from E. I. Dupont de Nemours, Wilmington, Del. One form of HYTREL of particular suitability is type HTX-8177. Such material has the advantage of being a lightweight, non-fatigue material, which is highly desirous in athletic shoes; as well as having a high tear strength which makes the shoe sole more durable than soles utilizing midsoles formed substantially of cellular PU or EVA. A mixture of other grades of HYTREL, or of other materials, may be utilized so long as they generally exhibit the characteristics noted above. Furthermore, if a clear shell is desired, a polyester elastomer such as SURLYN (also available from E. I. DuPont de Nemours) which is capable of being made transparent, may be used.

Intermediate layer 12 is preferably constructed as a hollow shell 28 by blow-molding, a technique known in the art. However, other techniques for constructing a hollow shell may also be used, for example, injection molding; rotational molding; and injection blow molding. The interior of shell 28 is defined by an outer wall 26 which forms a hollow chamber 30 (see FIGS. 3 and 4). Outer wall 26 is approximately 0.25 mm to 1.5 mm in thickness and preferably is 0.5 mm in thickness. Chamber 30 may contain a filler such as: air at ambient pressure; fluid other than air; pressurized air or gas; or synthetic foam. FIGS. 3 and 4 show an example of the present invention in which a foam 32 is encapsulated within chamber 30 of shell 28. A suitable foam for encapsulation within shell 28 is PU, EVA or SURLYN. Another aspect of the present invention, although not limited thereto, is the type of foam which is encapsulated within shell 28. It is preferred that foam 32 have a specific gravity less than that of shell 28 and within the range of approximately 0.08 to 0.20. Preferably, the specific gravity of foam 32 is 0.12. Of course, the present invention is not limited to this specific gravity range, neither is the invention limited to the use of foam as a filler. However, one advantage of this embodiment of the present invention is that it allows very lightweight foams to be effectively utilized in athletic shoe soles by providing a protective plastic shell outer covering to prolong the wear-life of the intermediate layer. The material forming foam 32 is preferably injected within chamber 30 and foamed therein. However, other methods of providing foam 32 within chamber 30 are possible, for example, the foam and a blowing agent

5,014,449

5                                                       6

may be inserted within chamber 30 and expanded therein.

Foam 32 is preferably of uniform density throughout chamber 30. However, it may also be possible to vary the density, and thus the stiffness of the foam along various regions of intermediate layer 12 to modify the stiffness of the sole. For example, the foam in the heel region 21 may be more dense than the foam in forefoot region 19. Similarly, the density of the foam along the medial side of the shoe may be different than the foam along the lateral side. Furthermore, it may be possible to provide foam 32 in selected areas of chamber 30, while leaving other areas foam-free or filled with ambient air, fluid other than air, or pressurized air or gas. In addition, plugs made of a more dense foam may be inserted into foam 32 to provide selected areas of hardness.

With continuing reference to FIG. 3 formed along the periphery of intermediate layer 12 are convolutions 22. Convolutions 22 preferably extend horizontally from upper surface 13 of intermediate layer 12 to lower surface 16. Each convolution 22 is formed by oppositely-angled surfaces 23, 23' which create a bellows-like structure allowing intermediate layer 12 to compress in an accordion-like fashion when force is applied to upper surface 13 or to lower surface 16, and to expand to its original configuration when force is removed, as will be explained in more detail below. Surfaces 23 and 23' are shown in the figures as planar. Alternatively, surfaces 23 and 23' may be arcuate. As best seen in FIG. 5, convolutions 22 are preferably arranged in a series of independent vertical columns 24 which are spaced apart from one another to form recesses 25 between adjacent columns. Recesses 25 are shown formed along substantially the entire periphery of intermediate layer 12. However, as discussed below, recesses 25 may be provided in only selected areas of intermediate layer 12 to allow adjustment of the degree of compression along intermediate layer 12 Recesses 25 provide an effective means for controlling the compressibility of intermediate layer 12. That is, convolutions 22 may be compressed more easily at columns 24 than at recesses 25, thus providing both increased cushioning and stability to the foot of the wearer. This concept will be explained in more detail below.

The particular number of convolutions 22 in each column 24 will likely vary along the medial and lateral peripheral portions 17 and 18 of intermediate layer 12. As best seen in FIG. 1, there is a greater number of convolutions (i.e., five) in heel portion 21 than the number (i.e., two) in forefoot portion 19. The exact number of convolutions per column may be other than that shown. Furthermore, the width w and depth d (see FIG. 5) of recesses 25 between adjacent columns 24 can also be varied to form columns of varying size and shape. The depth d of recesses 25 along lateral side 18 is approximately 3 mm to 8 mm, and preferably 5 mm; and along medial side 17, approximately 3 mm to 15 mm, and preferably 8 mm. The width w of recess 25 from the center of adjacent columns is approximately 10 mm to 25 mm, and preferably 22 mm on lateral side 18; and 18 mm along medial side 17. By varying the dimension and placement of recess 25, the overall flexibility and stiffness of intermediate layer 12 may be modified. For example, the depth and width of recesses 25 in heel region 21 and center region 20 may be greater than those in forefoot region 19. Similarly, the depth and width of recesses in heel region 21 may be greater along

the medial side 17 or lateral side 18 of the intermediate layer to increase the stiffness in the particular region. For example, where the width of all recesses 25 is 18 mm, the depth along the medial side may be 5 mm, while the depth along the lateral side may be 10 mm.

Thus, the present invention advantageously allows for the stiffness of intermediate layer 12 to be varied by changing one or more of the characteristics of convolutions 22, columns 24, and recesses 25. For example, to increase the stiffness of intermediate layer 12, one or more of the following changes can be made: (a) increase the number of convolutions 22; (b) increase the depth of the recesses 25; (c) increase the wall thickness of the convolutions 22; (d) increase the number of columns 24; and (e) increase the density of foam 32. Conversely, to decrease the stiffness of intermediate layer 12, one or more of the following modifications can be made: (a) decrease the number of convolutions 22; (b) decrease the depth of recesses 25; (c) decrease the wall thickness of the convolutions 22; (d) decrease the number of columns 24; and (e) decrease the density of foam 32. Furthermore, when modifying the stiffness of only a portion of intermediate layer 12 is desired, for example, the medial portion of heel region 21 to prevent pronation (i.e. the common condition of the human foot during the gait cycle, wherein the back of the foot everts), such modification can be achieved by varying the columns, convolutions, and/or recesses that are present in that particular portion of intermediate layer 12. For example, if increased stiffness is desired on medial side 17, deeper recesses can be provided in that area. While FIG. 5 shows intermediate layer 12 where the column size and recess depth are uniform throughout the periphery of the layer (i.e., uniformly arranged), it should be understood that various modifications are possible. Therefore, it should be apparent that the particular number and dimension of columns 24 and their associated recesses 25 shown in the figures is but one example of the almost infinite number of configurations of the intermediate layer which can be provided.

An alternate embodiment of the present invention is illustrated in FIGS. 6–11 in which similar reference numerals designated with regard to the embodiment described above in FIGS. 1–5 have been maintained. In general, this embodiment provides the intermediate layer of the present invention as separate insert members received within cavities formed in a middle layer or cradle 38. Cradle 38 is disposed between an outer sole and an upper (not shown).

FIG. 6 shows the three major components of this embodiment of the invention. The components are a forefoot insert 39, a heel insert 41, and cradle 38, all of which together comprise an intermediate layer of midsole member 36. Cradle 38 is preferably made of a resilient material such as foamed PU or EVA having a density less than that of inserts 39 and 41. Where PU is used, the specific gravity may range from 0.20 to 0.50, with a preferred specific gravity of 0.25; and when EVA is used, the specific gravity may range from 0.10 to 0.30, with a preferred specific gravity of 0.15. EVA is characteristically softer, more lightweight, and provides more cushioning than PU.

As seen in FIG. 7, the outer periphery 70 of cradle 38 generally follows the profile of the human foot. Cradle 38 includes a forefoot cavity 42 on the bottom surface 68 of cradle 38 and a heel cavity 43 on the upper surface 66 of cradle 38 (see FIG. 10). Forefoot cavity 42 and heel cavity 43 are adapted to receive forefoot insert 39

5,014,449

7

and heel insert 41, respectively. An interior flange 58 is provided in heel region 21 extending upwardly into cavity 43. Flange 58 helps support heel insert 41 within cradle 38, providing a cementing surface for attachment of, and a smooth transition with, heel insert 41. Thus, flange 58 cooperates with downwardly depending flange 60 of heel insert 41 (FIGS. 9 and 11). As shown in FIGS. 6 and 9, forefoot insert 39 includes a front wall 54 and a rear wall 56 which are slightly angled or beveled. Heel insert 41 includes a front wall 58 which is also slightly angled or beveled. Although forefoot insert 39 is shown positioned below cradle 38 and heel insert 41 is shown positioned above cradle 38 (FIG. 6), other arrangements of cradle 38 and inserts 39 and 41 are possible. Furthermore, a single cavity may be provided in cradle 38 to receive a single insert. The cavity may be disposed on the upper surface or bottom surface of cradle 38 and may be disposed in the forefoot region, central region, heel region or a combination of any two regions or all three.

As shown in FIG. 10, forefoot cavity 42 includes a bevelled front edge 44 and a bevelled rear edge 46. Heel cavity 43 includes beveled front edge 64. With reference to FIG. 8, edges 44, 46 cooperate with the angled walls 60, 62 and 64 of forefoot insert 39 and edge 64 cooperates with the angled wall 64 of heel insert 41 to form a tight fit. As with the previous embodiment, the height of the insert in the forefoot region 19 may be less than that in the heel region 21. Inserts 39 and 41 may include upstanding flanges 44 and 45 respectively along their medial and lateral sides for adding stability to the shoe upper (not shown).

With continuing reference to FIG. 10, rearfoot cavity 43 includes a cutout 52 in the bottom surface of cradle 38 allowing heel insert 39 to be visible through the bottom of cradle 38. A similar cutout may also be provided in the outsole to which midsole 36 is attached to allow the insert to be visible through the outsole. A protective layer which is preferably transparent may be provided on the exterior wear surface of the outsole positioned over the cutout.

As best seen in FIG. 9 and in phantom in FIG. 7, the length of forefoot insert 39 measured as the distance between front wall 54 and rear wall 56, progressively increases from medial side 17 to lateral side 18. Thus, the distance is approximately 70 mm on medial side 17 and 90 mm on lateral side 18. The heel insert, on the other hand, progressively decreases in length, as measured by the distance between front edge 58 to heel end 60, from medial side 17 to lateral side 18, such that it is approximately 126 mm on the medial side and 100 mm on the lateral side. Obviously, the length of the inserts could vary from that disclosed herein.

Both forefoot and heel inserts 39 and 41, like intermediate layer 12, are preferably hollow (see FIG. 11) and are formed by blow-molding. A plurality of convolutions 22, similar to those described above, are arranged in discrete independent columns 24 along at least a portion of the periphery of inserts 39 and 41. Columns 24 of heel insert 41 are separated by recesses 25 similar to those in the embodiment of FIGS. 1–5. As is best seen in FIG. 9, the convolutions 22 of forefoot insert 39 are shown arranged in columns 48 angled to a central axis of midsole member 36, separated by angled recesses 50. Angling the columns in the forefoot area increases the bending flexibility of insert 39, a characteristic which is particularly desirable along the metatarsal area of the foot. While FIG. 9 shows three angled columns 48 and

8

four angled recesses 50 along lateral side 18 of insert 39, and a single angled recess 50 along medial side 17, the particular number of recesses and columns may be varied in order to modify the flexibility of insert 39. Furthermore, if desired, angled recess 50 may be provided in heel insert 41; and recesses 25 may be provided in forefoot insert 39. It should be apparent to those skilled in the art that angled recesses may also be provided in intermediate layer 12 of FIGS. 1–5 described above.

As with intermediate layer 12, the depth and width of recesses 25 and 50 between columns 24 and 48 respectively may be varied in order to vary the stiffness of the particular insert. Similarly, the number of columns, placement and wall thickness may be varied to provide a customized insert to meet the particular needs of the user. Moreover, as with intermediate layer 12, chamber 30 provided within inserts 39 and 41 may be provided with a filler material such as ambient air; fluid other than air; pressurized air or gas; or synthetic foam.

In use of either the embodiment of FIGS. 1–5, or FIGS. 6–11, when force is provided on the upper surface of intermediate layer 12 or 36 by the weight of a wearer during the gait cycle, the force is transferred to intermediate layer 12 or 36, respectively. Such force causes convolutions 22 to compress in an accordion-like fashion to cushion the wearer's foot. When the force is removed, the convolutions 22 expand back to their original configuration. When foam 32 is provided within intermediate layer 12, or inserts 39 and 41, such foam further aids in compression and expansion of the convolutions 22.

While the present invention has been shown embodied as either a full insert for the entire length of the sole, or as two individual inserts, one provided in the heel area, the other in the forefoot area of the sole, inserts in other areas of the sole may be provided as desired. These inserts may be in addition to the heel and/or forefoot inserts or as a substitute for these inserts. Additionally, an insert which substantially joins heel insert 41 with forefoot insert 39 through the arch area, leaving the toe area of the sole insert-free, may also be provided.

While convolutions 22 of both embodiments of the present invention are shown unprotected and exposed, it is possible to provide a outer covering of foam or other material to protect the convolutions from being clogged by dirt and other debris associated with the ground. Such an outer covering may be transparent so that the interior cushioning of the intermediate layer is visible. If such an outer layer is provided, it should not interfere with the proper functioning of convolutions 22, i.e., that they be allowed to contract and expand as force is applied thereto.

It is to be understood that the foregoing is considered as illustrative only of the principles of the invention. Therefore, within the scope of the appended claims, the invention may be practiced otherwise than as specifically described herein.

What is claimed is:

1. A shoe sole construction comprising
an intermediate layer for supporting the forces generated by a wearer, said intermediate layer including a hollow outer shell defined by a top surface and a bottom surface connected by an outer periphery; and
a plurality of convolutions arranged horizontally along a substantial portion of said outer periphery of said intermediate layer extending from said top

5,014,449

**9**

surface to said bottom surface in independent vertical columns along said outer periphery of said intermediate layer with a recess formed between adjacent columns, whereby said convolution compress in an accordion-like fashion when force is applied thereto.

2. A shoe sole construction, as set forth in claim 1, wherein said columns are uniformly arranged along said outer periphery of said intermediate layer.

3. A shoe sole construction, as set forth in claim 1, wherein said columns are arranged at an angle to a central axis of said intermediate layer.

4. A shoe sole construction for a shoe comprising
a resilient midsole cradle element, said midsole cradle element including a cavity; and
a hollow insert disposed within said cavity;
said hollow insert including a plurality of convolutions arranged horizontally along a portion of said insert in independent vertical columns along an outer periphery of said hollow insert with a recess formed between adjacent columns such that said

**10**

convolutions compress in an accordion-like fashion when force is applied thereto.

5. A shoe sole, as set forth in claim 4, wherein said insert is disposed in a heel region of said midsole cradle element.

6. A shoe sole, as set forth in claim 4, wherein said insert is disposed in a forefoot region of said midsole cradle element.

7. A shoe sole, as set forth in claim 4, wherein said midsole cradle element further comprises
a second hollow insert disposed in a heel region of said midsole cradle element.

8. A shoe sole, as set forth in claim 7, further comprising
a filler material disposed within both of said inserts.

9. A shoe sole as set forth in claim 4, wherein said cavity is formed in an upper surface of said midsole cradle element.

10. A shoe sole, as set forth in claim 4, wherein said cavity is formed in a bottom surface of said midsole cradle element.

* * * * *

# UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

**PATENT NO.** : 5,014,449

**DATED** : May 14, 1991

**INVENTOR(S)** : Daniel Richard, Kenneth Kolman, Charles Case, Ronald Becker, Alex Gross

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 9, line 4, delete "convolution" and insert

--convolutions-- therefor; and

Column 10, line 9, delete "4" and insert --6--

therefor.

Signed and Sealed this

Sixth Day of October, 1992

Attest:

DOUGLAS B. COMER

*Attesting Officer*            *Acting Commissioner of Patents and Trademarks*



US005181873A

# United States Patent [19]

Tolbert

[11] Patent Number: **5,181,873**

[45] Date of Patent: **Jan. 26, 1993**

[54] **WATER SPORT FOOTWARE**

[76] Inventor: **James H. Tolbert,** 106 Winfield Cir., Newport News, Va. 23601

[21] Appl. No.: **772,065**

[22] Filed: **Oct. 7, 1991**

### Related U.S. Application Data

[63] Continuation-in-part of Ser. No. 324,732, Mar. 17, 1989, Pat. No. 5,078,633, which is a continuation-in-part of Ser. No. 784,577, Oct. 4, 1985, abandoned.

[51] Int. Cl.⁵ ............................................. **B63B 35/81**
[52] U.S. Cl. ......................................... **441/65;** 36/114
[58] Field of Search ...................... 441/65, 68, 79, 76, 441/77, 70, 61; 36/25 R, 30 R, 114, 115, 85, 88

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,229,387 | 1/1941 | Parker | 36/30 R |
| 2,349,866 | 5/1944 | Heck | 36/30 R |
| 4,366,634 | 1/1983 | Giese et al. | 36/114 |
| 5,078,633 | 1/1992 | Tolbert, Jr. | 441/65 |

#### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 218779 | 4/1987 | European Pat. Off. | 441/68 |
| 925359 | 5/1982 | U.S.S.R. | 441/76 |
| 8304166 | 12/1983 | World Int. Prop. O. | 36/115 |

*Primary Examiner*—Sherman Basinger
*Attorney, Agent, or Firm*—Keaty & Keaty

[57] **ABSTRACT**

The invention relates to improved water sport footwear designed for wearing during gliding on the surface of water with the bottom of the footwear contacting the water during the gliding process. The footwear includes a boot portion and a sole assembly which is fixedly attached to the boot portion. The size of the sole assembly is not considerably greater than the boot portion itself. The sole assembly is formed from with a rigid upper plate and a soft, impact absorbing bottom plate, the bottom surface of which contacts the water. A continuous shoe portion mounting wall extends upwardly from the top plate and defines an area within which the shoe portion is secured to the top plate and the mounting plate. The mounting wall is formed unitary with the upper plate and the bottom, and upper plates and the mounting wall form a composite unitary sole assembly.

**9 Claims, 2 Drawing Sheets**





F I G . I



F I G . 2



FIG. 5

FIG. 4

FIG. 3

5,181,873

**1**

## WATER SPORT FOOTWARE

### CROSS REFERENCE TO RELATED APPLICATIONS

This application is a continuation-in-part application of my co-pending application Ser. No. 324,732 Filed: Mar. 17, 1989 for "Water Sport Footwear", now U.S. Pat. No. 5,078,633 issued on Jan. 7, 1992, which is a continuation-in-part application of application Ser. No. 784,577 Filed on Oct. 4, 1985 for "Water Ski Shoes", now abandoned, the disclosures of both of the applications are being incorporated herewith by reference.

### BACKGROUND OF THE INVENTION

The present invention relates to footwear for water sports, and more specifically to footwear worn during gliding on the body of water, while the user is being pulled along the body of water by a motor boat or the like.

In the present years it has become popular to engage in barefoot waterskiing, which presents considerable danger to the feet of the skier. In barefoot waterskiing, a sportsman holds by hands on to a pulling rope, while contacting the surface of water with his bare feet, and is being propelled about the surface of water at considerable speed. Various mechanical objects in the body of water, such as wooden splinters, pieces of plastic containers and the like which float in the body of water can damage the feet of the sportsman, causing serious injuries.

There are also known various elongated skies in which conventional water ski shoes of the sportsman are secured by clamps or similar means which allows the sportsman to engage in conventional water skiing sports. But as with bare foot skiing, there is present a danger of injury to a sportman, such as when a sportsman falls, the ski may become the damaging object, causing injury to the sportsman, breaking and leaving the broken pieces on the surface of the water, so that the next skier is injured by the broken skis.

The present invention contemplates provision of water sport footwear which overcomes deficiencies of the prior art and provides a safe alternative to barefoot skiing, allowing the user to glide on the body of water while wearing the footwear without the assistance of water skis.

It is, therefore, an object of the present invention to provide a water sport footwear capable of absorbing impact shocks acting on a sportsman's foot during contact with water.

It is another object of the present invention to provide a water sport footwear having an improved breakage resistance, which is lightweight and resists bending.

It is a further object of the present invention to provide a water sport footwear which has improved hydrodynamic qualities.

It is still a further object of the present invention to provide a water sport footwear which protects the foot of the sportsman, as it comes in contact with the body of water during gliding on the surface of the water.

These and other objects of the invention will be more apparent to those skilled in the art from the following description of the invention.

### SUMMARY OF THE INVENTION

The present invention achieves its objects and overcomes its deficiencies of the prior art in a simple and

**2**

straightforward manner. The present invention contemplates provision of a water sport footwear which comprises a sole assembly and a boot portion fixedly attached to the sole assembly, while the sole assembly is not considerably greater than the boot portion itself. The sole assembly comprises a soft, flexible bottom plate, a substantially rigid upper plate which is fused to the bottom plate and a substantially continuous upwardly extending shoe mounting wall secured to a top surface of the upper plate.

The bottom surface of the contact (bottom) plate immediately contacts the body of water during entire water gliding by a sportsman, absorbing contact forces, while the upper plate supports the boot portion, fixedly engaging it, with the boot portion extending upwardly to a distance adjacent an ankle of the sportsman.

The boot portion fits within an area defined by the mounting wall and is fixedly attached thereto at the lower part of the boot portion. The boot portion is sized and shaped to follow natural size and shape of the sportsman's foot, so as to provide comfortable protection to the sportsman's foot without bulky support means, such as conventional water skis. The boot assembly provides improved stability and hydrodynamic qualities. One or more water channels formed in the bottom of the contact plate, at least one of the channels extending from the heel portion to a distance from the front portion gradually reducing in depth towards its innermost end.

There may be further included a pair of channels in the soft and flexible bottom plate along the front half of the shoe for providing improved control and maneuverability while skiing in the reversed position.

The upper plate has a smaller surface area than the bottom plate, such that a continuous border is formed between an outer peripheral edge of the bottom plate to further absorb any impact forces acting on the footwear.

The sole assembly has upwardly curved front and heel portions, with the front portion being curved upwardly to a greater degree than the heel portion. An upwardly turned arch portion further enhances comfort of using the water sport footwear while gliding on the water surface. The boot portion can be secured to the sportsman's feet by securing straps and/or laces.

### BRIEF DESCRIPTION OF THE DRAWINGS

Reference will now be made to the drawings, wherein like parts are designated by like numerals, and wherein

FIG. 1 is a perspective view of the water sport footwear in accordance with the present invention.

FIG. 2 is a bottom perspective view of the footwear shown in FIG. 1.

FIG. 3 is a side view of the sole assembly.

FIG. 4 is a cross-sectional view taken along lines 4—4 of FIG. 3; and

FIG. 5 is a back view of the sole assembly shown in FIG. 3.

### DETAIL DESCRIPTION OF THE PREFERRED EMBODIMENT

Reference will now be made to the drawings, wherein the water sport footwear in accordance with the present invention is generally designated by numeral 10. The footwear 10 comprises a sole assembly 12 and a boot, or shoe portion 14 which is fixedly attached

5,181,873

**3**

to the sole assembly 12 by adhesion, stitching or other similar methods.

The size of the sole assembly 12 is not considerably greater than the boot portion 14, which rests on a top surface 16 of the sole assembly 12. The bottom surface 18 of the sole assembly 12 is designed for gliding on the surface of water during the entire water gliding process, as will be described in more detail hereinafter.

The sole assembly 12 comprises two plates or layers 20 and 22, which are fixedly and integrally attached to each other to prevent their disengagement during use of the footwear 10. The plates 20 and 22 are attached by reactive injection molding, which fuses the materials, from which the plates are constructed.

As can be seen in FIGS. 1 and 3, the sole assembly 12 comprises a bottom plate 20 made from a relatively soft flexible material, for example polyurethane having 0.4 (0.33 g/cc) density. The soft plate 20 can be made by using compounds SES-5624 (resin) and ISO compound ES-12. The plate 22 is made from a much stronger material, for example polyurethane having 0.9 (0.85 g/cc) density. This material can be made from a resin compound SES-5506 and ISO compound MF-192. The materials mentioned above are manufactured by ICI polyurethane Co. of Sterling Heights, Mich.

The bottom plate 20 has a bottom surface 18 which contacts the water surface and a top surface 26 which engages the lower surface 23 and sides 28 and 29 of the upper plate 22. A recess or depression 27 is made in the surface 26, the recess being sized and shaped to accommodate the entire lower surface and sides of the plate 22. The recess 27 has a smaller periphery than the surface 26, as can be better seen in FIGS. 4 and 5.

The lower plate 20 has a somewhat greater surface than the upper plate 22, so that a continuous peripheral border 78 is formed between the outer peripheral edges of the lower plate 20 and the outer peripheral edges of the upper plate 22.

The plates 20 and 22 each have a front part 30 and 32, respectively, and a back part 34 and 36, respectively. The plate 22 gradually increases in thickness, or height from part 32 to part 36, so that an arch 40 is formed to make the footwear 10 more comfortable to the user. The arch 40 generally follows the natural arch curvature of the human sole of the foot.

Extending upwardly from the top surface 16 of the plate 22 and integrally formed therewith is a shoe mounting wall 50. The wall 50 is a substantially continuous wall and comprises a toe securing part, or protector 52, a heel securing part or protector 54 and a pair of opposing side wall parts 56 and 58 which extend between the parts 52 and 54. The toe securing part 52 and the heel securing part 54 are both arched in shape and are adapted for securing to the front, toe portion 60 of the shoe portion 14 and to the heel, back portion 62 of the shoe portion 14, respectively.

The wall 50 defines an area within which the shoe portion 14 is mounted. As can be seen in the drawings, the periphery of the wall 50 is somewhat smaller than the periphery of the plate 22, such that the sole assembly extends around the shoe portion 14 and protects the human foot from impact with water or foreign objects.

The shoe portion 14 is fixedly secured by adhesion and/or stitching on top of the upper plate 22, between the heel and front protectors 52 and 54 and side wall portions 56 and 58. The boot portion 14 generally follows a shape of a human foot and extends with its upper portion 64 to about an ankle of a sportsman. The boot

**4**

portion 14 is secured on the user's foot through the use of straps 66 and 68, which can be used in combination with laces, or separately. The strap 68 secures the instep part of the boot portion 14, while the strap 66 secures an ankle or upper portion of the footwear 10.

The securing straps 66 and 68 can vary in width and may utilize hook and loop fasteners, such as Velcro ®, or buckle, if so desired.

Reference will now be made to FIGS. 3 and 4, illustrating the sole of the footwear in accordance with the present invention. The sole assembly 12, as was discussed above has an upper surface 16 and a bottom surface 18. The bottom surface 18 is provided with a central water channel 70 which extends from the heel portion 34 inwardly towards the front portion 30 and terminates a distance from the front portion 30 of the plate 20. The depth of the channel 70 generally decreases from the heel part 34 towards its innermost end 72, so that the channel 70 gradually meets with the bottom surface 18 at its innermost end.

As further illustrated in FIGS. 2 and 4, the shoe sole plate 20 can have an additional pair of channel members 74 and 76, each channel 74 and 76 being carved into the undersurface 18 of the plate 20 and forming a channel which extends along substantially the forward front third of the surface 18, and somewhat overlaps in distance the primary central channel 70, as illustrated in FIG. 2. The pair of secondary channels 74 and 76 further define a means for providing ingress and egress of the pressurized water upon which footwear 10 is gliding, while the footwear is being utilized in a manner, wherein the skier is moving in a backwards mode. A pair of channels 74 and 76 would allow greater maneuverability and stability to the user.

The front 30 and the heel 34 portions are curved, so as to offer less resistance to a water flow and create less turbulence, while the bottom surface 18 contacts the body of water during water gliding process.

As can be seen in FIG. 3, the front portion 30 is curved upwardly to a degree substantially greater than the heel portion 34, wherein the upward curvature is not so pronounced.

The size of the water sport footwear 10 can vary, depending on the actual size of a sportsman's foot who uses the footwear in accordance with the present invention. Still, the proportions between the boot portion 14 and sole portion 12 are retained, so as to allow more freedom of movement for the user of the water sport footwear 10, while not restraining his movement, in giving the illusion of "barefoot skiing" with the protection to the foot that that sport cannot provide. The footwear is shaped slightly different for a left and a right foot, generally following the natural shape of human feet.

In operation, a sportsman secures the boot portion 14 about his foot, tightening the securing strap 66 and 68, when necessary, so as to completely cover his foot and the ankle, thus preventing accidental removal of the footwear during water gliding process. A conventional propelling means, such as a motor boat, is employed for towing and propelling the sportsman when he starts the water gliding process by placing his feet with bottom surface 18 on the surface of water, thus starting the gliding process in the footwear itself, without the use of water ski shoes and/or water skis of any kind. During the entire water gliding process the water sport footwear 10 is secured on the foot of the sportsman, allow-

5,181,873

5

ing him to perform various stunts, if desired, while not restricting his movements to any degree.

As will be appreciated, the boot portion **14** can vary in design, size, color or the material from which it is made. Some of the applications contemplate the use of water impermeable material for the boot portion **14**, while other applications utilize, at least in part, water permeable materials for the boot portion **14**. The plate **22** is made from substantially rigid plastic, such as polyurethane, which retains its shape during impact with the surface of water, does not easily deform, but still allows formation of various required curvatures in the shape of the sole, while the plate **20** is made from a soft, flexible resilient material, such as for example polyurethane with much less density than that used for plate **22**, for defining a cushion to help absorb impacts between the ski shoe and objects, which would further resist in the tearing or breaking of rigid support surface **22** during use. The lower plate **20** is able to absorb greater impact with the water, yet serve as a means, with utilization of continuous peripheral boarder **78**, to protect direct impact to the upper plate **22** during use of the water sport footwear **10**. Therefore, the user is provided with greater stability and safety during use.

Many changes and modifications can be made in the design of the present invention without departing from the spirit thereof. I, therefore, pray that my rights to the present invention be limited only by the scope of the appended claims.

I claim:

1. A water sport footwear, comprising:
an upper shoe portion for accommodating a foot of a wearer;
a sole assembly secured to the shoe portion along entire length of the shoe portion, the sole assembly further comprising:
a solid upper rigid plate having a top surface;
a lower flexible impact absorbing plate fixedly attached to the upper rigid plate, said lower plate having a top surface which is provided with a recess, the recess being sized and shaped to receive the upper plate therein; and
a continuous integral shoe portion mounting wall extending upwardly from the upper rigid plate and defining an area within which the shoe portion is secured, the mounting wall being integrally formed with the upper plate, and wherein a continuous outwardly extending border is formed between outer peripheral edges of the upper plate and outer peripheral edges of the mounting wall, said border being formed, at least in part, by the top surface of the upper plate.

6

2. The apparatus of claim **1**, wherein a continuous boarder is formed between outer peripheral edges of the lower plate and outer peripheral edges of the upper plate.

3. The apparatus of claim **1**, wherein said upper plate and said lower plate are fused together to form a composite unitary sole platform.

4. The apparatus of claim **1**, wherein said lower plate is provided with channel means formed in a bottom surface thereof for allowing water to flow therewithin and be delivered rearward of the footwear.

5. The device of claim **1**, wherein the sole assembly comprises an upwardly curved front part and an upwardly curved heel part, while the front part is curved upwardly to a degree at least slightly greater than the heel part.

6. The apparatus of claim **1**, wherein the upper plate comprises an arch part which is curved upwardly to accommodate natural curvature of a human foot.

7. The apparatus of claim **1**, further comprising a strap means extending across the foot of the wearer on the shoe portion for securing the foot of the wearer in the shoe portion during use.

8. A water sport footwear, comprising:
an upper shoe portion for accommodating a foot of a wearer;
a sole assembly secured to the foot portion along entire length of the shoe portion, the sole assembly further comprising an upper rigid plate having an arch part which is curved upwardly to accommodate natural curvature of a sole of a sportsman's foot;
a lower flexible impact absorbing plate fixedly secured to the upper plate, said lower plate having a top surface which is provided with a recess sized and shaped to receive bottom and sides of the upper plate in a fixed attachment thereto, while a continuous outwardly extending border is formed between outer peripheral edges of the lower plate and outer peripheral edges of the upper plate said sole assembly further comprising a continuous integral shoe portion mounting wall extending upwardly from an upper rigid plate and unitary formed therewith, said wall defining an area within which the shoe portion is secured to the upper plate, said upper plate forming an outwardly extending second continuous border formed between peripheral edges of the mounting wall and the outer peripheral edges of the upper plate.

9. The footwear of claim **8**, wherein the upper plate, the lower plate and the mounting wall are formed as a composite unitary sole assembly.

* * * * *

# EXHIBIT D
# (Part 6 of 17)

# United States Patent [19]

## Sang Do

US005224277A

[11] Patent Number: 5,224,277

[45] Date of Patent: Jul. 6, 1993

[54] **FOOTWEAR SOLE PROVIDING VENTILATION, SHOCK ABSORPTION AND FASHION**

[76] Inventor: **Kim Sang Do**, Mokdong Sinsigaji Apt. 723-403, Mokdong 926, Yangcheon-gu, Seoul, Rep. of Korea

[21] Appl. No.: **873,664**

[22] Filed: **Apr. 23, 1992**

### Related U.S. Application Data

[63] Continuation of Ser. No. 586,606, Sep. 21, 1990, abandoned.

### [30] Foreign Application Priority Data

May 22, 1990 [KR] Rep. of Korea ...................... 90-6939

[51] Int. Cl.[5] ............................................. **A43B 13/28**

[52] U.S. Cl. ....................................... **36/27;** 36/3 R; 36/3 B; 36/28; 36/35 R

[58] Field of Search ................... 36/3 R, 3 A, 3 B, 28, 36/29, 35 R, 35 B, 27

### [56] References Cited

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 103,770 | 5/1870 | Parish | 36/3 B |
| 635,101 | 10/1899 | Kennedy . | |
| 989,894 | 4/1911 | Byrne | 36/3 B |
| 1,109,130 | 9/1914 | Kaye | 36/29 |
| 1,932,557 | 6/1931 | Meucci . | |
| 2,074,121 | 3/1937 | Goodyear | 36/22 |
| 2,128,134 | 8/1938 | Giusto | 36/7.5 |
| 2,266,476 | 12/1941 | Riess | 36/3 |
| 2,532,742 | 2/1949 | Stonier | 36/35 |
| 2,559,609 | 11/1948 | Foust . | |
| 2,720,041 | 3/1953 | Kajtar . | |
| 2,884,716 | 5/1959 | Shelare et al. | 36/3 |
| 2,989,812 | 6/1961 | Lemon | 36/76 R |
| 3,044,190 | 7/1962 | Urbany | 36/29 |
| 3,180,039 | 4/1965 | Burns, Jr. | 36/3 |
| 3,475,836 | 11/1969 | Brahm | 36/3 |
| 3,791,051 | 2/1974 | Kamimura | 36/44 |
| 4,000,566 | 1/1977 | Famolare, Jr. | 36/28 |
| 4,078,321 | 3/1978 | Famolare, Jr. . | |
| 4,417,407 | 11/1983 | Fukuoka | 36/3 B |
| 4,499,267 | 2/1985 | Kim | 36/3 B |
| 4,602,441 | 7/1986 | Sakkaf | 36/3 R |
| 4,610,099 | 9/1986 | Signori | 36/3 B |
| 4,654,982 | 4/1987 | Lee | 36/3 R |
| 4,774,774 | 10/1988 | Allen, Jr. . | |
| 4,845,863 | 7/1989 | Yung-Mao . | |
| 4,942,677 | 7/1990 | Flemming et al. | 36/27 |

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 532936 | 8/1931 | Fed. Rep. of Germany ........ 36/3 B |
| 2902608 | 8/1979 | Fed. Rep. of Germany .......... 36/29 |
| 910813 | 6/1946 | France . |
| 2626150 | 7/1989 | France ........................... 36/3 B |
| 34-101702 | 7/1959 | Japan . |
| 84-2314 | 11/1984 | Rep. of Korea . |
| 87-2820 | 8/1987 | Rep. of Korea . |
| 87-2821 | 8/1987 | Rep. of Korea . |
| 91-1208 | 2/1991 | Rep. of Korea . |
| 91-1209 | 2/1991 | Rep. of Korea . |
| 91-1210 | 2/1991 | Rep. of Korea . |
| 91-1211 | 2/1991 | Rep. of Korea . |
| 142267 | 5/1920 | United Kingdom . |

Primary Examiner—Steven N. Meyers
Assistant Examiner—Thomas P. Hilliard
Attorney, Agent, or Firm—Darby & Darby

[57] **ABSTRACT**

A footwear sole has a waterproof ventilation part secured in the midsole or the outsole, and a horseshoe-shaped shock-absorbing heel member secured in the heel portion of the sole part in which the waterproof and ventilation part is secured. The waterproof and ventilation part includes a buoyancy plate that blocks penetration of water into the sole during bad weather. The shock-absorbing heel member has opposite flanges with an empty space therebetween that insure very good shock-absorbing properties of the shock absorbing heel member.

**29 Claims, 15 Drawing Sheets**



FIG. 1



FIG. 2



# FIG. 3



# FIG. 4



# FIG. 5



# FIG. 6



# FIG. 7



# FIG. 8





FIG. 9A

FIG. 9B

FIG. 9C

FIG. 10A

FIG. 10B

FIG. 11

FIG. 12

# FIG. 13A



# FIG. 13B

# FIG. 13C



# FIG. 13D





FIG. 14A

14

56

55

FIG. 14B

14

56

55

FIG. 14C

14

A

A

58

55

56

FIG. 14D

56

57

55



FIG. 15A



FIG. 15B



FIG. 15C

FIG. 15D



FIG. 16A

FIG. 16B    FIG. 16C



FIG. 17A

FIG. 17B    FIG. 17C    FIG. 17D

# FIG. 18A



# FIG. 18B     FIG. 18C

# FIG. 19A



# FIG. 19B     FIG. 19C

# FIG. 20A



# FIG. 20B    FIG. 20C

# FIG. 20D



# FIG. 21A



# FIG. 21B

# FIG. 21C



# FIG. 21D

# FIG. 22A



# FIG. 22B    FIG. 22C

# FIG. 23A



# FIG. 23B

# FIG. 24A



# FIG. 24B

# FIG. 25A



# FIG. 25B



FIG. 26A

FIG. 26B

5,224,277

<table>
<tr><td>1</td><td>2</td></tr>
</table>

## FOOTWEAR SOLE PROVIDING VENTILATION, SHOCK ABSORPTION AND FASHION

This is a continuation of application Ser. No. 586,606, filed Sep. 21, 1990, now abandoned.

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The invention relates to varied footwear soles for sport footwear, shoes, military shoes, safety shoes, mountain-climbing shoes, etc., that have an upper. In particular, the invention relates to a footwear sole which can be fixed to the heel to provide a cushion function and to prevent penetration of water into the footwear in bad weather and which utilizes waterproof and ventilation parts applied at the front of the footwear to provide good ventilation and further shock absorption.

2. Description of the Prior Art

Korean Utility Patent Publication No. 82-2591 (U.S. Pat. No. 4,499,672, Public Notice No. 80-31524 (85.9.20) of Japanese utility patent) discloses a midsole providing ventilation and shock absorption and joined to the outsole by means of projections.

The outsole has circular projections on its surface with circular projections applied at the heel having some air entry, while the midsole projections on the outskirts of its reverse side have a plurality of punched ventilation holes as on its inner side as well.

Korean Utility Patent Publication No. 82-2592 shows a footwear backsole with an air opening connected to an air passageway that was prepared on the heel.

Korean Utility Patent Publication No. 90-2356 shows a footwear sole providing ventilation and shock absorption and having a ventilation cap having a fixable connection joint cab.

The heel side part of the complementary sole has a cork layer on its surface formed as a circular curve part and, on the reverse side of it, projections for a cushion were prepared while on the front of it, a round projected part was formed as well as cushioning projections with ventilation punched holes.

The front part of the midsole has a space part with a round projected part prepared at the inner side of the outskirts.

The surface of the outsole has vertical and horizontal air inhalation and air supply passages with the front part of the air supply passage connected to the air inhalation chamber, and the joint part of the air inhalation passage has a punched ventilation hole.

Korean Utility Patent Publication No. 90-2537 discloses a footwear sole providing ventilation and shock absorption which has an airing cap fitted to its receptacle. The front part of a soft cushion midsole has punched holes while the reverse side of it has shock-absorbing projections.

The back part of the reverse side of the cushioned midsole has circular projections while the back part of the outsole has an air inhalation and exhalation opening. The projected part on the front of the heel was prepared for fitting to the airing cap which has ventilation holes and receptacles.

Further, Utility Patent Publication No. 90-2538 discloses a footwear sole providing ventilation and shock absorption and which has a heel cushioned pad on the surface of the outsole. A soft cushioned pad with a surface of a cork layer is fitted to the inside of the cut

part which was prepared at the front part of a hard board midsole.

The surface of the cushioned pad was attached to the board midsole by a textile net. The reverse side of the cushioned pad has cushioned projections through which ventilation holes extend.

The reverse side of the heel cushioned pad has a curve part on its surface containing an air ventilation chamber and an air supply passage.

The inner part of the air inhalation chamber has shock-absorbing projections.

The projected part of the air inhalation and exhalation opening means that lead to the ventilation chamber and the air supply passage has punched ventilation holes and an airing cap having hollow joints fitted to the outsole.

The above-described technology allows good ventilation within footwear as the airing cap has ventilation holes but can not effectively prevent water from getting into the footwear in bad weather.

In addition, the shock-absorbing material at the heel is not fitted in the inside of the heel of the sole, and the effective shock absorption at the heel of the sole cannot be expected.

Further, the fact that the cushioned shock-absorbing material for the heel is not fitted at a texon board does neither afford good shock-absorbing effect to the backside of the foot nor remove the negative factors for the shock absorption, in case of the sole of footwear having a heel, such as that of shoes, military shoes, safety shoes and mountain-climbing shoes, due to the hard iron for waist fitted at the texon board.

### SUMMARY OF THE INVENTION

An object of the invention is to eliminate the above-mentioned drawbacks and provide a sole that effectively absorbs shocks at the backside of the foot and with the midsole fitted into the backside of the footwear.

The midsole may include different horseshoe-shaped shock-absorbing members with excellent elasticity. The horse-shoe-shaped shock-absorbing members are located in the heel of the outsole in the case of shoes.

The inside of the shock-absorbing members for the foot heel is hollow, and the sectional parts of both sides form closed pipe-shaped elements.

In the shock-absorbing members with pipe-shaped elements, the elements have a flange at the upper and lower portions facing outside which can cushion the shock to the backside of the foot during walking.

The shock-absorbing members at the heel are horse-shoe-shaped. The sectional part of the inside is closed while the sectional part of the unit facing outside forms a plural layer of an opened circular arc or has a hexagonal shape.

According to the invention, a buoyancy plate fitted inside the waterproof and ventilation part prevents water from getting into the sole in bad weather by being raised due to buoyancy which closes the inhalation and exhalation opening leading to the sole.

Further, according to the invention, lowering of the buoyancy plate due to an exhausting force when the air in the sole is exhausted causes water exhaust in the waterproof and ventilation part through the ventilation port.

5,224,277

3

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is an exploded view of a footwear sole with a flat bottom for a sport footwear;

FIG. 2 is an exploded view of a footwear sole with a heel for leather shoes, safety shoes, military shoes, and mountain-climbing shoes;

FIG. 3 is an enlarged sectional view along A—A line of FIG. 1;

FIG. 4 is an enlarged sectional view along B—B line of FIG. 1;

FIG. 5 is an enlarged sectional view along C—C line of FIG. 1;

FIG. 6 is an enlarged sectional view along A—A line of FIG. 2;

FIG. 7 is an enlarged sectional view along B—B line of FIG. 2;

FIG. 8 is an enlarged sectional view along C—C line of FIG. 2;

FIG. 9A is an exploded view of a ventilation and waterproofing part according to the invention;

FIG. 9B is a partially cut-off perspective view of the ventilation and waterproofing part;

FIG. 9C is an enlarged vertical sectional view of the ventilation and waterproofing part;

FIG. 10A is an enlarged perspective view of the cushion member;

FIG. 10B is a sectional view of the cushion member;

FIG. 11 is a perspective view of a shock-absorbing member used with a midsole according to the invention;

FIG. 12 is an enlarged sectional view along line A—A of FIG. 11;

FIG. 13A is a perspective view of one embodiment of a shock-absorbing heel member according to the present invention;

FIG. 13B is an enlarged partial side view of the shock-absorbing heel member shown in FIG. 13A;

FIG. 13C is an enlarged perspective view of a portion of the shock-absorbing heel member shown in FIG. 13A;

FIG. 13D is a sectional view along line A—A of FIG. 13A;

FIGS. 14A–14D, 15A–15D and 21A–21D are views similar to those of FIGS. 13A–13D of other embodiments of shock-absorbing heel members according to the invention;

FIG. 16A is a perspective view of another embodiment of the shock-absorbing heel member according to the invention;

FIGS. 16B and 16C are sectional views along lines A—A and B—B, respectively, of FIG. 16A;

FIGS. 17A–17C, 18A–18C and 19A–19C are views similar to those of FIGS. 16A–16C of further embodiments of a shock-absorbing heel member according to the present invention;

FIG. 17D is a sectional view along line C—C of FIG. 17A;

FIG. 20A is a perspective partially cross-sectional view of still another embodiment of a shock-absorbing heel member according to the present invention;

FIG. 20B is a perspective partial view of a pipe member forming a part of the shock-absorbing heel member of FIG. 20A;

FIG. 20C is a perspective view of a plurality of ball members comprised in the shock-absorbing heel member of FIG. 20A;

FIG. 20D is a sectional view along line A—A of FIG. 20A;

4

FIGS. 22A–C, 23A–23B, 24A–24B, 25A–25B and 26A–26B are perspective and respective transverse sectional views of still further embodiments of a shock-absorbing heel member according to the present invention.

## DESCRIPTION OF THE PREFERRED EMBODIMENTS

The invention will now be described with reference to the attached figures.

FIG. 1 shows a footwear sole for use in sport shoes. The front part surface of the midsole (1) has an air ventilation chamber (2) and punched ventilation holes (3).

There are two circular arc-shaped elements (5)(5') on the outskirts of the air ventilation chamber (2). The rear portion of the midsole (1) has a round receiving chamber defined by a circular arc-shaped plate (6).

A rear cushion shock-absorbing element (9) linked to a flange (8)(80') is fitted into both sectional parts of the arc-shaped plate.

The air passage (10) leading to the receiving groove (11) extends between the air chamber (2) and the rear cushion shock-absorbing element on the surface of the midsole.

A waterproof and ventilation part (12) is fixed in a receiving groove (11) and a horseshoe-shaped shock-absorbing heel member (14) is fixed between the upper flap and the lower one of the rear portion of the midsole. The member (14) constitutes a body corresponding in shape to the midsole.

The flanges (15)(15') are formed between the upper part and the lower one of the outskirts of the back shock-absorbing member.

In the rear portion of the midsole, an air compression chamber is formed by a circular wall (17) having a shape similar to that of the heel shock-absorbing member.

The front of the wall (17) has an air passage (18).

The passage is linked with a ventilation passage (19) which leads through the central part of the midsole.

The ventilation passage (19) is connected with ventilation holes (3), and air cavities (75) are formed outside the ventilation passage (19).

On the board (20), the air ventilation chamber 25 (2') and a round receiving chamber (6') corresponding to those of the midsole (1) are also provided, forming two circular arc-shaped portions.

An air ventilation chamber (2'') and a round receiving chamber (6'') on the insole (22) have cushion air bags (23)(23'). The length of their reverse sides is such that the lower sectional part of the cushion air bags (23)(23') may contact the air ventilation chamber (2) of the midsole (1) and the rear cushion shock-absorbing element (7) when the board (20) and the insole (22) are fixed on the surface of the midsole (1), and the outsole (24) is fixed on the reverse side of the midsole (1).

The round wall (17') and the air compression chamber (16') may hold a deodorizing agent and a sponge agent (36)(37) containing perfume.

FIG. 2 shows a footwear sole used in shoes, military shoes, safety shoes and mountain-climbing shoes having a back heel. The front part surface of the outsole (25) has an air ventilation chamber (26) and two circular arc-shaped elements (27)(27') on the outskirts (4') of the air ventilation chamber (26).

The rear portion of the outsole (25) has ventilation walls (28)(28') as high as the outskirts. The exhaust

5,224,277

| 5 | 6 |

passage (29) is formed between the ventilation walls (28)(28') while the air supply passage (30) is located outside the ventilation walls (28)(28').

One portion of the exhaust passage (29) is connected to the exhaust hole (29') while one portion of the air supply passage (30)(30') is connected to the air supply hole (30''), respectively. The shank part (25') on the reverse side of the outsole (25) has a projected waist part (31) serving as a stiffening rib, and the rear heel part (32) has a receiving groove (11').

The waterproof and ventilation part (12) is fixable in the receiving groove (11'), while the horseshoe-shaped shock-absorbing member (14) forming a body corresponding to the heel part (32) is fitted between upper (13) and lower (13') flaps of the outsole (25).

The upper and lower parts of the rear shock-absorbing member (14) have flanges (15)(15') and the flat sole (33) is fixed to the reserve side of the heel part (32).

The air ventilation chamber (26') is also formed in the board (20') corresponding in shape to the outsole (25).

The circular arc-shaped element (27') extends into the air ventilation chamber (26'). The insole (22') has an air ventilation chamber (26'') and receiving chamber (6'') corresponding to those of the board (20').

The air ventilation chamber (26'') and the receiving chamber (6'') have cushion air bags (23)(23').

The length of its reverse side is so formed that the lower sectional part of the cushion air bags (23)(23') may contact the bottom of the air ventilation chamber (26) of the outsole (25) and the surface of the board (20').

In FIG. 1, the cushion air bags (23) in the ventilation chamber (2) of the midsole may displace those in the ventilation chamber (2'') of the insole.

In FIG. 2, the cushion pad (34) with cushion projections (35) and ventilation holes (74'') may be optionally located in the air ventilation chamber (26) of the outsole.

The waterproof and ventilation part (12) shown in detail in FIG. 9, constitutes a rectangular box-shaped body with holding joint means (38).

In the center of the reverse side of the upper plate (39) of the part (12), a small tubular part (40) extends vertically, and half of this part (40) is cut and closed at the backwall (42) of the body by a wall of inhalation and exhalation chamber (41).

Due to the partition of the wall (42) of inhalation and exhalation chamber (41), a ventilation chamber (43) and a water-receiving chamber (44) are formed in the waterproof and ventilation part (12).

The water-receiving chamber is connected to the ventilation opening (45) of the front wall (42') and the tubular part (40).

The inhalation and exhalation opening (46) of the pipe and the ventilation chamber (43) is connected to the ventilation part of the rear wall (42).

Under the tubular part (40), the bottom of the box-shaped body is closed with an outer plate (50) which has separate upwardly extending projections (49) for a buoyancy plate (48).

FIG. 13–26 are views showing different types of shock-absorbing heel members.

The shock-absorbing heel members are made of saturated resin or rubber with good elasticity. Being of a long form, they are all formed as a horseshoe-shaped hoof to be fixed in the midsole (1) of a sport footwear or the outsole of shoes and different soles of other footwear.

The shock-absorbing heel member (14) of FIGS. 13A–13D comprises a plurality of hollow pipes (53) connected with connecting bands (54). The inner end (52) of pipes (53) is open while the outer end is provided with a flange (51) and a circular arc-shaped projection (51').

The shock-absorbing heel member (14) of FIGS. 14A–14D comprises a hollow element (55) consisting of two rows of cylinders (56) closed at the inner ends thereof.

The shock-absorbing heel member (14) of FIGS. 15A–15D is formed of a plurality of duplicated hexagonal bodies (60') forming a hollow part (59) with hexagonal bodies (60) between bodies (60'). The hexagonal bodies (60') are closed at the inner side thereof with an inner arcuate part (61).

The shock-absorbing heel member (14) of FIGS. 16A–16D is formed so that the inside hollow cavity thereof is partitioned by a wall (64) arranged between the upper and lower walls (63) (63'). The cavity defined by spaced walls (63)(63') is closed by a circular arc (62). The wall (69) supports a plurality of internal mandrels (65). The outer end portions of the upper and lower walls (63)(63') form flanges (15) (15').

The shock-absorbing heel member of FIGS. 17A–17D is somewhat similar to that of FIGS. 16A–16D with the internal mandrels (67) (67') provided between the upper and lower walls (66)(66') and whose inner end is closed by a circular arc (62').

The shock-absorbing heel member of FIGS. 18A–18C is formed so that the half-ring bodies (69)(69) are provided between the upper and lower walls (68)(68'), and the outer end portions of the upper and lower walls (68)(68') form flanges (15)(15').

The shock-absorbing heel member (14) of FIGS. 19A–19C is formed so that it comprises a plurality of half-ring bodies (71) and a plurality of internal mandrels (72) supported between the upper wall (70) and the lower wall (70') of which the internal ends are closed by a circular arc (62''). The lower part of the half-ring bodies (71) has supporting bodies (73). The external end portions of the upper and lower walls (70)(70') form flanges (15)(15').

The shock-absorbing heel member (14) of FIGS. 20A–20D is formed so that the horseshoe-shaped shock-absorbing heel member (14) has flanges (15)(15') on the upper and lower part of the external outskirts with tubular bosses (76)(76'), respectively.

The heel member (14) contains elastic balls (77) or a pipe (78).

The shock-absorbing heel member (14) of FIGS. 21A–21D is formed so that its hollow element consists of a plurality of oral pipe sections (81) connected with bands (54''). The outer ends of pipe sections (81) are closed with circular arc-shaped elements (80) and defined therewith flanges (15).

The shock-absorbing heel member (14) of FIGS. 22A–22C is formed so that the internal cavity thereof defined by upper and lower walls, is closed by circular arcs (82) and includes triangular bodies in alternating upright and upside-down positions. The member has a horseshoe shape.

The shock-absorbing heel member (14) of FIGS. 23A–23B is formed so that the internal cavity defined by upper and lower walls is closed by circular arcs (84) and includes alternating upright and upside-down T-shaped bodies. The member has a horseshoe shape.

5,224,277

7                      8

The shock-absorbing heel member (14) of FIGS. 24A–24B is formed so that the internal cavity thereof defined by upper and lower walls is closed by circular arcs (86) and contains alternating upright and upside-down heart-shaped bodies (87). The member has a horseshoe shape.

The shock-absorbing heel member (14) of FIGS. 25A–25B is formed so that the internal cavity thereof defined by upper and lower walls is closed by circular arcs (88) and the elastic alphabet-shaped bodies (89) are located between the upper and lower walls.

The shock-absorbing heel member (14) of FIGS. 26A–26B is formed so that the internal cavity thereof defined by upper and lower walls is closed by circular arcs (90) and the elastic Olympic marks and the figures (91) of sportsmen are located between the upper wall (90) and lower one (90').

Reference numerals (74) and (74') designate ventilation holes punched on the sheet of the cushion air bag, and reference numerals (76) and (76') are supporting parts for the forming groove of a mold which is used when the shock-absorbing heel member (14) is fixed to the heel part of the midsole (1).

The sole of the invention is assembled as follows:

In FIG. 1, the shock-absorbing heel member (14), first of all, is fixed between the upper flap (13) and the lower one (13,) of the midsole (1), and the waterproof and ventilation part (12) is fixed in the receiving groove (11).

The ventilation port (47) at the rear wall (42) of the waterproof and ventilation part (12) is to be connected to the air passage (10).

As the ventilation openings (45) punched on the front wall (42'') of the waterproof and ventilation part (12) faces the outside of the midsole, the air from the inside can be introduced into the ventilation openings (45).

The air is conducted through the ventilation chamber (43) via the inhalation and exhalation opening (46) and passes into the air passage (10) through ventilation port (47). The air passes into the ventilation holes (3) of the air ventilation chamber (2) and then reaches the air compression chamber (16) through the ventilation passage (19) on the reverse side of the midsole (1).

The satisfactory air-inhalation stated above can be made when the outsole (24) is fixed to the reverse side of the midsole (1) with the cushioned shock-absorbing means (9) fixed on the surface of the midsole so that the middle of the receiving chamber (6) takes a circular arc shape and the board (20) is also fixed with the insole (22) fixed on the surface of the texon board.

The process of the air-exhalation is undergone vice versa.

In case of sport shoes, as well as boots, military shoes and safety shoes, etc., it is desirable that the footwear shoe has shock-absorbing means on the heel as the back part of the foot receives much shock during normal walk and exercise.

To this end, the shock-absorbing heel member (14) that is horseshoe-shaped and has the upper and lower flanges (15) (15'), is fixed in the rear portion of the footwear sole in this invention, and the arc-shaped cushion shock absorbing means (9) is fixed with flanges (8) (8') in the receiving chamber and further, at the reverse side of it the air compression chamber (16), is formed in the wall (17).

Due to the construction described above, the hollow shock-absorbing heel member (14), in walk, is contracted and with the upper and lower flanges (15)(15')

receiving load, the air in the air compression chambers (16) moves toward the front portion due to the contraction of the wall (17).

In this way, the heel part of the sole can absorb the shock ideally and the shock transmitted to the rear portion of the foot is so small that the fatigue feeling due to the shock from footwear can be eliminated.

The cushion air bags (23)(23') can be fitted in the insole (22) as well, and the air compression in the cushion air bags (23)(23') can not only absorb the shock, but also provide an elastic effect due to the elasticity of the cushion air bags.

The shock to the sole of a foot can be eliminated by means of air pockets (75).

In the waterproof and ventilation part (12), the buoyancy plate (48) is put on the projections (49) and does not cause any trouble in terms of air ventilation in good weather while, in bad weather, the water penetrating through the ventilation openings of the front wall (42') remains on the outplate (50) of the waterproof and ventilation part (12), and the buoyancy plate (48) is buoyant and rises.

The risen buoyancy plate (48) closes the lower part of the inhalation and exhalation opening (46), which makes waterproofing possible as water in the water-receiving chamber (44) of the waterproof and ventilation part (12) can not get into the inhalation/exhalation opening.

On the other hand, water in the water-receiving chamber (44) lowers the buoyancy plate (48) with the air in the sole of footwear exhaled.

Accordingly, with the air filling the upper part of the water-receiving chamber (44) forces the water out. Water in the chamber (44) is exhaled through the ventilation openings (45) to provide effective waterproofing.

In FIG. 2, as well in FIG. 1, the horseshoe-shaped shock-absorbing heel member (14) is to be fixed between the upper and lower flaps (13)(13') of the heel portion of the outsole (25) and the waterproof and ventilation part (22) is to be fixed in the receiving groove of the heel part on the reverse side of the outsole.

With the front wall (42') facing the front of the footwear sole and the rear wall (42) facing the opposite part of it, the ventilation port (47), the ventilation hole (29') and the exhaust passage (29) are to be connected to the air ventilation chamber (26), while the air compression chamber on the reverse side of the outsole (25), air supply hole (30''), and the air supply passages (30)(30') are to be connected to the air ventilation chamber (26) separately.

In landing, the air in the air compression chamber (16') that is compressed due to the contraction of the shock-absorbing heel member (14) of the heel part (32) passes into the air ventilation chamber (26) through the air supply hole (30'') and the air supply passages (30)(30').

Then, the air in the air ventilation chamber (26) compressed by the sole of the foot passes through the exhaust passageway (29) and the ventilation hole (29') and is exhausted through the inner ventilation port (47) and the external ventilation openings (45) of the waterproof and ventilation part (12).

With the cushion air bag (23) and the shock-absorbing heel material restored, the external air is introduced into the inside of the footwear and vice versa.

The effect from the function of the ventilation part (12) and the cushion air bags (23)(23') and the shock-absorbing heel member (14) of the insole is the same as the case of sport shoes in FIG. 1.

5,224,277

| 9 | 10 |

Especially, the waist part fitted on the outsole of the footwear having a rear heel, as in the case of boots, military shoes, safety shoes and mountain-climbing shoes, can remove the problems hindering shock-absorption due to fitting a steel element in texon board.

In addition, the waist part (31) can perform the function of the steel element usually fitted at waist portion.

What is claimed is:

1. A footwear sole comprising:
a sole member having a heel portion at one end, said heel portion being made of a thick material formed with a recess extending inwardly from the perimeter of said one end so as to define spaced upper and lower flaps;
a substantially horseshoe-shaped, shock-absorbing heel member secured in the recess of the heel portion between the flaps, the shock-absorbing heel member having spaced upper and lower walls abutting the upper and lower flaps, respectively, said upper and lower walls having outer end portions defining respective outer end surfaces which are flush with the outer periphery of the upper and lower flaps, and having an at least partially hollow space in an area of the outer end surfaces.

2. A footwear sole as set forth in claim 1, wherein the respective outer end portions define respective outer end flanges that form the at least partially hollow space.

3. A footwear sole as set forth in claim 1, wherein the shock-absorbing heel member includes elastic ball means arranged between the upper and lower walls.

4. A footwear sole as set forth in claim 1, wherein the shock-absorbing heel member comprises a plurality of pipe elements and linking band means connecting the pipe elements, each of the pipe elements having an open internal end, a circular arc-shaped part closing an external end of the each pipe element, and a circular flange extending at least up to the farthest external point of the arc-shaped part and defining the at least partially hollow space.

5. A footwear sole as set forth in claim 1, wherein said shock-absorbing heel member comprises internal wall means extending between the upper and lower walls adjacent to inner ends of side walls, and a plurality of triangular bodies arranged between the upper and lower walls in alternating upright and upside-down positions.

6. A footwear sole as set forth in claim 1, wherein said shock-absorbing heel member comprises internal wall means extending between the upper and lower walls adjacent to inner ends of side walls, and a plurality of T-shaped bodies arranged between the upper and lower walls in alternating upright and upside-down positions.

7. A footwear sole as set forth in claim 1, wherein said shock-absorbing heel member comprises a circular arc connecting the upper and lower walls at inner ends of said walls, and a plurality of heart-shaped bodies arranged between the upper and lower walls in alternating upright and upside-down positions.

8. A footwear sole as set forth in claim 1, wherein said shock-absorbing heel member comprises a circular arc for closing an internal opening defined by the upper and lower walls, and a plurality of elastic alphabet-shaped bodies arranged between the upper and lower walls.

9. A footwear sole as set forth in claim 1, wherein said shock-absorbing heel member comprises a circular arc connecting the upper and lower walls at inner ends of said walls, and a plurality of elastic Olympic marks and figures of sportsmen arranged between the upper and lower walls.

10. A footwear sole as set forth in claim 1, wherein said shock-absorbing heel member comprises spaced walls extending between the upper and lower walls at outer and inner ends of said walls, respectively, the respective outer end portions defining respective outer end flanges extending outwardly of the outer wall.

11. A footwear sole as set forth in claim 1, wherein said shock-absorbing heel member comprises a plurality of pipe-shaped bodies defining the upper and lower walls and linking band means for connecting the pipe-shaped bodies together, each of the pipe-shaped bodies comprising an external arc-shaped member for closing the external opening of the bodies and an outer circular flange defining the outer end portions of the outer and inner walls.

12. A footwear sole as set forth in claim 1, wherein said shock-absorbing heel member comprises two rows of hollow cylinders closed at internal ends of said cylinder with respective truncated arc-shaped elements.

13. A footwear sole as set forth in claim 1, wherein the shock-absorbing member comprises a plurality of alternatingly arranged hollow twin and single hexagonal bodies closed at internal ends of said bodies.

14. A footwear sole as set forth in claim 1, wherein the shock-absorbing heel member includes a partition wall arranged between the upper and lower walls and having a plurality of spaced openings, a plurality of circular arc-shaped members for closing the openings at internal sides of said bodies, and a plurality of mandrels extending in the openings, the respective outer end portions defining respective outer end flanges extending outwardly of the partition wall.

15. A footwear sole as set forth in claim 1, wherein said shock-absorbing heel member comprises arc-shaped means connecting the upper and lower walls at inner ends of said arc-shaped means, and a plurality of mandrels arranged between the upper and lower walls.

16. A footwear sole as set forth in claim 1, wherein the shock-absorbing member comprises a plurality of half-ring bodies arranged between the upper and lower walls, the respective outer end portions defining respective outer end flanges extending outwardly of the half-ring bodies.

17. A footwear sole as set forth in claim 1, wherein the shock-absorbing member comprises a plurality of half-ring bodies abutting at opposite ends of said bodies one of the upper and lower walls, a plurality of support bodies extending between the other of the upper and lower walls and the half-ring bodies, a plurality of mandrels received within the half-ring bodies, and arc-shaped means extending between the upper and lower walls at inner ends thereof, the respective outer end portion defining respective outer end flanges extending outwardly of the half-ring bodies.

18. A footwear sole as set forth in claim 1, wherein the shock-absorbing member includes elastic pipe-shaped means arranged between the upper and lower walls, the respective outer end portions defining respective outer end flanges extending outwardly of the pipe-shaped means.

19. A footwear sole as set forth in claim 1, wherein the sole member is one of a midsole and an outsole, said one of the midsole and outsole having a ventilation chamber, the footwear sole further comprising a water-proof and ventilation part secured in said one of the midsole and the outsole, said one of the midsole and the

5,224,277

11

outsole having a groove for receiving the waterproof and ventilation part therein and air passages for allowing communication between the waterproof and ventilation part and the ventilation chamber of said one of the midsole and outsole.

20. A footwear sole as set forth in claim 19, wherein said sole member is a midsole including an arc-shaped plate defining a rear rounded receiving chamber, a rear cushion shock-absorbing member fitted within the arc-shaped plate, the groove for receiving the waterproof and ventilation part being located between the ventilation chamber and the rear cushion shock-absorbing member, an air passage communicating the ventilation chamber with the receiving groove, and a partially circular wall located in the heel portion of the midsole and defining an air compression chamber, the partially circular wall having a front air passage connected with a ventilation passage extending through a central portion of the midsole and communicating with ventilation holes provided in a region of the ventilation chamber.

21. A footwear sole as set forth in claim 20, further comprising a plurality of air pockets arranged on opposite sides of the ventilation passage.

22. A footwear sole as set forth in claim 20, further comprising sponge means containing at least one of deodorant and perfume located at least in one of the partially circular wall and the air compression chamber.

23. A footwear sole as set forth in claim 20, further comprising an insole having a ventilation chamber and a round receiving chamber, the footwear sole further comprising cushion air bags located in the ventilation and round receiving chambers of the insole.

24. A footwear sole as set forth in claim 20, wherein cushion air bags are located in the ventilation chamber of the midsole.

25. A footwear sole as set forth in claim 19, wherein said sole member is the outsole, the receiving groove of the outsole being located in the heel portion on an outer side of the outsole, the outsole further including a shank part adjacent to the heel portion and having exhaust means on the outsole outside side, an air compression chamber adjacent to said receiving groove and having air supply and exhaust ports communicating, respectively, with inlet and outlet passage means of the outsole.

26. A footwear sole comprising:
a sole member having a heel portion with an upright outer peripheral side wall and a recess formed in said wall so as to extend along the periphery of the heel portion and inwardly from said side wall, and
a horseshoe-shaped shock-absorbing element mounted in said recess and having an outer end surface which is substantially flush with said pe-

12

ripheral side wall, said shock-absorbing element comprising two spaced horizontal walls and a vertically deformable means extending between the two horizontal walls having a connection point with the deformable means and a flange portion extending outwardly beyond the connection point, the flanges of the horizontal walls defining at least a partially hollow space therebetween.

27. A footwear sole comprising:
an insole;
a midsole having front and heel portions;
an outsole having front and heel portions;
a ventilation chamber formed in the front portion of one of the midsole and of the outsole; and
a waterproof and ventilation part secured in said one of the midsole and the outsole for communicating air to the ventilation chamber of said one of the midsole and the outsole, the waterproof and ventilation part having a housing with at least one external inlet port communicating with the atmosphere outside said sole, and at least one internal port communicating with the ventilation chamber of said one of the midsole and the outsole, and buoyant means supported in said housing and movable, upon penetration of water into the housing through the at least one external inlet port, from a first position in which it permits flow of air between the at least one external inlet port and the at least one internal port, to a second position in which it prevents flow of water from within the housing through the internal port, said buoyant means being unaffected by said air flow.

28. A footwear sole as set forth in claim 27, wherein the housing has an inlet chamber communicating with the inlet port and an outlet chamber communicating with the internal port, and an opening providing communication between the inlet and outlet chambers; said buoyant means normally spaced from said opening and being buoyantly movable upon penetration of water into the inlet chamber to close said opening.

29. A footwear sole as set forth in claim 28, wherein the housing has opposite vertical external and internal walls having said at least one external inlet port and said at least one internal port, respectively, and upper and lower spaced horizontal plates extending between the vertical external and internal walls, the upper plate having a downwardly extending projection defining at least partially the inlet chamber, the buoyant means comprising a buoyancy plate, and the lower plate having an upwardly extending projection means for supporting the buoyancy plate in the first position.

* * * * *

# EXHIBIT D
# (Part 7 of 17)

US005343639A

# United States Patent [19]

## Kilgore et al.

[11] **Patent Number:** 5,343,639

[45] **Date of Patent:** Sep. 6, 1994

[54] **SHOE WITH AN IMPROVED MIDSOLE**

[75] Inventors: **Bruce J. Kilgore,** Lake Oswego, Oreg.; **Thomas McMahon,** Wellesley, Mass.; **John C. Tawney,** Portland; **Gordon Valiant,** Beaverton, both of Oreg.

[73] Assignee: **Nike, Inc.,** Beaverton, Oreg.

[21] Appl. No.: **136,992**

[22] Filed: **Oct. 18, 1993**

### Related U.S. Application Data

[63] Continuation of Ser. No. 738,031, Aug. 2, 1991, abandoned.

[51] **Int. Cl.⁵** ........................ **A43B 13/20; A43B 21/28**
[52] **U.S. Cl.** ............................................. **36/29; 36/28; 36/35 B**
[58] **Field of Search** .................... 36/27, 28, 29, 35 R, 36/35 B, 7.8, 37, 38; 5/481

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 507,490 | 10/1893 | Gambino . | |
| 622,673 | 4/1899 | Ferrata . | |
| 933,422 | 9/1909 | Dee ................................. | 36/38 |
| 949,754 | 2/1910 | Busky . | |
| 1,094,211 | 4/1914 | Jenoi et al. ..................... | 36/38 |

(List continued on next page.)

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 806647 | 2/1949 | Fed. Rep. of Germany . |
| 3400997 | 7/1985 | Fed. Rep. of Germany . |
| 0465267 | 4/1914 | France ................ 36/38 |
| 1227420 | 4/1960 | France . |
| 2556118 | 6/1985 | France . |
| 146188 | 11/1990 | Japan . |
| 1526637A1 | 12/1989 | U.S.S.R. . |
| 21594 | of 1903 | United Kingdom . |
| 7163 | of 1906 | United Kingdom . |
| 2032761 | 5/1980 | United Kingdom . |
| 2173987A | 10/1986 | United Kingdom . |

#### OTHER PUBLICATIONS

UK Patent Appl. GB 2032761 A, May 14, 1980 Dr. Herbert Funck.

Elastocell ™ Microcellular Polyurethane Products, Technical Information, Elastocell ™, a Means for Antivibration and Sound Isolation.

Elastocell ™ Microcellular Polyurethane Products, Material Data Technical Information, Long Term Static and Dynamic Loading of Elastocell ®.

Elastocell ™ Microcellular Polyurethane Products, Technical Bulletin, Spring and Damping Elements made from Elastocell.

(List continued on next page.)

*Primary Examiner*—Paul T. Sewell
*Assistant Examiner*—Ted Kavanaugh
*Attorney, Agent, or Firm*—Banner, Birch, McKie & Beckett

[57] **ABSTRACT**

The invention is directed to a midsole for a shoe including one or more foam columns disposed between an upper and a lower plate. One or more elastomeric foam elements are disposed between the upper and lower plates. The foam elements are made of a material such as microcellular polyurethane-elastomer based on a polyester-alcohol and naphthalene-disocyanate (NDI). In one embodiment, the foam elements have the shape of hollow cylindrical columns, and may include grooves formed on the exterior surface. One or more elastic rings are disposed about the columns and are removably disposable in the grooves, allowing the stiffness of the columns to be adjusted. In a further embodiment, inflatable gas bladders are disposed in the hollow regions. The heights of the gas bladders may be less than the heights of the columns such that when the midsole is compressed, the wearer experiences a first stiffness corresponding to compression of the columns alone, and a second stiffness corresponding to compression of both the columns and the bladders. Alternatively, the bladders may be inflated so as to cause the columns to be stretched, even when no load is applied. Since the level of inflation of the bladders may be adjusted, the overall stiffness of the midsole may be tuned to the individual requirements of the wearer.

**17 Claims, 23 Drawing Sheets**



**5,343,639**

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,102,343 | 7/1914 | Kovacs | 36/38 |
| 1,272,490 | 7/1918 | Matear | 36/37 |
| 1,278,320 | 9/1918 | Ellithorpe . | |
| 1,328,816 | 1/1920 | Brown | 36/38 |
| 1,338,817 | 5/1920 | DeLuca | 36/38 |
| 1,502,087 | 7/1924 | Bunns | 36/28 |
| 1,670,747 | 5/1928 | Sestito | 36/28 |
| 1,870,065 | 8/1932 | Nusser | 36/38 |
| 2,104,924 | 1/1938 | Dellea . | |
| 2,122,108 | 6/1938 | Modlin . | |
| 2,299,009 | 10/1942 | Denk | 36/38 X |
| 2,710,460 | 6/1955 | Stasinos . | |
| 2,721,400 | 10/1955 | Israel | 36/28 X |
| 3,041,746 | 7/1962 | Rakus . | |
| 3,429,545 | 2/1969 | Michel . | |
| 3,822,490 | 7/1974 | Murawski . | |
| 4,030,213 | 6/1977 | Daswick . | |
| 4,074,446 | 2/1978 | Eisenberg . | |
| 4,223,457 | 9/1980 | Borgeas . | |
| 4,237,625 | 12/1980 | Cole et al. . | |
| 4,241,523 | 12/1980 | Daswick . | |
| 4,262,433 | 4/1981 | Hagg et al. . | |
| 4,267,648 | 5/1981 | Weisz . | |
| 4,271,607 | 6/1981 | Funck . | |
| 4,314,413 | 2/1982 | Dassler . | |
| 4,319,412 | 3/1982 | Muller et al. . | |
| 4,342,158 | 8/1982 | McMahon et al. . | |
| 4,399,621 | 8/1983 | Dassler . | |
| 4,439,936 | 4/1984 | Clarke et al. | 36/25 R X |
| 4,492,046 | 6/1985 | Kosova . | |
| 4,494,321 | 1/1985 | Lawlor . | |
| 4,536,974 | 8/1985 | Cohen . | |
| 4,546,555 | 10/1985 | Spademan . | |
| 4,559,366 | 12/1985 | Hostettler | 36/25 R X |
| 4,566,206 | 1/1986 | Weber . | |
| 4,592,153 | 6/1986 | Jacinto . | |
| 4,594,799 | 6/1986 | Lin . | |
| 4,598,484 | 7/1986 | Ma . | |
| 4,598,487 | 7/1986 | Misevich . | |
| 4,610,099 | 9/1986 | Signori | 36/29 X |
| 4,616,431 | 10/1986 | Dassler . | |
| 4,638,575 | 1/1987 | Illustrato . | |
| 4,660,299 | 4/1987 | Omilusik . | |
| 4,670,995 | 6/1987 | Huang | 36/29 |
| 4,680,875 | 7/1987 | Danieli . | |
| 4,680,876 | 7/1987 | Peng . | |
| 4,709,489 | 12/1987 | Welter . | |
| 4,715,130 | 12/1987 | Scatena . | |
| 4,731,939 | 3/1988 | Parracho et al. . | |
| 4,746,555 | 5/1988 | Luckanuck . | |
| 4,753,021 | 6/1988 | Cohen . | |
| 4,763,426 | 8/1988 | Polus et al. | 36/29 |
| 4,794,707 | 1/1989 | Franklin et al. | 36/30 R X |
| 4,798,009 | 1/1989 | Colonel et al. . | |
| 4,815,221 | 3/1989 | Diaz . | |
| 4,843,737 | 7/1989 | Vorderer . | |
| 4,843,741 | 7/1989 | Yung-Mao . | |
| 4,845,863 | 7/1989 | Yung-Mao . | |
| 4,878,300 | 11/1989 | Bogaty . | |
| 4,881,329 | 11/1989 | Crowley . | |
| 4,887,367 | 12/1989 | Mackness et al. . | |
| 4,910,884 | 3/1990 | Lindh et al. . | |
| 4,914,836 | 4/1990 | Horovitz | 36/29 X |
| 4,918,838 | 4/1990 | Chang . | |
| 4,936,029 | 6/1990 | Rudy . | |
| 4,956,927 | 9/1990 | Misevich et al. . | |
| 4,984,376 | 1/1991 | Walter et al. . | |
| 5,014,449 | 5/1991 | Richard et al. . | |
| 5,068,981 | 12/1991 | Jung | 36/29 X |
| 5,138,776 | 8/1992 | Levin | 36/27 X |

## OTHER PUBLICATIONS

FWN, vol. 40, No. 38, Sep. 17, 1990, "Macro Scatena puts spring in Athlon wearers' control".

SAE Technical Paper Series, "Microcellular Polyurethane Elastomers as Damping Elements in Automotive Suspension Systems", by Christoph Prolingheuer and P. Henrichs, International Congress and Exposition, Detroit, Michigan, Feb. 25–Mar. 1, 1991.

Spring— and Shock Absorber Bearing Spring Elements, Springing Comfort with High Damping "Activ Power Spring System" Brochure.



FIG.1

*FIG.Ib*



22

28

30

*FIG.Ia*



B

22

B



FIG. 2a



FIG.2b



*FIG. 2c*



*FIG.3b*



*FIG.3a*

*FIG. 3c*



*FIG. 3d*



*FIG. 4a*



*FIG. 4b*



*FIG. 4c*



*FIG. 4d*





*FIG.5a*



*FIG.5b*



*FIG.5c*



*FIG.5d*



*FIG.7a*



*FIG.7b*



FIG. 6a



*FIG. 6b*



*FIG. 6c*

Case 1:04-cv-12668-RGS     Document 18-12     Filed 05/02/2005     Page 16 of 35



*FIG.6d*



*FIG.6e*

*FIG.8*



*FIG.9a*



*FIG.9b*



*FIG.9c*



*FIG.9d*



*FIG.9e*



*FIG.9f*





FIG. 10a

DISTAL PHALANX

DISTAL HALLUX

MIDDLE PHALANX

PROXIMAL PHALANX

PROXIMAL HALLUX

(TIBIAL) SESAMOD

(FIBULAR) SESAMOD

1 ST METATARSAL

2ND CUNEFORM

3ND CUNEFORM

1 ST CUNEFORM

CUBOID

NAVICULAR

TALUS

CALCANEUS

64

62

60

*FIG.IOb*



*FIG. 11a*



*FIG. 11b*



*FIG. 11c*



*FIG. 11d*



FIG. 12

FIG. 13

26

232

232'

242

FIG. 14

FIG. 16

344

132    342

FIG. 15

26

32

142    32    142



FIG.17a



*FIG. 17b*

*FIG. 17c*



FIG. 18a

FIG. 18b



FIG. 19a

*FIG. 19b*



5,343,639

**1**

## SHOE WITH AN IMPROVED MIDSOLE

This application is a continuation-in-part of application Ser. No. 07/738,031, filed Aug. 2, 1991, now abandoned.

### BACKGROUND OF THE INVENTION

#### 1. Field of the Invention

The present invention relates to footwear, and more particularly, to an athletic shoe having improved cushioning and stability.

#### 2. Description of the Prior Art

It is known in the prior art to provide athletic shoes with a midsole made from a foam material, such as polyurethane, designed to provide for cushioning against impact, that is, attenuation of the applied load. The polyurethane materials which have been used are non-microcellular, having a non-uniform cell structure. These foam materials have a stiffness (k) which varies in dependence upon the applied load. At lower loads, the foam material is only slightly compressed, and has a low stiffness. As the applied load increases, the compression of the cushioning material increases as well, increasing the stiffness. Eventually, the cushioning material will be compressed to a maximum level such that a further increase in the applied load will not cause the material to be further compressed. At this point, for purposes of the maximum loads applied to midsoles, the stiffness of the material will approach an infinite level, that is, effectively no cushioning will be provided.

In general, during footstrike, the initial contact is made at the rearfoot lateral location, with the foot rolling towards the forward or anterior, and medial locations. The applied load increases until the maximum load is achieved, generally beneath the calcaneous. Since the magnitude and location of the applied load are not constant, it has been difficult to construct the midsole to provide a desired level of cushioning throughout the ground support phase, which includes the breaking phase and the propulsion phase, by using conventional non-microcellular polyurethane foam cushioning materials.

For example, a midsole having a predetermined thickness and therefore stiffness (at a given load) could be utilized. The stiffness may be appropriate for the range of loads experienced at the lateral rear of the shoe during footstrike. That is, at that location, the load may not exceed a level which causes maximum compression. However, at the location beneath the calcaneous, the load may exceed this level, the stiffness will approach infinity, and the wearer will experience a sudden loss of cushioning known as bottoming-out. Alternatively, if the material and thickness are designed to compensate for the maximum load, the initial stiffness experienced at the lateral rear will be too high. In addition, the thickness of such midsoles increases the weight of the shoe and reduces rearfoot stability, precluding their use in athletic shoes.

Furthermore, in prior art shoes, a particular level of midsole stiffness would be selected for a given shoe based upon the likely weight of a person wearing a given shoe size, and perhaps, the loads expected to be produced during the activity for which the shoe is designed. However, the midsole stiffness could not be adjusted to take into account weight variations between people having the same shoe size. In addition, even if a stiffness were achieved which was appropriate for a

**2**

given wearer performing a given activity, the stiffness could not be adjusted so as to provide an appropriate level for other activities having a different range of expected loads. For example, if a shoe were designed for running, even if the stiffness was appropriate for the weight of an "average" person having a particular shoe size, it would have a stiffness which was greater than desired for the loads expected during walking by the same "average" weight person. In addition, the shoe would be either overcushioned or undercushioned for a person having a smaller or greater than average weight, respectively.

### SUMMARY OF THE INVENTION

The present invention is directed to a shoe having an upper and a sole connected to the upper. The sole includes a midsole comprising one or more support elements made from a microcellular polyurethane-elastomer foam material. Suitable foam materials include microcellular NDI, microcellular MDI and microcellular TODI.

In a further embodiment, the midsole includes an envelope having an upper and lower plate, with the support elements disposed between the upper and lower plates.

In a further embodiment, the support elements include a plurality of hollow columns, with two of the columns disposed on each side of the sagittal plane of the shoe. The columns may have a hollow cylindrical shape.

In a further embodiment, an insert is disposed within each of the foam columns. The inserts have a height which is substantially less than the height of the column. The inserts may be gas-filled bladders, which may be adjustably inflatable. In a further embodiment, the gas-filled bladders may be inflated so as to stretch or distend the foam support element.

In a further embodiment the foam support elements include at least one annular groove disposed in the outer surface at one or more vertical positions. An elastic ring element is disposed about the support elements and is movable in the vertical direction so as to be removably disposable in the groove. The stiffness of the support elements is adjustable by selectively positioning the ring element into or out of the groove.

The present invention provides the advantage of allowing the stiffness of the midsole to correspond to the applied load as the load changes throughout the ground support phase. Overcushioning, undercushioning and bottoming-out are eliminated. Furthermore, the cushioning may be tuned to suit different wearer weights, and the use of the shoe for activities having different load ranges.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a lateral view of a shoe including a midsole according to the present invention.

FIG. 1a is a cross-sectional view along line a—a shown in FIG. 1.

FIG. 1b is a cross-sectional view along line b—b shown in FIG. 1a.

FIGS. 2a–2c are perspective views of a cushioning and stability component including a shell according to three embodiments, respectively, of the present invention.

FIG. 3a is an overhead view of the shell shown in FIG. 2 and including the rear foot bones superimposed thereon.

5,343,639

| 3 | 4 |

FIG. 3b is a side view of the shell shown in FIG. 3a.

FIG. 3c is a close-up view of a support element shown in a detent.

FIG. 3d is a close-up view similar to the view in FIG. 3c showing a second embodiment of the support element and detents.

FIGS. 4a–4d show a further embodiment of a shell for a cushioning component according to the invention.

FIG. 5a is a side view of a support element according to the present invention having a hollow cylindrical shape.

FIG. 5b is an overhead view of the element shown in FIG. 5a.

FIG. 5c is a closeup view of Circle "c" shown in FIG. 5a.

FIG. 5d is view along line d—d shown in FIG. 5b.

FIG. 6a is a graph of the load applied to a hollow support element as shown in FIG. 5 as a function of the displacement of the column.

FIG. 6b shows graphs of loads as a function of displacement for foam columns according to the present invention and the prior art.

FIG. 6c shows graphs of load as a function of displacement for a midsole having the structure shown in FIG. 2a with support elements made of microcellular NDI and a solid midsole made of non-microcellular polyurethane.

FIG. 6d is a graph showing the force as a function of the displacement percentage of the overall length for a microcellular NDI column.

FIG. 6e is a graph showing the force as a function of the displacement percentage of the overall length for a non-microcellular MDI column.

FIGS. 7a–7b are views showing a foam column having grooves in the exterior surface in conjunction with a ring removably disposable in the groove.

FIG. 8 is a cross-sectional side view of a cushioning and stability component in which the support elements include both inner and outer support elements.

FIGS. 9a–9f are views of support elements according to further embodiments of the invention.

FIG. 10a is a plantar view showing the bones of the foot.

FIG. 10b is a dorsal view showing bones of the foot.

FIGS. 11a–11d show a method of assembly of a shell according to the invention.

FIG. 12 is an overhead view showing a further embodiment of the cushioning and stability component including a single doughnut-shaped support element.

FIG. 13 is an overhead view showing a further embodiment of the cushioning and stability component including both a single doughnut-shaped support element and an outer element.

FIG. 14 is an overhead view showing a further embodiment of the cushioning and stability component including a plurality of hollow cylindrical elements each having a second support element disposed about the exterior thereof.

FIG. 15 is a side view of the combination of a single hollow cylindrical element and a second support element.

FIG. 16 is a side view similar to the view of FIG. 15 in which the second element is disposed in the interior of the hollow cylindrical element.

FIG. 17a is an overhead view of a cushioning and stability component according to a further embodiment of the invention.

FIG. 17b is a side view of an embodiment of a cushioning and stability component similar to the embodiment shown in FIG. 17a.

FIG. 17c is a close-up view of circle "C" shown in FIG. 17b.

FIG. 18a is a lateral view of the foot, showing the various planes thereof.

FIG. 18b is an underside view of the foot, showing the various planes thereof.

FIG. 19a is a lateral view of a shoe including a midsole having a cushioning and stability component combining aspects of FIGS. 1, 2a, 7a, 7b, 8 and 16.

FIG. 19b is a cross-sectional side view of a cushioning and stability component as shown in FIG. 19a.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

With reference to FIG. 1, a shoe including a midsole according to the present invention is disclosed. Shoe 10 includes conventional upper 12 attached in a conventional manner to sole 14. Sole 14 includes midsole 18, and conventional outsole layer 20 formed of a conventional wear-resistant material such as a carbon-black rubber compound. Midsole 18 includes footframe 23, cushioning and stability component 24, midfoot wedge 40 and cushioning layer 22 made of a conventional cushioning material such as ethyl vinyl acetate (E.V.A) or conventional non-microcellular polyurethane (PU) foam extending substantially throughout at least the forefoot portion of shoe 10.

Midsole 18 includes cushioning and stability component 24 extending rearwardly approximately from the forefoot to a location adjacent the posterior portion of cushioning layer 22. Cushioning and stability component 24 includes shell or envelope 26 having upper and lower plates 28 and 30, defining therebetween an open area of the sole, and a plurality of compliant elastomeric support elements 32 disposed in the open area. Resilient elements 32 are discrete from each other. In a preferred embodiment, elements 32 have the shape of hollow cylindrical columns as shown in FIGS. 5a–5d, or partitioned columns, that is, hollow columns with cavities extending inwardly from each planar end surface, as shown in FIG. 9a.

Shell 26 may be made from nylon or other suitable materials such as BP8929-2 RITEFLEX ™, a polyester elastomer manufactured by Hoechst-Celanese of Chatham, N.J., or a combination of nylon having glass mixed therewith, for example, nylon with 13% glass. Other suitable materials would include materials having a moderate flexural modulus and exhibiting high resistance to flexural fatigue. Support elements 32 are made from a material comprising a microcellular polyurethane, for example, a microcellular polyurethane-elastomer based on a polyester-alcohol and naphthalene-1,5-diisocyanate (NDI), such as the elastomeric foam material manufactured and sold under the name ELAS-TOCELL ™ by BASF Corporation of Wyandotte, Mich. Other suitable polyurethane materials such as a microcellular polyurethane-elastomer based on a polyester-alcohol and methylenediphenylene-4,4'-diisocyanate (MDI) and a microcellular polyurethane-elastomer based on a polyester-alcohol and bitolyene (TODI) may be used. These materials exhibit a substantially uniform cell structure and small cell size as compared to the non-microcellular polyurethanes which have been used in the prior art.

5,343,639

| 5 | 6 |

By utilizing microcellular polyurethanes, several advantages are obtained. For example, microcellular polyurethanes are more resilient, and thereby restore more of the input energy imparted during impact than non-microcellular polyurethanes. Furthermore, microcellular polyurethanes are more durable. This latter fact combined with the fact that the deflection of a foam column made from microcellular polyurethanes is more predictable than for non-microcellular polyurethanes allows the midsole to be constructed so as to selectively distribute and attenuate the impact load. This distribution of the load results in a midsole which provides a desirable level of cushioning thoughout a ground support phase, without overcushioning or undercushioning at any location. These advantages are explained further below.

With reference to FIGS. 18a and 18b, various planes are shown with reference to a foot. Reference to these planes as applied to a shoe and the axes defined thereby will be made throughout the description. The sagittal plane is the vertical plane that passes through the shoe from back to front and top to bottom, dividing it into a medial and lateral half and is shown as reference numeral 60. The frontal plane is the vertical plane that passes through the shoe from top to bottom and side to side dividing it into anterior and posterior halves, and is shown as reference numeral 62. The transverse plane is the horizontal plane that passes through the body from side to side and back to front dividing it into an upper and lower half, and is shown as reference numeral 64. The anterior-posterior axis is the intersection of the transverse and sagittal planes. The superior-inferior axis is the intersection of the sagittal and frontal planes. The medial-lateral axis is the intersection of the transverse and frontal planes.

With further reference to FIGS. 2a and 3a–3b, shell 26 includes upper and lower plates 28 and 30 which define an interior volume. Shell 26 serves to increase torsional rigidity about the anterior-posterior axis of the shoe. Additionally, shell 26 helps distribute the load between support elements 32, and thereby helps to control foot motion and provide foot stability. In the FIG. 2a embodiment, upper and lower plates 28 and 30 are joined such that shell 26 has the shape of a generally closed oval envelope. This embodiment has the advantages of ensuring that all of the columns are loaded substantially axially during footstrike, and of providing a torsional restoring moment to upper plate 28 with respect to lower plate 30 when the foot is everted or inverted. Thus, stability is enhanced, making this embodiment particularly useful in running shoes. In addition, the closed envelope limits the load on the adhesives which secure support elements 32 to shell 26, that is, the drawbacks associated with having only the small surface of the support elements for use as adhesive surfaces are avoided. Midfoot wedge 40 is disposed at the front of shell 26 and prevents total collapse of the shell structure at this region, which would cause a loss of midfoot support.

Alternatively, upper and lower plates 28 and 30 need not be joined and could take the form of unconnected upper and lower plates, or could be joined in only one portion, for example, the front or back, as shown in FIGS. 2b and 2c. This embodiment has the advantage of reducing shoe weight and the complexity of the manufacturing operation. As a further alternative, shell 26 could have the shape shown in FIGS. 4a–4d, in which shell 26' includes diagonal crossing member 33 extend-

ing between upper and lower plates 28' and 30'. This embodiment has the advantage of increasing torsional and lateral rigidity of the midsole and reducing the size of and thus the weight associated with support elements 32 and is particularly useful in creating a midsole with particularly low energy losses and low weight. As shown in all of FIGS. 1–4, shell 26 or 26' extends throughout the width of midsole 18 and has open sides.

With reference to FIGS. 5a–5c, a first embodiment of support elements 32 are shown. Support elements 32 may have an overall hollow cylindrical shape and may have smooth exterior surfaces. Alternatively, the outer surface may be escalloped, that is, support elements may include spaced grooves 32a formed in the exterior surface. Support elements 32 may be made from the elastomeric foam materials discussed above such as microcellular ELASTOCELL ™ or other microcellular elastomeric materials having the same properties.

As shown in FIGS. 2a–2c, four support elements 32 may be disposed between the upper and lower plates. Elements 32 are generally disposed in a rectangular configuration, with a pair of anterior lateral and medial elements and a pair of posterior lateral and medial elements. Elements 32 are secured to the upper and lower plates by a suitable adhesive such as a solvent based urethane adhesive. Elements 32 are positioned within raised circular detents 34, which are disposed on upper and lower plates 28 and 30 and abut the outer cylindrical surface of elements 32. As shown in FIG. 3d, inner detents 34' also may be provided to abut the inner surface of the elements. The provision of four detents for four support elements is shown as an example only, and more or less support elements could be used within the scope of the invention.

Preferred embodiments for the exact positioning of elements 32 are disclosed below in Table A. As shown, two detents 34 may be disposed on either side of the sagittal plane. In order to maximize the cushioning, it is desirable that no support element be disposed directly beneath the calcaneus, and as shown in FIG. 3a, detents 34 may be located such that the midpoint of elements 32 generally corresponds with the center of the plantar surface of the calcaneus, which is the location of the greatest vertical load, and which is shown as reference numeral 33 in FIG. 3a. As measured along an anterior-posterior axis, the center point is located at approximately 15% of the length of the foot as measured from the posterior-most aspect of the heel parallel to a line tangent to the medial-most edges of the heel and forefoot, as shown in FIG. 18b. In addition, as shown in FIG. 1a and 1b, cushioning layer 22 is also not disposed directly beneath the calcaneus, substantially throughout the region located above the space between elements 32 and may be eliminated entirely throughout most or all of the region above shell 26.

With reference to Table A, each of the four embodiments of envelope disclosed therein is used in one of the four ranges of men's shoe sizes shown in the table, and the three ranges of women's shoe sizes which correspond to the first three men's size ranges. The measurements are in millimeters and are defined as follows: WIDTH is the width of the envelope at the rear; LENGTH is the overall length of the envelope; HEIGHT is the height of the envelope measured from the lowermost surface of the lower plate to the uppermost surface of the upper plate; DIST. TO CALCANEUS is the distance along the anterior-posterior axis from the rear of the envelope to the center of the calca-

5,343,639

7

neus for the particular foot size shown; AXIAL DIS. REAR COLS. is the distance along the anterior-posterior axis from the rear of the envelope to the center of the rear columns; AXIAL DIST. FOR. COLS. is the distance along the anterior-posterior axis from the rear of the envelope to the center of the forward columns; SAG. PLANE REAR COLS. is the perpendicular distance from the sagittal plane to the center of the rear columns; and SAG. PLANE FOR. COLS. is the perpendicular distance from the sagittal plane to the center of the forward columns.

TABLE A

| SIZE RANGE | M4–M6 W5½–W7½ | M6½–M8½ W8–W10 | M9–M11 W10½–W12½ | M11½–M15½ |
|---|---|---|---|---|
| WIDTH | 40.8 | 42.5 | 44.4 | 47.4 |
| LENGTH | 137.5 | 147.1 | 156.5 | 168.8 |
| HEIGHT | 27.4 | 27.7 | 27.7 | 27.7 |
| DIST. TO CALCANEUS | 57.4 (Mens 5) | 60.5 (Mens 7) | 65.2 (Mens 9) | 70.8 (Mens 12) |
| AXIAL DIS. REAR COLS. | 35.7 | 38.9 | 40.4 | 40.5 |
| AXIAL DIST. FOR. COLS. | 73.1 | 79.6 | 87.5 | 94.5 |
| SAG. PLANE REAR COLS. | 17.7 | 18.1 | 19.7 | 22.0 |
| SAG. PLANE FOR. COLS. | 18.8 | 19.6 | 20.3 | 22.6 |

For the men's 4–6/women's 5½–7½ embodiment of shell 26, detents 34 measure 26.4 mm in inner diameter, 28.3 mm in diameter at the outer surface of the uppermost extension of detent 34, and 30.3 mm in diameter as measured at the base of detent 34. The corresponding measurements for the remaining embodiments are 29.6 mm. 31.5 mm and 33.5 mm.

As discussed above, during a footstrike, the initial contact is made at the rearfoot lateral location, with the foot rolling anteriorly and medially. Thus, the initial load is supported primarily by the rear lateral element 32, with the load progressively transferred anteriorly and medially to the other elements, as the foot pronates. Since each of support elements 32 is fixed to upper plate 28, the plate serves to distribute the load among the support elements. Lower plate 30 also distributes the impact. Accordingly, during initial impact at footstrike, when the load is minimal, the foot is supported almost entirely by the stiffness of the rear lateral column. This stiffness will be sufficient to provide adequate cushioning throughout the inital period of the footstrike. Since at the time of initial impact, the other support elements 32 are not significantly compressed, the overall stiffness of midsole 18 is substantially equal to the stiffness of the rear, lateral column. Thus, the feel of midsole 18 will not be stiffer than desired during the initial footstrike.

After the initial impact, the other support elements 32 will be compressed to a greater degree, due to the anterior and medial movement of the load as well as the distribution of the force provided by upper plate 28 and lower plate 30. Thus, the other elements will contribute to the overall stiffness of midsole 18 to an increasing degree as they are compressed. Therefore, when maximum load is achieved, the overall stiffness of midsole 18 will be sufficient to provide adequate cushioning, without requiring excessive stiffness at the initiation of footstrike. Since the load is gradually distributed from the lateral rear column to the other support elements 32, the increase in stiffness corresponds to the increase in load, such that the wearer does not experience bottoming-out. In addition, no support element is provided directly

8

beneath the center of the calcaneus, ensuring that the maximum load will be distributed away from the calcaneus and to each of the support elements. This arrangement also increases attenuation of impact load, in manner consistent with the disclosure of U.S. Pat. No. 4,439,936 to Clarke et al, hereby incorporated by reference.

The use of microcellular as opposed to non-microcellular polyurethane foam for the columns allows for the gradual increase in stiffness to be obtained without having the stiffness be too great or small at the location of the initial impact. It has been experimentally determined that for the average runner, a stiffness on the order of 70–100N/mm is desired at the time of maximum loading. At the time of initial impact, a stiffness on the order of 20N/mm is desired. FIG. 6a is a graph of the load applied to a hollow support element as shown in FIG. 5 as a function of the displacement of the column, that is, the vertical compression. The column is made of microcellular NDI having a height of 25.4 mm and a density of 0.423 g/cm$^3$. As the column is subjected to increasing load, it continues to compress to support the load, to a greater degree than with prior art materials. In addition, the column does not undergo a sudden increase in stiffness such as would cause the column to bottom-out.

With further reference to FIG. 6b, the advantage provided by the use of microcellular columns as opposed to non-microcellular columns will be explained. In FIG. 6b, the graphs of loads as a function of displacement are shown for a column made of microcellular NDI ("Elasto") and having a density of 0.44 g/cm$^3$, as well as columns made of non-microcellular MDI (PU) and having densities of 0.26, 0.35 and 0.45 g/cm$^3$. The columns each have a height of 25.4 mm, an outside diameter of 29.2 mm and an inside diameter of 18.5 mm. As can be seen, the MDI columns cease to undergo additional compression with increasing loads at loads which are much lower than the loads at which the NDI columns cease to undergo additional compression. For example, all of the non-microcellular tested materials cease to undergo additional compression at approximately 80N, at a displacement of under 6 mm. However, a column made of microcellular NDI having nearly the same density does not cease to undergo additional compression until a load of over 200N is applied, at a corresponding displacement of 9–10 mm.

The loads applied to the midsole at the lateral rear location during initial impact can easily exceed a level which will cause the conventional polyurethane columns to cease undergoing additional compression before the load is transferred forwardly and medially to the other columns. Since the column made from microcellular NDI does not cease to undergo additional compression until a much greater load is applied, support is provided throughout the period of initial contact until the load is transferred to the remaining columns. That is, as the load at the lateral rear increases, the lateral rear column will continuously compress to support the load. By the time the load reaches a level at which the column will not undergo additional compression with increasing load, the load will be distributed to the other columns. Thus, the use of microcellular NDI simultaneously achieves the goals of low initial stiffness at the lateral rear to correspond to lower initial loads, increasing stiffness to correspond to increasing loads, and avoidance of bottoming-out during the ground support phase.

5,343,639

9

These goals cannot be achieved simultaneously with the non-microcellular polyurethane, even if the four column design were used. If the columns had the densities shown in FIG. 6b, the wearer would experience bottoming out, at least at the lateral rear location, since the load at which the material would cease to undergo additional compression is under 80N. Thus, distribution of the load will not occur before the load exceeds the support capability of the lateral rear column. Alternatively, in order to allow for continuous compression throughout a higher range of loads, the initial stiffness would have to be greatly reduced. Thus, the midsole would feel mushy, and the height of the columns would have to be greatly increased, resulting in instability.

FIG. 6c shows graphs of load as a function of displacement for two midsoles having the structure shown in FIG. 2a with support elements made of microcellular NDI and two midsoles made of solid non-microcellular polyurethane. As can be seen, the curves for the present invention are more linear than the curves of the prior art, that is, the midsoles according to the present invention continue to undergo compression at increased loads throughout a greater range than in the prior art. Thus, the stiffness continually increases to support the increasing load, and bottoming-out can be avoided throughout substantially the entire range of compression of the midsole.

Furthermore, the durability of the microcellular foam is superior to non-microcellular polyurethane foams which have previously been used for cushioning. For example, after repeated compression, elastomeric foams will undergo some degree of permanent setting, that is, the foam element will remain compressed to a certain degree even when the load is removed. The compression of a microcellular foam element as a percentage of height is much lower than non-microcellular foams. In addition, after repeated compression, the vertical displacement of the foam element as a function of force, that is, the stiffness of the foam element, will be decreased such that for a given applied load the displacement of the element is increased after repeated use. In other words, the element will undergo greater compression for a given load. Thus, after repeated use, a foam midsole will not be able to support as great a load before reaching maximum compression, such that it is more likely to undergo bottoming-out. Once again, this change in stiffness is much greater for non-microcellular polyurethane foams used in the prior art than it is for microcellular foams.

A further advantage provided by the use of microcellular polyurethane as opposed to non-microcellular polyurethane is evident from the graphs of FIGS. 6d and 6e, which shows the force as a function of the displacement percentage of the overall length for a microcellular NDI column and a non-microcellular MDI column, respectively. The upper part of each graph represents the compression by an applied load and the lower part represents the decompression as the load is removed. In each case, the percentage of compression for a given load is higher as the load is removed, indicating a loss of energy during the impact. However, the energy loss is much greater for the non-microcellular MDI than it is for the microcellular NDI. In particular, the non-microcellular MDI has a 56% energy loss as compared to a 37% energy loss for the microcellular NDI.

Accordingly, it can be seen that a midsole according to the present invention which includes a plurality of

10

hollow elements constructed from a microcellular foam material such as ELASTOCELL® NDI improves over the prior art non-microcellular polyurethane foams by providing a lower stiffness at the location of the initial impact which corresponds to lower initial loads, and a smooth transition to a much higher stiffness corresponding to the maximum load which is achieved beneath the calcaneous, with the higher load distributed throughout the rear of the midsole. In addition, the desired stiffnesses are achieved in a manner which avoids bottoming-out throughout the ground support phase, without increasing the weight and initial stiffness of the midsole beyond a desired level.

It has been experimentally determined that in general, the best rearfoot control characteristics are obtained with elastomeric support elements of the preferred embodiment having a density ranging from 0.25–0.65 g/cm³, and in particular, a density of 0.41 g/cm³, and a height range of 15–35 mm, with a consistent height and density used for all of the support elements. Of course, in practice, one or more of the support elements could have a different height and/or density. Table B discloses linear sizes and density ranges of preferred embodiments of support elements 32. The linear measurements are given in millimeters, the weight ranges are given in grams and the densities are given in grams/cm³. The inside diameter is the diameter of the circular opening. The first measurement for the outside diameter represents the diameter as measured at the base of a groove 32a, as shown in FIG. 5c, and the second measurement represents the diameter as measured at the outermost surface of the column. Preferably, support element embodiment C is used for the men's 4–6/women's 5½–7½ embodiment of the shell as shown in Table A. Support element embodiment A is used for all other embodiments of the shell. In addition, embodiment A preferably is used in men's running shoes. Embodiment B preferably is used in men's cross-training shoes. Embodiment C preferably is used in women's running shoes. Embodiment D preferably is used in women's cross-training shoes.

TABLE B

| EMBODI-MENT | HEIGHT | INSIDE DIAMETER | OUTSIDE DIAMETER | DENSITY RANGE |
|---|---|---|---|---|
| A | 25.4 | 14.7 | 27.2–29.2 | 0.407–0.441 |
| B | 20.1 | 14.7 | 27.2–29.2 | 0.407–0.441 |
| C | 25.4 | 10.5 | 24.0–26.0 | 0.334–0.373 |
| D | 20.1 | 10.5 | 24.0–26.0 | 0.334–0.373 |

As discussed above, the outer surface of support elements 32 may be escalloped and include a plurality of spaced grooves 32a. In general, the overall force deflection curve of the support elements can be altered by geometry changes, that is, alteration of the outer or inner diameter when the support elements are in the form of hollow columns, or the use of escalloped surfaces, or by changing the density. The use of an escalloped outer surface provides the advantage that large vertical compressions are facilitated by the pre-wrinkled shape, that is, the columns tend to be deflected more vertically. If the columns are designed with straight walls rather than escalloped walls, the tendency of the column to buckle is greater. Buckling of the

5,343,639

**11**

columns is associated with a sudden change in the force-deflection curve. Thus, the shapes and sizes of the grooves can be selected to construct a column having a more linear compression as a function of applied force than columns having straight surfaces.

Since the stiffness is determined substantially by the density, dimensions and surface contours of the support elements as well as their location in the envelope, these factors can be adjusted to preclude any abrupt changes in stiffness and bottoming-out for typical loads and the likely maximum applied force. In addition, by selecting the relative locations of the support elements, the cushioning for each shoe size can be approximately tuned to a desired level of stiffness for a selected range of forces, while providing maximum rearfoot control. The exact determinations would be made by determining the level of force which would be applied by wearers likely to have body weights in a range corresponding to a given shoe size, and taking into account the stability requirements of the activity for which the shoe is designed to be used. For example, most runners apply a maximum vertical force of about 2.4 times body weight during steady long-distance running, and this factor would be considered in designing a running shoe for a runner of normal weight. Such determinations can be made by one skilled in the art without undue experimentation.

Furthermore, as shown in FIG. 7, the compliance of the columns and the overall stiffness of the midsole can be made adjustable by the provision of elastomeric rings 36 in grooves 32a. Rings 36 can be slid to fill the grooves to adjust the compliance as desired. Generally, as the grooves are filled with the ring, the compliance of each individual support element is stiffened. In this manner, the wearer can individually tune the stiffness of the midsole to his own requirements, taking into account body weight and the activity for which the shoe will be used. Rings 36 may be made from rubber or urethane elastomer.

With reference to FIG. 8, a further embodiment is shown in which internal element 42 is disposed within the hollow area of resilient support element 32, which as shown in this example have the form of hollow columns. Elements 32 are discrete from each other and are disposed in the open area of the sole formed by shell 26. Element 42 may comprise a cylindrical bladder filled with a gas and in one embodiment may be loosely fitted into the hollow circular area of support elements 32, that is, bladders 42 are distinct from and are not attached to support elements 32. Bladders 42 may be filled with air. In a preferred embodiment in which the column dimensions are as shown in TABLE B, bladders 42 have a height of 15 mm, and an outside diameter of 10.5 mm for the men's 4–6 embodiment and 14.7 mm for the other embodiments. Alternatively, bladders 42 may be made of the types of materials and filled with the types of gases disclosed in U.S. Pat. No. 4,183,156 to Rudy, hereby incorporated by reference. As disclosed in this patent, a preferred material for the bladders is a cast or extruded ether base polyurethane film having a shore "A" durometer hardness in the range of 80–95, e.g., TETRA-PLASTICS TPW-250. Preferred gases for use in the bladders are hexafluorethane (e.g., Freon F-116) and sulfur hexafluoride.

Since bladders 42 are not connected to support elements 32 and have a height less than that of support elements 32, they will not affect the stiffness during the application of normal loads due to the fact that elements 32 will not be compressed to the level of bladders 42.

**12**

However, bladders 42 compensate for loads which deviate from the norm and thus ensure the provision of adequate cushioning for various activities. For example, a shoe may be designed for both walking and running, and the normal expected load on the midsole would be the load experienced during walking. As discussed above, support elements 32 would be designed to provide a desired level of cushioning and stability control for the light loads experienced during walking, and during walking, elements 32 would not be compressed to a level where the height of the elements was less than the height of bladders 42. Therefore, bladders 42 would not be compressed and would have no effect on cushioning.

When the shoe is worn during running, greater loads would be experienced. These loads would cause compression of external elements 32 to a height less than the height of bladders 42. Thus, both bladders 42 and elements 32 would support the load, and the stiffness of bladders 42 would be added to the stiffness of elements 32 in order to provide the proper cushioning. By appropriately selecting the dimensions of the inner and outer elements, as well as the material of the inner element (air bladder or a post made of the same or a different cushioning material,) a single shoe can be designed to provide a desired level of cushioning for more than one activity.

The use of the internal post or bladder also compensates for people who may be heavier than normal for their shoe size. Heavier individuals may cause the loads developed on the midsole to exceed the expected load during normal activity. These loads may cause the compression of the outer element to exceed the threshold, and result in bottoming out. The use of both the inner and outer elements provides the desired cushioning and helps preclude bottoming-out in this situation by providing a greater stiffness during normal activity for heavier individuals since both the inner and outer elements will be engaged. Thus, the stiffness will not be too soft for heavier individuals during lighter activities. However, by providing both an inner and outer element which are not connected to each other, the stiffness will not be too large for normal sized individuals since during lighter activity the outer element will not be compressed to a height less than the inner element.

Accordingly, the provision of inner elements 42 provides adequate cushioning for individuals of normal weight for activities which provide a variety of loads on the midsole. In addition, elements 42 compensate for the greater loads provided by heavier individuals during even light activity. Essentially, the use of a second element such as an inner post allows for a greater degree of tuning than is possible with just one element, since one element can be designed to provide adequate cushioning for the typical loads associated with one particular activity, while the second element, acting in parallel with the first element, can be designed to cushion for the higher loads associated with a second activity. In addition, the range of tuning of the cushioning can be adjusted by the individual wearer to suit his individual needs in several ways. For example, where the second element is an air bladder, the stiffness of the bladder can be adjusted by changing the inflation pressure thereof through a fill inlet disposed through the elastomeric element, as shown in FIG. 16. Alternatively, the inflation of the air bladder can be adjusted concurrently with movement of the ring elements to achieve a desired stiffness. That is, the disclosures of FIGS. 1, 2a–c,

5,343,639

13

7a, 7b, 8 and 16 may be combined as shown in FIGS. 19a and 19b. FIG. 19a shows the overall structure of a cushioning and stability component disposed as part of a midsole, as disclosed, for example, in FIGS. 1 and 2a. With further reference to FIG. 19a and to FIG. 19b, bladders 42 are disposed within foam support elements 32, in the same manner as in FIG. 8. In addition, support elements 32 include grooves 32a, within which elastomeric rings 36 are removably disposable to adjust the compliance of elements 32, in the same manner as shown in FIGS. 7a and 7b. Finally, filler inlets 344 are provided through elements 32 for adjusting the inflation pressure of bladders 42, as discussed below with respect to FIG. 16. In addition, the height of the second element can be adjusted, for example, by disposing a screw element at the bottom of the second element and a corresponding receiving element on the bottom plate.

As shown, insert bladders 42 may extend for approximately 60% of the height of column 32. Other heights may be used as well, as a matter of design choice. Although insert elements 42 are disclosed as cylindrical gas-filled bladders, it is foreseeable that other materials such as conventional foam, gels, liquids or plastics could be used in combination. In addition, elements 42 could be made from the microcellular materials disclosed above having either the same or different density.

With reference to FIGS. 14–15, air bladder 142 may be formed in the shape of a hollow cylindrical column and disposed externally of foam column element 32, which is bonded to upper plate 28 and lower plate 30. Air bladder 142 is inflated to a pressure which causes its height to exceed the unloaded height of foam column element 32. Thus, foam column element 32 is in tension even when no external load is applied by a wearer, which causes foam column element 32 to be stretched beyond its relaxed height. Midsole 18 may be tuned to a particular stiffness by selecting the level of inflation of the bladder. Since both the air bladder and column will be compressed simultaneously throughout the ground support phase, each column/air bladder combination will have only one characteristic stiffness. However, this embodiment is particularly useful for tuning since each combination can be given a desired stiffness simply by adjusting air bladder pressure. Thus, the overall stiffness of the midsole can be adjusted for a given activity or wearer weight. In addition, each column/bladder combination easily can be given a different stiffness in accordance with the preference of the user.

As shown in FIG. 16, bladder 342 also can be disposed within the hollow region of column 32, with filler inlet 344 provided through the column element 32 for adjusting the inflation pressure. This embodiment provides puncture resistance for bladder 342 and ensures foam column element 32 will compress in an axially symmetric manner. Of course, filler inlet 344 could be disposed at other locations of bladder 342. For example, the filler inlet could be accessed from a superior or inferior position through an opening in the upper and lower plates of shell 26.

With reference to FIG. 17a, a further embodiment of the cushioning component is shown. Cushioning component 26″ includes holes 35 formed through upper plate 28 at the locations of the centers of detents 34″. Holes 35 allow gas bladders 444 to be removably disposed therethrough. The shape of detents 34″ including holes 35 is shown more clearly in FIGS. 17b and 17c, in which holes 35 are formed through lower plate 30. In the embodiment shown in FIG. 17a, access to holes 35

14

for removal and replacement of bladders 444 is gained by lifting the sock liner which is disposed above conventional cushioning layer 22. Corresponding holes would also be formed through layer 22 if necessary. In the embodiment shown in FIGS. 17b and 17c, holes 35 are formed through lower plate 30, and coresponding holes would be formed through outsole layer 20. In both cases, the stiffness of the midsole easily can be tuned by the wearer simply by removing the bladder and replacing with another bladder, for example, an air bladder inflated to a different pressure and/or having a different height. Alternatively, a second foam element can be inserted in the hollow region of support element 32, or the hollow region can be left unfilled.

With respect to FIGS. 9a–9f, alternative configurations for support elements 32 are shown. FIGS. 9a and 9b disclose support element 132 having the shape of a column having cavity 134 extending inwardly from each planar surface and terminating at partition 136, thereby forming an element having an "H-shaped" cross-section. Cavities 134 have a circular shaped cross-section, with the radius of the cross-section slightly decreasing in the direction towards partition 136. This design reduces the length of the column which is hollow, and prevents buckling, thus allowing a deflection-force curve with a more substantially linear region and like working range than is the case for the simple hollow cylinder shown in FIG. 2a. If desired, inner elements 42 could be inserted in cavities 134.

As shown in FIGS. 9c and 9d, support element 232 is similar to column element 132 having cavities 134, and further includes integrally formed foam webs 238 disposed in cavities 234 and extending from partition 136. Foam webs 238 have an "x-shaped" cross-section, and further reduce the buckling tendency of support elements 132 under large vertical compressions. With reference to FIGS. 9e and 9f, support element 332 is similar to support element 132, but is molded to have a barrel-shaped exterior surface. Once again, the shape of element 332 serves to preserve the linearity of the deflection-force curve by an axisymmetric deformation pattern at high loads.

A further alternative embodiment for the support element is shown in FIG. 12. Support element 232 is essentially doughnut-shaped, and extends substantially throughout the rearfoot area of the midsole. The central hole of the doughnut is disposed beneath the center of the calcaneus. The initial load is supported on the lateral rear portion of element 232, and then moves anteriorly and medially during the breaking portion of the ground support phase. Thus, the stiffness of the midsole would increase to compensate for the increasing load, as described above with respect to the four column embodiment. With reference to FIG. 13, the use of support element 232′ with air bladder 242 is shown. Air bladder 242 is shown as surrounding support element 232′, but could also be disposed within the central hole. In either case, air bladder 242 could be inflated to a height which would cause element 232 to be stretched even when no load is applied by a wearer.

With reference to FIGS. 10a and 10b, a plantar and a dorsal view, respectively, of the bones of the foot are shown. For purposes of description, the dashed lines in the Figures approximately divide the foot into three distinct reference zones. Rearfoot zone 60, commonly known as the heel, substantially contains the talus and calcaneus, that is, rearfoot zone 60 extends from the rear of the foot to a location generally forward of the calca-

5,343,639

15

neus and talus, and rearward of the navicular and cuboid. Midfoot zone 62, commonly known as the arch, substantially contains the navicular, cuboid and the first, second and third cuneiforms and a portion of the base of the lateral metatarsals, that is midfoot zone 62 extends from the border of rearfoot zone 60 to a location generally rearward of the metatarsal heads. Forefoot zone 64, commonly known as the ball and toe area substantially contains the five metatarsal heads, as well as the phalanges and sesmoids. That is, forefoot zone 64 extends from the border of midfoot zone 62 to the forward end of the foot. This division of the foot into three zones or portions must of course be an approximation due to the irregular shapes and partial overlap of some of the bones.

In a preferred embodiment of the invention, as shown in FIG. 1, cushioning and stability component 24 extends from the rear of the shoe to approximately the posterior border of the forefoot zone, that is, for about 50% of the length of the shoe. As shown in FIGS. 10a and 10b, in this embodiment cushioning and stability component 24 would be disposed in both rearfoot zone 60 and midfoot zone 62 of the shoe. This embodiment is useful for allowing the sole to flex at the metatarsal-phalangeal joint. In this embodiment, if the shoe were size 9 men's, the overall length of the shoe would be 29 cm and the length of cushioning and stability component 24 would be approximately 15 cm. The same proportions could be used for other size shoes. However, cushioning and stability component 24 could extend throughout only rearfoot zone 60. Alternatively, cushioning and stability component 24 could extend throughout the entire region between outsole 20 and upper 12 so as to include all of the rearfoot zone 60, midfoot zone 62 and forefoot zone 64, with layer 22 of conventional cushioning material completely eliminated, or disposed above only a portion of cushioning and stability element 24. This embodiment would be useful for extending the special cushioning properties of the present invention under the forefoot. Although only three embodiments of the cushioning component 24 are discussed, cushioning components which occupy any desired portion of the midsole area are within the scope of this invention.

In the present invention, adequate cushioning is provided without undesirably increasing the weight of the shoe. In a prior art shoe, where conventional polyurethane is used, 100% of the midsole will be filled with foam. By use of a midsole according to the present invention, less than approximately 40% of the shell will be occupied by solid cushioning material. Thus, a correspondingly reduced percentage of the overall midsole area will be occupied by solid cushioning material. These figures are shown in TABLE C for four preferred embodiments, utilizing the embodiments of shell 26 disclosed in Table A. In TABLE C, the volumes are expressd in cm³, with COLUMN representing the total volume of four hollow foam column elements 32; WEDGE representing the volume of midfoot wedge 40, INNER ELEMENT representing the volume of an inner air bladder such as bladder 344, SHELL representing the total volume enclosed by shell 26; and PERCENT representing the percent of the shell volume occupied by all of the elements disposed within, that is, the foam column, air bladder and the wedge.

TABLE C

| SIZE | M4-M6 | M6½-M8½ | M9-M11 | M11½- |
|------|-------|---------|--------|-------|

16

TABLE C-continued

| RANGE | W5½-W7½ | W8-W10 | W10½-W12½ | M15½ |
|-------|---------|--------|-----------|------|
| COLUMN | 43.36 | 48.70 | 48.70 | 48.70 |
| INNER ELEMENT | 5.195 | 10.183 | 10.183 | 10.183 |
| WEDGE | 22.200 | 25.287 | 28.690 | 36.199 |
| SHELL | 184.867 | 210.575 | 238.913 | 301.442 |
| PERCENT | 38.27 | 40.01 | 36.69 | 31.57 |

As shown in TABLE C, all of the support elements together, along with the inner elements and the midfoot wedge occupy less than 60% of the volume defined by the shell. Thus, a correspondingly reduced percentage of the entire volume of the midsole is ooccupied by solid material (including air bladders), as compared to the prior art in which 100% of the same area would be occupied by conventional polyurethane. In the present invention, adequate cushioning would be provided in the desired range of stiffness with support elements 32 disposed so as to occupy between 5–50% of the volume of the space contained in the region defined between the inferior aspect of the shoe upper as defined by the lasting margin and the outsole or ground engaging member and including both the midfoot and rearfoot, that is, the space defined for cushioning component 24. Both the extent of the space between the upper and lower plates which is occupied by foam or other solid matter, and the extent to which the cushioning and stability component extends throughout the midsole region would be a design choice.

With reference to FIGS. 11a–11d, a method for assembly of one embodiment of cushioning and stability component 24 is shown. Shell 26 is molded as a nearly flat piece having a thin central region 26a and thicker end regions 26b. Detents 34 are formed on the surface of thin central region 26a. Regions 26b include hinge elements 100 and 101. Hinge element 100 is a hollow cylinder cut away to form hollow alternating steps which serve as pin holes, as shown in FIG. 11c. Hinge element 101 is also a hollow cylinder and includes corresponding alternating steps which mate with the steps of hinge element 100.

With reference to FIGS. 11b–11c, shell 26 is heated to a temperature which renders it soft so that it may be folded over steel forming element 102, which forms the rear portion of shell 26 into a desired curved shape and simultaneously brings hinge element 100 into a position adjacent hinge element 101. With reference to FIGS. 11d, support elements 32 are secured into detents 34, for example, by cement, and hinge element 100 is brought into alignment with hinge element 101. A restraint 103, for example, a steel pin or metallic tube is pushed in place through the hollow alternating steps to secure the ends of shell 26 and thereby form a closed loop. If it is not desired that shell 26 have a closed loop, the last step of securing the hinge elements need not be performed.

The formation of shell 26 in the manner discussed above results in a shell having substantially one or both ends with a relatively large radius, that is, the ends are substantially rounded. This construction allows for unrestricted compressive motion of the support elements. If the shell were constructed to have ends which were less rounded, the result would be the formation of substantially planar vertical walls located near the support elements. This structure would undesirably alter the compressive characteristics of the support elements, as well as increase the stress on the shell itself and thus the possibility of failure. In order to reduce the possibil-

5,343,639

**17**

ity of failure, the material from which the shell is constructed would have to be stronger, adversely affecting the pattern of deflection of the support elements.

This invention has been disclosed with reference to the preferred embodiments. These embodiments, however, are merely for example only and the invention is not restricted thereto. It will be understood by those skilled in the art that other variations and modifications easily can be made within the scope of this invention as defined by the appended claims.

We claim:

1. A shoe having an upper and a sole connected to the upper, said sole including a substantially open space and means for cushioning disposed within said open space, said cushioning means comprising at least one two-stage cushioning element having a first compressible element having a first uncompressed height and a second compressible element having a second uncompressed height which is less than said first uncompressed height, one of said compressible elements comprising a resilient support element and the other of said compressible elements comprising a fluid-filled bladder, one of said compressible elements disposed within the other of said compressible elements, said first compressible element compressible to a height which is less than said second uncompressed height, said first compressible element compressible jointly with said second compressible element when said first compressible element is compressed below said second uncompressed height, wherein, said open space is maintained substantially about said cushioning means.

2. The shoe recited in claim **1**, said sole further comprising a shell having upper and lower plates.

3. The shoe recited in claim **1**, said fluid-filled bladder having a height which is approximately 60% of the height of said resilient support element.

4. The shoe recited in claim **1**, said cushioning means comprising a plurality of two-stage cushioning elements.

5. The shoe recited in claim **1**, said cushioning means comprising four said two-stage cushioning elements, two of said two-stage cushioning elements disposed on each side of the sagittal plane of the shoe.

6. The shoe recited in claim **1**, said fluid-filled bladder comprising a gas-filled bladder, said shoe further comprising means for adjusting the gaseous pressure within said bladder.

7. The shoe recited in claim **1**, said first compressible element comprising a hollow foam support element,

**18**

said second element comprising a fluid-filled bladder disposed within said hollow foam support element.

8. The shoe recited in claim **7**, said foam support element comprising a microcellular polyurethane-elastomer selected from the group consisting a microcellar polyurethane-elastomer based on a polyester-alcohol and naphthalene-1,5-diisocyanate (NDI), a microcellular polyurethane-elastomer based on a polyester-alcohol and methylenediphenylene-4,4′-diisocyanate (MDI), and a microcellular polyurethane-elastomer based on a polyester-alcohol and bitolylene(TODI).

9. A shoe having an upper and a sole connected to the upper, said sole including a midsole, said midsole comprising two substantially hollow support elements having an outer surface, said elements comprising a resilient material and discrete from each other, an insert disposed within each of said elements and having a height which is less than the height of said element, said inserts comprising a fluid-filled bladder, at least one of said support elements having at least one annular groove disposed in the outer surface, and at least one elastic ring element disposed about said at least one support element and movable in the vertical direction so as to be removably disposable in said at least one groove, the stiffness of said at least one support element adjustable by selectively positioning said ring element into or out of said groove.

10. The shoe recited in claim **1**, said resilient support element having an overall cylindrical shape.

11. The shoe recited in claim **1**, said resilient support element having an overall barrel-shape.

12. The shoe recited in claim **1**, said resilient support element having upper and lower planar surfaces and a partition.

13. The shoe recited in claim **12**, wherein, a cavity having a circular shaped cross-section extends inwardly from each planar surface and terminates at the partition, the radius of each cross-section decreasing in a direction towards the partition.

14. The shoe recited in claim **13** further comprising a plurality of webs disposed in said cavities and extending from the partition.

15. The shoe recited in claim **14**, said webs formed integrally with said column-shaped element and having an x-shaped cross-section.

16. The shoe recited in claim **12**, said resilient support element comprising a hollow foam support element having an overall barrel-shaped exterior surface.

17. The shoe recited in claim **12**, said resilient support element comprising a hollow foam support element having an overall cylindrical shape.

* * * * *

# EXHIBIT D
# (Part 8 of 17)

# United States Patent [19]

## Kilgore et al.

[11] **Patent Number:** 5,353,523

[45] **Date of Patent:** Oct. 11, 1994

US005353523A

[54] **SHOE WITH AN IMPROVED MIDSOLE**

[75] Inventors: **Bruce J. Kilgore**, Lake Oswego, Oreg.; **Thomas McMahon**, Wellesley, Mass.; **John C. Tawney**, Portland; **Gordon Valiant**, Beaverton, both of Oreg.

[73] Assignee: **Nike, Inc.**, Beaverton, Oreg.

[21] Appl. No.: **134,886**

[22] Filed: **Oct. 13, 1993**

### Related U.S. Application Data

[62] Division of Ser. No. 738,031, Aug. 2, 1991, abandoned.

[51] Int. Cl.⁵ ...................... **A43B 13/20;** A43B 21/28; A43B 13/18

[52] U.S. Cl. ........................................... **36/29;** 36/28; 36/35 B

[58] Field of Search ................... 36/27, 28, 29, 35 R, 36/35 B, 7.8, 37, 38; 5/481

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 507,490 | 10/1893 | Gambino . |
| 622,673 | 4/1899 | Ferrata . |
| 933,422 | 9/1909 | Dee . |
| 949,754 | 2/1910 | Busky . |
| 1,094,211 | 4/1914 | Jenoi et al. . |
| 1,099,180 | 6/1914 | Karacsonyi ............................. 36/38 |
| 1,102,343 | 7/1914 | Kovacs . |
| 1,272,490 | 7/1918 | Matear . |
| 1,278,320 | 9/1918 | Ellithorpe . |
| 1,328,816 | 1/1920 | Brown . |
| 1,338,817 | 5/1920 | De Luca . |
| 1,502,087 | 7/1924 | Bunns ...................................... 36/28 |
| 1,670,747 | 5/1928 | Sestito . |
| 1,870,065 | 8/1932 | Nusser . |
| 2,104,924 | 1/1938 | Dellea . |
| 2,122,108 | 6/1938 | Modlin . |
| 2,299,009 | 10/1942 | Denk . |
| 2,710,460 | 6/1955 | Stasinos . |
| 2,771,400 | 10/1955 | Israel . |
| 3,041,746 | 7/1962 | Rakus . |
| 3,429,545 | 2/1969 | Michel . |
| 3,822,490 | 7/1974 | Murawski . |
| 4,030,213 | 6/1977 | Daswick . |
| 4,074,446 | 2/1978 | Eisenberg . |
| 4,223,457 | 9/1980 | Borgeas . |
| 4,237,625 | 12/1980 | Cole et al. . |
| 4,241,523 | 12/1980 | Daswick . |

(List continued on next page.)

### FOREIGN PATENT DOCUMENTS

806647 1/1949 Fed. Rep. of Germany .

(List continued on next page.)

### OTHER PUBLICATIONS

Elastocell ™ Microcellular Polyurethane Products, Technical Information, Elastocell ™ , a Means for Antivibration and Sound Isolation.

(List continued on next page.)

*Primary Examiner*—Paul T. Sewell
*Assistant Examiner*—Ted Kavanaugh
*Attorney, Agent, or Firm*—Banner, Birch, McKie & Beckett

[57] **ABSTRACT**

The invention is directed to a midsole for a shoe including one or more foam columns disposed between an upper and a lower plate. One or more elastomeric foam elements are disposed between the upper and lower plates. The foam elements are made of a material such as microcellular polyurethane-elastomer based on a polyester-alcohol and naphthalene-diisocyanate (NDI). In one embodiment, the foam, elements have the shape of hollow cylindrical columns, and may include grooves formed on the exterior surface. One or more elastic rings are disposed about the columns and are removably disposable in the grooves, allowing the stiffness of the columns to be adjusted. In a further embodiment, inflatable gas bladders are disposed in the hollow regions. The heights of the gas bladders may be less than the heights of the columns such that when the midsole is compressed, the wearer experiences a first stiffness corresponding to compression of the columns alone, and a second stiffness corresponding to compression of both the columns and the bladders. Alternatively, the bladders may be inflated so as to cause the columns to be stretched, even when no load is applied. Since the level of inflation of the bladders may be adjusted, the overall stiffness of the midsole may be tuned to the individual requirements of the wearer.

**18 Claims, 21 Drawing Sheets**



**5,353,523**

Page 2

## U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,262,433 | 4/1981 | Hagg et al. . |
| 4,267,648 | 5/1981 | Weisz . |
| 4,271,606 | 6/1981 | Rudy .................................... 36/29 |
| 4,271,607 | 6/1981 | Funck . |
| 4,314,413 | 2/1982 | Dassler . |
| 4,319,412 | 3/1982 | Muller et al. . |
| 4,342,158 | 8/1982 | McMahon et al. . |
| 4,399,621 | 8/1983 | Dassler . |
| 4,439,936 | 4/1984 | Clarke et al. . |
| 4,492,046 | 6/1985 | Kosova . |
| 4,494,321 | 1/1985 | Lawlor . |
| 4,536,974 | 8/1985 | Cohen . |
| 4,546,555 | 10/1985 | Spademan . |
| 4,559,366 | 12/1985 | Hostettler . |
| 4,566,206 | 1/1986 | Weber . |
| 4,592,153 | 6/1986 | Jacinto . |
| 4,594,799 | 6/1986 | Lin . |
| 4,598,484 | 7/1986 | Ma . |
| 4,598,487 | 7/1986 | Misevich . |
| 4,610,099 | 9/1986 | Signori . |
| 4,616,431 | 10/1986 | Dassler . |
| 4,638,575 | 1/1987 | Illustrato . |
| 4,660,299 | 4/1987 | Omilusik . |
| 4,670,995 | 6/1987 | Huang ..................................... 36/29 |
| 4,680,875 | 7/1987 | Danieli . |
| 4,680,876 | 7/1987 | Peng . |
| 4,709,489 | 12/1987 | Welter . |
| 4,715,130 | 12/1987 | Scatena . |
| 4,731,939 | 3/1988 | Parracho et al. . |
| 4,746,555 | 5/1988 | Luckanuck . |
| 4,753,021 | 6/1988 | Cohen . |
| 4,763,426 | 8/1988 | Polus et al. . |
| 4,774,774 | 10/1988 | Allen, Jr. ........................... 36/29 X |
| 4,794,707 | 1/1989 | Franklin et al. . |
| 4,798,009 | 1/1989 | Colonel et al. . |
| 4,802,289 | 2/1989 | Guldager ..................... 36/153 X |
| 4,815,221 | 3/1989 | Diaz . |
| 4,843,737 | 7/1989 | Vorderer . |
| 4,843,741 | 7/1989 | Yung-Mao . |
| 4,845,863 | 7/1989 | Yung-Mao . |
| 4,878,300 | 11/1989 | Bogaty . |
| 4,881,329 | 11/1989 | Crowley . |
| 4,887,367 | 12/1989 | Mackness et al. ................... 36/29 X |

| | | |
|---|---|---|
| 4,910,884 | 3/1990 | Lindh et al. . |
| 4,914,836 | 4/1990 | Horovitz ............................. 36/29 X |
| 4,918,838 | 4/1990 | Chang . |
| 4,936,029 | 6/1990 | Rudy ..................................... 36/71 |
| 4,956,927 | 9/1990 | Misevich et al. . |
| 4,984,376 | 1/1991 | Walter et al. . |
| 5,014,449 | 5/1991 | Richard et al. . |
| 5,068,981 | 12/1991 | Jung . |
| 5,092,060 | 3/1992 | Frachey et al. ...................... 36/29 |
| 5,138,776 | 8/1992 | Levin . |
| 5,222,312 | 6/1993 | Doyle ................................. 36/29 X |

## FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 3400997 | 7/1985 | Fed. Rep. of Germany . |
| 0465267 | 4/1914 | France . |
| 1227420 | 4/1960 | France . |
| 2556118 | 6/1985 | France . |
| 146188 | 11/1990 | Japan . |
| 1526637A1 | 12/1989 | U.S.S.R. . |
| 21594 | of 1903 | United Kingdom . |
| 7163 | of 1906 | United Kingdom . |
| 2032761A | 5/1980 | United Kingdom . |
| 2032761 | 5/1980 | United Kingdom . |
| 2173987A | 10/1986 | United Kingdom . |

## OTHER PUBLICATIONS

Elastocell ™ Microcellular Polyurethane Products, Technical Bulletin, Spring and Damping Elements made from Elastocell.

Elastocell ™ Microcellular Polyurethane Products, Material Data Technical Information, Long Term Static and Dynamic Loading of Elastocell.

FWN, vol. 40, No. 38, Sep. 17, 1990, "Marco Scatena puts spring in Athlon wearers' control".

35015 SAE Technical Paper Series, "Microcellular Polyurethane Elastomers as Damping Elements in Automotive Suspension Systems", by Christoph Prolingheuer and P. Henrichs, International Congress and Exposition, Detroit, Michigan, Feb. 25–Mar. 1, 1991.

Spring and Shock Absorber Bearing Spring Elements, Springing Comfort with High Damping.



*FIG.1*



*FIG.1b*



*FIG.1a*



FIG. 2a



*FIG.2b*



*FIG.2c*



FIG.3b



FIG.3a

*FIG. 3c*



*FIG. 3d*



### FIG. 4a



### FIG. 4b



### FIG. 4c



### FIG. 4d



### FIG.5a



### FIG.5b



### FIG.5c



### FIG.5d



### FIG.7a



### FIG.7b





FIG. 6a



*FIG.6b*



FIG. 6c



FIG.6d



FIG.6e

*FIG.8*



*FIG.9a*



*FIG.9b*

*FIG.9c*



*FIG.9d*

*FIG.9e*



*FIG.9f*





**FIG. 10a**

- DISTAL PHALANX
- DISTAL HALLUX
- MIDDLE PHALANX
- PROXIMAL PHALANX
- PROXIMAL HALLUX
- (TIBIAL) SESAMOD
- (FIBULAR) SESAMOD
- I ST METATARSAL
- 2ND CUNEFORM
- 3ND CUNEFORM
- I ST CUNEFORM
- CUBOID
- NAVICULAR
- TALUS
- CALCANEUS

64
62
60

*FIG.10b*



Case 1:04-cv-12668-RGS    Document 18-13    Filed 05/02/2005    Page 20 of 33

*FIG. IIa*



*FIG. IIb*



*FIG. IIc*

*FIG. IId*





FIG. 12

FIG. 13

FIG. 14

FIG. 16

FIG. 15



FIG.17a



FIG. 17b

FIG. 17c

Case 1:04-cv-12668-RGS    Document 18-13    Filed 05/02/2005    Page 24 of 33



FIG.18a

FIG.18b

5,353,523

1

## SHOE WITH AN IMPROVED MIDSOLE

This application is a division, of application Ser. No. 07/738,031, filed Aug. 2, 1991, now abandoned.

### BACKGROUND OF THE INVENTION

#### 1. Field of the Invention

The present invention relates to footwear, and more particularly, to an athletic shoe having improved cushioning and stability.

#### 2. Description of the Prior Art

It is known in the prior art to provide athletic shoes with a midsole made from a foam material, such as polyurethane, designed to provide for cushioning against impact, that is, attenuation of the applied load. The polyurethane materials which have been used are non-microcellular, having a non-uniform cell structure. These foam materials have a stiffness (k) which varies in dependence upon the applied load. At lower loads, the foam material is only slightly compressed, and has a low stiffness. As the applied load increases, the compression of the cushioning material increases as well, increasing the stiffness. Eventually, the cushioning material will be compressed to a maximum level such that a further increase in the applied load will not cause the material to be further compressed. At this point, for purposes of the maximum loads applied to midsoles, the stiffness of the material will approach an infinite level, that is, effectively no cushioning will be provided.

In general, during footstrike, the initial contact is made at the rearfoot lateral location, with the foot rolling towards the forward or anterior, and medial locations. The applied load increases until the maximum load is achieved, generally beneath the calcaneous. Since the magnitude and location of the applied load are not constant, it has been difficult to construct the midsole to provide a desired level of cushioning throughout the ground support phase, which includes the breaking phase and the propulsion phase, by using conventional non-microcellular polyurethane foam cushioning materials.

For example, a midsole having a predetermined thickness and therefore stiffness (at a given load) could be utilized. The stiffness may be appropriate for the range of loads experienced at the lateral rear of the shoe during footstrike. That is, at that location, the load may not exceed a level which causes maximum compression. However, at the location beneath the calcaneus, the load may exceed this level, the stiffness will approach infinity, and the wearer will experience a sudden loss of cushioning known as bottoming-out. Alternatively, if the material and thickness are designed to compensate for the maximum load, the initial stiffness experienced at the lateral rear will be too high. In addition, the thickness of such midsoles increases the weight of the shoe and reduces rearfoot stability, precluding their use in athletic shoes.

Furthermore, in prior art shoes, a particular level of midsole stiffness would be selected for a given shoe based upon the likely weight of a person wearing a given shoe size, and perhaps, the loads expected to be produced during the activity for which the shoe is designed. However, the midsole stiffness could not be adjusted to take into account weight variations between people having the same shoe size. In addition, even if a stiffness were achieved which was appropriate for a given wearer performing a given activity, the stiffness

2

could not be adjusted so as to provide an appropriate level for other activities having a different range of expected loads. For example, if a shoe were designed for running, even if the stiffness was appropriate for the weight of an "average" person having a particular shoe size, it would have a stiffness which was greater than desired for the loads expected during walking by the same "average" weight person. In addition, the shoe would be either overcushioned or undercushioned for a person having a smaller or greater than average weight, respectively.

### SUMMARY OF THE INVENTION

The present invention is directed to a shoe having an upper and a sole connected to the upper. The sole includes a midsole comprising one or more support elements made from a microcellular polyurethane-elastomer foam material. Suitable foam materials include microcellular NDI, microcellular MDI and microcellular TODI.

In a further embodiment, the midsole includes an envelope having an upper and lower plate, with the support elements disposed between the upper and lower plates.

In a further embodiment, the support elements include a plurality of hollow columns, with two of the columns disposed on each side of the sagittal plane of the shoe. The columns may have a hollow cylindrical shape.

In a further embodiment, an insert is disposed within each of the foam columns. The inserts have a height which is substantially less than the height of the column. The inserts may be gas-filled bladders, which may be adjustably inflatable. In a further embodiment, the gas-filled bladders may be inflated so as to stretch or distend the foam support element.

In a further embodiment the foam support elements include at least one annular groove disposed in the outer surface at one or more vertical positions. An elastic ring element is disposed about the support elements and is movable in the vertical direction so as to be removably disposable in the groove. The stiffness of the support elements is adjustable by selectively positioning the ring element into or out of the groove.

The present invention provides the advantage of allowing the stiffness of the midsole to correspond to the applied load as the load changes throughout the ground support phase. Overcushioning, undercushioning and bottoming-out are eliminated. Furthermore, the cushioning may be tuned to suit different wearer weights, and the use of the shoe for activities having different load ranges.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a lateral view of a shoe including a midsole according to the present invention.

FIG. 1a is a cross-sectional view along line a—a shown in FIG. 1.

FIG. 1b is a cross-sectional view along line b—b shown in FIG. 1a.

FIGS. 2a–2c are perspective views of a cushioning and stability component including a shell according to three embodiments, respectively, of the present invention.

FIG. 3a is an overhead view of the shell shown in FIG. 2 and including the rear foot bones superimposed thereon.

FIG. 3b is a side view of the shell shown in FIG. 3a.

5,353,523

3

FIG. 3c is a close-up view of a support element shown in a detent.

FIG. 3d is a close-up view similar to the view in FIG. 3c showing a second embodiment of the support element and detents.

FIGS. 4a–4d show a further embodiment of a shell for a cushioning component according to the invention.

FIG. 5a is a side view of a support element according to the present invention having a hollow cylindrical shape.

FIG. 5b is an overhead view of the element shown in FIG. 5a.

FIG. 5c is a closeup view of Circle "c" shown in FIG. 5a.

FIG. 5d is view along line d—d shown in FIG. 5b.

FIG. 6a is a graph of the load applied to a hollow support element as shown in FIG. 5 as a function of the displacement of the column.

FIG. 6b shows graphs of loads as a function of displacement for foam columns according to the present invention and the prior art.

FIG. 6c shows graphs of load as a function of displacement for a midsole having the structure shown in FIG. 2a with support elements made of microcellular NDI and a solid midsole made of non-microcellular polyurethane.

FIG. 6d is a graph showing the force as a function of the displacement percentage of the overall length for a microcellular NDI column.

FIG. 6e is a graph showing the force as a function of the displacement percentage of the overall length for a non-microcellular MDI column.

FIGS. 7a–7b are views showing a foam column having grooves in the exterior surface in conjunction with a ring removably disposable in the groove.

FIG. 8 is a side view of a cushioning and stability component in which the support elements include both inner and outer support elements.

FIGS. 9a–9f are views of support elements according to further embodiments of the invention.

FIG. 10a is a plantar view showing the bones of the foot.

FIG. 10b is a dorsal view showing bones of the foot.

FIGS. 11a–11d show a method of assembly of a shell according to the invention.

FIG. 12 is an overhead view showing a further embodiment of the cushioning and stability component including a single doughnut-shaped support element.

FIG. 13 is an overhead view showing a further embodiment of the cushioning and stability component including both a single doughnut-shaped support element and an outer element.

FIG. 14 is an overhead view showing a further embodiment of the cushioning and stability component including a plurality of hollow cylindrical elements each having a second support element disposed about the exterior thereof.

FIG. 15 is a side view of the combination of a single hollow cylindrical element and a second support element.

FIG. 16 is a side view similar to the view of FIG. 15 in which the second element is disposed in the interior of the hollow cylindrical element.

FIG. 17a is an overhead view of a cushioning and stability component according to a further embodiment of the invention.

4

FIG. 17b is a side view of an embodiment of a cushioning and stability component similar to the embodiment shown in FIG. 17a.

FIG. 17c is a close-up view of circle "C" shown in FIG. 17b.

FIG. 18a is a lateral view of the foot, showing the various planes thereof.

FIG. 18b is an underside view of the foot, showing the various planes thereof.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

With reference to FIG. 1, a shoe including a midsole according to the present invention is disclosed. Shoe 10 includes conventional upper 12 attached in a conventional manner to sole 14. Sole 14 includes midsole 18, and conventional outsole layer 20 formed of a conventional wear-resistant material such as a carbon-black rubber compound. Midsole 18 includes footframe 23, cushioning and stability component 24, midfoot wedge 40 and cushioning layer 22 made of a conventional cushioning material such as ethyl vinyl acetate (E.V.A) or conventional non-microcellular polyurethane (PU) foam extending substantially throughout at least the forefoot portion of shoe 10.

Midsole 18 includes cushioning and stability component 24 extending rearwardly approximately from the forefoot to a location adjacent the posterior portion of cushioning layer 22. Cushioning and stability component 24 includes shell or envelope 26 having upper and lower plates 28 and 30, and a plurality of compliant elastomeric support elements 32 disposed therebetween. In a preferred embodiment, elements 32 have the shape of hollow cylindrical columns as shown in FIGS. 5a–5d, or partitioned columns, that is, hollow columns with cavities extending inwardly from each planar end surface, as shown in FIG. 9a.

Shell 26 may be made from nylon or other suitable materials such as BP8929-2 RITEFLEX ™, a polyester elastomer manufactured by Hoechst-Celanese of Chatham, N.J., or a combination of nylon having glass mixed therewith, for example, nylon with 13% glass. Other suitable materials would include materials having a moderate flexural modulus that is, semi-rigid, and exhibiting high resistance to flexural fatigue. Support elements 32 are made from a material comprising a microcellular polyurethane, for example, a microcellular polyurethane-elastomer based on a polyester-alcohol and naphthalene-1,5-diisocyanate (NDI), such as the elastomeric foam material manufactured and sold under the name ELASTOCELL ™ by BASF Corporation of Wyandotte, Mich. Other suitable polyurethane materials such as a microcellular polyurethane-elastomer based on a polyester-alcohol and methylenediphenylene-4,4'-diisocyanate (MDI) and a microcellular polyurethane-elastomer based on a polyester-alcohol and bitolyene (TODI) may be used. These materials exhibit a substantially uniform cell structure and small cell size as compared to the non-microcellular polyurethanes which have been used in the prior art.

By utilizing microcellular polyurethanes, several advantages are obtained. For example, microcellular polyurethanes are more resilient, and thereby restore more of the input energy imparted during impact than non-microcellular polyurethanes. Furthermore, microcellular polyurethanes are more durable. This latter fact combined with the fact that the deflection of a foam column made from microcellular polyurethanes is more

5,353,523

5

predictable than for non-microcellular polyurethanes allows the midsole to be constructed so as to selectively distribute and attenuate the impact load. This distribution of the load results in a midsole which provides a desirable level of cushioning thoughout a ground support phase, without overcushioning or undercushioning at any location. These advantages are explained further below.

With reference to FIGS. 18a and 18b, various planes are shown with reference to a foot. Reference to these planes as applied to a shoe and the axes defined thereby will be made throughout the description. The sagittal plane is the vertical plane that passes through the shoe from back to front and top to bottom, dividing it into a medial and lateral half and is shown as reference numeral 60. The frontal plane is the vertical plane that passes through the shoe from top to bottom and side to side dividing it into anterior and posterior halves, and is shown as reference numeral 62. The transverse plane is the horizontal plane that passes through the body from side to side and back to front dividing it into an upper and lower half, and is shown as reference numeral 64. The anterior-posterior axis is the intersection of the transverse and sagittal planes. The superior-inferior axis is the intersection of the sagittal and frontal planes. The medial-lateral axis is the intersection of the transverse and frontal planes.

With further reference to FIGS. 2a and 3a–3b, shell 26 includes upper and lower plates 28 and 30 which define an interior volume. Shell 26 serves to increase torsional rigidity about the anterior-posterior axis of the shoe. Additionally, shell 26 helps distribute the load between support elements 32, and thereby helps to control foot motion and provide foot stability. In the FIG. 2a embodiment, upper and lower plates 28 and 30 are joined such that shell 26 has the shape of a generally closed oval envelope. This embodiment has the advantages of ensuring that all of the columns are loaded substantially axially during footstrike, and of providing a torsional restoring moment to upper plate 28 with respect to lower plate 30 when the foot is everted or inverted. Thus, stability is enhanced, making this embodiment particularly useful in running shoes. In addition, the closed envelope limits the load on the adhesives which secure support elements 32 to shell 26, that is, the drawbacks associated with having only the small surface of the support elements for use as adhesive surfaces are avoided. Midfoot wedge 40 is disposed at the front of shell 26 and prevents total collapse of the shell structure at this region, which would cause a loss of midfoot support.

Alternatively, upper and lower plates 28 and 30 need not be joined and could take the form of unconnected upper and lower plates, or could be joined in only one portion, for example, the front or back, as shown in FIGS. 2b and 2c. This embodiment has the advantage of reducing shoe weight and the complexity of the manufacturing operation. As a further alternative, shell 26 could have the shape shown in FIGS. 4a–4d, in which shell 26' includes diagonal crossing member 33 extending between upper and lower plates 28' and 30'. This embodiment has the advantage of increasing torsional and lateral rigidity of the midsole and reducing the size of and thus the weight associated with support elements 32 and is particularly useful in creating a midsole with particularly low energy losses and low weight.

With reference to FIGS. 5a–5c, a first embodiment of support elements 32 are shown. Support elements 32

6

may have an overall hollow cylindrical shape and may have smooth exterior surfaces. Alternatively, the outer surface may be escalloped, that is, support elements may include spaced grooves 32a formed in the exterior surface. Support elements 32 may be made from the elastomeric foam materials discussed above such as microcellular ELASTOCELL ™ or other microcellular elastomeric materials having the same properties.

As shown in FIGS. 2a–2c, four support elements 32 may be disposed between the upper and lower plates. Elements 32 are generally disposed in a rectangular configuration, with a pair of anterior lateral and medial elements and a pair of posterior lateral and medial elements. Elements 32 are secured to the upper and lower plates by a suitable adhesive such as a solvent based urethane adhesive. Elements 32 are positioned within raised circular detents 34, which are disposed on upper and lower plates 28 and 30 and abut the outer cylindrical surface of elements 32. As shown in FIG. 3d, inner detents 34' also may be provided to abut the inner surface of the elements. The provision of four detents for four support elements is shown as an example only, and more or less support elements could be used within the scope of the invention.

Preferred embodiments for the exact positioning of elements 32 are disclosed below in Table A. As shown, two detents 34 may be disposed on either side of the sagittal plane. In order to maximize the cushioning, it is desirable that no support element be disposed directly beneath the calcaneus, and as shown in FIG. 3a, detents 34 may be located such that the midpoint of elements 32 generally corresponds with the center of the plantar surface of the calcaneus, which is the location of the greatest vertical load, and which is shown as reference numeral 33 in FIG. 3a. As measured along an anterior-posterior axis, the center point is located at approximately 15% of the length of the foot as measured from the posterior-most aspect of the heel parallel to a line tangent to the medial-most edges of the heel and forefoot, as shown in FIG. 18b. In addition, as shown in FIGS. 1a and 1b, cushioning layer 22 is also not disposed directly beneath the calcaneus, substantially throughout the region located above the space between elements 32 and may be eliminated entirely throughout most or all of the region above shell 26.

With reference to Table A, each of the four embodiments of envelope disclosed therein is used in one of the four ranges of men's shoe sizes shown in the table, and the three ranges of women's shoe sizes which correspond to the first three men's size ranges. The measurements are in millimeters and are defined as follows: WIDTH is the width of the envelope at the rear; LENGTH is the overall length of the envelope; HEIGHT is the height of the envelope measured from the lowermost surface of the lower plate to the uppermost surface of the upper plate; DIST. TO CALCANEUS is the distance along the anterior-posterior axis from the rear of the envelope to the center of the calcaneus for the particular foot size shown; AXIAL DIS. REAR COLS. is the distance along the anterior-posterior axis from the rear of the envelope to the center of the rear columns; AXIAL DIST. FOR. COLS. is the distance along the anterior-posterior axis from the rear of the envelope to the center of the forward columns; SAG. PLANE REAR COLS. is the perpendicular distance from the sagittal plane to the center of the rear columns; and SAG. PLANE FOR. COLS. is the per-

5,353,523

**7**

pendicular distance from the sagittal plane to the center of the forward columns.

TABLE A

| SIZE RANGE | M4-M6 W5½-W7½ | M6½-M8½ W8-W10 | M9-M11 W10½-W12½ | M11½-M15½ |
|---|---|---|---|---|
| WIDTH | 40.8 | 42.5 | 44.4 | 47.4 |
| LENGTH | 137.5 | 147.1 | 156.5 | 168.8 |
| HEIGHT | 27.4 | 27.7 | 27.7 | 27.7 |
| DIST. TO CALCA-NEUS | 57.4 (Mens 5) | 60.5 (Mens 7) | 65.2 (Mens 9) | 70.8 (Mens 12) |
| AXIAL DIS. REAR COLS. | 35.7 | 38.9 | 40.4 | 40.5 |
| AXIAL DIST. FOR. COLS. | 73.1 | 79.6 | 87.5 | 94.5 |
| SAG. PLANE REAR COLS. | 17.7 | 18.1 | 19.7 | 22.0 |
| SAG. PLANE FOR. COLS. | 18.8 | 19.6 | 20.3 | 22.6 |

For the men's 4–6/women's 5½–7½ embodiment of shell 26, detents 34 measure 26.4 mm in inner diameter, 28.3 mm in diameter at the outer surface of the uppermost extension of detent 34, and 30.3 mm in diameter as measured at the base of detent 34. The corresponding measurements for the remaining embodiments are 29.6 mm. 31.5 mm and 33.5 mm.

As discussed above, during a footstrike, the initial contact is made at the rearfoot lateral location, with the foot rolling anteriorly and medially. Thus, the initial load is supported primarily by the rear lateral element 32, with the load progressively transferred anteriorly and medially to the other elements, as the foot pronates. Since each of support elements 32 is fixed to upper plate 28, the plate serves to distribute the load among the support elements. Lower plate 30 also distributes the impact. Accordingly, during initial impact at footstrike, when the load is minimal, the foot is supported almost entirely by the stiffness of the rear lateral column. This stiffness will be sufficient to provide adequate cushioning throughout the initial period of the footstrike. Since at the time of initial impact, the other support elements 32 are not significantly compressed, the overall stiffness of midsole 18 is substantially equal to the stiffness of the rear, lateral column. Thus, the feel of midsole 18 will not be stiffer than desired during the initial footstrike.

After the initial impact, the other support elements 32 will be compressed to a greater degree, due to the anterior and medial movement of the load as well as the distribution of the force provided by upper plate 28 and lower plate 30. Thus, the other elements will contribute to the overall stiffness of midsole 18 to an increasing degree as they are compressed. Therefore, when maximum load is achieved, the overall stiffness of midsole 18 will be sufficient to provide adequate cushioning, without requiring excessive stiffness at the initiation of footstrike. Since the load is gradually distributed from the lateral rear column to the other support elements 32, the increase in stiffness corresponds to the increase in load, such that the wearer does not experience bottoming-out. In addition, no support element is provided directly beneath the center of the calcaneus, ensuring that the maximum load will be distributed away from the calcaneus and to each of the support elements. This arrange-

**8**

ment also increases attenuation of impact load, in a manner consistent with the disclosure of U.S. Pat. No. 4,439,936 to Clarke et al, hereby incorporated by reference.

The use of microcellular as opposed to non-microcellular polyurethane foam for the columns allows for the gradual increase in stiffness to be obtained without having the stiffness be too great or small at the location of the initial impact. It has been experimentally determined that for the average runner, a stiffness on the order of 70–100 N/mm is desired at the time of maximum loading. At the time of initial impact, a stiffness on the order of 20 N/mm is desired. FIG. 6a is a graph of the load applied to a hollow support element as shown in FIG. 5 as a function of the displacement of the column, that is, the vertical compression. The column is made of microcellular NDI and has a height of 25.4 mm and a density of 0.423 g/cm³. As the column is subjected to increasing load, it continues to compress to support the load, to a greater degree than with prior art materials. In addition, the column does not undergo a sudden increase in stiffness such as would cause the column to bottom-out.

With further reference to FIG. 6b, the advantage provided by the use of microcellular columns as opposed to non-microcellular columns will be explained. In FIG. 6b, the graphs of loads as a function of displacement are shown for a column made of microcellular NDI ("Elasto") and having a density of 0.44 g/cm³, as well as columns made of non-microcellular MDI (PU) and having densities of 0.26, 0.35 and 0.45 g/cm³. The columns each have a height of 25.4 mm, an outside diameter of 29.2 mm and an inside diameter of 18.5 mm. As can be seen, the MDI columns cease to undergo additional compression with increasing loads at loads which are much lower than the loads at which the NDI columns cease to undergo additional compression. For example, all of the non-microcellular tested materials cease to undergo additional compression at approximately 80N, at a displacement of under 6 mm. However, a column made of microcellular NDI having nearly the same density does not cease to undergo additional compression until a load of over 200N is applied, at a corresponding displacement of 9–10 mm.

The loads applied to the midsole at the lateral rear location during initial impact can easily exceed a level which will cause the conventional polyurethane columns to cease undergoing additional compression before the load is transferred forwardly and medially to the other columns. Since the column made from microcellular NDI does not cease to undergo additional compression until a much greater load is applied, support is provided throughout the period of initial contact until the load is transferred to the remaining columns. That is, as the load at the lateral rear increases, the lateral rear column will continuously compress to support the load. By the time the load reaches a level at which the column will not undergo additional compression with increasing load, the load will be distributed to the other columns. Thus, the use of microcellular NDI simultaneously achieves the goals of low initial stiffness at the lateral rear to correspond to lower initial loads, increasing stiffness to correspond to increasing loads, and avoidance of bottoming-out during the ground support phase.

These goals cannot be achieved simultaneously with the non-microcellular polyurethane, even if the four

5,353,523

| 9 | 10 |

column design were used. If the columns had the densities shown in FIG. 6b, the wearer would experience bottoming out, at least at the lateral rear location, since the load at which the material would cease to undergo additional compression is under 80N. Thus, distribution of the load will not occur before the load exceeds the support capability of the lateral rear column. Alternatively, in order to allow for continuous compression throughout a higher range of loads, the initial stiffness would have to be greatly reduced. Thus, the midsole would feel mushy, and the height of the columns would have to be greatly increased, resulting in instability.

FIG. 6c shows graphs of load as a function of displacement for two midsoles having the structure shown in FIG. 2a with support elements made of microcellular NDI and two midsoles made of solid non-microcellular polyurethane. As can be seen, the curves for the present invention are more linear than the curves of the prior art, that is, the midsoles according to the present invention continue to undergo compression at increased loads throughout a greater range than in the prior art. Thus, the stiffness continually increases to support the increasing load, and bottoming-out can be avoided throughout substantially the entire range of compression of the midsole.

Furthermore, the durability of the microcellular foam is superior to non-microcellular polyurethane foams which have previously been used for cushioning. For example, after repeated compression, elastomeric foams will undergo some degree of permanent setting, that is, the foam element will remain compressed to a certain degree even when the load is removed. The compression of a microcellular foam element as a percentage of height is much lower than non-microcellular foams. In addition, after repeated compression, the vertical displacement of the foam element as a function of force, that is, the stiffness of the foam element, will be decreased such that for a given applied load the displacement of the element is increased after repeated use. In other words, the element will undergo greater compression for a given load. Thus, after repeated use, a foam midsole will not be able to support as great a load before reaching maximum compression, such that it is more likely to undergo bottoming-out. Once again, this change in stiffness is much greater for non-microcellular polyurethane foams used in the prior art than it is for microcellular foams.

A further advantage provided by the use of microcellular polyurethane as opposed to non-microcellular polyurethane is evident from the graphs of FIGS. 6d and 6e, which shows the force as a function of the displacement percentage of the overall length for a microcellular NDI column and a non-microcellular MDI column, respectively. The upper part of each graph represents the compression by an applied load and the lower part represents the decompression as the load is removed. In each case, the percentage of compression for a given load is higher as the load is removed, indicating a loss of energy during the impact. However, the energy loss is much greater for the non-microcellular MDI than it is for the microcellular NDI. In particular, the non-microcellular MDI has a 56% energy loss as compared to a 37% energy loss for the microcellular NDI.

Accordingly, it can be seen that a midsole according to the present invention which includes a plurality of hollow elements constructed from a microcellular foam material such as ELASTOCELL® NDI improves

over the prior art non-microcellular polyurethane foams by providing a lower stiffness at the location of the initial impact which corresponds to lower initial loads, and a smooth transition to a much higher stiffness corresponding to the maximum load which is achieved beneath the calcaneous, with the higher load distributed throughout the rear of the midsole. In addition, the desired stiffnesses are achieved in a manner which avoids bottoming-out throughout the ground support phase, without increasing the weight and initial stiffness of the midsole beyond a desired level.

It has been experimentally determined that in general, the best rearfoot control characteristics are obtained with elastomeric support elements of the preferred embodiment having a density ranging from 0.25–0.65 g/cm$^3$, and in particular, a density of 0.41 g/cm$^3$, and a height range of 15–35 mm, with a consistent height and density used for all of the support elements. Of course, in practice, one or more of the support elements could have a different height and/or density. Table B discloses linear sizes and density ranges of preferred embodiments of support elements 32. The linear measurements are given in millimeters, the weight ranges are given in grams and the densities are given in grams/cm$^3$. The inside diameter is the diameter of the circular opening. The first measurement for the outside diameter represents the diameter as measured at the base of a groove 32a, as shown in FIG. 5c, and the second measurement represents the diameter as measured at the outermost surface of the column. Preferably, support element embodiment C is used for the men's 4–6/women's 5½–7½ embodiment of the shell as shown in Table A. Support element embodiment A is used for all other embodiments of the shell. In addition, embodiment A preferably is used in men's running shoes. Embodiment B preferably is used in men's cross-training shoes. Embodiment C preferably is used in women's running shoes. Embodiment D preferably is used in women's cross-training shoes

**TABLE B**

| EM-BODI-MENT | HEIGHT | INSIDE DIAMETER | OUTSIDE DIAMETER | DENSITY RANGE |
|---|---|---|---|---|
| A | 25.4 | 14.7 | 27.2–29.2 | 0.407–0.441 |
| B | 20.1 | 14.7 | 27.2 29.2 | 0.407–0.441 |
| C | 25.4 | 10.5 | 24.0 26.0 | 0.334–0.373 |
| D | 20.1 | 10.5 | 24.0 26.0 | 0.334–0.373 |

As discussed above, the outer surface of support elements 32 may be escalloped and include a plurality of spaced grooves 32a. In general, the overall force deflection curve of the support elements can be altered by geometry changes, that is, alteration of the outer or inner diameter when the support elements are in the form of hollow columns, or the use of escalloped surfaces, or by changing the density. The use of an escalloped outer surface provides the advantage that large vertical compressions are facilitated by the pre-wrinkled shape, that is, the columns tend to be deflected more vertically. If the columns are designed with straight walls rather than escalloped walls, the tendency of the column to buckle is greater. Buckling of the columns is associated with a sudden change in the force-deflection curve. Thus, the shapes and sizes of the grooves can be selected to construct a column having a

5,353,523

11

more linear compression as a function of applied force than columns having straight surfaces.

Since the stiffness is determined substantially by the density, dimensions and surface contours of the support elements as well as their location in the envelope, these factors can be adjusted to preclude any abrupt changes in stiffness and bottoming-out for typical loads and the likely maximum applied force. In addition, by selecting the relative locations of the support elements, the cushioning for each shoe size can be approximately tuned to a desired level of stiffness for a selected range of forces, while providing maximum rearfoot control. The exact determinations would be made by determining the level of force which would be applied by wearers likely to have body weights in a range corresponding to a given shoe size, and taking into account the stability requirements of the activity for which the shoe is designed to be used. For example, most runners apply a maximum vertical force of about 2.4 times body weight during steady long-distance running, and this factor would be considered in designing a running shoe for a runner of normal weight. Such determinations can be made by one skilled in the art without undue experimentation.

Furthermore, as shown in FIG. 7, the compliance of the columns and the overall stiffness of the midsole can be made adjustable by the provision of elastomeric rings 36 in grooves 32*a*. Rings 36 can be slid to fill the grooves to adjust the compliance as desired. Generally, as the grooves are filled with the ring, the compliance of each individual support element is stiffened. In this manner, the wearer can individually tune the stiffness of the midsole to his own requirements, taking into account body weight and the activity for which the shoe will be used. Rings 36 may be made from rubber or urethane elastomer.

With reference to FIG. 8, a further embodiment is shown in which internal element 42 is disposed within the hollow area of support element 32, which as shown in this example have the form of hollow columns. Element 42 may comprise a cylindrical bladder filled with a gas and in one embodiment may be loosely fitted into the hollow circular area of support elements 32, that is, bladders 42 are distinct from and are not attached to support elements 32. Bladders 42 may be filled with air. In a preferred embodiment in which the column dimensions are as shown in TABLE B, bladders 42 have a height of 15 mm, and an outside diameter of 10.5 mm for the the men's 4–6 embodiment and 14.7 mm for the other embodiments. Alternatively, bladders 42 may be made of the types of materials and filled with the types of gases disclosed in U.S. Pat. No. 4,183,156 to Rudy, hereby incorporated by reference. As disclosed in this patent, a preferred material for the bladders is a cast or extruded ether base polyurethane film having a shore "A" durometer hardness in the range of 80–95, e.g., TETRA-PLASTICS TPW-250. Preferred gases for use in the bladders are hexafluorethane (e.g., Freon F-116) and sulfur hexafluoride.

Since bladders 42 are not connected to support elements 32 and have a height less than that of support elements 32, they will not affect the stiffness during the application of normal loads due to the fact that elements 32 will not be compressed to the level of bladders 42. However, bladders 42 compensate for loads which deviate from the norm and thus ensure the provision of adequate cushioning for various activities. For example, a shoe may be designed for both walking and running, and the normal expected load on the midsole would be

12

the load experienced during walking. As discussed above, support elements 32 would be designed to provide a desired level of cushioning and stability control for the light loads experienced during walking, and during walking, elements 32 would not be compressed to a level where the height of the elements was less than the height of bladders 42. Therefore, bladders 42 would not be compressed and would have no effect on cushioning.

When the shoe is worn during running, greater loads would be experienced. These loads would cause compression of external elements 32 to a height less than the height of bladders 42. Thus, both bladders 42 and elements 32 would support the load, and the stiffness of bladders 42 would be added to the stiffness of elements 32 in order to provide the proper cushioning. By appropriately selecting the dimensions of the inner and outer elements, as well as the material of the inner element (air bladder or a post made of the same or a different cushioning material,) a single shoe can be designed to provide a desired level of cushioning for more than one activity.

The use of the internal post or bladder also compensates for people who may be heavier than normal for their shoe size. Heavier individuals may cause the loads developed on the midsole to exceed the expected load during normal activity. These loads may cause the compression of the outer element to exceed the threshold, and result in bottoming out. The use of both the inner and outer elements provides the desired cushioning and helps preclude bottoming-out in this situation by providing a greater stiffness during normal activity for heavier individuals since both the inner and outer elements will be engaged. Thus, the stiffness will not be too soft for heavier individuals during lighter activities. However, by providing both an inner and outer element which are not connected to each other, the stiffness will not be too large for normal sized individuals since during lighter activity the outer element will not be compressed to a height less than the inner element.

Accordingly, the provision of inner elements 42 provides adequate cushioning for individuals of normal weight for activities which provide a variety of loads on the midsole. In addition, elements 42 compensate for the greater loads provided by heavier individuals during even light activity. Essentially, the use of a second element such as an inner post allows for a greater degree of tuning than is possible with just one element, since one element can be designed to provide adequate cushioning for the typical loads associated with one particular activity, while the second element, acting in parallel with the first element, can be designed to cushion for the higher loads associated with a second activity. In addition, the range of tuning of the cushioning can be adjusted by the individual wearer to suit his individual needs in several ways. For example, where the second element is an air bladder, the stiffness of the bladder can be adjusted by changing the inflation pressure thereof through a fill inlet disposed through the elastomeric element, as shown in FIG. 16. Alternatively, the inflation of the air bladder can be adjusted concurrently with movement of the ring elements to achieve a desired stiffness. In addition, the height of the second element can be adjusted, for example, by disposing a screw element at the bottom of the second element and a corresponding receiving element on the bottom plate.

As shown, insert bladders 42 may extend for approximately 60% of the height of column 32. Other heights

13
5,353,523
14

may be used as well, as a matter of design choice. Although insert elements 42 are disclosed as cylindrical gas-filled bladders, it is foreseeable that other materials such as conventional foam, gels, liquids or plastics could be used in combination. In addition, elements 42 could be made from the microcellular materials disclosed above having either the same or different density.

With reference to FIGS. 14–15, air bladder 142 may be formed in the shape of a hollow cylindrical column and disposed externally of foam column element 32, which is bonded to upper plate 28 and lower plate 30. Air bladder 142 is inflated to a pressure which causes its height to exceed the unloaded height of foam column element 32. Thus, foam column element 32 is in tension even when no external load is applied by a wearer, which causes foam column element 32 to be stretched beyond its relaxed height. Midsole 18 may be tuned to a particular stiffness by selecting the level of inflation of the bladder. Since both the air bladder and column will be compressed simultaneously throughout the ground support phase, each column/air bladder combination will have only one characteristic stiffness. However, this embodiment is particularly useful for tuning since each combination can be given a desired stiffness simply by adjusting air bladder pressure. Thus, the overall stiffness of the midsole can be adjusted for a given activity or wearer weight. In addition, each column/bladder combination easily can be given a different stiffness in accordance with the preference of the user.

As shown in FIG. 16, bladder 342 also can be disposed within the hollow region of column 32, with filler inlet 344 provided through the column element 32 for adjusting the inflation pressure. This embodiment provides puncture resistance for bladder 342 and ensures foam column element 32 will compress in an axially symmetric manner. Of course, filler inlet 344 could be disposed at other locations of bladder 342. For example, the filler inlet could be accessed from a superior or inferior position through an opening in the upper and lower plates of shell 26.

With reference to FIG. 17a, a further embodiment of the cushioning component is shown. Cushioning component 26″ includes holes 35 formed through upper plate 28 at the locations of the centers of detents 34″. Holes 35 allow gas bladders 444 to be removably disposed therethrough. The shape of detents 34″ including holes 35 is shown more clearly in FIGS. 17b and 17e, in which holes 35 are formed through lower plate 30. In the embodiment shown in FIG. 17a, access to holes 35 for removal and replacement of bladders 444 is gained by lifting the sock liner which is disposed above conventional cushioning layer 22. Corresponding holes would also be formed through layer 22 if necessary. In the embodiment shown in FIGS. 17b and 17c, holes 35 are formed through lower plate 30, and coresponding holes would be formed through outsole layer 20. In both cases, the stiffness of the midsole easily can be tuned by the wearer simply by removing the bladder and replacing with another bladder, for example, an air bladder inflated to a different pressure and/or having a different height. Alternatively, a second foam element can be inserted in the hollow region of support element 32, or the hollow region can be left unfilled.

With respect to FIGS. 9a–9f, alternative configurations for support elements 32 are shown. FIGS. 9a and 9b disclose support element 132 having the shape of a column having cavity 134 extending inwardly from each planar surface and terminating at partition 136,

thereby forming an element having an "H-shaped" cross-section. Cavities 134 have a circular shaped cross-section, with the radius of the cross-section slightly decreasing in the direction towards partition 136. This design reduces the length of the column which is hollow, and prevents buckling, thus allowing a deflection-force curve with a more substantially linear region and like working range than is the case for the simple hollow cylinder shown in FIG. 2a. If desired, inner elements 42 could be inserted in cavities 134.

As shown in FIGS. 9c and 9d, support element 232 is similar to column element 132 having cavities 134, and further includes integrally formed foam webs 238 disposed in cavities 234 and extending from partition 136. Foam webs 238 have an "x-shaped" cross-section, and further reduce the buckling tendency of support elements 132 under large vertical compressions. With reference to FIGS. 9e and 9f, support element 332 is similar to support element 132, but is molded to have a barrel-shaped exterior surface. Once again, the shape of element 332 serves to preserve the linearity of the deflection-force curve by an axisymmetric deformation pattern at high loads.

A further alternative embodiment for the support element is shown in FIG. 12. Support element 232 is essentially doughnut-shaped, and extends substantially throughout the rearfoot area of the midsole. The central hole of the doughnut is disposed beneath the center of the calcaneus. The initial load is supported on the lateral rear portion of element 232, and then moves anteriorly and medially during the breaking portion of the ground support phase. Thus, the stiffness of the midsole would increase to compensate for the increasing load, as described above with respect to the four column embodiment. With reference to FIG. 13, the use of support element 232′ with air bladder 242 is shown. Air bladder 242 is shown as surrounding support element 232′, but could also be disposed within the central hole. In either case, air bladder 242 could be inflated to a height which would cause element 232 to be stretched even when no load is applied by a wearer.

With reference to FIGS. 10a and 10b, a plantar and a dorsal view, respectively, of the bones of the foot are shown. For purposes of description, the dashed lines in the Figures approximately divide the foot into three distinct reference zones. Rearfoot zone 60, commonly known as the heel, substantially contains the talus and calcaneus, that is, rearfoot zone 60 extends from the rear of the foot to a location generally forward of the calcaneus and talus, and rearward of the navicular and cuboid. Midfoot zone 62, commonly known as the arch, substantially contains the navicular, cuboid and the first, second and third cuneiforms and a portion of the base of the lateral metatarsals, that is midfoot zone 62 extends from the border of rearfoot zone 60 to a location generally rearward of the metatarsal heads. Forefoot zone 64, commonly known as the ball and toe area substantially contains the five metatarsal heads, as well as the phalanges and sesmoids. That is, forefoot zone 64 extends from the border of midfoot zone 62 to the forward end of the foot. This division of the foot into three zones or portions must of course be an approximation due to the irregular shapes and partial overlap of some of the bones.

In a preferred embodiment of the invention, as shown in FIG. 1, cushioning and stability component 24 extends from the rear of the shoe to approximately the posterior border of the forefoot zone, that is, for about

5,353,523

15

50% of the length of the shoe. As shown in FIGS. 10a and 10b, in this embodiment cushioning and stability component 24 would be disposed in both rearfoot zone 60 and midfoot zone 62 of the shoe. This embodiment is useful for allowing the sole to flex at the metatarsal-phalangeal joint. In this embodiment, if the shoe were size 9 men's, the overall length of the shoe would be 29 cm and the length of cushioning and stability component 24 would be approximately 15 cm. The same proportions could be used for other size shoes. However, cushioning and stability component 24 could extend throughout only rearfoot zone 60. Alternatively, cushioning and stability component 24 could extend throughout the entire region between outsole 20 and upper 12 so as to include all of the rearfoot zone 60, midfoot zone 62 and forefoot zone 64, with layer 22 of conventional cushioning material completely eliminated, or disposed above only a portion of cushioning and stability element 24. This embodiment would be useful for extending the special cushioning properties of the present invention under the forefoot. Although only three embodiments of the cushioning component 24 are discussed, cushioning components which occupy any desired portion of the midsole area are within the scope of this invention.

In the present invention, adequate cushioning is provided without undesirably increasing the weight of the shoe. In a prior art shoe, where conventional polyurethane is used, 100% of the midsole will be filled with foam. By use of a midsole according to the present invention, less than approximately 40% of the shell will be occupied by solid cushioning material. Thus, a correspondingly reduced percentage of the overall midsole area will be occupied by solid cushioning material. These figures are shown in TABLE C for four preferred embodiments, utilizing the embodiments of shell 26 disclosed in Table A. In TABLE C, the volumes are expressd in cm³, with COLUMN representing the total volume of four hollow foam column elements 32; WEDGE representing the volume of midfoot wedge 40, INNER ELEMENT representing the volume of an inner air bladder such as bladder 344, SHELL representing the total volume enclosed by shell 26; and PERCENT representing the percent of the shell occupied by all of the elements disposed within, that is, the foam column, air bladder and the wedge.

TABLE C

| SIZE RANGE | M4–M6 W5½–W7½ | M6½–M8½ W8–W10 | M9–M11 W10½–W12½ | M11½– M15½ |
|---|---|---|---|---|
| COLUMN | 43.36 | 48.70 | 48.70 | 48.70 |
| INNER ELE-MENT | 5.195 | 10.183 | 10.183 | 10.183 |
| WEDGE | 22.200 | 25.287 | 28.690 | 36.199 |
| SHELL | 184.867 | 210.575 | 238.913 | 301.442 |
| PERCENT | 38.27 | 40.01 | 36.69 | 31.57 |

As shown in TABLE C, all of the support elements together, along with the inner elements and the midfoot wedge occupy less than 60% of the volume defined by the shell. Thus, a correspondingly reduced percentage of the entire volume of the midsole is ooccupied by solid material (including air bladders), as compared to the prior art in which 100% of the same area would be occupied by conventional polyurethane. In the present invention, adequate cushioning would be provided in the desired range of stiffness with support elements 32 disposed so as to occupy between 5–50% of the volume of the space contained in the region defined between the

16

inferior aspect of the shoe upper as defined by the lasting margin and the outsole or ground engaging member and including both the midfoot and rearfoot, that is, the space defined for cushioning component 24. Both the extent of the space between the upper and lower plates which is occupied by foam or other solid matter, and the extent to which the cushioning and stability component extends throughout the midsole region would be a design choice.

With reference to FIGS. 11a–11d, a method for assembly of one embodiment of cushioning and stability component 24 is shown. Shell 26 is molded as a nearly flat piece having a thin central region 26a and thicker end regions 26b. Detents 34 are formed on the surface of thin central region 26a. Regions 26b include hinge elements 100 and 101. Hinge element 100 is a hollow cylinder cut away to form hollow alternating steps which serve as pin holes, as shown in FIG. 11c. Hinge element 101 is also a hollow cylinder and includes corresponding alternating steps which mate with the steps of hinge element 100.

With reference to FIGS. 11b–11c, shell 26 is heated to a temperature which renders it soft so that it may be folded over steel forming element 102, which forms the rear portion of shell 26 into a desired curved shape and simultaneously brings hinge element 100 into a position adjacent hinge element 101. With reference to FIG. 11d, support elements 32 are secured into detents 34, for example, by cement, and hinge element 100 is brought into alignment with hinge element 101. A restraint 103, for example, a steel pin or metallic tube is pushed in place through the hollow alternating steps to secure the ends of shell 26 and thereby form a closed loop. If it is not desired that shell 26 have a closed loop, the last step of securing the hinge elements need not be performed.

The formation of shell 26 in the manner discussed above results in a shell having substantially one or both ends with a relatively large radius, that is, the ends are substantially rounded. This construction allows for unrestricted compressive motion of the support elements. If the shell were constructed to have ends which were less rounded, the result would be the formation of substantially planar vertical walls located near the support elements. This structure would undesirably alter the compressive characteristics of the support elements, as well as increase the stress on the shell itself and thus the possibility of failure. In order to reduce the possibility of failure, the material from which the shell is constructed would have to be stronger, adversely affecting the pattern of deflection of the support elements.

This invention has been disclosed with reference to the preferred embodiments. These embodiments, however, are merely for example only and the invention is not restricted thereto. It will be understood by those skilled in the art that other variations and modifications easily can be made within the scope of this invention as defined by the appended claims.

We claim:

1. A shoe having an upper and a sole connected to said upper, said sole including an outsole and a midsole, said midsole comprising a layer of resilient material and a substantially open space defined by an upper boundary and a lower boundary, a two-element cushioning component disposed within said open space between said upper boundary and said lower boundary and including a first compressible cushioning element made of a resilient material having an open space and a second

5,353,523

17

compressible cushioning element comprising a pressurized bladder disposed within the open space of said first compressible element, an upper surface of said first compressible element secured at the location of said upper boundary, wherein, said open space between said upper boundary and said lower boundary is maintained substantially about said two-element cushioning component.

**2.** The shoe recited in claim **1,** further comprising an upper plate disposed so as to define the upper boundary of the open space and a lower plate disposed so as to define the lower boundary of the open space, the upper surface of said first compressible element secured to said upper plate.

**3.** The shoe recited in claim **2,** said first compressible element having a predetermined relaxed height which is substantially equal to the height of said open space between said upper plate and said lower plate, said bladder pressurized so as to have a height which exceeds said predetermined relaxed height and thereby causing said first compressible element to be stretched beyond said predetermined relaxed height.

**4.** The shoe recite in claim **2,** said upper plate comprising a semi-rigid material.

**5.** The shoe recited in claim **1,** said bladder containing a pressurized gas.

**6.** The shoe recited in claim **1,** said bladder containing a gel.

**7.** The shoe recited in claim **1,** said bladder containing a liquid.

**8.** The shoe recited in claim **1,** said resilient material comprising an elastomeric foam material.

**9.** The shoe recited in claim **8,** said foam material comprising a microcellular polyurethane.

**10.** A shoe having an upper and a sole connected to said upper, said sole including an outsole and a midsole, said midsole comprising a layer of resilient material and a substantially open space defined by an upper boundary and a lower boundary, a two-element cushioning

18

component disposed within said open space between said upper boundary and said lower boundary and including a first compressible cushioning element comprising a pressurized bladder having an open space and a second compressible cushioning element comprising a resilient material disposed within the open space of said bladder, an upper surface of said second compressible element secured at the location of said upper boundary, wherein, said open space between said upper boundary and said lower boundary is maintained substantially about said two-element cushioning component.

**11.** The shoe recited in claim **10,** said resilient material comprising an elastomeric foam material.

**12.** The shoe recited in claim **11,** said foam material comprising a microcellular polyurethane.

**13.** The shoe recited in claim **10** further comprising an upper plate disposed so as to define the upper boundary of the open space and a lower plate disposed so as to define the lower boundary of the open space, the upper surface of said second compressible element secured to said upper plate.

**14.** The shoe recite in claim **13,** said upper plate comprising a semi-rigid material.

**15.** The shoe recited in claim **13,** said second compressible element having a predetermined relaxed height which is substantially equal to the height of said open space between said upper plate and lower plate, said bladder pressurized so as to have a height which exceeds said predetermined relaxed height and thereby causing said second compressible element to be stretched beyond said predetermined relaxed height.

**16.** The shoe recited in claim **13,** said bladder containing a pressurized gas.

**17.** The shoe recited in claim **13,** said bladder containing a gel.

**18.** The shoe recited in claim **13,** said bladder containing a liquid.

* * * * *

# EXHIBIT D
# (Part 9 of 17)



# United States Patent [19]

## Richard et al.

[11] **Patent Number:** 5,367,792

[45] **Date of Patent:** * **Nov. 29, 1994**

[54] **SHOE SOLE CONSTRUCTION**

[75] Inventors: **Daniel Richard**, Westlinn; **Kenneth Kolman; Charles Case**, both of Beaverton, **Ronald Becker**, Stayton, all of Oreg.; **Alex Gross**, Aspen, Colo.

[73] Assignee: **Avia Group International, Inc.,** Beaverton, Oreg.

[ * ] Notice: The portion of the term of this patent subsequent to May 14, 2008 has been disclaimed.

[21] Appl. No.: **935,333**

[22] Filed: **Aug. 27, 1992**

### Related U.S. Application Data

[63] Continuation of Ser. No. 693,647, May 1, 1991, abandoned, which is a continuation of Ser. No. 411,044, Sep. 22, 1989, Pat. No. 5,014,449.

[51] Int. Cl.⁵ ...................... **A43B 5/00; A43B 13/18**
[52] U.S. Cl. ...................................... **36/114; 36/25 R;** 36/28
[58] Field of Search ...................... 36/114, 29, 28, 27, 36/35 R, 35 B, 7.8, 25, 30 R; 5/449, 450

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 1,241,142 | 9/1917 | O'Hara ...................................... 36/28 |
| 2,405,498 | 8/1946 | Gregg ................................. 36/28 X |
| 4,137,653 | 2/1979 | Famolare, Jr. ..................... 36/3 B |
| 4,229,889 | 10/1980 | Petrosky ............................ 36/29 |
| 4,342,158 | 8/1982 | McMahon et al. ................. 36/35 B |
| 4,680,876 | 7/1987 | Peng ............................... 36/35 B |
| 4,741,114 | 5/1988 | Stubblefield ..................... 36/114 |
| 4,753,021 | 6/1988 | Cohen ........................... 36/25 R X |
| 4,768,295 | 9/1988 | Ito ................................... 36/29 |
| 4,774,776 | 10/1988 | Gulli ............................... 36/7.8 X |
| 4,887,367 | 12/1989 | Mackness et al. ................. 36/35 B |
| 4,918,838 | 4/1990 | Chang ............................. 36/29 |
| 4,918,841 | 4/1990 | Turner et al. ..................... 36/28 |
| 5,014,449 | 5/1991 | Richard et al. ................... 36/28 X |
| 5,092,060 | 3/1992 | Frachey et al. ................... 36/28 X |

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 0299669 | 1/1989 | European Pat. Off. . |
| 979132 | 4/1951 | France ........................... 36/32 R |
| 203631 | 5/1907 | Germany ......................... 36/28 |
| 2800359 | 7/1979 | Germany ......................... 36/28 |
| 3542960A1 | 6/1986 | Germany . |
| 777630 | 6/1957 | United Kingdom .................. 36/29 |
| 1080926 | 8/1967 | United Kingdom .................. 36/29 |
| 2032761 | 5/1980 | United Kingdom ................ 36/35 B |
| 1603646 | 11/1981 | United Kingdom .................. 36/29 |

*Primary Examiner*—Paul T. Sewell
*Assistant Examiner*—Beth Anne C. Cicconi
*Attorney, Agent, or Firm*—Sterne, Kessler, Goldstein & Fox

[57] **ABSTRACT**

The present invention comprises an intermediate layer for a shoe sole consisting of a hollow shell having convolutions disposed along the periphery thereof. The convolutions are adapted to cushion the foot by compressing when force is applied thereto, and expanding to their original configuration when the force is relieved. An inner filler material may be provided within the shell for added cushioning and resilience.

**14 Claims, 7 Drawing Sheets**







*FIG. 5*

*FIG. 3*



*F I G.  4*



*F I G.  11*



FIG. 6



*FIG. 7*

*FIG. 10*



*FIG.8*



FIG. 9

5,367,792

1

## SHOE SOLE CONSTRUCTION

This application is a continuation, of application Ser. No. 07/693,647, filed May 1, 1991, now abandoned, which is a continuation, of application Ser. No. 07/411,044, filed Sep. 22, 1989, now U.S. Pat. No. 5,014,449.

## FIELD OF THE INVENTION

This invention relates to shoes, and more particularly to a shoe sole construction.

## BACKGROUND OF THE INVENTION

Through the years, attempts have been made to produce footwear that is both comfortable and exhibits improved performance. Many attempts have proved unsatisfactory, in that they have failed to produce the desired effectiveness. A major emphasis of these attempts has been to increase the cushioning and performance of an athletic shoe by making modifications to the midsole (the material which generally lies above the outsole and below the insole). The numerous attempts to provide superior cushioning in athletic shoes have led to at least two broad categories of developments.

One category utilizes different materials and configurations of the midsole to improve cushioning, as well as to provide selective stability. For example, materials of different hardness may be used, or a variety of devices may be encapsulated in the midsole to increase cushioning and stability. Typically, such midsoles are constructed of cellular ethyl vinyl acetate (EVA), polyurethane (PU), or a combination of both. While EVA has the advantage of being light-weight, and PU has the advantage of increased memory capabilities and resilience, the cellular structure of both materials has a tendency to break down and therefore, diminish the useful lifespan of the midsole, and thus, the shoe.

A second category of developments in midsoles includes those structures which have encapsulated an insert within the midsole material itself. The insert, usually made of plastic material that is harder than the midsole material, does to a limited degree increase the lifespan of the shoe sole since, unlike the cellular material, it does not break down. However, as with the first category of developments, in the second category, the insert is still designed to be encapsulated within either EVA or PU. Therefore, this structure does not completely eliminate the tendency of the cellular material to break down. Thus, the lifespan of these midsoles is still seriously limited by the lifespan of the primary midsole material itself.

## SUMMARY OF THE INVENTION

It is with these problems of the prior art in mind, that the present invention was developed. The present invention may be characterized as a shoe sole construction comprising an outer sole layer and an intermediate layer disposed above the outer sole layer. The intermediate layer may be comprised of a hollow outer shell defining an interior chamber. The shell may be comprised of a thermoplastic elastomer. An inner filler material may be encapsulated within the interior chamber of the intermediate layer. The filler material may be comprised of a synthetic foam. The foam is preferably selected from the group consisting of polyether polyurethane, polyester polyurethane and ethyl vinyl acetate. The shell may be formed by blow molding.

2

The present invention may also be characterized as a shoe sole construction comprising an intermediate layer for supporting the forces generated by a wearer. The intermediate layer may include a hollow outer shell having a plurality of convolutions arranged horizontally along a substantial portion of the outer periphery of the intermediate layer extending from the top surface to the bottom surface. The convolutions may be arranged in independent vertical columns along the outer periphery. A recess may be formed between adjacent columns. The columns may be uniformly arranged, and may be arranged at an angle to a central axis of the intermediate layer.

Furthermore, the present invention may be characterized as a midsole construction for a shoe comprising a resilient midsole cradle element having a cavity therein. A hollow insert may be disposed within the cavity. The hollow insert may include a plurality of convolutions arranged horizontally along a portion of the insert such that the convolutions compress in an accordion-like fashion when force from the foot of the wearer is applied thereto. The insert may be disposed in the heel region of the midsole; the forefoot region of the midsole; or both the heel and forefoot regions. The cavity may be formed in the upper surface, the bottom surface, or both the upper and bottom surfaces of the midsole cradle element.

In addition, the present invention may be characterized as a shoe sole construction comprising an outer sole having a plurality of lugs extending downwardly from a peripheral portion of the outer sole to create a concavity in the central portion of the outer sole. An intermediate layer may be disposed above the outer sole. The intermediate layer may include a plurality of convolutions formed along the periphery of the intermediate layer such that the convolutions are adapted to compress in an accordion-like fashion when the force from the foot of a wearer is applied thereto.

## BRIEF DESCRIPTION OF THE DRAWINGS

Various objects, features, and attendant advantages of the present invention will be more fully appreciated as the same becomes better understood from the following detailed description of the present invention when considered in connection with the accompanying drawings in which:

FIG. 1 is a right side view of an athletic shoe having the intermediate layer of the present invention;

FIG. 2 is a rear perspective view of the athletic shoe shown in FIG. 1;

FIG. 3 is a cross sectional view of the athletic shoe taken along line 3—3 in FIG. 1;

FIG. 4 is a cross sectional view of the athletic shoe taken along line 4—4 in FIG. 1;

FIG. 5 is a top plan view of the intermediate layer of the present invention shown removed from the shoe;

FIG. 6 is an exploded view of an alternate embodiment of the present invention showing discrete heel and forefoot inserts supported in a cradle element;

FIG. 7 is a top plan view of the intermediate layer of FIG. 6;

FIG. 8 is a side view of the forefoot and heel inserts of FIG. 6 shown within the cradle element;

FIG. 9 is a top plan view of the forefoot and heel inserts of FIG. 8, in partial cutaway showing, in phantom, the cradle element;

FIG. 10 is a cross sectional view of the cradle element, taken along line 10—10 of FIG. 6.

5,367,792

FIG. 11 is a cross sectional view taken along line 11—11 of FIG. 9.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

Referring now to the drawings, wherein like reference numerals represent identical or corresponding parts throughout the several views, FIG. 1 illustrates a right (medial) side view of an athletic shoe for the right foot of a wearer incorporating the intermediate layer of the present invention. An athletic shoe for the left foot having the intermediate layer of the present invention would be a mirror image of the one shown in FIG. 1. The upper of the athletic shoe, which does not form part of the present invention, is designated by reference numeral 8. Upper 8 may take numerous forms other than that shown in the figures. Similarly, while the present invention is shown embodied on an athletic shoe, the invention may be practiced on any type of footwear, including walking or dress shoes, and accordingly should not be limited to athletic shoes.

A shoe sole, disposed below upper 8, preferably includes an outer sole 14 and the intermediate layer or midsole of the present invention, designated generally by 12. Alternatively, outer sole 14 could be integral with intermediate layer 12. The periphery of outer sole 14 generally follows the profile of the human foot. Along the periphery of outer sole 14 are a plurality of lugs 52 which extend downwardly from outer sole 14. Lugs 52 create a concavity in the central portion of the heel region of outer sole 14 which advantageously provides improved shock absorption. The manner in which this is achieved is disclosed in U.S. Pat. No. 4,372,058 and is incorporated herein by reference.

Referring more particularly to FIGS. 3 and 4, intermediate layer 12 is disposed between outer sole 14 and upper 8. An upper surface 13 of intermediate layer 12 is secured along the lasting margin 11 of the bottom surface of upper 10. A lower surface 16 of intermediate layer 12 is secured to a top surface 15 of outer sole 14. Intermediate layer 12 is preferably secured to outer sole 14 and upper 10 by adhesives. However, other suitable securing means may be utilized, for example, radio frequency welding. Furthermore, the present invention should not be limited to the particular securement configuration shown; that is, it is not necessary that intermediate layer 12 be directly affixed to upper 8 or directly affixed to outer sole 14 as additional layers or materials may be interposed above and below intermediate layer 12. As can best be seen from FIG. 5, intermediate layer 12 has a medial side 17, a lateral side 18, a forefoot or front region 19, a center region 20 and a heel or rear region 21.

With continuing reference to FIG. 5, intermediate layer 12 is preferably shaped to conform to the shape of outer sole 14. That is, intermediate layer 12 follows the profile of the human foot, including a curved in arch area designated generally by 23. Furthermore, as best seen in FIG. 1, the height of intermediate layer 12 in heel region 21, measured by the distance between upper surface 13 and lower surface 16, is greater than the height in front region 19. Intermediate layer 12 preferably progressively increases in height beginning at center region 20. In the embodiment shown in FIGS. 1–5, the greatest height of intermediate layer 12 is in heel region 21 which is approximately two centimeters; and the smallest height is in forefoot region 19 which is approximately one centimeter. Obviously, the height of inter-

mediate layer 12 can be varied from that disclosed herein and the height in the heel region 21 could alternately be less than or equal to the height in the forefoot region.

One aspect of the present invention, although not limited thereto, is the material from which intermediate layer 12 is constructed. Intermediate layer 12 is preferably composed of a thermoplastic elastomer which exhibits the following characteristics:

| SPECIFIC GRAVITY | 1.0 to 1.5 |
|---|---|
| FLEXURAL MODULUS psi | 40,000–75,000 |
| IZOD IMPACT, notched ft-lbs/in | 2.0–NB |
| TENSILE PROPERTIES | |
| at 10% Elongation psi | 2,500–4,000 |
| at 15% Elongation psi | 3,000–4,400 |
| Tensile Strength psi | 6,000–9,300 |
| Elongation at Break, % | 300–500 |

One example of a suitable elastomer is HYTREL, a polyester elastomer available from E.I. Dupont de Nemours, Wilmington, De. One form of HYTREL of particular suitability is type HTX-8177. Such material has the advantage of being a lightweight, non-fatigue material, which is highly desirous in athletic shoes; as well as having a high tear strength which makes the shoe sole more durable than soles utilizing midsoles formed substantially of cellular PU or EVA. A mixture of other grades of HYTREL, or of other materials, may be utilized so long as they generally exhibit the characteristics noted above. Furthermore, if a clear shell is desired, a polyester elastomer such as SURLYN (also available from E.I. DuPont de Nemours) which is capable of being made transparent, may be used.

Intermediate layer 12 is preferably constructed as a hollow shell 28 by blow-molding, a technique known in the art. However, other techniques for constructing a hollow shell may also be used, for example, injection molding; rotational molding; and injection blow molding. The interior of shell 28 is defined by an outer wall 26 which forms a hollow chamber 30 (see FIGS. 3 and 4). Outer wall 26 is approximately 0.25 mm to 1.5 mm in thickness and preferably is 0.5 mm in thickness. Chamber 30 may contain a filler such as: air at ambient pressure; fluid other than air; pressurized air or gas; or synthetic foam. FIGS. 3 and 4 show an example of the present invention in which a foam 32 is encapsulated within chamber 30 of shell 28. A suitable foam for encapsulation within shell 28 is PU, EVA or SURLYN. Another aspect of the present invention, although not limited thereto, is the type of foam which is encapsulated within shell 28. It is preferred that foam 32 have a specific gravity less than that of shell 28 and within the range of approximately 0.08 to 0.20. Preferably, the specific gravity of foam 32 is 0.12. Of course, the present invention is not limited to this specific gravity range, neither is the invention limited to the use of foam as a filler. However, one advantage of this embodiment of the present invention is that it allows very light-weight foams to be effectively utilized in athletic shoe soles by providing a protective plastic shell outer covering to prolong the wear-life of the intermediate layer. The material forming foam 32 is preferably injected within chamber 30 and foamed therein. However, other

5,367,792

| 5 | 6 |

methods of providing foam 32 within chamber 30 are possible, for example, the foam and a blowing agent may be inserted within chamber 30 and expanded therein.

Foam 32 is preferably of uniform density throughout chamber 30. However, it may also be possible to vary the density, and thus the stiffness of the foam along various regions of intermediate layer 12 to modify the stiffness of the sole. For example, the foam in the heel region 21 may be more dense than the foam in forefoot region 19. Similarly, the density of the foam along the medial side of the shoe may be different than the foam along the lateral side. Furthermore, it may be possible to provide foam 32 in selected areas of chamber 30, while leaving other areas foam-free or filled with ambient air, fluid other than air, or pressurized air or gas. In addition, plugs made of a more dense foam may be inserted into foam 32 to provide selected areas of hardness.

With continuing reference to FIG. 3 formed along the periphery of intermediate layer 12 are convolutions 22. Convolutions 22 preferably extend horizontally from upper surface 13 of intermediate layer 12 to lower surface 16. Each convolution 22 is formed by oppositely-angled surfaces 23, 23' which create a bellows-like structure allowing intermediate layer 12 to compress in an accordion-like fashion when force is applied to upper surface 13 or to lower surface 16; and to expand to its original configuration when force is removed, as will be explained in more detail below. Surfaces 23 and 23' are shown in the figures as planar. Alternatively, surfaces 23 and 23' may be arcuate. As best seen in FIG. 5, convolutions 22 are preferably arranged in a series of independent vertical columns 24 which are spaced apart from one another to form recesses 25 between adjacent columns. Recesses 25 are shown formed along substantially the entire periphery of intermediate layer 12. However, as discussed below, recesses 25 may be provided in only selected areas of intermediate layer 12 to allow adjustment of the areas of compression along intermediate layer 12. Recesses 25 provide an effective means for controlling the compressibility of intermediate layer 12. That is, convolutions 22 may be compressed more easily at columns 24 than at recesses 25, thus providing both increased cushioning and stability to the foot of the wearer. This concept will be explained in more detail below.

The particular number of convolutions 22 in each column 24 will likely vary along the medial and lateral peripheral portions 17 and 18 of intermediate layer 12. As best seen in FIG. 1, there is a greater number of convolutions (i.e., five) in heel portion 21 than the number (i.e., two) in forefoot portion 19. The exact number of convolutions per column may be other than that shown. Furthermore, the width w and depth d (see FIG. 5) of recesses 25 between adjacent columns 24 can also be varied to form columns of varying size and shape. The depth d of recesses 25 along lateral side 18 is approximately 3 mm to 8 mm, and preferably 5 mm; and along medial side 17, approximately 3 mm to 15 mm, and preferably 8 mm. The width w of recess 25 from the center of adjacent columns is approximately 10 mm to 25 mm, and preferably 22 mm on lateral side 18; and 18 mm along medial side 17. By varying the dimension and placement of recess 25, the overall flexibility and stiffness of intermediate layer 12 may be modified. For example, the depth and width of recesses 25 in heel region 21 and center region 20 may be greater than

those in forefoot region 19. Similarly, the depth and width of recesses in heel region 21 may be greater along the medial side 17 or lateral side 18 of the intermediate layer to increase the stiffness in the particular region. For example, where the width of all recesses 25 is 18 mm, the depth along the medial side may be 5 mm, while the depth along the lateral side may be 10 mm.

Thus, the present invention advantageously allows for the stiffness of intermediate layer 12 to be varied by changing one or more of the characteristics of convolutions 22, columns 24, and recesses 25. For example, to increase the stiffness of intermediate layer 12, one or more of the following changes can be made: a) increase the number of convolutions 22; b) increase the depth of the recesses 25; c) increase the wall thickness of the convolutions 22; d) increase the number of columns 24; and e) increase the density of foam 32. Conversely, to decrease the stiffness of intermediate layer 12, one or more of the following modifications can be made: a) decrease the number of convolutions 22; b) decrease the depth of recesses 25; c) decrease the wall thickness of the convolutions 22; d) decrease the number of columns 24; and e) decrease the density of foam 32.

Furthermore, when modifying the stiffness of only a portion of intermediate layer 12 is desired, for example, the medial portion of heel region 21 to prevent pronation (i.e. the common condition of the human foot during the gait cycle, wherein the back of the foot everts), such modification can be achieved by varying the columns, convolutions, and/or recesses that are present in that particular portion of intermediate layer 12. For example, if increased stiffness is desired on medial side 17, deeper recesses can be provided in that area. While FIG. 5 shows intermediate layer 12 where the column size and recess depth are uniform throughout the periphery of the layer (i.e., uniformly arranged), it should be understood that various modifications are possible. Therefore, it should be apparent that the particular number and dimension of columns 24 and their associated recesses 25 shown in the figures is but one example of the almost infinite number of configurations of the intermediate layer which can be provided.

An alternate embodiment of the present invention is illustrated in FIGS. 6–11 in which similar reference numerals designated with regard to the embodiment described above in FIGS. 1–5 have been maintained. In general, this embodiment provides the intermediate layer of the present invention as separate insert members received within cavities formed in a middle layer or cradle 38. Cradle 38 is disposed between an outer sole and an upper (not shown).

FIG. 6 shows the three major components of this embodiment of the invention. The components are a forefoot insert 39, a heel insert 41, and cradle 38, all of which together comprise an intermediate layer of midsole member 36. Cradle 38 is preferably made of a resilient material such as foamed PU or EVA having a density less than that of inserts 39 and 41. Where PU is used, the specific gravity may range from 0.20 to 0.50, with a preferred specific gravity 0.25; and when EVA is used, the specific gravity may range from 0.10 to 0.30, with a preferred specific gravity of 0.15. EVA is characteristically softer, more lightweight, and provides more cushioning than PU.

As seen in FIG. 7, the outer periphery 70 of cradle 38 generally follows the profile of the human foot. Cradle 38 includes a forefoot cavity 42 on the bottom surface 68 of cradle 38 and a heel cavity 43 on the upper surface

7

66 of cradle 38 (see FIG. 10). Forefoot cavity .42 and heel cavity 43 are adapted to receive forefoot insert 39 and heel insert 41, respectively. An interior flange 58 is provided in heel region 21 extending upwardly into cavity 43. Flange 58 helps support heel insert 41 within cradle 38, providing a cementing surface for attachment of, and a smooth transition with, heel insert 41. Thus, flange 58 cooperates with downwardly depending flange 60 of heel insert 41 (FIGS. 9 and 11). As shown in FIGS. 6 and 9, forefoot insert 39 includes a front wall 54 and a rear wall 56 which are slightly angled or beveled. Heel insert 41 includes a front wall 58 which is also slightly angled or beveled. Although forefoot insert 39 is shown positioned below cradle 38 and heel insert 41 is shown positioned above cradle 38 (FIG. 6), other arrangements of cradle 38 and inserts 39 and 41 are possible. Furthermore, a single cavity may be provided in cradle 38 to receive a single insert. The cavity may be disposed on the upper surface or bottom surface of cradle 38 and may be disposed in the forefoot region, central region, heel region or a combination of any two regions or all three.

As shown in FIG. 10, forefoot cavity 42 includes a bevelled front edge 44 and a bevelled rear edge 46. Heel cavity 43 includes beveled front edge 64. With reference to FIG. 8, edges 44, 46 cooperate with the angled walls 60, 62 and 64 of forefoot insert 39 and edge 64 cooperates with the angled wall 64 of heel insert 41 to form a tight fit. As with the previous embodiment, the height of the insert in the forefoot region 19 may be less than that in the heel region 21. Inserts 39 and 41 may include upstanding flanges 44 and 45 respectively along their medial and lateral sides for adding stability to the shoe upper (not shown).

With continuing reference to FIG. 10, rearfoot cavity 43 includes a cutout 52 in the bottom surface of cradle 38 allowing heel insert 39 to be visible through the bottom of cradle 38. A similar cutout may also be provided in the outsole to which midsole 36 is attached to allow the insert to be visible through the outsole. A protective layer which is preferably transparent may be provided on the exterior wear surface of the outsole positioned over the cutout.

As best seen in FIG. 9 and in phantom in FIG. 7, the length of forefoot insert 39 measured as the distance between front wall 54 and rear wall 56, progressively increases from medial side 17 to lateral side 18. Thus, the distance is approximately 70 mm on medial side 17 and 90 mm on lateral side 18. The heel insert, on the other hand, progressively decreases in length, as measured by the distance between front edge 58 to heel end 60, from medial side 17 to lateral side 18, such that it is approximately 126 mm on the medial side and 100 mm on the lateral side. Obviously, the length of the inserts could vary from that disclosed herein.

Both forefoot and heel inserts 39 and 41, like intermediate layer 12, are preferably hollow (see FIG. 11) and are formed by blow-molding. A plurality of convolutions 22, similar to those described above, are arranged in discrete independent columns 24 along at least a portion of the periphery of inserts 39 and 41. Columns 24 of heel insert 41 are separated by recesses 25 similar to those in the embodiment of FIGS. 1–5. As is best seen in FIG. 9, the convolutions 22 of forefoot insert 39 are shown arranged in columns 48 angled to a central axis of midsole member 36, separated by angled recesses 50. Angling the columns in the forefoot area increases the bending flexibility of insert 39, a characteristic which is

8

particularly desirable along the metatarsal area of the foot. While FIG. 9 shows three angled columns 48 and four angled recesses 50 along lateral side 18 of insert 39, and a single angled recess 50 along medial side 17, the particular number of recesses and columns may be varied in order to modify the flexibility of insert 39. Furthermore, if desired, angled recess 50 may be provided in heel insert 41; and recesses 25 may be provided in forefoot insert 39. It should be apparent to those skilled in the art that angled recesses may also be provided in intermediate layer 12 of FIGS. 1–5 described above.

As with intermediate layer 12, the depth and width of recesses 25 and 50 between columns 24 and 48 respectively may be varied in order to vary the stiffness of the particular insert. Similarly, the number of columns, placement and wall thickness may be varied to provide a customized insert to meet the particular needs of the user. Moreover, as with intermediate layer 12, chamber 30 provided within inserts 39 and 41 may be provided with a filler material such as ambient air; fluid other than air; pressurized air or gas; or synthetic foam.

In use of either the embodiment of FIGS. 1–5, or FIGS. 6–11, when force is provided on the upper surface of intermediate layer 12 or 36 by the weight of a wearer during the gait cycle, the force is transferred to intermediate layer 12 or 36, respectively. Such force causes convolutions 22 to compress in an accordion-like fashion to cushion the wearer's foot. When the force is removed, the convolutions 22 expand back to their original configuration. When foam 32 is provided within intermediate layer 12, or inserts 39 and 41, such foam further aids in compression and expansion of the convolutions 22.

While the present invention has been shown embodied as either a full insert for the entire length of the sole, or as two individual inserts, one provided in the heel area, the other in the forefoot area of the sole, inserts in other areas of the sole may be provided as desired. These inserts may be in addition to the heel and/or forefoot inserts or as a substitute for these inserts. Additionally, an insert which substantially joins heel insert 41 with forefoot insert 39 through the arch area, leaving the toe area of the sole insert-free, may also be provided.

While convolutions 22 of both embodiments of the present invention are shown unprotected and exposed, it is possible to provide a outer covering of foam or other material to protect the convolutions from being clogged by dirt and other debris associated with the ground. Such an outer covering may be transparent so that the interior cushioning of the intermediate layer is visible. If such an outer layer is provided, it should not interfere with the proper functioning of convolutions 22, i.e., that they be allowed to contract and expand as force is applied thereto.

It is to be understood that the foregoing is considered as illustrative only of the principles of the invention. Therefore, within the scope of the appended claims, the invention may be practiced otherwise than as specifically described herein.

What is claimed is:

1. An athletic shoe including a forefoot region, a midfoot region and a heel region, comprising:
   an upper;
   an outer sole;
   a midsole disposed between said upper and said outer sole, said midsole comprising a top surface, a bottom surface, and a peripheral wall having an inte-

5,367,792

9

rior surface and an exterior surface exposed to the exterior of said shoe, said peripheral wall extending between said top surface and said bottom surface and being recessed at various locations to form a plurality of connected, substantially adjacent vertical columns along the exposed exterior surface and interior surface of said peripheral wall; and

a hollow chamber defined by said top surface, said bottom surfaces and said peripheral wall of said midsole, wherein said columns of said midsole are positioned beneath the wearer's foot to provide stability and support to the foot of the wearer when the wearer applies a force to the midsole.

2. An athletic shoe as set forth in claim 1, wherein said midsole is disposed in the heel region of said shoe.

3. An athletic shoe as et forth in claim 2, wherein said midsole is disposed in the midfoot region of said shoe.

4. An athletic shoe as set forth in claim 3, wherein the height of said midsole in said heel region is greater than the height of said midsole in said midfoot region.

5. An athletic shoe as set forth in claim 1, wherein said midsole is secured directly to an upper surface of said outer sole.

6. An athletic shoe as set forth in claim 1, wherein said midsole is formed by blow-molding.

7. An athletic shoe as set forth in claim 1, wherein said midsole is secured directly to a lower surface of said upper.

8. An athletic shoe as set forth in claim 1, wherein a plurality of horizontally arranged convolutions are formed along at least a portion of the peripheral wall of said midsole.

9. An athletic shoe as set forth in claim 1, wherein said hollow chamber is filled with a filler material.

10

10. An athletic shoe, comprising:

an upper;

an outer sole;

a midsole disposed between said upper and said outer sole, said midsole comprising a top surface, a bottom surface, and a peripheral wall extending between said top surface and said bottom surface, said peripheral wall having an interior surface and an exterior surface exposed to the exterior of said shoe, said peripheral wall being recessed at various locations to form a plurality of connected, substantially adjacent vertical columns along the interior and exterior surfaces of said peripheral wall; and

a hollow chamber defined by said top surface, said bottom surface and said peripheral wall of said midsole, wherein said columns of said midsole are positioned beneath the wearer's foot to provide stability and support to the foot of the wearer when the wearer applied a force to the midsole.

11. The athletic shoe of claim 1, wherein each said column includes a top surface and a bottom surface.

12. The athletic shoe of claim 11, wherein the top surface of each said column is in contact with the bottom surface of said upper and the bottom surface of each said column is in contact with the top surface of said outer sole.

13. The athletic shoe of claim 10, wherein each said column includes a top surface and a bottom surface.

14. The athletic shoe of claim 13, wherein the top surface of each said column is in contact with the bottom surface of said upper and the bottom surface of each said column is in contact with the top surface of said outer sole.

* * * * *

US005502901A

# United States Patent [19]

## Brown

[11] **Patent Number:** **5,502,901**

[45] **Date of Patent:** **Apr. 2, 1996**

[54] **SHOCK REDUCING FOOTWEAR AND METHOD OF MANUFACTURE**

[76] Inventor: **Jeffrey W. Brown**, 736 Windimere Ct., San Diego, Calif. 92109

[21] Appl. No.: **240,882**

[22] Filed: **May 10, 1994**

**Related U.S. Application Data**

[63] Continuation-in-part of Ser. No. 876,777, Apr. 28, 1992, which is a continuation-in-part of Ser. No. 673,470, May 7, 1991, abandoned.

[51] Int. Cl.⁶ ............................ **A43B 13/18**; A43B 13/28
[52] U.S. Cl. ......................... **36/28**; 36/7.8; 36/27; 36/29; 36/37; 36/38; 36/35 R
[58] Field of Search ............................ 36/114, 7.8, 25 R, 36/27, 28, 29, 37, 38, 35 R, 35 B, 3 R, 3 B

[56] **References Cited**

**U.S. PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 819,449 | 5/1906 | Otterstedt | 36/3 B |
| 1,099,180 | 6/1914 | Karacsonyi | 36/38 |
| 1,218,391 | 3/1917 | Gay | 36/38 |
| 1,261,488 | 4/1918 | Cerar et al. | 36/38 |
| 1,506,975 | 9/1924 | Cooney | 36/29 |
| 2,004,906 | 6/1935 | Simister | 36/29 |
| 2,444,865 | 7/1948 | Warrington | 36/38 |
| 2,555,654 | 6/1951 | Ostrom | 36/38 |
| 2,669,038 | 2/1954 | Werth | 36/38 |
| 3,044,190 | 7/1962 | Urbany | 36/29 |
| 3,180,039 | 4/1965 | Burns, Jr. | 36/3 B |
| 4,457,084 | 7/1984 | Horibata | 36/28 |
| 4,520,138 | 5/1985 | Himes | 521/91 |
| 4,753,021 | 6/1988 | Cohen | 36/28 |
| 4,760,651 | 8/1988 | Pon-Tzu | 36/3 B |

**FOREIGN PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 618719 | 8/1935 | Germany | 36/38 |
| 1161073 | 6/1985 | U.S.S.R. | 36/28 |
| 664554 | 1/1952 | United Kingdom | 36/38 |

*Primary Examiner*—Paul T. Sewell
*Assistant Examiner*—Marie Denise Patterson
*Attorney, Agent, or Firm*—Shoemaker and Mattare, Ltd.

[57] **ABSTRACT**

An article of footwear has an outsole with a cavity in the heel region in which a cushioning insert is installed to cushion impacts and provide added lift to the wearer. The heel region of the outsole projects outwardly beyond the periphery of the heel region of the shoe upper to form a projecting peripheral rim. The cavity has an upper wall and a lower wall and a plurality of springs extend between the upper and lower walls at spaced intervals around the peripheral rim. Opposing magnets are mounted in the upper and lower walls in a central region of the cavity with their like poles facing one another to provide a magnetic biasing force which augments the spring load.

**23 Claims, 3 Drawing Sheets**





FIG. 1



FIG. 2



FIG. 3



FIG. 4

FIG. 5

FIG. 6



5,502,901

**1**

# SHOCK REDUCING FOOTWEAR AND METHOD OF MANUFACTURE

## CROSS-REFERENCES TO RELATED APPLICATIONS

This application is a Continuation-In-Part of pending application Ser. No. 07/876,777 filed Apr. 28, 1992, which was a Continuation-In-Part of application Ser. No. 07/673, 470 filed May 7, 1991 (now abandoned).

## BACKGROUND OF THE INVENTION

This invention relates generally to footwear and is particularly concerned with footwear having shock absorbing or cushioning properties, and to methods of manufacturing such footwear.

Numerous shoe and other footwear designs have been proposed in the past for absorbing shock and adding lift, particularly in the athletic shoe field. U.S. Pat. No. 4,817,304 of Parker et al. describes footwear with a cushioning sole structure in which a sealed internal member in the sole is inflated with gas to form a resilient insert in the heel region of the shoe. Various shoe structures have been proposed in the past in which springs are embedded in the shoe sole in the heel region or over the entire sole, as shown, for example, in U.S. Pat. No. 5,138,776 of Levin, U.S. Pat. No. 4,566,206 of Weber, and U.S. Pat. No. 4,592,153 of Jacinto. Some of these structures are relatively bulky and heavy, and could not effectively be manufactured.

## SUMMARY OF THE INVENTION

It is an object of the present invention to provide new and improved items of footwear which have improved shock absorbing properties and which also add lift and propulsion to the foot of a wearer when walking or running.

According to the present invention, footwear is provided which comprises an upper shaped to conform to the upper contour of a wearer's foot and including a heel portion for conforming to a wearer's heel, a sole member attached to the undersurface of the upper for supporting the sole of a wearer's foot, the sole member having a heel region, an arch region and a toe region, the heel region of the sole member having a rim portion projecting outside the periphery of the heel portion of the upper, the sole member having a cavity extending across at least the heel region, the cavity having an upper wall and a lower wall, and a plurality of springs mounted between the upper and lower wall at spaced intervals around the rim portion of the heel region.

A number of advantages are achieved by positioning the cushioning springs outside the wearer's heel. Firstly, the enlarged heel region of the sole member adds increased surface area for shock absorption at the heel, which is the first region of the shoe or other article of footwear to strike the ground when walking, for example. The increased heel area also increases stability. Since no springs are positioned directly beneath a wearer's foot, the risk of harmful shock or uncomfortable spring pressure points under the heel is prevented.

Preferably, magnet configurations are mounted on the upper and lower wall of the cavity in a central region of the heel in magnetic opposition so that they are magnetically repelled from one another and tend to hold the cavity open. The magnets act in conjunction with the springs to dissipate shock and further add lift and propulsion to the wearer's foot in motion. The magnets are preferably high strength, high

**2**

intensity magnets placed with like poles opposing one another, mounted on a thin lightweight backing metal.

The springs and magnets together are designed to support an air-flux gap within the sole member at all times. This permits continuous and more effective shock dissipation than the case where a gap is closed, solid or absent under load. The size and number of springs used will be dependent on the shoe size and the weight of the wearer, and the springs will be designed such that they will not be fully compressed under load during normal motion of the wearer. In other words, a person will put between 2 and 3 times their weight on their foot during motion. If a person's weight is W and the number of springs is n, each individual spring must be able to support a weight or load of $3W/n$ without becoming fully compressed. Thus, springs having different load characteristics will be used for individuals of different weights, or a greater number of springs may be used for heavier individuals. Since the springs are never fully compressed, there will always be some cushioning of the foot while the person is in motion.

The springs and magnets work in conjunction to absorb and dissipate load or shock as the foot hits the ground, and subsequently as the person rotates from the heel to the ball of the foot, both the springs and the magnets will bias the opposing walls of the cavity apart, giving lift or propulsion to the shoe wearer.

In a preferred embodiment of the invention, the springs and magnets are mounted in upper and lower inserts which are installed in the heel cavity and optionally also in the ball of the foot region during manufacture. The insert has an upper piece for securing to the upper wall of the cavity and a lower piece for securing to the lower wall of the outsole. The upper and lower pieces have opposing inner faces each having a recess for mounting a respective one of the magnet configurations in opposition to the magnet configuration in the other piece. Preferably, a first set of projecting, tubular bosses or pegs extend at spaced intervals from one of the inner faces around its perimeter, while a second set of projecting tubular bosses of greater diameter than the first set project at spaced intervals around the perimeter of the other inner face so as to mate with the bosses of the first set when the insert is installed in the cavity. Each telescopically engaging pair of bosses forms a canister for holding a respective one of the springs.

One or more additional cavities may be provided elsewhere in the sole member and springs and/or magnets may be inserted in the additional cavities for increased shock absorption and cushioning if required.

The sole may be a horizontally split sole molded as an upper part and a lower part which are subsequently bonded or over molded together so as to leave one or more cavities or gaps of the desired dimensions in various locations, such as the heel portion, arch or ball portion of the sole.

The shock absorbing insert of this invention may be used in any type of footwear, such as sports/athletic shoes, boots, casual shoes, work shoes, children's shoes, orthopedic shoes, sandals and the like. It will significantly reduce shock to the body while walking, running or in other types of foot motion, and will add lift and propulsion, thereby reducing fatigue.

## BRIEF DESCRIPTION OF THE DRAWINGS

The present invention will be better understood from the following detailed description of some preferred embodiments of the invention, taken in conjunction with the accom-

5,502,901

3

panying drawings, in which like reference numerals refer to like parts, and in which:

FIG. 1 is a side elevation view of a shoe having an embedded shock reducing insert assembly according to a first embodiment of the present invention;

FIG. 2 is a bottom plan view of the undersurface of the sole of the shoe;

FIG. 3 is a cross-section on the lines 3—3 of FIG. 2;

FIG. 4 is a cross-section on the lines 4—4 of FIG. 1;

FIG. 5 is a cross-section similar to FIG. 3 illustrating an insert assembly according to another embodiment of the invention;

FIG. 6 is a partial cross-section on the lines 6—6 of FIG. 5;

FIG. 7 is a longitudinal cross-section through the sole of the shoe on the lines 7—7 of FIG. 2, illustrating an optional insert assembly for the ball of the foot region;

FIG. 8 is a cross-sectional view similar to FIG. 3 illustrating an alternative insert assembly; and

FIG. 9 is a partial cross section through part of an insert assembly illustrating a modified magnet configuration.

DESCRIPTION OF THE PREFERRED EMBODIMENTS

FIGS. 1–4 and 7 of the drawings illustrate a shoe 10 incorporating a shock reducing sole assembly 12 according to a first embodiment of the present invention. The shoe 10 illustrated in the drawings is of the sports or athletic type, but it will be understood that the shock reducing sole assembly of this invention may alternatively be incorporated in other types and styles of footwear including boots, casual shoes, sandals, work shoes and orthopedic shoes.

The shoe 10 comprises an upper 14 shaped to enclose the upper surface of a wearer's foot and including a heel-enclosing region 16 and a toe-enclosing region 18, and the sole assembly 12 which covers the lower surface of the molded composite uppers. The upper may be formed in several pieces which are joined together along seams via elongate attachment tongues 15 which are of T-shaped cross-section, as illustrated in FIG. 3, rather than by more conventional overlap stitching. The tongues or joints 15 may be attached to the composite uppers pieces by glue, sonic welding, overmolding, stitching, pop rivets, staples or the like. As best illustrated in FIG. 2, the sole of the shoe includes a heel region 20, arch region 21, ball of the foot region 22, and toe region 24. The heel region 20 has a rim 26 which projects outwardly from the outer periphery of the upper heel region 16 around the peripheral edge of the heel, as illustrated in FIGS. 2 and 3.

As best illustrated in FIGS. 3 and 4, at least the heel region 20 of the sole 12 has an internal cavity 28 having an upper wall 29 and a lower wall 30, and a plurality of springs 32 are mounted at spaced intervals between the upper wall 29 and lower wall 30 around the rim 26 of the heel region. The cavity 28 preferably runs from the rear end of the heel towards the instep or arch region, terminating around 4 inches from the rear end of the heel in one example. An outer debris shield 34 of flexible bellows-like construction extends between the upper wall 29 and lower wall 30 of the heel around the outer periphery of the cavity, as illustrated in FIGS. 3 and 4. Preferably, each spring is mounted in a pair of opposing, telescopic canisters 35,36. Each spring is secured at one end in the first cylindrical canister 35 secured to the upper wall 29 and is mounted at the opposite end in

4

the second cylindrical canister 36 secured to the lower wall 30. The second canister is of larger diameter than the first and has an open upper end which is in telescopic sliding engagement over the lower, open end of the first canister. Thus, the springs 32 are shielded and protected, and are also guided to compress and expand in a linear fashion. A small hole may be provided in one of each pair of canisters for relieving air pressure. Sliding O-ring type seals (not illustrated) may be provided between the overlapping or telescoping ends of the canisters to seal the interior of the canisters from dirt. In an alternative embodiment, the canisters 35,36 may be omitted and the springs may simply extend freely between the upper and lower walls.

The upper canisters 35 may be formed integrally with a one-piece upper insert member or plate 37, while the lower canisters are formed integrally with one piece lower insert member or plate 38, to form a two-part insert for securing in the heel cavity during manufacture. The upper insert member is suitably bonded or overmolded onto upper wall 29, while the lower insert member 38 is bonded or overmolded onto lower wall 30. The debris shield 34 may be formed integrally with the upper wall as a flat piece initially, and the upper and lower insert members can be installed through the gap between the upper and lower wall, compressing the springs and urging the upper and lower wall apart to allow the springs to be installed in the canisters. The debris shield 34 is then bent down over the gap between the upper and lower wall and suitably secured to the lower wall by bonding, overmolding or the like. Alternatively, the debris shield 34 may be formed as a separate piece which is suitably bonded or glued between the upper and lower wall of the heel region. The debris shield makes the heel cavity virtually impervious to debris and water. The shield 34 may be of a silicone-based aerogel material. The shield may be of transparent material to allow viewing of the shock absorbing insert inside the heel cavity.

Preferably, in addition to springs 32, opposing magnets 40,42 are installed in the central region of the upper and lower insert members, respectively, in order to urge the upper and lower insert members apart. The upper and lower insert members are provided with opposing rectangular recesses 44,45, respectively, for receiving the magnets, as illustrated in FIGS. 2–4. The magnets may each comprise a single rectangular plate-type magnet, but in the preferred embodiment each magnet 40,42 includes a plurality of spaced, parallel magnet strips 46, 47, respectively, oriented across the width of the heel. Each strip in a recess is positioned with its poles in the opposite direction to the or each adjacent strip in that recess, as illustrated in FIG. 4, and with its poles oriented in the same direction as the aligned strip of the opposing recess, as illustrated in FIG. 3. Thus, aligned strips are positioned with like poles opposing one another so that they are magnetically repelled from one another and tend to hold the cavity open.

In the embodiment illustrated in FIGS. 1–4, there are a total of 11 springs in canisters around the periphery of rim 26, and each magnet includes four spaced, parallel magnet strips. However, a greater or lesser number of springs may be provided in other embodiments, and a greater or lesser of magnet strips may be used if desired, depending on the wearer's weight and shoe size. The magnets are suitably bonded or adhesively secured in the respective recesses prior to installation of insert members into the split heel region of the sole. The magnets may be mounted on a non-magnetic backing plate for installation in the respective recess.

As best illustrated in FIGS. 2 and 3, the springs 32 are positioned outside the periphery of the heel region of the

5,502,901

| 5 | 6 |

shoe upper 14, so that they will not be positioned directly under the heel of a wearer of the shoe. The enlarged heel area of the sole adds increased surface area for shock absorption at the heel of the shoe, which is the first region to strike the ground when walking and typically must absorb the maximum impact forces. The increased heel area also adds stability. Since the springs are not positioned directly under the heel, the risk of harmful shock or uncomfortable spring pressure points under the heel is avoided. Preferably, the rim 26 extends outwardly to a width of around ¼ inch to ⅝ inch beyond the outer periphery of upper heel periphery 16.

The springs and opposing magnets together act to absorb and dissipate shock and to urge the upper and lower walls of the cavity apart when downward pressure on the heel is released by the wearer lifting their heel. This adds lift and propulsion to the wearer's foot in motion. Preferably, the maximum air gap between the upper and lower heel insert members is of the order of ½ to ⅝ inch, and the springs and magnets are designed to allow a deflection of around ½±⅝ inch. As the wearer presses down on the heel, the springs and magnets first dissipate load or shock by allowing a deflection or compression of up to ½=⅝ inch. The springs and magnets cushion the load and never allow the cavity to be completely closed. Then, as the wearer rotates from the heel to the ball of the foot, the springs and magnets urge the opposing walls of the cavity apart as they return to their initial, unloaded position. This results in lift or propulsion to the shoe wearer as the load moves from the heel to the ball, and finally to the toe of the shoe, in a normal walking motion.

Preferably, the upper wall 37 of the cavity 28 has aeration vents 48 which extend through the outsole and upper insole for air flow circulation inside the shoe uppers. This uses the increased air pressure in the cavity as the user strikes the ground with the heel of the shoe to force air upwardly through the vents 48. The wearer will push down the upper wall towards the lower wall of the heel as they walk, compressing springs 32 and moving the magnets closer together, forcing air out via vents 48. FIGS. 2 and 7 illustrate a modification for enhanced air flow into the upper 14. As best illustrated in FIG. 7, plunger 49 projects upwardly from the lower insert 38 of the outsole and slidably engages in the lower, open end of cylinder 50 projecting downwardly from upper insert 37. The interior of cylinder 50 forms an air chamber which is connected to one or more of the vents 48, as illustrated in FIG. 7. More than one pair of opposing plungers and cylinders may be provided. Thus, as the wearer presses down in the heel area, plunger 49 will be driven into cylinder 50 and will force air out along passageways 52 to the vents 48. The arrangement may be reversed with the plungers on the upper insert and the cylinders on the lower insert. This increased air circulation helps to control moisture inside the shoe.

In order to prevent the upper and lower heel inserts from being biassed too far away from one another on installation in the heel cavity, the insert members may be formed with integral snap lock fasteners, such as split sleeves 54 and telescopically engageable pins 56, respectively. These allow the cavity to be compressed since the pins are free to slide further into the sleeves, but restrict expansion of the cavity to the point at which the enlarged ends 57 of the pins reach the in-turned rims 58 of the sleeves.

The springs 32 are designed to handle approximately 2 to 5 times the wearer's body weight, and the designed spring load will be different for different size shoes and for different weight wearers. Shoes are preferably provided for varying weight individuals, for example adults from 100 lb to 250 lb at 15 lb increments. Thus, for a 200 lb man, the springs are

designed for approximately 600 to 1,000 lbs load, so that with a total of 11 springs, each spring would be designed to maintain a cushion up to a maximum load of around 56 to 91 lbs (in other words so that they will not "go solid" or compress completely under loads up to around 91 lbs). In one example, each spring 32 for a 200 lb man is 1 inch in total length, approximately ½ inch outer diameter, and had 9⅔ total coils, 7⅔ active coils. In another example the spring outer diameter was ⅜ inch, and the spring length was 1¼ inch to 1⅜ inch (±⅛ inch). The springs may be of any suitable material, such as piano wire, zinc-coated metal, stainless steel, composite plastic or the like.

The springs may be adjustable by the user, for example, as illustrated in FIG. 3. A movable end plate 150 may be provided at the lower end of each spring, which is adjustable by means of turnkey 152 inserted through bore 154 to engage screw threaded member 155 to move plate 150 up and down and thus selectively increase or decrease spring tension.

The magnets or magnet strips are preferably high intensity magnets of the order of 35–43 MGO (magnetic gauss output). The magnets may be of any suitable high grade rare earth magnetic material such as rare earths, neodymium, atrium oxide, alnico, samarium cobalt, carbon black, graphite, bizmuth, bizmuth crystals, barium, strontium, magnetite, electrum, quartz crystals, piezoelectric crystals, ceramics, diamond, cubic zirconium, ferrite, copper alloys, copper oxides of yttrium, lanthanum, electrum, NdFeB or other combinations. The recessed areas in the upper and lower insert members preferably have dimensions of 2 inches by 1.5 inches, and a depth of the order of 0.185 inches. As noted above, plate-like rectangular magnets may be provided of equivalent dimensions for flush fitting in recesses. In the preferred embodiment, as illustrated in the drawings, magnet strips were used which had a length of around 2 inches and width of around 0.17 to 0.25 inches, with a thickness of around 0.185 inches, i.e. substantially equal to the depth of the recess, up to 0.25 inches. The total magnet weight is designed to be no more than 3.2 ounces per shoe. The magnet strips may be mounted on a single rectangular backing plate 156 or multiple backing plates of non-magnetic metal material.

The magnets may alternatively be mounted in recesses in the spring-mounting canisters. Magnets may optionally replace the springs as a perimeter biassing means.

Preferably, the magnets are magnetized during manufacture of the shoe, and not prior to installation in the sole insert members. One possible manufacturing process for installing the insert assembly of FIGS. 1–4 in a shoe sole will now be described. Preferably, the entire sole 12 is formed in two halves, an upper sole part and a lower sole part split along line 60 of FIG. 1. The upper and lower sole parts will be recessed in the heel region to form cavity 28 when the two parts are bonded or otherwise secured together. As mentioned above, the debris shield 34 may be formed integrally with the upper sole part as an initially flat extension of the sole part, or may be formed separately from the upper and lower sole parts.

Preferably, the upper outsole part is designed for attachment to the shoe uppers at a feather line by glue, stitching, sonic welding or the like. Alternatively, the upper outsole part may be molded integrally with the shoe upper, and an insole may also be molded integrally with the upper outsole part. In this case, the upper will be of the same material as the outsole, and joints may be formed more readily via T-joint member 15. Additionally, the outsole has an opening

5,502,901

7

at the heel region through which heel cup **158** extends into an upper recessed area **159** of the upper insert part, forming a second feather line attachment. The recess for receiving the heel cup compensates for the height of the springs and the air gap, so that the shoe is not substantially higher at the heel than normal.

The upper and lower sole parts are first molded separately, and the upper and lower heel insert members are also formed separately by injection molding or the like. The upper and lower insert members are of much harder, more rigid material than the outsole. The outsole may be composite, plastic, polymer, copolymer, natural or synthetic rubber material or the like. In a preferred embodiment of the invention, the outsole material is a mixture of polybutadiene material (synthetic rubber) such as isoprene formulated for high resilience and light weight, substituting an aerogel as a filler material, and other materials. The insert members are of similar material but have a much higher strength than the outsole, for example a shore hardness of at least 90. The upper insert member is then suitably adhesively bonded or overmolded onto the recessed heel portion of the upper sole part, and the lower insert member is similarly secured to the recessed heel portion of the lower sole part. Alternatively, these members may be molded together with the upper and lower sole parts, respectively.

Non-magnetic metal slugs, which are initially non-magnetized, are pressed and bonded into the recessed regions of the upper and lower insert member, either prior to securing these members to the upper and lower sole parts, or after they have been bonded or molded to the upper and lower sole parts. The magnet slugs are then magnetized separately by means of a magnet saturation fixture or capacitor discharge machine of a known type. The magnet saturation fixture is of a conventional type used in magnet manufacture and suitably comprises a C-shaped yoke with magnetizing coils wound around the opposing ends of the yoke and separated by a field gap of a width designed to receive the heel portion of the upper or lower sole part. The magnets in the two sole parts are thus magnetized through the face separately by placing the heel portions successively in the field gap of the magnetizing fixture, and activating the fixture to saturate the magnet slugs. Alternatively, a multipole saturation process may be used, instead of a "through the face" magnetization as described above. The magnetizing polarity is switched for the lower sole part so that like magnet poles are in opposition when the upper and lower sole parts are secured together. By magnetizing the magnet slugs during manufacture, higher intensity magnets can be used in the insert. The magnets preferably have a 35 MGO or magnetic gauss output rating.

The springs are then inserted and secured in one of the canisters, and the two outsole parts are placed together so that the opposite ends of the springs extend into the opposing canisters, snapping closed the snap-lock pins and sleeves so as to prevent separation. The two outsole parts are then compression molded together to form an integral sole **12**, and the debris shield **34** is secured between the two parts to seal the cavity **28**. The outsole is then suitably fitted and attached to upper **14**.

The debris shield **34**, where formed separately from the outsole upper and lower parts, has a length of around 11 inches and a thickness of around 1/8–1/4 inch, and is suitably molded to form bellows as illustrated in FIG. 3.

The insert members may be of any suitable moldable high strength, durable material such as polyethylene, thermoplastics, nylon, PVC, polycarbonates, and the like.

8

Although the cavity and insert is placed in the heel of the shoe, it may be positioned elsewhere in the shoe in alternative embodiments, or additional cavities and inserts may be provided in the sole, for example in the ball of the foot region **22** or the arch region **21**. For example, as indicated in dotted outline in FIG. 1, an empty cavity **62** may be formed in the sole **12** to extend across most of the width of the sole in the ball of the foot region **22**. This may be formed by making suitable recessed regions or grooves in the upper and lower sole parts in the manufacturing process described above, with the recesses opposing one another to form a cavity **62** when the two sole parts are secured together. Empty cavity **62** has a length of at least 1 inch.

In the preferred embodiment, however, a further insert assembly **64** is installed in the sole of the shoe to extend from the heel region up to the toe region **24**, and across the width of the sole, as illustrated in FIG. 7. The insert assembly **64** is preferably centered in the ball of the foot region. It basically comprises a collapsible chamber **66** having an upper flexible wall **67** and a lower flexible wall **68** of composite material. The opposite ends of each wall are secured to end plates **69,70**, respectively, which are located in the arch region and the toe region, respectively of sole **12**. Each end plate **69,70** is slidably mounted in a respective C-shaped channel member **71,72**, and is biassed by spring **73,74** respectively towards the open end of the channel member so as to bias the walls **67,68** to their maximum or fully open position as illustrated in FIG. 7. The channel member **72** at the toe end of the sole has a projecting tongue or flange **75** which is secured in the toe region of the sole. Channel member **71** is secured to an oppositely directed, C-shaped channel member **76** which in turn engages in slots **77** provided for that purpose in the upper and lower wall of the heel region of the sole. The upper and lower parts of the sole are provided with suitably shaped recesses **78,79** for forming a cavity to receive the insert assembly when the sole parts are bonded or overmolded together.

The tension in springs **73** and **74** may be adjustable by means of cam wheels or discs **160** rotatably mounted in each C-channel **71,72** between the inner end of the channel and the respective spring. A turnkey **161** is provided for engaging a hex bore in the center of disc **160** so as to rotate the disc **160** and selectively increase or decrease the spring tension.

With this arrangement, when the wearer transfers weight from the heel to the ball region and toe of the shoe while running or walking, cavity **64** will be compressed, and end plates **69,70** will be pushed outwardly in their respective channel members **71,72**, compressing the springs **73** and **74**. When weight is released as the foot is lifted, springs **73** and **74** will expand and at the same time push walls **67** and **68** outwardly, providing added lift. Cavity **64** is preferably centered in the ball of the sole region, and extends across the entire width of the sole except for a thin outer wall or debris shield on opposite side edges of the sole for sealing the cavity.

FIGS. 5 and **6** illustrate a heel insert assembly according to another embodiment of the invention. As in the previous embodiment, the sole of the shoe has an enlarged rim **80** in the heel region which projects outside the heel region **16** of the shoe upper **14**. The sole has an internal cavity or air gap **82** of equivalent dimensions to the previous embodiment between the upper wall or part **84** of the sole and the lower wall or part **86** of the sole, while a flexible debris shield **88** extends between the upper and lower parts **84,86** of the sole to seal and protect the cavity. The upper part **84** of the sole has a recessed region **90** for receiving a heel cup or heel upper **91** secured to upper **14**, as illustrated in FIG. 5. An

5,502,901

<table>
<tr><td>9</td><td>10</td></tr>
</table>

upper insert member 92 is secured to the upper wall of the sole, while lower insert member 94 is secured to the lower wall 86. Aeration ports 48 extend through upper insert member 92 and heel cup 91 into the upper, as in the first embodiment.

Upper insert member 92 has a generally flat central portion with a rectangular, downwardly facing recess 96 equivalent to recess 44 in the previous embodiment for receiving magnet strips 46 as in the previous embodiment. By providing recesses for mounting the magnet strips such that the outer faces of the magnet strips are flush with the outer face of the recesses or recessed slightly inwardly, potential impact and resultant damage between the opposing magnet faces is prevented. The thickening of the outsole upper piece or wall in the region above the magnets will prevent development of a hard spot in the heel area due to repeated pressure against the magnets.

A plurality of spaced, downwardly facing tubular bosses or canisters 97 extend around the periphery of central portion to follow the periphery of the heel region of the shoe, in a similar fashion to canisters 35 of the previous embodiment. Lower insert member 94 has a central portion with a rectangular, upwardly facing recess 98 opposing recess 96 for receiving magnet strips 47 as in the previous embodiment, as illustrated in FIG. 6. A plurality of spaced, upwardly facing tubular bosses or canisters 100 extend around the periphery of insert 94 in alignment with downwardly facing bosses 97. Downwardly facing bosses 97 each have a central tubular portion or sleeve 102 and upwardly facing bosses 100 have an upwardly projecting post or peg 104 which is slidably engaged in sleeve 102 for alignment purposes. A spring 106 extends between each pair of opposing bosses. Each spring 106 is secured at one end to the inner end of boss 97 with its windings encircling inner sleeve 102, and is secured at the opposite end to the inner end of boss 100, so that the post 104 provides alignment for the spring which encircles it as the springs are repeatedly compressed and expanded.

Debris shield 88 may be formed separately or may be formed integrally with either the lower wall 86 or upper wall 88. As best illustrated in FIG. 5, the shield 88 comprises a relatively thin strip of resilient material with a series of longitudinal grooves 108 extending along its length. The shield may be formed as a flap projecting outwardly from lower wall 86 and then may be bent upwardly around the upper insert member, and may be suitably secured to the upper wall 84 around recess 90 by rivets, bonding or the like. The grooves 108 may be confined to the height of cavity 82 instead of extending the full height of the heel as illustrated in FIG. 5. The shield will be around 11 inches long, 2–3 inches wide, and have a thickness of around ⅛–¼ inch.

The insert assembly of FIGS. 5 and 6 may be installed in the heel of a shoe sole with no other inserts, or it may be used in conjunction with a simple empty cavity in the ball of the foot region as in FIG. 1, or in conjunction with the extended insert assembly 64 as illustrated in FIG. 7. It will operate in a similar fashion to cushion and absorb shock as the wearer pushes down at the heel, compressing springs and moving opposing magnet strips 46,47 closer together. Thus, when pressure is released, the springs will expand and the magnet strips will be biassed apart, the springs and magnets together providing enhanced lift as the wearer walks or runs. The recess 90 has a depth of approximately ⅝ to 1½ inch to compensate for the spring height.

The shoe upper 14 may be attached to the sole 12 of either of the above two embodiments by any conventional means,

such as gluing, stitching, sonic welding or other types of attachment. Alternatively, the upper may be integrally molded with the sole or outsole. Any desired tread pattern may be provided on the bottom surface of the sole 12. A heel guard may be provided if the sole utilizes a built up heel, rather than a generally flat bottomed heel as in FIG. 1. The heel guard will be molded with the outsole and will run across the bottom of the outsole at a location approximately one inch from the front of the heel. The heel guard will comprise a rib of height approximately ¾ of the total heel height and will be approximately ¼ to ½ inch wide.

In each of the above embodiments, additives such as aluminum or stainless steel flakes and other insulative non-conductive materials may be provided in the material/design of both the outsole and the insert members. This will provide EMI (electromagnetic interference), RFI (radio frequency interference) shielding, dB shielding, as well as Guns/Flux shielding.

FIG. 8 illustrates another alternative sole insert assembly 110 which may be installed in the heel or ball of the foot region. As illustrated in FIG. 8, insert assembly 110 replaces insert assembly 64 centered on the ball of the foot region in FIG. 7. The sole of the shoe has an internal cavity 112 extending from the arch to the toe and across the width of the shoe. A pair of alignment plates 114,115 extend lengthwise along cavity 112. A gap 116 is provided between the upper alignment plate 114 and upper floating wall 118 of the cavity, and a similar gap 119 is provided between lower alignment plate 115 and the lower floating wall 120 of the cavity. The upper alignment plate 114 has a series of openings 125 through which spaced posts 126 secured to wall 122 project downwardly. The lower alignment plate 115 has a series of larger openings 128 aligned with openings 125 in the upper plate. A series of tubular sleeves 130 project upwardly from wall 124 through openings 128, and the lower ends of posts 126 are slidably engaged in respective sleeves 130. A spring 132 is mounted on each of the sleeves 130 and extends between panel 124 and a stop collar 134 on the respective post 126. Thus, spring 132 biasses the two floating panels or walls apart.

When the wearer of the shoe pushes downwardly against the upper wall 118 of the cavity, the wall will be pushed downwardly, compressing springs 132 to absorb shock. When pressure is released, the springs will expand to push wall 118 back upwardly, providing lift.

FIG. 9 illustrates an optional modification in which the magnets 40,42 of the previous embodiments are replaced or augmented by electromagnets 140,142 mounted in the upper and lower wall of the cavity 28 as illustrated. The springs have been omitted in FIG. 9 for clarity. Each of the electromagnets coils is connected to a battery source 144,146 or a micro circuit/chip power source and may be pre-charged. The batteries or other power source may be embedded at an appropriate location in the outsole. Preferably, the batteries are designed to be switched on automatically via pressure transducers or the like when a wearer dons the footwear, and will be off to save power when the footwear is not being worn. This arrangement will provide an increased magnetic biassing force for both absorbing shocks and providing lift.

In all of the above embodiments, a cavity or gap in the outsole of the footwear is designed to stay open under all conditions, including when the wearer of the footwear bears downwardly on the sole while walking or running. Biassing means such as springs alone or springs in conjunction with magnetically opposing magnets act to bias the cavity into its fully open condition, such that after the wearer has pressed

5,502,901

**11**

down against the sole and releases pressure, lift will be provided to the wearer's foot by the springs and magnets. Thus, both cushioning against shock on impact with the ground, and lift in moving the foot away from the ground, are provided by means of the insert assembly of this invention.

Although some preferred embodiments of the invention have been described above by way of example only, it will be understood by those skilled in the field that modifications may be made to the disclosed embodiments without departing from the scope of the invention, which is defined by the appended claims.

I claim:

1. An article of footwear, comprising:

an upper shaped to conform to the upper contour of a wearer's foot and including a heel portion for conforming to the wearer's heel;

an outsole member attached to the upper for supporting the sole of a wearer's foot, the outsole member having a heel region, an arch region and a toe region;

the heel region of the outsole member having a rim portion projecting outwardly around the periphery of the heel portion of the upper;

the outsole member having a cavity extending across at least the heel region; the cavity having an upper wall and a lower wall;

biasing means mounted between the upper and lower wall of the cavity around the projecting rim portion of the heel region for biasing said upper and lower wall apart;

at least one upper magnet secured to the upper wall of the cavity in a region beneath the heel portion of the upper, and at least one lower magnet facing the upper magnet and secured to the lower wall of the cavity, the magnets being oriented with like poles facing one another so that there is a magnetic repulsion force between the magnets; and

a plurality of spaced, parallel magnet configurations secured, respectively, to the upper and lower wall of the cavity, each strip on the upper wall being aligned with a corresponding strip on the lower wall, each strip on the upper wall being positioned with its poles oriented in the opposite direction to each adjacent strip, and each strip on the upper wall having its poles oriented in the same direction as the aligned strip on the lower wall.

2. The article as claimed in claim 1, including a plurality of downwardly directed canisters projecting downwardly from the upper wall at spaced intervals around the rim region, and a plurality of upwardly directed canisters projecting upwardly from the lower wall at correspondingly spaced intervals so that the upwardly and downwardly directed canisters are aligned in pairs, each pair of canisters being in telescopic sliding engagement to define a chamber, and each spring being mounted in a respective canister chamber.

3. The article as claimed in claim 1, including a plurality of downwardly directed canisters projecting downwardly from the upper wall at spaced intervals around the rim region, and a plurality of upwardly directed canisters projecting upwardly from the lower wall at correspondingly spaced intervals so that the upwardly and downwardly directed canisters are aligned in pairs, each pair of canisters being spaced apart and each spring being secured at opposite ends in a respective canister.

4. The article as claimed in claim 1, including a flexible debris shield extending between the upper and lower wall of the cavity around the periphery of said rim region.

**12**

5. The article as claimed in claim 4, wherein the debris shield has horizontally extending ribs and grooves forming a bellows-like collapsible member.

6. The article as claimed in claimed 4, wherein the debris shield is formed integrally with the outsole member.

7. The article as claimed in claim 1, including a plurality of aeration vents in said upper wall for air flow into the upper.

8. The article as claimed in claim 1, wherein the outsole has at least one additional cavity extending across at least the ball of the foot region of the outsole member.

9. The article as claimed in claim 8, wherein the cavity is an empty cavity.

10. The article as claimed in claim 8, wherein the additional cavity extends across the width of the outsole member and extends from the arch region towards the toe region of the outsole.

11. The article as claimed in claim 10, including a collapsible chamber within said additional cavity, the chamber having an upper resilient wall and a spaced, lower resilient wall, and biasing means for biasing said resilient walls away from one another.

12. The article as claimed in claim 1, wherein the outsole member comprises in two halves split longitudinally along the length of the article of footwear, the halves being secured together, and the halves being recessed in said heel region to form said cavity when the halves are secured together.

13. The article as claimed in claim 12, wherein the upper is integral with the upper half of the outsole member.

14. The article as claimed in claim 13, including an insole molded integrally with the upper half of the outsole member.

15. The article as claimed in claim 1, wherein the outsole comprises a synthetic polybutadiene material and an aerogel filler.

16. An article of footwear, comprising:

an upper shaped to conform to the upper contour of a wearer's foot and including a heel portion for conforming to the wearer's heel;

an outsole member attached to the upper for supporting the sole of a wearer's foot, the outsole member having a heel region, an arch region and a toe region;

the heel region of the outsole member having a rim portion projecting outwardly around the periphery of the heel portion of the upper;

the outsole member having a cavity extending across at least the heel region, the cavity having an upper wall and a lower wall; and

biasing means mounted between the upper and lower wall of the cavity around the projecting rim portion of the heel region for biasing said upper and lower wall apart;

biasing means comprises a plurality of springs mounted at spaced intervals around said projecting rim portion including an upper insert member secured to the upper wall of the cavity and a lower insert member secured to the lower wall of the cavity, the upper insert member having a series of integrally formed, downwardly directed spring mounting bores for receiving one end of each of the springs and the lower insert member having a series of integrally formed, upwardly directed spring mounting bores for receiving the opposite end of each of the springs;

wherein the upper insert member has a central region having a rectangular, magnet mounting recess, and the lower insert member has an aligned central region with a corresponding magnet mounting recess, a pair of magnetically opposing magnets being mounted in the respective mounting recesses.

5,502,901

13

17. The article as claimed in claim 16, wherein each magnet has a backing plate of non-magnetic material.

18. An article of footwear, comprising:

an upper shaped to conform to the contour of the upper regions of a wearer's foot;

an outsole for securing to the upper to support the sole of a wearer's foot, the outsole having an outer periphery following the general contour of a foot and having a heel region, an arch region, a ball of the foot region add a toe region;

at least the heel region of the outsole being split to form a cavity of selected height extending from the outer periphery of the heel region of the outsole towards the arch region of the outsole, the cavity having an upper wall and a lower wall;

a plurality offsprings extending between the upper and lower wall at spaced intervals around the periphery of the heel region; and

at least one upper magnet mounted on the upper wall and at least one lower magnet mounted on the lower wall facing the upper magnet, the magnets being oriented with like poles opposing one another so that they are magnetically biased away from one another;

whereby said upper wall is pushed downwardly towards said lower wall against the biasing force of said magnets and springs when a wearer presses down on the

14

heel, and the upper wall is biased away from the lower wall by said magnets and springs when pressure is released;

wherein the magnets are electromagnets.

19. The article as claimed in claim 18, including a flexible debris shield extending between the upper and lower wall around the periphery of the split heel region to seal the cavity.

20. The article as claimed in claim 18, wherein said heel region has a peripheral rim projecting outside the periphery of said upper, and said springs are located around said peripheral rim.

21. The article as claimed in claim 18, including snap lock fastener means in said cavity for adjustably securing the upper wall to the lower wall to resist biassing of said upper wall away from said lower wall by a distance greater than said selected cavity height.

22. The article as claimed in claim 18, wherein said outsole has an empty cavity in the ball of the foot region.

23. The article as claimed in claim 18, wherein said cavity height is between ½ inch and ⅝ inch.

\* \* \* \* \*

# EXHIBIT D
# (Part 10 of 17)

US005505010A

# United States Patent [19]

## Fukuoka

| | |
|---|---|
| [11] | **Patent Number:** **5,505,010** |
| [45] | **Date of Patent:** **Apr. 9, 1996** |

[54] **VENTILATING SHOES**

[75] Inventor: **Sadao Fukuoka**, Tokushima, Japan

[73] Assignee: **Fukuoka Chemical Industry Co., LTD.**, Tokushima, Japan

[21] Appl. No.: **241,180**

[22] Filed: **May 11, 1994**

[30]     **Foreign Application Priority Data**

May 12, 1993 [JP] Japan ..................... 5-110279
Mar. 15, 1994 [JP] Japan ..................... 6-043550

[51] **Int. Cl.⁶** ...................................... A43B 7/06
[52] **U.S. Cl.** ................................. 36/3 B; 36/3 R
[58] **Field of Search** ........................... 36/3 R, 3 A, 3 B, 36/29, 114

[56]         **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,660,698 | 2/1928 | Williams, Sr. ................ | 36/2 R |
| 2,354,407 | 7/1944 | Shaks . | |
| 2,558,973 | 7/1951 | Meaker ...................... | 36/3 B |
| 2,716,293 | 8/1955 | Rath . | |
| 3,027,659 | 4/1962 | Gianola . | |
| 4,860,463 | 8/1989 | Pin . | |
| 5,068,981 | 12/1991 | Jung . | |

| | | | |
|---|---|---|---|
| 5,341,587 | 8/1994 | Huang ...................... | 36/3 B |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 0550079 | 8/1956 | Belgium ................... | 36/3 R |
| 0547724 | 6/1993 | European Pat. Off. . | |
| 9101837 | 6/1991 | Germany . | |
| 9210118 | 11/1992 | Germany . | |
| 0538325 | 7/1956 | Italy ...................... | 36/3 B |
| 2245145 | 1/1992 | United Kingdom ........... | 36/3 B |
| WO90/10396 | 9/1990 | WIPO . | |

Primary Examiner—Paul T. Sewell
Assistant Examiner—Ted Kavanaugh
Attorney, Agent, or Firm—Frishauf, Holtz, Goodman, Langer & Chick

[57]         **ABSTRACT**

Ventilation of shoes is efficiently performed by converting an ambulatory movement of the pumping moment of a ventilator in order to eliminate stuffiness and odor in the shoes. The ventilator is comprised of an air groove having a plurality of ventilating holes on the shoe sole, a pump provided inside the heel which returns to the original shape by releasing the stepping in the ambulatory movement, a first unidirectional valve connected between the air groove and the pump which opens/closes the valve by the pressure of the pump, and a second unidirectional valve for ventilating the air.

**14 Claims, 9 Drawing Sheets**



# F I G. 1



# F I G. 2



FIG. 3A



FIG. 3B





FIG. 4

PRESSURE

# FIG. 5



# FIG. 6



# FIG. 7



# FIG. 8



TO ATMOSPHERE

# FIG. 9





FIG. 10

PRESSURE

NEGATIVE
PRESSURE    8a

POSITIVE
PRESSURE

8

8h

PRESSURE

FIG. 11

PRESSURE

NEGATIVE
PRESSURE    8a

POSITIVE
PRESSURE

8b

8

8h

8c

PRESSURE

# FIG. 12



# FIG. 13



# FIG. 14



NEGATIVE
PRESSURE

# FIG. 15



POSITIVE
PRESSURE



FIG. 16

5,505,010

1

## VENTILATING SHOES

### BACKGROUND OF THE INVENTION

The present invention relates to ventilating the shoes having a ventilator for ventilating inside of a shoe during ambulatory movement.

Conventionally, various shoes are produced to improve wearing comfort by ventilating the inside of the shoes via ventilating holes to release damp air or odor in the shoes to the outside.

However, since the structure of such shoes is such that the inside and outside of each shoe are simply connected, ventilation could not be performed efficiently. To solve the above problem, ventilation means for forcefully ventilating air is proposed. However, to provide such ventilation means in a limited space such as a shoe sole, a compact pump with a small valve connected to the pump is needed. In addition, the shoes need to withstand various walking conditions such as dusty roads, wet streets or muddy surfaces. Accordingly, mass production of such shoes is difficult.

### SUMMARY OF THE INVENTION

In light of the above problems, it is an object of the present invention to provide ventilating shoes capable of performing ventilation inside the shoes, and releasing stuffy air and odor by utilizing a ventilator in the shoe using a unidirectional (one-way) valve sole, and converting the ambulatory movement into a pumping movement.

It is another object of the present invention to provide ventilating shoes capable of saving materials for the shoe sole by utilizing the cavity which was originally made to reduce the weight of the shoe.

According to the present invention, the foregoing object is attained by a ventilating shoe including a ventilator which is operated by ambulatory movement, comprising: an air groove having a plurality of ventilating holes; a pump provided inside the heel portion so as to be pressurized by heel pressure, and expand to the original shape by releasing the heel pressure; a first unidirectional valve, provided between the air groove and the pump, which is closed by the compression of the pump, and opened by the expansion of the pump; and a second unidirectional valve, branched off from the portion between the pump and the first unidirectional valve so as to communicate to the atmosphere, for performing ventilation by being opened by the compression of the pump and closed by the expansion of the pump.

According to the present invention, the foregoing object is attained by a ventilating shoe including a ventilator which is operated by ambulatory motion, comprising: an insole having a predetermined strength and a plurality of ventilating holes; a sole, to which a heel is incorporated, having a predetermined strength where a plurality of air grooves are integrated into a single air passage at a meeting portion; a pump provided inside the heel which is pressurized by heel pressure, and which returns to the original shape by releasing the heel pressure; a first unidirectional valve, connected between the meeting portion and the pump via a joint, which is closed by the compression of the pump or opened by the expansion of the pump; and a second unidirectional valve, branched off from the joint so as to connect to the outside of the shoe, which is opened by the compression of the pump, and is closed by the expansion of the pump.

According to the present invention, the foregoing object is attained by a ventilating shoe including a ventilator which is operated by ambulatory motion, comprising: an insole

2

having a predetermined strength which functions as a component of the shoe, and a plurality of ventilating holes; a sole, to which a heel is incorporated, having a predetermined strength where a plurality of air grooves are integrated into one at a meeting portion; a pump provided inside the heel which is compressed by heel pressure, and expanded to the original shape by releasing the heel pressure; a first unidirectional valve, connected between the meeting portion and the pump via a joint, which closes the compression of the pump or opens by the expansion of the pump; and a second unidirectional valve, branched off from the joint so as to connect to the outside of the shoe, which is opened by the pressure of the pump, and is closed by the recovery of the pump, and the pump of the ventilator is contained inside of the heel which is incorporated into the sole, and the joint, first unidirectional valve and second unidirectional valve are embedded in the space under the arch of the foot in the sole.

According to the present invention, the foregoing object is attained by a ventilating shoe having a ventilator which is operated by ambulatory movement, comprising: an air groove having a plurality of ventilating holes; a pump which is pressurized by heel pressure in the ambulatory movement, and expended to the original shape by releasing the heel pressure; a first unidirectional valve, provided between the air groove and the pump via a filter, which is closed by the compression of the pump, and opened by the expansion of the pump; and a second unidirectional valve, branched off from the portion between the pump and the first unidirectional valve so as to communicate to the atmosphere, for performing ventilation by being opened by the compression of the pump and closed by the expansion of the pump.

With the above structure, a positive pressure generated by the pump in the heel closes the first unidirectional valve when a heel pressure of the ventilating shoes is generated in the ambulatory movement, and air is released to the outside via the second unidirectional valve. When the heel pressure is released, an inner negative pressure is generated, and the second unidirectional valve is closed, while the first unidirectional valve is opened. The air inside the shoe is taken into the pump via the air grooves having a plurality of ventilating holes connected to the first unidirectional valve.

The space formed in the sole is efficiently used by containing the pump in the heel portion which is incorporated into the shoe sole, and embedding the first and second unidirectional valves in the space at the arch of foot on the sole.

A ventilating function can be maintained for a long time by preventing dust into the first unidirectional valve by a filtering means.

Other features and advantages of the present invention will be apparent from the following description taken in conjunction with the accompanying drawings, in which like reference characters designate the same or similar parts throughout the figures thereof.

### BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawings, which are incorporated and constitute a part of the specification, illustrate embodiments of the invention and, together with the description, serve to explain the principles of the invention.

FIG. 1 is a cross-sectional view of the case where a person is wearing the shoes of an embodiment according to the present invention;

FIG. 2 is a cross-sectional view of the heel portion of the shoe of FIG. 1;

3

FIG. 3A is a perspective view of the sole of the shoe of FIG. 1;

FIG. 3B is a diagram illustrating the arrangement of the pipes of the shoe of FIG. 1;

FIG. 4 is a perspective view of the assembled ventilator;

FIG. 5 is a perspective view of the suction unit of the ventilator shown in FIG. 4;

FIG. 6 is a perspective view of the joint of the ventilator shown in FIG. 4;

FIG. 7 is a perspective view of another embodiment of the joint of the ventilator shown in FIG. 4;

FIG. 8 is a fragmentary sectional view of the exhaustion unit of the ventilator shown in FIG. 4;

FIG. 9 is an exterior view of the air transmission-unit of the ventilator shown in FIG. 4;

FIG. 10 is a perspective view of the pump;

FIG. 11 is the perspective view of another embodiment of the pump;

FIG. 12 is a view of a partial air valve of the ventilator of the embodiment;

FIG. 13 is a view of a partial air valve of the ventilator of another embodiment;

FIG. 14 is a diagram illustrating the operational state when the air valve opens;

FIG. 15 is a diagram illustrating the operational state when the air valve closes; and

FIG. 16 is a perspective view of the assembled ventilator of another embodiment.

DESCRIPTION OF THE PREFERRED EMBODIMENTS

Preferred embodiments of the present invention will now be described in detail in accordance with the accompanying drawings.

FIG. 1 is a cross-sectional view of a shoe of the embodiment. In FIG. 1, the shoe which is mainly composed of sole 2, insole 3 and upper 1 fits to the foot 4. The insole 3 has a plurality of ventilating holes 5 around the toe tip, and ventilation is performed by these ventilating holes 5. Furthermore, the ventilating holes 5 are placed so as to correspond to the positions of the air holes 12 provided in the sole 2. The air holes 12 are integrated at the meeting portion 12a (FIG. 3A). The ventilator takes the air inside the shoe in the arrow's direction via the inlet 6a at the meeting portion 12a, while exhausting the air inside the shoe to the outside via the exhaustion unit 7 having an outlet 7a at the tip of the exhaustion unit 7. Furthermore, a cylindrical bellows pump 8 having a plurality of folds connects the inlet 6a and outlet 7a respectively via the air transmission unit 11. The sole with the above-described constitution is made into the heel by using polyurethane resin, natural rubber, synthetic rubber, mixture of natural rubber and synthetic rubber, and sponge rubber and RB rubber having a predetermined strength. Furthermore, the heel portion can be comprised of material different from the sole.

FIG. 2 is a cross-sectional view where the main body of the pump 8 is contained in the internal space of the heel. The heel portion is comprised of a concavity 2a, the space having a flat bottom in a substantially circle shape to contain the pump 8, a convexity 2b, in a substantially circle shape, located beneath the concavity 2a projected by thickness T, and a ring-shape groove 2c provided around the convexity 2b.

4

FIG. 3A is a perspective view of the sole 2 without the upper 1 and insole 3. FIG. 3B is a diagram illustrating the arrangement of the pipes of FIG. 3A. Since the air grooves 12 are connected to a plurality of ventilating holes 5 of the insole 3 when the components are assembled as a shoe, an air flow passage is formed, and the air inside of the shoe is taken from the rear end of the air grooves 12. At the rear end of the air groove 12, the above-described inlet 6a is provided, and connected to the joint 9, pump 8 and outlet 7a. A plurality of concavities 2d (FIG. 3A) on the sides of the joint 9 are made to reduce the weight of the shoe.

FIG. 4 shows the assembled ventilator before being installed in the sole 2. The suction unit 6 having the inlet 6a at one end is shown in detail in FIG. 5. The suction unit 6 is formed as a pipe comprising of hard material such as polyvinyl chloride, ABS resin, polypropylene, wood or bamboo. On the other end of the suction unit 6a, a unidirectional valve 13-1 is inserted. The detail of the unidirectional valve 13-1 is shown in FIG. 12. The air valve 13-1 is formed of elastic material such as rubber, soft polyvinyl chloride and AR synthetic rubber whose shape like a bullet. The base of the unidirectional valve 13-1 is open, and the tip is provided with the slit 13a which functions as a valve. This slit 13a can be a single slit or cross shape slit from the view point of the head of the unidirectional valve 13-1, or a single slant slit as shown in FIG. 13.

The suction unit 6 on the side of the unidirectional valve 13-1 is further inserted into the joint 9. FIGS. 6 and 7 are the detail of the joint 9. The joint 9 includes a branch unit 9a, as shown in FIGS. 6 and 7, which unites the suction unit 6, exhaustion unit 7 and air transmission unit 11. After the assembling, these units are assembled to maintain air tightness.

The exhaustion unit 7 inserted into one end of the branch unit 9a is described with reference to FIG. 8. The main body of the exhaustion unit 7 is a pipe made from soft material. The soft pipe 7c to which the unidirectional valve 13-2 is inserted is further inserted into one branch of the branch unit 9a. The unidirectional valve 13-2 is of the same type as that of the unidirectional valve 13-1. The discharge pipe 7b made from soft material is inserted into the other end of the exhaustion unit 7. The discharge pipe 7b is bent so as to discharge air to the bottom or side of the shoe sole, and its opening is outlet 7a. The air transmission unit 11 is shown in FIG. 9. The air transmission unit 11 which is inserted into the other branch of the branch unit 9a is made from soft material, and performs air transmission between the pump 8 and the joint 9.

The detail of the pump 8 is shown in FIGS. 10 and 11. The pump 8 is made from elastic rubber or recoverable materials such a polyethylene, "LINIREX, L-LDPE" (registered trademark of HIHON SEKIYU KAGAKU), polypropylene and styrene butadiene rubber. The pump 8 is cylindrical in shape having three folds 8h which contains air. The bottom of the pump 8 is closed, and the upper portion is a pipe shape. The pipe has an opening 8a, and is inserted into the transmission unit 11. When the pressure is released by exhausting the air inside of the pump 8 with respect to the pressure from the outside by the elasticity of the material and the operation of the folds, the pump recovers to the original shape. The pump of FIG. 11 is similar to the pump of FIG. 10. However, FIG. 11 differs from FIG. 10 in that the bottom is opened and closed by the separate cover 8c by glue or similar means, after the spring 8b is set inside of the pump 8.

The operation of the shoe having the ventilator of FIG. 4 assembled in the above-described manner is contained in the

5,505,010

5

sole 2 with the insole 3 and upper 1 is described below. When a person walks with these shoes, the convexity 2b projected thickness T (approximately 5–10 mm) from the heel surface 2f pushes up the bottom of the pump 8. Since the upper portion of the pump 8 is fixed on the insole 3, the air in the pump 8 is compressed, and air is sent to the joint 9, via the air transmission 11, where the unidirectional valve 13-1 of the suction unit 6 (a first unidirectional valve) and the unidirectional valve 13-2 of the exhaustion unit 7 (a second unidirectional valve) are pressurized.

The operational state of the unidirectional valve 13-1 is shown in FIGS. 14 and 15. FIG. 14 is a diagram illustrating the case where the unidirectional valve 13-1 is subject to negative pressure. The air flows through the opening of the unidirectional valve 13-1, that is, from the inside of suction unit 6 to the outside, but does not flow from the outside to the inside since the pressure inside is greater. This is because the unidirectional valve 13-1 is a bullet shape. In this shape, if the air inside of the valve is pressurized, a force to open the slit 13a to the outside is generated, and air flows out. FIG. 15 is a diagram illustrating the case where the unidirectional valve 13-1 is subject to positive pressure, i.e. outside pressure is greater. Since the unidirectional valve 13-1 is a bullet shape, when the positive pressure acts on the outside of the valve, a force to close the slit 13a is generated, and the air inside the valve 13-1 is prevented from flowing out. As the pressure increases, the force to open/close the slit 13a increases. The operating principal of unidirectional valve 13-2 is similar to that of unidirectional valve 13-1. As described above, both the first unidirectional valve and second unidirectional valve are constituted almost in the same manner.

As described above, ventilation is performed when the air flows only in one direction by using unidirectional valve 13-1 and 13-2. That is, in the joint 9, since unidirectional valve 13-1 connected to the suction unit 6 is arranged to close to positive pressure, while the unidirectional valve 13-2 connected to the exhaustion unit 7 is arranged to open when the pump 8 is pressed, air can be released to the atmosphere via the outlet 7a. Furthermore, when the pressure in the pump 8 is zero, the unidirectional valve 13-2 is automatically closed by elasticity.

When the shoe leaves the surface of the land, since the load on the convexity 2 and the pressure on the pump 8 are eliminated, the pump 8 is subject to a recovering force, and returns to the original shape by its own elasticity. The negative pressure generated at the returning process becomes a suction force which acts on the joint 9 via the unidirectional transmission unit 11. The slit 13a of the unidirectional valve 13-2 of the exhaustion unit 7 closes due to the negative pressure. On the other hand, since the unidirectional valve 13-1 of the suction unit 6 opens in the above-described manner, stuffy air in the shoe is drawn by the pump 8 via the joint 9a. Ventilation is performed by repeating the above operation along with ambulatory motion.

As described in FIG. 1, the ventilation of the unidirectional between the upper 1 and foot 4 is performed via the plurality of ventilating holes 5 and the corresponding air grooves 12 of the sole 2. Air in the shoe is sucked by the pump 8 from the inlet 6a, and discharged to the outside by the outlet 7a. Furthermore, ventilation around the toe tip can be efficiently performed.

The amount of ventilated air depends on the capability of the pump 8, however, air of approximately 2–3 cm³ can be exchanged per pumping. In case of men's shoes, the capac-

6

ity of the internal space of the shoe varies from 7–8 cm³ to 10–15 cm³ at most. Accordingly, in several steps, the entire volume of air in the shoes can be exchanged.

FIG. 16 is a partial sectional view of the assembled ventilator contained in the sole 2. The description of the structural components which have been already described is not needed. However, a filter 20 is inserted into the inlet 6a to prevent the pipe from choking with dust. A result, the slit 13a is protected from the choking, and can function properly for a long period of time.

Furthermore, in FIG. 16, assembling is simplified when the joint 9 is provided with the cover 9h. Furthermore, each part can be produced simply by injection resin molding.

In the above embodiments, men's shoes whose upper is below the anklebone are described. However, this does not impose a limitation upon the invention. For example, the invention can be applied to boots, sports shoes, mountain-climbing boots, women's shoes and children's shoes.

The present invention is not limited to the above-described embodiments. For example, if a shoe has a ventilator for discharging the air in a shoe by pumping means driven by ambulatory movement, various modifications are possible. The ventilator is also not limited to a separate pump, for pump and valves can be incorporated into one unit and contained in the heel portion to reduce the size.

As many apparently widely different embodiments of the present invention can be made without departing from the spirit and scope thereof, it is to be understood that the invention is not limited to the specific embodiments thereof except as defined in the appended claims.

What is claimed is:

1. A ventilating shoe including a ventilator which is operated by ambulatory movement, and which comprises a valve arrangement which includes only first and second unidirectional valves, the ventilating shoe comprising:

an air groove formed between an insole and a sole of the shoe, said insole having a plurality of ventilating holes formed therein and said insole having a strength so as to function as a component of the shoe while having said plurality of ventilating holes therein, and said sole having a strength so as to function as a component of the shoe;

a pump which is incorporated into a cylindrical bellows shape using a resin material and being provided inside a heel portion of the shoe so the cylindrical bellows is pressurized and compressed by heel pressure, and the cylindrical bellows expanding to an original shape thereof upon releasing of the heel pressure;

said first unidirectional valve which comprises a hollow body formed from elastic material, said hollow body of said first unidirectional valve being substantially in a bullet shape having a tapering head which has at least a single slit therein, and said first unidirectional valve being coupled between said air groove and said pump, which slit is closed by a compression of the cylindrical bellows of the pump, and opened by an expansion of the cylindrical bellows of the pump; and

said second unidirectional valve which comprises a hollow body formed from elastic material, said hollow body of said second unidirectional valve being substantially in a bullet shape having a tapering head which has at least a single slit therein, and said second unidirectional valve being branched off from a meeting portion between said pump and said first unidirectional valve so as to communicate to the atmosphere outside of said shoe, for performing ventilation by being

5,505,010

7

opened by the compression of the cylindrical bellows of the pump and being closed by the expansion of the pump.

**2.** The ventilating shoe according to claim **1**, wherein:

said air groove is provided from a toe tip of the shoe to an arch portion of the shoe; and

said first unidirectional valve and said second unidirectional valve are embedded under the arch portion of the shoe in the sole so as to connect to the pump via an air transmission pipe.

**3.** The ventilating shoe according to claim **1**, wherein a convex projection from a large contacting surface of the heel corresponds to a bottom of the pump and is pressurized by the heel pressure in an ambulatory movement.

**4.** The ventilating shoe according to claim **3**, comprising a ring-shaped concavity provided around said convex projection.

**5.** The ventilating shoe according to claim **1**, wherein said resin material of said cylindrical bellows is polyethylene.

**6.** The ventilating shoe according to claim **1**, wherein said resin material of said cylindrical bellows is styrene butadiene rubber.

**7.** The ventilating shoe according to claim **1**, wherein said pump further includes a compression spring coupled to said cylindrical bellows to enhance expansion of said cylindrical

8

bellows to the original shape thereof upon releasing of the heel pressure.

**8.** The ventilating shoe according to claim **1**, comprising a concavity formed in the vicinity of a space under the arch portion of the shoe to reduce an amount of material for forming the sole.

**9.** The ventilating shoe according to claim **1**, wherein said sole is formed of a polyurethane rubber resin.

**10.** The ventilating shoe according to claim **1**, wherein said sole comprises natural rubber.

**11.** The ventilating shoe according to claim **1**, wherein said sole is formed of a sponge rubber having a predetermined strength.

**12.** The ventilating shoe according to claim **1**, wherein said sole is formed of a thermal plasticity rubber.

**13.** The ventilating shoe according to claim **1**, wherein said sole comprises synthetic rubber.

**14.** The ventilating shoe according to claim **1**, comprising a plurality of said air grooves, each of said air grooves communicating with a plurality of ventilating holes in said insole, and each of said air grooves communicating with said pump via said first unidirectional valve.

*   *   *   *   *

US005595002A

# United States Patent [19]

## Slepian et al.

[11] **Patent Number:** 5,595,002

[45] **Date of Patent:** Jan. 21, 1997

[54] **STABILIZING GRID WEDGE SYSTEM FOR PROVIDING MOTION CONTROL AND CUSHIONING**

[75] Inventors: **Neil R. Slepian**, Durham, N.H.; **Michael P. Kirk**, Salem; **Joseph Hamill**, Florence, both of Mass.

[73] Assignee: **Hyde Athletic Industries, Inc.**, Peabody, Mass.

[21] Appl. No.: **349,405**

[22] Filed: **Dec. 5, 1994**

[51] Int. Cl.⁶ .......................... **A43B 13/28**; A43B 21/26; A43B 5/00

[52] **U.S. Cl.** .................................. **36/27**; 36/35 R; 36/114

[58] **Field of Search** ..................... 36/30 R, 31, 28, 36/114, 27, 35 R, 143, 144

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 2,001,821 | 5/1935 | Everston . |
| 2,677,906 | 5/1954 | Reed . |
| 3,724,106 | 4/1973 | Magidson . |
| 3,738,373 | 6/1973 | Glancy ...................................... 36/144 |
| 4,180,924 | 1/1980 | Subotnick . |
| 4,297,797 | 11/1981 | Meyers . |
| 4,364,188 | 12/1982 | Turner et al. ........................... 36/30 R |
| 4,364,189 | 12/1982 | Bates . |
| 4,445,283 | 5/1984 | Meyers . |
| 4,506,462 | 3/1985 | Cavanagh . |
| 4,547,979 | 10/1985 | Harada et al. ................................ 36/31 |
| 4,624,061 | 11/1986 | Wezel et al. ................................ 36/31 |
| 4,627,177 | 12/1986 | Meyers . |
| 4,680,875 | 7/1987 | Danieli ........................................ 36/31 |
| 4,694,591 | 9/1987 | Banich et al. ............................... 36/31 |
| 4,730,402 | 3/1988 | Norton et al. ......................... 36/30 R |
| 4,890,397 | 1/1990 | Harada et al. ......................... 36/30 R |
| 5,070,629 | 12/1991 | Graham et al. . |
| 5,402,588 | 4/1995 | Graham et al. ........................... 36/27 |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 1367968 | 1/1988 | U.S.S.R. ................................ 36/30 R |

*Primary Examiner*—B. Dayoan
*Attorney, Agent, or Firm*—Wolf, Greenfield & Sacks, P.C.

[57] **ABSTRACT**

A stabilizing system providing motion control and cushioning. The stabilizing system is locating in the heel assembly and has at least one grid assembly extending laterally over at least a portion of the shoe construction from the medial to the lateral side in the heel region, and a cushioning wedge supporting the grid assembly. The cushioning wedge is thicker along the lateral portion than the medial portion and has greater compressibility than the other components in vertical alignment therewith whereby the medial portion is less compressible than the lateral portion thereby mitigating the likelihood of overpronation.

**19 Claims, 3 Drawing Sheets**



**U.S. Patent**        Jan. 21, 1997        Sheet 1 of 3        **5,595,002**



*Fig. 1*



*Fig. 2*



Fig. 3

Fig. 4



*Fig. 5*

*Fig. 6*

5,595,002

**1**

## STABILIZING GRID WEDGE SYSTEM FOR PROVIDING MOTION CONTROL AND CUSHIONING

### SUBJECT MATTER OF THE INVENTION

1. Field of the Invention

The present invention relates to a shoe construction and more particularly to a shoe construction having means for stabilizing the foot of a runner by imparting motion control and cushioning.

2. Background of the Invention

Biomechanics has taught that the running gait cycle begins with the heel strike, that is when the foot first impacts the ground. The foot first strikes the ground along a lateral portion of the heel in a supinated position. As the gait cycle continues, the foot rotates substantially transverse or inward through the midstance position toward the medial portion of the foot. When the foot moves to the medial portion, it is in the pronated phase.

Ability to control the rearfoot through the gait cycle is important. Studies have shown that overpronation, which occurs when the foot rotates too far inward, may result in potentially serious injuries. One author noted that "[r]earfoot control can be defined in running shoes as the relative ability of a shoe to limit the amount and or rate of subtalar joint pronation immediately following foot strike. A normal amount of pronation is helpful in decreasing peak pressures experienced by the foot and leg, but excessive pronation can be harmful if it produces increased internal or medial leg rotation causing stress in various bones and soft tissue." Cheskin, *The Complete Handbook of Athletic Footwear* 267 (1987).

Avoiding such injuries may be accomplished through a variety of constructions. The basic concept of such constructions is to have a softer cushioning material on the outside or lateral portion of the shoe in comparison with a harder material on the inside or medial portion of the shoe. Having different material compressibilities between the medial and lateral portions is essential to providing rearfoot control to help overpronation. A prior art method to accomplish this includes use of discrete materials within the midsole region having different compressibility characteristics.

None of the prior art systems, however, satisfactorily achieve the combination of cushioning and motion control. Moreover, the prior art does not sufficiently slow the rate of rotation to mitigate the likelihood of overpronation.

### SUMMARY OF THE PRESENT INVENTION

It is the object of the present invention to provide a stabilizing system which is a combination motion control and cushioning system.

It is another object of the present invention to provide an improved stabilizing system which is simple and inexpensive to manufacture.

It is still another object of the present invention to provide a stabilizing system which provides cushioning to the foot during heel strike and thereafter slows the rate of pronation through the gait cycle.

These and other objects of the present invention are accomplished by having a heel assembly with at least one grid assembly extending laterally over at least a portion of the shoe construction from the medial to the lateral side in the heel region, and a cushioning wedge supporting the grid assembly. The cushioning wedge has a thicker portion along

**2**

the lateral portion than the medial portion and is also more compressible than the other components in vertical alignment therewith whereby the medial portion is less compressible than the lateral portion thereby mitigating the likelihood of overpronation.

These and other objects and features of the present invention will be better understood and appreciated from the following detailed description of one basic embodiment thereof, selected for the purpose of illustration and shown in the accompanying drawings, in which:

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a perspective view of a cut away of selected components of a shoe construction illustrating the present invention;

FIG. **2** is an exploded view of the present invention from a similar perspective as illustrated in FIG. **1**;

FIG. **3** is a top view of the present invention;

FIG. **4** is a bottom view illustrating a portion of the present invention;

FIG. **5** is a cross-sectional view of the present invention taken along the lines **5—5** of FIG. **3**; and

FIG. **6** is a cross-sectional view of the present invention taken along the lines **6—6** of FIG. **3**.

### DETAILED DESCRIPTION OF THE INVENTION

The primary components comprising the stabilizing system **20** may generally be seen in FIGS. **1**, **2**, and **5**. The system **20** is positioned in the heel region **21** of the midsole layer **22** of a standard shoe sole assembly **24** (FIG. **5**). The stabilizing system **20** has three basic components, a first or top grid **30**, a cushioning wedge **32**, and a second or bottom grid **34**. The preferred embodiment further has a cover **36** which is positioned above the top grid **30**. The overall assembly **20**, including cover **36**, is preferably secured in vertical alignment by means known in the art such as cement or other securing-means.

The grids **30** and **34** are generally illustrated and described in U.S. Pat. No. 5,070,629, which issued Dec. 10, 1991, and which is incorporated herein by reference. That patent describes the grids **30** and **34** which, in the present system **20**, are defined by peripheral flanges or frames **40** and **42**, and a plurality of fibers **44** and **46**, respectively. The fibers **44** and **46** may be of nylon, plastic, or some other suitable filament, which are molded into a structure resembling a net **48** and **50** positioned substantially in the plane of the frame **40** and **42**.

In the preferred embodiment, the respective plurality of fibers **44** and **46** are vertically aligned in the sole assembly **24**. A transparent, concave midsole dome **52** is secured to and extends upwardly through the sole **54**. In this arrangement, the fibers **46** of the bottom grid **34** can be seen with the top fibers **44** in the background (FIG. **4**). In another embodiment, the bottom grid **34** may be replaced with a structure only comprising the frame portion, that is, there would be no net **50** in this alternative embodiment. If such a replacement structure is used, then the net **48** of the top grid **30** will only be seen through the dome **52**. The dome **52** in combination with a grid is the subject of U.S. patent application Ser. No. 07/659,874, filed Feb. 25, 1991, which is also incorporated herein by reference.

5,595,002

3

A cushioning wedge 32 is positioned between the top and bottom grids 30 and 34. The wedge 32 has a sideways oriented V-shaped cross-section as seen in FIG. 6. The wedge top surface 60 lies in a horizontal plane and is parallel to and supports the frame 40 of the top grid 30, while the wedge bottom surface 62 is angled from the top surface 60 and lies in a plane parallel to and facing the upper surface of frame 42 of the bottom grid 34. Preferably, the angle formed by the top surface 60 and the bottom surface 62 is 10°, however, the angle may be in the range of approximately 5° to 20°. Thus, the cushioning wedge 32 has a thick side 70 and a thin side 72 (FIG. 6).

The cushioning wedge 32 has an open area 64 defined by its enclosing walls. The cushioning wedge 32 may be compressed by foot pressure on the net 48. When this occurs the net 48 deforms to conform to and cushion the heel. The net 48 may move downwardly into the open area 64 as it absorbs the force of the heel. The dimensions and alignment of the cushioning wedge 32 and grids 30 and 34 is such that the frames 40 and 42 of the respective grids 30 and 34 lie flush against the respective surfaces of the wedge 60 and 62. The cushioning wedge 32 does not contact either net 48 or 50. Moreover, the frame portion 42 of the bottom grid 34 supports the cushioning wedge 32 as downward force is imparted by the runner.

The stabilizing system 20 is oriented in the shoe sole assembly 24 with the thick side 70 on the lateral side 74 of the shoe sole assembly 24 and the thin side 72 on the medial side 76 (FIGS. 3 and 6). This orientation allows for the first strike through pronation to proceed from the thick side 70 to the thin side 72.

The combination of the materials which make up the lateral side of the heel region 21 and lateral side of the stabilizing system 20 is more compressible than the materials on the medial side of both the heel and the assembly 20. Since the thickness and compressibility of the cover 36 and grids 30 and 34 are the same on both sides, the compressibility of the lateral side 70 of the cushioning wedge 32 and the midsole 22 must be greater than the medial side 72 of the cushioning wedge 32 and the midsole 22. Obviously, the compressibility of the center portion is greatest because the open area 64 of the cushioning wedge 32 provides no resistance at all. As seen in FIG. 6, the midsole region 80 in vertical alignment below the lateral, thicker side 82 of the assembly 20 is smaller than the midsole region 86 below the thinner side 84 of the assembly 20. To maintain the greater cushioning characteristics of the lateral side in comparison with the medial side, the midsole material must be less compressible than the cushioning wedge material.

In the operation of the system, the initial, substantial cushioning of the foot during the first strike, which is on the lateral side 74, absorbs the initial force imparted by the runner. The gradual increase of the stiffness in the assembly 20 from the lateral to medial sides slows the rate of rotation of the foot thereby mitigating the likelihood of overpronation. Since the rotation of the foot is slowed down, the foot reaches maximum pronation at about fifty percent through the gait cycle as opposed to many other gait cycles where maximum pronation is reached at between 40 and 45 percent.

Among the dimensions and materials for use with the components are as follows.

The grids 30 and 34 have been described in U.S. Pat. No. 5,070,629. Preferably, the grids are made from a relatively non-compressible plastic, such as a polyester, including Hytrel®. The height of the grids is preferably 2.0 mm, while

4

in the range of about 0.5 mm to 3.0 mm. The width of the grids is preferably 58 mm, while in the range of about 50 mm to 65 mm. The preferably grid length is 82 mm, which is in the range of approximately 77 mm to 87 mm. Finally, the frame of the grid should be about 10 mm, while as wide as 15 mm. The grids should have a Shore D hardness value of approximately 72, and in the range of 55 to 82.

The cushioning wedge 32 and the cover 36 are preferably made from a low density polyurethane, EVA, or some other cushioning material with a Shore C hardness of approximately 50, but in the range of 47 to 53. The cover has a height of 2.2 mm, which may be as tall as 5.0 mm. The width and length of the cushioning wedge 32 and cover 36 should obviously be similar to the grids 20 and 34. The cushioning wedge 32 has a height of 2.0 mm on the medial side which increases to 12.4 mm on the lateral side. The height should be as tall as about 2.5 mm on the medial side and in the range of about 7 mm to 13 mm on the lateral side. The cushioning wedge 32 should support and be fully supported by the grid frames 40 and 42, respectively.

The midsole 22 should be made of a material that is less compressible than the cushioning wedge 32, but more compressible than the grid frames 40 and 42. Acceptable materials include resilient compressible material such as a microcellular filled closed cell foam, preferably a polyurethane (PU), an ethyl vinyl acetate (EVA), or a combination of the two materials. The preferable Shore C hardness value of the midsole material for PU is in the range of about 62 to 68 for the skin and approximately 35 for the core, while the EVA is preferably in the range of 53 to 59 after roughing the skin. This means that the total vertical thickness of the lateral side 82 and midsole region 80 is more compressible than the total vertical thickness of the medial side 84 and midsole region 86.

Having described this invention in detail, those skilled in the art will appreciate that numerous modifications may be made thereof without departing from the spirit of this invention. Therefore, it is not intended that the scope of this invention be limited to the embodiment illustrated and described. Rather, it is intended that the scope of this invention be determined by the appended claims and their equivalents.

We claim:

1. In a shoe construction with a heel region having a lateral and medial side, a stabilizing system, comprising:

at least one component extending laterally over at least a portion of the shoe construction from the medial side to the lateral side thereof in the heel region;

a cushioning wedge supporting said at least one component, said cushioning wedge having a lateral portion, medial portion, and center portion therebetween, said lateral portion being thicker than said medial portion and having greater compressibility than said medial portion; and

and said center portion having a compressibility greater than both said lateral portion and said medial portion of said cushioning wedge thereby resisting pronation.

2. The stabilizing system as set forth in claim 1, further including means supporting said cushioning wedge along its periphery with said supporting means having a higher durometer than said cushioning wedge.

3. The stabilizing system as set forth in claim 2, wherein said at least one component comprises a grid, said grid having a grid frame and grid net, and wherein said grid frame provides at least in part said supporting means and defines an opening wherein said grid net is suspended.

5,595,002

| 5 | 6 |

**4**. The stabilizing system as set forth in claim **2**, further including a sole assembly with components thereof extending below said supporting means and with the compressibility of the combination of the cushioning wedge, supporting means and sole components greater on the lateral than the medial side thereof.

**5**. The stabilizing system as set forth in claim **1**, wherein said at least one component comprises a grid.

**6**. The stabilizing system as set forth in claim **1**, wherein said cushioning wedge has a top surface and a bottom surface, said top surface and said bottom surface form an angle of 10°.

**7**. The stabilizing system as set forth in claim **2**, wherein said cushioning wedge has a Shore C hardness value of about 50.

**8**. The stabilizing system as set forth in claim **1**, further including a cover extending parallel and in vertical alignment with said at least one component.

**9**. The stabilizing system as set forth in claim **3**, wherein said cushioning wedge has walls at least along said lateral and medial portions, said walls defining an open area in vertical alignment with said grid net.

**10**. The stabilizing system as set forth in claim **9**, wherein said cushioning wedge has a top surface and a bottom surface, and wherein said grid is disposed on said top surface.

**11**. The stabilizing system as set forth in claim **10**, including a second component, said second component being a second grid disposed on said bottom surface of said cushion wedge.

**12**. The stabilizing system as set forth in claim **1**, wherein said cushioning wedge has a top surface and a bottom surface and said at least one component is disposed on said top surface.

**13**. The stabilizing system as set forth in claim **12**, wherein a second component is disposed on said bottom surface.

**14**. The stabilizing system as set forth in claim **13**, wherein said at least one component is a grid.

**15**. The stabilizing system as set forth in claim **1**, wherein said cushioning wedge has a top surface, said top surface oriented in a plane substantially parallel to a running surface.

**16**. The stabilizing system as set forth in claim **15**, wherein said cushioning wedge has a right angle triangle cross-section.

**17**. In a shoe construction, a heel assembly having lateral, medial, and center portions for controlling pronation and providing cushioning during running, comprising:

a plurality of vertically oriented components, the assembly having different material characteristics in the medial, center, and lateral portions of the heel, said components forming the lateral portion including a compressible material of one durometer and a medial portion including a compressible material of the same durometer but having less height, and the center portion being more compressible than the lateral and medial portions.

**18**. The stabilizing system as set forth in claim **17**, wherein said compressible material includes an open area along said center portion.

**19**. The stabilizing system as set forth in claim **18**, wherein said plurality of vertically oriented components include at least one grid.

*  *  *  *  *

US005607749A

# United States Patent [19]

## Strumor

[11] Patent Number: 5,607,749

[45] Date of Patent: Mar. 4, 1997

[54] **ERGONOMIC KINETIC ACUPRESSURE MASSAGING SYSTEM**

[76] Inventor: **Mathew A. Strumor**, 158 Key Heights Dr., Tavernier, Fla. 33070

[21] Appl. No.: **635,407**

[22] Filed: **Apr. 26, 1996**

### Related U.S. Application Data

[63] Continuation-in-part of Ser. No. 364,134, Dec. 27, 1994, abandoned.

[51] **Int. Cl.<sup>6</sup>** ..................................................... **B32B 3/00**
[52] **U.S. Cl.** ......................... **428/156**; 428/141; 428/179; 428/188; 428/313.5; 5/724; 5/652.1; 297/DIG. 8; 601/148; 36/28; 36/29
[58] **Field of Search** ................................ 428/85, 88, 141, 428/179, 156, 188, 313.5; 36/28, 29, 37, 71; 5/690, 724, 652.1, 944; 297/DIG. 8; 601/148, 149, 150, 156, 158

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,681,797 | 8/1972 | Messner | 5/347 |
| 4,263,728 | 4/1981 | Frecentese | 36/129 |
| 4,342,158 | 8/1982 | McMahon et al. | 36/35 R |
| 4,521,979 | 6/1985 | Blaser | 36/29 |
| 4,680,876 | 7/1987 | Peng | 36/35 B |
| 4,776,109 | 10/1988 | Sacre | 36/3 B |
| 4,895,352 | 1/1990 | Stumpf | 267/80 |

| | | | |
|---|---|---|---|
| 5,035,068 | 7/1991 | Biasi | 36/3 R |
| 5,060,328 | 10/1991 | Larson | 5/450 |
| 5,175,946 | 1/1993 | Tsai | 36/29 |
| 5,253,377 | 10/1993 | Larson | 5/451 |
| 5,467,489 | 11/1995 | Cohen | 5/475 |

*Primary Examiner*—Patrick Ryan
*Assistant Examiner*—Marie R. Yamnitzky
*Attorney, Agent, or Firm*—Donald A. Kettlestrings

[57] **ABSTRACT**

An acupressure massaging system includes a platform having an upper surface, and includes an array of intersecting air channels extending therethrough in communication with space external of the pad. An array of spaced, independently flexible nipples extends from the upper surface of the platform, each nipple having an upper distal end and a flexible, accordion-pleated side wall comprised of material having elastic memory and defining an internal air-flow chamber. The air-flow chamber is in fluid communication with the air-flow channels and each nipple is structured and disposed for movement from a biased and normally extended position to a compressed position in response to contact with the skin or clothing of the user. The elastic memory of the nipples' side walls, created by the accordion-pleated side wall structure in cooperation with the elastic memory of the material of the side walls, normally urges the nipples to their extended positions to exert a kinetic counterforce on the skin or through clothing of the user providing an acupressure massaging and air-flow effect.

**9 Claims, 8 Drawing Sheets**





*F/G.    1*



*F/G.    2*



*FIG.    3*



*FIG.    4*



*FIG.    5*



$$\underline{FIG. \quad 6a}$$



$$\underline{FIG. \quad 6b} \qquad \underline{FIG. \quad 6c} \qquad \underline{FIG. \quad 6d} \qquad \underline{FIG. \quad 6e}$$



*FIG.   7*



*FIG. 8*



*FIG. 10*



*FIG. 9a*



*FIG. 9b*



*FIG. 11*

*FIG. 12*

**U.S. Patent**        Mar. 4, 1997        Sheet 8 of 8        **5,607,749**



*FIG. 13*

5,607,749

**1**

# ERGONOMIC KINETIC ACUPRESSURE MASSAGING SYSTEM

## CROSS REFERENCE TO RELATED APPLICATION

This application is a continuation-in-part of application Ser. No. 08/364,134, filed Dec. 27, 1994, for Ergonomic Acupressure Air-Flow Pad (now abandoned).

## BACKGROUND OF THE INVENTION

The present invention relates to an acupressure massaging system, and more particularly to an acupressure ergonomic kinetic and massaging system having an array of normally extended compressible nipples adapted to acupressure massage and invigorate the user. Acupressure is defined as the application of pressure to parts of the human body. Ergonomics is defined as the study of the problems of people in adjusting to their environment; the science that seeks to adapt work or working conditions to suit the worker. Kinetic is defined as of or resulting from motion.

While it is recognized that sports and other highly active physical activities are often the cause of injuries, there is an increasing awareness that virtually any activity that involves a repetitious motion or contact of an object with the body may cause stress to the muscle and tendons, resulting in repetitive strain injury (RSI). Presently, injuries to the muscles and tendons are most commonly treated with physical therapy. Physical therapy encompasses a variety of modalities including massage, exercise, hydrotherapy, and ultrasound to name a few. Physical therapy, however, is concerned with the treatment of physical ailments, not the prevention of them. There is, therefore, a need to provide a means to prevent injuries, for instance those injuries resulting from repetitive strain, such as carpal tunnel and torsal tunnel syndrome.

Recently, the use of keyboards has been identified as a major contributing factor in repetitive .strain injuries to the hands and wrists. This is due to the fact that keyboards tend to force the upper body into unnatural positions, causing the hands to bend with the wrists cocked, resulting in straining of the tendons and muscles and reducing circulation. Although designers may reduce the incidence of repetitive stress injuries such as carpal tunnel syndrome through ergonomic considerations, experts expect that millions of workers per year will join the millions of workers around the world who have already been gripped by repetitive strain injuries.

The tragedy of repetitive strain injuries is that they are relatively easy to prevent but hard to cure. Doing warm-up exercises, maintaining good posture, keeping your arms loose, holding hands properly, stretching occasionally and taking frequent rest breaks all help to prevent injury. However, despite these simple preventive methods, many workers don't remember, or plainly ignore these guidelines. A need therefore exists for a device which helps prevent repetitive strain injuries, as well as other injuries, without requiring any additional action or preparatory rituals on the part of the user, other than going through the motions to perform the task at hand.

Accordingly, the present invention is directed to an ergonomic kinetic acupressure massaging system or material specifically structured to acupressure massage the user during and throughout a body motion, whether running, walking, typing, swinging an instrument such as a bat or golf club, or virtually any other motion required to perform an activity.

**2**

Numerous innovations for acupressure massaging materials have been provided in the prior art which are complex and expensive, for instance those found in the soles of athletic shoes. Even though these innovations may be suitable for the specific individual purposes to which they address, they differ significantly from the present invention, as hereinafter contrasted.

## SUMMARY OF THE INVENTION

The present invention is directed to an acupressure massaging system having a platform with an upper surface, the platform including an array of air-flow channels extending therethrough and in fluid communication with space external of the pad; and an array of spaced independently flexible nipples extending from the upper surface of the platform, each nipple having an upper distal end and a flexible collapsible side wall structure surrounding an internal chamber. The air chamber of each nipple is disposed in fluid communication with all channels in the platform. Each nipple is adapted for movement from a normally relaxed extended position to a compressed position in response to a kinetic external force resulting from contact with the skin or clothing of the user. The nipples are further configured with accordion-pleated side walls to be biased towards the normally relaxed extended positions as a result of elastic memory of the material of the side walls and the accordion-pleated side wall structure so as to exert a counterforce on the skin or through the clothing of the user.

Accordingly, it is an object of the present invention to provide an inexpensive acupressure massaging member which can be incorporated within a wide range of products and which is specially structured to reduce the incidence of injuries to the muscles and tendons.

Still further, it is an object of the present invention to provide an acupressure massaging pad which includes an array of protruding nipples structured to provide a kinetic massaging force to a user upon contact and movement so that the constant acupressure massaging creates a stimulating effect.

In keeping with these objects, and with others which will become apparent hereinafter, one feature of the present invention resides, briefly stated, in the compressibility of each of the nipples, which can be compressed to approximately one third of its size, and the kinetic counter-active force exerted by each of the nipples as the nipples are constantly urged towards the extended state because of the elastic memory characteristic of the material of the side walls of the nipples acting in cooperation with the accordion-pleated structure of the side walls.

The novel features are considered characteristics for the invention are set forth in appended claims. The invention itself, however, both as to its construction and its method of operation, together with additional objects and advantages thereof, will be best understood from the following description of the specific embodiments when read and understood in connection with the accompanying drawings.

## BRIEF LIST OF REFERENCE NUMERALS UTILIZED IN THE DRAWINGS

**1.** acupressure massaging system
**2.** nipple
**4.** platform

5,607,749

**3**

4A. upper surface of platform
**6.** air-flow holes
**8.** air-flow channels
**10.** distal end of nipple
**12.** wall of nipple
**14.** air-flow chamber
**15.** recess area
**16.** top open end of recess area
**18.** fabric on distal end of nipple
**22.** vertical axis
**24.** massaging movement
**26.** contacting surface
**28.** first horizontal directional movement of nipple
**30.** second horizontal directional movement of nipple
**32.** upward directional movement of nipple
**34.** downward directional movement of nipple
**36.** sport shoes or boots
**38.** inside lining
**40.** wrist wrap
**41.** wrist
**42.** keyboard
**44.** wheelchair
**50.** sleeve for knee brace or elbow brace with massaging comfort
**52.** limb
**54.** bending zone of sleeve
**60.** golf club handle
**62.** grip texture on distal ends of nipples
**64.** hands of user
**100.** acupressure massaging system
**200.** acupressure massaging system
**300.** acupressure massaging system

BRIEF DESCRIPTION OF THE DRAWINGS

For a fuller understanding of the nature of the present invention, reference should be had to the following detailed description taken in connection with the accompanying drawings in which:

FIG. 1 is a partial perspective view of an acupressure massaging system constructed in accordance with a first preferred embodiment of the present invention;

FIG. 2 is a cross-sectional view of a nipple taken along line 2—2 of FIG. 1;

FIG. 3 is a partial front elevational view of the system of FIG. 1 illustrating the nipples in an extended position;

FIG. 4 is a partial front elevational view of an acupressure massaging system constructed in accordance with a second preferred embodiment of the present invention illustrating fabric on the distal ends of the nipples;

FIG. 5 is a cross-sectional view of an acupressure massaging system constructed in accordance with a third preferred embodiment of the present invention illustrating the nipples recessed in the platform;

FIG. 6a is a perspective view of the platform of FIG. 2 illustrating the full range of motion of the nipple;

FIGS. 6b through 6e are partial front elevational views of the platform of FIG. 6a illustrating movement of the nipple in various directions;

FIG. 7 is a partial cutaway perspective view of the platform of FIG. 1 incorporated in a sport shoe or boot;

FIG. 8 is a perspective view of the platform of FIG. 1 incorporated into a wrist wrap;

FIG. 9a is an elevational view of the platform of FIG. 1 incorporated into a sleeve;

**4**

FIG. 9b is a view similar to that of 9a illustrating the sleeve on a limb;

FIG. 10 is a perspective view of the platform of FIG. 1 incorporated in a wheelchair;

FIG. 11 is an elevational view of an acupressure massaging system constructed in accordance with a fourth preferred embodiment of the present invention illustrating the acupressure massaging system incorporated into a golf club handle;

FIG. 12 is a partial cross-sectional view of the acupressure massaging system of FIG. 11 showing the nipples massaging the user's hand while the air-flow exiting the air holes creates a tender touch; and

FIG. 13 is an isolated elevational view of the embodiment of FIG. 11 shown on the handle of a garden tool or like instrument of the type having a shaft with a handle on the end.

DETAILED DESCRIPTION OF THE
PREFERRED EMBODIMENTS

Referring to FIGS. 1–3, there is illustrated acupressure massaging system **1** constructed in accordance with a first embodiment of the present invention. Acupressure massaging system **1** includes an array of spaced flexible and collapsible nipples **2** extended vertically upwardly from an upper surface 4A of platform **4**. As best seen in FIG. 2, a surrounding side wall **12** of nipple **2** is provided with an accordion-pleated construction to facilitate compression and circulation of air as will be explained in more detail. Side wall **12** is disposed in surrounding relation to an interior air chamber **14**. Platform **4** further includes air channels **8** extending both transversely and longitudinally within the interior of platform **4**. Air-flow holes **6** are formed through surface 4A of platform **4** and extend into air channels **8** in fluid air-flow communication therewith, creating air-flow throughout pad **1**.

Referring to FIGS. 6a–6e, each nipple **2** of pad **1** is structured and configured to move independently of the other nipples **2** in infinite directions with respect to a vertical axis **22** defined by the nipple **2** to provide a kinetic massaging motion **24**. When placed in contact with a surface **26**, for example a user, side wall **12** of each of nipples **2** compresses and moves in response to the kinetic force exerted by contacting surface **26** thereon. The movement of nipples **2** may be in horizontal directions **28, 30**, in vertical directions **32, 34**, or in a variety of combinations of the two. Compression and movement of nipples **2** is made possible by the flexible and collapsible accordion-pleated construction of side wall **12** along with the venting of air in and out of air chambers **14**. This creates a recirculation or air-flow effect through air-flow channels **8** and air-flow holes **6** to prevent suction, and thus promotes free movement of nipples **2**.

During contact with contacting surface **26**, nipples **2** exert an acupressure massaging counterforce on contacting surface **26** as the biasing structure of side wall **12** urges nipples **2** toward the relaxed extended position. Nipples **2** are urged toward the normally relaxed extended position because of the memory characteristics of the material of side wall **12** acting in cooperation with the accordion-pleated structure of side wall **12**. When the force of a contacting surface **26** is removed from a nipple **2**, the shape and memory characteristics of side wall **12** returns nipples **2** to their normal extended position, as seen in FIG. 1.

5,607,749

5

The acupressure massaging system 1 of the present invention may be incorporated into a variety of products and shapes, wherein nipples 2 can apply therapeutic massaging pressure on the user during normal activity and use of the product and can also create an air-flow to produce a stimulating effect.

One example of such a use is shown in FIG. 7 wherein acupressure massaging system 1 is incorporated into lining 38 of a sport shoe or boot 36. Another example of a use of acupressure massaging system 1 is shown in FIG. 8 wherein acupressure massaging system 1 is fitted as part of the inner lining of a wrist wrap 40. Wrist wrap 40 is adapted to apply support and acupressure massaging air-flow to wrist 41 of a user while performing an activity, such as operating a keyboard 42.

A further example of the use of an acupressure massaging system 1 is shown in FIGS. 9a–9b wherein acupressure massaging system 1 is incorporated into a sleeve 50 of a knee brace or elbow brace. Sleeve 50, including acupressure massaging system 1 on an inner surface, is dimensioned to be slid onto limb 52 of a user to provide massaging support and air circulation at the knee joint or elbow joint and surrounding muscles and tendons. Sleeve 50 may further be provided with an accordion-pleated bending zone 54 to promote bending at the knee or elbow.

Yet another example of a therapeutic use of acupressure massaging system 1 is shown in FIG. 10 wherein system 1 is secured to the seat surfaces of a wheelchair 44 so that each movement creates a massaging reaction and air circulation.

Acupressure massaging system 100 constructed in accordance with a second embodiment of the present invention is shown in FIG. 4. The acupressure massaging system 100 of this embodiment is very similar to that of acupressure massaging system 1 with the exception that acupressure massaging system 100 includes a fabric material 18 secured to the distal end of each nipple 2. Fabric material 18 is preferably water absorbent, soft to the touch and configured to provide additional comfort to a user while also providing the ability to absorb fluid, such as perspiration, as in a sweat band. It is contemplated that fabric material 18 may be color coordinated with surrounding surfaces of the product or device on which acupressure massaging system 100 is applied.

An acupressure massaging system 200 constructed in accordance with a third embodiment of the present invention is shown in FIG. 5. Acupressure massaging system 200 includes an array of nipples 2 formed in a recess area 15 in platform 4. Nipples 2 are recessed within the platform 4 with nipples 2 extending approximately one half of their length above upper surface 4A. A top open end 16 of each recess area 15 terminates at upper surface 4A, as shown in FIG. 5.

Referring to FIGS. 11 and 12, a fourth embodiment of the present invention is shown in which an acupressure massaging system 300 is very similar to that of acupressure massaging system 200 but includes a textured surface 62 on distal end 10 of nipples 2. Acupressure massaging system 300 is shown in FIGS. 11 and 12 as having been integrated into a golf club handle 60. Textured surface 62 is designed to promote a better grip on handle 60 while nipples 2 impart a massaging effect to the neural and acupressure points of hands 64 when swinging the club. In areas where the user grips firmly, textured surface 62 on nipples 2 provides a contoured grip to enhance grip control of the club when hitting a ball.

Acupressure massaging system 1 and nipples 2 are made using a conventional electronically controlled blow molding

6

process which enables the thickness of side walls 12 to be varied during the manufacturing process. The thickness of walls 12 determines the function to be accomplished. For example, if nipples 2 are to be used directly on the skin of the user, walls 12 will be made with a thinner thickness than if walls 12 are to be used to massage the user through fabric and clothing. The thickness of walls 12 in cooperation with the elastic memory of the material from which walls 12 are made and the accordion-pleated structure of walls 12 determine the amount of massaging pressure exerted by the nipples. Walls 12 are preferably from about 0.0156 inch to about 0.125 inch thick.

Acupressure massaging system 1, nipples 2 and walls 12 are preferably made from plastic rubber, such as "Santoprene" thermoplastic rubber. "Santoprene" rubber consists of highly crosslinked rubber particles dispersed throughout a continuous matrix of thermoplastic material. An average rubber particle size of one micron or less results in very favorable physical properties. "Santoprene" rubber is processed on standard thermoplastic equipment. It can be blow molded with the efficiency and economy associated with thermoplastic materials. Polyethylene can also be used as the material for acupressure massaging system 1 and for nipples 2 and side walls 12.

It will be understood that each of the elements described above, or two or more together, may also find a useful application in other types of constructions differing from the type described above.

While the invention has been illustrated and described as embodied in an acupressure massaging system, it is not intended to be limited to the details shown, since it will be understood that various omissions, modifications, substitutions and changes in the forms and details of the device illustrated and in its operation can be made by those skilled in the art without departing in any way form the spirit of the present invention.

Without further analysis, the foregoing will so fully reveal the gist of the present invention that others can, by applying current knowledge, readily adapt it for various applications.

What is claimed is:

1. An acupressure massaging system, comprising:

a platform having an upper surface and a lower surface, said lower surface defining a plurality of intersecting air-flow channels and said upper surface defining a plurality of air-flow holes through said upper surface in air-flow communication with said air-flow channels and with space external of said system;

an array of spaced, independently flexible nipples extending from the upper surface of the platform, each said nipple having an upper distal end and a flexible, collapsible, accordion-pleated side wall defining an internal air-flow chamber, the air-flow chamber being in fluid communication with said air-flow channels and with said air-flow holes to enable air flow into and out of said air-flow chambers and said air-flow holes, and wherein said side wall of each said nipple is comprised of a material having an elastic memory, whereby compression and movement of the nipples is made possible by the collapsible, memory-containing side walls in cooperation with movement of air into and out of the air-flow chambers.

2. An acupressure massaging system as in claim 1 wherein said memory-containing material of said side walls is thermoplastic rubber.

3. An acupressure massaging system as in claim 1 wherein said memory-containing material of said side walls is polyethylene.

5,607,749

| 7 | 8 |

**4.** An acupressure massaging system as set forth in claim **1** further comprising a fabric material attached to the distal ends of the nipples to absorb moisture.

**5.** An acupressure massaging system as set forth in claim **1** further including a textured surface on the distal ends of the nipples to provide an increased grip with a contacting surface.

**6.** An acupressure massaging system as set forth in claim **1** wherein the platform further includes an array of recessed areas structured to contain the nipples therein and wherein each of said recessed areas defines a top open end terminating at the upper surface of the platform.

**7.** An acupressure massaging system as set forth in claim **4** wherein the platform further includes an array of recessed areas structured to contain the nipples therein and wherein each of said recessed areas defines a top open end terminating at the upper surface of the platform.

**8.** An acupressure massaging system as in claim **2** wherein said side walls have a thickness of from 0.0156 inch to 0.125 inch.

**9.** An acupressure massaging system as in claim **3** wherein said side walls have a thickness of from 0.0156 inch to 0.125 inch.

*   *   *   *   *

# EXHIBIT D
# (Part 11 of 17)

US005621984A

# United States Patent [19]

## Hsieh

[11] Patent Number: 5,621,984

[45] Date of Patent: Apr. 22, 1997

[54] **AMUSEMENT FOOTWEAR HAVING A RESILIENT SOLE**

[76] Inventor: **Frank Hsieh**, 9th-1 Floor, Kuang Fu South Road, Taipei, Taiwan

[21] Appl. No.: **511,625**

[22] Filed: **Aug. 7, 1995**

[51] Int. Cl.⁶ ............................. **A43B 13/18**; A43B 3/26
[52] U.S. Cl. ........................... **36/28**; 36/27; 36/7.8; 36/97
[58] Field of Search ................................. 36/28, 27, 7.8, 36/38, 97, 115

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| 1,513,338 | 10/1924 | Menefee et al. | 36/7.8 |
| 1,566,513 | 12/1925 | Thackery | 36/7.8 |
| 2,700,832 | 1/1955 | Slovinski | 36/97 X |
| 3,996,677 | 12/1976 | Reina | 36/7.8 |
| 4,133,086 | 1/1979 | Brennan | 36/7.8 |

### FOREIGN PATENT DOCUMENTS

| 466770 | 1/1969 | Switzerland | 36/7.8 |
| 466357 | 5/1937 | United Kingdom | 36/7.8 |

Primary Examiner—Ted Kavanaugh
Attorney, Agent, or Firm—Browdy and Neimark

[57] **ABSTRACT**

An amusement footwear comprises an insole, an outsole, and a resilient portion disposed between the insole and the outsole for providing the footwear with a bouncing effect. The resilient portion comprises a plurality of coil springs which are held securely by the fitting portions of the insole and the outsole and are enclosed by a resilient casing fastened between the insole and the outsole. The insole is provided on the heel portion thereof with an adjustment device for adjusting the size of the footwear. The outsole is provided respectively on the undersides of both front and rear ends thereof with an anti-skidding device. The footwear is provided with a front foot-fastening strap held in the front retaining holes of a ring portion of the insole and is further provided with a rear foot-fastening strap held in the rear retaining holes of the ring portion of the insole and the retaining holes of the adjustment device.

**6 Claims, 3 Drawing Sheets**





F I G.1



F I G. 2



F I G. 3



F I G. 4



F I G. 5

5,621,984

**1**

# AMUSEMENT FOOTWEAR HAVING A RESILIENT SOLE

### FIELD OF THE INVENTION

The present invention relates generally to a footwear, and more particularly to a shoe having an improved resilient sole.

### BACKGROUND OF THE INVENTION

The conventional shoes having a resilient sole are generally provided with an elastic body disposed between the insole and the outsole thereof. Such conventional shoes as described above are generally limited in design in that they are provided respectively on the undersides of the front and the rear ends thereof with a relatively small area for making contact with the ground surface, and that they are incapable of providing their wearers with the state of balance so as to enable their wearers to keep themselves properly oriented or positioned, and further that they do not fit all foot sizes.

### SUMMARY OF THE INVENTION

It is therefore the primary objective of the present invention to provide a shoe with a resilient sole which is provided respectively on the undersides of the front and the rear ends thereof with a relatively greater contact area, a better controllability and a better cushioning effect.

It is another objective of the present invention to provide a shoe which has a resilient sole and can be worn adjustably by persons having different foot sizes, or by the growing children and youngsters.

The foregoing objectives of the present invention are attained by the shoe comprising an insole, an outsole, and a resilient portion located between the insole and the outsole. The insole is provided integrally with a U-shaped ring portion which is in turn provided respectively and oppositely at both sides of the front end thereof with a front retaining hole and at both sides of the rear end thereof with a plurality of first rear retaining holes arranged in a parallel manner. The insole is further provided at the rear end thereof with a plurality of retaining portions arranged in a parallel manner. The outsole is provided respectively on the undersides of the front and the rear ends thereof with an anti-skidding piece. An adjustment piece of a U-shaped construction is provided respectively and correspondingly on both sides of the front end thereof with a second rear retaining hole. The adjustment piece is further provided on the bottom side thereof with a second retaining portion. The adjustment piece is fitted into the rear end portion of the U-shaped ring portion such that the second retaining portion is engaged with one of the first retaining portions of the insole, and that the second rear retaining hole of the adjustment piece is corresponding in location to one of the first rear retaining holes.

The foregoing objectives, features, functions and advantages of the present invention will be more readily understood upon a thoughtful deliberation of the following detailed description of the present invention in conjunction with the accompanying drawings.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows an exploded view of a first preferred embodiment of the present invention.

**2**

FIG. 2 shows a perspective view of the first preferred embodiment in combination according to the present invention.

FIG. 3 shows a sectional view of a portion taken along the line 3—3 as shown in FIG. 2.

FIG. 4 shows a sectional view of a second preferred embodiment in combination according to the present invention.

FIG. 5 shows a perspective view of a third preferred embodiment in combination according to the present invention.

### DETAILED DESCRIPTION OF THE INVENTION

As shown in FIGS. 1–3, an amusement shoe of the first preferred embodiment of the present invention comprises an insole 10, an outsole 20, a resilient portion 30, and an adjustment piece 40.

The insole 10 is made integrally and is provided with a plate portion 11 which is in turn provided on the underside thereof with five outer fitting portions 12 of a tubular construction. The plate portion 11 is further provided peripherally on the upper side thereof with a U-shaped ring portion 13 which is provided respectively and correspondingly on both sides of the front end thereof with a front retaining hole 131. The U-shaped ring portion 13 is further provided respectively and correspondingly on both sides of the rear end thereof with three first rear retaining holes 132 parallel to one another. The plate portion 11 is provided at the rear end thereof with three first retaining portions 14 which are arranged side by side in a parallel manner and are of a round hole construction. The insole 10 is further provided on the side wall thereof with a plurality of holes 15.

The outsole 20 is made integrally and provided with five tubular inner fitting portions 21 which are corresponding in location and number to the outer fitting portions 12 of the insole 10. The outsole 20 is further provided respectively at the front and the rear ends thereof with a recess 22 which is so dimensioned as to receive therein an anti-skidding piece 23 fastened thereto. The outsole 20 is still further provided on the side wall thereof with a plurality of holes 24.

The resilient portion 30 comprises five coil springs 31 which are fitted respectively over the inner fitting portions 21 of the outsole 20 and the outer fitting portions 12 of the insole 10. The resilient portion 30 further comprises a resilient casing 34 which has an outer wall 341. Located respectively at the upper side and the lower side of the outer wall 341 is an upright inner attaching portion 342 extending outwards. The inner attaching portion 342 is provided with a plurality of threaded holes 343 corresponding in location to the holes 15 of the insole 10 or the holes 24 of the outsole 20. The resilient casing 34 is fastened with the insole 10 by a plurality of bolts engageable with the holes 15 and the threaded holes 343 of the upper attaching portion 342. The resilient casing 34 is further fastened with the outsole 20 by a plurality of bolts engageable with the holes 24 of the outsole 20 and the threaded holes 343 of the lower attaching portion 342.

The adjustment piece 40 is U-shaped in its cross section and is fitted into the rear end portion of the U-shaped ring portion 13 of the insole 10. The adjustment piece 40 is provided respectively on two opposite side walls thereof with a second rear retaining hole 41 and is further provided on the bottom wall thereof with a second retaining portion

5,621,984

**3**

42 of a tubular construction and engageable with any one of the first retaining portions 14 of the insole 10.

In combination, the adjustment piece 40 is disposed at the rear end of the ring portion 13 of the insole 10 such that the second retaining portion 42 of the ajustment piece 40 is engaged with one of the first retaining portions 14 of the insole 10, and that the second rear retaining holes 41 of the adjustment piece 40 are corresponding in location to the first rear retaining holes 132 of the insole 10. As shown in FIG. 2, a foot is secured to the shoe of the present invention by a front fastening strap A and a rear fastening strap B. The front fastening strap A is held securely in the front retaining holes 131 of the insole 10 while the rear fastening strap B is held securely in the first rear retaining holes 132 of the the insole 10 and the second rear retaining holes 41 of the adjustment piece 40. The position of the adjustment piece 40 can be so adjusted as to allow persons having different foot sizes to wear the shoe. The position adjustment of the adjustment piece 40 can be done easily by relocating manually the adjustment piece 40 such that the second retaining portion 42 of the adjustment piece 40 is engaged with another first retaining portion 14 of the insole 10.

The bouncing effect of the shoe of the present invention is brought about by the coil springs 31 of the resilient portion 30. The shoe of the present invention enables its wearer to do a stable jumping motion, thanks to the anti-skidding pieces 23 of the outsole 20, which are made of a soft material and are deformable upon making contact with the ground so as to provide the outsole 20 with a better control area for mitigating the inertia impulse of a human body in motion. It must be noted here that the coil springs 31 of the resilient portion 30 may be replaced with a plurality of inflatable air sacs.

As shown in FIG. 4, the second preferred embodiment of the present invention comprises the outsole 20 which is provided with a plurality of inner fitting portions 21 of a tubular construction. The inner fitting portions 21 are provided therein respectively with a cushioning rod 26 for regulating the compression of the coil spring 31 and providing the cushioning effect.

As shown in FIG. 5, the third preferred embodiment of the present invention comprises four wheels 25 which are fastened with the outsole 20 to allow a person to coast on the shoe.

The shoe of the present invention is unique in that it fits all foot sizes, and that the adjustment piece 40 can be relocated easily without the use of a hand tool, and further that the outsole 20 is provided with two anti-skidding means capable of preventing the skidding of the outsole 20 and of providing the outsole 20 with the cushioning effect.

The embodiments of the present invention described above are to be regarded in all respects as merely illustrative and not restrictive. Accordingly, the present invention may be embodied in other specific forms without deviating from

**4**

the spirit thereof. The present invention is therefore to be limited only by the scope of the following appended claims.

What is claimed is:

1. An amusement footwear comprising an insole, an outsole, and a resilient portion disposed between said insole and said outsole for providing said footwear with a bouncing effect; wherein said insole is provided integrally with a ring portion of a U-shaped construction having an open end corresponding in location to toes of a person's foot, said ring portion provided at said open end thereof with two front retaining holes opposite to each other, said ring portion further provided respectively at both sides of a closed end thereof with a plurality of first rear retaining holes parallel to each other, said insole having a rear end which is corresponding in location to heel of a person's foot and is provided with a plurality of first retaining means engageable with a second retaining means fastened to the underside of a bottom of an adjustment means dimensioned to fit into said rear end of said insole, said adjustment means provided respectively and correspondingly on both side walls thereof with a second rear retaining hole which is corresponding in location to one of said first rear retaining holes of said insole, said insole further provided on an underside thereof with a plurality of outer fitting means; wherein said outsole is provided thereon with a plurality of inner fitting means corresponding in location to said outer fitting means of said insole; and wherein said resilient portion comprises a plurality of coil springs which are fitted at one end thereof over said outer fitting means of said insole and are further fitted at another end thereof over said inner fitting means of said outsole, said resilient portion further comprising a resilient casing fastened securely with said insole and said outsole such that said casing encloses said coil springs.

2. The amusement footwear as defined in claim 1, wherein said outsole is provided respectively on the undersides of a front and a rear ends thereof with an anti-skidding means.

3. The amusement footwear as defined in claim 2, wherein said anti-skidding means is capable of becoming deformed upon making contact with the ground.

4. The amusement footwear as defined in claim 1, wherein said inner fitting means of said outsole are provided therein respectively with a cushioning rod for regulating the compression of said coil springs.

5. The amusement footwear as defined in claim 1, wherein said outsole is provided with a plurality of wheels fastened thereto so as to enable a wearer of said footwear to glide on the ground.

6. The amusement footwear as defined in claim 1, wherein said ring portion of said insole is provided with a front foot-fastening strap held in said front retaining holes of said ring portion and is further provided with a rear foot-fastening strap held in said first rear retaining holes of said ring portion and said second rear retaining holes of said adjustment means.

\* \* \* \* \*



US005625966A

# United States Patent [19]

## Perotto et al.

| [11] | Patent Number: | **5,625,966** |
|---|---|---|
| [45] | Date of Patent: | **May 6, 1997** |

[54] **HIGHLY FLEXIBLE ITEM OF SPORTS FOOTWEAR**

[75] Inventors: **Riccardo Perotto**, Volpago del Montello; **Giuliano Zavan**, Treviso, both of Italy

[73] Assignee: **Nordica S.P.A.**, Trevignano, Italy

[21] Appl. No.: **629,908**

[22] Filed: **Apr. 10, 1996**

**Related U.S. Application Data**

[63] Continuation of Ser. No. 341,619, filed as PCT/EP94/00688, Mar. 8, 1994 published as WO94/21148, Sep. 29, 1994, abandoned.

[30] **Foreign Application Priority Data**

Mar. 18, 1993 [IT] Italy .................................. MI93A0512

[51] Int. Cl.⁶ ...................................................... **A43B 5/04**
[52] U.S. Cl. ............................ **36/117.2**; 36/102; 36/103; 36/25 R; 36/31
[58] Field of Search ............................ 36/117.2, 88, 102, 36/103, 120, 25 R, 28, 37, 33, 45, 29, 114

[56] **References Cited**

**U.S. PATENT DOCUMENTS**

| 1,088,328 | 2/1914 | Cucinotta ...................................... 36/28 |
|---|---|---|
| 2,340,027 | 1/1944 | Story ............................................. 36/33 |
| 2,458,602 | 1/1949 | Johnson ................................. 36/117 X |
| 2,950,118 | 8/1960 | Sharpe ................................... 36/117 X |
| 4,616,431 | 10/1986 | Dassler .......................................... 36/28 |
| 4,677,769 | 7/1987 | Ahmad et al. ........................ 36/120 X |
| 4,937,955 | 7/1990 | Bonaventure .......................... 36/117 X |

**FOREIGN PATENT DOCUMENTS**

| 0096094 | 12/1983 | European Pat. Off. . |
|---|---|---|
| 0234908 | 9/1987 | European Pat. Off. . |
| 2478441 | 9/1981 | France . |
| 0033492 | 6/1908 | Germany .................................. 36/28 |
| 400538 | 11/1922 | Germany ................................ 36/117 |
| 2752491 | 11/1977 | Germany . |
| 479265 | 11/1969 | Switzerland . |
| 03225 | 8/1984 | WIPO . |
| 19117 | 11/1992 | WIPO . |

*Primary Examiner*—M. D. Patterson
*Attorney, Agent, or Firm*—Herbert Dubno

[57] **ABSTRACT**

A highly flexible item of sports footwear in which the bottom of the toe portion of the upper and the toe portion of the sole member define a free space in the form of a wedge-shaped gap which is sealed by a bellows extending around the periphery of the toe portion of the upper. The toe portion of the sole member has a unidirectional articulation enabling displacement of the toe portion of the sole member upwardly out of coplanarity with the plantar articulation portion of the sole member.

**9 Claims, 3 Drawing Sheets**







*Fig.5*



*Fig.6*



*Fig.7*



*Fig.8*



*Fig.9*



*Fig. 10*

*Fig. 11*

*Fig. 12*

5,625,966

1

**HIGHLY FLEXIBLE ITEM OF SPORTS FOOTWEAR**

### CROSS REFERENCE TO RELATED APPLICATION

This is a continuation of application Ser. No. 08/341,619 filed 23 Jan. 1995, now abandoned.

This application is a national phase of PCT/EP94/00688 filed 8 Mar. 1994 and based, in turn, upon Italian national application MI 93A000512 of 18 Mar. 1993, under the International Convention.

### FIELD OF THE INVENTION

The present invention relates to a highly flexible item of sports footwear.

### BACKGROUND OF THE INVENTION

As is known, footwear used for some specific skiing techniques, such as the so-called "telemark" and "cross-country" techniques, must have particular technical characteristics that ensure optimum longitudinal flexing of the item of footwear and excellent resistance to lateral torsion while allowing even prolonged use of the item of footwear on mixed terrain, uphill and downhill, and maintaining excellent comfort for the user's foot, and must ensure lateral support and precise transmission of movements to the ski.

However, current items of footwear for such purposes are not free of drawbacks.

For example, compression often occurs on the metatarsal region during the flexing of a known shoe due to the corrugation of the upper of the item of footwear, consequently reducing the comfort of the item of footwear.

Furthermore, in footwear of this type the flexibility and tilt of the item of footwear are almost exclusively entrusted to the elastic characteristics of the materials used to manufacture it, and particularly to the sole of the item, in order to ensure both precise ski control when turning and high resistance to lateral torsion and to flexibility in the metatarsal region.

Obviously, since the materials employed must simultaneously have several different requirements to ensure good technical performance, the consequent result is always poor.

### OBJECTS OF THE INVENTION

The object of the present invention is to eliminate the drawbacks described above by providing a highly flexible item of sports footwear that provides considerable comfort since compressions of the metatarsal region during its flexing are eliminated.

An important object of the invention is to provide an item of sports footwear that allows variation in flexibility and tilt according to the user's requirements.

Another object of the invention is to provide an item of sports footwear that has excellent rear support and enormously facilitates rolling of the foot while the user is walking.

Another object of the invention is to provide an item of sports footwear that can be advantageously assembled with known processes involving gluing, direct injection or mechanical assembly, with a rigid or partially rigid shell or with a conventional leather upper, preserving the main characteristics of an extremely high degree of flexing and tilting.

Another object of the invention is to provide a highly flexible item of sports footwear which can be industrially

2

fabricated, so as to reduce its production costs and facilitate its sale to the public.

### SUMMARY OF THE INVENTION

These objects and others are achieved by a highly flexible item of sports footwear, characterized in that it comprises, in a front portion, at the axis of natural flexing of the foot, a first unidirectional articulation means for the gradual tilting of at least the upper of the item of footwear with respect to the sole thereof, a first flexible means being furthermore provided between the upper and the sole to vary the value of the flexing of the item of footwear.

### BRIEF DESCRIPTION OF THE DRAWING

The above and other objects, features, and advantages will become more readily apparent from the following description, reference being made to the accompanying drawing in which:

FIGS. 1, 2, 3 and 4 are schematic side elevational views of the item of sports footwear according to the invention;

FIGS. 5, 6, 7 and 8 are schematic side elevational views of the gradual inclination of the upper of the item of footwear with respect to the sole thereof, according to the invention;

FIG. 9 is a schematic partial sectional view of the front part of the item of footwear, illustrating the first and second means for its articulation;

FIG. 10 is an exploded perspective detail view of the first and second articulation means according to the invention; and

FIGS. 11 and 12 are schematic cross sectional views of the part for connecting the front portion of the upper and the sole to allow easy rolling for walking.

### SPECIFIC DESCRIPTION

With particular reference to the above described figures, the highly flexible item of sports footwear according to the present invention, generally designated by the reference numeral 1, comprises, in a front portion, a first unidirectional articulation means, generally designated by the reference numeral 2 (FIG. 9), which is conveniently arranged at the natural flexing axis of the foot to allow the gradual tilting of the upper 3 with respect to the sole 4 of the item of footwear.

The first articulation means 2 is formed by a recess in the material in a downward region of the front portion of the bottom of the upper, so that the upper forms, together with the sole 4, an empty wedge-shaped space 5 that facilitates the inclination of the front part of the upper and thus the flexing of the item of footwear.

This solution facilitates ideal support of the skier and provides the fastest possible weight shifting, avoiding compressions of the upper on the metatarsal region of the skier due essentially to the corrugation of the upper.

A first flexible means is furthermore provided between the upper 3 and the sole 4 and comprises a bellows-like part 6, preferably made of plastic, that is connected to the front portion of the upper 3 at one end and to the sole 4 at the opposite end, so as to sealingly close the wedge-shaped space 5.

Obviously, depending on the type of material and the structure used to provide the bellows-like part 6, it is possible to modify at will the value of the reaction force that acts when the upper 3 moves toward the sole 4.

In order to avoid relying exclusively on the elasticity of the material of the sole for the flexing thereof toward the

5,625,966

| 3 | 4 |

front portion of the upper 3, on the sole, proximate to the first articulation means 2, there is at least a second unidirectional articulation means which is suitable to cooperate with the first articulation means to vary the flexibility and the tilt of the item of footwear.

Particularly, the second articulation means can include, as shown in FIGS. 1 and 2, one or more easy-flexing regions 7 that are formed on the sole by providing one or more notches.

In a different embodiment, the second articulation means comprises a tip 8 which is hinged, by virtue of a hinge 9, to the plantar arch 10 of the sole, the hinge having a pivot 11.

The pivot 11 engages respective holes formed on two wings 12 of the tip 8 and a central expansion 13 which lies between the wings 12 and extends from the plantar arch 10 (FIG. 10).

In this manner, the second articulation means allows high resistance to lateral torsion and considerable precision in transmitting the movements from the shoe to the ski.

Conveniently, the wings 12 have a retention block or abutment 15 (FIG. 9) that allows the tip 8 to rotate toward the upper 3 of the item of footwear but not in the opposite direction, when the tip is perfectly co-planar with respect to the plantar arch 10.

In addition to the bellows-like part 6, the item of footwear can have a second flexible means that includes a block 16 which is accommodated in a corresponding seat 17 formed on the sole 4 and particularly, as shown in FIG. 10, in the tip 8.

Conveniently, the block 16 is also wedge-shaped so as to follow the wedge-like shape of the sole 5.

Conveniently, the block 16 comprises at least two regions 18 and 19 offering different resistance to the compression force that occurs between the front portion of the upper 3 and the sole 4 during the flexing and tilting of the item of footwear.

In this manner, by virtue of the two regions 18 and 19 and the bellows-like part 6, it is possible to vary at will, and according to the user's requirements, the characteristics of flexing and longitudinal tilting of the item of footwear, so as to enhance its technical performance and its excellent comfort even with prolonged use on mixed terrain.

The item of footwear furthermore has at least one locking part and particularly two links or arms 20 which are hinged to the tip 8 at one end and to downwardly extending lugs of the front portion of the upper 3 at the opposite end.

As can be easily understood, the links 20 cooperate with the retention block 16 if the tip 8 is articulated to the plantar arch 10.

If instead the sole 4 is provided with flexing regions 7, as shown for example in FIGS. 1 and 2, the links 20 allow locking of the front portion of the upper with respect to the sole in a position for the maximum opening of the wedge-like space 5.

It should also be added that in order to facilitate walking, the item of footwear according to the present invention has a part for connecting the front portion of the upper 3 to the sole 4 in a position in which the wedge-shaped space 5 is completely closed, as shown in FIGS. 11 and 12.

Particularly, the connecting part can be formed by a pin or pintle 21 that simultaneously engages a hole that passes inside the sole 4 and the holes formed in two lugs or wings 22 provided on the upper 3.

The operation of the item of footwear according to the invention is evident from what has already been described

and illustrated; particularly, the fact is stressed that the rotation axis located in a downward region of the tip of the foot allows the best control of the ski and effective transmission of efforts between the shoe and the ski, eliminating any energy dispersion.

The devised solution allows the flexibility and inclination of the item of footwear and ensures excellent lateral stability and resistance to torsion with exceptional comfort, since the compressions produced by the upper on the metatarsal region during the flexing of the item of footwear are eliminated.

Furthermore, advantageously, the item of footwear allows to adjust the value of its flexibility and inclination, of its rear support and of its rolling action for walking.

An additional advantage provided by the solution is that it can be assembled, with known processes involving gluing, direct injection or mechanical assembly, to any item of footwear obtained from an upper or rigid or partially rigid shell or to a conventional item of footwear while maintaining the above mentioned main characteristics of flexing and inclination.

The invention thus conceived is susceptible to numerous modifications and variations, all of which are within the scope of the inventive concept; all the details may furthermore be replaced with technically equivalent elements.

In practice, the materials employed, as well as the dimensions, may be any according to the requirements and the state of the art.

Where technical features mentioned in any claim are followed by reference signs, those reference signs have been included for the sole purpose of increasing the intelligibility of the claims and accordingly such reference signs do not have any limiting effect on the scope of each element identified by way of example by such reference signs.

We claim:

1. A highly flexible item of footwear comprising:

a sole member having a heel portion, a plantar arch portion adjoining said heel portion and a toe portion adjoining said plantar arch portion and connected thereto by a unidirectional articulation extending across an entire width of said sole member enabling displacement of said toe portion of the sole member upwardly out of coplanarity with said plantar arch portion about said unidirectional articulation;

an upper on said sole member having a toe portion with a bottom extending upwardly away from said plantar arch portion and defining an empty wedge-shaped gap with said toe portion of said sole member, said wedge-shaped gap varying in height from a maximum when said toe portion of said sole member is coplanar with said plantar arch portion to a minimum when said toe portion of said sole member is proximal to said bottom of said toe portion of said upper; and

a bellows attached to said toe portions around a periphery of said wedge-shaped gap to seal said wedge-shaped gap from the exterior, said bellows contracting upon displacement of said toe portion of said sole member relative to said toe portion of said upper to vary said height from said maximum to said minimum, said toe portion of said sole member being flat and extending under said bellows beyond said toe portion of said upper and being substantially coplanar with said plantar arch portion upon reaching maximum of height of said wedge-shaped gap.

2. The item of footwear defined in claim 1, further comprising a second articulation along said toe portion of said sole member and a tip thereof.

5,625,966

5

3. The item of footwear defined in claim 1 wherein said articulation is a portion of said sole member formed with at least one notch.

4. The item of footwear defined in claim 1 wherein said articulation is a hinge formed by a central projection of said plantar arch portion and a pair of wings on said toe portion of said sole member flanking said projection, and a pintle extending through said wings and said central portion.

5. The item of footwear defined in claim 4, further comprising a second articulation along said toe portion of said sole member and a tip thereof.

6. The item of footwear defined in claim 5 wherein said second articulation is a further hinge.

7. The item of footwear defined in claim 1 wherein said toe portion of the upper is shorter than both said plantar arch portion and said toe portion of the sole respectively.

8. A highly flexible item of footwear comprising:

a sole member having a heel portion, a plantar arch portion adjoining said heel portion and a toe portion adjoining said plantar arch portion and connected thereto by a unidirectional articulation enabling displacement of said toe portion of the sole member upwardly out of coplanarity with said plantar arch portion about said unidirectional articulation;

an upper on said sole member having a toe portion with a bottom extending upwardly away from said plantar arch portion and defining an empty wedge-shaped gap with said toe portion of said sole member, said wedge-shaped gap varying in height from a maximum when said toe portion of said sole member is coplanar with said plantar arch portion to a minimum when said toe portion of said sole member is proximal to said bottom of said toe portion of said upper;

a bellows attached to said toe portions around a periphery of said wedge-shaped gap to seal said wedge-shaped

6

gap from the exterior, said bellows contracting upon displacement of said toe portion of said sole member relative to said toe portion of said upper to vary said height from said maximum to said minimum; and

means for locking said toe portion of said upper with respect to said toe portion of said sole member when said wedge-shaped gap is at said maximum height.

9. A highly flexible item of footwear comprising:

a sole member having a heel portion, a plantar arch portion adjoining said heel portion and a toe portion adjoining said plantar arch portion and connected thereto by a unidirectional articulation enabling displacement of said toe portion of the sole member upwardly out of coplanarity with said plantar arch portion about said unidirectional articulation;

an upper on said sole member having a toe portion with a bottom extending upwardly away from said plantar arch portion and defining an empty wedge-shaped gap with said toe portion of said sole member, said wedge-shaped gap varying in height from a maximum when said toe portion of said sole member is coplanar with said plantar arch portion to a minimum when said toe portion of said sole member is proximal to said bottom of said toe portion of said upper;

a bellows attached to said toe portions around a periphery of said wedge-shaped gap to seal said wedge-shaped gap from the exterior, said bellows contracting upon displacement of said toe portion of said sole member relative to said toe portion of said upper to vary said height from said maximum to said minimum; and

means for locking said toe portions together with said wedge-shaped gap completely closed.

* * * * *

US005901467A

# United States Patent [19]

**Peterson et al.**

[11] **Patent Number:** 5,901,467

[45] **Date of Patent:** May 11, 1999

[54] **SHOE CONSTRUCTION INCLUDING PNEUMATIC SHOCK ATTENUATION MEMBERS**

[75] Inventors: **William Peterson**, Granada Hills; **Robert O. Dillon**, Irvine, both of Calif.

[73] Assignee: **American Sporting Goods Corporation**, Irvine, Calif.

[21] Appl. No.: **08/988,825**

[22] Filed: **Dec. 11, 1997**

[51] Int. Cl.⁶ .......................... **A43B 13/18**; A43B 13/20; A43B 13/40

[52] U.S. Cl. ................................. **36/29**; 36/35 B; 36/28; 36/37; 36/92

[58] Field of Search ................................. 36/28, 29, 35 B, 36/35 R, 37, 92

[56] **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 836,364 | 11/1906 | Busby | 36/29 |
| 1,240,153 | 9/1917 | Olsen | 36/35 R |
| 2,724,914 | 11/1955 | Wick | 36/35 R |
| 4,265,033 | 5/1981 | Pols | 36/37 |
| 4,768,295 | 9/1988 | Ito | 36/28 |
| 4,779,359 | 10/1988 | Famolore, Jr. | 36/29 |
| 5,179,792 | 1/1993 | Brantingham | 36/29 |
| 5,353,459 | 10/1994 | Potter et al. | 36/29 |
| 5,363,570 | 11/1994 | Allen et al. | 36/28 |
| 5,375,346 | 12/1994 | Cole et al. | 36/29 |
| 5,443,529 | 8/1995 | Phillips | 36/29 |
| 5,685,090 | 11/1997 | Tawney et al. | 36/29 |
| 5,718,063 | 2/1998 | Yamashita et al. | 36/28 |

*Primary Examiner*—Paul T. Sewell
*Assistant Examiner*—Anthony Stashick
*Attorney, Agent, or Firm*—Michael A. Painter

[57] **ABSTRACT**

The construction of a shoe which includes shock attenuating members in the forefoot and heel thereof. The shock attenuating members in the heel of the shoe are in the form of a pair of vertically spaced, resilient cantilevered members, each of which comprises a substantially U-shaped air chamber having a load alignment surface for centering loads at heal strike while concurrently transferring peak loads to the outer perimeter of the cantilevered shock attenuating members. The forefoot shock attenuating member comprises a plurality of segmented air chambers in a planar relationship with each other disposed between the midsole and outsole at the forefoot thereof to properly balance and stabilize loads during running and concurrently maximize durability, cushioning and comfort.

**8 Claims, 2 Drawing Sheets**





FIG. 1.

FIG. 2.



FIG. 4.

FIG. 3.



FIG.7.



FIG.5.



FIG.6.

5,901,467

**1**

## SHOE CONSTRUCTION INCLUDING PNEUMATIC SHOCK ATTENUATION MEMBERS

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention generally relates to footwear and, more particularly to footwear having shock attenuating members incorporated at the heel and forefoot thereof.

2. Prior Art

During the conduct of athletic activities such as running, basketball and tennis, substantial shock forces are imposed upon the user's foot. The shock forces are transmitted through the user's shoes to the user's foot each time the shoe comes in contact with the ground or surface over which the surface moves. Over time, the shock imposed upon the user can result in discomfort, fatigue and possible injury.

The terms "shock attenuation" and "energy absorption" are often used without delineating the difference. While both effects relate to the independent responses of a midsole's response to the force of impact, the term "impact response" more properly describes the response of a midsole to both effects. A desirable midsole, therefore, is one in which the impact response contains the appropriate balance of shock attenuation and energy absorption.

The prior art discloses a variety of shoe designs which employ cushioned soles to absorb at least a portion of the shock and thereby alleviate the problems. However, it has long been understood that the employment of cushioned soles must be as part of a structural environment which avoids destabilizing the user's foot while maintaining a firm platform for the user.

To attenuate force resulting from heel and forefoot contact, shoes were designed which focused attention upon cushioning. To this end, some designs disclosed by the prior art merely increase the thickness of the midsole. Other designs incorporate cushioning elements intended to provide enhanced cushioning effects. As an example, resilient, inflated bladders were used as midsole inserts. These designs do not resolve the major problem resulting from the shock produced by heel contact. The present invention resolves these problems through the use of cantilevered, shock attenuating members mounted at the heels of the shoe.

One of the shoe designs disclosed by the prior art employs replaceable, compressible shock absorbers at the heel and forefoot of the shoe. In this construction, the compressible members are replaceable. As a result, the shock absorbing members do not extend fully across the heel or forefoot. To the contrary, the shock absorbing members are disposed within receiving, aligned apertures in the midsole and outsole. The disadvantages of this design are the result of its inability to fully respond to the shock of heel and forefoot contact. The present invention resolves these problems by providing for cantilevered, shock attenuating members mounted across the full extent of the heel. The cantilevered members include opposing load alignment surfaces which stabilize the shoe by centering the load on heel contact and transferring peak loads to the periphery thereof.

Other designs disclosed by the prior art disclose compressible shock absorbing members at both the heel and forefoot of the shoe. However, the shoe constructions disclosed by the prior art exhibit substantially uniform impact response across the entire width of the heel and forefoot. This results in improper balance and stabilization of the force imposed on the shoe. This inadequacy is resolved by the present invention shoe construction.

**2**

The present invention substantially resolves the problems inherent in those designs disclosed in the prior art. The present invention employs shock attenuating members disposed at both the heel and forefoot of the shoe. The shock attenuating members disposed in the heel comprise a pair of cantilevered air chambers which are vertically secured with relationship to each other. The upper air chamber includes a load alignment surface aligned along the longitudinal axis of the heel. The lower shock attenuating member employs an equivalent load alignment surface in opposed relationship to that of the upper shock attenuating member. The impact response of the two cantilevered attenuating members centers the shock associated with heel contact while distributing or otherwise transferring peak loads along the periphery thereof.

### SUMMARY OF THE INVENTION

The present invention comprises a shoe design which employs shock attenuating members at the heel and forefoot of the shoe. The shock attenuating member at the heel of the shoe consists of a pair of air chambers which are vertically separated by a foam moderator of predetermined density. Each heel shock attenuating member comprises a resilient, non-permeable chamber adapted to fully enclose a selected fluid such as air. Each air chamber is a substantially U-shaped configuration being centrally tapered downwardly from the base of the "U" to the frontal legs or margins thereof. Each of the heel shock attenuating members includes a load alignment depression uniformly centered about the chambers longitudinal axis. The heel shock attenuating members are vertically secured on either side of the foam moderator, the load alignment depression of each chamber being opposed with respect to the other. The assembled heel shock attenuating members are mounted at the heel of the shoe and when heel contact occurs at the rear strike zone, the frontal margins cantilever about the rearmost portion of the heel. The resulting structure results in the centering of impact loads upon heel contact and distributes peak loads along the periphery of the coupled shock attenuating members.

The forefoot shock attenuating member comprises a plurality of air chambers extending longitudinally along the forefoot of the shoe to maximize cushioning and stability when forces is being imposed upon the forefoot of the shoe. The combination of the heel and forefoot shock attenuating members improve shock and energy absorption and the response thereto.

It is therefore an object of the present invention to provide an improved construction for a shoe through the employment of heel and forefoot shock attenuating chambers.

It is another object of the present invention to provide a shoe construction which improves impact response to heel contact through the use of vertically oriented cantilevered pneumatic chambers.

It is still another object of the present invention to provide a shoe construction which, upon heel contact, results in distribution of loads along the periphery of the heel shock attenuating members.

It is still yet another object of the present invention to provide an improved shoe construction which is simple and inexpensive to fabricate.

The novel features which are believed to be characteristic of the invention, both as to its organization and method of operation, together with further objectives and advantages thereof, will be better understood from the following description considered in connection with the accompanying

5,901,467

3

drawing in which a presently preferred embodiment of the invention is illustrated by way of example. It is to be expressly understood, however, that the drawing is for the purpose of illustration and description only, and is not intended as a definition of the limits of the invention.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a side elevation view of a shoe employing the present invention shoe construction.

FIG. 2 is a bottom plan view of the shoe shown in FIG. 1.

FIG. 3 is a top plan view of a heel shock attenuating member shown in FIG. 2 in accordance with the present invention.

FIG. 4 is a cross-sectional view of the cantilevered shock attenuating members shown in FIG. 1 taken through line 4—4 of FIG. 1.

FIG. 5 is a frontal, cross-sectional view of a heel shock attenuating member taken through line 5—5 of FIG. 2.

FIG. 6 is a top plan view of the forefoot shock attenuating member shown in FIG. 2.

FIG. 7 is a cross-sectional view of the sole assembly shown in FIG. 1 and FIG. 2 taken through line 7—7 of FIG. 2.

## DESCRIPTION OF THE PRESENTLY PREFERRED EMBODIMENT

The present invention comprises an improved construction for the sole of an athletic shoe as shown in FIG. 1. An upper **10** is joined to a sole **11** at a lasting margin **12**. Although the upper **10** illustrated in FIG. 1 is representative of conventional athletic shoes, it is understood the principle of the present invention is applicable to the construction of soles **11** irrespective of the shoe style.

An objective of the present invention is to provide for improved impact response and stability during athletic endeavors such as running, tennis and the like. The present invention shock attenuating members are intended to be incorporated into a sole **11** comprising a midsole **15** and an outsole which is illustrated by the reference numerals **16** and **17**. Although outsole **16, 17** is shown to be segmented, it is understood the present invention may be utilized with a unitary outsole.

The upper portion of midsole **15** typically comprises an anatomically shaped middle form **18** typically constructed of ethylene-vinyl acetate copolymer which is generally referred to as EVA. The present invention comprises the use of cantilevered heel shock attenuating members **20** and **21** and a forefoot shock attenuating member **22**. As shown in FIG. 7, heel shock attenuating member **20** is secured to midsole form **18** at shaped margin **23**. Forefoot shock attenuating member **22** is disposed within a cavity defined by shaped margin **50**.

An understanding of the cantilevered, heel shock attenuating members may be best understood by reference to FIGS. 3, 4 and 5. The heel shock attenuating members **20** and **21** are identical in configuration. As can be seen in FIG. 3, shock attenuating members **20** and **21** are substantially U-shaped in orientation and are adapted to conform to the heel of the shoe. Each shock attenuating member **20** and **21** is constructed of a resilient material impermeable to the passage of fluid and defines enclosed chambers **24** and **25** which are adapted to enclose a pneumatic fluid such as air.

FIG. 3 and FIG. 5 illustrate the structural details of shock attenuating member **20**. It is understood the construction of

4

shock attenuating member **21** is identical. The upper surface of shock attenuating member **20** is defined by a peripheral load alignment surface **26** which extends from the rear panel **27** to the front margins **28** and **29**. The bottom surface **30** lies in a unitary plane. The rear panel **27** of shock attenuating member **20** extends upwardly from the bottom surface **30** and defines the maximum distance between peripheral load alignment surface **26** and bottom surface **30**. As can be best seen in FIG. 4, peripheral load alignment surface **26** is tapered forwardly and downwardly from the upper terminus of rear panel **27** to margin **28**. As can also be seen in FIG. 3 and FIG. 4, peripheral load alignment surface **26** is tapered downwardly and inwardly to inner margin **31**. In the same manner as described hereinabove, shock attenuating member **21** is identical to shock attenuating member **20** and is defined by a peripheral load alignment surface **32**, a bottom surface **33** and rear panel **34**.

As described hereinabove, it is an object of the present invention to provide improvement in the impact response of a shoe upon heel contact. This is accomplished through the use of the heel attenuating members **20** and **21** which are incorporated into the shoe through a cantilevered construction best shown in FIG. 7. As shown, the bottom surfaces **30** and **33** of shock attenuating members **20** and **21**, respectively, are each secured to the opposing surfaces of a planar foam moderator **40**. Heel contact will occur at the rear strike zone of outsole segment **17** thereby compressing the fluid, preferably in the form of air, stored within pneumatic chambers **24** and **25**. The forward extension of shock attenuating members **20** and **21** defined by the length of bottom surfaces **30** and **33** will act as a cantilever about the strike zone.

On heel impact, the shoe will tend to bend or flex on a line of flexion which can be considered to be aligned with the longitudinal axis **41** of the shoe. The force imposed on the user's foot will be centered about the longitudinal axis **41** of the shoe as a result of the tapered orientation of peripheral load alignment surfaces **26** and **32**. Furthermore, peak loads will be outwardly distributed through the outer extent of the peripheral load alignment surfaces **26** and **32** as the result of the tapered orientation of the peripheral load alignment surfaces **26** and **32** as shown in FIG. 4.

An objective of the present invention is to provide means for attenuating the forces incident to the impact between the shoe and the ground while concurrently providing stabilization and balance. In furtherance of this objective, forefoot shock attenuating member **22** is disposed within cavity **50** formed in the forefoot of midsole form **18** and outsole segment **16**. Forefoot shock attenuating member **22** can be best seen by reference to FIG. 6. Shock attenuating member **22** is substantially planar in configuration and is constructed of a resilient material which is impermeable to the passage of a fluid such as air. An important feature of forefoot shock attenuating member **22** is that it includes a plurality of independent, isolated chambers in both the longitudinal and transverse segments of the forefoot. Longitudinally, the independent chambers are identified by reference numerals **51**, **52** and **53**. With respect to the longitudinal axis of the shoe, pneumatic chambers **51, 52, 53** and **54** delineate three independent zones. When the strike zone of the shoe moves to the forefoot of the shoe, shock attenuating member **22** will cushion or otherwise attenuate the shock while distributing the force longitudinally and laterally across the full extent of attenuating member **22**. This will provide for increased stabilization, durability and improved balance. In the preferred form of the present invention, pneumatic chamber **51** may extend to and be visible at the lateral side of the midsole form **18**.

5,901,467

**5**

It can therefore be seen the present invention substantially improves upon the variety of sole constructions described in the prior art. With respect to the impact response of heel contact, the cantilevered construction of shock attenuating members **20** and **21** create an extended lever arm along bottom surfaces **30** and **33** at the rear of the shoe. This will result in centering the loads imposed upon the heel of the shoe and distribute peak loads to the periphery of the attenuating members **20** and **21**. Upon forefoot contact, shock attenuating member **22** provides improved cushioning on impact and thereby stabilizes the user's foot.

I claim:

**1**. A shoe sole comprising:

(a) a midsole having a heel segment and a forefoot segment and a line of flexion extending from the heel segment to the forefoot segment, the rear segment defining a rear strike zone;

(b) a forefoot shock attenuating member having at least three resilient pneumatic chambers extending along the line of flexion and coupled to the midsole at the forefoot segment; and

(c) first and second heel shock attenuating members each including a pneumatic chamber tapered downwardly and forwardly from the rear strike zone of said heel segment along the line of flexion, each comprising a substantially U-shaped chamber having a rear panel and frontal margins and an inner margin and a load alignment surface opposed to a bottom surface being tapered forwardly and downwardly from said rear panel to said frontal margin, said first and second heel attenuating members being coupled to the heel segment of said midsole; and

(d) a planar foam moderator having upper and lower surfaces, the bottom surfaces of said first and second heel shock attenuating members secured to the top and bottom surfaces of said foam moderator respectively.

**2**. A shoe sole as defined in claim **1** wherein said load alignment surface tapers downwardly and inwardly from the periphery to the inner margin.

**6**

**3**. A shoe sole as defined in claim **1** wherein said first and second heel shock attenuating members concurrently cantilever about the rear strike zone.

**4**. A shoe sole as defined in claim **1** wherein said line of flexion extends along a longitudinal axis of the midsole.

**5**. A shoe sole as defined in claim **1** wherein the pneumatic chambers of said forefoot shock attenuating member are isolated from one another.

**6**. A shoe sole as defined in claim **1** wherein the pneumatic chambers of said first and second heel shock attenuating members are isolated from one another.

**7**. A shoe sole comprising:

(a) a midsole having a heel segment and a forefoot segment and a line of flexion extending along the longitudinal axis of the midsole from the heel segment to the forefoot segment, the rear segment defining a rear strike zone;

(b) a forefoot shock attenuating member having at least three, isolated pneumatic chambers adapted for maintaining fluid therein extending along the line of flexion and coupled to the midsole at the forefoot segment;

(c) first and second shock attenuating members each including isolated pneumatic chambers adapted for maintaining fluid therein tapered downwardly and forwardly from the rear strike zone of said heel segment along the line of flexion, each comprising a substantially U-shaped chamber having a rear panel and frontal margins and an inner margin and a load alignment surface opposed to the bottom surfaced being tapered forwardly and downwardly from said rear panel to said frontal margin; and

(d) a planar foam moderator having upper and lower surfaces, the bottom surfaces of said first and second heel shock attenuating members being secured to the top and bottom surfaces of said foam moderator respectively.

**8**. A shoe sole as defined in claim **7** wherein said first and second heel shock attenuating members concurrently cantilever about the rear strike zone.

*   *   *   *   *

US005975861A

# United States Patent [19]

## Shin et al.

[11] **Patent Number:** **5,975,861**

[45] **Date of Patent:** **Nov. 2, 1999**

[54] **PUMPING ASSEMBLY FOR USE IN VENTILATED FOOTWEAR**

[76] Inventors: **Bongseop Shin**, Samsung Apt. 7-905,777, Mangmi 1 dong, Sooyong-ku; **Donggeon Kim**, Daeyon samik Apt. 102-108, 1808, Daeyon 3 dong, Nam-ku; **Seonjoon Kim**, Samhae Daelim Apt. 107-1705, 1199-11, Banyo 1 dong, Haeundae-ku; **Seongog Cho**, 653-12, Kuseo 2 dong, Kumjung-ku, all of Pusan; **Kwangseog Park**, Ssangyong A-jin Green Apt. 309-802, 773-13, Sangan-ri, Nongso-eup, Woolju-ku, Woolsan-si, Kyong-nam, all of Rep. of Korea

[21] Appl. No.: **08/890,143**

[22] Filed: **Jul. 9, 1997**

[30] **Foreign Application Priority Data**

Jan. 6, 1997 [KR] Rep. of Korea ........................... 97-167

[51] Int. Cl.⁶ ..................................................... F04B 53/00

[52] **U.S. Cl.** .......................... **417/234;** 417/229; 417/472; 36/29; 36/35 B; 36/3 B

[58] **Field of Search** .................................... 417/229, 234, 417/472; 36/3 B, 29, 35 B

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,194,152 | 8/1916 | Douglas | ........................ 36/3 B |
| 2,157,912 | 5/1939 | Nabokin | ........................ 36/37 |
| 3,331,146 | 7/1967 | Karras | ........................ 36/3 |
| 4,918,838 | 4/1990 | Chang | ........................ 36/28 |
| 5,010,661 | 4/1991 | Chu | ........................ 36/3 B |
| 5,068,981 | 12/1991 | Jung | ........................ 36/3 B |
| 5,138,775 | 8/1992 | Chu | ........................ 36/3 B |
| 5,333,397 | 8/1994 | Hausch | ........................ 36/3 B |
| 5,341,581 | 8/1994 | Huang | ........................ 36/3 B |
| 5,477,626 | 12/1995 | Kwon | ........................ 36/3 B |
| 5,697,170 | 12/1997 | Murrell et al. | ........................ 36/3 B |
| 5,697,171 | 12/1997 | Phillips | ........................ 36/3 B |
| 5,826,349 | 10/1998 | Goss | ........................ 36/3 R |

Primary Examiner—Timothy S. Thorpe
Assistant Examiner—Ehud Gartenberg
Attorney, Agent, or Firm—Notaro & Michalos P.C.

[57] **ABSTRACT**

A pumping assembly for use in ventilating footwear includes a supporting plate having a first protrusion which is formed in a center portion of an upper surface thereof; front and rear check valves which are respectively formed forwardly and rearwardly the first protrusion portion; an exhaust pipe which is connected to the front check valve; an intake pipe which is connected to the rear check valve; a spring which has a lower end inserted into the first protrusion on the supporting plate; a curve-shaped hard plate having a second protrusion portion which is formed in a center portion of a bottom surface thereof and is inserted into an upper end of the spring; and an elastic cover which has elasticity and tensibility and covers the hard plate. The cover is bonded to the hard plate, whereby the hard plate descends in such a manner that maximum volume variation within the elastic cover can occur; when the upper rear portion of a foot pressurizes the hard plate and the elastic cover is pressed down.

**1 Claim, 3 Drawing Sheets**







FIG. 1



FIG. 2

FIG. 3



5,975,861

1

# PUMPING ASSEMBLY FOR USE IN VENTILATED FOOTWEAR

## BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to a pumping assembly for use in ventilating footwear which is inserted into an inner portion of the upper rear portion of a footwear sole and forcibly inspires fresh air from outside toward the inner portion of the footwear, during walking, thereby preventing sweat and moisture within the footwear as well as a nasty smell caused by to the sweat and moisture. This also prevents skin disease such as athlete's foot from occurring, while absorbing external impact and increasing comfort due to a cushion action thereof. In particular, the present invention relates to a pumping assembly for use in ventilating footwear which has an air pumping function with a hard plate which is inserted into of an elastic cover.

2. Discussion of the Prior Art

Generally, existing footwear can not discharge sweat and moisture formed in the footwear to the outside, since air flow into and out of the footwear does not fully occur, so that the footwear is always humid and is well-known as a hotbed of various bacteria, thus causing a bad smell, athlete's foot and so on. As is known, this problem in footwear is more serious during the summer.

Even though footwear has been designed to prevent the aforesaid inconveniences, there still exists a disadvantage in that very little of air flows into/from the footwear, during walking.

In more detail, in the conventional ventilating footwear, a material of an upper portion of a pumping assembly is made of a soft material and that of a side portion thereof is thick, or made of a hard material. Therefore, during walking; since most pressure onto the footwear is delivered only on the soft material positioned on the center portion of an upper surface of the pumping assembly, the volume variation within the pumping assembly is small.

Accordingly, since the volume variation within the pumping assembly of the conventional ventilating footwear according to the pressure applied to the pumping assembly, during walking, is small, there is a problem in that the amount of air which flows into/from the footwear is accordingly small.

## SUMMARY OF THE INVENTION

An object of the present invention is to provide a pumping assembly for use in ventilating footwear which is capable of obtaining maximum volume variation efficiency, by application of a hard plate, to the extent that an amount of intake air into the footwear increases 5 to 10 times that of conventional ventilating footwear.

To achieve one or more objects of the present invention, there is provided a pumping assembly for use in ventilating footwear including a supporting plate having a first protrusion portion which is formed in a center portion of an upper surface thereof; front and rear check valves which are respectively formed forward and backward from the first protrusion portion; an exhaust pipe which is connected to the front check valve; an intake pipe which is connected to the rear check valve; a spring which has a lower end inserted into the first protrusion portion on the supporting plate; a curve-shaped hard plate having a second protrusion portion which is formed in a center portion of a bottom surface thereof and is inserted into an upper end of the spring; and

2

an elastic cover which has elasticity and tensibility and is covered over the hard plate, thereby being melted or bonded to the hard plate, whereby the hard plate descends in such a manner that maximum volume variation within the elastic cover occurs, when the upper rear portion of the foot pressurizes the hard plate and the elastic cover is pressed.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is an exploded perspective view illustrating a use state of a pumping assembly in ventilating footwear according to the present invention.

FIG. 2 is a sectional view illustrating a use state of a pumping assembly in ventilating footwear according to the present invention.

FIG. 3 is a partial view illustrating an operation state of a pumping assembly in ventilating footwear according to the present invention.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

With reference to the attached drawings, a pumping assembly for use in ventilating footwear according to the prevent invention will be explained in detail.

Referring to FIGS. 1 to 3 which show the use and operation states of a pumping assembly 10 for use in ventilating footwear according to the present invention, in construction, a first protrusion portion 15 is formed in a center portion of an upper surface of a supporting plate 14. Front and rear check valves 16 and 17 are respectively formed forwardly and rearwardly of the first protrusion portion 15. An exhaust pipe 18 is connected to the front check valve 16, and an intake pipe 19 is connected to the rear check valve 17. A spring 20 is inserted into the first protrusion portion 15 on the supporting plate 14 at the lower end thereof. A second protrusion portion 13 is formed in a center portion of a bottom surface of a dome-shaped hard plate 12 and is inserted into an upper end of the spring 20. An elastic cover 11, which has elasticity and tensibility, covers the hard plate 12, and is melted or bonded to the hard plate 12, whereby the hard plate 12 descends in such a manner that maximum volume variation within the elastic cover 11 can be generated, when the upper rear portion of foot pressurizes the hard plate 12 and the elastic cover 11 is pressed down.

The pumping assembly 10 according to the present invention may be applied to all typical footwear, and particularly, it is assumed that the pumping assembly 10 is installed in the footwear in which soles as shown in FIGS. 1 and 2 are used.

A space 31 is formed in the upper rear portion of a typical sole 30, and front and back slots 32 and 33 are formed in the bottom portion of the space 31. A vertical slot 36 is connected to the back slot 33, and an inclined passage 34, which is formed in a length direction, is connected to the front slot 32. A slot 35, which is perpendicular to the inclined passage 34, is connected across the front end of the inclined passage 34. The pumping assembly 10 constructed according to the present invention is mounted within the space 31 of the sole 30, and the upper end of the intake pipe 19 is fixed by a fixing protrusion 80 at the top side of the upper rear portion of an upper leather of footwear 70.

When a person wearing the footwear into which the pumping assembly is inserted, is walking, the bottom surface of the sole 30 of the footwear is in contact with the ground, and the hard plate 12 of the pumping assembly 10 and the elastic cover 11 which surrounds the hard plate 12 is pressurized by the weight of a step.

5,975,861

**3**

As the hard plate **12** and the upper portion of the elastic cover **11** descend, the spring **20** is contracted as far as the hard plate **12** descends.

As the hard plate **12** descends, the volume inside elastic cover **11** decreases and the inner air corresponding to the decrement amount of the volume, within the elastic cover **11**, is discharged within the footwear through the front check valve **16**, the exhaust pipe **18** and the slot **35**.

Next, when the sole **30** of the footwear raised off the ground, the hard plate **12** is returned to the original position, due to the restoring force of the spring **20**, and the elastic cover **11** also takes its original shape.

Accordingly, with a restoring force of the pumping assembly **10**, fresh air outside the footwear flows into the elastic cover **11** through the intake pipe **19** and the rear check valve **17**. The amount of air flowing in is proportional to that discharged previously.

Preferably, the spring **20** has a cone shape, and the elastic cover **11** covering the spring **20** has a constant thickness and is excellent in elasticity and tensibility. Therefore, the elastic cover **11** can be contracted and restored, while having no influence on the function of the spring **20**. As a result, the spring **20** can be completely pressed, without receiving any interference from the elastic cover **11**, when the pressure is applied from top.

Furthermore, in the pumping assembly **10** according to the present invention, the greater the load applied the larger an amount of air pumped. A piston action strength of an air cylinder, which corresponds to load of a person who puts on the footwear having the pumping assembly **10**, is divided into 20 Kg, 30 Kg, 40 Kg, 50 Kg, 60 Kg, 70 Kg, and 80 Kg, respectively. After pumping tests for each load are executed over 300 times or more, it can be appreciated that the amount of air pumped one time in the ventilating footwear having the pumping assembly according to the present invention increases as much as 5 to 10 times, compared with that of conventional ventilating footwear.

Moreover, since the front and-rear check valves are formed in the bottom surface of the supporting plate and the exhaust pipe and the intake pipe are protected by the supporting plate, the complete form of the pumping assembly during the pumping can be maintained, without any distortion. Further, the structure of the pumping assembly **10** has no influence over component parts associated therewith, exhibiting the excellent pumping function.

During walking, through the repeating pumping operation, a large amount of flesh air from the exterior of the

**4**

footwear flows into the interior of the footwear, and moisture and sweat existing within the footwear are fully discharged to the outside. Therefore, fresh air is always within the footwear, so it can more effectively remove skin disease such as athlete's foot as well as a bad smell away from the feet, when compared with the conventional footwear. Furthermore, since the elasticity of the pumping assembly functions as an excellent cushion, during walking, it can buffer the impact applied to the upper rear portion of foot. As a result, wearing the footwear feels good and fatigue is reduced.

The hard plate in the preferred embodiment of the present invention may be comprised of plastic, metal, wood, or resin, the elastic cover may have a cylindrical shape, and the supporting plate may have a circular plate shape.

What is claimed is:

1. A pumping assembly for use in ventilating footwear, comprising:

a supporting plate having a first protrusion portion which is in a center portion of an upper surface of the supporting plate;

front and rear check valves in the supporting plate and respectively forward and backward of the first protrusion portion;

an exhaust pipe connected to the front check valve for exhausting air from the front check valve into the footwear;

an intake pipe connected to the rear check valve for receiving air from the rear check valve and from outside the footwear;

a conical spring having a lower large end engaged around the first protrusion portion on the supporting plate;

a dome-shaped hard plate having a second protrusion portion which is in a center portion of a bottom surface of the hard plate, the spring having an upper small end engaged around the second protrusion portion; and

an elastic cover which has elasticity and tensibility and covers the hard plate, the cover being fixed to the hard plate, the hard plate descending to reduce a volume within the elastic cover when the hard plate is pressed down by a foot of a person wearing the footwear for exhausting air through the front check valve, the spring returning the cover to an upward position to increase the volume in the cover for receiving air through the rear check valve.

* * * * *

# EXHIBIT D
# (Part 12 of 17)

US006282814B1

(12) **United States Patent**

Krafsur et al.

(10) Patent No.: **US 6,282,814 B1**

(45) Date of Patent: **Sep. 4, 2001**

(54) **SPRING CUSHIONED SHOE**

(75) Inventors: **David S. Krafsur**, Lenoir City; **Francis E. LeVert**, Knoxville, both of TN (US)

(73) Assignee: **Shoe Spring, Inc.**, Lenoir City, TN (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/419,330**

(22) Filed: **Oct. 15, 1999**

**Related U.S. Application Data**

(60) Provisional application No. 60/131,658, filed on Apr. 29, 1999.

(51) Int. Cl.$^7$ .................................................. **A43B 13/28**

(52) U.S. Cl. ........................................ **36/27**; 36/38

(58) Field of Search ................................... 36/7.8, 27, 28, 36/38

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,502,087 | 7/1924 | Bunns . | |
| 2,444,865 | 7/1948 | Warrington . | |
| 2,447,603 | 8/1948 | Snyder . | |
| 2,668,374 | 2/1954 | Seigle . | |
| 2,669,038 | 2/1954 | De Werth . | |
| 3,822,490 | 7/1974 | Murawski | 36/2.5 R |
| 4,267,648 | 5/1981 | Weisz . | |
| 4,492,046 | 1/1985 | Kosova | 36/27 |
| 4,592,153 | 6/1986 | Jacinto | 36/38 |
| 4,815,221 | 3/1989 | Diaz | 36/27 |
| 4,901,987 | * 2/1990 | Greenhill et al. . | |
| 5,269,081 | 12/1993 | Gray | 36/136 |
| 5,337,492 | 8/1994 | Anderie et al. . | |
| 5,343,636 | 9/1994 | Sabol | 36/78 |
| 5,435,079 | 7/1995 | Gallegos | 36/38 |
| 5,437,110 | 8/1995 | Goldston et al. | 36/38 |
| 5,502,901 | 4/1996 | Brown | 36/28 |
| 5,511,324 | 4/1996 | Smith | 36/27 |
| 5,517,769 | 5/1996 | Zhao | 36/27 |
| 5,544,431 | 8/1996 | Dixon | 36/38 |
| 5,639,074 | 6/1997 | Greenhill et al. | 267/162 |
| 5,743,028 | 4/1998 | Lombardino | 36/27 |
| 5,875,567 | 3/1999 | Bayley | 36/27 |
| 5,896,679 | 4/1999 | Baldwin | 36/27 |
| 5,916,071 | 6/1999 | Lee | 482/77 |
| 6,006,449 | * 12/1999 | Orlowski et al. . | |

* cited by examiner

*Primary Examiner*—Ted Kavanaugh

(74) *Attorney, Agent, or Firm*—Fish & Richardson P.C.

(57) **ABSTRACT**

A spring cushioned shoe is disclosed. The shoe includes a sole assembly that has a first spring disposed within a vacuity in the heel portion of the assembly, and a second spring disposed within a vacuity in the ball portion of the assembly. The springs are, e.g., wave springs that extend vertically from the upper to the lower internal boundaries of the vacuities.

**9 Claims, 4 Drawing Sheets**









**FIG. 1**



**FIG. 2**



15B    15D

15A    15C

**FIG. 3**    15



5'

4C'    4B'

53B    65    58

64    50

54    56

64    60

4B'    53A

**FIG. 7**    56    63    65    4A'



**FIG. 4**



**FIG. 6**



**FIG. 5**

US 6,282,814 B1

1

# SPRING CUSHIONED SHOE

## CROSS-REFERENCE OF RELATED APPLICATIONS

Pursuant to 35 U.S.C. Section 119, the benefit of priority from Provisional Application Ser. No. 60/131,658 with a filing date of Apr. 29, 1999 is claimed for this Non-Provisional Application.

## BACKGROUND OF THE INVENTION

### 1. Technical Field

This invention relates to the use of wave springs to cushion a shoe. Wave springs allow for reduced impact on the user during foot strike, thus increasing comfort and decreasing injury. Also, the wave springs will return a portion of the impact energy to the user for more efficient jumping, walking and/or running.

### 2. Background Art

People involved in normal exercise programs are always seeking new equipment that can minimize the risk of injury to parts of the body caused by stress due to a foot strike. Athletes are also continually looking for ways to improve their performance levels in a variety of athletic and aerobic events that involve walking, running, or jumping while at the same time, taking steps to reduce the wear and tear attendant to the pounding endured by joints and bones. This can be achieved to some degree by the use of improved sporting equipment and more specifically improved shoes for both athletes and non-athletes.

When participating in sports, especially high impact sports such as volleyball and basketball, the foot of the participant; specifically the ball and heel areas are prone to extreme mechanical stress due to the force that will be imparted when the foot strikes a relative incompressible surface. This force, which will vary depending on the type of event that a person is involved in and the mass of the person, can be as large as five times the body weight of the participant. The reaction force resulting from contact with a non-yielding surface causes great shock to the body that can injure the lower back and all rotating joints of the leg.

Unlike events that involve jumping, the mechanics of running or walking involve a prescribed set of motions insofar as the foot is concerned. Except in those events that involve sprinting, the heel impacts the ground first, the weight then shifts forward onto the ball of the foot in a rolling manner with the toe region providing the last contact with the ground. The initial impact in the heel area is of special interest with non-sprinting runners because; it is here that landing forces come into play. It is desirable to absorb as much impact energy as possible, consistent with providing a stable landing and without slowing down the runner. It is also desirable to avoid the complete loss of energy absorbed by the shoe at impact. Also, since the ball and toe areas of the foot are the last to leave the surface in contact with the ground, it is desirable to recover some of the landing energy absorbed in the initial impact. A number of patents relate to shoe constructions, which are variously designed to address one or more of the desirable shoe features discussed above, are reviewed below:

U.S. Pat. No. 5,896,679 discloses an article of footwear with a spring mechanism located in the heel area of a shoe including two plates connected one to the other and attachment to the lower surface of the shoe sole. The invention of the '679 patent provides a heel mechanism that absorbs the shock or impact foot strikes. U. S. Pat. No. 5,743,028 (T. D.

2

Lombardino) discloses a plurality of vertically compression springs located in the heel area of a running shoe. The springs of the '028 patent are housed in a hermetically sealed unit filled with a pressurized gas which in combination with the springs provides a shock absorbing and energy return system. The springs having substantially a coiled appearance where each spiral coil must provide a torsional spring force and collapse in a vertical stack commonly called the solid height when totally compressed. Because of their design, these springs must have significant free heights to accord one with large deflections. U.S. Pat. No. 4,815,221, Diaz discloses an energy control system comprising a spring plate having a plurality of spring projections distributed over the surface of the plate which is placed in a vacuity formed within the mid-sole of an athletic shoe. U.S. Pat. No. 5,511,324 (R. Smith) discloses a shoe in which a coil spring extends from the top through the wedge sole in the heel area of an athletic shoe. U.S. Pat. No. 5,437,110 (Goldston et al.) discloses an adjustable shoe heel spring and stabilizer device for a running shoe including a spring mechanism disposed in the mid-sole of the shoe. The shoe heel spring includes a cantilevered spring member and an adjustable fulcrum. A shoe designed specifically for jumping is disclosed in U.S. Pat. No. 5,916,071 (Y. Y. Lee). Lee discloses a shoe mounted on a frame containing a coil spring that extends horizontally from the regions of the frame located at the toe and heel areas of the shoe which expands and contracts during walking and jumping. U.S. Pat. No. 4,492,046 (Kosova) discloses a running shoe which includes a spring wire located in a longitudinal slot in the shoe sole extending from the back edge thereof into the arch region. U.S. Pat. No. 2,447,603 (Snyder) discloses a U-shaped spring plate disposed between the heel of the shoe and overlying a rear portion of the shoe sole. Several other U.S. patents of related art are: U.S. Pat. No. 5,875,567 (R. Bayley); U.S. Pat. No. 5,269,081 (Gray); U.S. Pat. No. 2,444,865 (Warrington); U.S. Pat. No. 3,822,490 (Murawski); U.S. Pat. No. 4,592,153 (Jacinta); and, U.S. Pat. No. 5,343,636 (Sabol); U.S. Pat. No. 5,435,079 (Gallegos); U.S. Pat. No. 5,502,901 (Brown); U.S. Pat. No. 5,517,769 (Zhao); and U.S. Pat. No. 5,544,431 (Dixon).

Revisiting and expanding the above mentioned desirable attributes of a shoe of this type, there is a need for a shoe that enhances the performance of the wearer by providing a substantial spring force working through a significant distance while requiring a minimum volume for deployment. In addition there is a need for a shoe designed with a multiplicity of springs that also assists in propelling the foot off the ground while still maintaining sufficient lateral stability of the shoe for quick side-to-side movement of the wearer. This performance enhancement can be achieved by temporarily storing the shock energy imparted by foot strike and returning a substantial amount of the energy to the wearer's foot during the propelling-off portion of the stride. Also, there is a need to assure adequate spring fatigue life by limiting maximum stresses and preventing compression to the spring's solid height.

The prior art cited above has disclosed spring devices in athletic shoes for the purposes of absorbing shock and returning energy to the wearer's foot.

As can be seen from the background art, there have been many attempts to add spring cushioning to shoes. However, one only need to look at the current market to see that spring cushioned shoes are not commonly available.

Accordingly, it is an object of this invention to provide a spring-cushioned shoe that provides large heel deceleration and ball acceleration during the foot strike.

US 6,282,814 B1

3

A second object of this invention is to provide a shoe with a multiplicity of springs located at the heel and ball regions of the foot.

A third object of this invention is to provide a shoe that returns, by way of the spring force, a substantial energy stored in the springs during the initial compression cycle-of the heel or ball area of the foot.

A further object is to provide a shoe with maximum force and deflection within a minimal volume, as well as lateral stability. Other objects of this invention will become obvious during the review of the figures and the detailed description of the shoes of this invention.

BRIEF SUMMARY OF THE INVENTION

The present invention provides cushioning for a shoe that utilizes wave springs that are placed in the ball and heel areas of the sole of a shoe. It should be obvious to one skilled in the art that the placement of the wave springs is not limited to only the ball and heel areas of the shoe. In the present invention, the middle portion sole of the shoe sole assembly is made of foam with vacuities located at or near the ball and heel regions of the foot in order to accommodate placement of the springs. There are also numerous other methods and designs to place the wave springs into a shoe for cushioning and energy return. The ensuing description of the present invention discloses only a limited number of the countless methods and variations thereof that may be used. The advantages of the present invention will become apparent from reading the description of the invention in the preferred embodiments given below.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 illustrates a side view of the preferred embodiment of the spring-cushioned shoe.

FIG. 2 illustrates a cross sectional view of the spring-cushioned shoe taken in the heel region of the spring cushioned shoe.

FIG. 3 illustrates a view of the wave spring component of the preferred embodiment

FIG. 4 illustrates a plan view of the outer sole of the spring-cushioned shoe.

FIG. 5 illustrates a side view of the second embodiment of the spring cushioned shoe.

FIG. 6 illustrates a plan view of the outer sole of the second embodiment of the spring-cushioned shoe.

FIG. 7 illustrates a sectional view of one of the spring assemblies of the second embodiment of the spring-cushioned shoe with stabilizer and compression limiter.

DETAILED DESCRIPTION OF THE PREFFERED EMBODIMENTS

This invention relates to the use of ordinary compression springs as an integral part of shoes to cushion the impact of foot strikes and to provide recuperative energy return to the wearer. A spring-cushioned shoe incorporating the various features of the present invention is illustrated generally at 2 in FIGS. 1 and 2. The spring-cushioned shoe 2 shall hereafter be referred to as SCS 2.

The SCS 2 in FIG. 1 comprises: an upper shoe portion 5 firmly attached to the shoe sole assembly 4. The shoe sole assembly 4 includes an outer sole 4A with first and second surfaces; middle sole 4B having first and second surfaces positioned such that its first surface is adhesively attached to the second surface of outer sole 4A; and, inner sole 4C

4

whose first surface is adhesively attached to the second surface of middle sole 4B and whose second surface is in working contact with the lower region of upper shoe portion 5. In the present invention, the middle sole 4B is composed of foamed polymeric material, and the inner and outer soles 4A and 4C are made of solid polymeric materials. Particularly, the outer sole 4A is composed of ethyl vinyl acetate with the first surface of outer sole 4A having tractive characteristics. As shown in FIG. 1, the middle sole 4B is designed to include vacuities 6 and 7. Vacuity 6, the extent of which is defined by vertically opposing surfaces 8A and 8B of foamed polymeric material of middle sole assembly 4B, was formed in the heel region 8C of SCS 2. The surfaces 8A and 8B which are set apart from the second and first surfaces of middle sole 4B, respectively, define thick sections of middle sole 4B at the heel area of the shoe sole assembly 4 into which cylindrical countersunk volumes 11A and 11B, respectively are formed as shown in FIG.2. Vacuity 7 is disposed between vertically opposing surfaces 10A and 10B of foamed polymeric material 4B in the region 10C of shoe sole assembly 4. Like surfaces 8A and 8B, surfaces 10A and 10B define thick sections of the polymeric material of middle sole 4B located below and above the vacuity 7 in the vertical direction such that cylindrical countersunk volumes 16a and 16b(not shown in FIG. 1 or 2) can be formed therein. The cylindrical countersunk volumes 11A and 11B and 16A and 16B provide vertical stabilization and retention of the wave springs 15 and 19. The shoe sole assembly 4 is firmly attached to upper portion 5 of SCS 2. Wave springs 15 and 19 are deployed in vacuities 6 and 7 of foamed polymeric material 4B of shoe sole assembly 4, respectively.

The wave springs 15 and 19 are substantially identical to wave springs described by Greenhill in U.S. Pat. No. 4,901, 987. Greenhill describes a multi turn compression spring with distinct crests and troughs. A separate drawing of the wave spring 15 is presented in FIG. 3 for illustrative purposes. Wave spring 15 with circular flat shim ends 15A and 15B and wave crest 15C and wave trough 15D with prescribed periodicity are shown in FIG. 3. FIG. 3 illustrates the configuration of wave springs, 15 and 19 which provide for operationally acceptable force and deflection for a given free height of the springs. The compression wave springs of the preferred embodiment of this invention could be replaced with multi turn wave springs which do not employ flat shim ends but rather rely on the use of flat end plates in combination with ordinary wave springs.

The cylindrical countersunk volumes 11A and 11B are designed for slidably accepting the first and second shim ends 15A and 15B of wave spring 15, respectively, in heel region 8C. When fully inserted, the flat shim ends 15A and 15B of wave spring 15 are held in firm mechanical contact with the closed ends of cylindrical countersunk volumes 11A and 11B, respectively.

The region of shoe sole assembly 4 of the SCS 2 that is normally proximate the metatarsal region of the foot likewise having surfaces 10A and 10B (see FIGS. 1 and 4) containing counter sunk cylindrical volumes 16a and 16b (not shown) for slidably accepting in the following order the first shim end 19A and the second shim end 19B (not shown), respectively, of wave spring 19. When fully inserted the shim ends 19A and 19B of wave springs 19 are in mechanical contact with the closed end portions of cylindrical volumes 16a and 16b, respectively. The surfaces 8A and 8B are mechanically held in a manner so as to provide minimal compressive loading on the shim ends 15A and 15B of wave spring 15 by transparent strip 22 (see FIG. 4) which is connected thereto by adhesive. Similarly, transparent Strip

US 6,282,814 B1

5

28 (see FIG. 4) when adhesively attached to the surfaces 10A and 10B, provide a slight compressive load on shim ends 19A and 19B of wave spring 19. In addition to sealing vacuities 6 and 7 from the environment, strips 22 and 28 provide some lateral stability for the users of the SCS 2. It should be apparent that the strips 22 and 28 could also be made from a number of various materials. In FIG. 1, the upper portion 5 of the SCS 2 is made of high strength synthetic fabric. The materials that comprise the SCS 2 are not limited to only those mentioned in this disclosure. Any number of materials can be used in the manufacturing of the shoes of this invention. The cylindrical volumes 11A and 11B and 16a and 16b along with transparent strips 22 and 28 provide for retention and vertical stabilization of the wave springs 15 and 19 when they are inserted into vacuities 6 and 7 respectively.

Referring to FIG. 1, the front end 29, rear end 30 and middle region 32 of the shoe sole assembly 4 of the SCS 2 can be designed to provide retentive support for wave springs 15 and 19 that augments support provided by transparent strips 22 and 28. Such retentive support can consist of strips that connect the shoe sole assembly 4 to the upper shoe portion 5. In FIG. 1, wave springs 15 and 19 are shown as deployed in vacuities 6 and 7 in shoe sole assembly 4 which is attached to shoe upper portion 5. The cross sectional view in FIG. 2 shows interior wave spring compression limiters 36 and 38 which are integral parts of cylindrical countersunk volumes 11A and 11B respectively. That is, the compression limiter's outer dimensions define the inner diameters of countersunk volumes 11A and 11B, respectively.

The opposing spring compression limiters 36 and 38 (see FIGS. 2 and 4 ) are separated by extended waves spring 15 whose solid height when fully compressed by the strike force of the foot of a user is less than the linear distance in the vertical direction between spring compression limiters 36 and 38. The heights of compression limiters 36 and 38 are prescribed by the depth of the countersunk cylindrical volumes 11A and 11B in surfaces 8A and 8B, respectively. In the shoes of the present invention, the distance between the terminal ends of compression limiters 36 and 38 were set at 12 mm. The heights of spring compression limiters 36 and 38 are related mathematically to the spring constant of the wave spring and the mass of the user and are chosen such that the wave spring 15 can not be compressed to its solid height during use. Accordingly, because of the force generated at the portion of shoe sole assembly 4 of the SCS 2 that is normally proximate the metatarsal of the foot during normal use, the distance between the terminal ends of spring compression limiters 42 and 44 is set at 9 mm. The distance between spring compression limiters 42 and 44 (not shown) and the spring constant of wave spring 19 were selected such that the force generated, when the first surface of shoe sole assembly 4 opposite the ball of the foot contacts a surface while running, cannot compress wave spring 19 to its solid height.

It should be obvious to one skilled in the art that, depending on the weight of the user, the prescribed distances between the terminal ends spring compression limiters 36 and 38 as well as 42 and 44 will vary. In the present invention, the vacuities 6 and 7 of shoe sole assembly 4 were formed by splitting middle sole 4B into two substantially equal slabs forwardly from the heel area toward the toe of the shoe. The cylindrical countersunk volumes 11A and 11B and 16a and 16b were formed by machining, at the proper locations and depths in foam polymeric material of middle sole 4B. The combined depths of cylindrical countersunk

6

volumes 11A and 11B and 16a and 16b were selected such that the heights of wave springs 15 and 19 would create vacuities 6 and 7 at those regions of 4B, when inserted therein. Once wave springs 15 and 19 were inserted in the machined cylindrical countersunk volumes, the split portions of foamed polymeric material of middle sole 4B were adhesively reattached at the middle region of shoe sole assembly 4. And, the vacuities 6 and 7 are sealed by strips 22 and 28 respectively. The strips 22 and 28 were attached by adhesive to the shoe sole assembly 4 at the heel and ball of the foot regions of the SCS 2. The foamed polymeric material of middle sole 4B could be made from any number of materials such as polyurethane.

The method for forming the vacuities 6 and 7 and fixing the wave springs 15 and 19 in the middle sole 4B of SCS 2 in the present invention was as discussed above. However, it is obvious to one skilled in the art that the vacuities and spring retention methods could be formed by any number of manufacturing techniques available to the shoe industry such as the use of the molding process and the springs inserted into the assembled shoe sole. Or the complete shoe sole—spring assembly could be made in one single continuous process.

The wave spring 15 which primarily provides cushioning during foot strikes has a free height selected to be greater than that of wave spring 19 which provides primarily liftoff force to the foot of a wearer.

Even though the wave springs 15 and 19 used in the shoes of this invention are metallic in construction, it should be obvious to one skilled in the art that the material of the wave springs is not solely limited to metals and that a wide variety of other materials could be used as well. Likewise, the materials used in the other parts of the shoe may be made from any multitude of materials commonly used in the art. While the shoe of this invention use single leaf crest-to-crest wave springs, it could have employed interlaced wave springs described in U.S. Pat. No. 5,639,074 or commercially available nested wave springs. The interlaced and nested wave springs like the crest-to-crest wave springs provide the primary desirable characteristics of crest-to-crest wave springs important to the shoe of the invention. That is, like crest-to-crest wave springs, interlaced and nested wave springs provide maximum force and deflection for a given unloaded spring height.

FIG. 5 shows a second embodiment of the shoes of this invention. In FIGS. 5 and 6, wave springs 50 and 52 are mounted in vacuity 54 with their first and second terminal shim ends 56 and 58 mounted in U-shaped plastic receiving clip 60, which contain protrusions 64 as shown in FIG. 7 which slidably accepts the first and second terminal shim ends 56 and 58 of wave springs 50 and 52 until firm mechanical contact is achieved between the shim ends 56 and 58 and the closed ends 63 of protrusions 64 of U-shaped receiving plate 60. The U-shaped plastic receiving clip 60 containing wave springs 50 and 52 are inserted into vacuity 54 where it is attached as by adhesive to the plain interior surfaces 53A and 53B of vacuity 54 in heel area of foamed polymeric material 4B' of shoe sole assembly 4'. The U-shaped plastic-receiving clip 60 is designed to have one pair of cylindrically shaped compression limiters 65 associated with each wave spring. One of the terminal ends of each of the compression limiters 65 being adhesively attached to each of the opposing inner surfaces of clip 60 at the diametrical centers of protrusions 64 by adhesive, as shown in FIG. 7. The U-shaped plastic receiving clip 60 of this second embodiment of the shoes of this invention could be replaced by two plastic plates containing protrusions for

**7**

slidably accepting the shim ends of one or a multiplicity of wave springs. The vacuity **54** is sealed as shown in FIGS. 5 and **6** with extensionable plastic **69** which provide for strength of the SCS **2'** in the lateral or side to side direction during use.

Vacuity **66** is located in the metatarsal region of shoe sole assembly **4'**. Plastic plates **68** and **70** having protrusions **72** substantially identical to protrusions **64** of FIG. 7 on their first surface into which the first and second shim ends **73A** and **73B** of wave springs **73** and the first and second shim ends **74A** and **74B** (not shown) of wave springs **74** (FIG. **6**) are slidably inserted. The plastic plates **68** and **70**, in addition to the first surfaces, have substantially parallel second surfaces. The assembled unit consisting of plastic plates **68** and **70**, protrusions **72** and wave springs **73** and **74** are inserted into vacuity **66** of shoe sole assembly **4'**. The second surfaces of plastic plates **68** and **70**, with wave springs **73** and **74** inserted therebetween, are attached to the plain interior surfaces **75A** and **75B** of vacuity **66** by adhesive. The plates **68** and **70** are designed to accept with minimal resistance compression limiters **78** which are attached to diametrical centers of plates **68** and **70** in a manner similar to that of compression limiters **65** to plates **68** and **70**. The compression limiters **78** serve to limit the amount of compression that wave springs **73** and **74** can undergo during use. The vacuity **66** is sealed with extensionable plastic **76**.

It should be obvious to a person of ordinary skill in the art that more than two wave springs could be employed in each of the heel and metatarsal regions the shoes of this invention. A compression limiter, in this second embodiment, is associated with each wave spring. However, one or more strategically positioned pairs of regional compression limiters could be used to limit the compression of a plurality wave springs.

The spring-cushioned shoe of the second embodiment of this invention contains opposing plates, which are separated by intervening foam material shown in FIG. 5. The plastic plates could also be held firmly by friction or other mechanical means other than the previous mentioned adhesive, for slidable insertion into, and removal from, the shoe sole assembly **4'** to accommodate replacing the wave springs with other wave springs of different spring rates. Furthermore, the plastic plates could be concatenated giving rise to a plastic member that extends from the heel area to the ball of the foot area of the shoe sole assembly. A shoe sole assembly designed to accept the plastic member could be equipped with a single vacuity that like the plastic member that extends the full length of the shoe sole assembly.

The wave springs used in the preferred embodiment of the invention are made of spring steel with inner and outer diameters, transverse thicknesses, peak and trough heights and quantities chosen so as to provide spring rates for wave spring **15** and **19** of 600 lb/in and 500 lb/in respectively.

The critical design parameters and materials of the wave springs could be selected so as to provide springs of different spring forces and other characteristics. For example, other metallic and non-metallic materials, polymers, and composites could be selected for different weight and strength characteristics. Also, the design parameters of the wave springs may be altered to provide varying strength, deflection, and load characteristics. Further, the embodiment of this invention is described in terms of a single cushion shoe. It should be obvious that the companion cushion shoe will be of identical design and construction.

**8**

The operation of the SCS **2** will now be explained in view of the shoe of FIG. **1**. When a pair of spring cushioned shoes is placed in use by a user, for example a runner, the region of the shoe containing wave spring **15** strikes the running surface first. The strike force applied by the calcaneus portion of the foot compresses the wave spring to a prescribed height before the foot is brought to rest and the body mass is dynamically transferred to the metatarsal region of the foot in contact with the surface where the wave spring **19** becomes compressed. When the body mass is transferred to the metatarsal region of the foot, wave spring **15** which was in the initial footstrike undergoes a compress—recoil cycle. As the user lifts the metatarsal region of the foot, energy is transferred to this region as wave spring **19** recoils. Thus, wave springs **15** and **19** both provide cushioning and energy return to the user of the SCS **2**.

During footstrike (whether from jumping or running), peak forces of several times the body weight can be imparted to the wave springs. We can assume that an average user of the shoes would weigh 165 lbs. Therefore, average peak forces greater than 300 $lb_f$ can be imparted to the wave springs. Hence, the previous mentioned spring rates could be used for a 165-lb person.

Wave springs are ideal for use in this limited space application. Conventional spring methods are inferior in shoe cushioning applications because of the limited combination of force, deflection, and space requirements.

While a preferred embodiment has been shown and described, it will be understood that it is not intended to limit the disclosure, but rather it is intended to cover all modifications and alternate methods falling within the spirit and the scope of the invention as defined in the appended claims.

What is claimed is:

1. A sole assembly for an article of footwear, the sole assembly having a heel region and a ball region, and the sole assembly comprising:

a first wave spring disposed within the heel region;

a second wave spring disposed within the ball region;

a first vacuity in the heel region and a second vacuity in the ball region, wherein the first wave spring is disposed within the first vacuity, and the second wave spring is disposed within the second vacuity; and

a receiving clip disposed within the first vacuity, the receiving clip having a rigid upper internal surface and a rigid lower internal surface, the upper and lower internal surfaces each including a protrusion that defines a groove,

wherein the first wave spring has an upper and a lower terminal shim end, and the first wave spring is disposed within the receiving clip such that its upper terminal shim end is disposed within the groove of the upper internal surface, and its lower terminal shim end is disposed within the groove of the lower internal surface.

2. The sole assembly of claim **1**, wherein the receiving clip further comprises a pair of opposed spring compression limiters attached to the upper and lower internal surfaces respectively, the spring compression limiters engaging upper and lower sides of the wave spring respectively.

3. The sole assembly of claim **2**, wherein the spring compression limiters are generally cylindrically shaped.

4. The sole assembly of claim **1**, wherein the clip is U-shaped.

5. A sole assembly for an article of footwear, the sole assembly having a heel region and a ball region, and the sole assembly comprising:

US 6,282,814 B1

9

10

a first wave spring disposed within the heel region;

a second wave spring disposed within the ball region;

a first vacuity in the heel region and a second vacuity in the ball region, wherein the first wave spring is disposed within the first vacuity, and the second wave spring is disposed within the second vacuity; and

upper and a lower plastic plates disposed within the first vacuity, on opposite sides of the vacuity, each plate comprising a protrusion that defines a groove,

wherein the first wave spring has an upper and a lower terminal shim end, and the first wave spring is disposed between the plates such that its upper terminal shim end is disposed within the groove of the upper plate, and its lower terminal shim end is disposed within the groove of the lower plate.

**6**. The sole assembly of claim **5**, further comprising a pair of opposed spring compression limiters attached to the upper and lower plates respectively, the spring compression limiters engaging upper and lower sides of the wave spring respectively.

**7**. A sole assembly for an article of footwear, the sole assembly having a heel region and a ball region, and the sole assembly comprising:

a first wave spring disposed within the heel region;

a second wave spring disposed within the ball region;

a first vacuity in the heel region and a second vacuity in the ball region, wherein the first wave spring is disposed within the first vacuity, and the second wave spring is disposed within the second vacuity; and

upper and lower plates disposed within the first vacuity, on opposite sides of the vacuity, wherein the first wave spring is disposed between the upper and lower plates, and wherein the upper and lower plates each comprise a projection extending from a plane of the plate, and wherein the first wave spring has an upper and a lower end, and the first wave spring is disposed between the plates such that its upper end fits around the projection of the upper plate, and its lower end fits around the projection of the lower plate.

**8**. The sole assembly of claim **7**, wherein the projections extending from the upper and lower plates are generally circular in shape.

**9**. The sole assembly of claim **7**, wherein the upper and lower ends of the first wave spring are terminal shim ends.

\*   \*   \*   \*   \*

US006519873B1

(12) **United States Patent**　　　　(10) **Patent No.:**　　**US 6,519,873 B1**

Buttigieg　　　　　　　　　　　　　(45) **Date of Patent:**　　**Feb. 18, 2003**

(54) **PLASTIC BELLOWS INSERTED INTO SOLES**

(75) Inventor: **Carmel Buttigieg**, Triq Il-Ferrovija Santa Venera (MT)

(73) Assignee: **Yamamoto Limited**, Valletta (MT)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/686,340**

(22) Filed: **Oct. 10, 2000**

(30) **Foreign Application Priority Data**

Oct. 21, 1999　(MT) ................................................. 1398

(51) **Int. Cl.$^7$** ............................................. **A43B 13/20**

(52) **U.S. Cl.** ............................................................. **36/29**

(58) **Field of Search** ............................ 36/29, 35 B, 28

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,568,405 A | * | 1/1926 | Keller |
| 4,446,634 A | * | 5/1984 | Johnson et al. |
| 4,462,171 A | | 7/1984 | Whispell |
| 4,918,838 A | | 4/1990 | Chang |
| 5,068,981 A | * | 12/1991 | Jung |
| 5,222,312 A | * | 6/1993 | Doyle |

| | | | |
|---|---|---|---|
| 5,295,314 A | | 3/1994 | Moumdjian |
| 5,655,315 A | * | 8/1997 | Mershon |
| 5,673,498 A | * | 10/1997 | Amir et al. |
| 5,794,361 A | * | 8/1998 | Sadler |
| 5,813,142 A | * | 9/1998 | Demon |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| DE | 3031818 | | 4/1982 |
| EP | 576734 | * | 1/1994 |
| WO | 9854996 | | 12/1998 |

* cited by examiner

*Primary Examiner*—Ted Kavanaugh

(74) *Attorney, Agent, or Firm*—Bucknam and Archer

(57)　　　　**ABSTRACT**

A plastic bellow system inserted into the sole of a shoe. The system having a first pair and a second pair of side-by-side plastic bellows in the forward portion and the rear portion of the shoe sole. The bellows placed in hollows formed in a midsole. The first pair of bellows having two convolutions with an opening formed in the lower convolution. The second pair of bellows having three convolutions with an opening formed in the lower convolution. A pneumatic valve associated with each bellows and the exterior of the midsole. The user can modify foot position by operating the valve of each bellows of the first and second pair of plastic bellows to inflate or deflate each bellows to thereby modify the volume of each bellows.

**5 Claims, 8 Drawing Sheets**







FIG.1B3

FIG.1B1

FIG.1B2

FIG.1A3

FIG.1A1

FIG.1A2



FIG.2A

FIG.2B





FIG.4



FIG.5A

FIG.5B



FIG.6A

FIG.6B





US 6,519,873 B1

1

## PLASTIC BELLOWS INSERTED INTO SOLES

### DESCRIPTION OF THE PRIOR ART

Up until today all of the producers of shoes have proposed to the market a lot of special devices inserted into soles for a better cushioning effect. Generally all the systems used for this purpose are located in the rear part of the sole and often are special plastic blisters filled with air or a gel. These special mattresses give the customer a sensation of cushion, but, wearing the shoes for a long time, sometime some pains or biomechanical diseases occur.

The reason is that if a customer has a foot problem as over pronation or impacting the ground with the heel he has an inversion or eversion problem, the air or gel contained into these blisters is compressed where this problem exists, moving this air or gel to the opposite side, with the result that the biomechanical anomaly is increased.

The use of separate plastic bellows which can be self inflatable and self deflatable can correct foot anomalies and can prevent foot injuries.

### SUMMARY OF THE INVENTION

The crux of this invention resides in the insertion of special plastic bellows into the sole.

How the bellows work inside a sole.

These bellows are produced with the process of blow moulding or rotational moulding using special polymers defined engineering thermoplastic elastomers which are characterized by their high elastic modulus and therefore give the bellows the possibility to react instantaneously when compressed.

If they are vacuum formed have an enormous elasticity, giving the sole the best cushioning effect.

If they have a hole pre-formed in any side, if compressed they eject the internal air, but always, when the compression is over, they come back to the original position.

In this case if a pneumatic valve is put into the hole, this valve can regulate the air flow, making the bellows self inflatable and self deflatable.

This invention relates on the applications of these innovative technologies with the use of valves as following:

A—A sole with two or four self inflatable and self deflatable bellows for corrective shoes,

B—A sole with four self inflatable and self deflatable bellows for shoes for diabetics,

C—A sole with one or more simple bellows for walking and running shoes with a special cushioning effect,

D—A sole with one or more self inflatable and self deflatable bellows for the support of the plantar arch,

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1A1 is a plan view of a plastic bellows for insertation into a shoe according to the present invention;

FIG. 1A2 is a front elevational view of the plastic bellows shown in FIG. 1A1;

FIG. 1A3 is a side elevational view of the plastic bellows shown in FIG. 1A1;

FIG. 1B1 is a plan view of a second embodiment of a plastic bellows for insertation into a shoe according to the present invention;

FIG. 1B2 is a front elevational view of the plastic bellows shown in 1B1;

2

FIG. 1B3 is a side elevational view of the plastic bellows shown in FIG. 1B1;

FIG. 2A is a side elevational view of a show midsole shown partly in cross-section showing the plastic bellows of the present invention installed therein;

FIG. 2B is a plan view of the show midsole shown in FIG. 2A;

FIG. 3A is a side elevational view of a shoe midsole similar to FIG. 2A showing another embodiment of thereof;

FIG. 3B is a plan view of the shoe midsole shown in FIG. 3A;

FIG. 4 is a cross-sectional view of the pneumatic valve used in the plastic bellows of the present invention;

FIG. 5A is a side elevational view of a show midsole similar to FIG. 2A showing another embodiment thereof;

FIG. 5B is a plan view of the shoe midsole shown in FIG. 5A;

FIG. 6A is a side elevational view of a shoe midsole similar to FIG. 2A showing another embodiment thereof;

FIG. 6B is a plan view of the shoe midsole shown in FIG. 6A;

FIG. 7A is a side elevational view of a slipper shown partly in cross-section on a foot for supporting the plantar arch;

FIG. 7B is a plan view of slipper shown in FIG. 7A;

FIG. 7C is a view similar to FIG. 7A wherein one of the plastic bellows is deflatable;

FIG. 7D is a plan view of the slipper shown in FIG. 7C;

FIG. 8A is a side elevational view of a shoe midsole similar to FIG. 2A showing another embodiment wherein an intermediate plastic bellows is interconnected to the front and rear bellows; and

FIG. 8B is a plan view of the shoe midsole shown in FIG. 8A.

In FIGS. 1–4 the application—A—and all the components of the system are shown, where:

The plastic bellows may have three convolutions (1) or two convolutions (2), from the lower convolution a tube (3) comes out. In both these cases these convolutions are inserted in a midsole (4) produced with foamed plastic material as PU—polyurethane- or EVA—ethylene-vinyl-acetate or other foamed materials obviously with the corresponding hollows pre-formed in order to place the bellows. This midsole is normally glued or pre-formed with the corresponding outersole (5).The tube (3) is formed on the longitudinal side of the bellows, corresponding to the edge of the midsole (4) as in—FIG. 2—or on the head of the bellows, corresponding to the inner part of the midsole (4) as in—FIG. 3—In the case—FIG. 2—a special pneumatic valve (6) is directly inserted into this tube.

In the case—FIG. 3—a tube (7) is inserted into this tube (3) which will go to the nearest edge of the midsole. Internally this tube (7) the same pneumatic valve (6) is inserted. In FIG. 4 is shown how this valve is composed:

A ring (11) which enters the tube (3) or (7). On its inner side it has a gasket (14),

A spring (15) which reacts between the inner head of the push-button (12) and the inner teeth (10) pre-formed in the tubes (3) or (7). The push-button (12), whose head overcomes the edge of the midsole (4) and whose arms are in opposition to the gasket (14) push on the inner part of the ring (11).

US 6,519,873 B1

<table>
<tr><td>3</td><td>4</td></tr>
</table>

How this valve works:

Taking on a hand a shoe, therefore when the bellows are not compressed by the body load, pushing the push-button (12) with a finger, will allow the entry of the air, because its natural property to extend the convolutions due to the high elastic modulus of its material and the bellows will inflate to its maximum.

If the shoe is worn and the wearer pushes, with his foot, on a specific area of the sole, he will compress this area which corresponds to one or more bellows. Now pushing with a finger the push-button, the air will come out, deflating the bellows. This exit of the air can be regulated because if the push is terminated before the total compression of the bellows, a part of the air will remain in the interior and the bellows will be partially deflated.

For the application—A—the system will work as follows: Corrective Shoes

The basic foot anomalies are:

1a—Inversion. When the foot touches, during the impact phase, the ground internally,

1b—Eversion. When the foot touches, during the impact phase, the ground externally,

1c—Over-pronation, or "pronation". When the foot leaves the ground, during the push—off phase, pushing internally,

1d—Sub-pronation, or "supination". When the foot leaves the ground, during the push—off phase, pushing externally.

With reference to FIGS. 1–4:

To correct an inversion the bellows located in the rear part and innerly (1a) must be totally inflated and the opposite (1b) partially or totally deflated.

To correct an eversion the bellows located in the rear part and externally (1b) must be totally inflated and the opposite (1a) partially or totally deflated.

To correct an over-pronation the bellows located in the front part and in the interior (2a) must be totally inflated and the opposite (2b) partially or totally deflated.

To correct a sub-pronation the bellows located in the front part and externally (2b) must be totally inflated and the opposite (2a) partially or totally deflated. These adjustments of the inner air can be regulated as a function of the gravity of the anomalies.

For the application—B—the system will work as follows: Shoes for Diabetics

The diabetic neuropathy can lessen the patient's ability to feel pain, this loss of sensation is the problem that leads most often foot injuries. A foot injury can go unnoticed until there is skin ulceration and infection which can lead to gangrene and amputation. An excellent habit for a diabetic is to change the shoes during the day four-five times. Following this advice the patient will never be in danger of an ischemic pressure ulcer because the shoes being changed will be tight in a different place. This advice is the best one that the experts can give the patient but unfortunately it is quite impossible to bring several pairs of shoes during the entire day. It is obvious that by using soles that can be inflated or deflated in prefixed points, a patient can modify, during the day, the position of the foot. Therefore for preventing diabetic foot injuries the bellows system will work as follows:

Starting from the morning the system will be totally air loaded,

First four–five hours one bellows, i.e. "inversion" (1a), will be deflated,

Second four–five hours another bellows, i.e. "pronation" (2a), will be deflated,

Third four–five hours another bellows, i.e. "supination" (2b), will be deflated,

Fourth four–five hours another bellows, i.e. "eversion" (1b), will be deflated.

In the evening, when the shoes are not worn, the system must be re-inflated for the day after and therefore the user, taking on hands each shoe, will push the push-button (12) of all the valves (6). The systems, as described for applications A and B, can be adapted also for walking and running shoes. In this case only two bellows, as shown in FIG. 5, are studied because the front part of the sole does not allow the insertion of a bellows with at least two convolutions. Only for shoes with a roomy plant area may be possible the insertion of the plastic bellows in the front part of the sole. In FIG. 5 is shown a sole for a walking or a running shoe with two bellows (1) with the corresponding valves (6). In this case the user can adjust the foot position during the impact phase of a step. In FIG. 6 a sole for walking or running is shown, it is made with one bellows (1), without valve, in other words without any possibility for the adjustment. The object is to give the sole an extraordinary cushioning effect, due to the elasticity of the convolution of the bellows, which being produced with special technopolymers and vacuum formed, reacts as a spring like an elastic pad. To speed up the production of the sole and the consequent construction of the shoe it will proceed as follows. Being these bellows produced with the process of blowing moulding or rotational moulding it is possible to insert inside the mould, and before the entering of the material, the whole sole or part of it with the consequence that once the material of the bellows is formed it is amalgamated with the material of the sole, avoiding the process of the gluing of the two materials. Another aspect to be considered is that the mould of the bellows can be produced forecasting the formation of some parts of the shoe upper as the heel contour or the braces which generally are made to support the laces.

For the application—D—the system will work as follows: Soles for the Support of the Plantar Arch

This application derives from a Japanese concept which relates about the reflexology's principle based on the consideration that, supporting the plantar arch, a lot of pains can be avoided. For this reason it is possible to find in the market some special very short slippers characterized by a high support on the plantar arch, leaving the heel free and without any support. Obviously these special slippers can be worn only for a short time just for a period of few hours during the day. Using the bellows system as shown in FIG. 7 it is possible to adjust a slipper for this purpose acting as follows. In the position—N—the two bellows are completely inflated and the slipper is working as a normal one, supporting the whole foot plant and giving the foot a good feeling of cushioning. In the position —H—the bellows (19) remains inflated and the bellows (20) is deflated, acting on the valve (6). In this case this slipper will work as the Japanese one. Obviously this special system will work also using only one bellows, located in the rear part (20).

What is claimed is:

1. A plastic bellows system inserted into the sole of a shoe, said shoe sole including a midsole (4) and an outer sole (5) attached to midsole (4), said plastic bellows system comprising:

a) a first pair of side by side plastic bellows each formed with two convolutions and arranged in the forward portion of the shoe sole in hollows formed in said midsole (4);

US 6,519,873 B1

5

b) a second pair of side by side plastic bellows each formed with three convolutions and arranged in the heel portion of the shoe sole in hollows formed in said midsole (**4**);

said first and second pairs of plastic bellows being formed by blow molding or rotational molding of engineering thermoplastic elastomers having high elastic modulus so that said bellows have instantaneous recovery following compression;

c) an opening formed in the lower convolution of each of said bellows of said first and second pairs of plastic bellows communicating via a tube (**3,7**) to the exterior of said midsole (**4**); and

d) a pneumatic valve (**6**) associated with each of said bellows of said first and second pairs of plastic bellows and arranged in the tube communicating between each said bellows and the exterior of said midsole (**4**),

whereby the user can modify foot position by operating the pneumatic valve of each bellows of said first and second pairs of plastic bellows to inflate or deflate each bellows to thereby modify the volume of each bellows.

**2**. The plastic bellows system inserted into the sole of a shoe as defined in claim **1**, wherein said opening in the lower convolution of each bellows of said first and second pairs of plastic bellows is disposed on a longitudinal side of each said bellows arranged adjacent an exterior edge of said midsole.

6

**3**. The plastic bellows system inserted into the sole of a shoe as defined in claim **1**, wherein said opening in the lower convolution of each bellows of said first and second pairs of plastic bellows is disposed on a head side of each said bellows.

**4**. The plastic bellows system inserted into the sole of a shoe as defined in claim **1**, wherein said pneumatic valve (**6**) associated with each of said bellows comprises a ring shaped seat (**11**) inserted into the tube (**3,7**) communicating with said bellows, a push button (**12**) having an inner head and movable in said tube to seat against a gasket (**14**) of said ring shaped seat (**11**), and a spring (**15**) acting against the inner head of said push button to bias said push button against said ring shaped seat (**11**), said spring being disposed in said tube (**3,7**) between inner teeth (**10**) formed in said tube (**3,7**) and the inner head of said push button,

whereby the depression of said push button allows air to enter into or exit from said bellows.

**5**. The plastic bellows system inserted into the sole of a shoe as defined in claim **1**, wherein said midsole (**4**) is formed of foamed plastic material and during the molding of said first and second pairs of plastic bellows is amalgamated therewith.

* * * * *

US 20010049888A1

(19) **United States**

(12) **Patent Application Publication** (10) Pub. No.: US 2001/0049888 A1

Krafsur et al. (43) Pub. Date: **Dec. 13, 2001**

(54) **SPRING CUSHIONED SHOE**

(76) Inventors: **David S. Krafsur**, Lenoir City, TN
(US); **Francis E. LeVert**, Knoxville,
TN (US)

Correspondence Address:
**DAVID A. SIMONS**
**Fish & Richardson P.C.**
**225 Franklin Street**
**BOSTON, MA 02110-2804 (US)**

(21) Appl. No.: **09/902,236**

(22) Filed: **Jul. 10, 2001**

**Related U.S. Application Data**

(63) Continuation of application No. 09/419,330, filed on
Oct. 15, 1999, now Pat. No. 6,282,814, which is a

non-provisional of provisional application No.
60/131,658, filed on Apr. 29, 1999.

**Publication Classification**

(51) Int. Cl.$^7$ .......................... **A43B 13/28**; A43B 13/18
(52) U.S. Cl. ..................................... **36/27**; 36/28; 36/38

(57) **ABSTRACT**

A spring cushioned shoe is disclosed. The shoe includes a
sole assembly that has a first spring disposed within a
vacuity in the heel portion of the assembly, and a second
spring disposed within a vacuity in the ball portion of the
assembly. The springs are, e.g., wave springs that extend
vertically from the upper to the lower internal boundaries of
the vacuities.



Case 1:04-cv-12668-RGS   Document 18-17   Filed 05/02/2005   Page 25 of 39



**FIG. 1**



**FIG. 2**



**FIG. 3**



**FIG. 7**

Case 1:04-cv-12668-RGS    Document 18-17    Filed 05/02/2005    Page 27 of 39



**FIG. 4**



**FIG. 6**

Case 1:04-cv-12668-RGS    Document 18-17    Filed 05/02/2005    Page 28 of 39



## FIG. 5

1

# SPRING CUSHIONED SHOE

## CROSS-REFERENCE OF RELATED APPLICATIONS

[0001] Pursuant to 35 U.S.C. Section 119, the benefit of priority from Provisional Application Serial No. 60/131,658 with a filing date of Apr. 29, 1999 is claimed for this Non-Provisional Application.

## BACKGROUND OF THE INVENTION

[0002] 1. Technical Field

[0003] This invention relates to the use of wave springs to cushion a shoe. Wave springs allow for reduced impact on the user during foot strike, thus increasing comfort and decreasing injury. Also, the wave springs will return a portion of the impact energy to the user for more efficient jumping, walking and/or running.

[0004] 2. Background Art

[0005] People involved in normal exercise programs are always seeking new equipment that can minimize the risk of injury to parts of the body caused by stress due to a foot strike. Athletes are also continually looking for ways to improve their performance levels in a variety of athletic and aerobic events that involve walking, running, or jumping while at the same time, taking steps to reduce the wear and tear attendant to the pounding endured by joints and bones. This can be achieved to some degree by the use of improved sporting equipment and more specifically improved shoes for both athletes and non-athletes.

[0006] When participating in sports, especially high impact sports such as volleyball and basketball, the foot of the participant; specifically the ball and heel areas are prone to extreme mechanical stress due to the force that will be imparted when the foot strikes a relative incompressible surface. This force, which will vary depending on the type of event that a person is involved in and the mass of the person, can be as large as five times the body weight of the participant. The reaction force resulting from contact with a non-yielding surface causes great shock to the body that can injure the lower back and all rotating joints of the leg.

[0007] Unlike events that involve jumping, the mechanics of running or walking involve a prescribed set of motions insofar as the foot is concerned. Except in those events that involve sprinting, the heel impacts the ground first, the weight then shifts forward onto the ball of the foot in a rolling manner with the toe region providing the last contact with the ground. The initial impact in the heel area is of special interest with non-sprinting runners because; it is here that landing forces come into play. It is desirable to absorb as much impact energy as possible, consistent with providing a stable landing and without slowing down the runner. It is also desirable to avoid the complete loss of energy absorbed by the shoe at impact. Also, since the ball and toe areas of the foot are the last to leave the surface in contact with the ground, it is desirable to recover some of the landing energy absorbed in the initial impact. A number of patents relate to shoe constructions, which are variously designed to address one or more of the desirable shoe features discussed above, are reviewed below:

[0008] U.S. Pat. No. 5,896,679 discloses an article of footwear with a spring mechanism located in the heel area

of a shoe including two plates connected one to the other and attachment to the lower surface of the shoe sole. The invention of the '679 patent provides a heel mechanism that absorbs the shock or impact foot strikes. U.S. Pat. No. 5,743,028 (T. D. Lombardino) discloses a plurality of vertically compression springs located in the heel area of a running shoe. The springs of the '028 patent are housed in a hermetically sealed unit filled with a pressurized gas which in combination with the springs provides a shock absorbing and energy return system. The springs having substantially a coiled appearance where each spiral coil must provide a torsional spring force and collapse in a vertical stack commonly called the solid height when totally compressed. Because of their design, these springs must have significant free heights to accord one with large deflections. U.S. Pat. No. 4,815,221, Diaz discloses an energy control system comprising a spring plate having a plurality of spring projections distributed over the surface of the plate which is placed in a vacuity formed within the mid-sole of an athletic shoe. U.S. Pat. No. 5,511,324 (R. Smith) discloses a shoe in which a coil spring extends from the top through the wedge sole in the heel area of an athletic shoe. U.S. Pat. No. 5,437,110 (Goldston et al.) discloses an adjustable shoe heel spring and stabilizer device for a running shoe including a spring mechanism disposed in the mid-sole of the shoe. The shoe heel spring includes a cantilevered spring member and an adjustable fulcrum. A shoe designed specifically for jumping is disclosed in U.S. Pat. No. 5,916,071 (Y. Y. Lee). Lee discloses a shoe mounted on a frame containing a coil spring that extends horizontally from the regions of the frame located at the toe and heel areas of the shoe which expands and contracts during walking and jumping. U.S. Pat. No. 4,492,046 (Kosova) discloses a running shoe which includes a spring wire located in a longitudinal slot in the shoe sole extending from the back edge thereof into the arch region. U.S. Pat. No. 2,447,603 (Snyder) discloses a U-shaped spring plate disposed between the heel of the shoe and overlying a rear portion of the shoe sole. Several other U.S. patents of related art are: U.S. Pat. No. 5,875,567 (R. Bayley); U.S. Pat. No.5,269,081 (Gray); U.S. Pat. No.2,444,865 (Warrington); U.S. Pat. No.3,822,490 (Murawski); U.S. Pat. No.4,592,153 (Jacinta); and, U.S. Pat. No. 5,343,636 (Sabol); U.S. Pat. No.5,435,079 (Gallegos); U.S. Pat. No.5,502,901 (Brown); U.S. Pat. No.5,517,769 (Zhao); and U.S. Pat. No.5,544,431 (Dixon).

[0009] Revisiting and expanding the above mentioned desirable attributes of a shoe of this type, there is a need for a shoe that enhances the performance of the wearer by providing a substantial spring force working through a significant distance while requiring a minimum volume for deployment. In addition there is a need for a shoe designed with a multiplicity of springs that also assists in propelling the foot off the ground while still maintaining sufficient lateral stability of the shoe for quick side-to-side movement of the wearer. This performance enhancement can be achieved by temporarily storing the shock energy imparted by foot strike and returning a substantial amount of the energy to the wearer's foot during the propelling-off portion of the stride. Also, there is a need to assure adequate spring fatigue life by limiting maximum stresses and preventing compression to the spring's solid height.

[0010] The prior art cited above has disclosed spring devices in athletic shoes for the purposes of absorbing shock and returning energy to the wearer's foot.

2

[0011] As can be seen from the background art, there have been many attempts to add spring cushioning to shoes. However, one only need to look at the current market to see that spring cushioned shoes are not commonly available.

[0012] Accordingly, it is an object of this invention to provide a spring-cushioned shoe that provides large heel deceleration and ball acceleration during the foot strike.

[0013] A second object of this invention is to provide a shoe with a multiplicity of springs located at the heel and ball regions of the foot.

[0014] A third object of this invention is to provide a shoe that returns, by way of the spring force, a substantial energy stored in the springs during the initial compression cycle of the heel or ball area of the foot.

[0015] A further object is to provide a shoe with maximum force and deflection within a minimal volume, as well as lateral stability. Other objects of this invention will become obvious during the review of the figures and the detailed description of the shoes of this invention.

### BRIEF SUMMARY OF THE INVENTION

[0016] The present invention provides cushioning for a shoe that utilizes wave springs that are placed in the ball and heel areas of the sole of a shoe. It should be obvious to one skilled in the art that the placement of the wave springs is not limited to only the ball and heel areas of the shoe. In the present invention, the middle portion sole of the shoe sole assembly is made of foam with vacuities located at or near the ball and heel regions of the foot in order to accommodate placement of the springs. There are also numerous other methods and designs to place the wave springs into a shoe for cushioning and energy return. The ensuing description of the present invention discloses only a limited number of the countless methods and variations thereof that may be used. The advantages of the present invention will become apparent from reading the description of the invention in the preferred embodiments given below.

### BRIEF DESCRIPTION OF THE DRAWINGS

[0017] FIG. 1 illustrates a side view of the preferred embodiment of the spring-cushioned shoe.

[0018] FIG. 2 illustrates a cross sectional view of the spring-cushioned shoe taken in the heel region of the spring cushioned shoe.

[0019] FIG. 3 illustrates a view of the wave spring component of the preferred embodiment

[0020] FIG. 4 illustrates a plan view of the outer sole of the spring-cushioned shoe.

[0021] FIG. 5 illustrates a side view of the second embodiment of the spring cushioned shoe.

[0022] FIG. 6 illustrates a plan view of the outer sole of the second embodiment of the spring-cushioned shoe.

[0023] FIG. 7 illustrates a sectional view of one of the spring assemblies of the second embodiment of the spring-cushioned shoe with stabilizer and compression limiter.

### DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

[0024] This invention relates to the use of ordinary compression springs as an integral part of shoes to cushion the impact of foot strikes and to provide recuperative energy return to the wearer. A spring-cushioned shoe incorporating the various features of the present invention is illustrated generally at 2 in FIGS. 1 and 2. The spring-cushioned shoe 2 shall hereafter be referred to as SCS 2.

[0025] The SCS 2 in FIG. 1 comprises: an upper shoe portion 5 firmly attached to shoe sole assembly 4. The shoe sole assembly 4 includes an outer sole 4A with first and second surfaces; middle sole 4B having first and second surfaces positioned such that its first surface is adhesively attached to the second surface of outer sole 4A; and, inner sole 4C whose first surface is adhesively attached to the second surface of middle sole 4B and whose second surface is in working contact with the lower region of upper shoe portion 5. In the present invention, the middle sole 4B is composed of foamed polymeric material, and the inner and outer soles 4A and 4C are made of solid polymeric materials. Particularly, the outer sole 4A is composed of ethyl vinyl acetate with the first surface of outer sole 4A having tractive characteristics. As shown in FIG. 1, the middle sole 4B is designed to include vacuities 6 and 7. Vacuity 6, the extent of which is defined by vertically opposing surfaces 8A and 8B of foamed polymeric material of middle sole assembly 4B, was formed in the heel region 8C of SCS 2. The surfaces 8A and 8B which are set apart from the second and first surfaces of middle sole 4B, respectively, define thick sections of middle sole 4B at the heel area of the shoe sole assembly 4 into which cylindrical countersunk volumes 11A and 11B, respectively are formed as shown in Fig.2. Vacuity 7 is disposed between vertically opposing surfaces 10A and 10B of foamed polymeric material 4B in the region 10C of shoe sole assembly 4. Like surfaces 8A and 8B, surfaces 10A and 10B define thick sections of the polymeric material of middle sole 4B located below and above the vacuity 7 in the vertical direction such that cylindrical countersunk volumes 16a and 16b (not shown in either FIG. 1 or 2) can be formed therein. The cylindrical countersunk volumes 11A and 11B and 16A and 16B provide vertical stabilization and retention of the wave springs 15 and 19. The shoe sole assembly 4 is firmly attached to upper portion 5 of SCS 2. Wave springs 15 and 19 are deployed in vacuities 6 and 7 of foamed polymeric material 4B of shoe sole assembly 4, respectively.

[0026] The wave springs 15 and 19 are substantially identical to wave springs described by Greenhill in U.S. Pat. No. 4,901,987. Greenhill describes a multi turn compression spring with distinct crests and troughs. A separate drawing of the wave spring 15 is presented in FIG. 3 for illustrative purposes. Wave spring 15 with circular flat shim ends 15A and 15B and wave crest 15C and wave trough 15D with prescribed periodicity are shown in FIG. 3. FIG. 3 illustrates the configuration of wave springs, 15 and 19 which provide for operationally acceptable force and deflection for a given free height of the springs. The compression wave springs of the preferred embodiment of this invention could be replaced with multi turn wave springs which do not employ flat shim ends but rather rely on the use of flat end plates in combination with ordinary wave springs.

[0027] The cylindrical countersunk volumes 11A and 11B are designed for slidably accepting the first and second shim ends 15A and 15B of wave spring 15, respectively, in heel region 8C. When fully inserted, the flat shim ends 15A and

3

15B of wave spring 15 are held in firm mechanical contact with the closed ends of cylindrical countersunk volumes 11A and 11B, respectively.

[0028]   The region of shoe sole assembly 4 of the SCS 2 that is normally proximate the metatarsal region of the foot likewise having surfaces 10A and 10B (see FIGS. 1 and 4) containing counter sunk cylindrical volumes 16a and 16b (not shown) for slidably accepting in the following order the first shim end 19A and the second shim end 19B (not shown), respectively, of wave spring 19. When fully inserted the shim ends 19A and 19B of wave springs 19 are in mechanical contact with the closed end portions of cylindrical volumes 16a and 16b, respectively. The surfaces 8A and 8B are mechanically held in a manner so as to provide minimal compressive loading on the shim ends 15A and 15B of wave spring 15 by transparent strip 22 (see FIG. 4) which is connected thereto by adhesive. Similarly, transparent Strip 28 (see FIG. 4) when adhesively attached to the surfaces 10A and 10B, provide a slight compressive load on shim ends 19A and 19B of wave spring 19. In addition to sealing vacuities 6 and 7 from the environment, strips 22 and 28 provide some lateral stability for the users of the SCS 2. It should be apparent that the strips 22 and 28 could also be made from a number of various materials. In FIG. 1, the upper portion 5 of the SCS 2 is made of high strength synthetic fabric. The materials that comprise the SCS 2 are not limited to only those mentioned in this disclosure. Any number of materials can be used in the manufacturing of the shoes of this invention. The cylindrical volumes 11A and 11B and 16a and 16b along with transparent strips 22 and 28 provide for retention and vertical stabilization of the wave springs 15 and 19 when they are inserted into vacuities 6 and 7 respectively.

[0029]   Referring to FIG. 1, the front end 29, rear end 30 and middle region 32 of the shoe sole assembly 4 of the SCS 2 can be designed to provide retentive support for wave springs 15 and 19 that augments support provided by transparent strips 22 and 28. Such retentive support can consist of strips that connect the shoe sole assembly 4 to the upper shoe portion 5. In FIG. 1, wave springs 15 and 19 are shown as deployed in vacuities 6 and 7 into shoe sole assembly 4 which is attached to shoe upper portion 5. The cross sectional view in FIG. 2 shows interior wave spring compression limiters 36 and 38 which are integral parts of cylindrical countersunk volumes 11A and 11B respectively. That is, the compression limiter's outer dimensions define the inner diameters of countersunk volumes 11A and 11B, respectively.

[0030]   The opposing spring compression limiters 36 and 38 (see FIGS. 2 and 4 ) are separated by extended waves spring 15 whose solid height when fully compressed by the strike force of the foot of a user is less than the linear distance in the vertical direction between spring compression limiters 36 and 38. The heights of compression limiters 36 and 38 are prescribed by the depth of the countersunk cylindrical volumes 11A and 11B in surfaces 8A and 8B, respectively. In the shoes of the present invention, the distance between the terminal ends of compression limiters 36 and 38 were set at 12 mm. The heights of spring compression limiters 36 and 38 are related mathematically to the spring constant of the wave spring and the mass of the user and are chosen such that the wave spring 15 can not be compressed to its solid height during use. Accordingly,

because of the force generated at the portion of shoe sole assembly 4 of the SCS 2 that is normally proximate the metatarsal of the foot during normal use, the distance between the terminal ends of spring compression limiters 42 and 44 is set at 9 mm. The distance between spring compression limiters 42 and 44 and the spring constant of wave spring 19 were selected such that the force generated, when the first surface of shoe sole assembly 4 opposite the ball of the foot contacts a surface while running, cannot compress wave spring 19 to its solid height.

[0031]   It should be obvious to one skilled in the art that, depending on the weight of the user, the prescribed distances between the terminal ends spring compression limiters 36 and 38 as well as 42 and 44 will vary. In the present invention, the vacuities 6 and 7 of shoe sole assembly 4 were formed by splitting middle sole 4B into two substantially equal slabs forwardly from the heel area toward the toe of the shoe. The cylindrical countersunk volumes 11A and 11B and 16a and 16b were formed by machining, at the proper locations and depths in foam polymeric material of middle sole 4B. The combined depths of cylindrical countersunk volumes 11A and 11B and 16a and 16b were selected such that the heights of wave springs 15 and 19 would create vacuities 6 and 7 at those regions of 4B, when inserted therein. Once wave springs 15 and 19 were inserted in the machined cylindrical countersunk volumes, the split portions of foamed polymeric material of middle sole 4B were adhesively reattached at the middle region of shoe sole assembly 4. And, the vacuities 6 and 7 are sealed by strips 22 and 28 respectively. The strips 22 and 28 were attached by adhesive to the shoe sole assembly 4 at the heel and ball of the foot regions of the SCS 2. The foamed polymeric material of middle sole 4B could be made from any number of materials such as polyurethane.

[0032]   The method for forming the vacuities 6 and 7 and fixing the wave springs 15 and 19 in the middle sole 4B of SCS 2 in the present invention was as discussed above. However, it is obvious to one skilled in the art that the vacuities and spring retention methods could be formed by any number of manufacturing techniques available to the shoe industry such as the use of the molding process and the springs inserted into the assembled shoe sole. Or the complete shoe sole-spring assembly could be made in one single continuous process.

[0033]   The wave spring 15 which primarily provides cushioning during foot strikes has a free height selected to be greater than that of wave spring 19 which provides primarily liftoff force to the foot of a wearer.

[0034]   Even though the wave springs 15 and 19 used in the shoes of this invention are metallic in construction, it should be obvious to one skilled in the art that the material of the wave springs is not solely limited to metals and that a wide variety of other materials could be used as well. Likewise, the materials used in the other parts of the shoe may be made from any multitude of materials commonly used in the art. While the shoe of this invention use single leaf crest-to-crest wave springs, it could have employed interlaced wave springs described in U.S. Pat. No. 5,639,074 or commercially available nested wave springs. The interlaced and nested wave springs like the crest-to-crest wave springs provide the primary desirable characteristics of crest-to-crest wave springs important to the shoe of the invention.

4

That is, like crest-to-crest wave springs, interlaced and nested wave springs provide maximum force and deflection for a given unloaded spring height.

[0035] FIG. 5 shows a second embodiment of the shoes of this invention. In FIGS. 5 and 6, wave springs 50 and 52 are mounted in vacuity 54 with their first and second terminal shim ends 56 and 58 mounted in U-shaped plastic receiving clip 60, which contain protrusions 64 as shown in FIG. 7 which slidably accepts the first and second terminal shim ends 56 and 58 of wave springs 50 and 52 until firm mechanical contact is achieved between the shim ends 56 and 58 and the closed ends 63 of protrusions 64 of U-shaped receiving plate 60. The U-shaped plastic receiving clip 60 containing wave springs 50 and 52 are inserted into vacuity 54 where it is attached as by adhesive to the plain interior surfaces 53A and 53B of vacuity 54 in heel area of foamed polymeric material 4B' of shoe sole assembly 4'. The U-shaped plastic-receiving clip 60 is designed to have one pair of cylindrically shaped compression limiters 65 associated with each wave spring. One of the terminal ends of each of the compression limiters 65 being adhesively attached to each of the opposing inner surfaces of clip 60 at the diametrical centers of protrusions 64 by adhesive, as shown in FIG. 7. The U-shaped plastic receiving clip 60 of this second embodiment of the shoes of this invention could be replaced by two plastic plates containing protrusions for slidably accepting the shim ends of one or a multiplicity of wave springs. The vacuity 54 is sealed as shown in FIGS. 5 and 6 with extensionable plastic 69 which provide for strength of the SCS 2' in the lateral or side to side direction during use.

[0036] Vacuity 66 is located in the metatarsal region of shoe sole assembly 4'. Plastic plates 68 and 70 having protrusions 72 substantially identical to protrusions 64 of FIG. 7 on their first surface into which the first and second shim ends 73A and 73B of wave springs 73 and the first and second shim ends 74A and 74B (not shown) of wave spring 74 (FIG. 6) are slidably inserted. The plastic plates 68 and 70, in addition to the first surfaces, have substantially parallel second surfaces. The assembled unit consisting of plastic plates 68 and 70, protrusions 72 and wave springs 73 and 74 are inserted into vacuity 66 of shoe sole assembly 4'. The second surfaces of plastic plates 68 and 70, with wave springs 73 and 74 inserted therebetween, are attached to the plain interior surfaces 75A and 75B of vacuity 66 by adhesive. The plates 68 and 70 are designed to accept with minimal resistance compression limiters 78 which are attached to diametrical centers of plates 68 and 70 in a manner similar to that of compression limiters 65 to plates 68 and 70. The compression limiters 78 serve to limit the amount of compression that wave springs 73 and 74 can undergo during use. The vacuity 66 is sealed with extensionable plastic 76.

[0037] It should be obvious to a person of ordinary skill in the art that more than two wave springs could be employed in each of the heel and metatarsal regions the shoes of this invention. A compression limiter, in this second embodiment, is associated with each wave spring. However, one or more strategically positioned pairs of regional compression limiters could be used to limit the compression of a plurality of wave springs.

[0038] The spring-cushioned shoe of the second embodiment of this invention contains opposing plates, which are separated by intervening foam material shown in FIG. 5. The plastic plates could also be held firmly by friction or other mechanical means other than the previous mentioned adhesive, for slidable insertion into, and removal from, the shoe sole assembly 4' to accommodate replacing the wave springs with other wave springs of different spring rates. Furthermore, the plastic plates could be concatenated giving rise to a plastic member that extends from the heel area to the ball of the foot area of the shoe sole assembly. A shoe sole assembly designed to accept the plastic member could be equipped with a single vacuity that like the plastic member that extends the full length of the shoe sole assembly.

[0039] The wave springs used in the preferred embodiment of the invention are made of spring steel with inner and outer diameters, transverse thicknesses, peak and trough heights and quantities chosen so as to provide spring rates for wave spring 15 and 19 of 600 lb/in and 500 lb/in respectively.

[0040] The critical design parameters and materials of the wave springs could be selected so as to provide springs of different spring forces and other characteristics. For example, other metallic and non-metallic materials, polymers, and composites could be selected for different weight and strength characteristics. Also, the design parameters of the wave springs may be altered to provide varying strength, deflection, and load characteristics. Further, the embodiment of this invention is described in terms of a single cushion shoe. It should be obvious that the companion cushion shoe will be of identical design and construction.

[0041] The operation of the SCS 2 will now be explained in view of the shoe of FIG. 1. When a pair of spring cushioned shoes is placed in use by a user, for example a runner, the region of the shoe containing wave spring 15 strikes the running surface first. The strike force applied by the calcaneus portion of the foot compresses the wave spring to a prescribed height before the foot is brought to rest and the body mass is dynamically transferred to the metatarsal region of the foot in contact with the surface where the wave spring 19 becomes compressed. When the body mass is transferred to the metatarsal region of the foot, wave spring 15 which was in the initial footstrike undergoes a compress-recoil cycle. As the user lifts the metatarsal region of the foot, energy is transferred to this region as wave spring 19 recoils. Thus, wave springs 15 and 19 both provide cushioning and energy return to the user of the SCS 2.

[0042] During footstrike (whether from jumping or running), peak forces of several times the body weight can be imparted to the wave springs. We can assume that an average user of the shoes would weigh 165 lbs. Therefore, average peak forces greater than 300 lb$_f$ can be imparted to the wave springs. Hence, the previous mentioned spring rates could be used for a 165-lb person.

[0043] Wave springs are ideal for use in this limited space application. Conventional spring methods are inferior in shoe cushioning applications because of the limited combination of force, deflection, and space requirements.

[0044] While a preferred embodiment has been shown and described, it will be understood that it is not intended to limit the disclosure, but rather it is intended to cover all modifications and alternate methods falling within the spirit and the scope of the invention as defined in the appended claims.

5

1. A sole assembly for an article of footwear, the sole assembly having a heel region and a ball region, and the sole assembly comprising:

a first wave spring disposed within the heel region; and

a second wave spring disposed within the ball region.

2. The sole assembly of claim 1, wherein the wave springs are crest-to-crest wave springs.

3. The sole assembly of claim 1, wherein the wave springs are selected from the group consisting of interlaced wave springs and nested wave springs.

4. The sole assembly of claim 1, further comprising a first vacuity in the heel region and a second vacuity in the ball region, wherein the first wave spring is disposed within the first vacuity, and the second wave spring is disposed within the second vacuity.

5. The sole assembly of claim 4, further comprising a receiving clip disposed within the first vacuity, the receiving clip having a rigid upper internal surface and a rigid lower internal surface, the upper and lower internal surfaces each including a protrusion that defines a groove,

wherein the first wave spring has an upper and a lower terminal shim ends, and the first wave spring is disposed within the receiving clip such that its upper terminal shim end is disposed within the groove of the upper internal surface, and its lower terminal shim end is disposed within the groove of the lower internal surface.

6. The sole assembly of claim 5, wherein the receiving clip further comprises a pair of opposed spring compression limiters attached to the upper and lower internal surfaces respectively, the spring compression limiters engaging upper and lower sides of the wave spring respectively.

7. The sole assembly of claim 6, wherein the spring compression limiters are generally cylindrically shaped.

8. The sole assembly of claim 5, wherein the clip is U-shaped.

9. The sole assembly of claim 4, further comprising upper and a lower plastic plates disposed within the first vacuity, on opposite sides of the vacuity, each plate comprising a protrusion that defines a groove,

wherein the first wave spring has an upper and a lower terminal shim end, and the first wave spring is disposed between the plates such that its upper terminal shim end is disposed within the groove of the upper plate, and its lower terminal shim end is disposed within the groove of the lower plate.

10. The sole assembly of claim 9, further comprising a pair of opposed spring compression limiters attached to the upper and lower plates respectively, the spring compression limiters engaging upper and lower sides of the wave spring respectively.

11. The sole assembly of claim 1, wherein the first wave spring has a greater free height than the second wave spring.

12. A spring cushioned shoe comprising:

an upper support member for receiving a human foot; and

a sole assembly affixed to the upper support member, the sole assembly comprising a first wave spring disposed within a heel region of the assembly, and a second wave spring disposed within a ball region of the assembly.

13. The sole assembly of claim 4, wherein the first vacuity is bounded vertically by opposed first upper and first lower internal surfaces, the second vacuity is bounded vertically by opposed second upper and second lower internal surfaces, and wherein the first wave spring extends vertically from the first upper surface to the first lower surface, and the second wave spring extends vertically from the second upper surface to the second lower surface.

14. The sole assembly of claim 4, further comprising a lower sole, a middle sole, and an upper sole, the middle sole including the first and second vacuities.

15. The sole assembly of claim 4, wherein a distance between the first upper and first lower surfaces of the first vacuity is greater than a distance between the second upper and second lower surfaces of the second vacuity.

16. The sole assembly of claim 15, wherein the first wave spring has a free height greater than a free height of the second wave spring.

17. The sole assembly of claim 4, further comprising upper and lower plates disposed within the first vacuity, on opposite sides of the vacuity, wherein the first wave spring is disposed between the upper and lower plates.

18. The sole assembly of claim 17, wherein the upper and lower plates each comprise a projection extending from a plane of the plate, and wherein the first wave spring has an upper and a lower end, and the first wave spring is disposed between the plates such that its upper end fits around the projection of the upper plate, and its lower end fits around the projection of the lower plate.

19. The sole assembly of claim 18, wherein the projections extending from the upper and lower plates are generally circular in shape.

20. The sole assembly of claim 18, wherein the upper and lower ends of the first wave spring are terminal shim ends.

21. The sole assembly of claim 1, wherein the first and second wave springs are configured such that routine compressive forces applied by a user wearing the article of footwear do not fully compress the first and second wave springs.

22. The sole assembly of claim 1, wherein the heel region includes a plurality of wave springs disposed therein.

23. The sole assembly of claim 22, wherein the ball region includes a plurality of wave springs disposed therein.

24. The sole assembly of claim 1, wherein the ball region includes a plurality of wave springs disposed therein.

* * * * *


(19) **United States**

(12) **Patent Application Publication** (10) Pub. No.: US 2003/0196354 A1

Chu (43) Pub. Date: **Oct. 23, 2003**

(54) **CLIMBING SHOE WITH HOOKING TEETH ON THE HEEL**

(76) Inventor: **Young Chu**, Fullerton, CA (US)

Correspondence Address:
**Young Chu**
**744 Rancho Circle**
**Fullerton, CA 92835 (US)**

(21) Appl. No.: **10/127,666**

(22) Filed: **Apr. 22, 2002**

**Publication Classification**

(51) **Int. Cl.$^7$** .......................... **A43B 23/08**; A43B 21/00
(52) **U.S. Cl.** ................................ **36/113**; 36/69; 36/34 R

(57) **ABSTRACT**

A climbing shoe with a hooking teeth heel that wraps around the heel part of the climbing shoe and is connected to the upper portion. The hooking teeth are made of multiple lateral ridges that will improve the grip of the foot during heel maneuvers.



*Ridges*

*Heel Side View*

Fig 1.

10



Fig 2



Ridges

Heel Side View

Fig 3



Rear View

Fig 4



Fig 5



1

## CLIMBING SHOE WITH HOOKING TEETH ON THE HEEL

### BACKGROUND

[0001]   1. Field of Invention

[0002]   The invention relates to a rock-climbing shoe with hooking teeth on the heel that will assist rock-climbers in their climb by increasing the grip of the heel on rock surfaces in heel maneuvers.

[0003]   2. Description of Prior Art

[0004]   Rock-climbers need a heel that can grip rock surfaces when they are climbing. Rock climbers must often use the heel of their foot to grip the rock surface when they are climbing. Although the toe part of the shoe is most often used to support the rock-climber, a foothold may be too high for the rock-climber to use his toes. In these instances, a rock climber must maneuver to the next foothold by using the heel part of his foot to hook onto a rock surface.

[0005]   In the heel maneuver, a rock climber must: lift and extend his leg above his waist; grip the rock surface with his heel; and push off of his heel to the next foothold or handhold. While in this maneuver, a rock climber may support a substantial portion of his weight with the heel of his foot. During this maneuver, the rock-climber must rely on the grip of his heel on the rock surface. If the heel slips, the rock-climber may fall from his climb.

[0006]   Traditional rock-climbing shoes consist of a sole connected to an upper portion. The upper portion covers the sides (or "flash") and heel of the foot. The sole is usually made of rubber and covers the entire bottom surface of the rock-climber's foot. The upper portion is usually made of fabric or leather and is substantially smooth.

[0007]   In a heel maneuver, the rock-climber needs to maintain a foothold by using the outside surfaces of his heel on a rock-surface. During the heel maneuver, the rock-climber may apply a substantial portion of his weight on the heel. If the rock-climber's heel slips off the rock surface during the heel maneuver, the rock-climber can lose his grip and fall. Thus, a heel with gripping properties is beneficial during heel maneuvers.

[0008]   The traditional rock-climbing shoe is not effective in heel maneuvers because the upper portion covering the heel is substantially smooth with no gripping properties and does not bite into a rock surface. Thus, a rock-climber may slip during a heel maneuver. Consequently, the design of the traditional rock-climbing shoe presents problems unique to rock-climbers: slipping during heel maneuvers.

[0009]   There is a need for a climbing shoe with hooking teeth on the heel to provide improved grip during heel maneuvers.

[0010]   The hooking teeth on the heel will have lateral ridges that can bite into a rock surface and improve the grip of the heel during heel maneuvers. The hooking teeth is comprised of multiple ridges protruding from the heel and angled upwards. The upward angle of the ridges will allow the heel to bite into a rock surface during a heel-maneuver. Rock-climbing shoes with hooking teeth on the heel will give the rock-climber additional safety and confidence in rock-climbing by increasing the grip and stability during heel maneuvers.

### SUMMARY OF THE INVENTION

[0011]   A rock-climbing shoe with a hooking teeth heel fulfills the objectives of a rock-climbing shoe that will provide improved grip during heel maneuvers.

[0012]   The rock-climbing shoe with a hooking teeth heel includes an upper portion, a sole and a heel part.

[0013]   The upper portion is made of various materials and conforms to the shape of the foot. The upper portion varies in size according to the size the wearer's foot. The upper portion covers the flash sides of the wearer's foot.

[0014]   The sole is made of rubber and covers the bottom of the foot and is attached to the upper portion. The sole varies in size according to the size of the wearer's foot.

[0015]   The heel part is made of rubber and is attached to the sole and upper portion. The heel part covers the heel and Achilles' tendon area of the foot. The heel part wraps around the heel. The heel part has multiple lateral ridges angled upward that protrude out from the heel.

[0016]   The rock-climbing shoe with a hooking teeth heel is further described with detail in the appended figures, description and claims.

### BRIEF DESCRIPTION OF DRAWINGS

[0017]   FIG. 1 is an exterior side view of the climbing shoe.

[0018]   FIG. 2 is an exterior offset side view of the heel part.

[0019]   FIG. 3 is an exterior rear view of the heel part.

[0020]   FIG. 4 is a representative diagram of the heel part in use during a heel maneuver on a rock surface.

[0021]   FIG. 5 is a representative drawing of a rock-climber engaged in a heel maneuver.

### DETAILED DESCRIPTION OF DRAWINGS

[0022]   Referring to FIG. 1 through FIG. 3, a climbing shoe 10 includes an upper portion 11 and a sole 12 attached to the upper portion 11. There is an opening 15 in the shoe 10 to allow a foot to enter. The heel part 13 is at the rear of the climbing shoe 10 and is connected to the sole 12 and the upper portion 11. The hooking teeth 14 are connected to the heel part 13. The hooking teeth 14 cover the exterior of the heel part 13. The hooking teeth 14 is set at substantially the same lateral angle as the sole 12.

[0023]   Referring to the exterior side view of FIG. 1, the upper portion 11 can include any material commonly used for shoes, such as leather, nylon and cotton fabrics. There is an opening 15 at the top for a foot to enter. The heel of the foot would rest in the heel part 13 of the shoe 10. The bottom of the shoe 10 is covered by a sole 12. The sole 12 can be made of rubber polymer. The sole 12 is substantially flat and covers the bottom of the foot. The heel part 13 can be made of rubber. The hooking teeth 14 is attached to the toe part 13 of the climbing shoe 10 and wraps around the heel part 13. The hooking teeth 14 are set at substantially the same angle as the sole 12.

[0024]   Referring to the exterior offset side view of FIG. 2, the hooking teeth 14 is located around the heel part 13 of the

US 2003/0196354 A1                                    Oct. 23, 2003

2

shoe **10**. The heel part **13** covers the rear of the shoe **10**. The hooking teeth **14** is connected to the toe part **13** and wraps around the heel part **13**. The hooking teeth **14** cover the rear area between the sole **12** and the opening **15**.

[0025]  Referring to the exterior rear view of **FIG. 3**, the hooking teeth **14** are set at substantially the same angle as the sole **12**. The heel part **13** covers the rear area between the opening **15** and the sole **12**. The heel part **13** has hooking teeth **14** made up of multiple lateral ridges. The hooking teeth **14** are connected to the toe part **13** and wraps around the heel part **13**. The hooking teeth **14** cover the rear area between the sole **12** and the opening **15**.

[0026]  Referring to the representative diagram of the heel part in use during a heel maneuver on a rock surface of **FIG. 4**, the hooking teeth **14** are set at an angle to bit into a rock surface **16**. During a heel maneuver, the heel part **13** is pressed against the rock surface **16**. The lateral ridges of the hooking teeth **14** and the sole **12** faces upward.

[0027]  Referring to the representative drawing of a rock-climber engaged in a heel maneuver of **FIG. 5**, the rock climber must extend his foot to grip the rock surface **16** with the heel part **13**.

### REFERENCE NUMERALS IN DRAWINGS

[0028]  **10** climbing shoe

[0029]  **11** upper portion

[0030]  **12** sole

[0031]  **13** heel part

[0032]  **14** hooking teeth

[0033]  **15** opening

[0034]  **16** representative rock surface

What is claimed:

1. A climbing shoe comprising:

a) an upper portion;

b) a sole attached to the upper portion; and

c) a heel part, wherein the exterior of the heel part has lateral ridges.

2. The climbing shoe of claim 1, wherein the heel part covers the rear of the foot and is connected to the upper portion.

3. The climbing shoe of claim 2, wherein the heel part is made of a rubber polymer.

4. The climbing shoe of claim 3, wherein the heel part has multiple lateral ridges.

5. A climbing shoe comprising:

a) an upper portion;

b) a sole attached to the upper portion;

c) a heel part; and

d) a hooking teeth on the heel part.

6. The climbing shoe of claim 5, wherein the heel part wraps around the heel of the climbing shoe.

7. The climbing shoe of claim 6, wherein the hooking teeth is made of ridges protruding outward a width 'w'; in one embodiment the 'w' of the hooking teeth is 3 millimeters.

8. The climbing shoe of claim 7, wherein the hooking teeth is set at a horizontal angle and covers the sides of the foot.

9. The climbing shoe of claim 8, wherein the hooking teeth is made of rubber.

10. A climbing shoe comprising:

a) an upper portion;

b) a sole attached to the upper portion;

c) a heel part; and

d) multiple ridges around the exterior of the heel part.

11. The climbing shoe of claim 12, wherein the heel part wraps around the rear of the climbing shoe.

12. The climbing shoe of claim 13, wherein heel part covers the sides of the foot.

13. The climbing shoe of claim 14, wherein the multiple ridges extend laterally to cover the heel of the foot.

14. The climbing shoe of claim 13, wherein the multiple ridges are made of a hard rubber polymer.

15. The climbing shoe of claim 14, wherein the multiple ridges are patterned to grip various rock surfaces.

16. The climbing shoe of claim 15, wherein the multiple ridges are angled upward to bite into rock surfaces.

\*   \*   \*   \*   \*

# EXHIBIT D
# (Part 13 of 17)

Dec. 4, 1934.　　　　　A. M. BRESSLER　　　　　Des. 93,966

SHOE OR SIMILAR ARTICLE

Filed Oct. 29, 1934

*Fig. 1*



*Fig. 2*



INVENTOR.

*Albert M. Bressler*

BY

*Carelu Cohen*

ATTORNEY.

Patented Dec. 4, 1934

**Des. 93,966**

# UNITED STATES PATENT OFFICE

93,966

## DESIGN FOR A SHOE OR SIMILAR ARTICLE

Albert M. Bressler, New York, N. Y.

Application October 29, 1934, Serial No. 53,801

Term of patent 3½ years

*To all whom it may concern:*

Be it known that I, ALBERT M. BRESSLER, a citizen of the United States, and a resident of New York city, county of New York, and State of New York, have invented a new, original, and ornamental Design for a Shoe or Similar Article, of which the following is a specification, reference being had to the accompanying drawing, forming part thereof.

In the drawing:

Fig. 1 is a perspective view of the shoe embodying the present design.

Fig. 2 is a bottom plan view, slightly in perspective.

The dominant feature of the present design is the ornamental effect produced by the sole having the contour substantially as shown.

I claim:

The ornamental design for a shoe or similar article substantially as shown and described.

ALBERT M. BRESSLER.

May 28, 1935.        J. C. MARKS        Des. 95,767

SANDAL OR SIMILAR ARTICLE

Filed March 27, 1935



*Fig.1.*



*Fig.2.*

INVENTOR

*John C. Marks*

BY *Wood Crosby & Neal*

*his* ATTORNEYS

Patented May 28, 1935

# Des. 95,767

# UNITED STATES PATENT OFFICE

95,767

### DESIGN FOR A SANDAL OR SIMILAR ARTICLE

John C. Marks, New York, N. Y.

Application March 27, 1935, Serial No. 56,069

Term of patent 3½ years

*To all whom it may concern:*

Be it known that I, John C. Marks, a citizen of the United States, residing at New York, in the Borough of Manhattan, county and State of New York, have invented a new, original, and ornamental Design for a Sandal or Similar Article, of which the following is a specification, reference being had to the accompanying drawing, forming part thereof.

Fig. 1 is a perspective view of a sandal or similar article showing my new design, and

Fig. 2 is a rear elevation of the heel of said sandal or similar article.

The dominating feature of my design resides in the contour of the heel shown in full lines.

I claim:

The ornamental design for a sandal or similar article substantially as shown and described.

JOHN C. MARKS.

Nov. 22, 1938.                    C. B. COURT                    Des. 112,267

HEEL

Filed Oct. 20, 1938



Fig. 1.



Fig. 2.



Fig. 3.

INVENTOR.
COLLEY B. COURT

BY

Paul A. Talbot
ATTORNEY.

Patented Nov. 22, 1938

# Des. 112,267

# UNITED STATES PATENT OFFICE

112,267

DESIGN FOR A HEEL

Colley B. Court, Haverhill, Mass.

Application October 20, 1938, Serial No. 80,567

Term of patent 3½ years

*To all whom it may concern:*

Be it known that I, Colley B. Court, a citizen of the United States of America, residing in Haverhill, county of Essex, and State of Massachusetts, have invented a new, original, and ornamental Design for a Heel, of which the following is a specification, reference being had to the accompanying drawing, forming part thereof.

Fig. 1 is a side view of a heel showing my new design.

Fig. 2 is a rear view thereof.

Fig. 3 is a bottom plan view thereof.

I claim:

The ornamental design for a heel, substantially as shown.

COLLEY B. COURT.

**March 11, 1941.**

A. C. MACAULEY

Des. 125,773

HEELPLATE FOR SKIING BOOTS

Filed Dec. 28, 1940

*Fig. 1.*



*Fig. 2.*



*Fig. 4.*



*Fig. 3.*





INVENTOR.

*Alan C. Macauley*

BY *Carlos G. Stratton*

ATTORNEY

Patented Mar. 11, 1941

Des. 125,773

# UNITED STATES PATENT OFFICE

125,773

DESIGN FOR A HEELPLATE FOR SKIING
BOOTS

Alan C. Macauley, Pasadena, Calif.

Application December 28, 1940, Serial No. 97,696

Term of patent 7 years

*To all whom it may concern:*

Be it known that I, Alan C. Macauley, a citizen of the United States, residing in Pasadena, in the county of Los Angeles and State of California, have invented a new, original, and ornamental Design for a Heelplate for Skiing Boots, of which the following is a specification, reference being had to the accompanying drawing, forming part thereof.

**Fig. 1** is a rear elevational view of a heelplate for skiing boots, showing my new design.

Fig. 2 is a bottom view of the design shown in Fig. 1, taken on the line 2—2 of Fig. 1.

Fig. 3 is a top view of my said design, taken on the line 3—3 of Fig. 1.

Fig. 4 is a vertical section taken on the line 4—4 of Fig. 1.

I claim:

The ornamental design for a heelplate for skiing boots, substantially as shown.

ALAN C. MACAULEY.

# United States Patent [19]

## Schmohl

[11]  **Des. 261,446**

[45]  ** **Oct. 27, 1981**

[54]  **SHOE**

[75]  Inventor:  **Michael W. Schmohl,** Nuremberg, Fed. Rep. of Germany

[73]  Assignee:  **Uniroyal GmbH,** Aachen, Fed. Rep. of Germany

[**]  Term:  **14 Years**

[21]  Appl. No.:  **909,878**

[22]  Filed:  **May 26, 1978**

[30]  **Foreign Application Priority Data**

Nov. 29, 1977 [DE]  Fed. Rep. of Germany ... 7736457[U]

[51]  **Int. Cl.** ....................................................... **D2—04**
[52]  **U.S. Cl.** ..................................................... **D2/309**
[58]  **Field of Search** ................ D2/309, 310, 311, 312, D2/322, 324; 36/113, 114, 115, 129, 32 R, 59 C

[56]  **References Cited**

**U.S. PATENT DOCUMENTS**

D. 227,519  7/1973  Meadows ............................. D2/309
D. 237,426  11/1975  Thornberry ........................... D2/310
D. 237,427  11/1975  Thornberry ........................... D2/310

### FOREIGN PATENT DOCUMENTS

974269  11/1976  United Kingdom ................. D2/309

### OTHER PUBLICATIONS

*American Shoemaking*–11/16/77 p. 15–Shoe at bottom–left.

*Primary Examiner*—Nelson C. Holtje
*Attorney, Agent, or Firm*—Charles A. Blank

[57]  **CLAIM**

The ornamental design for a shoe, substantially as shown and described.

### DESCRIPTION

FIG. **1** is a right side elevational view of a shoe showing my new design;
FIG. **2** is a top plan view thereof;
FIG. **3** is a left side elevational view thereof;
FIG. **4** is a front elevational view thereof;
FIG. **5** is a rear elevational view thereof;
FIG. **6** is a top left front perspective view of another embodiment of my new design of FIGS. 1–5;
FIG. **7** is a right side elevational view thereof; and
FIG. **8** is a top plan view thereof.



Fig. 1.



Fig. 2.





Fig. 3.



Fig. 4.



Fig. 5.

Case 1:04-cv-12668-RGS    Document 18-18    Filed 05/02/2005    Page 13 of 55



Fig.6.



Fig. 7.



Fig. 8.

# United States Patent [19]

**O'Rourke**

[11]  **Patent Number:**  **Des. 290,542**

[45]  **Date of Patent:** ∗∗ **Jun. 30, 1987**

[54]  **ATHLETIC SHOE**

[75]  Inventor:  **John J. O'Rourke**, Weston, Mass.

[73]  Assignee:  **Converse Inc.**, North Reading, Mass.

[∗∗]  Term:  **14 Years**

[21]  Appl. No.:  **649,825**

[22]  Filed:  **Sep. 12, 1984**

[52]  **U.S. Cl.** ..................................... **D2/310; D2/314**

[58]  **Field of Search** ............................... D2/309–313, D2/326, 314; 36/113–115, 136, 132, 50, 83–84, 129, 45

[56]  **References Cited**

**U.S. PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| D. 258,772 | 4/1981 | Norton | D2/309 |
| D. 262,411 | 12/1981 | Crowley | D2/311 |
| D. 278,757 | 5/1985 | Werman | D2/309 |
| D. 281,116 | 10/1985 | Gamm | D2/309 |
| D. 281,639 | 12/1985 | Gamm | D2/309 |

**OTHER PUBLICATIONS**

*Footwear News*–4/84–p. 45–Shoes.

*Primary Examiner*—Nelson C. Holtje
*Attorney, Agent, or Firm*—Bromberg, Sunstein & Casselman

[57]  **CLAIM**

The ornamental design for an athletic shoe, as shown.

**DESCRIPTION**

FIG. **1** is a right front perspective view of an athletic shoe showing my new design;
FIG. **2** is a rear elevational view thereof;
FIG. **3** is a right side elevational view thereof;
FIG. **4** is a left side elevational view thereof; and
FIG. **5** is a bottom plan view thereof.





*FIG. 1*



*FIG. 2*



*FIG. 3*



*FIG. 4*



*FIG. 5*

# United States Patent [19]

**Zuidema et al.**

[11] **Patent Number:** **Des. 295,459**

[45] **Date of Patent:** ** May 3, 1988

[54] **SHOE SOLE**

[75] Inventors: **Gary Zuidema**, Rohnert Park; **John Schelling**, Orinda; **Steve Dodds**, Novato, all of Calif.

[73] Assignee: **The Donner Mountain Corporation**, San Rafael, Calif.

[**] Term: **14 Years**

[21] Appl. No.: **61,386**

[22] Filed: **Jun. 15, 1987**

[52] **U.S. Cl.** .................................... **D2/320**

[58] **Field of Search** ........ D2/264, 265, 274, 308–315, D2/317–321; 36/1, 83, 87, 106, 100–103, 25 R, 32 R, 59 R, 59 C, 112–114

[56] **References Cited**

**U.S. PATENT DOCUMENTS**

D. 281,460  11/1985  Parker ................................. D2/320
D. 287,065  12/1986  Austin ................................. D2/320

D. 291,147  8/1987  Kelley et al. ...................... D2/320
2,162,912  6/1939  Craver ............................. 36/59 C

*Primary Examiner*—Louis S. Zarfas
*Attorney, Agent, or Firm*—Saidman, Sterne, Kessler & Goldstein

[57] **CLAIM**

The ornamental design for a shoe sole, as shown and described.

**DESCRIPTION**

FIG. 1 is a left side elevational view of a shoe sole showing our new design;
FIG. 2 is a right side elevational view thereof;
FIG. 3 is a bottom plan view thereof; the top plan view being substantially planar and un-ornamented;
FIG. 4 is a front elevational view thereof; and
FIG. 5 is a rear elevational view thereof.
The broken line showing of a shoe upper in FIGS. 1–5 and the area within are environmental only and form no part of the claimed design.





**FIG.1**



**FIG.2**



**U.S. Patent**      May 3, 1988      Sheet 2 of 2      **D295,459**

*FIG.3*



*FIG.4*



*FIG.5*

# United States Patent [19]

## Zuidema et al.

[11] Patent Number: **Des. 295,691**

[45] Date of Patent: ** May 17, 1988

[54] **SHOE SOLE**

[75] Inventors: **Gary Zuidema**, Rohnert Park; **John Schelling**, Orinda; **Steve Dodds**, Novato, all of Calif.

[73] Assignee: **The Donner Mountain Corporation,** San Rafael, Calif.

[**] Term: **14 Years**

[21] Appl. No.: **61,384**

[22] Filed: **Jun. 15, 1987**

[52] U.S. Cl. ..................................... D2/320

[58] Field of Search ........ D2/264, 265, 274, 308–315, D2/317–321; 36/1, 83, 87, 100–103, 106, 112–114, 25 R, 32 R, 59 R, 59 C

[56] **References Cited**

**U.S. PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| D. 120,316 | 4/1940 | Reeves | D2/320 |
| D. 146,504 | 3/1947 | Kavenagh | D2/320 |
| D. 234,014 | 12/1974 | Traver | D2/320 |
| D. 245,734 | 9/1977 | Jacobs | D2/320 |
| D. 269,139 | 5/1983 | Stubblefield | D2/320 |
| D. 280,568 | 7/1985 | Stubblefield | D2/320 |
| D. 287,185 | 12/1986 | Sironi | D2/320 |
| D. 287,303 | 12/1986 | Peterson | D2/320 |
| 2,722,756 | 11/1955 | Ecclesine | 36/59 C |
| 3,354,562 | 11/1967 | Munari | 36/2.5 |
| 4,060,917 | 12/1977 | Canale | 36/59 C |
| 4,255,874 | 3/1981 | Sironi | 36/32 R |

**FOREIGN PATENT DOCUMENTS**

255084  1/1949  Switzerland .

*Primary Examiner*—Louis S. Zarfas
*Attorney, Agent, or Firm*—Saidman, Sterne, Kessler & Goldstein

[57] **CLAIM**

The ornamental design for a shoe sole, as shown and described.

**DESCRIPTION**

FIG. 1 is a left side elevational view of a shoe sole showing our new design;
FIG. 2 is a right side elevational view thereof;
FIG. 3 is a bottom plan view thereof; the top plan view being substantially planar and un-ornamented;
FIG. 4 is a front elevational view thereof; and
FIG. 5 is a rear elevational view thereof.
The broken line showing of a shoe upper in FIGS. 1–5 and the area within are environmental only and form no part of the claimed design.







*FIG.1*



*FIG.2*



*FIG.3*



*FIG.4*



*FIG.5*

# United States Patent [19]

## Zuidema et al.

[11] Patent Number: **Des. 295,692**

[45] Date of Patent: ∗∗ May 17, 1988

[54] **SHOE SOLE**

[75] Inventors: **Gary Zuidema**, Rohnert Park; **John Schelling**, Orinda; **Steve Dodds**, Novato, all of Calif.

[73] Assignee: **The Donner Mountain Corporation**, San Rafael, Calif.

[∗∗] Term: **14 Years**

[21] Appl. No.: **61,385**

[22] Filed: **Jun. 15, 1987**

[52] U.S. Cl. .................................................. D2/320

[58] Field of Search ........ D2/264, 265, 274, 308–315, D2/317–321; 36/1, 83, 87, 106, 100–103, 25 R, 32 R, 59 R, 59 C, 112–114

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D. 203,741 | 2/1966 | Wakeland | D2/320 |
| D. 234,014 | 12/1974 | Traver | D2/320 |
| D. 259,595 | 6/1981 | Famolare, Jr. | D2/320 |
| D. 266,371 | 10/1982 | Stubblefield | D2/320 |
| D. 267,366 | 12/1982 | Davis | D2/320 |
| D. 286,342 | 10/1986 | Stubblefield | D2/320 |
| 4,060,917 | 12/1977 | Canale | 36/59 C |
| 4,096,649 | 6/1978 | Saurwein | 36/32 R |
| 4,213,255 | 7/1980 | Olberz et al. | 36/32 R |
| 4,494,320 | 1/1985 | Davis | 36/25 R |

### FOREIGN PATENT DOCUMENTS

176153 10/1951 Fed. Rep. of Germany .

*Primary Examiner*—Louis S. Zarfas
*Attorney, Agent, or Firm*—Saidman, Sterne, Kessler & Goldstein

[57] **CLAIM**

The ornamental design for a shoe sole, as shown and described.

### DESCRIPTION

FIG. **1** is a left side elevational view of a shoe sole showing our new design;

FIG. **2** is a right side elevational view thereof;

FIG. **3** is a bottom plan view thereof; the top plan view being substantially planar and un-ornamented;

FIG. **4** is a front elevational view thereof; and

FIG. **5** is a rear elevational view thereof.

The broken line showing of a shoe upper in FIGS. 1–5 and the area within are environmental only and form no part of the claimed design.





**U.S. Patent**    May 17, 1988    D295,692

FIG.1



FIG.2



FIG.3

FIG.4



FIG.5



# United States Patent [19]

## Tong

[11] Patent Number: **Des. 296,384**

[45] Date of Patent: ** Jun. 28, 1988

[54] **SHOE SOLE**

[75] Inventor: **James K. Tong**, Beaverton, Oreg.

[73] Assignee: **AVIA Group International, Inc.,**
Portland, Oreg.

[**] Term: **14 Years**

[21] Appl. No.: **94,803**

[22] Filed: **Sep. 10, 1987**

[52] U.S. Cl. .................................................. **D2/320**

[58] Field of Search ................ D2/264, 274, 308–314,
D2/317–321, 326–328; 36/103–106, 114, 132,
136, 25 R, 28, 32 R, 59 R, 59 C

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D. 279,044 | 6/1985 | Norton et al. | D2/320 |
| D. 285,023 | 8/1986 | Tong et al. | D2/320 |
| D. 285,984 | 10/1986 | Tong et al. | D2/320 |
| D. 287,182 | 12/1986 | Stubblefield | D2/320 |
| D. 288,027 | 2/1987 | Tonkel | D2/320 |
| D. 290,660 | 7/1987 | Selbiger | D2/320 |
| D. 291,944 | 9/1987 | Tong | D2/320 |

| | | | |
|---|---|---|---|
| 2,433,303 | 12/1947 | Spini | 36/59 |
| 4,624,062 | 11/1986 | Autry | 36/114 |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1018202 | 12/1952 | France | 36/59 C |
| 1222578 | 6/1960 | France | 36/114 |

*Primary Examiner*—Louis S. Zarfas
*Attorney, Agent, or Firm*—Saidman, Sterne, Kessler &
Goldstein

[57] **CLAIM**

The ornamental design for a shoe sole, as shown and
described.

**DESCRIPTION**

FIG. **1** is a left side elevational view of a shoe sole
showing my new design;
FIG. **2** is a right side elevational view thereof;
FIG. **3** is a bottom plan view thereof;
FIG. **4** is a front elevational view thereof; and
FIG. **5** is a rear elevational view thereof.
The broken line showing of a shoe upper in FIGS. **1–5**
and the area within are environmental only and form no
part of the claimed design.





*FIG.1*



*FIG.2*



## FIG. 3



## FIG. 4



## FIG. 5



# United States Patent [19]

**Le**

[11] **Patent Number:** **Des. 301,659**

[45] **Date of Patent:** ✱✱ Jun. 20, 1989

[54] **SHOE OUTSOLE**

[75] Inventor: **Tuan Le**, New York, N.Y.

[73] Assignee: **Reebok International Ltd.**, Canton, Mass.

[✱✱] Term: **14 Years**

[21] Appl. No.: **254,124**

[22] Filed: **Oct. 6, 1988**

[52] U.S. Cl. ...................................................... **D2/320**

[58] Field of Search ........ D2/264, 265, 274, 308–314, D2/317–322; 36/3 B, 15, 25 R, 28, 29, 32 R, 32 A, 43, 44, 59 R, 59 C, 102–106, 112–116, 132, 136

[56] **References Cited**

**U.S. PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| D. 294,424 | 3/1988 | Brown et al. | D2/320 |
| D. 294,425 | 3/1988 | Le | D2/320 |
| D. 297,682 | 9/1988 | Le | D2/320 |
| 1,528,782 | 3/1925 | Perry . | |
| 2,394,454 | 2/1946 | Kappeler | 36/59 C |
| 2,683,317 | 7/1954 | Sprigg | 36/32 R |
| 4,060,917 | 12/1977 | Canale | 36/59 C |

**FOREIGN PATENT DOCUMENTS**

280453   4/1952   Switzerland ......................... 36/59 C

**OTHER PUBLICATIONS**

Boot & Shoe Recorder, 4/15/62, p. 15–Sole at top left.
Men's Wear, 8/20/71, p. 98–Sole at top left.

*Primary Examiner*—Louis S. Zarfas
*Attorney, Agent, or Firm*—Saidman, Sterne, Kessler & Goldstein

[57]          **CLAIM**

The ornamental design for a shoe sole, as shown and described.

**DESCRIPTION**

FIG. **1** is a left side elevational view of a shoe sole showing my new design;
FIG. **2** is a right side elevational view thereof;
FIG. **3** is a bottom plan view thereof;
FIG. **4** is a front elevational view thereof; and
FIG. **5** is a rear elevational view thereof.
The broken line showing of a shoe upper in FIGS. **1–5** and the area within are environmental only and form no part of the claimed design.







*FIG.1*

*FIG.2*

*FIG.3*





*FIG.4*



*FIG.5*

# United States Patent [19]

## Austin

[11] **Patent Number:** **Des. 302,352**

[45] **Date of Patent:** ** **Jul. 25, 1989**

[54] **SHOE SOLE**

[75] Inventor: **Arnold S. Austin,** Brookfield, Mass.

[73] Assignee: **Quabaug Corporation,** North Brookfield, Mass.

[**] Term: **14 Years**

[21] Appl. No.: **47,042**

[22] Filed: **May 6, 1987**

[52] **U.S. Cl.** .................................................... **D2/320**

[58] **Field of Search** ................ D2/264, 265, 274, 311, D2/317–321; 36/25 R, 28, 29, 32 R, 43, 59 R, 59 C

[56] **References Cited**

### U.S. PATENT DOCUMENTS

D. 115,636  7/1939  Sperry ................................. D2/320

D. 278,851  5/1985  Austin ................................. D2/320
D. 281,459  11/1985  Parker ................................ D2/320
D. 291,147  8/1987  Kelley et al. ...................... D2/320

*Primary Examiner*—Louis S. Zarfas
*Attorney, Agent, or Firm*—I. Stephen Samuels

[57] **CLAIM**

The ornamental design for a shoe sole, as shown and described.

### DESCRIPTION

FIG. **1** is a bottom plan view of a shoe sole showing my new design;
FIG. **2** is a right side elevational view thereof, the left side being substantially a mirror image thereto;
FIG. **3** is a top plan view thereof;
FIG. **4** is a front elevational view thereof; and
FIG. **5** is a rear elevational view thereof.



**U.S. Patent**          Jul. 25, 1989          **D302,352**



FIG. I          FIG. 2          FIG. 3

          

FIG. 4          FIG. 5

# United States Patent [19]

## Weiner

[11] **Patent Number:** **Des. 303,451**

[45] **Date of Patent:** ∗∗ **Sep. 19, 1989**

[54] **WALKING SHOE**

[75] Inventor: **Stanley Weiner,** Cincinnati, Ohio

[73] Assignee: **The United States Shoe Corporation,** Cincinnati, Ohio

[∗∗] Term: **14 Years**

[21] Appl. No.: **126,667**

[22] Filed: **Dec. 1, 1987**

[52] U.S. Cl. ........................................... **D2/313**

[58] **Field of Search** ................. D2/264, 265, 268, 269, D2/271, 272, 274, 308–314, 317–322; 36/11, 45, 83, 102–106, 112–115, 132, 136

[56]                **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D. 73,396 | 9/1927 | Bates | D2/313 |
| D. 130,425 | 7/1941 | Daniels . | |
| D. 146,774 | 5/1947 | Parker | D2/313 |
| D. 149,139 | 3/1948 | Parker | D2/309 |
| D. 236,663 | 9/1975 | Cotton | D2/268 |
| D. 265,015 | 6/1982 | Higgins | D2/309 |
| D. 265,144 | 6/1982 | Vermonet | D2/309 |
| D. 266,455 | 10/1982 | Famolare, Jr. | D2/326 |
| D. 270,015 | 8/1983 | Radford | D2/313 |
| D. 290,783 | 7/1987 | Selbiger et al. | D2/314 |

| | | | |
|---|---|---|---|
| D. 291,143 | 8/1987 | Selbiger et al. | D2/314 |
| D. 293,159 | 12/1987 | Sacre | D2/313 |
| D. 295,458 | 5/1988 | Selbiger | D2/314 |
| 4,644,673 | 2/1987 | Gamm | 36/136 |

### OTHER PUBLICATIONS

Boot & Shoe Recorder, 10/1/63, p. 57—Shoe at bottom center.
Footwear News, Mom, 7/28/86, p. 111—Dexter Walking Shoe at bottom left.

*Primary Examiner*—Louis S. Zarfas
*Attorney, Agent, or Firm*—Jones, Tullar & Cooper

[57]                    **CLAIM**

The ornamental design for walking shoe, as shown.

## DESCRIPTION

FIG. **1** is a perspective view of a walking shoe with insert showing my new design, the laces being removed for clarity of illustration;
FIG. **2** is a perspective view with laces in place;
FIG. **3** is a top plan view with laces removed;
FIG. **4** is a front elevational view thereof;
FIG. **5** is a rear elevational view thereof;
FIG. **6** is a left side elevational view thereof;
FIG. **7** is a right side elevational view thereof; and
FIG. **8** is a bottom plan view thereof.



FIG 1

FIG 2











FIG 6



FIG 7

U.S. Patent    Sep. 19, 1989    Sheet 4 of 4    D303,451



FIG. 8

# United States Patent [19]

## Valle

[11]  Patent Number:  **Des. 316,773**

[45]  Date of Patent: ⁎⁎ **May 14, 1991**

[54]  **SHOE SOLE**

[75]  Inventor:  **Diego D. Valle**, Comunanza, Italy

[73]  Assignee:  **Tomaificio**, Italy

[⁎⁎]  Term:  **14 Years**

[21]  Appl. No.:  **63,272**

[22]  Filed:  **Jun. 16, 1987**

[30]      **Foreign Application Priority Data**

Dec. 16, 1986 [IT]  Italy ..................................... 36327/86

[52]  **U.S. Cl.** .................................................. **D2/320**

[58]  **Field of Search** ........ D2/264, 265, 274, 308–314, D2/269, 317–321; 36/25 R, 28, 29, 32 R, 43, 59 R, 59 C, 102–106, 114, 132, 136

[56]           **References Cited**

**U.S. PATENT DOCUMENTS**

D. 267,676  1/1983  Allen ................................. D2/269 X
D. 268,543  4/1983  Bretschneider ..................... D2/320

*Primary Examiner*—Louis S. Zarfas
*Attorney, Agent, or Firm*—Jacobs & Jacobs

[57]           **CLAIM**

The ornamental design for a shoe sole, as shown and described.

           **DESCRIPTION**

FIG. **1** is a bottom perspective view of a shoe sole showing my new design;
FIG. 2 is a top plan view;
FIG. 3 is a front elevational view;
FIG. 4 is a rear elevational view; and
FIG. 5 is a left side elevational view.





F I G. I



FIG. 2



FIG. 3

**U.S. Patent**     May 14, 1991     Sheet 3 of 3     **Des. 316,773**



*FIG. 4*



*FIG. 5*

# United States Patent [19]

## Hatfield

[11] **Patent Number: Des. 319,337**

[45] **Date of Patent: ₊₊ Aug. 27, 1991**

[54] **CUP SHAPED SHOE SOLE**

[75] Inventor: **Tinker L. Hatfield**, Portland, Oreg.

[73] Assignees: **Nike, Inc.; Nike International Ltd.,** Beaverton, Oreg.

[**] Term: **14 Years**

[21] Appl. No.: **624,676**

[22] Filed: **Dec. 7, 1990**

### Related U.S. Application Data

[63] Continuation-in-part of Ser. No. 558,419, Jul. 27, 1990.
[52] U.S. Cl. ..................................... **D2/320**
[58] Field of Search ................ D2/264, 265, 271–276, D2/308–314, 317–322; 36/25 R, 28, 29, 30 R, 32 R, 59 R, 59 C, 43, 44, 102–107, 112–116, 132, 136

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D. 256,067 | 7/1980 | Hagg et al. | D2/322 |
| D. 260,196 | 8/1981 | Plagenhoef | D2/319 |
| D. 265,017 | 6/1982 | Vermonet . | |
| D. 265,019 | 6/1982 | Vermonet . | |
| D. 265,521 | 7/1982 | Vermonet | D2/309 |
| D. 266,286 | 9/1982 | Vermonet | D2/309 |
| D. 280,355 | 9/1985 | Austin . | |
| D. 286,342 | 10/1986 | Stubblefield . | |
| D. 287,661 | 1/1987 | Tonkel | D2/320 |
| D. 288,027 | 2/1987 | Tonkel . | |
| D. 288,028 | 2/1987 | Chassaing . | |
| D. 291,146 | 8/1987 | Selbiger . | |
| D. 293,274 | 12/1987 | Igoe . | |
| D. 296,384 | 6/1988 | Tong . | |
| D. 299,081 | 12/1988 | Greenberg | D2/314 |
| D. 299,681 | 2/1989 | Miller et al. . | |
| D. 301,385 | 6/1989 | Weiner | D2/308 |
| D. 303,451 | 9/1989 | Weiner | D2/313 |
| D. 304,259 | 10/1989 | Nakano . | |
| D. 305,278 | 1/1990 | Kiyosawa | D2/320 |
| D. 306,652 | 3/1990 | Kiyosawa | D2/320 |
| D. 307,212 | 4/1990 | Aveni | D2/320 |
| 2,853,809 | 9/1958 | Bianchi . | |
| 3,793,750 | 2/1974 | Bowerman | 36/59 C |
| 4,130,947 | 12/1978 | Denu | 36/30 R |
| 4,262,433 | 4/1981 | Hagg et al. | 36/25 R |
| 4,378,643 | 4/1983 | Johnson | 36/129 |
| 4,439,936 | 4/1984 | Clarke et al. | 36/102 |
| 4,559,723 | 12/1985 | Hamy et al. | 36/102 |
| 4,562,651 | 1/1986 | Frederick et al. | 36/102 |
| 4,817,304 | 4/1989 | Parker et al. | 36/114 |
| 4,918,841 | 4/1990 | Turner et al. | 36/114 |
| 4,947,560 | 8/1990 | Fuerst et al. | 36/88 |

### OTHER PUBLICATIONS

Air Flight '90 Brochure.
Nike Fall 1987 Catalog, pp. 50, 52, 54.
Nike Fall 1988 Catalog, pp. 60, 62, 64, 66.
Nike Spring 1991 Catalog, pp. 54, 56, 58, 60, 62, 64.
Nike Fall 1990 Catalog, pp. 56, 58, 60, 62, 64, 66.
Nike Spring 1990 Catalog, pp. 56, 58, 60, 62, 64, 66.
Nike Fall 1989 Catalog, pp. 54, 56, 58, 60.

*Primary Examiner*—Louis S. Zarfas
*Attorney, Agent, or Firm*—Banner, Birch, McKie & Beckett

[57] **CLAIM**

The ornamental design for a cup shaped shoe sole, as shown and described.

### DESCRIPTION

FIG. 1 is a side elevational view of a cup shaped shoe sole showing my new design;
FIG. 2 is a cross section as shown in section 2—2 of FIG. 1;
FIG. 3 is a cross section as shown in section 3—3 of FIG. 1;
FIG. 4 is a side elevational view of the other side of the cup shaped sole;
FIG. 5 is a front elevational view of the cup shaped sole;
FIG. 6 is a rear elevational view of the cup shaped sole;
FIG. 7 is a bottom plan view of a cup shaped shoe sole showing my new design;
FIG. 8 is a cross section of the sole as shown in section 8—8 of FIG. 7;
FIG. 9 is a cross section of the sole as shown in section 9—9 of FIG. 7; and
FIG. 10 is a cross section as shown in section 10—10 of FIG. 7;
The broken line showing of a shoe upper in FIGS. 1 and 4–6 is for illustrative purposes only and forms no part of the claimed design.





*FIG. 1*

*FIG. 3*

*FIG. 2*



*FIG. 4*



*FIG. 6*



*FIG. 5*



FIG. 7

FIG. 8

FIG. 9

FIG. 10

# United States Patent [19]

## Kiyosawa

[11]  Patent Number:  Des. 320,303

[45]  Date of Patent:  ** Oct. 1, 1991

[54]  **HEEL SOLE**

[75]  Inventor:  **Junichi Kiyosawa,** Kobe, Japan

[73]  Assignee:  **ASICS Corporation,** Hyogo, Japan

[**]  Term:  **14 Years**

[21]  Appl. No.:  **349,290**

[22]  Filed:  **May 9, 1989**

[30]  **Foreign Application Priority Data**

Nov. 16, 1988 [JP]  Japan ................................... 63-44893

[52]  **U.S. Cl.** ...................................................... **D2/323**

[58]  **Field of Search** ................. D2/264, 265, 294, 309,
D2/311, 314, 317–323; 36/25 R, 28, 29, 30 R,
32 R, 43, 59 R, 59 C, 102–106, 112–114, 132,
136

[56]  **References Cited**

**U.S. PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| D. 55,115 | 5/1920 | Barney | D2/317 |
| D. 119,894 | 4/1940 | Sherman | D2/323 |
| D. 122,131 | 8/1940 | Sannar | D2/323 |
| D. 128,817 | 8/1941 | Esterson | D2/323 |
| D. 310,131 | 8/1990 | Hase | D2/320 |
| D. 310,132 | 8/1990 | Hase | D2/320 |
| 1,077,535 | 1/1913 | Lendgren | D2/323 X |
| 2,145,994 | 2/1939 | Rubel | D2/323 X |

*Primary Examiner*—Louis S. Zarfas
*Attorney, Agent, or Firm*—Nixon & Vanderhye

[57]  **CLAIM**

The ornamental design for a heel sole, as shown and described.

**DESCRIPTION**

FIG. **1** is a left side elevational view of a heel sole showing my new design in a position of use;
FIG. **2** is a left side elevational view thereof;
FIG. **3** is a front elevational view thereof;
FIG. **4** is a right side elevational view thereof;
FIG. **5** is a rear elevational view thereof;
FIG. **6** is a top plan view thereof; and
FIG. **7** is a bottom plan view thereof.
The broken line showing of a shoe in FIG. **1** is for illustrative purposes only and forms no part of the claimed design.





*Fig. 1*



Fig. 4



Fig. 3



Fig. 2



*Fig.6*

*Fig.7*



*Fig.5*

# United States Patent [19]

**Schneider et al.**

[11] Patent Number: **Des. 322,153**

[45] Date of Patent: ** * Dec. 10, 1991**

[54] **SHOE SOLE**

[75] Inventors: **Jules Schneider**, New York, N.Y.; **Emilio Kaiser**, Florence, Tex.

[73] Assignee: **What's What, Inc.**, Edison, N.J.

[ * ] Notice: The portion of the term of this patent subsequent to May 15, 2007 has been disclaimed.

[**] Term: **14 Years**

[21] Appl. No.: **399,782**

[22] Filed: **Aug. 28, 1989**

[52] U.S. Cl. .................................................... **D2/320**

[58] Field of Search ............... D2/264, 265, 274, 311, D2/317–322; 36/25 R, 28, 29, 30 R, 32 R, 43, 59 R, 59 B, 59 C, 80, 83, 102, 103, 114, 132, 136; D3/12

[56] **References Cited**

**U.S. PATENT DOCUMENTS**

D. 136,065   7/1943   Herron .................................. D2/320

| | | | |
|---|---|---|---|
| D. 288,144 | 2/1987 | Cain .................................. | D3/12 |
| D. 297,185 | 8/1988 | Berzak .............................. | D2/320 |
| D. 307,816 | 6/1990 | Schneider et al. ................. | D2/320 |
| D. 310,599 | 9/1990 | Cain .................................. | D3/12 |
| 354,693 | 12/1886 | Dick .................................. | D2/320 X |
| 2,421,932 | 6/1947 | Goldstein .......................... | D2/320 X |

*Primary Examiner*—Louis S. Zarfas
*Attorney, Agent, or Firm*—Kenyon & Kenyon

[57]            **CLAIM**

The ornamental design for a shoe sole, as shown.

**DESCRIPTION**

FIG. 1 is a top plan view of a shoe sole showing our new design;
FIG. 2 is a side elevational view thereof;
FIG. 3 is a front elevational view thereof;
FIG. 4 is a rear elevational view thereof;
FIG. 5 is a bottom plan view thereof;
FIG. 6 is a sectional view taken along line 6—6 of FIG. 1; and
FIG. 7 is a sectional view taken along line 7—7 of FIG. 1;





FIG. 1

FIG. 2

FIG. 3



FIG. 4

FIG. 5

FIG. 6

FIG. 7

# EXHIBIT D
# (Part 14 of 17)

US00D323577S

# United States Patent [19]

## Kayano

[11]  Patent Number:  **Des. 323,577**

[45]  Date of Patent:  ✱✱ **Feb. 4, 1992**

[54]  **SHOE SOLE**

[75]  Inventor:  **Toshikazu Kayano,** Kobe, Japan

[73]  Assignee:  **Asics Corporation,** Hyogo, Japan

[✱✱]  Term:  **14 Years**

[21]  Appl. No.:  **493,280**

[22]  Filed:  **Mar. 14, 1990**

[30]  **Foreign Application Priority Data**

Sep. 29, 1989 [JP]  Japan ..................... 1-35798

[52]  **U.S. Cl.** ..................................................... **D2/320**

[58]  **Field of Search** ................. D2/264, 265, 274, 311,
D2/317–322; 36/25 R, 28, 29, 30 R, 32 R, 43,
59 R, 59 C, 112–114, 132, 136

[56]  **References Cited**

### U.S. PATENT DOCUMENTS

D. 285,023  8/1986  Tong et al. .......................... D2/320
D 298,381  11/1988  Brown et al. ........................ D2/320

D. 304,259  10/1989  Nakano .............................. D2/320
D. 304,520  11/1989  Clark ................................. D2/320
D. 308,593  6/1990  Kawasaki ............................ D2/320

*Primary Examiner*—Louis S. Zarfas
*Attorney, Agent, or Firm*—Nixon & Vanderhye

[57]  **CLAIM**

The ornamental design for a shoe sole, as shown and
described.

### DESCRIPTION

FIG. **1** is a perspective view of a shoe sole showing my
new design in a position of use. The broken line show-
ing of the shoe in FIG. **1** is for illustrative purposes only
and forms no part of the claimed design;
FIG. **2** is a left side elevational view thereof;
FIG. **3** is a front elevational view thereof;
FIG. **4** is a right side elevational view thereof;
FIG. **5** is a rear elevational view thereof;
FIG. **6** is a top plan view thereof;
FIG. **7** is a bottom plan view thereof; and
FIG. **8** is a perspective view thereof.





Fig. 1



*Fig.2*        *Fig.3*        *Fig.4*

*Fig.5*



*Fig. 6*



*Fig.7*





Fig.8



US00D324940S

# United States Patent [19]

## Claveria

[11] Patent Number: **Des. 324,940**

[45] Date of Patent: ✶✶ **Mar. 31, 1992**

[54] **MIDSOLE**

[75] Inventor: **Ric Claveria**, Loma Linda, Calif.

[73] Assignee: **L.A. Gear, Inc.,** Los Angeles, Calif.

[✶✶] Term: **14 Years**

[21] Appl. No.: **369,099**

[22] Filed: **Jun. 20, 1989**

[52] U.S. Cl. ..................................... **D2/319**

[58] Field of Search ............... D2/264, 265, 274, 311, D2/314, 317–322; 36/25 R, 28, 29, 30 R, 32 R, 43, 59 R, 59 C, 112–116, 102–107, 132, 136, 137

[56] **References Cited**

**U.S. PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| D. 129,487 | 9/1941 | Kardo-Sessoeff . | |
| D. 236,559 | 9/1975 | Senter ................................. | D2/310 |
| D. 256,066 | 7/1980 | Hagg et al. ......................... | D2/322 |
| D. 260,196 | 8/1981 | Plagenhoef ......................... | D2/319 |
| D. 270,965 | 10/1983 | Pritt ................................... | D2/314 |
| D. 296,035 | 6/1988 | Le ...................................... | D2/314 |
| D. 299,788 | 2/1989 | Kelley ................................ | D2/320 |
| D. 301,800 | 6/1989 | Mitsui ................................ | D2/320 |
| D. 301,801 | 6/1989 | McCrea .............................. | D2/320 |
| 4,262,433 | 4/1981 | Hagg et al. . | |
| 4,342,157 | 8/1982 | Gilbert . | |
| 4,408,401 | 10/1983 | Seidel et al. . | |
| 4,438,573 | 3/1984 | McBarron . | |
| 4,445,284 | 5/1984 | Sakutori . | |
| 4,535,553 | 8/1985 | Derderian et al. . | |
| 4,598,487 | 7/1986 | Misevich . | |
| 4,611,412 | 9/1986 | Cohen . | |
| 4,697,362 | 10/1987 | Wasserman . | |

*Primary Examiner*—Louis S. Zarfas
*Attorney, Agent, or Firm*—Don C. Lawrence

[57] **CLAIM**

The ornamental design for a midsole, as shown and described.

**DESCRIPTION**

FIG. 1 is a left side elevational view of a midsole showing my new design;
FIG. 2 is a front elevational view thereof;
FIG. 3 is a right side elevational view thereof;
FIG. 4 is a rear elevational view thereof;
FIG. 5 is a top plan view thereof; and,
FIG. 6 is a bottom plan view thereof.
The broken line showing of the remainder of a shoe upper in FIG. 1 is for illustrative purposes only and forms no part of the claimed design.



**U.S. Patent**    Mar. 31, 1992    Sheet 1 of 2    **Des. 324,940**



*Fig. 1.*



*Fig. 2.*



*Fig. 4.*



*Fig. 3.*

**U.S. Patent**          Mar. 31, 1992          Sheet 2 of 2          **Des. 324,940**



*Fig. 5.*



*Fig. 6.*



US00D325288S

# United States Patent [19]

## Richard et al.

[11] Patent Number: **Des. 325,288**

[45] Date of Patent: ∗∗ **Apr. 14, 1992**

[54] **ELEMENT OF A SHOE SOLE**

[75] Inventors: **Daniel Richard**, Westlinn; **Kenneth Kolman**, Beaverton; **Larry Selbiger**, Portland, all of Oreg.

[73] Assignee: **Avia Group International, Inc.**, Portland, Oreg.

[∗∗] Term: **14 Years**

[21] Appl. No.: **480,520**

[22] Filed: **Feb. 15, 1990**

### Related U.S. Application Data

[63] Continuation of Ser. No. 411,044, Sep. 22, 1989.

[52] **U.S. Cl.** ...................................... **D2/314**; D2/319

[58] **Field of Search** ........ D2/264, 265, 274, 308–314, D2/317–323; 36/25 R, 28, 29, 30 R, 32 R, 43, 44, 112–114, 102–107, 132, 136, 7.8

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| Re. 3,641 | 9/1869 | Thornton | D2/322 |
| D. 235,701 | 7/1975 | Famolare, Jr. | D2/322 X |
| D. 235,819 | 7/1975 | Famolare, Jr. | D2/322 X |
| D. 257,186 | 10/1980 | Famolare, Jr. | D2/322 |
| D. 266,798 | 11/1982 | Famolare, Jr. | D2/322 |
| D. 268,221 | 3/1983 | Argyropoulos | D2/322 |
| D. 296,384 | 6/1988 | Tong | D2/320 |
| 1,088,328 | 2/1914 | Cucinotta . | |
| 2,326,198 | 8/1943 | Brandel et al. | D2/322 X |
| 4,918,838 | 4/1990 | Chang | 36/28 |

#### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 203631 | 5/1907 | Fed. Rep. of Germany | 36/7.8 |

#### OTHER PUBLICATIONS

"Footwear News", Dec. 11, 1989 (The Agilus shoe).

*Primary Examiner*—Louis S. Zarfas
*Attorney, Agent, or Firm*—Sterne, Kessler, Goldstein & Fox

[57] **CLAIM**

The ornamental design for an element of a shoe sole, as shown and described.

**DESCRIPTION**

FIG. 1 is a left perspective view an element of a shoe sole showing our new design;
FIG. 2 is a left side elevational view thereof;
FIG. 3 is a right side elevational view thereof; and,
FIG. 4 is a rear elevational view thereof.
The broken line showing of a shoe sole in FIGS. 1–4.





*FIG. 1*



*FIG. 4*



*FIG. 2*



*FIG. 3*

US00D326355S

# United States Patent [19]

## Cotsidas

[11] Patent Number:  **Des. 326,355**

[45] Date of Patent: ** **May 26, 1992**

[54] **SHOE SOLE**

[75] Inventor:  **Kristin N. Cotsidas,** Manhattan Beach, Calif.

[73] Assignee:  **L.A. GEAR, Inc.,** Los Angeles, Calif.

[**] Term:  **14 Years**

[21] Appl. No.:  **757,918**

[22] Filed:  **Sep. 11, 1991**

[52] U.S. Cl. ...................................................... **D2/320**

[58] Field of Search ................ D2/264, 265, 274, 311, D2/317–321, 323; 36/25 R, 28, 29, 32 R, 43, 44, 59 R, 59 C, 114, 132, 136

[56]  **References Cited**

U.S. PATENT DOCUMENTS

D. 247,998  5/1978  Lobosco ............................. D2/320
D. 304,259  10/1989  Nakano ................................. D2/320

D. 319,725  9/1991  Claveria ............................... D2/320

*Primary Examiner*—Louis S. Zarfas
*Attorney, Agent, or Firm*—Don C. Lawrence

[57]  **CLAIM**

The ornamental design for a shoe sole, as shown and described.

**DESCRIPTION**

FIG. **1** is a right side elevational view of a shoe sole showing my new design;
FIG. **2** is a bottom plan view thereof;
FIG. **3** is a top plan view thereof;
FIG. **4** is a left side elevational view thereof;
FIG. **5** is a front elevational view thereof; and,
FIG. **6** is a rear elevational view thereof.
The dotted line showing of a shoe upper in FIG. **1** is for environmental purposes only and forms no part of the claimed design.





*Fig. 1.*

*Fig. 2.*

*Fig. 3.*



*Fig. 4.*



*Fig. 5.*



*Fig. 6.*



US00D327770S

# United States Patent [19]

## Prats et al.

[11] Patent Number: **Des. 327,770**

[45] Date of Patent: ∗∗ **Jul. 14, 1992**

[54] **SHOE SOLE**

[75] Inventors: **Gabriel P. Prats**, Santa Ana; **Kristin N. Cotsidas**, Manhattan Beach, both of Calif.

[73] Assignee: **L.A. Gear, Inc.**, Los Angeles, Calif.

[∗∗] Term: **14 Years**

[21] Appl. No.: **757,920**

[22] Filed: **Sep. 11, 1991**

[52] U.S. Cl. ............................................... **D2/320**

[58] Field of Search ........ D2/264, 265, 274, 308–314, D2/317–321; 36/25 R, 28, 29, 43, 44, 59 R, 595, 114, 113, 132, 136

[56] **References Cited**

U.S. PATENT DOCUMENTS

D. 319,725   9/1991   Claveria ............................... D2/320

*Primary Examiner*—Louis S. Zarfas
*Attorney, Agent, or Firm*—Don C. Lawrence

[57] **CLAIM**

The ornamental design for a shoe sole, as shown and described.

**DESCRIPTION**

FIG. **1** is a right side elevational view of a shoe sole showing our new design;
FIG. **2** is a bottom plan view thereof;
FIG. **3** is a top plan view thereof;
FIG. **4** is a left side elevational view thereof;
FIG. **5** is a front elevational view thereof; and,
FIG. **6** is a rear elevational view thereof.
The dotted line showing of a shoe upper in FIG. **1** is for environmental purposes only and forms no part of the claimed design.





Fig. 1.

Fig. 2.

Fig. 3.



*Fig. 4.*



*Fig. 5.*



*Fig. 6.*



US00D334463S

# United States Patent [19]

## Chang

[11]  Patent Number:  **Des. 334,463**

[45]  Date of Patent:  ∗∗ **Apr. 6, 1993**

[54]  **SHOE SOLE SHOCK ABSORBER**

[75]  Inventor:  **David J. H. Chang**, Taichung, Taiwan

[73]  Assignee:  **Hi-Tec Sports PLC**, South-On-Sea, Great Britain

[∗∗]  Term:  **14 Years**

[21]  Appl. No.:  **209,797**

[22]  Filed:  **Jun. 22, 1988**

[52]  U.S. Cl. ...................................... **D2/314**

[58]  Field of Search ................ D2/264, 265, 308–314, D2/317–322; 36/25 R, 28, 29, 35 R, 35 B, 102–107, 112–114, 132, 136, 43, 72 R

[56]  **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,077,579 | 2/1963 | Hanko et al. | D2/314 X |
| 4,342,158 | 8/1982 | McMahon et al. | 36/28 X |
| 4,680,876 | 7/1987 | Peng | 36/35 R |
| 4,887,367 | 12/1989 | Mackness et al. | 36/28 |
| 4,918,838 | 4/1990 | Chang | 36/28 |

*Primary Examiner*—Louis S. Zarfas
*Attorney, Agent, or Firm*—James R. Cypher

[57]  **CLAIM**

The ornamental design for a shoe sole shock absorber, as shown.

### DESCRIPTION

FIG. **1** is a front elevational view of a shoe sole shock absorber;

FIG. **2** is a top plan view thereof;

FIG. **3** is a bottom plan view thereof;

FIG. **4** is a perspective view thereof; and,

FIG. **5** is a front elevational view thereof in a position of use.

The broken line showing of a shoe in FIG. 5 is for illustrative purposes only and forms no part of the claimed design.





FIG. 1



FIG. 2



FIG. 3



FIG. 4





US00D334833S

# United States Patent [19]

**Blissett**

[11] Patent Number: **Des. 334,833**

[45] Date of Patent: ** Apr. 20, 1993

[54] **SHOE SOLE**

[75] Inventor: **Malcolm G. Blissett**, Grand Rapids, Mich.

[73] Assignee: **Wolverine World Wide, Inc.,** Rockford, Mich.

[**] Term: **14 Years**

[21] Appl. No.: **785,695**

[22] Filed: **Oct. 31, 1991**

### Related U.S. Application Data

[63] Continuation-in-part of Ser. No. 549,718, Jul. 9, 1990, Pat. No. Des. 322,158.

[52] **U.S. Cl.** ..................................................... **D2/320**
[58] **Field of Search** ................. D2/264, 265, 270, 274, D2/308–314, 317–322; 36/25 R, 28, 29, 32 R, , 43, 44, 59 R, 59 C, 83, 84, 89, 101–107, 112–114, 132, 136

[56] **References Cited**

### U.S. PATENT DOCUMENTS

D. 125,433  2/1941  Starner ............................... D2/320

| | | | |
|---|---|---|---|
| D. 242,091 | 11/1976 | Tornero | D2/320 |
| D. 262,158 | 12/1981 | Bartneck | D2/319 |
| D. 266,798 | 11/1982 | Famolare, Jr. | D2/320 |
| D. 282,123 | 1/1986 | Davis | D2/320 |
| D. 294,423 | 3/1988 | Zuidema et al. | D2/320 |
| D. 297,384 | 8/4988 | Miller | D2/270 |
| 4,827,631 | 5/1989 | Thornton | D2/320 X |

*Primary Examiner*—Louis S. Zarfas
*Attorney, Agent, or Firm*—Price, Heneveld, Cooper, DeWitt & Litton

[57]          **CLAIM**

The ornamental design for a shoe sole, as shown and described.

### DESCRIPTION

FIG. 1 is a bottom plan view of a shoe sole showing my new design;
FIG. 2 is a top plan view thereof;
FIG. 3 is a side elevational view of the lateral side thereof;
FIG. 4 is a side elevational view of the medial side thereof;
FIG. 5 is a front elevational view thereof; and,
FIG. 6 is a rear elevational view thereof.



**U.S. Patent**          Apr. 20, 1993          Sheet 1 of 3          **Des. 334,833**



FIG. 1



FIG. 2



FIG. 3

FIG. 4

FIG. 6

FIG. 5

US00D341708S

# United States Patent [19]

## Blissett

[11] Patent Number: **Des. 341,708**

[45] Date of Patent: ∗∗ **Nov. 30, 1993**

[54] **SHOE SOLE**

[75] Inventor: **Malcolm G. Blissett**, Grand Rapids, Mich.

[73] Assignee: **Wolverine World Wide, Inc.,** Rockford, Mich.

[∗∗] Term: **14 Years**

[21] Appl. No.: **869,640**

[22] Filed: **Apr. 15, 1992**

[52] U.S. Cl. ...................................................... **D2/957**

[58] Field of Search ................ D2/264, 265, 268, 269, D2/274, 311, 317–323; 36/25 R, 28, 29, 30 R, 32 R, 43, 44, 59 R, 59 C, 83, 84, 89, 100–107, 132, 136

[56]            **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D. 266,798 | 11/1982 | Famolare, Jr. | D2/322 |
| D. 297,383 | 8/1988 | Mourad | D2/320 |
| D. 302,765 | 8/1989 | Esser | D2/320 |
| 500,385 | 6/1893 | Hall . | |
| 4,724,622 | 2/1988 | Mills | 36/30 R |

*Primary Examiner*—Louis S. Zarfas
*Attorney, Agent, or Firm*—Price, Heneveld, Cooper, DeWitt & Litton

[57]            **CLAIM**

The ornamental design for a shoe sole, as shown and described.

### DESCRIPTION

FIG. **1** is a bottom view of a shoe sole showing my new design;

FIG. **2** is a side elevational view of the medial side thereof;

FIG. **3** is a side elevational view of the lateral side thereof;

FIG. **4** is a rear elevational view thereof; and,

FIG. **5** is a front elevational view thereof.

The top of the sole is plain.





FIG. 1



FIG. 2

FIG. 3

FIG. 5

FIG. 4

US00D344401S

# United States Patent [19]

## Kilgore

[11] **Patent Number:** **Des. 344,401**

[45] **Date of Patent:** ✶✶ **Feb. 22, 1994**

[54] **HEEL INSERT FOR A SHOE SOLE**

[75] Inventor: **Bruce J. Kilgore,** Lake Oswego, Oreg.

[73] Assignee: **Nike, Inc.,** Beaverton, Oreg.

[**] Term: **14 Years**

[21] Appl. No.: **786,933**

[22] Filed: **Nov. 1, 1991**

[52] U.S. Cl. .................................... **D2/965; D2/964**

[58] Field of Search ............... D2/264, 265, 308–314, D2/317–324, 278; 36/1, 3 B, 7.8, 28, 29, 35 R, 35 B, 37, 38, 43, 89, 114, 132, 136

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D. 39,747 | 1/1909 | McKenna . | |
| D. 136,960 | 1/1944 | Shuford | D2/324 |
| D. 260,196 | 8/1981 | Plagenhoef | D2/319 |
| D. 261,946 | 11/1981 | Trask | D2/322 |
| D. 296,493 | 7/1988 | Diaz | D2/318 |
| D. 308,285 | 6/1990 | Serna | D2/320 |
| 507,490 | 10/1893 | Gambino | 36/28 |
| 622,673 | 4/1899 | Ferrata | 36/313 |
| 1,075,039 | 10/1913 | Keith | 36/1 |
| 2,048,683 | 7/1936 | Brockman | 36/35 R |
| 2,710,460 | 6/1955 | Stasinos | 36/28 X |
| 2,985,971 | 8/1960 | Murawski | 36/29 |
| 4,223,457 | 9/1980 | Borgeas | 36/37 X |
| 4,237,625 | 12/1980 | Cole et al. | 36/28 |
| 4,322,892 | 4/1982 | Inohora | 36/29 |
| 4,438,573 | 3/1984 | McBarron | 36/3 B |
| 4,535,553 | 8/1985 | Derderian et al. | 36/28 |
| 4,573,279 | 3/1986 | Feurer-Zogel et al. | 36/35 R |
| 4,611,412 | 9/1986 | Cohen | 36/28 |
| 4,616,431 | 10/1986 | Dassler | 36/28 |
| 4,660,299 | 4/1987 | Omilusik | 36/7.8 |
| 4,663,865 | 5/1987 | Telecemian | 36/114 |
| 4,680,875 | 7/1987 | Danieli | 36/28 X |
| 4,680,876 | 7/1987 | Peng | 36/35 B |
| 4,715,130 | 12/1987 | Scatena | 36/28 X |
| 4,722,131 | 2/1988 | Huang . | |
| 4,815,221 | 3/1989 | Diaz | 36/28 X |
| 4,817,304 | 4/1989 | Parker et al. | 36/114 |
| 4,843,741 | 7/1989 | Yung-Mao | 36/114 |
| 4,878,300 | 11/1989 | Bogaty | 36/28 X |
| 4,887,367 | 12/1989 | Mackness et al. | 36/28 |
| 4,918,838 | 4/1990 | Chang | 36/28 |
| 4,918,841 | 4/1990 | Turner et al. | 36/114 |
| 4,936,029 | 6/1990 | Rudy | 36/29 |
| 4,956,927 | 9/1990 | Misevich et al. | 36/28 X |
| 5,014,449 | 5/1991 | Richard et al. | 36/114 |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1227420 | 8/1960 | France . | |
| 1526637A1 | 12/1989 | U.S.S.R. . | |

*Primary Examiner*—Louis S. Zarfas
*Attorney, Agent, or Firm*—Banner, Birch, McKie & Beckett

[57] **CLAIM**

The ornamental design for a heel insert for a shoe sole, as shown and described.

**DESCRIPTION**

FIG. 1 is a left side elevational view of a heel insert for a shoe sole showing my new design;

FIG. 2 is a right side elevational view;

FIG. 3 is a top plan view;

FIG. 4 is a rear elevational view;

FIG. 5 is a cross-sectional view taken on line 5—5 of FIG. 1; and,

FIG. 6 is a cross-sectional view taken on line 6—6 of FIG. 1.

The broken line showing of the remaining portions of the shoe sole and upper is for illustrative purposes only and forms no part of the claimed design.



Case 1:04-cv-12668-RGS    Document 18-19    Filed 05/02/2005    Page 31 of 73



*FIG. 1*



*FIG. 2*



FIG. 3



FIG. 5

FIG. 6

FIG. 4

US00D350018S

# United States Patent [19]

## Kilgore

[11] **Patent Number: Des. 350,018**

[45] **Date of Patent:** ∗∗ **Aug. 30, 1994**

[54] **HEEL INSERT FOR A SHOE SOLE**

[75] Inventor: **Bruce J. Kilgore**, Lake Oswego, Oreg.

[73] Assignee: **Nike, Inc.**, Beaverton, Oreg.

[∗∗] Term: **14 Years**

[21] Appl. No.: **17,646**

[22] Filed: **Jan. 19, 1994**

### Related U.S. Application Data

[62] Division of Ser. No. 786,930, Nov. 1, 1991, Pat. No. Des. 344,398.

[52] U.S. Cl. ........................................ **D2/964; D2/967**
[58] Field of Search ................ D2/896, 946, 950, 961, D2/964–967; 36/1, 33, 7.8, 28, 29, 34 R, 35 R, 35 B, 37, 38, 43, 44, 89, 27, 106, 114, 132, 136

[56]          **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D. 136,960 | 1/1944 | Shuford | D2/965 |
| D. 145,817 | 10/1946 | Payne | D2/965 |
| D. 261,946 | 11/1981 | Trask | D2/950 |
| 413,693 | 10/1889 | Walker | 36/28 |
| 507,490 | 10/1893 | Gambino | 36/28 |
| 622,673 | 4/1899 | Ferrata | 36/3 B |
| 968,020 | 8/1910 | Yandoli | 36/27 X |
| 1,075,039 | 10/1913 | Keith | 36/1 |
| 1,469,717 | 10/1923 | Cutting | 36/3 B |
| 2,048,683 | 7/1936 | Brockman | 36/35 R |
| 2,399,543 | 4/1946 | Dack . | |
| 2,710,460 | 6/1955 | Stasinos | 36/28 X |
| 2,985,971 | 8/1960 | Murawski | 36/29 |
| 3,822,490 | 7/1974 | Murawski | 36/35 R |
| 4,223,457 | 9/1980 | Borgeas | 36/37 X |
| 4,237,625 | 12/1980 | Cole et al. | 36/28 |
| 4,262,433 | 4/1981 | Hagg et al. | 36/35 B |
| 4,322,892 | 4/1982 | Inohora | 36/29 |
| 4,438,573 | 3/1984 | McBarron | 36/3 B |
| 4,535,553 | 8/1985 | Derderian et al. | 36/28 |
| 4,573,279 | 3/1986 | Feurer-Zogel et al. | 36/35 R |
| 4,611,412 | 9/1986 | Cohen | 36/28 |
| 4,616,431 | 10/1986 | Dassler | 36/28 |
| 4,660,299 | 4/1987 | Omilusik | 36/7.8 |
| 4,663,865 | 5/1987 | Telecemian | 36/114 |
| 4,680,875 | 7/1987 | Danieli | 36/28 X |
| 4,680,876 | 7/1987 | Peng | 36/35 B |
| 4,715,130 | 12/1987 | Scatena | 36/28 X |
| 4,815,221 | 3/1989 | Diaz | 36/28 X |
| 4,817,304 | 4/1989 | Parker et al. | 36/28 X |
| 4,843,741 | 7/1989 | Yung-Mao | 36/114 |
| 4,878,300 | 11/1989 | Bogaty | 36/28 X |
| 4,881,329 | 11/1989 | Crowley | 36/38 |
| 4,887,367 | 12/1989 | Mackness et al. | 36/28 |
| 4,918,838 | 4/1990 | Chang | 36/28 |
| 4,936,030 | 6/1990 | Rennex | 36/28 |
| 5,014,449 | 5/1991 | Richard et al. | 36/114 |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 51380 | 12/1911 | Austria . | |
| 946494 | 6/1949 | France | 36/7.8 |

*Primary Examiner*—Louis S. Zarfas
*Attorney, Agent, or Firm*—Banner, Birch, McKie & Beckett

[57]          **CLAIM**

The ornamental design for a heel insert for a shoe sole, as shown and described.

### DESCRIPTION

FIG. 1 is an elevational view of one side of a heel insert for a shoe sole showing my new design;
FIG. 2 is an elevational view of the other side thereof;
FIG. 3 is a top plan view thereof;
FIG. 4 is a rear elevational view thereof;
FIG. 5 is a cross sectional view taken along line **5—5** of FIG. 1;
FIG. 6 is a cross sectional view taken along line **6—6** of FIG. 1;
FIG. 7 is an elevational view of one side of a second embodiment of a heel insert for a shoe sole showing my new design;
FIG. 8 is an elevational view of the other side of the second embodiment;
FIG. 9 is a top plan view of the second embodiment;
FIG. 10 is a rear elevational view of the second embodiment;
FIG. 11 is a cross sectional view taken along line **11—11** of FIG. 7; and,
FIG. 12 is a cross sectional view taken along line **12—12** of FIG. 7.
The broken lines showing the remaining portions of the sole and shoe upper in FIGS. 1–12 form no part of the claimed design.





U.S. Patent    Aug. 30, 1994    Sheet 2 of 8    Des. 350,018



FIG. 2



FIG. 3



*F I G. 5*



*F I G. 6*



*F I G. 4*



FIG. 7



*FIG. 8*



*FIG. 9*



*FIG. 11*

*FIG. 12*



*FIG. 10*

US00D350019S

# United States Patent [19]

## Kilgore

[11] Patent Number: **Des. 350,019**

[45] Date of Patent: ∗∗ **Aug. 30, 1994**

[54] **HEEL INSERT FOR A SHOE SOLE**

[75] Inventor: **Bruce J. Kilgore**, Lake Oswego, Oreg.

[73] Assignee: **Nike, Inc.**, Beaverton, Oreg.

[∗∗] Term: **14 Years**

[21] Appl. No.: **17,626**

[22] Filed: **Jan. 19, 1994**

### Related U.S. Application Data

[62] Division of Ser. No. 786,927, Nov. 1, 1991, Pat. No. Des. 344,174.

[52] U.S. Cl. .................................... **D2/965; D2/964**
[58] Field of Search ................ D2/896, 946, 950, 961, D2/964–967; 36/1, 33, 7.8, 28, 29, 34 R, 35 R, 35 B, 37, 38, 43, 44, 89, 27, 106, 114, 132, 136

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D. 136,960 | 1/1944 | Shuford | D2/965 |
| D. 145,817 | 10/1946 | Payne | D2/965 |
| D. 261,946 | 11/1981 | Trask | D2/950 |
| 413,693 | 10/1889 | Walker | 36/28 |
| 507,490 | 10/1893 | Gambino | 36/28 |
| 622,673 | 4/1899 | Ferrata | 36/3 B |
| 968,020 | 8/1910 | Yandoli | 36/27 X |
| 1,075,039 | 10/1913 | Keith | 36/1 |
| 1,469,717 | 10/1923 | Cutting | 36/3 B |
| 2,048,683 | 7/1936 | Brockman | D2/964 X |
| 2,399,543 | 4/1946 | Dack | 36/106 |
| 2,710,460 | 6/1955 | Stasinos | 36/28 X |
| 2,985,971 | 8/1960 | Murawski | 36/29 |
| 3,822,490 | 7/1974 | Murawski | 36/35 R |
| 4,223,457 | 9/1980 | Borgeas | 36/37 X |
| 4,237,625 | 12/1980 | Cole et al. | 36/28 |
| 4,262,433 | 4/1981 | Hagg et al. | 36/35 B |
| 4,322,892 | 4/1982 | Inohora | 36/29 |
| 4,392,666 | 7/1983 | Ramer | 36/38 X |
| 4,438,573 | 3/1984 | McBarron | 36/3 B |
| 4,535,553 | 8/1985 | Derderian et al. | 36/28 |
| 4,573,279 | 3/1986 | Feurer-Zogel et al. | 36/35 R |
| 4,611,412 | 9/1986 | Cohen | 36/28 |
| 4,616,431 | 10/1986 | Dassler | 36/28 |
| 4,660,299 | 4/1987 | Omilusik | 36/7.8 |
| 4,663,865 | 5/1987 | Telecemian | 36/114 |
| 4,680,875 | 7/1987 | Danieli | 36/28 X |
| 4,680,876 | 7/1987 | Peng | 36/35 B |
| 4,715,130 | 12/1987 | Scatena | 36/28 X |
| 4,815,221 | 3/1989 | Diaz | 36/28 X |
| 4,817,304 | 4/1989 | Parker et al. | 36/114 |
| 4,843,741 | 7/1989 | Yung-Mao | 36/114 |
| 4,878,300 | 11/1989 | Bogaty | 36/28 X |
| 4,881,329 | 11/1989 | Crowley | 36/38 |
| 4,887,367 | 12/1989 | Mackness et al. | 36/28 |
| 4,918,838 | 4/1990 | Chang | 36/28 |
| 4,936,030 | 6/1990 | Rennex | 36/28 |
| 5,014,449 | 5/1991 | Richard et al. | 36/114 |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 51380 | 12/1911 | Austria . | |
| 946494 | 6/1949 | France | 36/7.8 |

*Primary Examiner*—Louis S. Zarfas
*Attorney, Agent, or Firm*—Banner, Birch, McKie & Beckett

[57] **CLAIM**

The ornamental design for a heel inset for a shoe sole, as shown and described.

**DESCRIPTION**

FIG. **1** is an elevational view of one side of a heel insert for a shoe sole showing my new design;
FIG. **2** is an elevational view of the other side thereof;
FIG. **3** is a top plan view thereof;
FIG. **4** is a rear elevational view thereof;
FIG. **5** is a cross sectional view taken along line **5—5** of FIG. **1**; and,
FIG. **6** is a cross sectional view taken along line **6—6** of FIG. **1**.
The broken lines showing the remaining portions of the sole and shoe upper in FIGS. **1–6**.





FIG. 1



FIG. 2



*FIG. 3*



*FIG. 5*

*FIG. 6*



*FIG. 4*

US00D350020S

# United States Patent [19]

## Kilgore

[11]    **Patent Number:    Des. 350,020**

[45]    **Date of Patent:** ∗∗ **Aug. 30, 1994**

[54]    **HEEL INSERT FOR A SHOE SOLE**

[75]    Inventor:    **Bruce J. Kilgore,** Lake Oswego, Oreg.

[73]    Assignee:    **Nike, Inc.,** Beaverton, Oreg.

[∗∗]    Term:    **14 Years**

[21]    Appl. No.:    **17,647**

[22]    Filed:    **Jan. 19, 1994**

### Related U.S. Application Data

[62]    Division of Ser. No. 786,927, Nov. 1, 1991, Pat. No. Des. 344,174.

[52]    **U.S. Cl.** ...................................... **D2/965;** D2/964

[58]    **Field of Search** ................. D2/896, 946, 961, 964, D2/905, 967, 965, 966, 950; 36/1, 3 B, 7.8, 28, 29, 34 R, 35 R, 35 B, 37, 38, 43, 44, 89, 114, 132, 136, 106, 27

[56]    **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D. 136,960 | 1/1944 | Shuford | D2/965 |
| D. 145,817 | 10/1944 | Payne | D2/965 |
| D. 261,946 | 11/1981 | Trask | D2/950 |
| 413,693 | 10/1889 | Walker | 36/28 |
| 507,490 | 10/1893 | Gambino | 36/28 |
| 622,673 | 4/1899 | Ferrata | 36/3 B |
| 968,020 | 8/1910 | Yandoli | 36/27 X |
| 1,075,039 | 10/1913 | Keith | 36/1 |
| 1,469,717 | 10/1923 | Cutting | 36/3 B |
| 2,048,683 | 7/1936 | Brockman | D2/964 X |
| 2,399,543 | 4/1946 | Dack | 36/106 |
| 2,710,460 | 6/1955 | Stasinos | 36/28 X |
| 2,985,971 | 8/1960 | Murawski | 36/29 |
| 3,822,490 | 7/1974 | Murawski | 36/35 R |
| 4,223,457 | 9/1980 | Borgeas | 36/37 X |
| 4,237,625 | 12/1980 | Cole et al. | 36/28 |
| 4,262,433 | 4/1981 | Hagg et al. | 36/35 B |
| 4,322,892 | 4/1982 | Inohorx | 36/29 |
| 4,392,666 | 7/1983 | Ramer | 36/38 X |
| 4,438,573 | 3/1984 | McBarron | 36/3 B |
| 4,535,553 | 8/1985 | Derderian et al. | 36/28 |
| 4,573,279 | 3/1986 | Feurer et al. | 36/35 R |
| 4,611,412 | 9/1986 | Cohen | 36/28 |
| 4,616,431 | 10/1986 | Dassler | 36/28 |
| 4,660,299 | 4/1987 | Omilusik | 36/7.8 |
| 4,663,865 | 5/1987 | Telecemian | 36/114 |
| 4,680,875 | 7/1987 | Danieli | 36/28 X |
| 4,680,876 | 7/1987 | Peng | 36/35 B |
| 4,715,130 | 12/1987 | Scetana | 36/28 X |
| 4,815,221 | 3/1989 | Diaz | 36/28 X |
| 4,817,304 | 4/1989 | Parker et al. | 36/114 |
| 4,843,741 | 7/1989 | Yung-Mao | 36/114 |
| 4,878,300 | 11/1989 | Bogaty | 36/28 X |
| 4,881,329 | 11/1989 | Crowley | 36/38 |
| 4,887,367 | 12/1989 | Mackness et al. | 36/28 |
| 4,918,038 | 4/1990 | Chang | 36/28 |
| 4,936,030 | 6/1990 | Rennex | 36/28 |
| 5,014,449 | 5/1991 | Richard et al. | 36/114 |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 51380 | 12/1911 | Austria . | |
| 946494 | 6/1949 | France | 36/7.8 |

*Primary Examiner*—Louis S. Zarfas
*Attorney, Agent, or Firm*—Banner, Birch, McKie & Beckett

[57]    **CLAIM**

The ornamental design for a heel insert for a shoe sole, as shown and described.

### DESCRIPTION

FIG. **1** is an elevational view of one side of a heel insert for a shoe sole showing my new design;
FIG. **2** is an elevational view of the other side thereof;
FIG. **3** is a top plan view thereof;
FIG. **4** is a rear elevational view thereof;
FIG. **5** is a cross sectional view taken along line **5—5** of FIG. **1;** and,
FIG. **6** is a cross sectional view taken along line **6—6** of FIG. **1.**
The broken lines showing the remaining portions of the sole and shoe upper in FIGS. **1–6** form no part of the claimed design.





FIG. 1



*FIG. 2*



FIG. 3



*FIG. 5*



*FIG. 6*



*FIG. 4*

US00D350225S

# United States Patent [19]

## Kilgore

[11] **Patent Number:** **Des. 350,225**

[45] **Date of Patent:** ** **Sep. 6, 1994**

[54] **HEEL INSERT FOR A SHOE SOLE**

[75] Inventor: **Bruce J. Kilgore,** Lake Oswego, Oreg.

[73] Assignee: **Nike, Inc.,** Beaverton, Oreg.

[**] Term: **14 Years**

[21] Appl. No.: **17,640**

[22] Filed: **Jan. 19, 1994**

### Related U.S. Application Data

[62] Division of Ser. No. 786,931, Nov. 1, 1991, Pat. No. D. 344,399.

[52] **U.S. Cl.** .................................... **D2/964;** D2/965
[58] **Field of Search** ............... D2/896, 946, 950, 961, D2/964–967; 36/1, 3 B, 7.8, 28, 29, 34 R, 35 R, 35 B, 37, 38, 43, 44, 89, 106, 114, 139, 136

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D. 39,747 | 1/1909 | McKenna . | |
| D. 136,960 | 1/1944 | Shuford | D2/965 |
| D. 145,817 | 10/1946 | Payne . | |
| D. 260,196 | 8/1981 | Plagenhoef . | |
| D. 261,946 | 11/1981 | Trask | D2/950 |
| D. 296,493 | 7/1988 | Diaz . | |
| D. 308,285 | 6/1990 | Serna . | |
| 413,693 | 10/1889 | Walker | 36/7.8 X |
| 507,490 | 10/1893 | Gambino | 36/28 |
| 622,673 | 4/1899 | Ferrata | 36/3 B |
| 968,020 | 8/1910 | Yandoli | 36/37 X |
| 1,075,039 | 10/1913 | Keith | 36/1 |
| 1,469,717 | 10/1923 | Cutting | 36/3 B |
| 2,048,683 | 7/1936 | Brockman | 36/35 R |
| 2,399,543 | 4/1946 | Dack . | |
| 2,710,460 | 6/1955 | Stasinos | 36/28 X |
| 2,985,971 | 8/1960 | Murawski | 36/29 |
| 3,822,490 | 7/1974 | Murawski | 36/35 R |
| 4,223,457 | 9/1980 | Borgeas | 36/37 X |
| 4,237,625 | 12/1980 | Cole et al. | 36/28 |
| 4,262,433 | 4/1981 | Hagg et al. | 36/35 B |
| 4,322,892 | 4/1982 | Inohora | 36/29 |
| 4,438,673 | 3/1984 | McBarron | 36/3 B |
| 4,535,553 | 8/1985 | Derderian et al. | 36/28 |
| 4,573,279 | 3/1986 | Feurer-Zogel et al. | 36/35 R |
| 4,611,412 | 9/1986 | Cohen | 36/28 |
| 4,616,431 | 10/1986 | Dassler | 36/28 |
| 4,660,299 | 4/1987 | Omilusik | 36/7.8 |
| 4,663,865 | 5/1987 | Telecemian | 36/114 |
| 4,680,875 | 7/1987 | Danieli | 36/28 X |
| 4,680,876 | 7/1987 | Peng | 36/35 B |
| 4,715,130 | 12/1987 | Scatena | 36/28 X |
| 4,722,131 | 2/1988 | Huang . | |
| 4,815,221 | 3/1989 | Diaz | 36/28 X |
| 4,817,304 | 4/1989 | Parker et al. | 36/114 |
| 4,843,741 | 7/1989 | Yung-Mao | 36/114 |
| 4,878,300 | 11/1989 | Bogaty | 36/28 X |
| 4,881,329 | 11/1989 | Crowley | 36/38 |
| 4,887,367 | 12/1989 | Mackness et al. | 36/28 |
| 4,918,838 | 4/1990 | Chang | 36/28 |
| 4,918,841 | 4/1990 | Turner et al. | 36/28 |
| 4,936,029 | 6/1990 | Rudy | 36/29 |
| 4,936,030 | 6/1990 | Rennex | 36/29 |
| 4,956,927 | 9/1990 | Misevich et al. | 36/28 X |
| 5,014,449 | 5/1991 | Richard et al. | 36/114 |

#### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 51380 | of 1911 | Austria | 36/37 |
| 946494 | 6/1949 | France | 36/7.8 |
| 1227420 | 8/1960 | France . | |
| 1526637A1 | 12/1989 | U.S.S.R. . | |

*Primary Examiner*—Louis S. Zarfas
*Attorney, Agent, or Firm*—Banner, Birch, McKie & Beckett

[57] **CLAIM**

The ornamental design for a heel insert for a shoe sole, as shown and described.

**DESCRIPTION**

FIG. 1 is an elevational view of one side of a heel insert for a shoe sole showing my new design;
FIG. 2 is an elevational view of the other side thereof;
FIG. 3 is a top plan view thereof;
FIG. 4 is a rear elevational view thereof;
FIG. 5 is a cross sectional view taken along line 5—5 of FIG. 1; and,
FIG. 6 is a cross sectional view taken along line 6—6 of FIG. 1.
The broken lines showing the remaining portions of the sole and shoe upper in FIGS. 1–6 form no part of the claimed design.





*FIG. 1*



FIG. 2



*FIG. 3*



*FIG. 5*



*FIG. 6*



*FIG. 4*

US00D350227S

# United States Patent [19]

## Kilgore

[11]  **Patent Number:**    **Des. 350,227**

[45]  **Date of Patent:**  ** **Sep. 6, 1994**

[54] **HEEL INSERT FOR A SHOE SOLE**

[75] Inventor: **Bruce J. Kilgore,** Lake Oswego, Oreg.

[73] Assignee: **Nike, Inc.,** Beaverton, Oreg.

[**] Term: **14 Years**

[21] Appl. No.: **17,644**

[22] Filed: **Jan. 19, 1994**

### Related U.S. Application Data

[62]  Division of Ser. No. 786,887, Nov. 1, 1991, Pat. No. Des. 344,400.

[52] **U.S. Cl.** ...................................... **D2/964; D2/967**

[58] **Field of Search** ............... D2/896, 946, 950, 961, D2/964–967; 36/1, 3 B, 7.8, 28, 29, 34 R, 35 R, 35 B, 37, 38, 43, 44, 89, 27, 106, 114, 132, 136

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D. 39,747 | 1/1909 | McKenna . | |
| D. 136,960 | 1/1944 | Shuford . | |
| D. 145,817 | 10/1946 | Payne | D2/965 |
| D. 260,196 | 8/1981 | Plagenhoef . | |
| D. 261,946 | 11/1981 | Trask | D2/950 |
| D. 296,493 | 7/1988 | Diaz . | |
| D. 308,285 | 6/1990 | Serna . | |
| 413,693 | 10/1889 | Walker | 36/7.8 |
| 507,490 | 10/1893 | Gambino | 36/28 |
| 622,673 | 4/1899 | Ferrata | 36/3 B |
| 968,020 | 8/1910 | Yandoli | 36/27 X |
| 1,075,039 | 10/1913 | Keith | 36/1 |
| 1,469,717 | 10/1923 | Cutting | 36/3 B |
| 2,048,683 | 7/1936 | Brockman | D2/964 X |
| 2,399,543 | 4/1946 | Dack | 36/106 |
| 2,710,460 | 6/1955 | Stasinos | 36/28 X |
| 2,985,971 | 8/1960 | Murawski | 36/29 |
| 3,822,490 | 7/1974 | Murawski | 36/35 R |
| 4,223,457 | 9/1980 | Borgeas | 36/37 X |
| 4,237,625 | 12/1980 | Cole et al. | 36/28 |
| 4,262,433 | 4/1981 | Hagg et al. | 36/35 B |
| 4,322,892 | 4/1982 | Inohora | 36/29 |
| 4,392,666 | 7/1983 | Ramer | 36/38 X |
| 4,438,573 | 3/1984 | McBarrow | 36/3 B |
| 4,535,553 | 8/1985 | Derderian et al. | 36/28 |
| 4,573,279 | 3/1986 | Feuer-Zogel et al. | 36/35 R |
| 4,611,412 | 9/1986 | Cohen | 32/28 |

| | | | |
|---|---|---|---|
| 4,616,431 | 10/1986 | Dassler | 36/28 |
| 4,660,299 | 4/1987 | Omilusik | 36/7.8 |

(List continued on next page.)

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 51380 | 12/1911 | Austria . | |
| 1227420 | of 0000 | France . | |
| 946494 | 6/1949 | France | 36/7.8 |
| 1526637A1 | of 0000 | U.S.S.R. . | |

*Primary Examiner*—Louis S. Zarfas
*Attorney, Agent, or Firm*—Banner, Birch, McKie & Beckett

[57]  **CLAIM**

The ornamental design for a heel insert for a shoe sole, as shown and described.

### DESCRIPTION

FIG. 1 is an elevational view of one side of a heel insert for a shoe sole showing my new design;

FIG. 2 is an elevational view of the other side thereof;

FIG. 3 is a top plan view thereof;

FIG. 4 is a rear elevational view thereof;

FIG. 5 is a cross sectional view taken along line 5—5 of FIG. 1;

FIG. 6 is a cross sectional view taken along line 6—6 of FIG. 1;

FIG. 7 is an elevational view of one side of a second embodiment of a heel insert for a shoe sole showing my new design;

FIG. 8 is an elevational view of the other side of the second embodiment;

FIG. 9 is a top plan view of the second embodiment;

FIG. 10 is a rear elevational view of the second embodiment;

FIG. 11 is a cross sectional view taken along line 11—11 of FIG. 7; and,

FIG. 12 is a cross sectional view taken along line 12—12 of FIG. 7.

The broken lines showing the remaining portions of the sole and shoe upper in FIGS. 1–12 form no part of the claimed design.



**Des. 350,227**

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,663,865 | 5/1987 | Telecemian | 36/114 |
| 4,680,875 | 7/1987 | Danieli | 36/28 X |
| 4,680,876 | 7/1987 | Peng | 36/35 B |
| 4,715,130 | 12/1987 | Scatena | 36/28 X |
| 4,722,131 | 2/1988 | Huang . | |
| 4,815,221 | 3/1989 | Diaz | 36/28 X |
| 4,817,304 | 4/1989 | Parker et al. | 36/114 |
| 4,843,741 | 7/1989 | Yung-Mao | 36/114 |
| 4,878,300 | 11/1989 | Bogaty | 36/28 X |
| 4,881,329 | 11/1989 | Crowley | 36/38 |
| 4,887,367 | 12/1989 | Mackness et al. | 36/28 |
| 4,918,838 | 4/1990 | Chang | 36/28 |
| 4,918,841 | 4/1990 | Turner et al. | 36/114 |
| 4,936,029 | 6/1990 | Rudy | 36/29 |
| 4,936,030 | 6/1990 | Rennex | 36/28 |
| 4,956,927 | 9/1990 | Misevich et al. | 36/28 X |
| 5,014,449 | 5/1991 | Richard et al. | 36/114 |

Case 1:04-cv-12668-RGS    Document 18-19    Filed 05/02/2005    Page 61 of 73



FIG. 1



FIG. 2



FIG. 3



FIG. 5



FIG. 6



FIG. 4



*FIG. 7*



FIG. 8



FIG. 9

**U.S. Patent**    Sep. 6, 1994    Sheet 8 of 8    **Des. 350,227**



*FIG. 11*

*FIG. 12*



*FIG. 10*

US00D350433S

# United States Patent [19]

## Kilgore

[11] **Patent Number:** **Des. 350,433**

[45] **Date of Patent:** ⁎⁎ **Sep. 13, 1994**

[54] **HEEL INSERT FOR A SHOE SOLE**

[75] Inventor: **Bruce J. Kilgore,** Lake Oswego, Oreg.

[73] Assignee: **Nike, Inc.,** Beaverton, Oreg.

[⁎⁎] Term: **14 Years**

[21] Appl. No.: **786,932**

[22] Filed: **Nov. 1, 1991**

[52] **U.S. Cl.** ..................................... **D2/961**

[58] **Field of Search** ............... D2/896, 961, 946, 964; 36/43, 44, 28, 29, 13 B, 32 R, 7.8, 35 R, 35 B, 37, 31, 114

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D. 39,747 | 1/1909 | McKenna . | |
| D. 260,196 | 8/1981 | Plagenhoef . | |
| D. 261,946 | 11/1981 | Trask . | |
| D. 296,493 | 7/1988 | Diaz . | |
| D. 308,285 | 6/1990 | Serna . | |
| 507,490 | 10/1893 | Gambino . | |
| 622,673 | 4/1899 | Ferrata | 36/3 B |
| 1,075,039 | 10/1913 | Keith | 36/1 |
| 2,710,460 | 6/1955 | Stasinos . | |
| 2,985,971 | 8/1960 | Murawski | 36/28 |
| 4,223,457 | 9/1980 | Borgeas | 36/37 |
| 4,237,625 | 12/1980 | Cole et al. | 36/28 |
| 4,322,892 | 4/1982 | Inohora . | |
| 4,438,573 | 3/1984 | McBarron | 36/3 B |
| 4,535,553 | 8/1985 | Derderian et al. | 36/28 |
| 4,573,279 | 3/1986 | Feurer-Zogel et al. | 36/35 R |
| 4,611,412 | 9/1986 | Cohen | 36/28 |
| 4,616,431 | 10/1986 | Dassler | 36/28 |
| 4,660,299 | 4/1987 | Omilusik | 36/7.8 |
| 4,663,865 | 5/1987 | Telecemian | 36/114 |
| 4,680,875 | 7/1987 | Danieli | 36/31 |
| 4,680,876 | 7/1987 | Peng | 36/35 B |
| 4,715,130 | 12/1987 | Scatena | 36/28 X |
| 4,722,131 | 2/1988 | Huang . | |
| 4,815,221 | 3/1989 | Diaz | 36/28 X |
| 4,817,304 | 4/1989 | Parker et al. | 36/114 |
| 4,843,741 | 7/1989 | Yung-Mao | 36/114 |
| 4,878,300 | 11/1989 | Bogaty | 36/35 R |
| 4,887,367 | 12/1989 | Mackness et al. | 36/28 |
| 4,918,838 | 4/1990 | Chang | 36/28 |
| 4,918,841 | 4/1990 | Turner et al. | 36/114 |
| 4,936,029 | 6/1990 | Rudy | 36/29 |
| 4,956,927 | 9/1990 | Misevich et al. | 36/32 R |
| 5,014,449 | 5/1991 | Richard et al. | 36/114 |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 1227420 | 8/1960 | France . |
| 1526637A1 | 12/1989 | U.S.S.R. . |

*Primary Examiner*—Louis S. Zarfas
*Attorney, Agent, or Firm*—Banner, Birch, McKie & Beckett

[57] **CLAIM**

The ornamental design for a heel insert for a shoe sole, as shown and described.

**DESCRIPTION**

FIG. 1 is a left side elevational view of a heel insert showing my new design;

FIG. 2 is a right side elevational view;

FIG. 3 is a top plan view;

FIG. 4 is a rear elevation view;

FIG. 5 is a cross-sectional view taken on line 5—5 of FIG. 1; and,

FIG. 6 is a cross-sectional view taken on line 6—6 of FIG. 1.

The broken line showing of the remaining portions of the shoe sole and upper is for illustrative purposes only and forms no part of the claimed design.





*FIG. 1*



*FIG. 2*



*FIG. 3*



# EXHIBIT D
# (Part 15 of 17)



US00D351057S

# United States Patent [19]

## Kilgore

[11] Patent Number: **Des. 351,057**

[45] Date of Patent: ** **Oct. 4, 1994**

[54] **HEEL INSERT FOR A SHOE SOLE**

[75] Inventor: **Bruce J. Kilgore**, Lake Oswego, Oreg.

[73] Assignee: **Nike, Inc.**, Beaverton, Oreg.

[**] Term: **14 Years**

[21] Appl. No.: **17,642**

[22] Filed: **Jan. 19, 1994**

### Related U.S. Application Data

[62] Division of Ser. No. 786,931, Nov. 1, 1991, Pat. No. Des. 344,399.

[52] U.S. Cl. .................................... **D2/964; D2/965**

[58] **Field of Search** ............... D2/896, 946, 950, 961, D2/964–967; 36/1, 3 B, 7.8, 28, 29, 34 R, 35 R, 35 B, 37, 38, 43, 44, 89, 106, 114, 132, 136

### [56] References Cited

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D. 39,747 | 1/1909 | McKenna . | |
| D. 136,960 | 1/1944 | Shuford . | |
| D. 145,817 | 10/1946 | Payne ...................... | D2/965 |
| D. 260,196 | 8/1981 | Plagenhoef . | |
| D. 261,946 | 11/1981 | Trask ...................... | D2/950 |
| D. 296,493 | 7/1988 | Diaz . | |
| D. 308,285 | 6/1990 | Serna . | |
| 413,693 | 10/1889 | Walker ................... | 36/7.8 X |
| 507,490 | 10/1893 | Gambino ................. | 36/28 |
| 622,673 | 4/1899 | Ferrata .................... | 36/3 B |
| 968,020 | 8/1910 | Yandoli ................... | 36/37 X |
| 1,075,039 | 10/1913 | Keith ....................... | 36/1 |
| 1,469,717 | 10/1923 | Cutting ................... | 36/3 B |
| 2,048,683 | 7/1936 | Brockman ............... | 36/35 R |
| 2,399,543 | 4/1946 | Dack . | |
| 2,710,460 | 6/1955 | Stasinos ................. | 36/28 X |
| 2,985,971 | 8/1960 | Murawski ............... | 36/29 |
| 3,822,490 | 7/1974 | Murawski ............... | 36/35 R |
| 4,223,457 | 9/1980 | Borgeas ................. | 36/37 X |
| 4,237,625 | 12/1980 | Cole et al. ............. | 36/28 |
| 4,262,433 | 4/1981 | Hagg et al. ............ | 36/25 R |
| 4,322,892 | 4/1982 | Inohora .................. | 36/29 |
| 4,438,573 | 3/1984 | McBarron .............. | 36/3 B |
| 4,535,553 | 8/1985 | Derderian et al. ..... | 36/28 |
| 4,573,279 | 3/1986 | Feuerer-Zogel et al. ........... | 36/35 R |

| | | | |
|---|---|---|---|
| 4,611,412 | 9/1986 | Cohen ..................... | 36/28 |
| 4,616,431 | 10/1986 | Dassler .................. | 36/28 |
| 4,660,299 | 4/1987 | Omilusik ............... | 36/7.8 |

(List continued on next page.)

#### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 51380 | 12/1911 | Austria ................... | 36/37 |
| 946494 | 6/1949 | France .................... | 36/7.8 |
| 1227420 | 8/1960 | France . | |
| 1526637A1 | 12/1989 | U.S.S.R. . | |

*Primary Examiner*—Louis S. Zarfas

*Attorney, Agent, or Firm*—Banner, Birch, McKie & Beckett

## [57] CLAIM

The ornamental design for a heel insert for a shoe sole, as shown and described.

## DESCRIPTION

FIG. **1** is an elevational view of one side of a heel insert for a shoe sole showing my new design;

FIG. **2** is an elevational view of the other side thereof;

FIG. **3** is a top plan view thereof;

FIG. **4** is a rear elevational view thereof;

FIG. **5** is a cross sectional view taken along line **5—5** of FIG. **1**;

FIG. **6** is a cross sectional view taken along line **6—6** of FIG. **1**;

FIG. **7** is an elevational view of one side of a second embodiment of a heel insert for a shoe sole showing my new design;

FIG. **8** is an elevational view of the other side of the second embodiment;

FIG. **9** is a top plan view of the second embodiment;

FIG. **10** is a rear elevational view of the second embodiment;

FIG. **11** is a cross sectional view taken along line **11—11** of FIG. **7**; and,

FIG. **12** is a cross sectional view taken along line **12—12** of FIG. **7**.

The broken lines showing the remaining portions of the sole and shoe upper in FIGS. **1–12** form no part of the claimed design.



## Des. 351,057

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,663,865 | 5/1987 | Telecemian | 36/114 |
| 4,680,875 | 7/1987 | Danieli | 36/28 X |
| 4,680,876 | 7/1987 | Peng | 36/35 B |
| 4,715,130 | 12/1987 | Scatena | 36/28 X |
| 4,722,131 | 2/1988 | Huang . | |
| 4,815,221 | 3/1989 | Diaz | 36/28 X |
| 4,817,304 | 4/1989 | Parker et al. | 36/114 |
| 4,843,741 | 7/1989 | Yung-Mao | 36/114 |
| 4,878,300 | 11/1989 | Bogaty | 36/28 X |
| 4,881,329 | 11/1989 | Crowley | 35/38 X |
| 4,887,367 | 12/1989 | Mackness et al. | 36/28 |
| 4,918,838 | 4/1990 | Chang | 36/28 |
| 4,918,841 | 4/1990 | Turner et al. | 36/114 |
| 4,936,029 | 6/1990 | Rudy | 36/29 |
| 4,936,030 | 6/1990 | Rennex | 36/28 |
| 4,956,927 | 9/1990 | Misevich et al. | 36/28 X |
| 5,014,449 | 5/1991 | Richard et al. | 36/114 |



*FIG. 1*



FIG. 2



*FIG. 3*

**U.S. Patent**        Oct. 4, 1994        Sheet 4 of 8        **Des. 351,057**



*FIG. 5*

*FIG. 6*



*FIG. 4*



FIG. 7



*FIG. 8*



*FIG. 9*

Case 1:04-cv-12668-RGS    Document 18-20    Filed 05/02/2005    Page 11 of 72



FIG. 11



FIG. 12



FIG. 10

US00D351720S

# United States Patent [19]

## Kilgore

[11] Patent Number: **Des. 351,720**

[45] Date of Patent: ** Oct. 25, 1994

[54] **HEEL INSERT FOR A SHOE SOLE**

[75] Inventor: **Bruce J. Kilgore**, Lake Oswego, Oreg.

[73] Assignee: **Nike, Inc.**, Beaverton, Oreg.

[**] Term: **14 Years**

[21] Appl. No.: **17,636**

[22] Filed: **Jan. 19, 1994**

### Related U.S. Application Data

[62] Division of Ser. No. 786,930, Nov. 1, 1991, Pat. No. Des. 344,398.

[52] U.S. Cl. ...................................... **D2/967; D2/964**

[58] Field of Search ............... D2/896, 946, 961, 964, D2/965, 967; 36/1, 3 B, 7.8, 25 R, 28, 29, 35 R, 35 B, 37, 38, 43, 44, 81, 89, 114, 132, 136, 106

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D. 39,747 | 1/1909 | McKenna . | |
| D. 136,960 | 1/1944 | Shuford | D2/965 |
| D. 145,817 | 10/1946 | Payne | D2/965 |
| D. 260,196 | 8/1981 | Plagenhoef | D2/947 |
| D. 261,946 | 11/1981 | Trask | D2/950 |
| D. 296,493 | 7/1988 | Diaz . | |
| D. 308,285 | 6/1990 | Serna . | |
| 413,693 | 10/1889 | Walker | 36/7.8 |
| 507,490 | 10/1893 | Gambino | 36/28 |
| 622,673 | 4/1899 | Ferrata | 36/3 B |
| 968,020 | 8/1910 | Yandoli | 36/37 X |
| 1,075,039 | 10/1913 | Keith | 36/1 |
| 1,469,717 | 10/1923 | Cutting | 36/3 B |
| 2,048,683 | 7/1936 | Brockman | 36/35 R |
| 2,399,543 | 4/1946 | Dack | 36/106 |
| 2,710,460 | 6/1955 | Stasinos | 36/28 X |
| 2,985,971 | 8/1960 | Murawski | 36/29 |
| 3,822,490 | 7/1974 | Murawski | 36/35 R |
| 4,223,457 | 9/1980 | Borgeas | 36/37 X |
| 4,237,625 | 12/1980 | Cole et al. | 36/28 |
| 4,262,433 | 4/1981 | Hagg et al. | 36/25 R |
| 4,322,892 | 4/1982 | Inohora | 36/29 |
| 4,438,573 | 3/1984 | McBarron | 36/3 B |
| 4,535,553 | 8/1985 | Derderian et al. | 36/28 |
| 4,573,279 | 3/1986 | Feurer-Zogel et al. | 36/35 R |

| | | | |
|---|---|---|---|
| 4,611,412 | 9/1986 | Cohen | 36/28 |
| 4,616,431 | 10/1986 | Dassler | 36/28 |
| 4,660,299 | 4/1987 | Omilusik | 36/7.8 |
| 4,663,865 | 5/1987 | Telecemian | 36/114 |
| 4,680,875 | 7/1987 | Danieli | 36/28 X |
| 4,680,876 | 7/1987 | Peng | 36/35 B |
| 4,715,130 | 12/1987 | Scatena | 36/28 X |
| 4,722,131 | 2/1988 | Huang . | |
| 4,815,221 | 3/1989 | Diaz | 36/28 X |
| 4,817,304 | 4/1989 | Parker et al. | 36/114 |
| 4,843,741 | 7/1989 | Yung-Mao | 36/114 |
| 4,878,300 | 11/1989 | Bogaty | 36/28 X |
| 4,881,329 | 11/1989 | Crowley | 36/38 |
| 4,887,367 | 12/1989 | Mackness et al. | 36/28 |
| 4,918,838 | 4/1990 | Chang | 36/28 |
| 4,918,841 | 4/1990 | Turner et al. | 36/114 |
| 4,936,029 | 6/1990 | Rudy | 36/29 |
| 4,936,030 | 6/1990 | Rennex | 36/28 |
| 4,956,927 | 9/1990 | Misevich et al. | 36/28 X |
| 5,014,449 | 5/1991 | Richard et al. | 36/114 |

#### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 51380 | 12/1911 | Austria . | |
| 946494 | 6/1949 | France | 36/7.8 |
| 1227420 | 8/1960 | France . | |
| 1526637A1 | 12/1989 | U.S.S.R. . | |

*Primary Examiner*—Louis S. Zarfas
*Attorney, Agent, or Firm*—Banner, Birch, McKie & Beckett

[57] **CLAIM**

The ornamental design for a heel insert for a shoe sole, as shown and described.

**DESCRIPTION**

FIG. **1** is an elevational view of one side of a heel insert for a shoe sole showing my new design;
FIG. **2** is an elevational view of the other side thereof;
FIG. **3** is a top plan view thereof;
FIG. **4** is a rear elevational view thereof;
FIG. **5** is a cross sectional view taken along line 5—5 of FIG. **1**; and,
FIG. **6** is a cross sectional view taken along line 6—6 of FIG. **1**.
The broken lines showing the remaining portions of the sole and shoe upper in FIGS. 1–6 form no part of the claimed design.





FIG. 1



*FIG. 2*



*FIG. 3*

**U.S. Patent**     Oct. 25, 1994     Sheet 4 of 4     **Des. 351,720**



FIG. 5



FIG. 6



FIG. 4

US00D351936S

# United States Patent [19]

## Kilgore

[11] Patent Number: **Des. 351,936**

[45] Date of Patent: **** **Nov. 1, 1994**

[54] **HEEL INSERT FOR A SHOE SOLE**

[75] Inventor: **Bruce J. Kilgore**, Lake Oswego, Oreg.

[73] Assignee: **Nike, Inc.**, Beaverton, Oreg.

[**] Term: **14 Years**

[21] Appl. No.: **17,637**

[22] Filed: **Jan. 19, 1994**

### Related U.S. Application Data

[62] Division of Ser. No. 786,933, Nov. 1, 1991, Pat. No. D 344,401.

[52] **U.S. Cl.** .................................... **D2/965;** D2/964
[58] **Field of Search** ................ D2/896, 946, 950, 961, D2/964–967; 36/1, 3 B, 7.8, 28, 29, 34 R, 35 R, 35 B, 37, 38, 43, 44, 89, 106, 114, 132, 136

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| D. 39,747 | 1/1909 | McKenna . |
| D. 136,960 | 1/1944 | Shuford ................................ D2/965 |
| D. 145,817 | 10/1946 | Payne ................................. D2/965 |
| D. 260,196 | 8/1981 | Plagenhoef . |
| D. 261,946 | 11/1981 | Trask ................................. D2/950 |
| D. 296,493 | 7/1988 | Diaz . |
| D. 308,285 | 6/1990 | Serna . |
| 413,693 | 10/1889 | Walker ......................... 36/7.8 X |
| 507,490 | 10/1893 | Gambino ........................... 36/28 |
| 622,673 | 4/1899 | Ferrata ........................... 36/3 B |
| 968,020 | 8/1910 | Yandoli ......................... 36/37 X |
| 1,075,039 | 10/1913 | Keith ............................... 36/1 |
| 1,469,717 | 10/1923 | Cutting .......................... 36/3 B |
| 2,048,683 | 7/1936 | Brockman .................... 36/35 R |
| 2,399,543 | 4/1946 | Dack ................................ 36/76 |
| 2,710,460 | 6/1955 | Stasinos ..................... 36/28 X |
| 2,985,971 | 8/1960 | Murawski ....................... 36/29 |
| 3,822,490 | 7/1974 | Murawski .................... 36/35 R |
| 4,223,457 | 9/1980 | Borgeas ....................... 36/37 X |
| 4,237,625 | 12/1980 | Cole et al. ....................... 36/28 |
| 4,262,433 | 4/1981 | Hagg et al. .................. 36/35 B |
| 4,322,892 | 4/1982 | Inohora .......................... 36/29 |
| 4,438,573 | 3/1984 | McBarron ..................... 36/3 B |
| 4,535,553 | 8/1985 | Derderian et al. ............... 36/28 |
| 4,573,279 | 3/1986 | Feurer-Zogel et al. ......... 36/35 R |
| 4,611,412 | 9/1986 | Cohen ............................. 36/28 |
| 4,616,431 | 10/1986 | Dassler ........................... 36/28 |
| 4,660,299 | 4/1987 | Omilusik ....................... 36/7.8 |
| 4,663,865 | 5/1987 | Telecemian .................. 36/114 |
| 4,680,875 | 7/1987 | Danieli ..................... 36/28 X |
| 4,680,876 | 7/1987 | Peng .......................... 36/35 B |
| 4,715,130 | 12/1987 | Scatena ..................... 36/28 X |
| 4,722,131 | 2/1988 | Huang . |
| 4,815,213 | 3/1989 | Diaz .......................... 36/28 X |
| 4,817,304 | 4/1989 | Parker et al. .................. 36/114 |
| 4,843,741 | 7/1989 | Yung-Mao ..................... 36/114 |
| 4,878,300 | 11/1989 | Bogaty ....................... 36/28 X |
| 4,881,329 | 11/1989 | Crowley ......................... 36/38 |
| 4,887,367 | 12/1989 | Mackness et al. ............... 36/28 |
| 4,918,838 | 4/1990 | Chang ............................. 36/28 |
| 4,918,841 | 4/1990 | Turner et al. ................. 36/114 |
| 4,936,029 | 6/1990 | Rudy .............................. 36/29 |
| 4,936,030 | 6/1990 | Rennex ............................ 36/28 |
| 4,956,927 | 9/1990 | Misevich et al. ............ 36/28 X |
| 5,014,449 | 5/1991 | Richard et al. ................ 36/114 |

#### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 51380 | 12/1911 | Austria | .............................. 36/37 |
| 946494 | 6/1949 | France | ............................ 36/7.8 |
| 1227420 | 8/1960 | France . | |
| 1526637 A1 | 12/1989 | U.S.S.R. . | |

*Primary Examiner*—Louis S. Zarfas
*Attorney, Agent, or Firm*—Banner, Birch, McKie & Beckett

[57] **CLAIM**

The ornamental design for a heel insert for a shoe sole, as shown and described.

## DESCRIPTION

FIG. 1 is an elevational view of one side of a heel insert for a shoe sole showing my new design;
FIG. 2 is an elevational view of the other side thereof;
FIG. 3 is a top plan view thereof;
FIG. 4 is a rear elevational view thereof;
FIG. 5 is a cross sectional view taken along line 5—5 of FIG. 1; and,
FIG. 6 is a cross sectional view taken along line 6—6 of FIG. 1.
The broken lines showing the remaining portions of the sole and shoe upper in FIGS. 1-6 form no part of the claimed design.







FIG. 1



*FIG. 2*



*FIG. 3*



*FIG. 5*



*FIG. 6*



*FIG. 4*

US00D352155S

# United States Patent [19]

## Merceron

[11] **Patent Number:** **Des. 352,155**

[45] **Date of Patent:** ∗∗ **Nov. 8, 1994**

[54] **SHOE SOLE**

[75] Inventor: **Jean-Paul Merceron**, Monthodon, France

[73] Assignee: **Article Chaussant Europeen (Arche S.A.)**, Chateau-Renault, France

[**] Term: **14 Years**

[21] Appl. No.: **12,193**

[22] Filed: **Aug. 26, 1993**

[30]     **Foreign Application Priority Data**

Feb. 26, 1993 [FR]   France .............................. FR 931076

[52] **U.S. Cl.** ...................................... **D2/952; D2/956**

[58] **Field of Search** ........ D2/896, 897, 947, 951–960, D2/908, 910; 36/25 R, 30 R, 32 R, 59 R, 59 C, 83, 84, 89, 102–107, 112–114, 132, 136

[56]           **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D. 253,137 | 10/1979 | Foldes | D2/910 |
| D. 257,074 | 9/1980 | Gucci | D2/908 |
| D. 275,147 | 8/1984 | Phillpott | D2/954 |
| D. 306,794 | 3/1990 | Trülsen | D2/951 |
| 1,988,784 | 1/1935 | Carrier | D2/956 X |

*Primary Examiner*—Louis S. Zarfas
*Attorney, Agent, or Firm*—Jacobson, Price, Holman & Stern

[57]           **CLAIM**

The ornamental design for a shoe sole, as shown and described.

### DESCRIPTION

FIG. 1 is a top, left side perspective view showing my new design for a shoe sole;
FIG. 2 is a top plan view thereof;
FIG. 3 is a right side elevational view thereof;
FIG. 4 is a rear elevational view thereof;
FIG. 5 is a front elevational view thereof; and,
FIG. 6 is a bottom plan view thereof.



**U.S. Patent**    Nov. 8, 1994    Sheet 1 of 2    **Des. 352,155**

FIG. 1



FIG. 2



FIG. 3



**U.S. Patent**          Nov. 8, 1994          Sheet 2 of 2          **Des. 352,155**

FIG. 4



FIG. 5



FIG. 6



US00D352157S

# United States Patent [19]

## Merceron

[11] **Patent Number:** **Des. 352,157**

[45] **Date of Patent:** ** **Nov. 8, 1994**

[54] **SHOE SOLE**

[75] Inventor: **Jean-Paul Merceron**, Monthodon, France

[73] Assignee: **Article Chaussant Europeen (Arche S.A.)**, Chateau-Renault, France

[**] Term: **14 Years**

[21] Appl. No.: **12,194**

[22] Filed: **Aug. 26, 1993**

[30]    **Foreign Application Priority Data**

Feb. 26, 1993 [FR] France ..................................... 931076

[52] U.S. Cl. ..................................... **D2/957**; D2/959
[58] Field of Search ................ D2/896, 947, 951–960; 36/25 R, 37 R, 32 R, 59 R, 59 C, 83, 84, 89, 102–107, 132, 136

[56]    **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D. 87,136 | 6/1932 | Tebbutt | D2/957 X |
| D. 120,217 | 4/1940 | Daniels | D2/960 X |
| D. 292,142 | 10/1987 | Tonkel | D2/957 |
| D. 297,185 | 8/1988 | Berzak | D2/957 |

*Primary Examiner*—Louis S. Zarfas
*Attorney, Agent, or Firm*—Jacobson, Price, Holman & Stern

[57]    **CLAIM**

The ornamental design for a shoe sole, as shown and described.

**DESCRIPTION**

FIG. **1** is a top, left side perspective view showing my new design for a shoe sole;
FIG. **2** is a top plan view thereof;
FIG. **3** is a right side elevational view thereof;
FIG. **4** is a rear elevational view thereof;
FIG. **5** is a front elevational view thereof; and,
FIG. **6** is a bottom plan view thereof.



FIG. 1



FIG. 2



FIG. 3



FIG. 4



FIG. 5



FIG. 6



US00D352159S

# United States Patent [19]

## Kilgore

[11] Patent Number: **Des. 352,159**

[45] Date of Patent: ** **Nov. 8, 1994**

[54] **HEEL INSERT FOR A SHOE SOLE**

[75] Inventor: **Bruce Kilgore**, Lake Oswego, Oreg.

[73] Assignee: **Nike, Inc.**, Beaverton, Oreg.

[**] Term: **14 Years**

[21] Appl. No.: **17,635**

[22] Filed: **Jan. 19, 1994**

### Related U.S. Application Data

[62] Division of Ser. No. 786,933, Nov. 1, 1991, Pat. No. D. 344,401.

[52] U.S. Cl. ........................................ **D2/965**; D2/964
[58] Field of Search ................ D2/896, 946, 961, 964,
D2/965; 36/1, 3 B, 7.8, 28, 29, 25 R, 35 R, 35
B, 37, 38, 43, 44, 81, 89, 114, 132, 136, 106

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D. 39,747 | 1/1909 | McKenna . | |
| D. 136,960 | 1/1944 | Shuford | D2/965 |
| D. 145,817 | 10/1946 | Payne | D2/965 |
| D. 260,196 | 8/1981 | Plagenhoef | D2/947 |
| D. 261,946 | 11/1981 | Trask | D2/950 |
| D. 296,493 | 7/1988 | Diaz . | |
| D. 308,285 | 6/1990 | Serna . | |
| 413,693 | 10/1889 | Walker | 36/7.8 |
| 507,490 | 10/1893 | Gambino | 36/28 |
| 622,673 | 4/1899 | Ferrata | 36/3 B |
| 968,020 | 8/1910 | Yandoli | 36/37 X |
| 1,075,039 | 10/1913 | Keith | 36/1 |
| 1,469,717 | 10/1923 | Cutting | 36/3 B |
| 2,048,683 | 7/1936 | Brockman | 36/35 R |
| 2,399,543 | 4/1946 | Dack | 36/106 |

(List continued on next page.)

#### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 51380 | 12/1911 | Austria . | |
| 946494 | 6/1949 | France | 36/7.8 |
| 1227420 | 8/1960 | France . | |
| 1526637A1 | 12/1989 | U.S.S.R. . | |

*Primary Examiner*—Louis S. Zarfas
*Attorney, Agent, or Firm*—Banner, Birch, McKie & Beckett

[57] **CLAIM**

The ornamental design for a heel insert for a shoe sole, as shown and described.

**DESCRIPTION**

FIG. **1** is an elevational view of one side of a heel insert for a shoe sole showing my new design;
FIG. **2** is an elevational view of the other side thereof;
FIG. **3** is a top plan view thereof;
FIG. **4** is a rear elevational view thereof;
FIG. **5** is a cross sectional view taken along line **5—5** of FIG. **1**;
FIG. **6** is a cross sectional view taken along line **6—6** of FIG. **1**;
FIG. **7** is an elevational view of one side of a second embodiment of a heel insert for a shoe sole showing my new design;
FIG. **8** is an elevational view of the other side of the second embodiment;
FIG. **9** is a top plan view of the second embodiment;
FIG. **10** is a rear elevational view of the second embodiment;
FIG. **11** is a cross sectional view taken along line **11—11** of FIG. **7**;
FIG. **12** is a cross sectional view taken along line **12—12** of FIG. **7**;
FIG. **13** is an elevational view of one side of a third embodiment of a heel insert for a shoe sole showing my new design;
FIG. **14** is an elevational view of the other side of the third embodiment;
FIG. **15** is a top plan view of the third embodiment;
FIG. **16** is a rear elevational view of the third embodiment;
FIG. **17** is a cross sectional view taken through line **17—17** of FIG. **13**; and,
FIG. **18** is a cross sectional view taken through line **18—18** of FIG. **13**.
The broken lines showing the remaining portions of the sole and shoe upper in FIGS. **1**–**18** form no part of the claimed design.



## Des. 352,159

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,710,460 | 6/1955 | Stasinos | 36/28 X |
| 2,985,971 | 8/1960 | Murawski | 36/29 |
| 3,822,490 | 7/1974 | Murawski | 36/35 R |
| 4,223,457 | 9/1980 | Borgeas | 36/37 X |
| 4,237,625 | 12/1980 | Cole et al. | 36/28 |
| 4,262,433 | 4/1981 | Hagg et al. | 36/25 R |
| 4,322,892 | 4/1982 | Inohora | 36/29 |
| 4,438,573 | 3/1984 | McBarron | 36/3 B |
| 4,535,553 | 8/1985 | Derderian et al. | 36/28 |
| 4,573,279 | 3/1986 | Feurer-Zogel et al. | 36/35 R |
| 4,611,412 | 9/1986 | Cohen | 36/28 |
| 4,616,431 | 10/1986 | Dassler | 36/28 |
| 4,660,299 | 4/1987 | Omilusik | 36/7.8 |
| 4,663,865 | 5/1987 | Telecemian | 36/114 |
| 4,680,875 | 7/1987 | Danieli | 36/28 X |
| 4,680,876 | 7/1987 | Peng | 36/35 B |
| 4,715,130 | 12/1987 | Scatena | 36/28 X |
| 4,722,131 | 2/1988 | Huang . | |
| 4,815,221 | 3/1989 | Diaz | 36/28 X |
| 4,817,304 | 4/1989 | Parker et al. | 36/114 |
| 4,843,741 | 7/1989 | Yung-Mao | 36/114 |
| 4,878,300 | 11/1989 | Bogaty | 36/28 X |
| 4,881,329 | 11/1989 | Crowley | 36/38 |
| 4,887,367 | 12/1989 | Mackness et al. | 36/28 |
| 4,918,838 | 4/1990 | Chang | 36/28 |
| 4,918,841 | 4/1990 | Turner et al. | 36/114 |
| 4,936,029 | 6/1990 | Rudy | 36/29 |
| 4,936,030 | 6/1990 | Rennex | 36/28 |
| 4,956,927 | 9/1990 | Misevich et al. | 36/28 X |
| 5,014,449 | 5/1991 | Richard et al. | 36/114 |



FIG. 1



*FIG. 2*



*FIG. 3*



*FIG. 5*

*FIG. 6*



*FIG. 4*





*FIG. 8*



*FIG. 9*



*FIG. 11*

*FIG. 12*



*FIG. 10*



FIG. 13



FIG. 14



*FIG. 15*



*FIG. 17*

*FIG. 18*



*FIG. 16*

US00D352160S

# United States Patent [19]

## Kilgore

[11] Patent Number: Des. 352,160

[45] Date of Patent: ** Nov. 8, 1994

[54] **HEEL INSERT FOR A SHOE SOLE**

[75] Inventor: **Bruce J. Kilgore**, Lake Oswego, Oreg.

[73] Assignee: **Nike, Inc.**, Beaverton, Oreg.

[**] Term: **14 Years**

[21] Appl. No.: **20,267**

[22] Filed: **Mar. 23, 1994**

### Related U.S. Application Data

[62] Division of Ser. No. 786,932, Nov. 1, 1991.
[52] U.S. Cl. ..................................... **D2/967**; D2/964
[58] Field of Search ............... D2/896, 961, 946, 964, D2/965, 967, 950; 36/1, 3 B, 7.8, 28, 29, 35 R, 35 B, 37, 38, 43, 83, 84, 89, 112–114, 132, 136

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| D. 39,747 | 1/1909 | McKenna . |
| D. 136,960 | 1/1944 | Shuford ......................... D2/965 |
| D. 145,817 | 10/1946 | Payne ......................... D2/965 |
| D. 260,196 | 8/1981 | Plagenhoef . |
| D. 261,946 | 11/1981 | Trask ......................... D2/950 |
| D. 296,493 | 7/1988 | Diaz . |
| D. 308,285 | 6/1990 | Serna . |
| 413,693 | 10/1889 | Walker ......................... 36/7.8 X |
| 507,490 | 10/1893 | Gambino ......................... 36/28 |
| 622,673 | 4/1899 | Ferrata ......................... 36/3 B |
| 968,020 | 8/1910 | Yandoli ......................... 36/37 X |
| 1,075,039 | 10/1913 | Keith ......................... 36/1 |
| 1,469,717 | 10/1923 | Cutting ......................... 36/3 B |
| 2,048,683 | 7/1936 | Brockman ......................... 36/35 R |
| 2,399,543 | 4/1946 | Dack ......................... 36/76 |
| 2,710,460 | 6/1955 | Stasinos . |
| 2,985,971 | 8/1960 | Murawski . |
| 3,822,490 | 7/1974 | Murawski ......................... 36/35 R |
| 4,223,457 | 9/1980 | Borglas ......................... 36/37 X |
| 4,237,625 | 12/1980 | Cole et al. ......................... 36/28 |
| 4,262,433 | 4/1981 | Hagg et al. ......................... 36/35 B |
| 4,322,892 | 4/1982 | Inohora ......................... 36/29 |
| 4,438,573 | 3/1984 | McBarron ......................... 36/3 B |
| 4,535,553 | 8/1985 | Derderian et al. ......................... 36/28 |
| 4,573,279 | 3/1986 | Feurer-Zogel et al. ......................... 36/35 R |
| 4,611,412 | 9/1986 | Cohen ......................... 36/28 |
| 4,616,431 | 10/1986 | Dassler ......................... 36/28 |
| 4,660,299 | 4/1987 | Omilusik ......................... 36/7.8 |

| | | |
|---|---|---|
| 4,663,865 | 5/1987 | Telecemian ......................... 36/114 |
| 4,680,875 | 1/1987 | Dameli ......................... 36/28 X |
| 4,680,876 | 7/1987 | Peng ......................... 36/35 B |
| 4,715,130 | 12/1987 | Scatena ......................... 36/28 X |

(List continued on next page.)

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 51380 | 12/1911 | Austria ......................... 36/37 |
| 946494 | 6/1949 | France ......................... 36/7.8 |
| 1227420 | 8/1960 | France . |
| 1526637A1 | 12/1989 | U.S.S.R. . |

*Primary Examiner*—Louis S. Zarfas
*Attorney, Agent, or Firm*—Banner, Birch, McKie & Beckett

[57] **CLAIM**

The ornamental design for a heel insert for a shoe sole, as shown and described.

### DESCRIPTION

FIG. 1 is an elevational view of one side of a heel insert for a shoe sole showing my new design;
FIG. 2 is an elevational view of the other side thereof;
FIG. 3 is a top plan view thereof;
FIG. 4 is a rear elevational view thereof;
FIG. 5 is a cross sectional view taken along line 5—5 of FIG. 1;
FIG. 6 is a cross sectional view taken along line 6—6 of FIG. 1;
FIG. 7 is an elevational view of one side of a second embodiment of a heel insert for a shoe sole showing my new design;
FIG. 8 is an elevational view of the other side of the second embodiment;
FIG. 9 is a top plan view of the second embodiment;
FIG. 10 is a rear elevational view of the second embodiment;
FIG. 11 is a cross sectional view taken along line 11—11 of FIG. 7; and,
FIG. 12 is a cross sectional view taken along line 12—12 of FIG. 7.
The broken lines showing the remaining portions of the sole and shoe upper in FIGS. 1–12 form no part of the claimed design.



**Des. 352,160**

Page 2

## U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,722,131 | 2/1988 | Huang . |
| 4,815,221 | 3/1989 | Diaz ................................... 36/28 X |
| 4,817,304 | 4/1989 | Parker et al. ........................ 36/114 |
| 4,837,367 | 12/1989 | Mackness et al. . |
| 4,843,741 | 7/1989 | Yung-Mao ........................... 36/114 |
| 4,878,300 | 11/1989 | Bogaty ................................. 36/28 X |
| 4,881,329 | 11/1989 | Crowley ................................. 36/38 |
| 4,887,367 | 12/1989 | Mackness et al. ..................... 36/28 |
| 4,918,838 | 4/1990 | Chang ................................... 36/28 |
| 4,918,841 | 4/1990 | Turner et al. . |
| 4,936,029 | 6/1990 | Rudy . |
| 4,936,030 | 6/1990 | Rennex ................................. 36/28 |
| 4,956,927 | 9/1990 | Misevich et al. . |
| 5,014,449 | 5/1991 | Richard et al. ....................... 36/114 |



*FIG. 1*



*FIG. 2*



FIG. 3





*FIG. 7*



FIG. 8

Case 1:04-cv-12668-RGS     Document 18-20     Filed 05/02/2005     Page 50 of 72



FIG. 9



*FIG. 11*

*FIG. 12*

*FIG. 10*



US00D354617S

# United States Patent [19]

## Kilgore

[11] Patent Number: **Des. 354,617**

[45] Date of Patent: ** **Jan. 24, 1995**

[54] **HEEL INSERT FOR A SHOE SOLE**

[75] Inventor: **Bruce J. Kilgore,** Lake Oswego, Oreg.

[73] Assignee: **Nike Inc.,** Beaverton, Oreg.

[**] Term: **14 Years**

[21] Appl. No.: **20,275**

[22] Filed: **Mar. 23, 1994**

### Related U.S. Application Data

[62] Division of Ser. No. 786,932, Nov. 1, 1991, Pat. No. Des. 350,433.

[52] U.S. Cl. ..................................... **D2/964; D2/967**

[58] Field of Search ................ D2/896, 961, 946, 964, D2/965, 967, 950; 36/1, 3 B, 7.8, 27, 28, 29, 35 R, 35 B, 37, 76, 38, 43, 83, 84, 89, 112–114, 132, 136

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| D. 39,747 | 1/1909 | McKenna . |
| D. 136,960 | 1/1944 | Shuford ............................ D2/965 |
| D. 145,817 | 10/1946 | Payne ............................... D2/965 |
| D. 260,196 | 8/1981 | Plagenhoef . |
| D. 261,946 | 11/1981 | Trask ............................... D2/950 |
| D. 296,493 | 7/1988 | Diaz . |
| D. 308,285 | 6/1990 | Serna . |
| 413,693 | 10/1889 | Walker ......................... 36/7.8 X |
| 507,490 | 10/1893 | Gambino ........................... 36/28 |
| 622,673 | 4/1899 | Ferrata ............................ 36/3 B |
| 968,020 | 8/1910 | Yandoli ........................ 36/37 X |
| 1,075,039 | 10/1913 | Keith ................................. 36/1 |
| 1,469,717 | 10/1923 | Cutting ............................ 36/3 B |
| 2,048,683 | 7/1936 | Brockman ..................... 36/35 R |
| 2,399,543 | 4/1946 | Dack .................................. 36/76 |
| 2,710,460 | 6/1955 | Stasinos . |
| 2,985,971 | 8/1960 | Murawski . |
| 3,822,490 | 7/1974 | Murawski ..................... 36/35 R |
| 4,223,457 | 9/1980 | Borgeas ........................ 36/37 X |
| 4,237,625 | 12/1980 | Cole et al. ......................... 36/28 |
| 4,262,433 | 4/1981 | Hagg et al. .................... 36/35 B |
| 4,322,892 | 4/1982 | Inohora ............................. 36/29 |
| 4,438,573 | 3/1984 | McBarron ........................ 36/3 B |
| 4,535,553 | 8/1985 | Derderian et al. ............... 36/28 |
| 4,573,279 | 3/1986 | Feurer-Zogel et al. ........... 36/35 R |

| | | |
|---|---|---|
| 4,611,412 | 9/1986 | Cohen ............................... 36/28 |
| 4,616,431 | 10/1986 | Dassler ............................. 36/28 |
| 4,660,299 | 4/1987 | Omilusik .......................... 36/7.8 |
| 4,663,865 | 5/1987 | Telecemian ...................... 36/114 |
| 4,680,875 | 7/1987 | Danieli ......................... 36/28 X |
| 4,680,876 | 7/1987 | Peng ............................. 36/35 B |
| 4,715,130 | 12/1987 | Scatena ......................... 36/28 X |
| 4,722,131 | 2/1988 | Huang . |
| 4,815,221 | 3/1989 | Diaz ............................. 36/28 X |
| 4,817,304 | 4/1989 | Parker et al. ................... 36/114 |
| 4,843,741 | 7/1989 | Yung-Mao ...................... 36/114 |
| 4,878,300 | 11/1989 | Bogaty ......................... 36/28 X |
| 4,881,329 | 11/1989 | Crowley ............................ 36/38 |
| 4,887,367 | 12/1989 | Mackness et al. ................ 36/28 |
| 4,918,838 | 4/1990 | Chang .............................. 36/28 |
| 4,918,841 | 4/1990 | Turner et al. . |
| 4,936,029 | 6/1990 | Rudy . |
| 4,936,030 | 6/1990 | Rennex ............................. 36/28 |
| 4,956,927 | 9/1990 | Misevich et al. . |
| 5,014,449 | 5/1991 | Richard et al. ................... 36/114 |

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 51380 | 12/1911 | Austria .............................. 36/37 |
| 946494 | 6/1949 | France .............................. 36/7.8 |
| 1227420 | 8/1960 | France . |
| 1526637A1 | 12/1989 | U.S.S.R. . |

*Primary Examiner*—Louis S. Zarfas
*Attorney, Agent, or Firm*—Banner, Birch, McKie & Beckett

[57] **CLAIM**

The ornamental design for a heel insert for a shoe sole, as shown and described.

**DESCRIPTION**

FIG. 1 is an elevational view of one side of a heel insert for a shoe sole showing my new design;

FIG. 2 is an elevational view of the other side thereof;

FIG. 3 is a top plan view thereof;

FIG. 4 is a rear elevational view thereof;

FIG. 5 is a cross sectional view taken along line 5—5 of FIG. 1; and,

FIG. 6 is a cross sectional view taken along line 6—6 of FIG. 1.

The broken lines showing the remaining portions of the sole and shoe upper in FIGS. 1–6 form no part of the claimed design.



**U.S. Patent**      Jan. 24, 1995      Sheet 1 of 4      **Des. 354,617**





*FIG. 2*



FIG. 3



US00D377859S

# United States Patent [19]

**Bramani**

[11] Patent Number: **Des. 377,859**

[45] Date of Patent: ✳✳**Feb. 11, 1997**

[54] **COMBINED TREAD SURFACE AND PERIPHERY OF A SHOE SOLE**

[75] Inventor: **Marco Bramani**, Milan, Italy

[73] Assignee: **Vibram S.p.A.**, Albizzate, Italy

[**] Term: **14 Years**

[21] Appl. No.: **47,314**

[22] Filed: **Nov. 30, 1995**

[30] **Foreign Application Priority Data**

May 31, 1995 [WO]   WIPO ......................... DMA/002955

[52] **U.S. Cl.** .............................. **D2/953**; D2/957; D2/960
[58] **Field of Search** ............................. D2/897, 902, 906,
D2/908, 946–960, 962, 964; 36/101, 103,
104, 106, 113–115, 124, 126, 127–130,
3 B, 12–15, 22 R, 25 R, 32 R 32 A, 172

[56]                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D. 337,427 | 7/1993 | Tonkel ...................................... | D2/953 |
| D. 343,726 | 2/1994 | Kawasaki ................................. | D2/960 |
| D. 348,558 | 7/1994 | Saez ........................................ | D2/956 |
| D. 349,391 | 8/1994 | Yang ........................................ | D2/951 |
| D. 354,162 | 1/1995 | O'Rorke ................................. | D2/954 |
| D. 360,292 | 7/1995 | O'Rorke et al. ........................ | D2/951 |
| D. 368,795 | 4/1996 | Tanaka et al. .......................... | D2/954 |

*Primary Examiner*—Celia Murphy
*Attorney, Agent, or Firm*—Jacobson, Price, Holman & Stern, PLLC

[57]                **CLAIM**

The ornamental design for a combined tread surface and periphery of a shoe sole, as shown and described.

DESCRIPTION

FIG. **1** is a perspective view of a combined tread surface and periphery of a shoe sole showing my new design;
FIG. **2** is a bottom plan view thereof;
FIG. **3** is a right side elevational view thereof;
FIG. **4** is a left side elevational view thereof;
FIG. **5** is a rear edge elevational view thereof; and,
FIG. **6** is a front edge elevational view thereof.
The portions of the interior which are left unshaded are for illustrative purposes only and form no part of the claimed design.

**1 Claim, 4 Drawing Sheets**



**U.S. Patent**          Feb. 11, 1997          Sheet 1 of 4          **Des. 377,859**



Fig.1



Fig.2

**U.S. Patent**    Feb. 11, 1997    Sheet 3 of 4    **Des. 377,859**



Fig.3

Fig.4

# Fig.5



# Fig.6



US00D379864S

# United States Patent [19]

## Kayano

[11] **Patent Number:** **Des. 379,864**

[45] **Date of Patent:** \*\*Jun. 17, 1997

[54] **SHOE SOLE**

[75] Inventor: **Toshikazu Kayano**, Irvine, Calif.

[73] Assignee: **Asics Corporation**, Kobe, Japan

[**] Term: **14 Years**

[21] Appl. No.: **52,535**

[22] Filed: **Apr. 3, 1996**

[51] **LOC (6) Cl.** ..................................................... **02-04**
[52] **U.S. Cl.** ................................ **D2/960**; D2/951; D2/954; D2/956; D2/957
[58] **Field of Search** ............................ D2/897, 902, 906, D2/908, 946–960, 962, 964; 36/101, 103, 104, 106, 113–115, 124, 126, 127–130, 3 B, 12–15, 22 R, 25 R, 32 R, 32 A, 172

[56] **References Cited**

U.S. PATENT DOCUMENTS

D. 299,185   1/1989   Selbiger ............................... D2/959

| | | | |
|---|---|---|---|
| D. 343,048 | 1/1994 | Hauglin | D2/957 |
| D. 345,454 | 3/1994 | Hauglin | D2/957 |
| 4,559,723 | 12/1985 | Hamy et al. | 36/114 |
| 4,571,858 | 2/1986 | Faulin | 36/117 |

*Primary Examiner*—Celia Murphy
*Attorney, Agent, or Firm*—Michael E. Zall

[57] **CLAIM**

The ornamental design for a shoe sole, as shown and described.

**DESCRIPTION**

FIG. 1 is a right side elevational view of a shoe sole showing our new design in use, the broken line showing of a shoe being for illustrative purposes only and forming no part of the claimed design;
FIG. 2 is a left side elevational view thereof;
FIG. 3 is a top plan view thereof;
FIG. 4 is a bottom plan view thereof;
FIG. 5 is a front elevational view thereof; and,
FIG. 6 is a rear elevational view thereof.

**1 Claim, 5 Drawing Sheets**





FIG. 1



FIG. 2



FIG. 3



FIG. 4

**U.S. Patent**         Jun. 17, 1997         Sheet 5 of 5         **Des. 379,864**

# FIG. 5



# FIG. 6



US00D384192S

# United States Patent [19]

## Hsieh

[11] **Patent Number:** **Des. 384,192**

[45] **Date of Patent:** **∗∗Sep. 30, 1997**

[54] **BOUNCING SHOE**

[76] Inventor: **Frank Hsieh,** 9th-1 Floor, Kuang Fu South Road, Taipei, Taiwan

[∗∗] **Term:** **14 Years**

[21] Appl. No.: **47,951**

[22] Filed: **Dec. 15, 1995**

[51] **LOC (6) Cl.** ..................................... **02-04**

[52] **U.S. Cl.** ........................................ **D2/896**

[58] **Field of Search** ........................... D2/896, 902, 904, D2/907, 946; 36/7.1 A, 7.8, 1.5, 7.2, 132, 136, 100, 101, 28, 38; D21/66, 67, 72; 482/77

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D. 319,339 | 8/1991 | Stringham | D2/902 |
| 2,469,969 | 5/1949 | Lee | D2/896 X |
| 3,886,674 | 6/1975 | Pava | 36/38 |
| 3,996,677 | 12/1976 | Reina | 36/7.8 |
| 4,566,206 | 1/1986 | Weber | 36/7.8 |
| 5,282,325 | 2/1994 | Beyl | 36/27 |
| 5,435,079 | 7/1995 | Gallegos | D2/902 X |

*Primary Examiner*—Prabhakar G. Deshmukh
*Attorney, Agent, or Firm*—Browdy and Neimark

[57] **CLAIM**

The ornamental design for a "bouncing shoe", as shown and described.

## DESCRIPTION

FIG. 1 is a perspective view of a bouncing shoe showing my new design;
FIG. 2 is a right side elevational view thereof;
FIG. 3 is a left side elevational view thereof;
FIG. 4 is a front elevational view thereof;
FIG. 5 is a rear elevational view thereof;
FIG. 6 is top plan view thereof; and,
FIG. 7 is a bottom plan view thereof.

**1 Claim, 4 Drawing Sheets**





FIG. 1



FIG. 2



FIG. 3



FIG. 4



FIG. 5



FIG. 6



FIG. 7

# EXHIBIT D
# (Part 16 of 17)



US00D388241S

# United States Patent [19]

## Merceron

[11] **Patent Number:** **Des. 388,241**

[45] **Date of Patent:** **∗∗Dec. 30, 1997**

[54] **SHOE SOLE**

[75] Inventor: **Jean-Paul Merceron**, Monthodon, France

[73] Assignee: **L'Article Chaussant Europeen**, Chateau-Renault, France

[∗∗] Term: **14 Years**

[21] Appl. No.: **57,909**

[22] Filed: **Aug. 2, 1996**

[30]    **Foreign Application Priority Data**

Feb. 2, 1996 [FR] France ...................... 96 0657

[51] **LOC (6) Cl.** .......................................... **02-04**
[52] **U.S. Cl.** ................................................ **D2/959**
[58] **Field of Search** ........................... D2/902, 906, 908, D2/910, 946, 951, 953, 954, 956, 957, 959, 960, 962, 964; 36/25 R, 28, 29, 32 R, 43, 59 C, 44, 59 D, 84, 89, 101–107, 114, 132, 136

[56]    **References Cited**

U.S. PATENT DOCUMENTS

| D. 115,636 | 7/1939 | Sperry | D2/959 |
| D. 201,864 | 8/1965 | Smith | D2/959 |
| D. 317,627 | 6/1991 | Schneider | D2/959 |
| D. 322,509 | 12/1991 | Issler | D2/957 |
| D. 346,480 | 5/1994 | Davidson | D2/959 |
| D. 352,154 | 11/1994 | Merceron . | |
| D. 352,155 | 11/1994 | Merceron . | |
| D. 352,157 | 11/1994 | Merceron . | |
| D. 353,480 | 12/1994 | Merceron . | |
| 3,416,174 | 12/1968 | Novitske | D2/959 X |
| 5,231,776 | 8/1993 | Wagner | 36/132 |
| 5,448,839 | 9/1995 | Blissett et al. | 36/103 |

*Primary Examiner*—Ralf Seifert
*Attorney, Agent, or Firm*—Jacobson, Price, Holman & Stern, PLLC

[57]    **CLAIM**

The ornamental design for a shoe sole, as shown and described.

**DESCRIPTION**

FIG. 1 is a top plan view showing my new design for a shoe sole;
FIG. 2 is a bottom plan view thereof;
FIG. 3 is a right side elevational view thereof;
FIG. 4 is a left side elevational view thereof;
FIG. 5 is a toe end elevational view thereof; and,
FIG. 6 is a heel end elevational view thereof.

**1 Claim, 2 Drawing Sheets**



**U.S. Patent**        Dec. 30, 1997        Sheet 1 of 2        **Des. 388,241**



FIG.1



FIG.2



FIG.3



FIG.4



FIG.5



FIG.6



US00D404896S

# United States Patent [19]

## Cooper

[11] Patent Number: **Des. 404,896**

[45] Date of Patent: **∗∗Feb. 2, 1999**

[54] **PORTION OF A SHOE**

[75] Inventor: **Aaron Alexander Carroll Cooper**, Roznsis, Oreg.

[73] Assignee: **Nike, Inc.,** Beaverton, Oreg.

[∗∗] Term: **14 Years**

[21] Appl. No.: **90,577**

[22] Filed: **Jul. 10, 1998**

[51] LOC (6) Cl. ............................................... **02-99**

[52] U.S. Cl. .................................... **D2/947;** D2/972

[58] Field of Search ........................... D2/896, 902, 906, D2/907, 946, 947, 972–974; 36/114, 126–130, 45, 52, 53

[56]     **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D. 261,446 | 10/1981 | Schmohl . | |
| D. 262,581 | 1/1982 | Chevallereau . | |
| D. 279,044 | 6/1985 | Norton et al. . | |
| D. 285,022 | 8/1986 | Schornstein . | |
| D. 295,691 | 5/1988 | Zuidema et al. . | |
| D. 308,592 | 6/1990 | Kayano . | |
| D. 319,720 | 9/1991 | Selbiger | D2/972 |
| D. 319,725 | 9/1991 | Claveria . | |
| D. 324,131 | 2/1992 | Lucas . | |
| D. 332,861 | 2/1993 | Worthington . | |
| D. 335,571 | 5/1993 | Peterson . | |
| D. 357,570 | 4/1995 | Parisotto . | |
| D. 381,496 | 7/1997 | Smith | D2/972 |
| D. 385,409 | 10/1997 | Smith, III . | |
| D. 386,591 | 11/1997 | Kuerbia . | |
| D. 393,357 | 4/1998 | Cooper | D2/972 |
| D. 395,739 | 7/1998 | Mervar . | |
| 2,208,330 | 7/1940 | Oakley . | |
| 5,060,401 | 10/1991 | Whatley . | |

OTHER PUBLICATIONS

Nike Footwear Catalog, Late Spring 1998, p. 133. Published Sep. 1997.
Nike Footwear Catalog, Holiday, pp. 48 and 193. Published Mar. 1997.
Nike Footwear Catalog, Fall 1996, p. 6. Published Dec. 1995.
Nike Footwear Catalog, Holiday 1995, p. 83. Published Mar. 1995.

*Primary Examiner*—Dominic Simone
*Attorney, Agent, or Firm*—Banner & Witcoff, Ltd.

[57]     **CLAIM**

The ornamental design for a portion of a shoe, as shown and described.

**DESCRIPTION**

FIG. **1** is a rear perspective view of a portion of a shoe from one side thereof showing my new design;

FIG. **2** is a rear perspective view of the portion of a shoe from the other side thereof;

FIG. **3** is a side elevational view of one side thereof;

FIG. **4** is a rear elevational view thereof;

FIG. **5** is a side elevational view of the other side thereof; and,

FIG. **6** is a top plan view thereof.

The broken line showing of the reminder of the shoe shown in FIGS. **1–6** is for illustrative purposes only and forms no part of the claimed design.

**1 Claim, 3 Drawing Sheets**





FIG. 1



FIG. 2



FIG.3



FIG.4



FIG. 5



FIG. 6

US00D485053S

(12) **United States Design Patent** (10) Patent No.: **US D485,053 S**

McDowell (45) Date of Patent: ** **Jan. 13, 2004**

(54) **PORTION OF A SHOE MIDSOLE**

(75) Inventor: **Sean M. McDowell**, Beaverton, OR (US)

(73) Assignee: **Nike, Inc.**, Beaverton, OR (US)

(**) Term: **14 Years**

(21) Appl. No.: **29/183,291**

(22) Filed: **Jun. 11, 2003**

(51) **LOC (7) Cl.** .................................................. **02-99**
(52) **U.S. Cl.** ........................................ **D2/972**; D2/964
(58) **Field of Search** ........................ D2/896, 902, 907, D2/942, 944, 964, 967, 972–974; 36/28, 45, 50.1, 77 M, 77 R, 83, 88, 113, 114, 126–130

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 413,693 A | * | 10/1889 | Walker ............................ 36/28 |
| 1,088,328 A | * | 2/1914 | Cucinotta ........................ 36/28 |
| D325,288 S | * | 4/1992 | Richard et al. .............. D2/977 |
| D344,398 S | | 2/1994 | Kilgore |
| D344,399 S | | 2/1994 | Kilgore |
| D344,400 S | | 2/1994 | Kilgore |
| D350,018 S | | 8/1994 | Kilgore |
| D350,225 S | | 9/1994 | Kilgore |
| D350,227 S | | 9/1994 | Kilgore |
| D351,057 S | | 10/1994 | Kilgore |
| D351,720 S | | 10/1994 | Kilgore |
| D429,877 S | | 8/2000 | Lozano et al. |
| D431,898 S | | 10/2000 | Clegg et al. |
| D433,216 S | | 11/2000 | Avar et al. |
| D447,330 S | | 9/2001 | McCourt |

| | | | |
|---|---|---|---|
| D450,437 S | * | 11/2001 | Simpson et al. ............. D2/946 |
| D462,830 S | * | 9/2002 | Greene ........................ D2/946 |
| 6,457,261 B1 | * | 10/2002 | Crary ............................ 36/28 |
| D474,581 S | | 5/2003 | Cooper |
| D474,582 S | | 5/2003 | Cooper |
| D476,474 S | * | 7/2003 | McDowell ................... D2/972 |

OTHER PUBLICATIONS

Nike Footwear Catalog Holiday 2001, p. 33, published Feb. 2001.
Nike Footwear Catalog Holiday 2003, p. 36, published Mar. 2003.
Nike Footwear Catalog Holiday 2003, p. 83, published Mar. 2003.

* cited by examiner

*Primary Examiner*—Dominic Simone
(74) *Attorney, Agent, or Firm*—Banner & Witcoff, Ltd.

(57) **CLAIM**

The ornamental design for a portion of a shoe midsole, as shown and described.

**DESCRIPTION**

FIG. **1** is a perspective view of a portion of a shoe midsole showing my new design;
FIG. **2** is a second perspective view thereof; and,
FIG. **3** is a side view thereof.
The uneven broken line immediately adjacent to the shaded area represents an unclaimed boundary of the design. The uneven broken line showing of the remainder of the shoe is for illustrative purposes only and forms no part of the claimed design.

**1 Claim, 3 Drawing Sheets**





FIG. 1



FIG. 2



FIG.3



(19) Europäisches Patentamt

European Patent Office

Office européen des brevets

(11) Publication number: **0 299 669 B1**

(12) **EUROPEAN PATENT SPECIFICATION**

(45) Date of publication of patent specification: **15.12.93**    (51) Int. Cl.⁵: **A43B  13/18**

(21) Application number: 88306144.2

(22) Date of filing: 06.07.88

(54) **Sports or casual shoe with shock absorbing sole.**

(30) Priority: **09.07.87 GB 8716200**
**31.05.88 GB 8812867**

(43) Date of publication of application:
**18.01.89 Bulletin  89/03**

(45) Publication of the grant of the patent:
**15.12.93 Bulletin  93/50**

(84) Designated Contracting States:
**AT BE CH DE ES FR GR IT LI LU NL SE**

(56) References cited:
| | |
|---|---|
| **EP-A- 0 111 084** | **DE-U- 8 703 244** |
| **FR-A- 1 018 215** | **FR-A- 2 492 236** |
| **GB-A- 223 748** | **GB-A- 2 145 615** |
| **GB-A- 2 183 446** | **GB-A- 2 188 825** |
| **GB-A- 2 203 025** | **US-A- 1 506 975** |
| **US-A- 4 342 157** | |

(73) Proprietor: **HI-TEC SPORTS PLC**
**Hi-Tec House**
**Aviation Way**
**Southend-on-Sea Essex SS2 6GH(GB)**

(72) Inventor: **Mackness, Terry**
**Hi-Tec Sports PLC**
**Hi-Tec House**
**Aviation Way**
**Southend-on-Sea Essex SS2 6GH(GB)**
Inventor: **Van Wezel, Frank**
**Hi-Tec Sports PLC**
**Hi-Tec House**
**Aviation Way**
**Southend-on-Sea Essex SS2 6GH(GB)**

(74) Representative: **Milhench, Howard Leslie et al**
**R.G.C. Jenkins & Co.**
**26 Caxton Street**
**London SW1H 0RJ (GB)**

EP 0 299 669 B1

Note: Within nine months from the publication of the mention of the grant of the European patent, any person may give notice to the European Patent Office of opposition to the European patent granted. Notice of opposition shall be filed in a written reasoned statement. It shall not be deemed to have been filed until the opposition fee has been paid (Art. 99(1) European patent convention).

Rank Xerox (UK) Business Services
(3. 10 / 3.6 / 3.3. 1)

## Description

The present invention relates generally to sports shoes or casual shoes and more specifically concerns shoes incorporating improved shock absorbing soles.

## BACKGROUND OF THE INVENTION

Generally speaking, most people put their bodies under varying degrees of impact during exercise and it has been established that the forces exerted on the heel and the ball or front sole of the feet during running are three to four times higher than those exerted during normal walking. Thus during running or jogging the reaction forces exerted on the body from the ground may be three to four times higher than individual body weight and not only is this the cause of many sports injuries but also it makes the participants tired or exhausted. Sports shoes for running or jogging or playing games and casual shoes for walking are commercially available in a variety of designs, but generally speaking the soles of such shoes and consequently the shoes in their entirety do not match the individual requirements of the wearer as regards providing the desired degree of resilience and elasticity.

It is known to provide means in a sports shoe for enabling the characteristics of the shoe to be adapted to the requirements of the user. For example, in US Patent No. 4 430 810 there is described an arrangement wherein a number of bores extend through the relatively soft material of the heel portion of a running shoe from one side thereof to the other, the bores being spaced apart from each other in the longitudinal heel-to-toe direction of the shoe, and rod-shaped stiffening members of selectable greater hardness than the soft heel material can be inserted into the bores so as selectively to increase the overall hardness of the sole and adapt the shock-absorbing capabilities of the shoe to the individual requirements of the runner and to the nature of the surface upon which he intends to run. The proposal to stiffen the heel of a shoe by insertion of appropriate stiffening elements into bores in the heel is known also from French Patent No. 958766, and in US Patent No. 3785646 there is disclosed a shoe having a rubber sole with transverse bores into which rod-like metal weights may be inserted. Another arrangement is known from our British Patent No. 2156654 which not only enables heel hardness characteristics to be selectively varied to suit the requirements of the wearer, but also allows different relative hardnesses to be achieved on different sides of the heel for controlling rear-foot movement and minimizing the risk of damage through excessive pronation or supination.

Another known arrangement of only marginal interest to the present invention is disclosed in European Patent Application Serial No. 0161653.

It is further known to incorporate air pockets into the heel portion and/or the sole portion of a shoe so as to provide shock absorption and/or resiliency properties. Described in British Patents Nos. 2150010 and 2183446 are shoes which incorporate an inflatable bladder within a cavity in the heel portion of the shoe, the degree of inflation of the bladder in each case being selectively variable. The shoe of British Patent No. 2150010 also incorporates a plurality of sealed air pockets generally in the metatarsal region of the ball of the foot. Disclosed in European Patent Application Serial No. 0160880 is a moulded shoe sole wherein air can transfer between cavities defined by bulges moulded into the sole and heel portions for providing shock absorption and movement facilitation characteristics, though without any possibility of adjusting the air pressure within the cavities. A similar arrangement to that disclosed in European Patent Application Serial No. 0160880 is described in British Patent Application No. 2073006, and in the latter case means are provided to enable the desired fluid pressure in the interconnected cavities to be determined. A shoe provided with a selectively inflatable insole is described in British Patent No. 358205. The shoe described in International Patent Application No. WO 82/00571 has a gas pressure chamber in its sole and includes a pump arrangement which keeps the gas pressure constant. Other shoes incorporating pneumatic structures in their heel and/or sole portions are described in British Patent Specifications Nos. 390368, 490647, 2023405 and 2034169 and in US Patent Specifications Nos. 4 183 156, 4 219 945 and 4 271 606.

None of the aforementioned documents is considered to disclose a sports shoe which affords to the user a sufficient degree of resilience coupled with selectability as regards hardness characteristics particularly within the heel region of the shoe.

## SUMMARY OF THE INVENTION

According to the present invention there is provided a sports shoe or casual shoe comprising an upper, a sole, and a removable footbed, said sole comprising a wear-resistant outsole, a midsole, and an insole, said removable footbed overlying said insole, and wherein an opening in said insole in the region thereof which corresponds to the heel of said shoe communicates with a recess in said midsole, and a pneumatic resilient member is accommodated in said recess, as known from GB-A-2183446 for example, the shoe according to the invention being characterized in that said pneu-

3                     EP 0 299 669 B1                     4

matic resilient member comprises a generally cy-
lindrical body portion axially received in said re-
cess and supported by the axially innermost end of
said recess, and an enlarged head portion having a
domed upper surface underlying said removable
footbed and peripherally supported by said insole,
the cylindrical surface of the body portion of said
pneumatic resilient member being concertina-pleat-
ed whereby the pneumatic resilience of said mem-
ber is predominantly axially directed.

In the structure of an exemplary sport or casual
shoe in accordance with the present invention, the
shoe has an upper, a sole extending the full length
of the shoe from the heel to the toes and a remov-
able footbed, and the sole comprises a treaded
wear-resistant outsole, a mid-sole portion formed
for example of foamed plastics material and an
insole formed of a board material such as Texon
board. The heel, and possibly also the metatarsal
region of the front sole, is provided with one or
more punched holes or otherwise formed recesses
which penetrate through the insole and part way
through the mid-sole towards the outsole. These
recesses underlying the removable footbed are ac-
cessible to the wearer and may be used by the
wearer to removably accommodate pneumatic re-
silient members as aforesaid, more specifically
comprising generally cylindrical air-filled bodies ax-
ially received within the recesses and having
concertina-folded cylindrical walls whereby the re-
silience of the bodies is concentrated predomi-
nantly in their axial direction so as to be of greatest
assistance to the wearer of the shoe. The air-filled
bodies may be arranged to be selectively inflatable
for determining their hardness characteristics so as
to ensure that they provide adequate elasticity and
support during sporting and recreational activities.

By virtue of the shoe structure according to the
present invention, impact forces arising from con-
tact with the ground can be accommodated to suit
the special requirements of the user. Particularly in
the case where the bodies incorporated into the
shoe sole are inflatable but also in other cases
where they are simply replaceable by alternative
bodies of different resilience characteristics, the
shock absorber bodies can be selectively adjusted
to provide or to maintain a given elastic response.
Furthermore, the weight of the shoe itself can be
reduced, because the punched hole portions can
accommodate insert bodies in the form of air sacs
which are certainly lighter than the EVA or PU
(polyurethane) materials commonly used for the
midsole; during exercise, the lighter the shoes, the
greater generally are the benefits to the exerciser.
Additionally, the geometric shape of the insert bod-
ies enables optimum elasticity characteristics to be
achieved, and by providing the wearer with direct
access to the insert bodies, the option is obtained

to further increase the flexibility of use by varying
the degree of inflation of the bodies with air or
other gases, or even by the injection of fluids such
as oils, emulsions, water, hydrogen, helium etc.,
into the bodies.

Other features of the present invention are set
forth with particularity in the appended claims and
will become apparent from the following detailed
description of exemplary embodiments which are
illustrated in the accompanying drawings.

DESCRIPTION OF THE DRAWINGS

Fig.1 shows schematically a side-elevation view
of the construction of the heel portion of an
exemplary sports shoe in accordance with the
present invention; and
Fig.2 is a schematic sectional end-elevation view
of the heel portion of the sports shoe of Fig.1.

DESCRIPTION OF THE EMBODIMENT

Referring to Figs.1 and 2 of the drawings, the
shoe shown schematically therein comprises an
upper 21 and a sole 22, the sole comprising a
rubber outsole layer 23, a midsole 24 formed of
one or more layers of compression moulded EVA
for example, an insole 25 formed of Texon board
for example, and a removable footbed 26 which
desirably is reinforced so as to contribute to the
lateral stability of the shoe for example by being
transversely ridged. As shown, an opening 27 is
provided in the insole 25 in registry with a recess
28 formed in the midsole 24, a reinforcing piece of
Texon board 29 is provided in the bottom of the
recess 28, and a gas-filled member 30 is received
partially within the recess 28.

The gas-filled member 30 as shown has a
domed upper or head portion 31 of greater trans-
verse dimension than the opening 27 provided in
the insole 25 so that such head portion 31 does not
fit into the recess 28 formed in the midsole 24, but
rather rests upon the upper surface of the Texon
insole 25 around the periphery of the opening 27
and defines an upwardly domed gas cushion seat-
ed on the insole. A body portion 32 of the gas-filled
member 30 is of generally cylindrical shape with
concertina side walls as shown and a flat base and
fits into the recess 28 formed in the midsole 24.

The gas-filled member 30 is preferably ar-
ranged to be removable from its accommodating
recess in the shoe sole and different members
having different gas pressures can be made avail-
able whereby the shoe can be configured to suit
the requirements of the user. Additionally, or alter-
natively, the gas-filled member 30 can as shown be
provided with a valve 33 enabling it to be selec-
tively inflated or deflated, thus to increase or de-

5                              **EP 0 299 669 B1**                              6

crease the hardness characteristics of the member 30 body for matching the shoe to the body weight and individual requirements of the wearer. This facility is advantageous particularly in the course of a long run, such as a marathon, or a long game since it enables the shoe characteristics to be adjusted during the run or during the game to take account of different conditions and changing levels of fatigue. On a long run, running shoes can become up to 15 ° C hotter than at the start of the run, on account of friction effects, which can cause the member 30 to become undesirably firm and insufficiently cushioning. This problem can be overcome by adjusting the pressure of the inflatable member 30. In use of a sports shoe constructed in accordance with the present invention, the presence of the resilient member provides excellent cushioning and protection against shock, and also provides a resilience to the shoe characteristics which is invigorating and beneficial, the resilience of the gas-filled member as it resiles from its compressed state as the foot is lifted providing a positive spring to the step of the wearer.

By virtue of the concertina-pleated side walls of the gas-filled member 30, the advantage is obtained that the pneumatic resilience of the member is substantially unidirectional and in the axial direction of its accommodating recess which is advantageous as regards the stability of the shoe.

The lateral edges of the midsole 24, at least in the region of the heel of the shoe, may be of increased durometer hardness than the central midsole region to ensure that the lateral stability of the shoe is maintained during the life of the shoe. This might for example be achieved by forming the midsole of a number of different portions formed of different density materials and adhered together.

The gas-filled member 30 can be made in the form of a single hollow gas-filled sac formed of a suitable synthetic plastics material, or could be a composite body formed as a plurality of gas-filled sacs adhered together. Alternatively, the gas-filled member 30 could be formed in whole or in part as a closed-cell foamed plastics structure. Additionally, pneumatic resilience could be provided in the ball of the foot region of the shoe by incorporation therein of resilient bodies similar to the member 30 or of any other suitable shape and form. Furthermore, whilst Figs. 1 and 2 show the provision of only one resilient member 30 in the heel of the shoe, it will be appreciated that more than one such member could be provided.

**Claims**

1.   A sports shoe or casual shoe comprising an upper, (21) a sole (22), and a removable footbed (26), said sole comprising a wear-resistant outsole (23), a midsole (24), and an insole (25), said removable footbed (26) overlying said insole (25), and wherein an opening (27) in said insole (25) in the region thereof which corresponds to the heel of said shoe communicates with a recess (28) in said midsole (24), and a pneumatic resilient member (30) is accommodated in said recess, characterized in that said pneumatic resilient member (30) comprises a generally cylindrical body portion (32) axially received in said recess and supported by the axially innermost end of said recess, and an enlarged head portion (31) having a domed upper surface underlying said removable footbed (26) and peripherally supported by said insole (25), the cylindrical surface of the body portion (32) of said pneumatic resilient member (30) being concertina-pleated whereby the pneumatic resilience of said member (30) is predominantly axially directed.

2.   A shoe as claimed in claim 1 wherein said pneumatic resilient member (30) is removably received in said recess (28).

3.   A shoe as claimed in claim 1 or 2 wherein a plurality of said recesses (28) are provided in the heel region of the shoe and a said pneumatic resilient member (30) is accommodated in each said recess (28).

4.   A shoe as claimed in claim 1 or 2 or 3 wherein the pneumatic resilience of the or each said pneumatic resilient member (30) is selectively adjustable by virtue of the or each said pneumatic resilient member (30) comprising a gas-filled body including valve means (33) whereby the gas pressure may be selectively adjusted.

5.   A shoe as claimed in any of the preceding claims wherein a plurality of further recesses are formed in said midsole (24) in the region thereof corresponding to the metatarsal region of a wearer's foot and a resilient body is received in each of said further recesses.

6.   A shoe as claimed in claim 5 wherein the resilient bodies received in said further recesses are removably received therein for enabling the hardness characteristics thereof to be selected by a user, the further recesses being accessible by removal of the removable footbed (26).

7.   A shoe as claimed in any of the preceding claims wherein the lateral edges of the midsole, at least in the region of the heel of the shoe are of increased durometer hardness

7                           EP 0 299 669 B1                          8

than the central midsole region.

**Patentansprüche**

1. Sport- oder Freizeitschuh, umfassend einen Schaft (21), eine Sohle (22) und ein herausnehmbares Fußbett (26), wobei die Sohle eine abriebfeste Laufsohle (23), eine Zwischensohle (24) und eine Brandsohle (25) umfaßt, wobei das herausnehmbare Fußbett (26) auf der Brandsohle (25) liegt, und wobei eine Öffnung (27) in der Brandsohle (25) in ihrem dem Schuhabsatz entsprechenden Bereich mit einer Ausnehmung (28) in der Zwischensohle (24) in Verbindung steht und in dieser Ausnehmung ein pneumatisches elastisches Element (30) untergebracht ist, dadurch gekennzeichnet, daß das pneumatische elastische Element (30) einen generell zylindrischen Hauptteil (32), der in der Ausnehmung axial angeordnet ist und auf deren axial innerstem Ende aufliegt, sowie einen sich an seinem Rand auf der Brandsohle (25) abstützenden erweiterten Kopfteil (31) mit einer unter dem herausnehmbaren Fußbett (26) liegenden balligen Oberfläche aufweist, wobei die Zylinderfläche des Hauptteils (32) des pneumatischen elastischen Elements (30) mit einer Ziehharmonika-Faltung versehen ist, so daß die pneumatische Elastizität dieses Elements (30) vorwiegend axial gerichtet ist.

2. Schuh nach Anspruch 1, wobei das pneumatische elastische Element (30) herausnehmbar in der Ausnehmung (28) angeordnet ist.

3. Schuh nach Anspruch 1 oder 2, wobei im Absatzbereich des Schuhs mehrere der Ausnehmungen (28) vorgesehen sind und in jeder davon ein besagtes pneumatisches elastisches Element (30) angeordnet ist.

4. Schuh nach einem der Ansprüche 1 bis 3, wobei die pneumatische Elastizität des bzw. jedes pneumatischen elastischen Elements (30) dadurch selektiv einstellbar ist, daß es einen gasgefüllten Hauptteil mit einer Ventileinrichtung (33) zur selektiven Einstellung des Gasdrucks umfaßt.

5. Schuh nach einem der vorhergehenden Ansprüche, wobei in der Zwischensohle (24) in deren dem Mittelfußbereich des Trägers entsprechenden Bereich mehrere weitere Ausnehmungen ausgebildet sind, in deren jeder ein elastischer Körper angeordnet ist.

6. Schuh nach Anspruch 5, wobei die elastischen Körper in den weiteren Ausnehmungen heraus-

nehmbar angeordnet sind, so daß der Benutzer ihre Härteeigenschaften wählen kann, und wobei die weiteren Ausnehmungen durch Entfernen des herausnehmbaren Fußbetts (26) zugänglich sind.

7. Schuh nach einem der vorhergehenden Ansprüche, wobei die Seitenkanten der Zwischensohle mindestens im Bereich des Schuhabsatzes eine höhere Durometer-Härte aufweisen als im mittleren Zwischensohlenbereich.

**Revendications**

1. Chaussure de sport ou chaussure de loisir comprenant une empeigne (21), une semelle (22) et une première amovible (26), ladite semelle comprenant une semelle externe résistante à l'usure (23), une semelle intermédiaire (24) et une semelle intérieure (25), ladite première amovible (26) recouvrant ladite semelle intérieure (25) et dans laquelle une ouverture (27) dans ladite semelle intérieure (25) dans la zone correspondant au talon de ladite chaussure communique avec un creux (28) dans ladite semelle intermédiaire (24) et une pièce élastique pneumatique (30) est logée dans ledit creux,
       chaussure caractérisée en ce que ladite pièce élastique pneumatique (30) comprend une partie de corps globalement cylindrique (32) logée, de façon axiale, dans ledit creux et supportée par l'extrémité axiale la plus interne dudit creux et une partie de tête agrandie (31) possédant une surface supérieure bombée sous-jacente à ladite première amovible (26) et supportée sur la périphérie par ladite semelle intérieure (25), la surface cylindrique de ladite partie de corps (32) de ladite pièce élastique pneumatique (30) étant plissée de façon télescopique, l'élasticité pneumatique de ladite pièce élastique pneumatique (30) étant ainsi essentiellement axiale.

2. Chaussure selon la revendication 1, dans laquelle ladite pièce élastique pneumatique (30) est logée, de façon amovible, dans ledit creux (28).

3. Chaussure selon la revendication 1 ou 2, dans laquelle une pluralité desdits creux (28) sont prévus dans la zone de talon de la chaussure et une dite pièce élastique pneumatique (30) est logée dans chacun desdits creux (28).

4. Chaussure selon la revendication 1, 2 ou 3, dans laquelle l'élasticité pneumatique de la ou de chaque dite pièce élastique pneumatique

5

9                    **EP 0 299 669 B1**                    10

(30) est réglable, de façon sélective, en vertu de la ou de chaque dite pièce élastique pneumatique (30) comprenant un corps rempli de gaz muni d'un moyen de soupape (33), la pression du gaz pouvant être ainsi réglée de façon sélective.

5.  Chaussure selon l'une quelconque des revendications précédentes, dans laquelle une pluralité de creux supplémentaires sont formés dans ladite semelle intermédiaire (24) dans une zone correspondant à la région du métatarse du pied de l'utilisateur et un corps élastique est logé dans chacun desdits creux supplémentaires.

6.  Chaussure selon la revendication 5, dans laquelle les corps élastiques logés dans lesdits creux supplémentaires sont reçus, de façon amovible, pour permettre à sa caractéristique de dureté d'être choisie par un utilisateur, les creux supplémentaires étant accessibles par enlèvement de la première amovible (26).

7.  Chaussure selon l'une quelconque des revendications précédentes, dans laquelle les bords latéraux de la semelle intermédiaire, au moins dans la zone du talon de la chaussure, présentent une dureté accrue par rapport à la zone de la semelle intermédiaire centrale.

6

EP 0 299 669 B1

FIG.1.



FIG.2.



⑲ RÉPUBLIQUE FRANÇAISE

INSTITUT NATIONAL
DE LA PROPRIÉTÉ INDUSTRIELLE

PARIS

⑪ N° de publication : **2 563 979**
(à n'utiliser que pour les commandes de reproduction)

㉑ N° d'enregistrement national : **84 07223**

�51 Int Cl⁴ : A 43 B 13/20.

⑫      **DEMANDE DE BREVET D'INVENTION**      A1

㉒ Date de dépôt : 10 mai 1984.

㉚ Priorité :

㊸ Date de la mise à disposition du public de la demande : BOPI « Brevets » n° 46 du 15 novembre 1985.

㉟ Références à d'autres documents nationaux apparentés :

㉑ Demandeur(s) : *MOZAYAN Gaspard.* — FR.

㉒ Inventeur(s) : Gaspard Mozayan.

㉓ Titulaire(s) :

㉔ Mandataire(s) : Cabinet Beau de Loménie.

㊹ Semelage à coussin d'air pour chaussures diverses et notamment pour chaussures de sport.

�57 Le semelage comprend une semelle d'usure 4 et une première 3 pour le montage de la tige 1.

Selon l'invention, une cavité unique 7 s'étendant sur une partie au moins de la longueur du semelage est ménagée entre la première de montage 3, la semelle d'usure 4 et une paroi périphérique 5 sensiblement verticale reliant ces dernières avec étanchéité, cette paroi présentant, sur une partie au moins de son étendue, une épaisseur variable pour être aplatissable (en 10 à 12) avec rappel élastique amorti.



FR 2 563 979 - A1

2563979

1

## Semelage à coussin d'air pour chaussures diverses et notamment pour chaussures de sport.

       La présente invention concerne un semelage à coussin d'air pour chaussures destinées aux utilisations les plus variées : ville, sport, travail, montagne, appartement etc...

5        Un tel semelage comprend une semelle d'usure et une première pour le montage de la tige, un vide étant ménagé entre elles.

       Un premier semelage connu de ce type comporte sur la semelle des cloisonnements sur lesquels la première
10 s'appuie. Dès lors, le pied repose sur les parties dures, constituées par les cloisonnements ainsi que sur les caissons d'air ménagés entre eux. Ce premier semelage procure un confort limité.

       Un deuxième semelage connu de ce type comporte
15 une chambre à air insérée entre la première et la semelle d'usure. Le confort se trouve amélioré, mais un inconvénient majeur apparaît : la vessie s'use prématurément ; lors de la marche par friction contre la semelle d'usure et la première.

20        Un troisième semelage connu mais d'un type différent ne pouvant pas s'assimiler à celui du coussin d'air comporte un élément amortisseur situé sous le talon et constitué par une petite vessie aplatie, interposée à cet endroit entre la première de montage et la pre-
25 mière de propreté. Ce moyen n'apporte qu'un confort très réduit.

       La présente invention a pour but de remédier aux inconvénients de ces semelages connus en réalisant un véritable coussin d'air exerçant une action d'amortisseur,
30 ce coussin d'air assurant un confort parfait du pied et en même temps une bonne statique du corps, une isolation thermique et à l'humidité.

       Dans ce but et conformément à l'invention, une

2563979

2

cavité unique s'étendant sur une partie au moins de la
longueur du semelage est ménagée entre la première de
montage, la semelle d'usure et une paroi périphérique
sensiblement verticale reliant ces dernières avec étan-
5    chéité, cette paroi présentant, sur une partie au moins
de son étendue, une épaisseur variable pour être aplatis-
sable avec rappel élastique amorti.

      Suivant une forme de réalisation particulière-
ment avantageuse, la paroi périphérique est venue de mou-
10    lage avec la semelle d'usure.

      La cavité peut être limitée en étendue et s'é-
tend alors de l'arrière du talon jusqu'à la pliure du
pied. Dans cette zone, et que la cavité soit limitée à
celle-ci ou qu'elle se prolonge jusqu'au bout du pied,
15    la paroi périphérique présente, en arrière de la pliure
du pied, plusieurs saignées superposées et profilées sen-
siblement en V afin de former un soufflet.

      De préférence, la première est armée à l'en-
droit de la cambrure et du talon pour être indéformable.
20    La face inférieure de la première est revêtue d'un film
étanche, appliqué de préférence par projection ou enduc-
tion. La cavité interne du semelage est définitivement
isolée de l'extérieur.

      Ainsi, ce semelage permet d'éviter les répercu-
25    tions dans le corps des chocs et vibrations prenant nais-
sance au contact du sol, ainsi que les mouvements latéraux
involontaires des chevilles dûs au relief du sol.

      Divers    autres caractéristiques et avantages
de l'invention ressortent d'ailleurs de la description
30    détaillée qui suit.

      Une forme de réalisation de l'objet de l'inven-
tion est représentée, à titre d'exemple non limitatif,
sur le dessin annexé.

      Sur ce dessin :
35          - la fig. 1 est une élévation-coupe longitudi-
nale d'une chaussure faisant application d'un semelage

2563979

3

conforme à l'invention,

- la fig. 2 est une perspective illustrant la semelle d'usure de ce semelage, le trait mixte permettant de schématiser une variante de réalisation.

5  - les fig. 3 à 5 sont des coupes transversales prises suivant les lignes III-III à V-V respectivement de la fig. 2, la fig. 4 montrant cependant les autres parties du semelage et de la tige tels que représentés sur la figure 1.

10  - la fig. 6 est une coupe prise en travers de la première et de ses accessoires, sensiblement suivant la ligne III-III précitée, pour illustrer un mode d'exécution de l'équilibre pneumatique du coussin d'air.

- les fig. 7 et 8 sont des vues partielles analogues à la fig. 4, concernant deux autres modes d'exécution de cet équilibre.

15  Ainsi que cela ressort clairement de la fig. 1, la chaussure comporte une tige 1 fixée par son rebord inférieur 2 sur une première de montage 3. Elle comporte

20  également une semelle d'usure 4 en matière plastique moulée à base de caoutchouc, de polyuréthane ou autre, semelle sur laquelle est venue de moulage, en saillie vers le haut, une paroi périphérique 5 sur le dessus de laquelle sont soudés ou collés le rebord 2 et la première 3 ; la

25  paroi 5 peut présenter une bordure de finition 6 qui se trouve alors solidarisée avec le côté de la tige, en même temps que la paroi elle-même l'est avec la première.

Dans l'exemple représenté, la paroi périphérique 5 fait partie intégrante de la semelle d'usure 4.

30  Bien que cette réalisation soit la plus économique, rien ne s'oppose à ce que ladite paroi 5 soit intégrée à la tige 1 montée sur la première 3 ou bien qu'elle en soit distincte ainsi que de la semelle d'usure 4. L'important est que la fixation de l'ensemble 1,3,4,5 soit

35  parfaitement étanche.

2563979

4

En effet, suivant la forme de réalisation re-
présentée, la paroi 5 délimite,entre la première 3 et
la semelle d'usure 4,une cavité unique 7 constituant le
coussin d'air ; elle est unique en ce sens qu'elle est
5      exempte de cloisonnements sur lesquels la première 3
pourrait reposer.

De préférence, la première 3, généralement
en cuir , est armée avec une plaque métallique 8 ou au-
tre ,s'étendant à l'endroit de la cambrure et du talon
10     (fig. 1), cette plaque étant conformée en correspondance
avec ceux-ci.

Par ailleurs, un film étanche 9 revêt le des-
sous de la première armée 3,8 jusqu'à la paroi 5, film
qui peut être appliqué par projection, enduction, colla-
15     ge ou autre. Ainsi, l'air emprisonné dans la cavité 7
ne peut pas s'échapper (fig. 1 à 5) à moins que cela
soit prévu et seulement par les orifices ménagés spéciale-
ment dans les modes d'exécution décrits dans ce qui suit
en se référant aux fig. 6 à 8. Dès lors, cet air consti-
20     tue un matelas pneumatique ayant un effet élastique amor-
tisseur.

Il est important de remarquer que la paroi pé-
riphérique 5 présente une relative raideur latérale, en
raison de son épaisseur bien qu'elle soit constituée par
25     la même matière relativement souple qui forme la semelle
d'usure 4. Par suite, la tendance au déversement latéral
et à l'avachissement du semelage 3,4,5 se trouve-t-elle
annihilée et la statique du corps assurée.

Cependant, cette paroi périphérique 5 est, mal-
30     gré cela, aplatissable sur une partie au moins de son é-
tendue. A cet effet, des saignées longitudinales sont
ménagées de moulage dans l'épaisseur de la paroi 5. Elles
peuvent déboucher dans la cavité 7, comme cela est repré-
senté pour la forme de réalisation préférentielle illus-
35     trée par les fig. 1 à 5, mais elles peuvent aussi débou-
cher à l'extérieur. Rien ne s'oppose en outre à ce que

2563979

5

certaines débouchent à l'extérieur et d'autres à l'inté-
rieur ou encore que les côtés intérieur et extérieur de
la paroi 5 étant exempts de saignées, celles-ci soient
ménagées dans la masse en définissant une fente de démou-
5      lage débouchant sur le dessus  de la paroi.

Quel que soit le mode d'exécution retenu, la
forme de réalisation selon les fig. 1 à 5 prévoit que :

- la paroi périphérique 5 délimite, en avant de
la pliure du pied et sur tout le pourtour antérieur, une
10     rainure 10 de préférence mince et à flancs sensiblement
parallèles,

- cette paroi 5 délimite, en arrière de la pliu-
re du pied et sur tout le pourtour postérieur, deux sai-
gnées 11, 12 superposées et profilées sensiblement en V
15     pour former un soufflet,

- ladite paroi 5 est raidie, derrière la pliure
du pied à la naissance de la cambrure, en étant pleine  à
cet endroit 13, ce raidisseur 13 étant exempt de saignées
et pouvant même être renforcé.

20     Dans cette forme de réalisation, la cavité 7
occupe toute la longueur du semelage 3 à 5. Mais il est
bien évident qu'elle peut être limitée à une partie seu-
lement de l'étendue de la semelle. Ainsi, selon une va-
riante illustrée en trait mixte sur la fig. 2, la cavité
25     7a s'étend sous le talon jusqu'à un épaulement 14 qui li-
mite la partie antérieure 7b, dite pleine, du semelage ;
en réalité, cette partie pleine est allégée par des évi-
dements ménageant des cloisonnements d'appui pour la pre-
mière 3.

30     Qu'il s'agisse de la réalisation en trait plein
ou de la variante en trait mixte, le semelage ainsi cons-
titué est souple, léger, confortable, isolant, étanche et
relativement bon marché.

Dans cette réalisation ou sa variante, la cavi-
35     té interne 7 est définitivement isolée de l'extérieur et
le coussin d'air stabilisé à la fabrication.

2563979

6

Selon d'autres modes d'exécution illustrés par les fig. 6 à 8, le coussin d'air peut "respirer".

La fig. 6 montre qu'un ou plusieurs petits orifices 15 peuvent être percés, à des endroits judicieusement choisis, soit à travers la première 3 et ses revêtements, soit à travers la paroi 5.

La fig. 7 montre que la cavité interne 7 peut être gonflable au moyen d'une valve de remplissage 16 noyée, lors du moulage de la semelle d'usure 4, dans la paroi 5 sur un conduit 17, cette valve étant du type à bille dans l'exemple représenté.

La fig. 8 montre que la cavité interne 7 peut être reliée à l'extérieur par l'intermédiaire d'une soupape 18 s'ouvrant et se fermant en fonction des variations de la pression interne sous la poussée du pied ; de préférence, cette soupape 18 est montée dans la paroi périphérique 5 ; dans l'exemple représenté, elle est à simple effet, mais rien ne s'oppose à ce qu'elle soit à double effet et à seuils de déclenchement réglables.

2563979

7

R E V E N D I C A T I O N S

1.- Semelage à coussin d'air pour chaussures diverses
et notamment pour chaussures de sport, comprenant une semelle d'usure
(4) et une première (3) pour le montage de la tige (1), un vide étant
ménagé entre elles,

5          caractérisé en ce qu'une cavité unique (7) s'étendant
sur une partie au moins de la longueur du semelage est ménagée entre
la première de montage (3), la semelle d'usure (4) et une paroi
périphérique (5) sensiblement verticale reliant ces dernières avec
étanchéité, cette paroi présentant sur une partie au moins de son
10   étendue, une épaisseur variable pour être aplatissable (en 10 à 12)
avec rappel élastique amorti.

        2.- Semelage selon la revendication 1, caractérisé en
ce que la paroi périphérique (5) est venue de moulage avec la semelle
d'usure (4).

15         3.- Semelage selon la revendication 1, caractérisé en
ce que la paroi périphérique (5) est injectée sur l'ensemble monté :
tige (1) - première (3).

        4.- Semelage selon l'une quelconque des revendications
1 à 3, caractérisé en ce que la paroi périphérique (5) présente en
20   creux, pour la variation de son épaisseur des saignées longitudinales
(10 à 12).

        5.- Semelage selon la revendication 4, caractérisé en ce
que la paroi périphérique (5) est raidie (en 13), derrière la pliure
du pied à la naissance de la cambrure, en étant pleine à cet endroit
25   et donc exempte de saignées.

        6.- Semelage selon la revendication 4, caractérisé en
ce que la paroi périphérique (5) présente, en avant de la pliure du
pied, une saignée unique (10) profilée en rainure à flancs sensible-
ment parallèles.

30         7.- Semelage selon la revendication 4, caractérisé en
ce que la paroi périphérique présente, en arrière de la pliure du
pied, plusieurs saignées (11, 12) superposées et profilées sensible-
ment en V afin de former un soufflet.

2563979

8

8.- Semelage selon la revendication 1, caractérisé en ce que la première (3) est armée (en 8) à l'endroit de la cambrure et du talon pour être indéformable.

9.- Semelage selon la revendication 1, caractérisé en ce que la face inférieure de la première est revêtue d'un film étanche (9), appliqué de préférence par projection ou enduction.

10.- Semelage selon la revendication 1, caractérisé en ce que sa cavité interne (7) est définitivement isolée de l'extérieur.

11.- Semelage selon la revendication 1, caractérisé en ce que sa cavité interne (7) communique en permanence avec l'extérieur par au moins un orifice (15), ménagé dans la première (3) ou la paroi périphérique (5).

12.- Semelage selon la revendication 1, caractérisé en ce que sa cavité interne (7) est gonflable à travers une valve de remplissage (16) montée de préférence dans la paroi périphérique (5).

13.- Semelage selon la revendication 1, caractérisé en ce que sa cavité interne (7) est reliée à l'extérieur par l'intermédiaire d'une soupape (18) s'ouvrant et se fermant en fonction des variations de la pression interne sous la poussée du pied, cette soupape étant montée de préférence dans la paroi périphérique (5).

2563979

1/2



Fig. 1



Fig. 2

2563979

2/2



Fig. 5

Fig. 4

Fig. 3

Fig. 8

Fig. 7

Fig. 6

# EXHIBIT D
# (Part 17 of 17)

(12) **UK Patent Application** (19) **GB** (11) **2 244 200** (13) **A**

(43) Date of A publication 27.11.1991

(21) Application No 9108685.0

(22) Date of filing 23.04.1991

(30) Priority data
(31) 906939     (32) 22.05.1990     (33) KR

(71) Applicant
Sang Do Kim
Mokdong Shinsigaji Apt 723-403, Kokdong 926,
Yangcheon-Gu, Seoul, Republic of Korea

(72) Inventor
Sang Do Kim

(74) Agent and/or Address for Service
F J Cleveland & Co
40-43 Chancery Lane, London, WC2A 1JQ,
United Kingdom

(51) INT CL⁵
A43B 7/08

(52) UK CL (Edition K)
A3B B11 B3B B7C3

(56) Documents cited
None

(58) Field of search
UK CL (Edition K) A3B
INT CL⁵ A43B
Online databases: WPI

(54) **Ventilated footwear sole**

(57) A footwear sole is disclosed which provides ventilation, shock absorption and fashion in a shoe having a flat bottom surface. The sole comprises, a mid-sole with a front part surface having an air ventilation chamber (2) and ventilation holes (3), two arc-shaped parts (21) projecting inwardly on the outskirts of the air ventilation chamber (2), a round reception chamber (6) on the rear part of the mid-sole (1) and an arc-shaped plate (7) in the round reception chamber; an air way (10) leading to a reception groove (11) disposed behind the chamber (2); a water proof and ventilation device (12) fixed in the reception groove (11); and a horseshoe-shaped shock absorbing material (14) fixed between an upper flap and a lower flap in the rear part of the mid-sole. Ventilation paths (19) and air chamber (75) are provided in the sole.



FIG. 1

GB 2 244 200 A



FIG. 1

FIG. 2



3/15

FIG. 3



FIG. 4



FIG. 5



4/15

FIG. 6



FIG. 7



FIG. 8



5/15



FIG. 9

FIG. 10

FIG. 11

FIG. 12

FIG. 13



(A)

14

53

51' 51

54



(B)

51' 51    54    53



(C)

53

A

A

51' 51

54



(D)

51'    52

51



FIG. 14





9/15

FIG. 16



FIG. 17





FIG. 18



FIG. 19

FIG. 20

(A)



(B)



12/15

FIG. 21



(A)

14

81

54"

80



(B)

81    54"



(C)

81

54"

80

(D)

15    81

79

80

FIG. 22



A – A    B – B

FIG. 23.



A – A

14/15

FIG. 24



14

A

A

87

A − A

86

FIG. 25



14

A

A

89

A − A

88

15/15

FIG. 26



A-A

- 1 -

## FOOTWEAR SOLE

The invention relates to varied footwear soles for sports

footwear, shoes, military shoes, safety shoes and mountain-climbing

shoes etc. that have uppers.

The invention is to provide   footwear sole which can be

fixed to the heel  to promote cushion function and prevent  water

to get in the footwear in bad weather utilizing waterproof

and ventilation part applied at the front of the heel,  providing

good ventilation and further afford shock absorption effect by

means of  rib  applied at shank  of  out-sole  in case  of shoes,

military shoes, safety shoes and mountain-climbing shoes.

Pulbication No. 82-2591 of utility patent (U.S. Patent No.

4499672,  Pulbic Notice No. 80-31524 (85. 9. 20)   of Japanese

utility Patent) revealed a out-sole   and mid-sole providing

- 2 -

ventilation and shock absorption   which was jointed to the
out-sole  by means of   projections.

The out-sole   had circular projection on its surface
and the circular projections applied at the  heel had some
of air entry while the mid-sole projections on the outskirts
of its reverse side and lots of punched ventilation  holes
on its innerside as well.

Publication No. 82-2592 of utility patent showed a
back-sole of footwear with air entry connected to air
passage way that was prepared on the heel.

Opening No. 90-2356 of utility patent also showed a
footwear sole providing   of ventilation and shock absorption
which a ventilation cap having connective joint cap be
fixed to.

Heel side part of the complemented sole having cork
layer on its surface formed a circular curve part and on the
reverseside of its projections for cushion were prepared
while on the front of it the round projected part were formed
and projections for cushion as well, with  ventilation holes

- 3 -

punched.

Front part of mid-sole has the space part with the round projected part prepared at the inner side of the outskirt.

The surface of out-sole    has vertical and horizontal air inhalation way and air supply way while frontend part of air supply way was connected to the air inhalation room and joint part of the air inhalation way had punched ventilation hole.

Publication No. 90-2537 of utility patent revealed  footwear sole providing  ventilation and shock absorption which had airing cap fitted to its receptacle.   The front part of soft cushion mid-sole has punched holes while the reverse-side of it shock-absorbing projections.

Back part of the reverse side of the cushioned mid-sole had circular projections while back part of the out-sole air-inhalation and exhalation entry.   The projected part on the front of the heel   was    prepared for fitting to the airing cap which has ventilation holes and receptacles.

Further, publication no. 90-2538 of utility patent revealed footwear sole providing ventilation and shock

- 4 -

absorption which had heel cushioned pad on the surface of out-sole.    Soft cushioned pad with surface of cork layer was to be fitted to the inside of the cut-part which was pre-pared at the front part of hard  texon board mid-sole.

The surface of cushioned pad was attached to texon board mid-sole by textile net. The reverseside of cushioned pad had cushioned projections through which ventilation holes lead.

The reverseside of heel cushioned pad having curve part on its surface contained air inhalation room and air-supply way.    The inner part of air inhalation room had shock-absorbing projections.

The projected part of air inhalation and exhalation entry that lead to an ventilation room and air-supply way had punched ventilation holes, and airing cap having holeing joints was fitted to the out-sole.

The above-described technology allows good ventilation within footwear as the airing cap has ventilation holes but can not effectively prevent water from getting into the foot-wear in bad weather.

- 5 -

In addition, the shock absorbing material at the heel is not fitted in the inside of the heel of the sole and the effective shock absorption at the heel of the sole can not be expected.

Further, the fact that the cushioned shock absorbing material for the heel is not fitted at texon board can neither afford good shock absorbing effect to the back-side of the foot nor remove the negative factors for the shock absorption in case of the sole of footwear having heel such as that of shoes, military shoes, safety shoes and mountain-climbing shoes due to the hard iron for waist fitted at texon board.

This invention aimed at improving and removing the above-mentioned drawbacks can afford the effective shock absorbing effect to the backside of foot with the mid-sole fitted into the backside of the footwear.

The mid-sole has varied horseshoes-shaped shock-absorbing material with the excellent elasticity (heel of out sole in case of shoes).

- 6 -

The innerside of the shock absorbing material for the heel is hollow but the sectional parts of the both side form the closed pipe types.

The shock absorbing material of pipe type has flange at the upper & lower parts facing outside which can lighten the shock to the backside of foot in walk.

The shock absorbing material at the heel is horseshoes-shaped.            The sectional part of the innerside is closed while the unit sectional part facing outside forms the plural layer of the opened circular arc or hexagonal shape.

The invention / a feature that buoyancy plate fitted
         may have
at the inner part of waterproof and ventilation portion pre-vents water from getting into the sole in bad weather by means of its rising due to buoyancy which close inhalation and exha-lation entry leading to the sole.

The invention / another feature that subsiding of the
         may have
buoyancy plate due to exhausting force when the air in the sole is exhausted can exhaust water in waterproof and ventilation part through ventilation entry.

- 7 -

Specific embodiments of the invention will now be described, by way of example only, and with reference to the accompanying drawings in which:-

Figure 1    is a dismantled perspective view of footwear sole

with a flat bottom as per sports footwear

Figure 2    is a dismantled perspective view of footwear sole

with a heel such as that of leather shoes, safety

shoes, military shoes and mountain-climbing shoes

Figure 3    is an enlarged sectional view of A-A line of Figure 1

Figure 4    is an enlarged sectional view of B-B line of Figure 1

Figure 5    is an enlarged sectional view of C-C line of Figure 1

Figure 6    is an enlarged sectional view of A-A line of Figure 2

Figure 7    is an enlarged sectional view of B-B line of Figure 2

Figure 8    is an enlarged sectional view of C-C line of Figure 2

- 8 -

Figure 9    is an perspective view of the ventilation and

water-proofing part ;

   (A)  Figure is a dismantled perspective view

   (B)  Figure is a partly-incised perspective view

   (C)  Figure is an enlarged vertical sectional view

Figure 10   is an enlarged perspective view of cushion portion of

the heel

Figure 11   is a perspective view of shock absorbing material of

the heel

Figure 12   is an enlarged sectional view of A-A line of Figure 11

Figure 13   is an illustration one of appearance of shock absorb-

ing material applied ;

   (A) is a perspective view of appearance of shock

absorbing material applied.

   (B) is an enlarged figure of outer sectional part

   (C) is a perspective view of enlarged portion

   (D) is a sectional view of A-A line of (C) part

Figure 14   is an illustration one of appearance of shock absorb-

ing material applied ;

- 9 -

(A) is a perspective view of appearance of shock

absorbing material applied

(B) is an enlarged figure of outer sectional part

(C) is a perspective view of enlarged portion

(D) is a sectional view of A-A line of (C) part

Figure 15   is an illustration one of appearance of shock

absorbing material applied at the heel

(A) is a perspective view of appearance of shock

absorbing material applied

(B) is an enlarged figure of outer sectional part

(C) is a perspective view of enlarged portion

(D) is a sectional view of A-A line of (C) part

Figure 16   to Figure 26 are varied illustration ones and their

sectional views of shock absorbing

material applied at the heel

## Code description of major part of a Figure

1 : mid-sole          2, 2″: ventilation room

3 : ventilation hole   4 : outskirt part

- 10 -

| | |
|---|---|
| 5, 5 ' : round projected part | 6, 6 " : reception room |
| 7 : circular arc-shaped | 8, 8 ' : flange |
| 9 : cushion material for heel | 10 : air way |
| 11, 11 ' : reception groove | 12 : water-proofing and ventilation entry |
| 13, 13 ' : flap | 14 : shock absorbing heel material |
| 15, 15 ' : flange | 16, 16 ' : air compression room |
| 17 : elliptic wall body | 18 : air entry |
| 19 : ventilation way | 22 : in-sole |
| 23, 23 ' : cushion airbag | 25 : out-sole |
| 29 : exhaust way | 29 ' : exhaust hole |
| 30, 30 ' : air supply way | 30 " : air supply hole |
| 31 : waist part | 39 : upper plate |
| 40 : hollow pipe-shaped small bodies | 41 : wall of inhaling and exhausting room |
| 42 : backward wall | 42 ' : forward wall |
| 43 : ventilation room | 44 : water-incoming room |
| 45 : ventilation entry | 46 : inhalation and exhalation entry |
| 47 : ventilation part | 48 : buoyancy plate |

- 11 -

49 : seperation projection          50 : lower plate

51 : circular flange                51' : circular arc-shaped
                                           projection

52 : inner sectional part           53 : hollow pipe-shaped
                                         bodies
54, 54', 54": connecting
             band                   55 : hollow part'

56 : cylinder body                  57, 61 : inner sectional
                                             part

58 : incoming part                  59 : hollow part

60 : hexa-angled body               60' : dual body

62, 62', 62", 62'", 79 : circular arc shape

63, 63', 66, 66', 68, 68', 70, 70' : upper and lower
                                           bodies
64 : X-shaped wall
                                    65 : rod
67, 67', 72 : rods
                                    69, 69', 71 : half-
                                           circled body

73 : supporting body                74, 74' : ventilation hole

75 : air room                       77 : ball

78 : tube-shaped body               80 : circular arc part

81 : oval-shaped body               83 : triangle-shaped body

87 : heart-shaped body              85 : T-shaped body

88, 88' : round wall

- 12 -

Figure 1 is a view of dismantled footwear sole applied
to the sports shoes.    The front part surface of the mid-sole
(1) has air ventilation room(2) and punched ventilation
holes.

There are two circular arc-shaped parts (5)(5') on the
the outskirts of the air ventilation room(2).    The round
receptive room (6) on the rear part surface of the mid-sole
(1) and a circular arc-shaped plate is in the round receptive

- 13 -

room.

The rear cushioned shock absorbing material(9) linked to flange(8)(8´) is fitted into the both sectional parts of the arc-shaped plate.

The air way(10) leading to the receptive groove is prepared between the air passage room(2) and the rear cushioned shock absorbing material on the surface of the mid-sole.

The waterproof and ventilation part(12) is fixed to the receptive groove(11) and the horseshoes-shaped back shock absorbing material(14) is fixed between the upper flap and the lower one of the rear part of the mid-sole, constituting a body identical with the mid-sole.

The flanges(15)(15´) are formed between the upper part and the lower one of the outskirts of the back shock absorbing material.

On the rear part of the mid-sole the air compression room is prepared by circular wall(17), constituting a body identical with the back shock absorbing material.

The front of the wall(17) has air passage(18).

- 14 -

The passage is linked with the ventilation way (19) which leads through the central part of the mid-sole.

The ventilation way (19) is connected with ventilation holes(3) and air rooms(75) are prepared at the outside of ventilation way(19).

On texon board, the air ventilation room (2') and the round receptive room(6') corresponding to those of the mid-sole(1) are also maintained, forming two circular arc-shaped parts.

The air ventilation room(2") and the round receptive room(6") on the inner sole(22) have the cushioned air bags (23)(23'). The length of its reverse side is prepared so that the lower sectional part of the cushioned air bags (23)(23') may contact the air ventilation room(2) of the mid-sole(1) and the rear cushioned shock absorbing material (7) when texon board (20) and the inner sole(22) is fixed on the surface of the mid-sole(1) and the out-sole (24) is fixed on the reverse side of the mid-sole(1).

The round wall(17) and the air compression room(16')

- 15 -

may hold a deodorizing agent and a sponge agent(36)(37) containing perfume.

Figure 2 is a view of dismantled footwear sole applied to shoes, military shoes, safety shoes and mountain-climbing shoes having back heel.    The front part surface of out-sole (25) has air ventilation room(26) and there are two circular arc-shaped parts(27)(27') on the outskirts(4') of the air ventilation room(26).

The rear part surface of the out sole(25) has ventilation walls(28)(28') as high as the outskirts.    The exhaust way(29) is prepared between the ventilation walls(29)(28') while the air supply way outside the ventilation walls (28) (28').

One part of the exhaust way(29) is connected to the exhaust hole(29') while one part of the air supply way(30) (30') to the air supply hole(30") respectively.

The shank part on the reverseside of the out-sole(25) has the projected waist part(31) playing the role of the iron for waist and the rear heel part(32) has the receptive groove(11').

- 16 -

The waterproof and ventilation part(12) is to be fixed into the receptive groove(11') while the horseshoes-shaped shock absorbing material(14) into between the upper flap and the lower one(13)(13'), constituting a body identical with the heel part(32).

The upper and lower parts of the rear shock absorbing material(14) have flanges(15)(15') and the flat sole(33) is fixed to the reverse side of the heel part(32).

The air ventilation room(26') is also prepared on the texon board(20'),     corresponding to that of the out sole (25).

The circular arc-shaped part(27") is projected toward the air ventilation room(26').    The inner sole(22') has the air ventilation room(26") and the receptive room(6") corres-ponding to those of  texon board(20').

The air ventilation room(26") and the receptive room (6") have cushioned air bags(23)(23').

The length of its reverse side is prepared so that the lower sectional part of the cushioned air bags(23)(23') may

- 17 -

contact bottom of the air ventilation room(26) of the out sole (25) and the surface of texon board(20').

In Figure 1, the cushioned air bags(23) in the ventilation room(2) of the mid-sole may displace those in the ventilation room(2") of the inner sole.

In Figure 2, the cushioned pad(34) with the cushioned projection(35) and the ventilation holes(74") may be prepared optionally in the air ventilation room(26) of the out sole.

The water-proof and ventilation part(12) in Figure 9 constitutes 4 angled box-shaped body with holding joint(38).

On the center of the reverseside of the upper plate(39) small pipe(40) is prepared vertically and the half of this pipe (40) is cut and closed at the back wall(42) of the body by the wall of inhalation and exhalation room(41).

Due to the partition of this wall of inhalation and exhalation room(41) ventilation room(43) and water-incoming room (44) take forms in the water-proof and ventilation part(12).

The water-incoming room is connected to the ventilation entry(45) of the front wall(42') and the pipe(40).

- 18 -

The inhalation and exhalation entry(46) of the pipe and the ventilation room(43) is connected to the ventilation part of the rear wall(42).

Under the pipe(40) the bottom of the box-shaped body is closed with the out plate(50) which has separation projections(49) toward upward for buoyancy plate(48).

Figure 13 to Figure 26 is a view showing the varied types available for transformation of shock absorbing heel material.

It is made of saturated resin or rubber with good elasticity.  Being a long form, it is transformed to horse-shoes-shaped hoof for being fixed to the mid-sole(1) of sports footwear or the out sole of shoes and the varied sole of footwear.

The shock absorbing heel material(14) of Figure 13 is hollow.  The inner sectional part(52) is open while the outer one has the  composition which has pipe-shaped bodies with flange and the circular arc-shaped projections(51´) linked

- 19 -

by connecting band.

The shock absorbing heel material(14) of Figure 14 has the composition that two lines of the cylinders(56) of hollow part(55) are linked and the inner sectional part(57) is closed while the shortened parts are prepared at the inner part.

The shock absorbing heel material(14) of Figure 15 has the composition that there are the duplicated hexagonal bodies (60´) of hollow part(59) having one hexagonal body(60) between them(60´).

The inner sectional part(61) is closed.

The shock absorbing heel material(14) of Figure 16 has the composition that the inner sectional part is partitioned by wall(64) between the upper wall and the lower one(63)(63´) whose inner sectional part is closed in the circular arc shape.

The internal mandrel is prepared in the wall(64) and the outer sectional part of the upper and lower walls have flanges (15)(15´).

The shock absorbing heel material of Figure 17 has the composition that the internal mandrels(67)(67´) are prepared

- 20 -

between the upper wall and the lower one(66)(66') whose inner sectional parts are closed in circular arc-shape(62').

The shock absorbing heel material of Figure 18 has the composition that the half-ringed bodies(69)(69') are prepared between the upper wall and the lower one (68)(68') and the outer sectional part of the upper and lower walls(68)(68') take forms of flanges(15)(15').

The shock absorbing heel material(14) of Figure 19 has the composition that there are the half-ringed bodies(71) and the internal mandrels(72) between the upper wall and the lower one of which the internal sectional part are closed in the shape of circular arc(62) and the lower part of the half-ringed body has a supporting body(73) and further, the external sectional part of the upper and lower walls(70)(70') take forms of flanges(15)(15').

The shock absorbing heel material(14) of Figure 20 has the composition that there are horseshoes-shaped shock absorbing heel material(14) with flanges(15)(15') on the upper and lower part of the external outskirts.

- 21 -

The heel material(14) contains the elastic ball(77) or the pipe(78).

The shock absorbing heel material(14) of Figure 21 has the composition that it is hollow and the internal sectional part is open while the external sectional one taking form of circular flange(15) has pipes(81) containing circular arc-shaped part(80) which are connected with linking band(54‴).

The shock absorbing heel material(14) of Figure 22 has the composition that the internal sectional part of the hollow upper and lower walls is closed in the type of circular arc(82) and the inside of the hollow part has triangled bodies in the form of upright position and upside-down one, constituting horseshoes shape.

The shock absorbing heel material(14) of Figure 23 has the composition that the internal sectional part of the upper and lower walls is closed and the external hollow part contains the upright and upside-down T-shaped bodies, constituting the horseshoes shape.

The shock absorbing heel material(14) of Figure 24 has the

- 22 -

composition that the internal sectional part of the hollow

upper and lower walls is closed in the shape of circular arc

(86) and the external hollow part contains the upright and up-

side-down Heart-shaped bodies, constituting the horseshoes

shape.

The shock absorbing heel material(14) of Figure 25 has the

composition that the internal sectional part of the upper and

lower walls is closed in the shape of circular arc and the ela-

stic alphabet-shaped bodies are between the upper wall and the

lower one.

The shock absorbing heel material(14) of Figure 26 has the

composition that the internal sectional part of the upper and

lower walls is closed in the shape of circular arc and the

elastic Olympic marks and the figures(91) of sportsmen are

between the upper wall and the lower one.

Code no. 74 and 74' are ventilation holes punched on the

sheet of the cushioned air bag and Code no. 76 and 76' are

supporting parts for the forming groove of mold which is used

when the shock absorbing heel material(14) is fixed to the heel

- 23 -

part of the mid-sole(1).

The processing steps of the invention are as follows :

In Figure 1, the shock absorbing heel material(14), first of all, is to be fixed between the upper flap and the lower one (13)(13') of the mid-sole(1) and the water proof and venfilation part(12) to be fixed in the reception groove.

The ventilation part(47) applied at the rear wall(42) of the water proof and ventilation part(12) is to be connected to the air way(10).

As the ventilation entry(45) punched on the front wall (42") of the water proof and ventilation part(12) faces the outside of the mid-sole, the air from the outside can be induced into the ventilation entry(45).

The air is to get through the ventilation room(43) by means of the inhalation and exhalation entry(46) and to pass the air way(10) by the ventilation part(47). The air gets into the ventilation hole(3) at the air ventilation room(2) and then reach the air compression room(16) through the ventilation way (19) existing at the reverse side of the mid-sole(1).

- 24 -

The satisfactory air-inhalation stated above can be made when the out-sole(24) is fixed to the reverse side of the mid-sole(1) with the cushioned shock absorbing material(9) fixed on the surface of the mid-sole so as to have the middle of the reception room(6) take the circular arc shape and   texon board   (20) is also fixed with the inner sole(22) fixed on the surface of texon board.

The process of the air-exhalation is undergone vice versa.

In case of sports shoes as well as boots, military shoes and safety shoes etc., it is desirable that the footwear sole has a device affording the possible shock absorbing means to the heel as back part of the foot receives much shock in walk and exercise taking.

So, the shock absorbing heel material(14) that is horse-shoes-shaped with the upper and lower flanges(15)(15') is fixed at the back part of the footwear sole in this invention and on the material the circular arc-shaped(7) cushioned shock absorbing material(9) is fixed with flanges(8)(8') getting into the reception room and further, at the reverse side of it the air compression room(16) is formed with wall(17).

- 25 -

Due to the composition as described above, the hollow shock absorbing heel material(14), in walk, is contracted and with the upper and lower flanges(15)(15') receiving load, the air in the air compression room(16) moves toward the front part due to the contraction of the wall(17).

By means of the course stated above, the heel part of the sole can absorbe the shock   ideally and the shock transmitted to the back part of foot is so little that the fatigue feeling due to the shock from footwear can be dissolved.

The cushioned airbags(23)(23') can be fitted to the inner-sole(22) as well and the air compression in the cushioned airbag(23)(23') can not only  absorve the shock but give the elastic effect by means of the elasiticity of the cushioned airbag.

The shock to the sole of a foot can be alleviated by means of the air room(75).

In the water-proof and ventilation part(12) the buoyancy plate(48) is to be put on the seperation projection(49) and does not cause any tronble in terms of air ventilation in good

- 26 -

weather while in bad weather the water-permeating through the
ventilation entry of the front wall(42') remain on the out-
plate(50) of the water-proof and ventilation part(12) and the
buoyancy plate(48) is buoyant and rises.

The buoyancy plate(48) risen closes the lower part of the
inhalation and exhalation entry(46),which makes water-proofing
possible as water in the water-incoming room(44) of the water-
proof and ventilation part(12) can not get into the inhalation
exhalation entry.

On the other hand water in the water-incoming room(44)
lower the buoyancy plate(48) with the air in the sole of
footwear exhaled.

Accordingly, with the air full of the upper part of the
water-incoming room(44) compresses, water in the room(44) is
exhaled through the ventilation entry(45) to give the
effective water-proofing.

In Figure 2 as well as is Figure 1, the horseshoes-shaped
shock absorbing heel material(14) is to be fixed between the
upper flap and the lower one(13)(13') of the heel part of the

- 27 -

out-sole(25) and the water-proof and ventilation part(12) to be fixed in the reception groove of heel part on the reverse side of the out-sole.

With the front wall(42') facing    the front of the footwear sole and the rear wall(42)    the opposite part of it, the ventilation part(47) the ventilation hole(29') and the exhaust way(29) are to be connected to the air ventilation room (26) while the air compression room on the reverse side of the out-sole(25), air supply hole(30") and the air supply ways(30) (30') to the air ventilation room(26) seperately.

In landing, the air in the air compression room(16') that is compressed due to the contraction of the shock absorb-ing heel material(14) of the heel part(32) get into the air ventilation room(26) through the air supply hole(30") and the air supply ways(30)(30').

Then, the air in the air ventilation room(26) compressed by the sole of foot pass the exhaust way(29) and the ventila-tion hole(29') and is exhausted through the inner ventilation part(47) and the external ventilation entry(45) of the

- 28 -

water-proof and ventilation part(12).

With the cushioned airbag(23) and the shock absorbing heel material restored the external air is induced into the inside of the footwear vice versa.

The effect from the function of the ventilation entry(12) and the cushioned airbags(23)(23') and the shock absorbing heel material(14) of the inner sole is same as that in case of sportsshoes of Figure 1.

Especially, the waist part fitted on the out-sole of the footwear having rear heel as in case of boots, military shoes, safety shoes and mountain-clambing shoes can remove the factors of problem to shock absorbing due to fitting the steel in texon board.

In addition, the waist part(31) can excercise the function of steel usually fitted at waist portion.

The composition of the shock absorbing heel material(14) effective for shock absorption are stated hereunder:  the composition that the elastic hollow pipes(53) linked with the connecting band (54) are fixed to heel part of the footwear sole,  the composition that a hexagoned body(60) is between the duplicated hexagoned bodies(60') of hollow part(59).

- 29 -

the composition that the inner sectional part is partitioned by wall(64) between the upper wall and the lower one(63)(63') whose inner sectional part is closed in the circular arc shape.

The internal mandrel is prepared in the wall(64) and the outer sectional part of the upper and lower walls have flanges (15)(15').

the composition that the internal mandrels(67)(67') are prepared between the upper wall and the lower one(66)(66') whose inner sectional parts are closed in circular arc-shaped(62'),

the composition that the half-ringed bodies(69)(69') are prepared between the upper wall and the lower one(68)(68') and the outer sectional part of the upper and lower walls(68)(68') take forms of flanges(15)(15'),

the composition that there are half-ringed bodies(71) and the internal mandrels(72)  between the upper wall and the lower one of which the internal sectional part are closed in the type of circular arc(62''')  and the lower part of the half-ringed body has a supporting body(73) and further, the external sectional part of the upper and lowe walls(70)(70') take forms of flanges(15)(15').

- 30 -

the composition in  the horseshoes-shaped shock absorbing

heel material contains the elastic ball(77) or the pipe(78),

the composition that the internal sectional part of the hollow

upper and lower walls is closed in the type of circular arc(82)

and the inside of the hollow part has triangled bodies in the

form of upright position and upside-down one, constituting

horse-shoes shape.

the composition that the internal sectional part of the upper

and lower walls is closed and the external hollow part contains

the upright and upside-down T-shaped bodies, constituting the

horseshoes shape.

the composition that the internal sectional part of the hollow

upper and lower walls is closed in the shape of circular arc

(86) and external hollow part contains the upright and upside-

down Heart-shaped bodies, constituting the horseshoes shape.

the composition that the internal sectional part of the upper

and lower walls is closed in the shape of circular arc and the

elastic alphabet-shaped bodies are between the upper wall and

the lower one.

the composition that the internal sectional part of the upper

- 31 -

and lower walls is closed in the shape of circular arc and the elastic Olympic marks and the figures(91) of sportsmen are between the upper wall and the lower one.

- 32 -

## CLAIMS

1.   A footwear sole providing ventilation, shock absorption and fashion in a shoe having a flat bottom surface, said sole comprising:

a mid-sole with a front part surface having air ventilation room    and punched ventilation holes, two arc-shaped parts    projecting inwardly on the outskirts of the air ventilation room (2), round reception room (6) on the rear part surface of the mid-sole (1) and an arc-shaped plate in the round reception room;

rear cushioned shock absorbing material (9) linked to flange (8)(8') and fitted into the both sectional parts of the arc-shaped plate;

an air way (10) leading to a reception groove (11) disposed between the air passage room (2) and the rear cushioned shock absorbing material (9) on the surface of the mid-sole;

a water proof and ventilation part (12) fixed in the reception groove (11);

a horseshoe-shaped back shock absorbing material (14) fixed between an upper flap and a lower one in the rear part of the mid-sole which are integral with the mid-sole;

on a rear part of the mid-sole an air compression room is formed by a circular wall (17), constituting a

- 33 -

body integral with the back shock absorbing material;

a elliptical wall (17) having a front air passage (18) linked with a ventilation way (19) which leads through a central part of the mid-sole, the ventilation way (19) being connected with ventilation holes (9) and air rooms (75) are formed outside of ventilation way (19), the elliptical wall (17) and the air compression room (16') may hold a deodoring agent and a sponge agent (36)(37) containing perfume;

the air ventilation room (2'') and the round reception room (6'') on the inner sole (22) having cushioned air bags (23)(23').

2.   A footwear sole in accordance with Claim 1 utilized in a shoe having a heel, the reception groove (11') being formed at a heel part on reverse side of an out-sole (25), the groove being designed for a water proof and ventilation part (12) to be fitted there into, the sole further comprising a shank part on the front side having a projected waist part (31), an exhaust hole (29') and air supply hole (30'') being formed in an air compression room (16') and the reception groove (11") so as to be connected to the exhaust way (29) and the air supply ways (30)(30') on the heel part of the sole (25) surface.

- 34 -

3.. A shoe sole as in Claim 1 wherein the horseshoe-shaped shock absorbing heel material (14) is installed at the rear part of the mid-sole (1).

4. A shoe sole as in Claim 1 wherein the horseshoe-shaped shock absorbing heel material (14) is installed at the rear part of the out-sole (25).

5. A shoe sole as in Claim 1, characterized in that with the water-proof and ventilation part (12) fixed into the inner side of the reception groove (11) prepared between the air ventilation room (2) of the mid-sole (1) and the ball-shaped receptive room (6), the ventilation part (47) of the water-proof and ventilation part (12) is connected to the air passage (10) and the ventilation part (45) of the water-proof and the ventilation part (12) is installed so as to face the external part of the mid-sole (1).

6. A shoe sole as in Claim 2, characterized in that the water-proof and the ventilation part (12) fixed at the reception groove (11') prepared on the rear heel part of the reverse side of the out-sole (25) and with the ventilation entry (45) of the water-proof and ventilation part facing the front direction, the ventilation part (47) is to face the rear direction, connected to the exhaust hole (29').

- 35 -

7.. A shoe sole as in Claim 2, characterized in that the projected waist part (31) is installed on the shank of the out-sole (25).

8. A shoe sole as in Claim 2, characterized in that the reception room (6) of the heel part of the mid-sole has the cushioned shock absorbing rear material(9) with flanges (8)(8') at the both sectional parts, the material (9) whose center is circular arc-shaped being connected to the air compression room (16).

9. A shoe sole as in Claim 1, characterized in that not only the air compression room (16) is formed by means of the round wall (17) on the heel part of the reverse side of the mid-sole (1) but the air inhalation and exhalation entry on the front part of the round wall (17) that is connected to the ventilation way (19).

10. A shoe sole as in Claim 2, characterized in that the air ventilation room (2'') and the reception room (6'') of the inner sole (22) have the punched cushioned airbags (23)(23').

11. A shoe sole as in Claim 1, characterized in that small pipe (40) is prepared vertically on the center of the reverse side of the upper plate (39) and the half of this pipe

- 36 -

(40) is cut and closed at the back wall (42) of the body by the wall of inhalation and exhalation room (41), due to the partition of this wall of inhalation and exhalation room (41) ventilation room (43) and water-incoming room (44) take forms in the water-proof and ventilation part (12), the water-incoming room being connected to the ventilation entry (45) of the front wall (42') and the pipe (40).

12.  A shoe sole as in Claim 1, characterized in that both sectional parts of the horseshoes-shaped shock absorbing heel material are closed and the inside of it is hollow with the external upper and lower parts having the projected flanges (15)(15').

13.  A shoe sole as in Claim 1, characterized in that the inner sectional part is open while the outer one has composition which has pipe-shaped bodies with flange and the circular arc-shaped projections (51') linked by connecting band.

14.  A shoe sole as in Claim 1, characterized in that two lines of the cylinders (56) of hollow part (55) are linked and the inner sectional part (57) is closed while the shortened parts are prepared at the inner part.

- 37 -

15. A shoe sole as in Claim 1, characterized in that there are the duplicated hexagonal bodies (60') of hollow part (59) having one hexagonal body (60) between them (60') and the inner sectional part (61) is closed.

16. A shoe sole as in Claim 1, characterized in that the inner sectional part is partitioned by wall (64) between the upper wall and the lower one (63)(63') whose inner sectional part is closed in the circular arc shape, the internal mandrel being prepared in the wall (64) and the outer sectional part of the upper and lower walls have flanges (15)(15').

17. A shoe sole as in Claim 1, characterized in that the internal mandrels (67)(67') are prepared between the upper wall and the lower one (66)(66') whose inner sectional parts are closed in circular arc-shape (62').

18. A shoe sole as in Claim 1, characterized in that the half-ringed bodies (69)(69') are prepared between the upper wall and the lower one (68)(68') and the outer sectional part of the upper and lower walls (68)(68') take forms of flanges (15)(15').

19. A shoe sole as in Claim 1, characterized in that there are the half-ringed bodies (71) and the internal mandrels

- 38 -

(72) between the upper wall and the lower one of which the internal sectional part are closed in the shape of circular arc (62''') and the lower part of the half-ringed body has a supporting body (73) and further, the external sectional part of the upper and lower walls (70)(70') take forms of flanges (15)(15').

20.  A shoe sole as in Claim 1, characterized in that there are horseshoes-shaped shock absorbing heel material (14) with flanges (15)(15') on the upper and lower part of the external outskirts.  The heel material (14) contains the elastic ball (77).

21.  A shoe sole as in Claim 1, characterized in that it is hollow, and the internal sectional part is open while the external sectional one taking form of circular flange (15) has pipes (81) containing circular arc-shaped part (80) which are connected with linking band (54'').

22.  A shoe sole as in Claim 1, characterized in that the internal sectional part of the hollow upper and lower walls is closed and the inside of the hollow part has triangled bodies in the form of upright position and upside-down one, constituting horseshoes shape.

23.  A shoe sole as in Claim 1, characterized in that the internal sectional part of the upper and lower walls is closed and the external hollow part contains the upright and upside-down T-shaped bodies, constituting the horseshoes shape.

24.  A shoe sole as in Claim 1, characterized in that the internal sectional part of the hollow upper and lower walls is closed in the shape of circular arc (86) and the external hollow part contains the upright and upside-down Heart-shaped bodies, constituting the horseshoe shape.

25.  A shoe sole as in Claim 1, characterized in that there are horseshoes-shaped shock absorbing heel material (14) with flange (15)(15') on the upper and lower part of the external outskirts, the heel material (14) containing the elastic pipe-shaped bodies (78).

26.  A shoe sole as in Claim 1, characterized in that the internal sectional part of the upper and lower walls is closed in the shape of circular arc and the elastic alphabet-shaped bodies are between the upper wall and the lower one.

27.  A shoe sole as in Claim 1, characterized in that the internal sectional part of the upper and lower walls is closed in the shape of circular arc and the elastic Olympic

- 40 -

marks and the figures (91) of sportsmen are between the upper wall and the lower one.

28.  A shoe sole as in Claim 1, characterized in that the sponge bodies (36)(37) containing deodoring material and perfume are put in the wall (17) and the air compression room (16).

29.  A shoe sole as in Claim 1, characterized in that the cushioned pad with the cushion projections (35) and ventila
tion hole (74'') is installed in the air compression room (26) of the out-sole (25).

30.  A shoe sole as in Claim 1, characterized in that the cushioned airbag (23) is installed in the air ventilation room (2).

31.  A shoe sole as in Claim 1, characterized in that the several air rooms (75) are installed along the boundary on the reverse side of the mid-sole.

32.  A sole substantially as hereinbefore described with reference to the drawings.

33.  A sole substantially as hereinbefore described and as shown in figures 1, 3, 4 and 5 or figures 2, 6, 7 and 8 of the drawings.

Published 1991 at The Patent Office, Concept House, Cardiff Road, Newport, Gwent NP9 1RH. Further copies may be obtained from Sales Branch, Unit 6, Nine Mile Point, Cwmfelinfach, Cross Keys, Newport, NP1 7HZ. Printed by Multiplex techniques ltd, St Mary Cray, Kent.

SHOES, A LEXICON OF STYLE

OPPOSITE There is no denying the erotic pull of these stilett[...]
by Manolo Blahnik. The thin black straps encase the taut musc[...]
of the leg as they work to keep the ankle erect.

BELOW Ferragamo was constantly experimenting with heel shapes and structure to push shoe design to its limits, as in this model dating from 1930 for a heel of brass layers.



ankle and an extended leg. The arch of the foot is radically curved — lik[...] ballet dancer on point. The entire lower body is thrown into a state of tensi[...] resembling that of female sexual arousal. By tilting the pelvis, high heels ca[...] the lower back to arch. The breasts thrust forward, and the derrière protrud[...] As the fashion model Veronica Webb says, "High heels put your ass o[...] pedestal — where it belongs."[4]

Even before she moves, a woman in high heels has transformed her bo[...] She looks taller and thinner. Her secondary sexual characteristics are flagra[...] ly emphasized, while her legs — the pathway to the genitals — are as long [...] Bambi's. As the leg muscles tighten, the calves appear shapelier. And beca[...] they are at an angle, her feet look smaller and more pointed.

The erotic appeal of high heels cannot be separated from their associat[...] with the physical attributes of "femininity." According to the fetishist magaz[...] *High Heels*, "Flat is ... a dirty word! And you'll find nothing 'flat' in this is[...] of HIGH HEELS except the tummies of the models — who wouldn't [...] caught dead in 'flats,' who all have FULL bosoms, CURVY tors[...] ROUND hips, LITHE legs, and ... HIGH HEELS!"[5]

High heels also change the wearer's gait. "Your body balances [...] ferently if you are wearing two-inch heels or six-inch heels," obser[...] Manolo Blahnik, master of the skyscraper heel. "You can see this es[...] cially with mules, because you haven't got support at t[...] heel, so you have to contort yourself when you w[...] Think of Marilyn Monroe!" Balanced on narrow stilt[...]

18

# EXHIBIT E

A. GEIGER.
PIECED HEEL.
APPLICATION FILED MAY 20, 1912.

1,081,442.

Patented Dec. 16, 1913.



WITNESSES:

INVENTOR
Adolph Geiger
BY

ATTORNEY

COLUMBIA PLANOGRAPH CO., WASHINGTON, D. C.

# UNITED STATES PATENT OFFICE.

## ADOLPH GEIGER, OF BROOKLYN, NEW YORK.

### PIECED HEEL.

**1,081,442.**  Specification of Letters Patent.  **Patented Dec. 16, 1913.**

Application filed May 20, 1912. Serial No. 698,573.

*To all whom it may concern:*

Be it known that I, ADOLPH GEIGER, a citizen of the United States, and a resident of the city of Brooklyn, county of Kings, and State of New York, have invented cer-5 tain new and useful Improvements in Pieced Heels, of which the following is a specification.

The essential object of this invention is to provide a heel in which some or all of the 10 lifts can be or are made of two or more pieces of leather, thus permitting the utilization of small pieces or remnants of leather which would have to be discarded or wasted entirely if it were necessary to form the lift 15 of a single integral piece. The pieces of which the various lifts are composed, are so formed or shaped, however, that only as many nails will be required to hold the heel together as there are pieces to each lift. 20 For example: In some of the figures a construction is shown in which there are two pieces to each lift, and in this construction only two nails will be necessary. In the other figures, the lifts are shown as being 25 made of three pieces each, in which event three nails are necessary.

In the drawings Figure 1 is a bottom plan view of a pile of lifts assembled together before being secured together to form a 30 heel, each of the lifts being made of two pieces of leather; Fig. 2 is a sectional view on the lines 2—2, Fig. 1; Fig. 3 is a bottom plan view of a pieced heel in which the upper two lifts are each formed of one piece, 35 the remainder of the lifts being each formed of two pieces of leather; Fig. 4 is a section on the line 4—4, Fig. 3; Fig. 5 is an end elevation of a heel formed as shown in Figs. 3 and 4; Fig. 6 40 is a plan view showing the shape of the pieces used to form each of the lifts of the heels depicted in Figs. 1 to 5, inclusive; Fig. 7 is a view showing the shape of the pieces used to form the lifts depicted in Figs. 8 45 to 11, inclusive; Fig. 8 is a top plan view of a heel formed partly of three-piece lifts and partly of two-piece lifts; Fig. 9 is a view of a heel formed entirely of three-piece lifts, the jaws of a heel-building ma-50 chine being shown in dotted lines; Fig. 10 is a sectional view on the line 10—10, Fig. 9; and Fig. 11 is an end elevation of a heel formed as shown in Figs. 7 to 10, inclusive.

In that form of the invention shown in 55 Figs. 1 to 6, inclusive, the pieced lifts are

made of two pieces each, which are shaped as shown in Fig. 6. Each piece is formed with one edge 1 which extends perpendicularly to the breast of the heel, and with 60 edges 2, each of which is disposed obliquely to the edge 1 and to the breast. The two pieces comprising the heel are brought together and then the nails 3 are driven through the pieces, said nails being placed 65 closely to the edges 1. The various lifts may be arranged with the joints between the two pieces of adjoining lifts crossing each other, as shown in Figs. 3, 4, and 5. In order to secure the best results, it is pref- 70 erable that the top-most lift or lifts be each of one piece, as in Figs. 4 and 5, and the lower lifts be pieced.

In that form of the invention shown in Figs. 7 to 11, inclusive, the pieced heels are 75 made of three pieces each, preferably shaped substantially as shown in Fig. 7, each piece being provided with a circular offset 5, and the three offsets 5 all engage each other, thus tending to lock the three pieces of the 80 lift together. Each piece of the lift is provided with a recess or notch 6 adapted to receive the offset 5 of one of the other pieces. The heel may be composed entirely of lifts formed of three pieces each, as shown in 85 Fig. 9, or there may be some lifts of three pieces each and some of two pieces each, as shown in Fig. 8. Two of the offsets 5 of the three-piece variety are so located that they will receive those nails which are spe- 90 cifically designated in Fig. 8, it being understood that the nails 3 in Fig. 8 are in the same position as the nails 3 in Fig. 5. In other words, the two nails which are indicated by reference numerals 3 in Fig. 5, 95 and which are shown in Fig. 5, will catch and pass through both of the pieces of the two-piece lifts and will pass through two of the pieces of the three-piece lift.

It is preferable to make small heels of the 100 two-piece lifts, such heels being suitable for ladies' and children's shoes, and to make large heels for men's shoes of three-piece lifts. The heel shown in Fig. 8 may be used for medium sized heels. 105

In that form of the invention shown in Figs. 1 to 6, inclusive, the nails are driven through that center line of the top lift which is parallel to the breast, and the nails are also equidistant from the center line which 110 is perpendicular to the breast of the heel. In order to give all of the lifts the same

**2**                          1,081,442

strength between the nail-hole and the joint, all of the edges 1 of all of the lifts are in registration with each other. The point 9 which is found at the angle between edge 1 and that edge 2 which extends to the curved portion or back of the heel, is preferably a little farther from the breast 11 of the heel than the exact geometric center of the smallest lift, this construction being used in order to allow as much stock as possible for the nail in the top lift of each heel. The angles 9 which are formed between the edges 1 and those edges 2 which lead to the breast of the heel, are not all uniform, but the angles 10 are the same in each lift.

It is to be noted that the edges 1 and 2 of the two piece lifts and the corresponding edges of the three piece lifts are each cut straight or perpendicularly to the surface of the lifts and of the pieces comprising the same. The various pieces forming the lifts, therefore, can be cut or stamped by dies or similar tools from the pieces of leather which are to be utilized, and each piece can be cut or formed by one stroke of the cutter and at a single operation. Each edge 1 or 2, therefore, abuts against the corresponding edge of the adjoining piece, and the shoemaker is enabled to dispense with interlocking or dove-tailed edges.

Many changes in the details of construction may be made without departing from the scope of the invention or of the various claims.

I claim as my invention:

1. A pieced heel comprising a plurality of lifts of two pieces each, each piece of each lift having a straight edge perpendicular to the breast of the heel, and two oblique edges, one extending from said straight edge to the breast and the other from said straight edge to the curved back of the heel, each piece edge of each piece being substantially perpendicular to the surface of that piece and of the lift of which the piece forms a part.

2. A pieced heel comprising a plurality of lifts of two pieces each, each piece of each lift having a straight edge perpendicular to and, if produced, bisecting the breast of the heel, and two oblique edges, one extending from said straight edge to the breast and the other from said straight edge to the curved back of the heel, each edge of each piece being substantially perpendicular to the surface of that piece and of the lift of which the piece forms a part.

3. A pieced heel comprising a plurality of lifts of two pieces each, each piece of each lift having a straight edge perpendicular to and, if produced, bisecting the breast of the heel, and two oblique edges, one extending from said straight edge to the breast and the other from said straight edge to the curved back of the heel, each edge of each piece being substantially perpendicular to the surface of that piece and of the lift of which the piece forms a part, said pieces being secured together by two nails, one nail being on one side of said edge which is perpendicular to the breast, and the other nail being on the other side of said edge.

4. A pieced heel composed of a plurality of lifts each of which is formed of two pieces, each piece having an edge which if produced would bisect the breast of the heel and extend perpendicularly thereto, each piece having also two edges extending outwardly from said first-mentioned edge and obliquely thereto, and a pair of nails driven through the heel, there being one nail on each side of said first-mentioned edge, the line connecting said nails being substantially parallel to the breast of the heel, each edge of each piece being substantially perpendicular to the surface of the lift.

In testimony whereof I have hereunto affixed my name in the presence of two witnesses.

ADOLPH GEIGER.

Witnesses:
  REBECCA C. TALBOT-PERKINS,
  JOSEPH A. MEEHAN.

Copies of this patent may be obtained for five cents each, by addressing the "Commissioner of Patents, Washington, D. C."

# EXHIBIT F

# SHOES, A LEXICON OF STYLE

HIGH HEELS

OPPOSITE There is no denying the erotic pull of these stiletto[s] by Manolo Blahnik. The thin black straps encase the taut musc[les] of the leg as they work to keep the ankle erect.

BELOW Ferragamo was constantly experimenting with heel shapes and structure to push shoe design to its limits, as in this model dating from 1930 for a heel of brass layers.



ankle and an extended leg. The arch of the foot is radically curved — like [a] ballet dancer on point. The entire lower body is thrown into a state of tensi[on] resembling that of female sexual arousal. By tilting the pelvis, high heels cau[se] the lower back to arch. The breasts thrust forward, and the derrière protrud[es]. As the fashion model Veronica Webb says, "High heels put your ass on [a] pedestal — where it belongs."[4]

Even before she moves, a woman in high heels has transformed her bo[dy]. She looks taller and thinner. Her secondary sexual characteristics are flagra[nt]-ly emphasized, while her legs — the pathway to the genitals — are as long [as] Bambi's. As the leg muscles tighten, the calves appear shapelier. And beca[use] they are at an angle, her feet look smaller and more pointed.

The erotic appeal of high heels cannot be separated from their associat[ion] with the physical attributes of "femininity." According to the fetishist magaz[ine] *High Heels*, "Flat is … a dirty word! And you'll find nothing 'flat' in this is[sue] of HIGH HEELS except the tummies of the models — who wouldn't [be] caught dead in 'flats,' who all have FULL bosoms, CURVY tors[os,] ROUND hips, LITHE legs, and … HIGH HEELS!"[5]

High heels also change the wearer's gait. "Your body balances [dif]-ferently if you are wearing two-inch heels or six-inch heels," obser[ves] Manolo Blahnik, master of the skyscraper heel. "You can see this es[pe]-cially with mules, because you haven't got support at [the] heel, so you have to contort yourself when you w[alk.] Think of Marilyn Monroe!" Balanced on narrow stilts

18

# EXHIBIT G

Feb. 16, 1954     R. DE WERTH     2,669,038

SHOCK ABSORBING SHOE HEEL

Filed Nov. 19, 1951                   2 Sheets—Sheet 1



INVENTOR.

ROBERT DE WERTH

BY

*Sollan H. Holacheck*

ATTORNEY.

**Feb. 16, 1954**              R. DE WERTH              **2,669,038**

SHOCK ABSORBING SHOE HEEL

Filed Nov. 19, 1951                                    2 Sheets-Sheet 2



INVENTOR.
ROBERT DE WERTH

BY

*Zoltan H. Polachek*

ATTORNEY

Patented Feb. 16, 1954

**2,669,038**

# UNITED STATES PATENT OFFICE

2,669,038

SHOCK ABSORBING SHOE HEEL

Robert De Werth, New York, N. Y.

Application November 19, 1951, Serial No. 257,064

5 Claims.  (Cl. 36—38)

**1**

The present invention relates to new and useful improvements in a shock absorbing shoe heel.

More particularly, the present invention proposes the construction of a shock absorbing shoe heel which is resilient in construction so as to relieve shock and jolting encountered with each step taken during normal walking. It has been determined that many of the annoyances connected with sore and aching feet and legs and back trouble are caused by the shock which the body absorbs with each step taken with shoes equipped with the conventional rubber, leather or the like heels. The principal object of the present invention is the construction of a resilient heel having wear heels attached thereto which will absorb all of the shock and jolt of the heaviest step regardless of whether the wear heels are constructed of rubber or leather relieving the body of absorbing such shocks and jolts and so doing away with the agonies and discomfort of aching feet and legs and back trouble.

Another object of the present invention proposes constructing the shock absorbing heel to include an outer member for attachment to the shoe and which has an open bottom into which an inner member, mounting the wear heel, is slidably mounted in a manner so that the inner member and its attached wear heel may have freedom of movement relative to the outer member.

Still further, the present invention proposes the provision of a plurality of spring connectors interposed between the outer and inner members and have connection with each in a manner to constitute the inner member and integral part of the outer member while at the same time leaving the inner member free for sliding movements relative to the outer member.

The present invention further proposes constructing the spring connectors to include coil springs which are under normal unbiased extension in a manner to hold the inner member in a normal extended position relative to the outer member when there is no pressure on the heel.

A further object of the present invention proposes constructing the inner member with a recess in its bottom face within which the wear heel is removably mounted in a manner so that the wear heels can be quickly and easily replaced when worn out without requiring replacement of the complete heel and without having to take the shoes to a shoe repair man eliminating the usual delays encountered when heels have to be replaced.

**2**

Still another object of the present invention proposes constructing the inner member of separate sections arranged one behind the other with the rearmost section having its spring connectors arranged at a downward and rearward inclination in a manner to be substantially at right angles to the floor surface as the back of the heel first strikes the surface during a normal walking step.

Still further, the present invention proposes mounting the wear heel of that rearmost section of the inner member so that its bottom face will be inclined upward and rearward in a manner to be parallel to and strike the floor surface with the flat of its bottom face as the back of the heel first strikes the surface during a normal walking step and thereby eliminate much of the wear and tear on the rearmost section of the heel.

Another object of the present invention proposes constructing the inner member of a plurality of separate laterally extended portions, each of which mounts a separate wear heel portion in a manner so that individual portions of the wear heel which receive the most wear and tear can be removed and replaced without requiring replacement of the entire wear heel.

Another important feature of those heels of the present construction in which the wear heel is divided into two or more transversely extended sections is that the sections are free so that their respective springs will be compressed progressively less from the rear to the front of the heel as the rear of the heel first strikes the ground and the heel is rocked forward as the step is being completed.

Still further, the present invention proposes the construction of a shock absorbing heel which is neat in appearance and in which all of the spring connectors are completely enclosed between the outer and inner members eliminating the possibility of dirt and grime collecting on those spring connectors while at the same time protecting the spring connectors against the ravages of mud, rain, snow, ice and the like; particularly, when shoes equipped with the shock absorbing heels of the present invention are worn during inclement weather.

It is a further object of the present invention to construct a shock absorbing heel which is simple and durable, which is completely effective for its intended purposes and which can be manufactured and sold at a reasonable price for use on new shoes or for attachment to old shoes as a part of the resoling and rebuilding thereof.

For further comprehension of the invention,

2,669,038

and of the objects and advantages thereof, reference will be had to the following description and accompanying drawings, and to the appended claims in which the various novel features of the invention are more particularly set forth.

In the accompanying drawings forming a material part of this disclosure:

Fig. 1 is an elevational view of the rear portion of a man's shoe equipped with a shock absorbing heel constructed in accordance with the present invention.

Fig. 2 is a bottom elevational view of the heel, per se, shown in Fig. 1.

Fig. 3 is a longitudinal sectional view taken substantially on the line 3—3 of Fig. 2.

Fig. 4 is a horizontal sectional view taken substantially on the line 4—4 of Fig. 3.

Fig. 5 is a plan view of a portion of Fig. 3.

Fig. 6 is an elevational view of the spring, per se, of one of the spring connectors.

Fig. 7 is a plan view of Fig. 6.

Fig. 8 is a perspective view of the spring retainer, per se, of one of the spring connectors.

Fig. 9 is a view similar to Fig. 3, but illustrating the shock absorbing heel constructed in accordance with a modification of the present invention.

Fig. 10 is a bottom plan view of Fig. 9.

Fig. 11 is an enlarged detailed view of the rear portion of Fig. 9.

Fig. 12 is a partial transverse vertical sectional view taken on the line 12—12 of Fig. 11 with the bottom portion thereof broken away to reveal details of the means for mounting the bottom wedge member in position.

Fig. 13 is a plan view of the top wedge member used in the form of the invention shown in Figs. 9 to 12.

Fig. 14 is a plan view of the bottom wedge member used in the form of the invention shown in Figs. 9 to 12.

Fig. 15 is another view similar to Fig. 3, but illustrating the shock absorbing heel constructed in accordance with a further modification of the present invention.

Fig. 16 is a bottom plan view of Fig. 15.

Fig. 17 is an enlarged detailed view of a portion of Fig. 15.

Fig. 18 is a partial transverse vertical sectional view taken on the line 18—18 of Fig. 17.

Fig. 19 is a plan view of the wedge member used in the form of the invention shown in Figs. 15 to 18.

The shock absorbing heel, according to the first form of the present invention shown in Figs. 1 to 8, wherein the heel is shown attached to the back of a man's shoe 30 and as including a top or outer member 31. The outer member 31 is fashioned of a non-corroding metal such as stainless steel and has a top wall 32 and a depending skirt wall 33 all about the top wall 32. Thus, the outer member 31 is completely open at its bottom. The top wall 32 is provided with a plurality of spaced threaded holes 34, one of which is shown in Fig. 3, by which the outer member 31 can be attached to the outer sole of the shoe 30. The attachment is accomplished by screws, not shown, which are passed through the outer sole and threaded into the holes 34 with the heads of the screws located beneath the inner sole of the shoe. However, the manner of attaching the outer member 31 to the shoe is not an essential feature of the present invention and any other feasible method can be substituted for the screws and complementary holes 34 with-

out departing from the scope and intent of the present invention.

Extended completely about the outer face of the skirt wall 33 of the outer member 31, there is a strip of leather 35 which matches in color and texture the leather of the shoe 30. The strip of leather 35 is secured in position by a thin layer of mucilage 36 interposed between the skirt wall 33 and the strip of leather 35. So that the mucilage 36 will have greater affinity for the surface of the skirt wall 33 the same can be suitably roughened, if desired. While a strip of leather is preferably used for covering the outer face of the skirt wall 33, it is appreciated that other materials can be used for that purpose.

Fitted into the open bottom of the outer member 31, there is a lower or inner member 37 fashioned of the same material used for making the outer member. The inner member 37 has a bottom wall 38 and an upstanding skirt wall 39. The skirt wall 39 of the inner member 37 has an outer circumference to be snugly fitted with freedom of sliding movement into the skirt wall 33 of the outer member 31.

The bottom wall 38 of the inner member 37 has a recess 40 extended in from its bottom face and into which a wear heel 41 is fitted. The wear heel 41 has its bottom face extended below the bottom face of the bottom wall 38 of the inner member 37. The wear heel 41 is releasably retained in position by several screws 42 passed through complementary holes 43 in the wear heel 41 and threaded into complementary threaded holes 44 formed in the bottom wall 38 of the inner member 37.

Welded to the inner face of the bottom wall 38 of the inner member 37, concentric with each of the threaded holes 44, there are small internally threaded collars 42ᵃ. The inner ends of the screws 42 after passing through the holes 44 are threaded into the collars 42ᵃ. Thus, the collars 42ᵃ function as nuts in the assembled heel to securely anchor the screws 42 in position. The use of the collars 42ᵃ is particularly important in cases where the bottom wall 38 is particularly thin providing very little anchorage for the inner ends of the screws.

By removing the screws 42, the wear heel 41 can be lifted out and replaced by a new one without requiring replacement of the complete heel or engaging the services of a professional shoe repair man. On the drawings, the wear heel is illustrated as being formed of rubber; however, that is by way of illustration only as the wear heel can be made of leather or one of the synthetic resinous materials, if desired.

Spring connectors 45 are provided for connecting together the outer member 31 and the inner member 37 to make an integral assembly of the heel parts. Each of the spring connectors 45 is comprised of a coil spring 46 and spring retainers 47 at the ends thereof. The coil springs 46 are shaped from a piece of relatively stiff wire biased to maximum extension, as shown in Fig. 3. At their ends, the coil springs 46 have enlarged endmost convolutions 48 for a purpose which will become clear as this specification proceeds and smaller intermediate convolutions 49 between the enlarged endmost convolutions 48.

The spring retainers 47 are shaped of a noncorrosive metal and are substantially cup-shaped in formation with open sides directed away from each other and with inwardly directed flanges 50 opposite their open sides. Internally, the spring retainers 47 are of a diameter just slightly smaller

2,669,038

5

than the external diameter of the enlarged end-most convolutions 48 of the coil springs 46. Those endmost convolutions 48 of the springs 46 are fitted into the spring retainers 47 with slight compression so as to frictionally grip and maintain the spring retainers 47 in a fixed position with relation to the coil springs 46. As shown in Figs. 4 and 8, the flanges 50 of the spring retainers 47 are formed with cutouts 51 in one side thereof through which the springs 46 extend to the exterior of the spring retainers 47.

Extending from the outwardly facing open sides of the spring retainers 47, there are spaced lugs 52 which are projected through complementary holes 53 formed in the top wall 32 of the outer member 31 and in the bottom wall 38 of the inner member 37. The free ends of the lugs 52 are bent over against the outer faces of the walls 32 and 38 to secure the spring retainers 47 fixedly in position. To assemble the inner and outer members by means of the spring retainers 47, the retainers at one end of each of the spring connectors 45 are first connected with one of the walls 32 or 38. The retainers 47 at the other ends of the spring connectors 45 are then all rotated to the desired position in which the lugs 52 will be in proper alignment with the holes 53 of the other plate 32 or 38. The other plate is then slipped into position over those lugs 52 and the lugs bent over to complete the assembly.

With the coil springs 46 biased to maximum extension as shown in Fig. 3, the inner member 37 will be retained with the top edges of its upstanding skirt wall 39 extended just slightly into the depending skirt wall 33 of the outer member 31. The tension of the coil springs 46 should be such that they will be compressed to approximately one-half their maximum extension under the force exerted during a normal walking step by the person wearing the shoes equipped with the shock absorbing heels. That tension will, of course, vary in accordance with the weight of different persons. It is known that people of certain heights have weights falling within certain extremes and wear shoes of a certain size. Shoes of different sizes are equipped with heels of different sizes, so that in manufacturing the heels they will be equipped with coil springs 46 possessing a tension in accordance with the size of the heel into which they are fitted resulting in springs of the proper tension being attached to proper shoes in accordance with the weight of the person who will eventually wear the shoes.

In the modification of the invention shown in Figs. 9 to 14, the inner member 37 is divided into a front portion 37ᵃ and a rear portion 37ᵇ each of which is provided with a separate wear heel portion 41 and 41ᵇ respectively. The wear heel portion 41ᵇ of the rearmost portion 37ᵇ of the inner member 37 has a flat bottom face extended parallel to the flat bottom face of the wear heel portion 41. However, the spring connectors 45ᵃ of the rearmost portion 37ᵇ are positioned at a downwardly and rearwardly inclined angle, as shown in Fig. 9. Those spring connectors 45ᵃ are mounted between wedge members 55 and 56 having parallel downwardly and forwardly inclined faces engaged by the spring retainers 47 of the spring connectors 45ᵃ.

The topmost wedge member 55 is secured in position between the sides of the skirt wall 33 of the outer member and against the inner face of its top wall 32 by screws 57 passed through holes formed in the skirt wall 33 and the top wall 32 and threaded into complementary threaded re-

6

cesses 58 formed in the wedge member 55. In this form of the invention it is the wedge member 55 and 56 which are formed with the holes 53ᵃ, see Figs. 11, 13 and 14, which are engaged by the lugs 52 of the spring connectors 45ᵃ of the rear portion 37ᵇ of the inner member 37.

The bottommost wedge member 56 is secured to the bottom wall 38 of the rear portion 37ᵇ of the inner member 37 by several screws 59, one of which is shown in Fig. 12, which are passed through holes 60, see Fig. 14, in the ends of the wedge member 56 and threaded into complementary threaded recesses 61 formed in the bottom wall 38.

Regarding the screws 57 and 59, in certain instances it may be desirable to eliminate the use of those screws and secure the wedge members 55 and 56 in position by welding or similar means. The use of welding is particularly desirable in those instances where the material of the inner member 37 and the outer member 31 is so thin as to provide a very insecure anchorage for the head ends of the screws.

Along its front edge, the topmost wedge member 55 is formed with a depending transversely extending wall 62 which is disposed between the portions 37ᵃ and 37ᵇ of the inner member 37 and which holds those portions separated for individual sliding movement relative to the outer member 31 and to each other. The spring connectors 45ᵃ are arranged at a downward and rearward extended angle to be substantially at right angles to the floor surface when the rear end of the heel first strikes the floor surface during a normal walking step. That arrangement leaves the spring connectors 45ᵃ free so that their springs 46 will be compressed only in a direction parallel to their axis when the heel first strikes the floor surface so that all of the force will be exerted to compress the spring in a direction parallel to its axis without being absorbed by the heel portions in some direction other than the direction of compression and to be eventually absorbed by the wearer's foot.

In all other respects, the form of the invention shown in Figs. 9 to 14 is similar to that described and illustrated in connection with Figs. 1 to 8 and like reference numerals are used to identify like parts throughout.

The modification of the invention shown in Figs. 15 to 19 is similar to that described in connection with Figs. 9 to 14 distinguishing only in the arrangement and sliding positioning of the rear portion 37ᵇ of the inner member 37. In this form of the invention, a block 65 is fitted into the rear of the outer member 31 behind the front portion 37ᵃ of the inner member 37. The block 65 is secured in position by several screws 66 which are passed through complementary holes formed in the skirt wall 33 of the outer member 31 and threaded into complementary threaded recesses 67 formed about the outer periphery of the block 65. The bottom face of the block 65 is hollowed out to slidably receive the rear portion 37ᵇ for sliding movements extended parallel to the downward and rearward inclination of the spring connectors 45ᵇ of that rear portion 37ᵇ. The rear portion 37ᵇ is shaped to have its bottom wall 38 extend downward and forward at right angles to the axis of sliding of the rear portion and so as to mount the respective rear portion 41ᵇ of the wear heel 41 so that its bottom face will be extended downward and forward at an inclination. Thus, the bottom face of the rear portion

2,669,038

**7**

41[b] of the wear heel 41 will be in a position to strike the floor surface substantially flat as the rear of the heel is brought down on the floor surface during a normal walking step.

As in the case of the wedge members 55 and 56 of the form of the invention illustrated in Figs. 9 to 14, it may be desirable to weld the block 65 in position within the rear of the outer member 31 rather than to secure it in position using the screws 66. It being appreciated that welding can be substituted for the screws 66 without departing from the scope and intent of the present invention.

The top wall of the block 65 is shaped to provide an internal wedge member 55[a] having the holes 53[a] engaged by the lugs 52 of the topmost spring retainer 47. The bottom wall 39 of the rear portion 37[b] of the inner member 31 being inclined, as shown in Figs. 15 and 17, there is no need for a bottom wedge member as in the previous form of the invention. Therefore, the bottom spring retainer 47 of the spring connector 45[b] is secured directly to that bottom wall by having its lugs 52 passed through the holes 53, as shown in Fig. 17.

In all other respects, the form of the invention shown in Figs. 15 to 19 is similar to that described in connection with Figs. 9 to 14 and like reference numerals identify like parts throughout the several views.

Each of the modifications of the invention has been characterized by the use of eleven spring connectors and while that is the preferred arrangement, the same is by way of illustration only as the number of spring connectors can be increased or decreased as desired without departing from the scope and intent of the present invention. The eleven spring connectors are shown arranged in three transversely extending rows of three each and one row at the rear of the heel which has only two spring connectors. That, too, is by way of illustration only, particularly as regards the rear row of spring connectors where more than two connectors can be used if desired. However, best results are obtained if not less than two connectors are used in that rear row.

While I have illustrated and described the preferred embodiments of my invention, it is to be understood that I do not limit myself to the precise constructions herein disclosed and the right is reserved to all changes and modifications coming within the scope of the invention as defined in the appended claims.

Having thus described my invention, what I claim as new, and desire to secure by United States Letters Patent is:

1. A shock absorbing shoe heel, comprising an outer member for attachment to a shoe and having an open top slidably fitted into said outer member, spring connectors between said members joining them together so that said inner member can move relative to said outer member, said inner member having a recess in its bottom face, and a wear heel mounted in said recess and depended from the bottom face of said inner member, said inner member being divided into a front portion and a rear portion, said wear heel being divided into separate portions one for each of said portions of said inner member.

2. A shock absorbing shoe heel, comprising an outer member for attachment to a shoe and having an open bottom, an inner member having an open top slidably fitted into said outer member,

**8**

spring connectors between said members joining them together so that said inner member can move relative to said outer member, said inner member having a recess in its bottom face, and a wear heel mounted in said recess and depended from the bottom face of said inner member, said inner member being divided into a front portion and a rear portion, said wear heel being divided into separate portions one for each of said portions of said inner member, said rear portion of said inner member having its spring connectors arranged at a downward and rearward inclination with the bottom face of the rear portion of said wear heel arranged on the same plane with the bottom face of the front portion of said wear wheel.

3. A shock absorbing shoe heel, comprising an outer member for attachment to a shoe and having an open bottom, an inner member having an open top slidably fitted into said outer member, spring connectors between said members joining them together so that said inner member can move relative to said outer member, said inner member having a recess in its bottom face, and a wear heel mounted in said recess and depended from the bottom face of said inner member, said inner member being divided into a front portion and a rear portion, said wear heel being divided into separate portions one for each of said portions of said inner member, said rear portion of said inner member having its spring connectors arranged at a downward and rearward inclination with the bottom face of the rear portion of said wear heel arranged at a downward and forward inclination.

4. A shock absorbing shoe heel, comprising an outer member for attachment to a shoe and having an open bottom, an inner member having an open top slidably fitted into said outer member, spring connectors between said members joining them together so that said inner member can move relative to said outer member, said inner member having a recess in its bottom face, and a wear heel mounted in said recess and depended from the bottom face of said inner member, said inner member being divided into a front portion and a rear portion, said wear heel being divided into separate portions one for each of said portions of said inner member, said rear portion of said inner member having its spring connectors arranged at a downward and rearward inclination with the bottom face of the rear portion of said wear heel arranged on the same plane with the bottom face of the front portion of said wear heel, said spring connectors being supported at the downward and rearward inclination by being mounted between wedge members fixedly mounted within said outer member and the rear portion of said inner member.

5. A shock absorbing shoe heel, comprising an outer member for attachment to a shoe and having an open bottom, an inner member having an open top slidably fitted into said outer member, spring connectors between said members joining them together so that said inner member can move relative to said outer member, said inner member having a recess in its bottom face, and a wear heel mounted in said recess and depended from the bottom face of said inner member, said inner member being divided into a front portion and a rear portion, said wear heel being divided into separate portions one for each of said portions of said inner member, said rear portion of said inner member having its

2,669,038

| 9 | 10 |

spring connectors arranged at a downward and rearward inclination with the bottom face of the rear portion of said wear heel arranged at a downward and forward inclination, said rear portion being mounted for sliding movements 5 parallel to the inclination of said spring connectors within a hollowed block member fixedly mounted within said outer member behind the front portion of said inner member.

ROBERT DE WERTH.    10

References Cited in the file of this patent

UNITED STATES PATENTS

| Number | Name | Date |
|---|---|---|
| 993,279 | Scruggs _____ | May 23, 1911 |
| 1,094,211 | Jenoi & Kruchio ____ | Apr. 21, 1914 |
| 1,099,180 | Karacsonyi _____ | June 9, 1914 |
| 1,469,920 | Dutchak _____ | Oct. 9, 1923 |

# EXHIBIT H











